# EXHIBIT 1





**United Nations**

---

S/RES/986 (1995)

14 April 1995

---

## RESOLUTION 986 (1995)

*Adopted by the Security Council at its 3519th meeting,*

*on 14 April 1995*

*The Security Council,*

*Recalling* its previous relevant resolutions,

*Concerned* by the serious nutritional and health situation of the Iraqi population, and by the risk of a further deterioration in this situation,

*Convinced* of the need as a temporary measure to provide for the humanitarian needs of the Iraqi people until the fulfilment by Iraq of the relevant Security Council resolutions, including notably resolution 687 (1991) of 3 April 1991, allows the Council to take further action with regard to the prohibitions referred to in resolution 661 (1990) of 6 August 1990, in accordance with the provisions of those resolutions,

*Convinced also* of the need for equitable distribution of humanitarian relief to all segments of the Iraqi population throughout the country,

*Reaffirming* the commitment of all Member States to the sovereignty and territorial integrity of Iraq,

*Acting* under Chapter VII of the Charter of the United Nations,

1.*Authorizes* States, notwithstanding the provisions of paragraphs 3 (a), 3 (b) and 4 of resolution 661 (1990) and subsequent relevant resolutions, to permit the import of petroleum and petroleum products originating in Iraq, including financial and other essential transactions directly relating thereto, sufficient to produce a sum not exceeding a total of one billion United States dollars every 90 days for the purposes set out in this resolution and subject to the following conditions:

(a) Approval by the Committee established by resolution 661 (1990), in order to ensure the transparency of each transaction and its conformity with the other provisions of this resolution, after submission of an application by the State concerned, endorsed by the Government of Iraq, for each proposed purchase of Iraqi petroleum and petroleum products, including details of the purchase price at fair market value, the export route, the opening of a letter of credit payable to the escrow account to be established by the Secretary-General for the purposes of this resolution, and of any other directly related financial or other essential transaction;

(b) Payment of the full amount of each purchase of Iraqi petroleum and petroleum products directly by the purchaser in the State concerned into the escrow account to be established by the Secretary-General for the purposes of this resolution;

2. *Authorizes* Turkey, notwithstanding the provisions of paragraphs 3 (a), 3 (b) and 4 of resolution 661 (1990) and the provisions of paragraph 1 above, to permit the import of petroleum and petroleum products originating in Iraq sufficient, after the deduction of the percentage referred to in paragraph 8 (c) below for the Compensation Fund, to meet the pipeline tariff charges, verified as reasonable by the independent inspection agents referred to in paragraph 6 below, for the transport of Iraqi petroleum and petroleum products through the Kirkuk- Yumurtalik pipeline in Turkey authorized by paragraph 1 above;

3. *Decides* that paragraphs 1 and 2 of this resolution shall come into force at 00.01 Eastern Standard Time on the day after the President of the Council has informed the members of the Council that he has received the report from the Secretary-General requested in paragraph 13 below, and shall remain in force for an initial period of 180 days unless the Council takes other relevant action with regard to the provisions of resolution 661 (1990);

4. *Further decides* to conduct a thorough review of all aspects of the implementation of this resolution 90 days after the entry into force of paragraph 1 above and again prior to the end of the initial 180 day period, on receipt of the reports referred to in paragraphs 11 and 12 below, and *expresses its intention*, prior to the end of the 180 day period, to consider favourably renewal of the provisions of this resolution, provided that the reports referred to in paragraphs 11 and 12 below indicate that those provisions are being satisfactorily implemented;

5. *Further decides* that the remaining paragraphs of this resolution shall come into force forthwith;

6. *Directs* the Committee established by resolution 661 (1990) to monitor the sale of petroleum and petroleum products to be exported by Iraq via the Kirkuk-Yumurtalik pipeline from Iraq to Turkey and from the Mina al-Bakr oil terminal, with the assistance of independent inspection agents appointed by the Secretary-General, who will keep the Committee informed of the amount of petroleum and petroleum products exported from Iraq after the date of entry into force of paragraph 1 of this resolution, and will verify that the purchase price of the petroleum and petroleum products is reasonable in the light of prevailing market conditions, and that, for the purposes of the arrangements set out in this resolution, the larger share of the petroleum and petroleum products is shipped via the Kirkuk-Yumurtalik pipeline and the remainder is exported from the Mina al-Bakr oil terminal;

7. *Requests* the Secretary-General to establish an escrow account for the purposes of this resolution, to appoint independent and certified public accountants to audit it, and to keep the Government of Iraq fully informed;

8. *Decides* that the funds in the escrow account shall be used to meet the humanitarian needs of the

Iraqi population and for the following other purposes, and *requests* the Secretary-General to use the funds deposited in the escrow account:

(a)To finance the export to Iraq, in accordance with the procedures of the Committee established by resolution 661 (1990), of medicine, health supplies, foodstuffs, and materials and supplies for essential civilian needs, as referred to in paragraph 20 of resolution 687 (1991) provided that:

(i) Each export of goods is at the request of the Government of Iraq;

(ii)Iraq effectively guarantees their equitable distribution, on the basis of a plan submitted to and approved by the Secretary-General, including a description of the goods to be purchased;

(iii) The Secretary-General receives authenticated confirmation that the exported goods concerned have arrived in Iraq;

(b)To complement, in view of the exceptional circumstances prevailing in the three Governorates mentioned below, the distribution by the Government of Iraq of goods imported under this resolution, in order to ensure an equitable distribution of humanitarian relief to all segments of the Iraqi population throughout the country, by providing between 130 million and 150 million United States dollars every 90 days to the United Nations Inter-Agency Humanitarian Programme operating within the sovereign territory of Iraq in the three northern Governorates of Dihouk, Arbil and Suleimaniyeh, except that if less than one billion United States dollars worth of petroleum or petroleum products is sold during any 90 day period, the Secretary-General may provide a proportionately smaller amount for this purpose;

