This email makes clear that AWB knew:

- A fee for 'trucking in Iraq' was to be included in the wheat price.

- The fee was to be recovered by AWB from the UN escrow account by its inclusion in the wheat price.

- AWB was to pay the US dollar fee to Iraq.

- Iraq would tell AWB how the fee was to be paid to it.

- AWB knew that payment of such a fee to Iraq was prohibited by UN sanctions and Australian government policy.

- Accordingly, it was necessary to hide or disguise the payment of the fee to Iraq.

- AWB and Iraq, through the IGB, had agreed to the fee being paid to a 'third party' as part of the hiding of the payment.

It necessarily follows that AWB cannot maintain that payment of the trucking fee was approved by either the UN or the Australian Government because AWB had deliberately hidden or disguised the payment of the fee to Iraq and knew that neither the UN or the Australian Government was aware of it making payments to Iraq.

AWB sought to hide the payments and to distance itself from them in three ways. First, it amended the charterparties with willing shipowners so that it paid to the shipowner the ocean freight plus the US$12.00 fee, with the shipowner having the obligation to pay that fee to the ISCWT or Alia. In some instances AWB paid the shipowner a fee for so doing. In any event, the shipowner had the use of the money between sailing from Australia and arrival in Iraq. Thus AWB under that arrangement made no payment direct to Alia. Not all shipowners agreed to that arrangement. Some declined because they thought the payments were in breach of UN sanctions. Another declined when the transactions were investigated by Singaporean authorities as suspected money laundering. Others declined because there was no satisfactory reason forthcoming from AWB as to why it did not itself make the payments direct to Alia.

Second, AWB interposed an intermediary between itself and the shipowner. The intermediary was Ronly Holdings Limited, an English company, or its nominee. Ronly established a nominee company, called Tse Yu Hong Metal Limited in Liechtenstein. That company was used by AWB in two ways. First, Tse Yu Hong Metal Limited was interposed in charterparties AWB had entered into with shipping companies. AWB, Tse Yu Hong Metal Limited and the shipowner entered into back-to-back contracts of affreightment on voyage charterparty terms. AWB Chartering paid freight and inland transport fees to Tse Yu Hong Metal Limited under the terms

of the contract of affreightment between AWB and Tse Yu Hong Metal Limited; thereafter, under the back-to-back contracts with the shipowner, Tse Yu Hong Metal Limited paid the same freight and transport fee to the shipowner, which paid the inland transport fee to Alia. The second method was for AWB to pay the freight to the shipowner in the usual way but to pay the inland transport fee to Tse Yu Hong Metal Limited, which then paid it to Alia. Tse Yu Hong Metal Limited received a fee of US$0.20 per tonne for providing either service.

These methods were established in March 2000.

There was no sensible basis for making the payments to Tse Yu Hong Metal Limited, at a cost to AWB, rather than paying the fee directly to Alia, except to seek to disguise AWB's making of the payments to Alia.

According to a letter written by a director of Ronly to AWB in July 2002:

> I was present during the meetings and discussions which took place with Trevor Flugge, the then Chairman of AWB, Michael Watson, the then head of chartering and Nigel Officer and Mark Emons who, at that time were responsible for AWB's business with Iraq. Paul Ingleby head of AWB's finance department was also fully aware of and authorised these transactions …
>
> In early 2000 the AWB became concerned at whether payments which they were making for inland trucking in Iraq were in breach of sanctions against Iraq. The AWB approached us for assistance.

Third, AWB changed the wording of its short-form contract to remove any reference to the payment of a US dollar fee for 'discharge' cost. The short-form contract then read, 'USD pmt CIF FOT to silo all governorates of Iraq via Umm Qasr port'.

It was said this was to align the terms of the AWB short-form contract with the IGB long-form contract, which omitted any reference to a monetary sum for a discharge cost. If the objective was to make the short- and long-form contracts compatible, the proper approach would have been to ask the IGB to amend the long-form contract because the short-form contract at least made reference to the payment of a discharge cost. Aligning the short-form contract with the long-form contract effectively removed from scrutiny all reference to payment of a US dollar sum to an Iraqi entity.

The true reason was, as Mr Emons said, 'We didn't want to advertise the fact that we were paying a fee'.

This change occurred in all AWB contracts signed with the IGB after October 1999.

