that the transport fee of US$44.50 per tonne had been approved by the United Nations. He intended to get confirmation of that from the IGB in writing. He did not ever do so. He asked the IGB to 'forward the conditions especially regarding the UN approved Trucking fee and percentage increase'.

The IGB had confirmed the sale in an email to AWB stating the sale price in US dollars 'CIF Iraq via Umm Qasr all governorates including 44.5 inland transportation to be paid to the water transport co'. The inland transportation fee was thus not to be paid to a trucking company, but to the ISCWT, an Iraqi entity at Umm Qasr. In fact it was paid to Alia.

Mr Hogan cleared the agreement he had reached with Mr Stott. Mr Stott said be obtained approval for it from his superiors, Mr Goodacre and Mr Geary. However, Mr Stott gave evidence that he instructed Mr Hogan that he would accept the US$44.50 'as a trucking fee—but you have to show me—the IGB has to present me with proof that this is indeed approved by the UN, and I need that in writing'. Mr Stott said he was shown the finalised version of the Iraqi contract with the seals of the IGB on it, which, on its face, showed separately identified the Iraqi transport component of US$44.50 per tonne.

The Inquiry had both the short-form and long-form contracts signed by the parties. Neither so identifies the Iraqi transport component of US$44.50. No contract documents signed by Iraq and produced to this Inquiry by AWB, DFAT, the United Nations or Mr Stott show that information. This evidence of Mr Stott was a fabrication designed to establish that he had a sensible reason for approving a transport fee inflated by 10 per cent of the contract value at the request of the IGB, for which there could be no proper explanation as a transport fee and which he knew was a payment to Iraq.

On 2 November 2000 Mr Hogan circulated an email widely within AWB, advising of the sale, showing how the price was broken down, and showing the trucking fee of US$25.00 per tonne but noting:

> 10% will be added to PX and included into trucking fee–i.e. IGB will confirm US$ and T/fee will be US$44.50 ... this has been approved by UN (as per IGB—I will get this in writing.)

No one within AWB queried this information or questioned why the transportation fee had increased from US$14 to US$25 or why it was to be further inflated by a sum equivalent to 10 per cent of the contract price.

The 'inland transport fee' had to that time been paid prior to the arrival of the vessel in Iraq. AWB funded the fees between the time of payment to Alia and the receipt of payments from the UN escrow account. With the increase of such fees from US$14.00 to US$44.50 per tonne, this holding charge became significant. Accordingly, AWB reached agreement with the IGB that AWB would pay US$14.00 per tonne prior to the

arrival of the vessel in Iraq and the remaining US$30.50 per tonne within one week of payment by the United Nations from the escrow account.

A 'Notification or request to ship goods to Iraq' form was forwarded to DFAT in respect of contract A0430, accompanied by both the short- and long-form contracts for submission to the United Nations. Neither contract referred to a 'transport fee' or an 'after-sales-service fee' or any US dollar payment to any company. The United Nations received the documents on 8 November and an approval was issued on 5 January 2001. The checking officer on behalf of the UN customs office was Ms Johnston.

## The Arthur Andersen report

In August 2000 Arthur Andersen was engaged because 'AWB has concerns about the integrity about international business transactions conducted by the International Marketing group. You are seeking independent assistance in determining the existence of any illegal or unethical behaviour and any failure of control systems'.

Arthur Andersen produced a report dated December 2000. Its overall conclusion was:

> The concerns initially raised by AWB management were supported by the identification of red flags/risk factors for illegal and improper acts. A number of the red flags were shown to be explainable and reasonable, however, other red flags remain significant risks to AWB. The control of these risks is important to the organisation and to the protection of its employees.
>
> The Integrity Risk Review has uncovered a number of areas that could be improved. There are opportunities to create a better culture within the organisation that will reduce the likelihood of the incidence of integrity risks.
>
> The ethics of AWB staff is critical to the reputation and integrity risks of AWB. Particular higher risk areas such as the marketing of products, shipping and finance were assessed at a high level through this review. We found incidents that created ethical questions such as the offer of gifts, entertainment and money were encountered by your employees. We found that the incidents while not frequent did cause concern to your staff. Reduction of these risks can be achieved through education, improved communication, a consistent AWB policy and the enforcement of that policy. Other methods can be implemented to review and prevent incidents such as rotation of staff, audits, awareness of ethical issues and dilemmas that may be encountered.
>
> 1.6 Key Recommendations
>
> It is recommended that AWB:
>
> - Conduct an assessment of the ethical culture at AWB.
> - Create a transparent environment where employees are encouraged to report incidents, risks and improper conduct;

- Construct controls that will prevent and deter illegal or improper conduct;
- Educate staff in relation to risk, controls and expectations of AWB.

