> Due to the inability to make payments direct to IGB because of the long standing UN sanctions, we will propose that these amounts will be paid to BHP to offset the Tigris debt owed by IGB to BHP dating back to January 1996.

Mr Hogan and Mr Whitwell put certain propositions to the IGB at their meetings in Baghdad in October 2002. They reported their proposals widely to senior executives in AWB and AWB (International). Their meeting report recorded discussion of the following proposals:

> 1. Offsetting vessel claims (iron filings) against Tigris (BHP) debt—approx USD2 million.
>
> 2. Balance of debt to be recovered against new business (load up contract).—approx USD7.5 million (if using compound)
>
> 3. No further vessel claims would be used as offset—but would need to be redirected through UN account.
>
> IGB—confused abt amount and offer made by Tigris—Jan 2001, where Tigris would accept simple interest amount.
>
> AWB advised we were not involved in the actual amount, but only the mechanism. Actual amount would be agreed between Tigris and relevant authority.
>
> IGB—referred any decisions to the Minister.
>
> AWB to get copy of letter sent by Tigris in Jan this year.

Thus AWB proposed to 'load-up' contracts with the IGB to recover the supposed debt, after offsetting the iron filings compensation claim. That proposal was known to senior management within AWB. The quoted paragraph numbered 3 makes clear that AWB knew that any quality claim payments due by AWB to the IGB should be paid into the UN escrow account.

The report of this trip also recorded a meeting on 28 October 2002 with Minister Saleh. It noted:

> Simple Interest amount to be recovered by Tigris through loading up the next Phase 13 wheat business. This has received Cabinet approval.
>
> Vessel rejection claims as per original agreement to be paid through inland transport system against next contract—phase 13 …
>
> AWB to advise re payment mechanism of rebate and to brief Tigris re Iraqi position on their debt. Tigris to have arranged figures and agreed prior to AWB visit to Iraq in December.

The second quoted paragraph makes plain that Minister Saleh and Mr Hogan and Mr Whitwell understood that the 'transport system' was a mechanism for passing monies to Iraq. That must also have been apparent to each of the senior AWB executives who read the report.

Whilst in Iraq, Mr Hogan and Mr Whitwell also met with Mr Sabah, whom they believed was the Director General of the Iraqi Oil Board and a man of influence. They discussed with him whether loading-up the full amount of the Tigris debt on a 500,000-tonne contract would mean the inflation of the price would be obvious to the United Nations and suggested an increased tonnage 'to make things easier to pass through UN'. The trip report noted:

> We discussed possible difficulties in raising the price significantly to incorporate the entire debt into one 500K contract. Suggested some alternate pressure could be brought to bear on the Iraqi government to increase the tonnage of next contract to make things easier to pass through UN. He said he would look into it.

Thus AWB sought to disguise and hide the loading-up of the contract from the United Nations. No recipient of the trip report expressed disagreement with the proposal.

On 7 November 2002 Mr Whitwell advised all members of the Executive Leadership Group that at the meetings in Baghdad the Minister had advised that the iron filings compensation claim of US$6.00 per tonne was to be treated separately from other debt issues — that is, not offset against the Tigris debt — and that the Minister 'has asked for repayment through inland transport mechanism'. He also advised, 'Tigris debt has cabinet approval for repayment — final amount to be agreed during the next month by Tigris/Iraqis and then mechanism for repayment to be agreed during next visit'.

The 'inland transport mechanism' was apparently a well-understood concept in AWB: no member of the Executive Leadership Group inquired what it meant.

In mid-November there was an exchange of correspondence between Tigris and the IGB. The proposal in each letter included the following:

1. Tigris would waive its right to compound interest on the debt owed, provided that repayment of the debt be tied to the next contract for the shipment of Australian grain and a calculation based on simple interest would leave the amount owing at US$ 8,375,000;

2. Interest would run at US$41,666 per month until settlement;

3. Tigris would be willing to convert the US$ amounts outstanding to Euros at the exchange rate ruling on the date of the agreement of the contract with AWB

4. The mechanism for repayment would involve a surcharge per ton, to be agreed with AWB in relation to the forthcoming contracts for the supply of Australian grains;

5. Any overpayment due to variations in quantities delivered under the contract would be accounted for by Tigris immediately to Iraq; and

6. The AWB delegation was authorised by Tigris Petroleum to discuss this proposal in detail and to agree the necessary mechanism for repayment of the loan.