(c)To transfer to the Compensation Fund the same percentage of the funds deposited in the escrow account as that decided by the Council in paragraph 2 of resolution 705 (1991) of 15 August 1991;

(d)To meet the costs to the United Nations of the independent inspection agents and the certified public accountants and the activities associated with implementation of this resolution;

(e)To meet the current operating costs of the Special Commission, pending subsequent payment in full of the costs of carrying out the tasks authorized by section C of resolution 687 (1991);

(f)To meet any reasonable expenses, other than expenses payable in Iraq, which are determined by the Committee established by resolution 661 (1990) to be directly related to the export by Iraq of petroleum and petroleum products permitted under paragraph 1 above or to the export to Iraq, and activities directly necessary therefor, of the parts and equipment permitted under paragraph 9 below;

(g)To make available up to 10 million United States dollars every 90 days from the funds deposited in the escrow account for the payments envisaged under paragraph 6 of resolution 778 (1992) of 2 October 1992;

9.*Authorizes* States to permit, notwithstanding the provisions of paragraph 3 (c) of resolution 661 (1990):

(a)The export to Iraq of the parts and equipment which are essential for the safe operation of the Kirkuk-Yumurtalik pipeline system in Iraq, subject to the prior approval by the Committee established by resolution 661 (1990) of each export contract;

(b)Activities directly necessary for the exports authorized under subparagraph (a) above, including

financial transactions related thereto;

10.*Decides* that, since the costs of the exports and activities authorized under paragraph 9 above are precluded by paragraph 4 of resolution 661 (1990) and by paragraph 11 of resolution 778 (1991) from being met from funds frozen in accordance with those provisions, the cost of such exports and activities may, until funds begin to be paid into the escrow account established for the purposes of this resolution, and following approval in each case by the Committee established by resolution 661 (1990), exceptionally be financed by letters of credit, drawn against future oil sales the proceeds of which are to be deposited in the escrow account;

11.*Requests* the Secretary-General to report to the Council 90 days after the date of entry into force of paragraph 1 above, and again prior to the end of the initial 180 day period, on the basis of observation by United Nations personnel in Iraq, and on the basis of consultations with the Government of Iraq, on whether Iraq has ensured the equitable distribution of medicine, health supplies, foodstuffs, and materials and supplies for essential civilian needs, financed in accordance with paragraph 8 (a) above, including in his reports any observations he may have on the adequacy of the revenues to meet Iraq's humanitarian needs, and on Iraq's capacity to export sufficient quantities of petroleum and petroleum products to produce the sum referred to in paragraph 1 above;

12.*Requests* the Committee established by resolution 661 (1990), in close coordination with the Secretary-General, to develop expedited procedures as necessary to implement the arrangements in paragraphs 1, 2, 6, 8, 9 and 10 of this resolution and to report to the Council 90 days after the date of entry into force of paragraph 1 above and again prior to the end of the initial 180 day period on the implementation of those arrangements;

13.*Requests* the Secretary- General to take the actions necessary to ensure the effective implementation of this resolution, authorizes him to enter into any necessary arrangements or agreements, and *requests* him to report to the Council when he has done so;

14.*Decides* that petroleum and petroleum products subject to this resolution shall while under Iraqi title be immune from legal proceedings and not be subject to any form of attachment, garnishment or execution, and that all States shall take any steps that may be necessary under their respective domestic legal systems to assure this protection, and to ensure that the proceeds of the sale are not diverted from the purposes laid down in this resolution;

15.*Affirms* that the escrow account established for the purposes of this resolution enjoys the privileges and immunities of the United Nations;

16.*Affirms* that all persons appointed by the Secretary-General for the purpose of implementing this resolution enjoy privileges and immunities as experts on mission for the United Nations in accordance with the Convention on the Privileges and Immunities of the United Nations, and *requires* the Government of Iraq to allow them full freedom of movement and all necessary facilities for the discharge of their duties in the implementation of this resolution;

17.*Affirms* that nothing in this resolution affects Iraq's duty scrupulously to adhere to all of its obligations concerning servicing and repayment of its foreign debt, in accordance with the appropriate international mechanisms;

18.*Also affirms* that nothing in this resolution should be construed as infringing the sovereignty or territorial integrity of Iraq;

19. *Decides* to remain seized of the matter.

# EXHIBIT 2





**United Nations**

S/RES/0661 (1990)
6 August 1990

# RESOLUTION 661 (1990)

### Adopted by the Security Council at its 2933rd meeting on 6 August 1990

The Security Council,

Reaffirming its resolution 660 (1990) of 2 August 1990,

Deeply concerned that that resolution has not been implemented and that the invasion by Iraq of Kuwait continues with further loss of human life and material destruction,

Determined to bring the invasion and occupation of Kuwait by Iraq to an end and to restore the sovereignty, independence and territorial integrity of Kuwait,

Noting that the legitimate Government of Kuwait has expressed its readiness to comply with resolution 660 (1990),

Mindful of its responsibilities under the Charter of the United Nations for the maintenance of international peace and security,

Affirming the inherent right of individual or collective self-defence, in response to the armed attack by Iraq against Kuwait, in accordance with Article 51 of the Charter,

Acting under Chapter VII of the Charter of the United Nations,

1. Determines that Iraq so far has failed to comply with paragraph 2 of resolution 660 (1990) and has usurped the authority of the legitimate Government of Kuwait;