### The Canadian complaint

In January 2000 the United Nations was advised by Canada of a requirement by the Iraqi Ministry of Trade that the Canadian Wheat Board deposit US$700,000 in a Jordanian bank account allegedly to cover transport costs of US$14.00 per tonne for wheat under a proposed contract. The Canadian Wheat Board refused to make the payment and did not get the contract. It was alleged that 'similar arrangements had been made with the Australian Wheat Board'.

The United Nations raised the matter with the Australian mission to the United Nations, which referred it to DFAT. DFAT inquired of AWB about the accuracy of the report. AWB, through Mr McConville, its Government Relations Officer, without inquiry of AWB officers, emphatically denied the allegations, describing them as 'bullshit'. DFAT so reported to the Australian mission, which advised the United Nations.

Ms Johnston, the Chief Customs Officer at the Office of Iraq Programme, in January and February 2000 checked AWB contracts to see if they disclosed any irregularity. In January she looked at contract A4821, which contained no reference to a 'discharge fee' or to US dollar payments, merely stating a CIF price per tonne. In February, she looked at contract A4822. It provided:

> The cargo will be discharged Free Into Truck to all silos within all Governorates of Iraq ... The discharge cost will be a maximum of USD12.00 and shall be paid by Sellers to the nominated Maritime Agents in Iraq. This clause is subject to UN approval of the Iraq distribution plan.

Ms Johnston overlooked this clause. However, she noted that the contract referred to:

> All other terms and conditions as per AWB Limited and Grain Board of Iraq standard terms and conditions for Australian wheat of which the parties admit they have knowledge and notice, to apply to this contract where not inconsistent with the above.

Ms Johnston raised with Mr Nicholas, of Austrade in New York, the issues of any 'irregularities in AWB contracts' and the issue of a parallel contract with 'standard terms and conditions'.

In March 2000 Mr Nicholas raised these matters at a meeting in Washington DC with AWB attended by Mr Flugge, the AWB Chairman, Mr McConville and Mr Snowball from AWB's US office. AWB assured Austrade there were no irregularities in its dealings with Iraq. It said it would provide a full response to the United Nations. Mr Snowball knew the complaint related to payment of trucking fees. On 15 March he spoke by telephone with Mr Emons, who faxed to the IGB, under the heading 'UN Enquiry concerning trucking fees':

> We wish to advise that the office of AWB Limited in New York has been approached by the Customs office of the United Nations who are questioning the payments by AWB to the Jordanian trucking company.
>
> We are very concerned to learn from the UN that the Canadian Government has taken action within the United Nations to discover the manner of AWB payments.
>
> We ask your assistance in this matter and would ask that no information of a confidential nature is released.

There could be no reason to keep confidential payments to a Jordanian trucking company if AWB believed the payment was for a genuine service. AWB knew it was not.

Also on 15 March 2000, Mr Snowball faxed Mr Emons:

> Alistair (Nicholas) mentioned that someone at the UN was asking him quietly/informally about payments AWB was making to Iraq for discharge/trucking. Alistair suggested to us that the request for information on the above contract clause was linked to this discharge/trucking payment issue.
>
> 3. We played down the issue and said that we'd look at the UN request…
>
> 5. Bronte (Moules) confirmed that the UN were asking for information on the contract clause above. She has put this request through to DFAT in Canberra and DFAT will contact you. If all the UN wants is some understanding on the standard terms and conditions in AWB contracts then I think we have nothing to worry about. We should ensure that we do provide something to DFAT when they contact you.

As Mr Snowball wrote, and Mr Emons said in evidence, if the UN inquiry was about the discharge or trucking fee, there was something to worry about; if it was about standard terms and conditions, there was not.

In April 2000 a copy of the 'standard terms and conditions' was provided to the United Nations. AWB advised that the standard terms and conditions did not apply where they were contrary to 'UN policy to trade with Iraq'. That was the case with the 'demurrage/despatch' clause. Nothing was said about discharge or trucking fees, although AWB knew this was the true cause of the United Nations' concern.

The United Nations dropped any further consideration of the Canadian complaint. Ms Johnston said that was because she thought that, although contract A4822 contractually required payment of a US dollar 'discharge fee', because payment of such a fee would be contrary to 'UN policy to trade with Iraq' she assumed such payment was not being made. She thought her view was reinforced by AWB's earlier emphatic denial of any irregular payments.