In relation to inland transportation fees, Arthur Andersen wrote:

> Iraq—Inland Trucking:
>
> During our review we found a number of email records that related to Iraq. These records contained indicators of integrity risks or red flags. We conducted a review of the Iraq dealings. The main aspect of these findings is the state of mind, knowledge and involvement of AWB employees.
>
> Mr Watson informed us that approximately two years ago a UN tender for 'Free on Truck' was in place. IGB (Iraq Grain Board) would pay the trucking fee to AWB together with the C and F value. AWB would remit the trucking fee to the Jordanian trucking company transporting the grain.
>
> AWB received information that apparently originated from the AWB New York Office that the UN were asking about the payment to the trucking company. The information was that the Canadians had asked for an inquiry into the arrangements.
>
> Mr Watson informed us that this raised concerns at AWB about future sales to Iraq. There was AWB management pressure to maintain the sales to Iraq. He advised that Mr Emons and Mr Officer wanted to find ways to avoid attracting the attention of the UN.
>
> We were informed by Mr Aucher and Mr Owen of Trade Finance that they were approached by Mr Emons to assist in structuring payments. They declined to have anything to do with it.
>
> The next solution to the situation was to have the shipping company's owner make the payments to the trucking company on behalf of AWB. Mr Watson approached some ship companies such as SANKO who refused to conduct the payment. He stated that they advised him that they did not wish to break UN laws. One company asked why AWB did not wish to make the payments themselves. Mr Watson then approached another company who did make the payments. This company made two payments to the Jordanian trucking company. They withdrew from making any other payments to the trucking company after inquiries were made by the Singapore Monetary Authority for suspicion of money laundering. AWB were asked to support the transactions with a letter.
>
> Ronly then provided the mechanism to make the payments to the trucking company. Two methods were utilised. The first was that AWB make two payments, one to Ronly for the trucking fees and the second to the ship owner for the freight. The second method was to make a single payment to Ronly. Ronly would then make two payments one to the ship owner and the other to the Jordanian trucking company. Mr Watson authorised the payments to Ronly. These payments were made through a Liechtenstein company. Mr Watson said that there was concern that payments made by Ronly in the UK would attract UN interest. Ronly for its part in the transactions received a payment per metric tonne (20 cents). We were informed that Ronly held the full amounts of these payments in their accounts for 20 days or more.
>
> Mr Emons was the one who spoke to Mr Watson about the structure of the payments in the first instance. It was Mr Officer who instructed him to conduct the payments through the

> shipping companies and then through Ronly. Mr Watson arranged the trucking payments as part of the freight.
>
> The payment of the freight is paid at 90% until the confirmation of the letter of credit came through then the final 10% is paid. There has recently been an issue with the payments as to whether AWB has paid the full amount. Iraq has claimed that only 90% has been paid. Mr Watson informed us that the Iraq systems are poor. The death of the Iraqi official responsible for the grain contracts, a person known as Zuhair, may have affected the Iraq knowledge of the payments.
>
> There are a number of red flags that the employees were faced with in relation to these payments. This type of arrangement could be misinterpreted as a money laundering process. There were a number of clear warning signs in relation to these transactions that were not fully explored by AWB in legal or commercial terms. For example the issue of trying to use ship owners to make payments on behalf of AWB potentially damaged the reputation of AWB as would the attempt to disguise the transactions.
>
> The current management have removed this payment process through Ronly. There has been a recent increase in the trucking cost to $45MT. This appears to be high. There may be a risk that this money is being diverted to other purposes. There may be a risk to AWB of excessive trucking fees.

Those passages make clear at least the following:

- The culture of AWB, and its employees, required review and attention, so far as ethical dealing was concerned.
- Payment of inland trucking fees in Iraq was a concern. The concern arose because
  - There had been a UN inquiry about AWB's payment of trucking fees.
  - AWB had sought to hide or disguise the payment of the trucking fees.
  - There had been AWB management pressure to maintain sales to Iraq, and avoidance of UN scrutiny of trucking fees was necessary if such sales were to be maintained.
  - Entities requested by AWB to make payments of trucking fees on its behalf had declined because of fears such payments may have been in breach of UN sanctions or may have constituted money laundering.
  - Increases in trucking fees appeared excessive, with the risk that some portion of the fees may be diverted to purposes other than trucking.