In a further letter of 17 November 2002, to Mr Jumah, Mr Davidson Kelly also authorised him to act on Tigris' behalf to agree on repayment terms.

Later in November, Mr Long and Mr Whitwell met with the IGB in Baghdad. Mr Long inquired whether 'for corporate governance reasons' the payment of the iron filings compensation could be passed through Tigris or through the provision of equipment by AWB rather than through Alia. The IGB agreed to refer the matter to the Minister.

It is undoubted that AWB knew that payment through the 'inland transport mechanism' was a payment to Iraq that was neither approved by nor would be permitted by the United Nations because of the sanctions regime. That was because it was a payment to Iraq. Using the 'inland transport mechanism' was a means of avoiding the prohibition, as AWB well knew. The 'corporate governance reasons' to which Mr Long referred was AWB's knowledge that to pay monies to Iraq through the inland transport mechanism was a breach of UN sanctions.

AWB consulted DFAT in November 2002 regarding how the US$2.17 million iron filings compensation could be paid to Iraq. After consulting the United Nations, DFAT advised AWB on 27 November 2002:

1. If there are additional shipments of wheat to go to Iraq under the contract in question, AWB can give a discount to Iraq when it receives its next invoice for those additional shipments.

2. If there are no further shipments under the contract, AWB can transfer funds to the Iraq escrow account operated by BNP Paribas. Any such transfer would have to clearly acknowledge the LC number (and any other relevant details) that would tie the refund explicitly to the AWB contract and would enable Treasury and BNP to ensure that the money is assigned back to the relevant phase and sector.

Notwithstanding this, on 28 November 2002, the day following the receipt of advice from DFAT and the United Nations, Mr Whitwell wrote to the IGB asking whether the Minister had reconsidered 'his position to repay it [the iron filings compensation] directly to Alia transport' and instead asked 'whether it would be possible to offset it against Tigris for reasons already advised'.

The 'reasons already advised' were the corporate governance reasons that payment to Iraq via Alia was a breach of UN sanctions, as AWB well knew.

On 4 December 2002 a sale of 1 million tonnes of wheat to Iraq was confirmed. The agreed price did not include an inland transport fee, which was to be later mutually agreed. The contract was to be in euros.

On 5 December 2002 Tigris emailed AWB a letter prepared for the IGB. It advised that Tigris would accept US$8.375 million and would not require payment of further

Case 1:07-cv-07955-GEL   Document 1-6   Filed 09/11/2007   Page 4 of 10

interest on the basis that repayment of the debt was tied to the next contract for a shipment of Australian wheat.

On 9 December 2002 AWB emailed the IGB in the following terms:





Thus AWB advanced two alternative methods of inflating the contract price to hide both the inland transport fee, including the 10 per cent after-sales-service fee, and the recovery of the Tigris debt in the wheat price. Option A, involving an offset of the iron filings compensation against the Tigris debt, was contrary to the clear advice conveyed to AWB by DFAT after consultation with the United Nations 12 days earlier.

Mr Long thought it important to raise the iron filings rebate payment and the Tigris debt recovery with the most senior management. He directed Mr Whitwell to prepare a memorandum to be circulated. The memorandum went through seven iterations and was discussed between Mr Whitwell, Mr Long and Mr Geary, the Group General Manager Trading. Notwithstanding this, contracts were entered into on 12 December 2002, being contracts A1670 and A1680, each for 500,000 tonnes. No reference was made in either the short-form or the long-form contracts, approved by both Mr Long and Mr Geary, of the inflation of the prices by either the inland transportation fee, including the 10 per cent surcharge, or the Tigris debt recovery figure of US$8.375 per tonne in euros. The price in the contracts accorded with Option B. The iron filings compensation was to be paid through the 'inland transport mechanism'.

On 12 December 2002 there was circulated widely throughout AWB an email setting out the final details of pricing of those contracts to produce a netback FOB price to AWB. In that netback calculation a deduction of €51.30 for the inland transportation fee was made, as was an identified figure of €8.40 in respect of the Tigris debt. No one within senior management raised any query about or objection to the Tigris factor in the wheat contracts, which was said to be 'common knowledge' amongst Executive Leadership Group members.