2. Decides, as a consequence, to take the following measures to secure compliance of Iraq with paragraph 2 of resolution 660 (1990) and to restore the authority of the legitimate Government of Kuwait;

3. Decides that all States shall prevent:

(a) The import into their territories of all commodities and products originating in Iraq or Kuwait exported therefrom after the date of the present resolution;

(b) Any activities by their nationals or in their territories which would promote or are calculated to promote the export or trans-shipment of any commodities or products from Iraq or Kuwait; and any dealings by their nationals or their flag vessels or in their territories in any commodities or products originating in Iraq or Kuwait and exported therefrom after the date of the present resolution, including in particular any transfer of funds to Iraq or Kuwait for the purposes of such activities or dealings;

(c) The sale or supply by their nationals or from their territories or using their flag vessels of any commodities or products, including weapons or any other military equipment, whether or not originating in their territories but not including supplies intended strictly for medical purposes, and, in humanitarian circumstances, foodstuffs, to any person or body in Iraq or Kuwait or to any person or body for the purposes of any business carried on in or operated from Iraq or Kuwait, and any activities by their nationals or in their territories which promote or are calculated to promote such sale or supply of such commodities or products;

4. Decides that all States shall not make available to the Government of Iraq or to any commercial, industrial or public utility undertaking in Iraq or Kuwait, any funds or any other financial or economic resources and shall prevent their nationals and any persons within their territories from removing from their territories or otherwise making available to that Government or to any such undertaking any such funds or resources and from remitting any other funds to persons or bodies within Iraq or Kuwait, except payments exclusively for strictly medical or humanitarian purposes and, in humanitarian circumstances, foodstuffs;

5. Calls upon all States, including States non-members of the United Nations, to act strictly in accordance with the provisions of the present resolution notwithstanding any contract entered into or licence granted before the date of the present resolution;

6. Decides to establish, in accordance with rule 28 of the provisional rules of procedure of the Security Council, a Committee of the Security Council consisting of all the members of the Council, to undertake the following tasks and to report on its work to the Council with its observations and recommendations:

(a) To examine the reports on the progress of the implementation of the present resolution which will be submitted by the Secretary-General;

(b) To seek from all States further information regarding the action taken by them concerning the effective implementation of the provisions laid down in the present resolution;

7. Calls upon all States to co-operate fully with the Committee in the fulfilment of its task, including supplying such information as may be sought by the Committee in pursuance of the present resolution;

8. Requests the Secretary-General to provide all necessary assistance to the Committee and to make the necessary arrangements in the Secretariat for the purpose;

9. Decides that, notwithstanding paragraphs 4 through 8 above, nothing in the present resolution shall

prohibit assistance to the legitimate Government of Kuwait, and calls upon all States:

(a) To take appropriate measures to protect assets of the legitimate Government of Kuwait and its agencies;

(b) Not to recognize any regime set up by the occupying Power;

10. Requests the Secretary-General to report to the Council on the progress of the implementation of the present resolution, the first report to be submitted within thirty days;

11. Decides to keep this item on its agenda and to continue its efforts to put an early end to the invasion by Iraq.

# EXHIBIT 3



# Report of the Inquiry into certain Australian companies in relation to the UN Oil-for-Food Programme

## Volume 1

### Summary, recommendations and background



Commissioner
The Honourable Terence RH Cole AO RFD QC

November 2006

© Commonwealth of Australia 2006

This work is copyright. Apart from any use as permitted under the *Copyright Act 1968*, no part may be reproduced by any process without prior written permission from the Commonwealth. Requests and inquiries concerning reproduction and rights should be addressed to the Commonwealth Copyright Administration, Attorney General's Department, Robert Garran Offices, National Circuit, Barton ACT 2600 or posted at http://www.ag.gov.au/cca

Report of the Inquiry into certain Australian companies in relation to the UN Oil-for-Food Programme

**ISBN**

| | |
|---|---|
| Volume 1 | 0-9803082-0-8 |
| Volume 2 | 0-9803082-1-6 |
| Volume 3 | 0-9803082-2-4 |
| Volume 4 | 0-9803082-3-2 |
| Volume 5 | 0-9803082-4-0 |
| CD-ROM | 0-9803082-5-9 |

**Special note**

In quoted material—particularly in translated material and in correspondence—there is often variation in the spelling of the names of people, places and other things. The Inquiry accepted the spelling used in the original material.

www.oilforfoodinquiry.gov.au



*Inquiry into certain Australian companies in relation to the*
*UN Oil-for-Food Programme*

24 November 2006

His Excellency Major General Michael Jeffery AC CVO MC
Governor-General of the Commonwealth of Australia
Government House
CANBERRA ACT 2600

Your Excellency

In accordance with the Letters Patent issued to me on 10 November 2005, as amended by Letters Patent dated 6 February 2006, 10 March 2006, 17 March 2006, 22 June 2006 and 21 September 2006, I have inquired into and prepared a report on certain Australian companies in relation to the UN Oil-for-Food Programme.

I have the honour to present to you my report. I return my Letters Patent.