### Contracts A4970, A4971 and A4972

Contracts A4970, A4971 and A4972 were entered into with the IGB in February 2000. The contracts were under phase VII of the Oil-for-Food Programme. The relevant Iraqi tender for this phase included, in relation to the price:

> CIF Free on Truck to all silo to all governate of Iraq. Cost of discharge at Umm Qaser and land transport will be U.S.D. (14) per metric ton. To be paid to the Land Transport Co …

Following negotiations between the IGB and AWB, an agreement was reached that AWB would pay the IGB a fee of US$15.00 per tonne and that fee would be included in the price. AWB drafted short-form contracts that contained a clause in substance the same as the 'discharge costs' clause in the earlier contracts, except that the cost was specified as a maximum of US$15.00. However, by the time the short-form contract came to be executed, the clause had been deleted from the contract. The IGB-prepared long-form contracts made no reference to the payment by AWB of a discharge cost, transport cost or fee. Both forms of contract expressed the terms to be 'CIF Free on Truck to all silos within all governorates of Iraq'. Neither form of contract revealed that the CIF Free on Truck price had included in it the fee payable by AWB to Iraq.

The consequence was that the contracts submitted to DFAT and the United Nations did not reveal in any way AWB's obligation to pay a fee, or that the fee had been included in the price, or that the fee was payable to an Iraqi entity. By referring to the terms as 'CIF Free on Truck to all silos within all governorates of Iraq' the contracts suggested that AWB's contractual obligations included discharge and delivery. In truth, however, as with prior contracts, AWB had no obligation to discharge or transport the wheat to all governorates: its obligation was to pay the specified fee to the entity nominated by the IGB. The reason the reference to a 'discharge cost' was removed from the draft short-form contracts was to conceal from DFAT and the United Nations AWB's obligation to make the fee payment. The contracts were finalised within weeks of the Canadian complaint having been raised with AWB. AWB knew that the United Nations, and DFAT, were looking into the very matter of payments of US$14.00 per tonne of wheat 'outside the Oil-for-Food Programme' and to an account in Jordan. Any contract that contained a requirement to pay a US dollar sum would have been known to be likely to be subject to close scrutiny. As Mr Officer said, the removal of the clause was consistent with AWB's position of not highlighting the payment of the discharge or trucking fee.

The contracts submitted with the associated documents to DFAT and the United Nations did not record or reflect the true arrangements between AWB and the IGB. AWB was not responsible for delivering the wheat free in truck to all governorates, as the short-form contract provided; AWB was obliged to pay a fee of US$15.00 per tonne to an Iraqi entity, a matter not revealed by the contracts; and the fee payable by AWB to the Iraqi entity was included in the contract price, another matter not disclosed. These matters were deliberately and dishonestly concealed from DFAT and

the United Nations. Contemporaneously with the Canadian complaint, which made apparent that the United Nations and DFAT were investigating payments outside the Oil-for-Food Programme, AWB removed from the short-form contract with Iraq reference to payment of that fee, although it had been included in the draft contracts. Further, AWB disguised the payments to the Iraqi entity by the interposition of Ronly, Tse Yu Hong Metal Limited and Alia.

## More Russian contracts

In February, March and April 2000 AWB entered into three further Russian trade contracts, which became contracts A4993, A0662 and A0101. These contracts were negotiated contemporaneously with the documentation of contracts A4970, A4971 and A4972, from which there was removed in the short-form contract any reference to any payment of a 'discharge cost' or US dollar sum to any Iraqi entity. Yet the contracts AWB entered into with Savas Grain and CSC contained such a provision.

The formal contract for A4993 and A0662 with Savas provided for a price:

> CIF FOT to silo at all governorates of Iraq via Umm Qasr Port.
>
> This price includes a IGB nominated trucking fee to be paid directly by Sellers to trucking company advised account for each shipment at latest three days prior to arrival of each shipment.

This differed from the previous contract with Savas in that the fee was now described as 'a IGB nominated trucking fee', the amount of the fee was not disclosed, and the payment was now expressed to be to the 'trucking company advised account' rather than the 'Grain Board of Iraq advised account'. AWB paid a fee of US$15.00 per tonne. It did not obtain approval from the United Nations, relying on that obtained by the Russian Federation. Accordingly, the contract between AWB and Savas was not submitted to DFAT or the United Nations. In applying for permission to export from Australia, AWB relied on the United Nations approval obtained by the Russian Federation. Thus it did not advise DFAT of its agreement or obligation to pay 'a IGB nominated trucking fee'.