Two meetings with AWB were held to discuss the Arthur Andersen report. The first, on 15 February 2001, was between the author of the report Mr Tuohy and Mr Goodacre and Mr Stott. The second, on 23 February 2001, was between Mr Tuohy and Messrs Lindberg, Goodacre and Stott and a lawyer from AWB. Each person had a copy of the report. Mr Tuohy gave a PowerPoint presentation. The important

components in each section of the report were discussed. Management was asked by Mr Lindberg to implement the recommendations.

The report was discussed at a meeting of the Executive Leadership Group on 23 February 2001 but in less detail.

It necessarily follows from the report and the meetings to discuss it that Messrs Lindberg, Goodacre and Stott knew that steps had been taken by AWB to disguise inland trucking payments and that there was the possibility, because of the increased trucking fees, that some of those fees were being paid to the Iraqi regime. There is nothing to suggest in the evidence that Mr Stott disclosed to Arthur Andersen or Mr Lindberg that he knew from 1 November 2000 that the increase in trucking fees to US$44.50 was due in part to a 10 per cent surcharge imposed by Iraq.

Mr Stott was delegated the task of implementing the Arthur Andersen recommendations. At some later time he informed Mr Goodacre:

> He had made inquiries with both the IGB and DFAT as part of his investigations into the issues relating to the trucking payments and was satisfied that the level of trucking fees was justified and that the trucking company (Alia) was legitimate.

He also told Mr Goodacre that the increase in the payments to Alia had been authorised by the United Nations. Neither statement was true.

On 27 February 2001 the Board of AWB noted from the Chief Executives Officer's report that:

> Chartering is currently in the process of reviewing every component of its business. Integral to this review is a detailed process and procedure audit being conducted by Arthur Andersen and an internal staff capability audit.
>
> A revised business plan, risk reporting framework and legal procedures are also being reviewed and re-developed.

On 30 May 2001 the Chief Executive Officer's report to the Board again advised that effort was being put into revising policies and procedures in the chartering department and addressing risks identified in the Arthur Andersen audit report. Apart from this, the Board was not given any summary of Arthur Andersen's findings.

The Arthur Andersen report was made available to those conducting Project Rose in June 2003.

Following the Arthur Andersen report there was no inquiry into the culture at AWB, why AWB had thought it necessary to disguise payments of trucking fees, the circumstances relating to the payment of trucking fees to a Jordanian company, the

reason for the significant increase in trucking fees, or why AWB had agreed to pay such increased fees or trucking arrangements generally.

## Sales to Iraq: January 2001 to June 2002

In January 2001 the Iraqi Ministry of Trade issued a wheat tender for phase IX of the Oil-for-Food Programme. It sought offers on a price:

> CIF FOT to silo to all governorates of Iraq cost of discharge at Umm Qasr and land transport will be equivalent to US$25.00 per metric tonne to be paid for each shipment in any exchangeable currency to the water transport company before arrival of the vessel to Umm Qasr Port. For more details contact Iraqi Maritime in Basrah (Iraqi State co. for water transport—Basrah).

The tender did not mention any obligation to pay an additional 10 per cent service or after-sales-service fee.

By 2 February 2001 a contract had been agreed for the sale of 1 million tonnes divided into two contracts, each of 500,000 tonnes. They became contracts A0552 and A0553. The export sales note was dated 2 February 2001, as were the long- and short-form contracts. Each specified a price of US$217.80 per tonne. That price included a trucking fee component of US$25.00 per tonne plus a 10 per cent surcharge of US$19.80, representing 10 per cent of the contract price. The calculation sheet prepared by Mr Lister for each of these two contracts showed the breakdown of ingredient costs, including US$25.00 for 'trucking' and a further '10%—19.80'. On 2 February Mr Hogan confirmed the terms of sale to the IGB and noted:

> AWB will pay US$14.00 pmt in equivalent agreed currency for partial payment of transport fee prior to the vessel arriving in Umm Qasr. Balance of USD30.80 pmt will be paid as final payment of transport fee within one week of receipt of UN payment being received by sellers. Total transport fee payable is USD44.80 pmt in equivalent agreed currency.