On 17 December 2002 the IGB advised AWB that the US$2.017 was to be added to the inland transport payment to be made in respect of each of contracts A1670 and A1680 to effect repayment of the iron filings compensation claim.

On 7 February 2003 the final iteration of Mr Whitwell's memorandum, commenced in December and signed by Mr Long, was circulated. It read:

LPL.105.111

# AWB Limited Memorandum

AWB.8001.0016

| | |
|---|---|
| To: | P Geary, M Long |
| CC: | S Scales, D Johnson, D Hogan, D Johnstone, J Cooper, J Lyons, D Hockey, M Thomas |
| From: | C Whitwell |
| Date: | 7 February 2003 |
| Subject: | Iron filing rebate payment and Tigris Petroleum fee |

### PRIVATE AND CONFIDENTIAL

This memo is in respect to refunding the Grain Board of Iraq the quality rebate of approx USD 2,016,133 through the inland transport payments for the new contract as requested by the Minister of Trade, Iraq. In addition, for the record IS & M has negotiated (through an uplift in price the recovery of a USD 8.375 million outstanding debt to Tigris by IGB through this contract. AWB will repay this debt back to Tigris less an agreed recovery fee of USD 500 K on a pro rata basis as tonnage is shipped.

### Overview

Delegation led by Andrew Lindberg (August 2002) to Baghdad agreed to settle the contamination of the 'Iron Filings' vessels by paying them USD 6 pmt for each vessel total = USD 2,016,133

After being approached by Tigris Petroleum AWB and IGB have agreed to allow the new contract to be the conduit for a repayment of USD 8,375,000 owed to Tigris by IGB for a cargo of wheat shipped in 1996. IGB have agreed to raising the contract price by the debt amount and when payments are made under the Letter of Credit AWB will pay Tigris its debt less AWBs recovery fee.

We have suggested the following during our last two visits.

- Offsetting the debt against the Outstanding debt to 'Tigris petroleum' (approx USD 8.35 million)
- Reducing the any new contract price by the amount of the rebate on a pmt basis
- Repaying the debt through the provision of aid in some form – Wheat, Health supplies etc.

However, in discussion with the Minister of Trade he has continually insisted on repayment directly as an addition to the inland transport and said that this was his understanding of the agreement with Andrew Lindberg – Michael Long was present and confirms that this was discussed. Now that the new contract has been concluded ISM need a sign off to organise this payment when shipments start.

### Issues

- Possible implications for AWB on a corporate governance basis ie/ direct payment to a company with links to the Iraqi regime may be construed to be in contravention of the UN Sanctions.

    The relevant UN Security Council Resolution is 661 (1990). This resolution provides at clause 4: -

    "...All States shall not make available to the **Government of Iraq** or to any commercial, industrial or public utility undertaking **in Iraq** any funds or any other financial or economic resources and shall prevent their nationals and any persons within their territories from removing from their territories or otherwise making available to that Government or to any such undertaking any such funds or resources and from remitting any other funds to persons

Page 1 of 3

# AWB Limited Memorandum

LPL.105.112


AWB.0001.0017

or bodies within Iraq.... except payments exclusively for strictly medical or humanitarian purposes and, in humanitarian circumstances, foodstuffs."

In summary, this means that the Government of the Commonwealth of Australia would be obliged to prevent AWB Limited from making any remittance of funds to the IGB.

AWB Legal opinion in this regard is set out below.


LPP

This does not mean, however, that a payment might not be able to be made which will comply with the terms of the UN Resolutions. As a minimum, if AWB management determines to make the payment, then it should be made in the following circumstances:

1. The payment is made in installments over time and coincides with payments for future shipments of wheat (ie not a lump sum payment);

2. The payments preferably be made to a company other than the IGB and in a jurisdiction other than Iraq; and

3. The payments be recorded as being made as a part of a settlement reached between AWB and IGB, the terms of which contemplated that IGB would agree not to take any action against AWB for the alleged contamination of the 8 vessels in 2002 with iron filings AND would agree to enter into contracts for the purchase of Australian bulk wheat in the future in exchange for a renegotiation of the price on the 8 vessels.