Yours faithfully

*7. R. V. Cole*

The Honourable TRH Cole AO RFD QC
Commissioner

# Contents

Prologue ..................................................................................................................... xi

Summary of events regarding AWB ........................................................................ xiii

Findings.................................................................................................................. lxxxi

Recommendations ............................................................................................... lxxxiii

1      United Nations resolutions restricting trade with Iraq ..................................... 1
       Procedures adopted by the 661 Committee to approve contracts.................... 11
       The Office of the Iraq Programme .............................................................. 14
       Variation to procedures: Security Council Resolution 1284............................ 14
       Revised procedures: Security Council Resolutions 1409 and 1454 ................. 16
       Interpretation of Security Council resolutions ...................................... 21
       Construction of paragraph 3(c) of Resolution 661 ................................... 24
       UN Office of Legal Affairs advice................................................................ 25
       The practice of the 661 Committee and the Secretary-General........................ 29
       Conclusion: interpretation of Security Council resolutions ........................... 33
       UN procedures related to notification and financing of contracts................... 35
       Contractual review by the United Nations........................................................ 51

2      Australian enforcement of United Nations resolutions ................................. 61
       The status of United Nations resolutions under Australian law ...................... 61
       Implementation of United Nations resolutions in Australian law.................... 62
       The Customs (Prohibited Exports) Regulations 1958........................................ 63
       The Banking (Foreign Exchange) Regulations 1959 ........................................... 68

3      Imposition of inland transportation fees and after-sales-service
       fees: Iraq documentation ................................................................................. 83
       Inland transportation fees .......................................................................... 84
       The after-sales-service fee ........................................................................... 85

4       United Nations knowledge of breaches of sanctions: 1999 to 2003 ............. 101
        The Secretariat's state of knowledge .................................................................. 102
        The 661 Committee's state of knowledge ............................................................. 112
        Conclusion ......................................................................................................... 115

5       United Nations investigation into the Oil-for-Food Programme ................. 121
        The expressions 'illicit' and 'kickbacks' ............................................................. 124
        The manner of approval of purchasing contracts ............................................. 126
        Direct financial transactions with the Government of Iraq or Iraqi
        companies ........................................................................................................... 127
        The Government of Iraq's purchasing structure ............................................... 129
        Inland transportation costs ............................................................................... 131
        Introduction of mandatory transportation charges ......................................... 131
        Payment mechanisms for internal transportation fees ..................................... 133
        Distribution of internal transportation fees ...................................................... 133
        The broadening of the kickback scheme ............................................................ 134
        Introduction of after-sales service fees .............................................................. 134
        Expansion of the transportation fee scheme ..................................................... 135
        Payment mechanisms for after-sales service fees .............................................. 136
        Front companies ................................................................................................. 136
        Alia for Transportation and General Trade ...................................................... 137
        The final report's findings in relation to AWB ................................................. 138
        AWB's response .................................................................................................. 148
        Alkaloids of Australia Pty Limited ................................................................... 148
        Rhine Ruhr Pty Limited ..................................................................................... 154

6       The Letters Patent ............................................................................................. 157
        Constitutional validity of the Letters Patent .................................................... 158
        Interpretation of the Letters Patent ................................................................... 159
        A commissioner's role: amendment of Letters Patent ...................................... 163

7       Conduct of the Inquiry: principles and procedures ...................................... 169
        Independence ...................................................................................................... 169
        Investigations and hearings ............................................................................... 171
        Assessment of evidence ...................................................................................... 182
        Legal professional privilege ............................................................................... 183

Reform of the Royal Commissions Act 1902 .................................................... 189

Public interest immunity claims ........................................................................ 190

Dissemination of public materials ..................................................................... 192

The requirements of procedural fairness ........................................................... 192

Notification of adverse evidence........................................................................ 193

The nature of an adverse finding ....................................................................... 195

Publication of Counsel Assisting's submissions ................................................ 196

Costs .................................................................................................................. 197

Appreciation ...................................................................................................... 198

8    AWB's approach to investigation and disclosure ......................................... 201

The Canadian complaint: January to March 2000 ........................................... 202

The US Wheat Associates complaint: June 2003 .............................................. 204

The UN Independent Inquiry Committee inquiry: 2004 and 2005 ................. 221

This Inquiry: 2005 and 2006 ............................................................................. 235

Glossary................................................................................................................ 249

Shortened forms ................................................................................................... 256

Volume 2        Negotiations and sales
                July 1999 – December 2000

9       AWB Limited and the AWB group of companies

10      AWB's sales to Iraq before July 1999

11      AWB's participation in the Oil-for-Food Programme

12      The role of the Department of Foreign Affairs and Trade

13      July to December 1999: Iraq introduces an inland transportation fee

14      October 1999: further sales of wheat to Iraq

15      January 2000: a deletion to the AWB short-form contract

16      January to March 2000: the Canadian complaint

17      April to July 2000: delays and demurrage

18      April to July 2000: changes within International Sales and Marketing

19      October 2000: a visit to Iraq and subsequent events

20      October 2000: an 'eloquent solution'

21      November 2000: introduction of the 10 per cent after-sales-service fee

22      December 2000: the Arthur Andersen report


Volume 3        Sales, allegations and inquiries
                January 2001 – December 2005

23      January 2001 to June 2002: more sales to Iraq

24      June 2002 to March 2003: contracts A1670 and A1680

25      March to September 2003: renegotiation of AWB contracts

26      August 2000 to March 2003: inland transportation fees

27      BHPP, the Iron Filings Claim, and Tigris

28      May 2003 to December 2005: allegations and inquiries

*Report of the Oil-for-Food Inquiry*

Volume 4          Findings

29        The Wheat Export Authority

30        The knowledge of the Commonwealth

31        Findings: AWB and associated persons

32        Findings: Alkaloids of Australia Pty Ltd

33        Findings: Rhine Ruhr Pty Ltd


Volume 5          Appendices

# Prologue

> AWB knew that paying inland transportation fees to Alia was a means of making payments to the Iraqi Government. This plan was concealed from the United Nations.