Contract A0101 with CSC was in similar terms, except it provided 'this price includes a fee of USD15.00 per tonne to be paid directly by Sellers to Grain Board of Iraq advised account'. This contract was also not submitted to DFAT or the United Nations, reliance for permission to export being placed on the UN 661 Committee approvals obtained by the Russian Federation. The contracts submitted by the Russian Federation to the United Nations to obtain approval in respect of the Savas and CSC contracts made no mention of discharge costs, transport fees or US dollar payments.

### Delays and demurrage

By April 2000 AWB was suffering significant costs in consequence of delays in discharging ships at Umm Qasr. As a result, AWB was obliged to make substantial payments of demurrage to shipowners. Under the terms of its contracts with Iraq, there was no provision for payment of demurrage and despatch, and thus the demurrage AWB was obliged to pay to shipowners was not recoverable by AWB from Iraq. The United Nations would not approve a demurrage and despatch clause in contracts because it had the potential to result in payments of US dollars to Iraq, which was prohibited by the sanctions.

A delegation from AWB wished to discuss these problems, and possible solutions, with the new Director General of the IGB, Dr Rahman, but could not make appropriate arrangements to do so since Dr Rahman was avoiding meetings. In addition, the IGB had advised that the future trucking fee would be US$15.00 per tonne, rather than the US$12.00 AWB had been paying.

Mr Emons discussed these problems with Mr Flugge in late March 2000 and emailed Mr Watson, AWB's Chartering Manager, on 4 April 2000:

> Couple of issues before we take off for Iraq at the weekend
>
> 1. We need to clarify when we get to Baghdad that the fee on the new contract is USD15 that the method of payment remains the same to Alia etc and in what amounts. This is an increase on the last phase which was USD12 you will recall. I suspect we will be confronted with proposals that will be complicated but we will cross that bridge when we get to it. For your information I had a discussion with Trevor Flugge last week to discuss some of the finer points of the trucking fee. He is happy for us to carry on in fact he is determined that we should be accommodating to the Iraqi's so that our business does not come under threat from our US or CWB friends.

On 5 April 2000, following his discussion with Mr Flugge the previous week, Mr Emons emailed Dr Rahman:

> Our Chairman has asked me to discuss with you while I am in Baghdad the issue of the position of the United Nations on trucking fee and also future phases of the Food-for-Oil programme.

On the same day Mr Emons drafted a letter for signature by Mr Flugge. It restated the position agreed between Mr Flugge and Mr Emons in their discussion in late March— that AWB should accommodate Iraq's requirements to ensure preservation of the Iraqi trade, even if that involved acting contrary to UN sanctions. Mr Emons' letter, signed by Mr Flugge, stated in part:

> While in Baghdad I will ask AWB to discuss the recent communications from United Nations concerning trucking fees. As you are aware both the Canadian and American Governments have raised this issue with the United Nations. It is our intention to remain

> committed to the terms of trade agreed between IGB and AWB. The Australian Government equally supports this commitment to our trade.

The 'recent communications from United Nations concerning trucking fees' was the UN inquiry of AWB following the Canadian complaint regarding whether AWB was making any payment to Iraq outside the Oil-for-Food Programme. The passage quoted is an acknowledgment by AWB that it knew of that inquiry, that it knew the United Nations and the Canadian and American Governments had raised with the United Nations the issue of whether such payments were contrary to sanctions but that, notwithstanding this, AWB intended to continue making the trucking fee payments to Iraq in breach of sanctions, as it had previously agreed.

With the IGB prevaricating about a meeting, AWB decided to use the knowledge of both AWB and the IGB that payment of the trucking fee was contrary to UN sanctions as a 'direct threat' to force a meeting. The threat was effective only because both AWB and the IGB knew the trucking fee was a payment to Iraq. AWB knew Iraq would not want disclosure of the trucking fee arrangements to the United Nations because it would be likely to result in the whole transportation fee structure being disclosed and dismantled. Accordingly, AWB wrote to the IGB on 7 April 2000:

> For good order we had wished to discuss the following issues:
>
> 1. We had hoped to discuss at our meeting the issue of the payment of the trucking fee. You will be aware of the restrictions that the UN has placed on such payments and as you are aware this now means that we must halt further payments. We have endeavoured to meet the requirements of the IGB but without direct consultation we are now restricted to the accepted methods of payment to be used. We had hoped that we could discuss personally with your good selves this issue due to the sensitivity however if you would prefer we can discuss with the UN as to the appropriate method of paying for the trucking fee? Please respond by Monday 10th April so an alternative action can be undertaken that does not result in the delay of vessels.