Although the export sales note, the contracts and the telexes referred to the contract price of US$217.80, none referred to the fact that that sum included the additional 10 per cent after-sales-service fee. Only the email to the IGB noted that that additional 10 per cent would be paid as part of the transport fee, through the transport fee payment mechanism by payment to Alia.

Notwithstanding that, on 5 February 2001 Mr Borlase circulated an email confirming the sale and providing a benchmark analysis of the price. The price he analysed in the email was not $217.80: it was $198.00. The benchmarking noted the freight cost, the trucking fee of US$25.00 and other costs. It made no reference to the 10 per cent surcharge and excluded it from the commencing price from which the benchmark FOB price was derived.

The same day Mr Stott sent an email to Mr Goodacre and Mr Lindberg, advising them of the sale and providing them with the same information in Mr Borlase's email. Again, Mr Stott showed the price as US$198.00 when in truth it was US$217.80.

The additional 10 per cent figure was not included in the trucking price in the analysis because AWB knew it was unrelated to the trucking price. It was, as Mr Borlase indicated in his trip report, 'a mechanism for extracting more dollars from the escrow account'. His trip report stated:

> Trucking fee/services fee—the trucking fee is now US$25.00 pmt all governorates of Iraq with a 10% service fee on the entire FIT value of the contract. We believe the increase in trucking fee and addition of the service charge is a mechanism of extracting more dollars from the escrow account.

As Mr Hogan said in relation to a note he took in May 2001:

> Q: This would then have confirmed to you your earlier suspicions that the money that was being paid albeit the 10% or the US$25.00 transport trucking fee, was finding its way to the Iraqis.
>
> A: I never had a doubt—well, the money was always going into Iraq whether it was $12.00, $14.00 or $15.00.'

Mr Borlase's trip report was widely circulated within AWB. By February 2001 it was widely known within AWB that those dealing with the Iraqi trade believed payments that AWB was making by way of transport fees or 10 per cent surcharge fees were payments being made to Iraq via Alia and that they were not going to Alia for trucking services.

On 5 February 2001 the IGB asked AWB to increase the price for these contracts by US$1.00 per tonne. AWB agreed to that on 12 February, noting:

> Iraq have requested transport fee to be altered to US$26.00 pmt. As this does not effect AWB costings, as the contract price will be increased, I have agreed to do this with IGB.

This agreement is consistent only with a recognition that the additional dollar per tonne was to be extracted from the escrow account in payment of the wheat contract and paid not to Alia for transport but to the IGB via Alia.

On 27 February 2001 AWB forwarded both the short-form and the long-form contracts to DFAT for forwarding to the United Nations. Neither of those contracts referred to the trucking fee of $25.00 per tonne or the additional 10 per cent surcharge. As the contracts submitted had been, by agreement, converted into Deutschmarks, the increase of US$1.00 per tonne was not apparent. On 15 March 2001 the United Nations issued approvals dated 13 March 2001 for each contract.

In March 2001 the ISCWT sought to impose a fee of US$0.50 per tonne to cover 'agencies expenses and services for vessels calling Umm Qasr'. Mr Hogan was of the

opinion that 'this charge contravenes the UN sanctions on Iraq as nobody is meant to be able to transfer US dollars into or out of Iraq without UN approval'. He asked for AWB's US office to raise the issue and 'confirm this is correct and that this charge is in effect illegal under the current sanctions'. The AWB's US office contacted the Australian mission to the United Nations, advising that AWB had been told by the 'Iraq state port agents' that it could not discharge its vessels until a port fee of US$0.50 per tonne was paid in cash to the port agents. The Australian mission consulted the Chief Customs Officer from the Office of the Iraq Programme (Ms Johnston) and the Norwegian mission to the UN in its capacity as Chairman of the Iraq Sanctions Committee (the 661 Committee). The advice the Australian mission received was that the Office of the Iraq Programme could not give a proper answer. The best available answer was that such fees were not inconsistent with the sanctions regime provided they were reasonable in amount and paid in Iraqi dinars, not US dollars. The United Nations recognised this presented practical difficulties because Iraqi dinars could not be purchased outside Iraq and if they were purchased inside Iraq they would normally be bought with US dollars, thus effectively transferring US dollars to Iraq in breach of sanctions. The Office of the Iraq Programme also advised that if the cost was factored into the price and was not obvious it would likely pass UN scrutiny. If the payment was apparent on the face of the contract, it would likely be put on hold. This information was conveyed to AWB by the Australian mission. It confirmed its advice that, pending further advice from the 661 Committee, the only course, if the fee was to be paid, was to pay it in dinars. As Mr Snowball's note recorded, 'Any USD to Iraq gov't is a definite No'.