If we ensure that the above requirements are met, then Legal consider it will be at least arguable that we are not 'making funds or financial resources available' to the Iraqi Government'. Instead, we are **repaying** part of the contract price for the 8 vessels following a re-negotiation of the sale price due to a downgrading of the grain (which potentially contained iron filings).

In addition to the above the UN Security Council resolutions also require (resolution 986 (1995) clause 8) that the cost of food exports to Iraq must be met by draw down from the UN "escrow account". Furthermore draw down from the escrow account is only allowable under strict conditions. Those conditions include, at clause 8(a)(iii) that the goods to which payment is referable shall have arrived in Iraq. In this case, the goods have already arrived in Iraq and HAVE been paid for in full. However, the Resolutions are SILENT on the procedure for any repayment of part of the price in circumstances where there has been a quality complaint (and a subsequent renegotiation of price).

This may therefore give us more scope to make the repayment to IGB.

**Even if we make payment as outlined above, there is still a risk that the Australian Government and/or the United Nations will take a contrary view on the interpretation of the above mentioned resolutions and declare that AWB has breached the terms of those resolutions by making the payment. This is a commercial and political issue, which AWB's management will need to consider.**

- According to an informal discussion with DFAT any repayment of a quality rebate should be either re-payed through UN ESCROW account or as a contract price reduction however they have not had a full legal argument put in front of them or been told officially. In Public affairs opinion as long as the repayment is legal and could not be seen to be breaking UN Sanctions then we should proceed (with the proviso that we have an independent legal opinion to that effect – see above legal opinion).

  Public Affairs also expressed concern that this would not be well received by the UN OIP office and that there was a reasonable chance of them finding out. IS & M on the other hand do not want them involved and feel confident that this issue could be handled without the need for the OIP to be consulted. It has been articulated to us and we have circumstantial

Page 2 of 3

> LPL.105.113
>
> ## AWB Limited Memorandum
>
> 
> AWB.8001.0018
>
> evidence that other participants in the OIP program (Russian and Pakistani companies) have had to sort out quality problems in a similar way and it is unlikely either their national governments or the OIP were consulted
>
> - IS & M feel strongly that a failure to repay the IGB as discussed will lead to serious consequences for AWBs relationship with the IGB. IS & M also believe that failure to refund this agreed debt in this way would have serious implications for the execution of the new contracts. AWBI are aware of all the issues laid out above and in light of the commercial imperative of this situation agree with the recommendation as laid out below. **They do however insist that the Managing Director is appraised of the situation.**
>
> Actions
>
> Whilst IS & M have received a number of different opinions from different areas of AWB and an informal opinion from DFAT we still feel this issue is a grey area with no prescriptive answers. Based on the opinions we do have and the commercial circumstances surrounding this issue IS & M recommend and seek approval for the following:
>
> - IS & M is to repay debt as per method outlined in AWBs legal opinion (and requested by the Minister of Trade) directly to Alia Transport in Jordan in instalments. IS & M will also look to obtain written agreement from IGB to the payment in the format agreed by legal however it is not guaranteed.
>
> - Managing Director **only** to convey our intentions to the Australian Government at the appropriate time prior to Shipment. The timing of such a disclosure is important and we would recommend that nothing be done until at least Letters of Credit are in place for these contracts. Given that this is unlikely to happen until after a war with Iraq it may allow us a further chance of renegotiation with a new regime.
>
> - IS & M to finalise as soon as possible a written agreement with Tigris with regard to the settlement of their debt.
>
> ...........................
> Recommended
>
> M Long
>
> General Manager International Sales and Marketing.
>
>
> ...........................
> Approved
>
> P Geary
>
> Group General Manager – Trading
>
> Page 3 of 3

The so-called legal opinion was nothing of the sort. It was an attempt to devise a method whereby the payments to Iraq would not be obvious by spreading them thinly over future shipments (paragraph 1), to hide the fact of payment to Iraq by making the payment to an intermediary rather than IGB direct and in a country other than Iraq (paragraph 2), and to falsify the nature of the transaction by recording it as a

transaction different from payment of compensation (paragraph 3). This, AWB's lawyers thought, might make it 'at least arguable' that AWB was not 'making funds or financial resources available' to the Iraqi Government, which AWB and its lawyers knew was prohibited by the UN sanctions. This advice was contrary to the clear, specific advice given to AWB by DFAT after consultation with the United Nations in November 2002.