Justice Young, Federal Court of Australia, 18 September 2006

I have examined in detail the transactions between AWB Limited and Iraq and the relationship of those transactions to United Nations sanctions and the law in Australia. The facts are now not in doubt. It is not my function to make findings of breach of the law; my function is to indicate circumstances where it might be appropriate for authorities to consider whether criminal or civil proceedings should be commenced. I found such circumstances to exist. If proceedings are commenced, and are successful, the consequences for individuals might be great. However, for AWB, any monetary consequence of any proceedings prosecuting authorities might bring would be less significant.

The consequences of AWB's actions, however, have been immense. AWB has lost its reputation. The Federal Court has found that a 'transaction was deliberately and dishonestly structured by AWB so as to misrepresent the true nature and purpose of the trucking fees and to work a trickery on the United Nations'. Shareholders have lost half the value of their investment. Trade with Iraq worth more than A$500 million per annum has been forfeited. Many senior executives have resigned, their positions being untenable. Some entities will not deal with the company. Some wheat farmers do so unwillingly but are, at present, compelled by law to do so. AWB is threatened by law suits both in Australia and overseas. There are potential further restrictions on AWB's trade overseas. And AWB has cast a shadow over Australia's reputation in international trade. That shadow has been removed by Australia's intolerance of inappropriate conduct in trade, demonstrated by shining the bright light of this independent public Inquiry on AWB's conduct.

How could AWB have conducted itself in such a way as to produce such consequences? I asked Mr Lindberg, without any objection from AWB or its directors, 'Are you able to give me any understanding as to how you think this came about? How it happened in a company like AWB?' Mr Lindberg gave no answer other than to say that it should not have happened. AWB submitted that the question I asked was 'obviously a question the directors must consider and answer'.

I consider the answer obvious.

The conduct of AWB and its officers was due to a failure in corporate culture. The question posed within AWB was:

> What must be done to maintain sales to Iraq?

The answer given was:

> Do whatever is necessary to retain the trade. Pay the money required by Iraq. It will cost AWB nothing because the extra costs will be added into the wheat price and recovered from the UN escrow account. But hide the making of those payments for they are in breach of sanctions.

No one asked, 'What is the right thing to do?' Instead, much time and money was spent trying to determine if arrangements could be formulated in such a way as to avoid breaching the law or sanctions, whether conduct could be protected, by various subterfuges, from discovery or scrutiny, and whether actions were legal or illegal. There was a lack of openness and frankness in AWB's dealing with the Australian Government and the United Nations. At no time did AWB tell the Australian Government or the United Nations of its true arrangements with Iraq. And when inquiries were mounted into its activities it took all available measures to restrict and minimise disclosure of what had occurred. Necessarily, one asks, 'Why?'

The answer is a closed culture of superiority and impregnability, of dominance and self-importance. Legislation cannot destroy such a culture or create a satisfactory one. That is the task of boards and the management of companies. The starting point is an ethical base. At AWB the Board and management failed to create, instil or maintain a culture of ethical dealing.

A government grant, by legislation, of a monopoly power confers on the recipient a great privilege. It carries with it a commensurate obligation. That obligation is to conduct itself in accordance with high ethical stands. The reason such an obligation is imposed is because, by law, persons are denied choice with whom they may deal.

It is not my function to comment on the grant of monopoly power to part of the AWB group, and I do not do so. Nor is it my function to classify or judge the conduct of AWB against some indeterminate standard, and I do not do so. In my report I describe the conduct of AWB in its dealings with Iraq. It is for others to determine whether, as a matter of public policy, it is appropriate for the law to require persons to deal with a group that behaved in the manner I describe.

# Summary of events regarding AWB

> This summary is prepared for the assistance of those who wish to gain a rapid understanding of the findings regarding AWB and the recommendations of the Inquiry. It does not explain the details of the findings or the reasoning behind the recommendations. That is contained in the balance of the report. A reading of this summary is not a substitute for a reading of the balance of the report.

## United Nations sanctions

In 1990, following the invasion of Kuwait, the United Nations imposed sanctions on Iraq. By Resolution 661 the United Nations required that all states prevent their nationals making available funds to the Government of Iraq, or to persons or bodies within Iraq. The resolution also required that states prohibit their nationals from trading with Iraq, except for the provision of supplies for medical purposes or, in humanitarian circumstances, foodstuffs.

Deprived of hard currency, Iraq was unable to purchase foodstuffs. Hardship was occasioned to its people. In consequence, in 1995 the Security Council adopted Resolution 986, which established the Oil-for-Food Programme. That permitted Iraq to sell oil under UN-approved contracts, with the proceeds of sale being paid into an escrow account controlled by the United Nations. Iraq was permitted to purchase humanitarian goods, including foodstuffs. Contracts for such purposes, if approved by the United Nations, were to be funded from the escrow account. Otherwise, the restrictions on dealings with Iraq imposed by Resolution 661 remained. In 1996 Iraq commenced purchasing foodstuffs under the Oil-for-Food Programme, including significant quantities of wheat from AWB.

By 1999 AWB was selling to Iraq about 10 per cent of Australia's annual wheat exports. It was a large and profitable market. AWB dealt with the Iraqi Grain Board (IGB), an Iraqi Government instrumentality. Sales of wheat were made on 'CIF Free out Umm Qasr terms'. This meant that AWB's contractual obligations terminated on delivery of the wheat to the port of Umm Qasr. Iraq was responsible thereafter for unloading and transporting the grain to the ultimate usage or distribution points.