Mr Emons addressed this issue in evidence:

> Q: Quite directly, you were using the fact of the illegality as a threat.
>
> A: Quite; correct.
>
> Q: You knew at that time, from the evidence you've given to this point-I think we can infer-that the Iraqi's were imposing similar conditions on other traders.
>
> A: That's correct.
>
> Q: And if you wanted to trade with Iraq-that is, export goods to Iraq-you had to pay such a fee. So what you were threatening was the reporting in effect of the whole system?
>
> A: Correct. Mr Agius, to put it in context, I mean, AWB had two choices: we either complied with the IGB's requirements under their contracts; or we allowed the wheat market to disappear altogether to other companies. We wouldn't allow that to happen without taking some action against the Iraqi's, and this is where the suggestion would come through, that

> we would make the UN aware completely of the trucking arrangements for everybody. Therefore, hopefully, we might be able to have a more reasonable response.

On the way to the resulting meetings to discuss discharge improvements at Umm Qasr, AWB met with Alia. Alia advised the appointment of a 'protective agent' at Umm Qasr to improve discharge. The cost was US$9,000 per vessel. AWB entered into a written agreement with Alia for provision of that service. In contrast, there was no written agreement with Alia is relation to any provision of trucking services involving the payment of millions of dollars. This was because AWB knew it was not in fact responsible for providing trucking services under its contracts with the IGB and that Alia in fact did not provide trucking services to transport its wheat. At the meetings in April 2000 with Alia, at which the provision of a 'protective agent' was agreed, there was no discussion of trucking by Alia or the trucking fee.

In April and May 2000 there were meetings between AWB and Alia to discuss discharge problems. Messrs Emons and Watson stated, in an email describing the meetings:

> 13. IGB recognise current demurrage pain, however in Zuhair's words 'we have had a long term relationship with AWB whereby in past years AWB has earned dispatch and IGB has never asked for reduction'. IGB fully prepared to assist in some form of compensation in future contracts, either by reduction of trucking fee or increase in prices and have asked for supply of further 1 million tonnes.

And Mr Emons, in a file note on the meeting, wrote:

> During discussion with IGB the AWB proposed that a method of recovering the cost of demurrage would be to hold part or all of the trucking fee or as an alternative there could be a reduction for future contracts. Discussion to a degree took place however it was clear that the option of AWB holding part or all of the trucking fee would not be acceptable to the Minister (and therefore the Regime). It became clear that there was some confusion in the IGB as to the amount of trucking due, with explanations that the rate on the AWB contracts was different to that charged to some Russian, Thai and Algerian companies. Comment was made that the Minister had proposed to increase the trucking fee to USD18 per tonne for phase 8 contracts but at the time of the meeting no approval had been received from the President.

Both these reports recognise that the so-called trucking fee was known by AWB to be an impost imposed by the Iraq regime and to be paid to Iraq. Both documents spoke of compensation to AWB for future delays in discharge being met by 'reduction of trucking fees'. This would not be possible if the trucking fees were the true cost of trucking. Nor would it be possible if the fee was a genuine fee negotiated with the supposed trucking company in Jordan, Alia. An Iraqi Minister of State would not be involved in determining the quantum of a genuine trucking fee between an Australian company and a Jordanian company.

In June 2000 the IGB rejected a part shipment alleging contamination. In July a further AWB delegation visited Iraq to discuss that rejection and matters related to improving

discharge rates. It was not suggested that insufficient trucks were a cause of discharge delays. In July Mr Stott had rejoined AWB. He was aware of the discharge problems and of the prohibition on paying US dollars to Iraq. On 31 July he wrote:

> Iraq does not guarantee discharge rates at Umm Qasr, nor do they pay demurrage/dispatch at discharge port. The argument is that it is a US$ transaction which is not allowed by the UN. The effect is, that the Iraqi's discharge our vessels at low rates and we get hit with massive demurrage bills. Solution, change contract to guarantee discharge rate with Iraq being obliged to pay Dem and earn dispatch. AWB to keep the Dem/despatch account for Iraq and settle with owners on behalf of Iraq's surplus funds if and when available to be refunded in Iraq.