Throughout March and April 2001 AWB refused to pay the fee on the basis that it was illegal. Mr Borlase, in an email to the Australian Embassy in Amman, said, 'We assume it is another method of claiming more dollars from escrow account'. There was correspondence with the ISCWT, Alia and the IGB. AWB maintained its position that such a US dollar payment would 'fall outside the United Nations terms and conditions for the shipment of wheat to Iraq'. In the meantime AWB advised the Australian mission to the United Nations that two ships had not been allowed to berth and discharge cargo because the port fees had not been paid. Ultimately it was agreed between the IGB and AWB that the 50 cents per tonne would not be required to be paid to the ISCWT.

The reason AWB refused to pay the US$0.50 per tonne in respect of the shipment was that it had not been factored into the price and would have been a cost to AWB.

In May 2001 Messrs Hogan, Jones and Roland travelled to the Middle East, including Iraq. They met with the Chairman of Alia in Amman and representatives of the IGB in Baghdad. They travelled to Umm Qasr and met with Alia's representative and the UN inspection agents. During that trip the operation of the transportation of grain was explained to the group. Mr Hogan made a diagram of that explanation.




Explaining that diagram Mr Hogan said:

> 75% of the trucks were from the Iraqi Ministry of Trade. My understanding was that the IGB controlled those trucks. I do not know who controlled the other 25% of the trucks but was told that Alia had no influence on the trucks. I had made these enquiries as to how the transport arrangements worked because AWB was concerned about the excessive demurrage costs and delays at the port. I believe that this was the first time that I became aware that Alia had no influence over the trucking arrangements.

Mr Hogan said in evidence it became apparent to him that Alia played no role in transportation of grain other that to receive a commission for receiving the funds for inland transportation. He said:

> A: I never had a doubt—well, the money was always going into Iraq, whether it was $12, $14 or $15.
>
> Q: But here we have a note with your evidence that Alia was simply taking a commission?
>
> A: Correct—acting as the conduit for the mechanism to get the payments into Iraq because of frozen accounts, et cetera, as we raised right from the start. So that confirms that system. My issue was with the 10 per cent—the loading. I always was of the belief that there was a true transport cost in Iraq. You have to move grain somehow, and this is the mechanism of how this was working.
>
> Q: But now what was confirmed to you was that all of the money was going to the ISCWT?

> A: It was all going through, apart from taking the commission off the top there.

And later:

> … it was my, I think, interpretation that the 10 per cent, after the—what they call this after sales service fee was introduced, it seemed to be my thinking well, that service fee is being used—what we called the siphoning of the escrow account, was what they were using for this.

From May 2001 at the latest there is no doubt that AWB was aware that Alia was not engaged in the transport of grain; was aware that Alia was used as a conduit to pass funds to either the IGB or the ISCWT, both being Iraqi entities; was aware that the 10 per cent surcharge was a method of extracting funds from the UN escrow account; and was aware that the payment of US dollars to Iraq or Iraqi entities was contrary to the UN sanctions.

In June 2001 AWB and the IGB agreed the sale of a further 1 million tonnes of wheat. This sale became contracts A0784 and A0785, each of 500,000 tonnes. The agreed inland transportation fees were US$46.70 and US$46.90 per tonne, each of which included the 10 per cent after-sales-service fee and an allowance of US$0.50 for port fees. The inland transportation fees were payable before vessel discharge. Any necessary crane hire for unloading was included in the transportation fee. Thus the payment of port fees in US dollars, which AWB had argued and knew could not be paid because it was contrary to the sanctions, was made by including such fees in the 'transportation fee'. In that way AWB knowingly breached the sanctions.

Each of the short- and long-form contracts provided for a CIF Free in Truck price to all silos within all governorates of Iraq. Neither contained a reference to the obligation to pay inland transportation fees, the additional 10 per cent after-sales-service fee or the amount of either of those fees. Nor did they contain a notification that the price included US$0.50 in port fees that AWB was to pay to Iraq through the transportation fee system. Those fees were, however, recorded on Mr Lister's cover sheet for the files for each contract. The contracts were submitted to the United Nations for approval. The approval for A0784 was issued by the United Nations on 31 July 2001 and that for A0785 on 30 August 2001.