The memorandum recognised corporate governance issues associated with making a direct payment to a company with links to the Iraqi regime. The only company to whom a payment was to be made was Alia. Obviously AWB—at a very senior management level—knew Alia was linked to the Iraqi regime by at least December 2002. AWB also knew that the Australian Government, were it aware of the contemplated payments, would be obliged to stop such payments. It also knew that DFAT had, on UN advice, indicated that any iron filings compensation should be paid to the escrow account or deducted from the price in future sales. Nonetheless, AWB decided both to load-up two contracts to recover $8.375 million for Tigris (and thus earn a fee of US$500,000) and to pay the iron filings compensation 'as per method outlined in AWB's legal opinion (and requested by the Minister of Trade) directly to Alia Transport in Jordan in instalments'. AWB was also to look to 'obtain written agreement from IGB to the payment in the format agreed by legal however it is not guaranteed'.

The course of action referred to was recommended by the General Manager International Sales and Marketing and the Group General Manager Trading. AWB (International), the grains pool, being aware of all the corporate governance and legal issues, agreed with the recommendation 'in light of the commercial imperative of this situation'. That imperative was to retain the Iraqi grain trade, which it feared would be lost if the compensation claim was not paid.

The memorandum was forwarded to Mr Geary, who in turn forwarded it with his approval to Mr Lindberg's office. Mr Lindberg did not receive the document. The intention of AWB was to hide from the Australian Government these transactions—that is, the inflation of the contract price to recover the Tigris debt and the repayment of the iron filings compensation via the inland transport mechanism to Alia. AWB did not ever inform the Australian Government of either matter.

Long- and short-form contracts for A1670 and A1680 were signed and dated 12 December 2002. They were submitted to DFAT for transmission to the United Nations for approval; the approvals were issued in January 2003. Permissions to export wheat under the Customs (Prohibited Exports) Regulations were granted by the Minister between 10 February 2003 and 27 May 2003. Delivery of the cargoes occurred throughout 2003.

The contracts submitted by AWB to DFAT and the United Nations did not reflect the true agreement for the sale of wheat. The contracts did not disclose:

- the inflation of the price to recover the Tigris debt

- the agreement to pay an inland transportation fee to Iraq via Alia

- the agreement to pay a 10 per cent after-sales-service fee, to be included in the transportation fee

- the agreement to pay an additional US$2.01 per tonne to Iraq via the inland transportation fee mechanism in payment of the iron filings compensation

- the fact that AWB had no obligation to transport grain to all governorates of Iraq, its obligation being only to pay a fee to an Iraqi entity via Alia.

In May 2003 the Executive Leadership Group received a report stating:

> Tigris Petroleum (BHP) has asked for an update of status of their agreement in light [of] current contract execution and when they will begin receiving payments. They intimated a number of influential people will need to start receiving funds and that further delays may cause difficulties going forward.

This was code for payment of bribes. It raised no alarms within the Executive Leadership Group.

In May 2003 Mr Davidson Kelly of Tigris sent to AWB a draft agreement, called a 'service agreement', between AWB and Tigris. It recited that 'Tigris has been of material assistance in procuring for AWB a contract for the supply of Australian wheat to Iraq'. It provided that AWB would pay Tigris US$7.875 million as 'compensation' for the services said to have been provided by Tigris. That 'compensation' was to be at the rate of US$7.875 per tonne of grain delivered. Undoubtedly, US$7.875 million is the $8.375 million less the US$500,000 commission it had been agreed AWB would receive for recovering the Tigris debt of US$8.375 million.

This draft agreement was a sham. It did not represent the true agreement between Tigris and AWB, which was that AWB would inflate wheat contracts with Iraq, recover the Tigris 'debt', receive US$500,000 for so doing, and pay to Tigris the 'debt' so recovered.

The draft agreement was sent to AWB Legal and other senior executives, including AWB's Group Tax Manager.

Instead of retaining US$500,000 as commission for recovery of the Tigris debt and paying to Tigris the balance of US$7.875 million recovered as the Tigris debt, AWB