### The introduction of an inland transportation fee

In June 1999, for phase VI of the Oil-for-Food Programme, Iraq, through the IGB, introduced as a condition of tender a requirement that sales of wheat be on terms 'CIF Free on Truck to the silo at all governorates. Cost of discharge at Umm Qasr and land transport will be USD12.00 per metric tonne. To be paid to the Land Transport Co. for more details contact Iraqi Maritin in Basrah'. This tender purported to impose on AWB for the first time an obligation to transport wheat to silos throughout Iraq and to pay a 'discharge and land transport' fee of US$12.00 per metric tonne to an Iraqi entity, 'the Land Transport Co.'

Mr Emons, AWB's Regional Manager for Middle East and Africa, and Mr Hogan, from AWB's office in Cairo, went to Iraq in June 1999 to discuss the terms of tender with the IGB Director General, Mr Daoud. AWB learnt that the US$12.00 per metric tonne was to be included in the price quoted by AWB and thus recouped from the UN escrow account. It also learnt that the money was to be paid to 'maritime agents' in Iraq but that the payment could be made to an Iraqi bank in Amman, Jordan. The IGB was to provide to AWB details of the bank account into which the 'discharge and land transport' fee could be paid in Jordan. AWB understood from the June meeting that the US$12.00 fee was a payment going back to the Iraqi Government.

AWB also understood that payment of hard currency to Iraq was prohibited by UN sanctions. There was much internal discussion in AWB about how the payment of US$12.00 per tonne could be made to Iraq through an Iraqi entity. AWB knew that if it declined to make the payment it would lose its Iraqi trade. Senior management decided to do what was necessary to retain that trade. Mr Officer spoke with Mr Flugge, the Chairman, about the new Iraqi requirement on the basis that:

> There was no option. There was no choice. It was $12 or not, or if you don't make that payment then, of course, there would be no business. That was made very clear. It was in that context that I discussed it with the Chairman, and that was the nature of those discussions.

In summary, following AWB's receipt of the wheat tender for phase VI of the Oil-for-Food Programme and the visit of Mr Emons and Mr Hogan to Iraq in June 1999, there were widespread communications amongst Messrs Flugge, Officer, Lister, Emons, Owen, Watson, Geary, Snowball and Hogan and Ms Scales regarding the terms of the new tender and how they could be met. It was understood by those discussing these terms within AWB that:

- The inland transportation fee (or trucking fee) was fixed by Iraq.

- It was being paid to Iraq.

- It was being paid for the benefit of the Iraqis.

*Report of the Oil-for-Food Inquiry*

- Imposition of the inland transportation fee was a method of obtaining US dollars from the UN escrow account.

- AWB did not have to arrange or effect the discharge of the wheat at Umm Qasr.

- AWB did not have to arrange or effect the transportation of the wheat within Iraq.

- AWB was not required to enter into a contract with any transport company.

- The Iraqis would continue to organise the discharge, transportation and distribution of wheat in Iraq, as they had under the earlier phases of the Oil-for-Food Programme and under their earlier contracts with AWB.

- AWB's obligation was limited to payment of the fee set by the Iraqis.

- The Iraqis had said they either had obtained or would obtain UN approval for the payment of the inland transportation fee.

- The method of payment of that fee had not been approved.

- It was up to AWB to find a method of payment that was acceptable to the Iraqis.

- One method of payment suggested by Iraq was payment to an Iraqi bank in Amman, Jordan.

- AWB was not prepared to raise with the United Nations the issue of the transportation fee for fear it might be prohibited by the United Nations, thus costing AWB its Iraq market.

Thus, from mid-1999 AWB knew it was not required to discharge the wheat and effect delivery to all governorates of Iraq, despite any tender or contractual terms to that effect. The obligation to transport the wheat to all governorates was to remain with the Iraqis, as it always had. Suggestions in the tender or contracts to the contrary were a sham designed to deceive the United Nations and extract hard currency from the UN escrow account for payment to Iraq. AWB's obligation was to deliver the wheat to Umm Qasr and to pay a fee in US dollars into an account nominated by the IGB.

## Contracts for the sale of wheat

Against this background AWB entered into three contracts in July 1999 and two in October 1999. For each, a short-form contract and a long-form contract were prepared, the short-form by AWB and the long-form by the IGB. The AWB short-form contract for each of contracts A4653, A4654 and A4655 contained the following clause:

> The cargo will be discharged Free into Truck to all silos within all Governates of Iraq at the average rate of 3,000 metric tons per weather working day of 24 consecutive hours. The discharge cost will be a maximum of USD 12.00 and shall be paid by Sellers to the nominated Maritime Agents in Iraq. This clause is subject to UN approval of the Iraq distribution plan.

The long-form contract expressed the price as being 'CIF F.O.T. to silo at all governorate of Iraq via Umm Quser port'. It made no mention of any discharge cost.

To obtain UN approval to export to Iraq and to receive payment from the escrow account it was necessary for there to be submitted to the United Nations a document called a 'Notification or request to ship goods to Iraq'. Apart from the short-form contracts themselves, the documents submitted for those three contracts made no reference to any 'discharge' or transportation cost. That form and the short- and long-form contracts were forwarded through the Department of Foreign Affairs and Trade (DFAT) and the Australian mission to the United Nations to the Office of Iraq Programme for approval. Approval was obtained from the United Nations, its customs inspectors overlooking the reference in the short-form contract to the provision that the US$12.00 'shall be paid by sellers to the nominated maritime agents in Iraq'. Under the UN procedures, the customs experts were to check all contracts for 'price and value' and to ensure the contracts did not offend the sanctions resolutions.

Subsequent to the granting of approvals by the United Nations, AWB sought and was granted permission to export wheat under these contracts in various shipments. The permission was granted by the delegate of the Minister for Foreign Affairs and Trade, pursuant to the Customs (Prohibited Exports) Regulations.