Thus Mr Stott knew of the UN sanctions prohibiting payment of monies to Iraq, and thus payment of despatch to Iraq, and suggested a means of circumventing those sanctions by maintaining a demurrage and dispatch account in Australia. As noted below, the proposal was put to DFAT, which rejected it as being a breach of the sanctions.

In August 2000 AWB wrote to DFAT asking if contractual terms with Iraq could be amended to impose a demurrage and despatch provision. AWB proposed it would operate a trust account into which any despatch earned by Iraq would be paid, such funds to be used to provide grain-handling equipment and technical training. This would avoid AWB paying money to Iraq contrary to sanctions. AWB did not spell out how Iraq would pay to AWB demurrage for slow unloading.

DFAT responded that such a trust account would breach the UN sanctions because 'money paid to Iraq must be paid into an escrow account established by SCR 707 and 712 or in accordance with SCR 986'. However, it advised:

> The AWB's proposal to establish a trust account for Iraq as an incentive to unload shipments more quickly breaches current UN sanctions. It may be possible to discuss with the UN Treasury other methods of encouraging Iraq to unload wheat shipments more quickly without breaking the sanctions regime, for example, an incentive payments scheme operating within the escrow account.

AWB was thus told, in terms, that it could not pay monies to Iraq. The demurrage problem remained.

## Restructuring

In April 2000, upon Mr Rogers' resignation, Mr Lindberg was appointed Managing Director of AWB. This resulted in management changes. Messrs Officer and Emons resigned in June. Mr Stott was appointed in July.

Before his resignation Mr Officer required a release in the following terms:

> 8. AWB acknowledges that it (by its Board and Chief Executive Officer) authorised agency payment during the period 15 December 1999 to 9 June 2000 to overseas agents for sales.

He required that release because of concern about the legality of the payment of agency fees in Pakistan and because he began to realise that the payments of inland transport fees in Iraq might be 'questionable as a matter of law' as being 'facilitation fees'.

Mr Lindberg agreed to the release after discussing it with Mr Flugge. In that discussion Mr Lindberg did not refer to the payment of the transportation fees to Alia.

Mr Emons required and received a similar release.

In July 2000 Mr Stott terminated the use of Ronly and Tse Yu Hong Metal Limited as a conduit for the payment of both shipping freight and inland transportation fees. Mr Stott said he was told the trucking fee had been approved by the United Nations but that AWB nonetheless wished to distance itself from the payment and so used Ronly as an intermediary. He said he accepted the first part of what he was told but not the latter part, believing that the use of Ronly was to benefit Ronly and to allow, in some unexplained way, AWB employees to steal from AWB. Although he ceased the use of Ronly and Tse Yu Hong Metal Limited, he paid the latter company the US$0.20 per tonne for the whole 1.5 million tonnes referred to in AWB's contract with Ronly.

Mr Stott decided that all payments to Alia were to be made directly by AWB. This also meant that payment of inland transport fees through shipowners ceased.

### Contracts A0265, A0266 and A0267

In July 2000 AWB concluded contracts A0265, A0266 and A0267 with the IGB for the sale of 1 million tonnes of wheat. These contracts were under phase VIII of the Programme. The Iraqi tender was in essentially the same terms as the phase VII tender, in that it required the supplier to pay US$14.00 per tonne to the ISCWT. As with contracts A4970, A4971 and A4972, the short- and long-form contracts for A0265, A0266 and A0267 that AWB submitted to DFAT and the United Nations did not contain any reference to an obligation on the part of AWB to pay a 'discharge cost' or fee of any sort or that this fee was added to or included in the contract price. It is clear, however, that the arrangements between the IGB and AWB did include the payment of a fee: fees of US$14.00 per tonne were paid in respect of each of the shipments made by AWB under these contracts. All the fees were paid by AWB Chartering, direct to Alia.

### The October 2000 delegation to Iraq

In October 2000 Messrs Stott and Hogan met the IGB in Iraq. The objectives were to examine the continuing constraints on discharge rates and to endeavour to improve contractual performance, including the promptness of payment processing. Discharge rates and consequential demurrage claims remained an issue. Mr Hogan noted in his trip report, as a minor aspect of factors of delay, that the protective agent at Umm Qasr had reported that 'lack of transports' had reduced the rate of discharge. This was rejected by the IGB. AWB was to seek details from the protective agent, Alia, but it received no information before November 2000 that absence of trucks was a factor in the delays. The real reasons for discharge delays were new testing procedures introduced by Iraq, the time taken to obtain test results and to fumigate cargo if necessary, and the inability of available equipment to discharge grain at the contractual rate.