The three types of impost imposed by Iraq were well known amongst the shipping trade. In November 2001 AWB received an email from ship brokers conveying a message the shipowners had received from their agent in Iraq:

> re: inland transport/ass/agency fee.
>
> …
>
> Kindly noted that our office in Basrah informed us day that m/s, ISCWT informed them that the inland transport charges as well as the A.S.S. charges and the agency fees on cargo of USD0.50 per tonne have not been paid yet ...

Thus, the so-called inland transport fee was distinguished from the 'A.S.S.' fee of 10 per cent of contract value, in turn distinguished from the 50 cents per tonne imposed as port charges. AWB was well aware of these three separate ingredients. It did not inform DFAT or the United Nations of its agreement to pay them.

## The December 2001 sale

Negotiations for a contract in December 2001 make clear two matters: first, AWB knew the inland transportation fee ingredient in contracts was a mechanism for payment of monies to Iraq; second, the inland transport company, the ISCWT, being an Iraqi government enterprise within Iraq, was to be the recipient of the inland transportation fees.

By a tender dated 12 December 2001, the IGB sought a price for the supply of 500,000 tonnes of Australian wheat. A price was sought:

> CIF free out Umm Qasr on truck to warehouses at all governorates of Iraq cost of discharge at Umm Qasr and land transport will be equivalent to USD$26.50 per metric tonne to be paid in any exchangeable currency to the water transport company.
>
> For more details contact Iraqi Maritime in Basrah Iraqi State co. for Water Transport—Basrah.

AWB was concerned about the war risk insurance premium approximating US$10.00 per tonne. It proposed that, as the price of the premium and whether any premium would be imposed would not be known until ships carrying grain reached the Gulf, the IGB, not AWB, should pay that premium. In that way, if the premium was not imposed, Iraq would not pay it. Accordingly, AWB proposed, 'Due to the limitations imposed by the sanctions, settlement of the additional war risk insurance premium will need to be managed via the inland transport fee'.

The reasoning for this proposal was:

> If the above is not acceptable to Iraq, then an additional amount will be added to our offer to cover any potential losses due to War Risk Premiums. Based on our current estimates, the War Risk Premiums are around US$10.00 pmt. In this case, AWB will absorb the risk of increased premiums, or benefit if premiums are reduced or abolished. However, this is not the desired outcome, as Iraq should be the holder of this risk/benefit. Hence I suggest the management via the inland transport system is the most appropriate method.

On 20 December 2001 AWB sent to the IGB an email entitled 'inland transport for tender'. It noted that the IGB required 100 per cent of the transportation fee to be paid before a ship's arrival in Iraq. AWB proposed a payment of 10 per cent by that time, with the remaining 90 per cent to be paid within seven days of receipt of proceeds from the UN escrow account. It objected to paying 100 per cent in advance because, were the port blockaded or the UN inspectors removed, or if for some other reason the

ship could not unload, AWB would be 'unable to recover the money from the transport company'. For that reason the split payment method was said to be reasonable. AWB wrote, 'As far as we can see the only risk that the inland transport company (ISWTC) has is that our company does not make the second payment'. AWB knew the transport fees were going not to Alia but to the ISCWT, an Iraqi entity.

In December 2001 a sale of 1 million tonnes of wheat was agreed, split into two equal contracts known as A1111 and A1112. The inland transportation fee was €55.17 per tonne for the former and €55.40 per tonne for the latter. This sale was under phase XI. Details of the sale, including the amount of the 'inland transport fee' were widely known within AWB because an email containing its details was circulated. Mr Lindberg noted on such an email the comment 'a great result'.

The IGB sought in December 2001 and January 2002 to renegotiate the price of these contracts. AWB would not agree to change the confirmed contracts unless four conditions were fulfilled. The first was that there be a guaranteed rate of discharge, with demurrage and despatch payable and to be settled at the completion of each shipment 'by an adjustment to the final inland transport payment'. The second was that the IGB accept the additional war risk premium, with this to 'be settled by an adjustment to the final inland transport payment'. The third was splitting of the inland transportation payments by a first payment of US$14.00 per tonne prior to the ship's arrival, with the balance on payment by the United Nations to AWB. The fourth was an agreed US$–€ exchange rate.