None of the documents submitted to DFAT or the United Nations, be they the short-form or long-form contracts, the notifications or request to ship goods to Iraq, or the application for export approval, stated the true contractual arrangements between AWB and the IGB. Shortly stated, the true contractual arrangements between AWB and IGB in relation to these contracts involved the supply of wheat on terms 'CIF Free Out Umm Qasr', with AWB to pay a fee of US$12.00 per tonne to an Iraqi entity or account nominated by the IGB and, further, that the US$12.00 fee was to be added to the CIF price and therefore effectively paid out of the escrow account. None of those provisions was disclosed in the documents submitted. Additionally, the short-form contract submitted stated AWB was obliged to pay nominated maritime agents in Iraq the cost of discharging the vessels, capped at US$12.00 per tonne, with that agent performing those services on behalf of AWB. There was no such obligation. The true arrangement was that the IGB would advise AWB of the account into which the US$12.00 fee was to be paid. Nor was AWB responsible for delivery 'Free into Truck to all silos within all Governorates of Iraq', as the short-form contract stated. AWB did not make any contractual arrangements for the discharge of the wheat at Umm Qasr or for its transportation within Iraq after discharge.

*Report of the Oil-for-Food Inquiry*

Thus AWB submitted to DFAT and the United Nations documents that AWB knew did not reflect the true contractual arrangements between it and the IGB in respect of the 3 July 1999 contracts.

In October 1999 two more contracts were signed on the same day. They were contracts A4821 and A4822. Contract A4822 was materially identical to the 3 July contracts, containing a clause in the short-form contract stating that 'the discharge cost will be a maximum of USD12.00 and shall be paid by the Sellers to the nominated Maritime Agents in Iraq'. The long-form contract said nothing of any discharge cost. In contrast, contract A4821 was treated as a contract under phase IV, not phase VI, and the US$12.00 fee was thus inapplicable. The price in A4821 was US$12.00 less than that in A4822. Neither the short- nor long-form contracts for A4821 provided for payment of any discharge or transportation fee.

For the reasons given, the documents submitted to DFAT and the United Nations for contract A4822 did not disclose the true arrangements between AWB and the IGB for that contract.

## Payment of the fee to Iraq

Following the discussions in June 1999, AWB knew that the IGB was to nominate the entity and the account into which the fee was to be paid. On 29 August 1999 the IGB faxed AWB, advising it to contact the Iraqi State Company for Water Transport (ISCWT) in Basrah regarding the 'transport charges' from Umm Qasr port to all governorates of Iraq. This confirmed AWB's knowledge that the payments it was to make were to go to an Iraqi government entity. AWB did not contact the ISCWT, nor by October 1999 had the IGB provided details of the bank accounts into which the US dollar fees were to be paid. Mr Emons spoke to Mr Daoud to resolve 'the payment of the trucking cost as per our contract back to the IGB'. This restated AWB's knowledge that the monies were to be paid to Iraq. On 9 October 1999 Mr Hogan was told by Mr Daoud that there were two shipping companies in Jordan that could receive the funds—namely, 'Alia Shipping Co.' and 'Water Transport Co.' He was also told President Hussein had directed all ministries that suppliers to Iraq must pay the US$12.00 per tonne before the ship carrying the cargo arrived otherwise the ship would not be unloaded. On 19 October 1999 AWB received a facsimile from 'Alia for Transportation and General Trade'. It stated that Alia was 'one of the Jordanian Establishment specialised on the fields of overland and ocean freight transportation moreover, our company is a member of the syndicate of shipping agents in Jordan also we are agents of the State company for Iraqi land transport and Iraq'. Alia wrote it had been advised officially that AWB had won a contract to supply wheat to Iraq and offered its services in the field of transport from Umm Qasr in Basrah to other governorates in Iraq. AWB ignored that and a later similar facsimile from Alia as it

was awaiting from the IGB the name and number of the bank account into which it should pay the fees.

By early November 1999 the MV *Pretty Ruby*, a vessel carrying Australian grain under a July contract, was approaching Umm Qasr. AWB had made no arrangements for the grain's discharge, for the transportation of the grain to the governorates of Iraq, or for payment of the fee of US$12.00. It knew it had no obligation to arrange discharge or transportation and made no efforts to do so. It was simply awaiting details of the account to which the fee should be paid. On 10 and 11 November 1999 Alia faxed to AWB its bank account details at the Arab Land Bank in Amman, Jordan.

There were ongoing discussions between AWB and the IGB regarding whether the US$12.00 fee was payable on load weight or discharge weight. There was also discussion about amending the letters of credit to remove provisions that required AWB to provide proof of delivery of the grain to all governorates of Iraq (as the contracts stated was AWB's obligation) to obtain payment. AWB required removal of those provisions in the letter of credit because it knew it had no obligation to deliver to all governorates of Iraq and had no control over such delivery since it had made no arrangements for such delivery. Within AWB, executives had decided to seek to distance AWB from payment of the fee. It was agreed within AWB that the 'best means [by] which to arrange to refund the trucking fees to Iraq' was to use shipowners carrying the grain to Umm Qasr to make the fee payments. However, because those arrangements were not concluded and the MV *Pretty Ruby* was approaching Umm Qasr the payment had to be made by AWB direct to Alia. Mr Emons wrote to Mr Officer:

> I know this is a little direct but he [Mr Daoud] assured me it is a one off and that the full details will be supplied when we meet him or the company that will be handling the matter in the future.

It was also agreed that AWB would pay 90 per cent of the fee on load weight tonnage, with the balance to be paid after discharge weight was determined.