The IGB claimed that there remained outstanding unpaid trucking fees. It also advised that for the next phase of the Oil-for-Food Programme the trucking fee would be increased to US$35.00.

The Iraqi Minister of Trade also discussed with Mr Stott and Mr Hogan Russian contracts with the IGB for provision of Australian wheat. Russian traders had concluded contracts with the IGB for delivery of Australian wheat. The traders did not have contracts with AWB to supply to them that wheat. Since the traders had concluded the contracts with the IGB the world price of wheat had risen. Thus the Russian traders faced severe losses. The Minister of Trade requested that AWB supply the Russian traders with wheat at a price that would provide them with a profit of US$1.00 per tonne. The Minister said that if AWB was unable to do this, Iraq may only be able to buy 800,000 metric tonnes of wheat from AWB, rather than the 1.3 million tonnes planned. AWB rightly interpreted this as a threat: if AWB wished to remain the dominant supplier to Iraq it would need to accommodate the Russian trader's position, Russia being a favoured nation politically with Iraq.

The response of AWB was twofold. The first was to propose a reduction in the grade of Australian wheat delivered to Russian traders. The second was for Iraq to remove the trucking fee. This latter proposal would make sense only if AWB knew that the trucking fee was not in truth used for trucking but was a payment to Iraq. The proposal meant that, instead of the trucking fee being paid to Iraq, it would be retained by AWB. The increase in the world wheat price would be accommodated by the trucking fee being retained by the seller, rather than by the sum being paid to Iraq. The advancing of this proposal by AWB necessarily meant that Messrs Stott and Hogan knew the trucking fee was a payment to Iraq.

On returning to Australia, Mr Stott caused there to be investigated whether there were outstanding trucking fees, as IGB had alleged. This led to considerable email

correspondence between many AWB officers. AWB was satisfied that it had paid to Alia all trucking fees due. Accordingly, it was suggested that 'we simply advise IGB of the above and have them check with their trucking company'. AWB checked with Alia whether it had received all the trucking fees. Mr Watson noted, 'Trucking company has also confirmed they have received 100% trucking fees and have paid IGB'.

Thus AWB knew that Alia was a conduit for payments of US dollars to IGB. Having confirmed that AWB had paid all trucking fees, sometimes directly and sometimes through intermediaries, Mr Cowan of AWB wrote, 'The obvious one ... we can't confirm ... is whether the intermediate parties paid in full to Alia, or whether Alia has paid in full to IGB'.

### An 'eloquent solution'

Both Mr Long and Mr Whitwell in March 2004, and Mr Long in late 2004, at a time when the payment of inland transportation fees was being investigated, sought to rely on the asserted fact that AWB had advised DFAT in 2000 of 'the arrangement with the Jordanian trucking company'. It was said, in relation to the payment of the 10 per cent surcharge, that there was 'a letter in existence from DFAT which gave approval for AWB's arrangements under OFF'.

In truth, AWB never advised DFAT of 'the arrangement with the Jordanian trucking company'. Nor was there a letter in existence from DFAT that gave approval to AWB's 'arrangements under OFF' in relation to payment of trucking fees to Alia or payment of the 10 per cent surcharge.

The letter to which they were referring was a letter dated 2 November 2000 from DFAT in reply to a letter from AWB dated 30 October 2000. The letter from AWB, signed by Mr Stott, stated:

> Dear Jill,
>
> The purpose of writing is to ensure that DFAT is comfortable with AWB proceeding with the approach outlined below. As previously discussed we are currently experiencing problems managing our Iraq business. The first problem concerns United Nations procedural issues, which we will document in a separate note.
>
> The second issue is, vessels discharging at Umm Qasr suffer long delays and as a consequence AWB incurs substantial demurrage bills. Our recent mission identified that the slow discharge of vessels is caused by a lack of trucks at discharge port.
>
> For your guidance, Jordan based trucking companies are responsible for arranging trucks at discharge port. To rectify the problem, we propose entering into discussions with the Jordan trucking companies with a view to agreeing a commercial arrangement in order to

ensure that there are enough trucks to enable the prompt discharge of Australian wheat cargoes.