The first two conditions make plain the understanding that the 'inland transportation payment' was a mechanism for channelling funds to Iraq, which was available to be used for contractual monetary adjustments of payments to or from Iraq. AWB was aware that demurrage and despatch payments to or from Iraq were not permissible because of the UN sanctions. Use of the inland transportation mechanism was a means of circumventing those sanctions.

Iraq did not agree to the conditions. Ultimately, Mr Flugge, the AWB Chairman, wrote to the Minister of Trade requesting confirmation of the agreement as reached on 20 December 2001. The Minister subsequently confirmed the sale.

Short-form and long-form contracts were prepared. The contracts submitted to DFAT and the United Nations did not reflect the true arrangements between AWB and the IGB. Neither mentioned the inland transportation fee, the obligation to pay the additional 10 per cent after-sales-service fee incorporated in the inland transportation fee, or the amounts of either fee. The contracts were expressed to be 'CIF F.O.T. to silo all governorates of Iraq via Umm Qasr Port', or equivalent. They did not indicate that in truth AWB had no obligation to discharge or transport grain. The contracts were submitted with an application to export to Iraq to the United Nations on 23 January

2002. Approvals under phase XI were issued by the United Nations on 5 February 2002.

## The June 2002 contract

In June 2002 Mr Long and Mr Hogan visited Iraq. They negotiated a sale of 500,000 tonnes on terms similar to those in contract A1111 dated December 2001. This contract became A1441. The inland transportation fee was US$47.75 per tonne in euro equivalent, including the 10 per cent after-sales-service fee. Short- and long-form contracts were signed, and approvals by the United Nations, dated 13 August 2002, were issued on 8 October 2002. Neither the short-form nor the long-form contracts made reference to the amount of inland transportation fee, the additional 10 per cent after-sales-service fee, or the amount of either fee or its payment by AWB to Iraq.

During negotiation of this contract in June 2002 the Iraqi Minister of Trade made clear that the contract had been reduced from 1 million tonnes to 500,000 tonnes because of what Iraq described as the 'aggressive policy and attitude that the Australian Prime Minister has towards Iraq and his public display of support for Bush and the USA government'. The trip report noted that because of that 'Iraq can no longer justify the significant purchases of Australian wheat'. The report also noted that 'the Minister has reserved a further 500,000 tonnes for AWB under this existing phase (12), if we provide a positive response'. Accordingly, on 1 July 2002 Mr Lindberg wrote a letter to the Prime Minister, recording the Iraqi Minister's concerns and the consequences for the wheat trade. The importance to AWB of the wheat trade in Iraq is indicated by the note in the AWB trip report: 'If negative (Aust gov is not going to provide retraction), then we need to seriously consider the political angle we need to take to ensure we continue sales to Iraq'. The Australian Government did not change its attitude to Iraq.

## Recovery of the Tigris debt

In 1995 BHP Petroleum (BHPP) agreed to make a 'humanitarian' donation of a US$5 million shipload of wheat to Iraq. Iraq was not told the shipment, delivered in 1996, was a donation. Mr Davidson Kelly of the Tigris Petroleum Corporation Limited and Mr Stott of AWB represented to Iraq that the shipment was paid for by a loan by BHPP to Iraq of US$5 million. In September 2000 BHPP assigned to Tigris any rights it had flowing from the 1996 shipment, subject to Tigris paying to it 25 per cent of any recovery. Throughout 2001 and 2002 AWB assisted Tigris in obtaining Iraq's agreement to repay the 'loan'.

In July 2002 the IGB claimed that delivered shipments of wheat were contaminated with iron filings. It sought compensation of approximately US$2 million from AWB.

In August 2002 a delegation comprising Messrs Flugge, Lindberg, Long and Cracknell travelled to Iraq to resolve the iron filings compensation claim. Agreement was reached that AWB would pay compensation of US$6.00 per tonne in respect of the contaminated wheat. This required a payment of US$2.017 million. Mr Hogan wrote, 'We need to think how we 'legally' pay Iraq'.