On 24 November 1999 Alia faxed AWB, stating it had received a fax from the ISCWT noting that the *Pretty Ruby* was to berth that day but that 'remittance in respect of overland transport charges amount to US$504,000 had not been received yet'. It urgently sought details of the remittance 'to enable us [to] follow up the matter with the appropriate bank here and the Grain Board of Iraq, Baghdad as well as aforesaid company accordingly and remit the subject funds to them'. This made clear that Alia was receiving the funds on behalf of the ISCWT and was to remit the funds so received to that Iraqi government entity. It made equally clear that Alia was not receiving the monies as a trucking fee for services to be provided by it. That confirmed the arrangements that AWB already knew. Mr Emons had confirmed with Mr Daoud that the monies should be paid to the Alia account, details of which Alia had faxed to AWB. The funds were remitted by AWB from its New York account on 26 November

1999. Thus AWB paid the fee to Alia knowing it would be remitted to the ISCWT. AWB made no arrangements for either discharge or transportation of the grain.

## Contracts with grain traders

In December 1999 AWB sold grain to grain traders Commodities Specialists Company (CSC) of the United States and Savas Grain & Commodities Limited of the British Virgin Islands. Those companies, which apparently had arrangements with Russian-based trading companies, had contracts with the IGB for the supply of Australian wheat to Iraq. Contract A4908 with CSC and contract A4906 with Savas each contained a clause:

> USD per tonne CIF FOT to silo at all governorates of Iraq via Umm Qasr port. This price includes a fee of US$12.00 per tonne to be paid directly by seller to Grain Board of Iraq advised account, for each shipment at latest three days prior to arrival of each shipment.

In contrast, contract A4907 was treated as a phase V contract and thus, as Savas advised AWB, 'The payment of US$12.00 per m tonne for inland transportation was not required'. In consequence, the price of the wheat in contract A4907 was US$12.00 per tonne less than the price in contract A4906, signed the same day for wheat of the same quality.

The clause quoted accurately described the US$12.00 fee as being a fee to be paid directly to the IGB-advised account. It was not described as a 'discharge' cost or a transportation cost. The clause in the two contracts is to be contrasted with the July and October contracts describing the fee as a 'discharge cost'.

UN approval to ship the grain under the contracts with CSC and Savas had been obtained by the Russian Federation. It was that approval that was submitted to DFAT when permissions to export under the Customs (Prohibited Exports) Regulations were sought. That meant the contracts between AWB and the Russian companies — which plainly stated AWB's obligation to pay a US$12.00 per tonne fee 'directly to the Grain Board of Iraq advised account' — were not submitted to DFAT when export approval was sought. AWB did not tell DFAT of the clause in its contract with the two Russian companies requiring it to pay a fee to the IGB-nominated account.

Thus between June and December 1999 AWB entered into eight contracts for the sale of grain to Iraq. Four of the short-form contracts referred to 'the discharge cost which will be a maximum of US$12.00 and shall be paid by the sellers to the nominated maritime agents in Iraq'. The four corresponding long-form contracts made no reference to any discharge cost or any payment of US dollars to any entity in Iraq. None of the short-form or long-form contracts in truth reflected the arrangements made between AWB and the IGB for the sale of grain under those contracts. Two contracts with the Russian grain traders accurately described one aspect of the true

arrangements—namely, the obligation on AWB to pay 'a fee of US$12.00 per tonne to be paid directly by seller to Grain Board of Iraq advised account for each shipment at least three days prior to arrival of each shipment'. However, those contracts were not shown to either DFAT or the United Nations. The remaining two contracts reflected sales under prior phases of the Oil-for-Food Programme and did not attract the US$12.00 fee. The prices were, accordingly, US$12.00 per tonne less than corresponding contracts entered into on the same day for grain of the same quality.

## Attempts to hide the payments to Iraq

AWB decided to try to hide the payments it was making to Iraq. It had been forced to make some payments to Alia directly because alternative arrangements were not in place and ships would not be unloaded until the fee had been paid. Unavoidably, the payments to Alia were 'a little direct'.

The reason AWB sought to hide the payments to Alia, knowing such payments were payments to Iraq, was it knew that payments to Iraq were contrary to UN sanctions and Australian government policy. That was made explicit in a 7 March 2000 email from Mr Emons to Mr Bali at Ronly Holdings Limited:

1.    We have received approval from the United Nations to ship to Iraq 900,000 tonnes in March, April and May.

2.    A requirement in the tender document and in our contract price is the inclusion of a payment of USD15 per tonne for trucking in Iraq. I have confirmed this figure with the Iraqi official I deal with but he has not as yet confirmed how he wants it paid specifically

3.    This is the twist, under UN / Australian policy no payment can be made directly to Iraq however our contracts have been endorsed by both parties to pay this trucking fee to a third party. Under the last contracts we have instructed the shipping companies under the Charter party to make payment to a Jordanian trucking company. We did this to a) simplify the process from our point of view but b) To divorce clearly from the FOB price any connection with a shipping / logistics charge should the contracts come under scrutiny. The only difference is under our own Time charters we have made the payment ourselves.

4.    Now this has been going quite smoothly until recently when two of our companies ran into internal problems with making the payment. One was obviously an issue where its offshore senior management ran scarred of getting caught up in sanctions etc. and everything that could entail for their business. The other companies problems stemmed from its banking route through Singapore where there are always serious concerns in that environment on money laundering and despite assurances from ourselves they obviously have more to lose than we can guess at.

5.    Now why do we want to use Ronly? It would be ideal from our point of view if we have a third party that handles the freight and trucking as an item. This not only saves us time but does disguise the fee.

*Report of the Oil-for-Food Inquiry*