We believe the proposed solution will eloquently solve our problem and look forward to receiving your response.

Thank you in anticipation.

Best regards,
Charles Stott
General Manager
International Marketing

The letter from DFAT, signed by Ms Drake-Brockman, stated:

Dear Mr Stott,

Thank you for your communication outlining the manner in which you propose to proceed to deal with problems you have encountered in discharging vessels of your wheat exports to Iraq at Umm Qasr port. As you have explained to us the delays in discharge were causing you to incur substantial demurrage costs and affecting the viability of your trade.

We understand that, on your recent visit to Baghdad, you identified the source of the problem as being a lack of trucks at the discharge point. These trucks are supplied by Jordan-based companies. You therefore propose to enter into discussions with the Jordan trucking companies with a view to agreeing to a commercial arrangement in order to ensure that there are enough trucks available to enable the prompt discharge of Australian wheat cargoes when they arrive.

We have examined, at your request, this proposed course of action and can see no reason from an international legal perspective why you should not proceed. That is, this would not contravene the current sanctions regime on Iraq.

International Legal Division has been consulted in the preparation of this response.

I trust this is of assistance to you.

The letter from AWB signed by Mr Stott was a charade, for a variety of reasons:

- The recent mission to Iraq had not identified that the slow discharge of vessels was caused by a lack of trucks at the discharge port.

- The AWB letter did not inform DFAT of the true arrangements known to AWB — namely, that AWB was not in fact responsible for arranging trucking but only for payment of a trucking fee, that AWB had made no commercial arrangements with any Jordanian trucking company, that AWB had been paying monies to Alia for approximately 12 months, or that Alia was a conduit for payment of monies to Iraq.

- After receipt of DFAT's reply, AWB made no inquiries of, or arrangements with, Jordanian trucking companies for the provision of trucks, let alone additional

trucks. Indeed, the only change in pre-existing arrangements made in November 2000 was that AWB agreed with the IGB to pay an increased trucking fee of US$25.00 per tonne and to pay a further surcharge or 'after-sales-service fee' equivalent to 10 per cent of the agreed price for the wheat, which 10 per cent increment was incorporated in the so-called trucking fee and thus into the contract price received by AWB from the UN escrow account and returned to the IGB via Alia.

The real reason AWB, through its General Manager International Marketing, Mr Stott, wrote the letter of 30 October 2000 was an attempt by AWB to obtain correspondence from DFAT that would justify, or appear to justify, the establishment of a despatch and demurrage system operating through the trucking fee mechanism, it being known by AWB that neither DFAT nor the United Nations would approve a demurrage and despatch mechanism with Iraq. The letter of 30 October did not truly state AWB's intentions, nor did it inform DFAT of the absence of contractual relationships for trucking services with Alia or, indeed, any other trucking company.

### An after-sales-service fee of 10 per cent

Between 1998 and 2000 AWB made various donations of equipment to Iraq. In 1998 it obtained UN approval to donate a bobcat. In 1999 it contemplated a donation of laboratory equipment and intended to send the equipment to the Iraqi Embassy 'as we have successfully done previously'. AWB advised Austrade of this intention; Austrade advised DFAT, which warned AWB against forwarding equipment to Iraq without UN approval. AWB agreed to notify DFAT of any future export of equipment and materials to Iraq.

In April and May 2000 the IGB approached AWB to provide 'after-sales-service'. AWB noted that it needed to 'determine' what 'after sales service required i.e. equipment/cash (Board approval may be required for this)'. In July, Mr Hogan noted, 'how do we get equipment in. I assume reagents are problem. Speak with IGB regarding this issue'. In the same month Mr Borlase wrote:

> We are donating $20k of laboratory equipment, however need UN approval. I haven't approached DFAT or UN for this to date as waiting to get approval for bobcats first before hammering them on lab.. equipment.

Following the visit to Iraq by Mr Stott and Mr Hogan in October 2000, a contract for the sale of wheat was agreed. It became contract A0430. On 1 November 2000, after the price for wheat had been agreed, including a 'trucking fee' of US$25.00 (an increase from the previous US$14.00), the IGB advised AWB that the price was to have added to it a 'handling fee' equivalent to 10 per cent of the price and such 10 per cent was to be included in the 'transportation fee'. The transportation fee thus became US$44.50 per tonne. Mr Hogan agreed this contract, having been informed by the IGB