In September 2002 the IGB requested that representatives of AWB and Tigris attend Baghdad to seek to resolve the Tigris 'debt'. AWB obtained legal advice regarding whether it could negotiate on Tigris' behalf to effect such recovery. In a memorandum dated 16 September 2002, sent to all members of the AWB Risk Committee, as well as AWB Legal and the AWB (International) pool, Mr Long wrote:

> During 1995/1996 BHP agreed to provide USD 5m worth of Australian wheat to the IGB as a gesture of good faith in view of BHP's desire to enter the Iraqi oil market.
>
> AWB shipped the wheat on board MV Ikan Sempat in Jan. 1996 and were paid by BHP Petroleum.
>
> IGB have acknowledged the outstanding debt owed to BHP who subsequently assigned their rights to Tigris Petroleum. The current debt including interest stands at some USD 8.8m.
>
> AWB has always acknowledged that it would assist in this debt recovery process. This issue has been raised by AWB personnel with the Minister of Trade, HE Mohamed Medhi Saleh on a few occasions since the debt became due on 26 January 2001. The Minister has always acknowledged this debt.
>
> AWB has agreed to pay IGB USD 6 per tonne on approximately 300 000mt under Contract Number A1111/A1112 as settlement for the 'iron filings' quality issues amounting to some USD1.8m. AWB raised the possibility of settlement of this quality claim by AWB paying Tigris as settlement of the Iraqi debt to Tigris. UN Regulations prohibit direct payment of funds to Iraq whilst Iraq is under UN sanctions.
>
> The IGB has recently invited representatives from AWB and Tigris to visit Baghdad to discuss this issue.

The advice sought was as follows:

> 1. ISM request AWB Legal to review the file attached and to advise CRRC if ISM is authorised to negotiate with IGB/Tigris the settlement of the Iraqi debt to Tigris. Specifically it would involve AWB I paying monies to Tigris Petroleum subject to all the correct paperwork being received from both IGB and Tigris. Advice to go to CRRC for meeting Thursday 19 Sept 2002.

Although the matter was discussed, it is not clear whether any legal advice was provided.

In October 2002 Tigris proposed, and AWB accepted, that AWB receive a fee of US$500,000 for its assistance in recovering the Tigris debt. Mr Davidson Kelly wrote,

'In relation to the recovery of the loan, I suggest that we settle on a fee payable in line with repayment of the loan. I expect this to be based upon deliveries of grain to you'.

Thus, it was apparent to senior management within AWB, and to lawyers advising them, that there was a proposal for AWB or AWB (International) to receive monies from Iraq in settlement of the Tigris 'debt', that AWB would receive a US$500,000 fee for its assistance, and that thereafter AWB or AWB (International) would pay the received monies to Tigris.

On 27 October 2002 Tigris wrote to Mr Jumah, a senior official in the Iraqi Oil Ministry and an agent of Tigris. It discussed the amount outstanding under the so-called debt being US$9.519 million with compound interest or US$8.375 million with simple interest. It stated:

> **2. AWB Position**
>
> AWB have a contractual dispute concerning cargo quality, under which they owe the IGB US$ 1.6 million approximately. After detailed review they are of the opinion that they can only do one of two things. They can either return this amount to the escrow account, or make the payment to Tigris in an agreed front-end payment in relation to our transaction.
>
> They have communicated this to the IGB. But 'in code', not directly.
>
> The balance could be attached to 'new business', i.e. a new contract of say 500,000 tons with an agreed payment as Commission. I suggested that this Commission would relate to the hard work we have done in turning round the Australian Government's hard line position, which led to the suspension of business with Australia.
>
> **3. Mechanics**
>
> We would agree a payment per ton. Any underpayment would be dealt with in a subsequent contract, and any overpayment would be accounted for in full by Tigris to the authorities.
>
> It was recommended that we agree the amounts outstanding as part of the commercial negotiations. We would then translate Tigris' US Dollar amount into Euros.
>
> **4. Authority**
>
> AWB have my authority to deal with all these issues. They will communicate the result to you, and seek your assistance if they require. You know how to contact me if required.
>
> Dominic Hogan, Regional Manger Middle East, heads the delegation. Chris Whitwell, Account Manager, accompanies him. They are staying at the Al Mansur hotel, and are currently planning to leave on Royal Jordanian on Tuesday evening.

Tigris did nothing to 'turn around the Australian Government's hardline position'.

Before Mr Hogan and Mr Whitwell travelled to Baghdad there was prepared an Iraq brief. It noted in relation to the iron filings compensation payment: