and Tigris agreed to recast the transaction so that the payment to Tigris of the recovered debt would appear as a payment by AWB (International) to Tigris of a commission earned by Tigris for assisting AWB (International) to obtain contracts for the sale of wheat to Iraq. The amount agreed to be paid by AWB as 'commission' was initially US$7.875 million, being the US$8.375 million debt recovered less the commission to AWB of US$500,000.

The recast agreement was a sham for three reasons:

- The monies being paid by AWB to Tigris were the recovered debt, not a commission.

- Tigris did not assist AWB (International) to obtain contracts for the sale of wheat with Iraq.

- The amount of the so-called commission was in truth the debt recovered less AWB (International)'s agreed fee of US$500,000.

The recasting of the transaction was done on the advice of, or with the concurrence of, internal and external lawyers for AWB.

The recasting of the agreement with Tigris was done with the knowledge within AWB of Messrs Whitwell, Stott, Long and Cooper. Ms Scales, on learning in 2004 that the contracts had been 'loaded up' to recover the Tigris debt but not disclosed in the contracts submitted to the United Nations, required that senior legal advice be obtained to determine if it was legally permissible to pay the money to Tigris.

Advice regarding aspects of the Tigris transaction, known as Project Water, was obtained from Mr Tracey QC, Mr Richter QC, Dr Donaghue, Mr Quennell, Mr Cooper and Ms Peavey. The final advice from Mr Richter QC was that it did not breach the law to pay the money to Tigris.

Mr Long persuaded Mr Davidson Kelly that, because AWB had been required to reduce its contract prices for contracts A1670 and A1680 in renegotiations with the Coalition Provisional Authority and the World Food Programme, the sum to be paid to Tigris should be reduced by 10 per cent to US$7.0375 million.

On 10 November 2004 Mr Cooper sought the approval of and advised Mr Lindberg and Ms Scales that a factual review of the Tigris transaction had been completed and signed off, that advice from senior counsel was that no breach of the law was involved, that the matter did not require Board approval, and that his view was that 'this transaction did assist AWBI in securing the Iraqi grain market'.

On 19 November 2004 Mr Lindberg approved payment in principle of monies to Tigris. This approval was sought by Dr Fuller at the request of Mr Cooper.

On 1 December 2004 Tigris faxed AWB (International) an invoice for US$7,537,500 for a 'service fee', less a 'success fee' of US$500,000, plus interest of US$55,224.72, less Australian withholding tax of US$5,522.46—making a total payable to Tigris of US$7,087,202.24. The invoice was a sham for the same reasons that the agreement was a sham.

Authorisation to pay Tigris was signed by Mr Cooper and Ms Scales. The payment of US$7,087,202.24 was made on 9 December 2004.

The Tigris transaction was executed on 10 December 2004, having an effective date of 12 December 2002, the date of contracts A1670 and A1680.

The Tigris transaction was discussed at an Executive Leadership Group meeting on 13 December 2004. What was said is not known.

The Tigris transaction was discussed at a joint information session and Board meetings of AWB and AWB (International) on 14 and 15 December. The agreement was presented to the Boards as a 'done deal'. It was said to be within Mr Lindberg's authority and presented to the Boards for information only. Approval was not sought. Several directors raised concerns. Mr Thame thought AWB was now 'tainted' and likened the transaction to 'James Hardie'. Mr Simpson sought a paper on the transaction for the next meeting. None was produced.

On 13, 14 and 15 December 2004 Messrs Stott, Long and Whitwell signed off on the factual summary of Project Water. That summary said nothing about Tigris securing the Iraqi grain market for AWB in 2002.

The true nature of the transaction, and the false nature of the agreement in fact signed, were not explained by Mr Lindberg or Mr Cooper to the Boards. Mr Lindberg conveyed to the Boards what he had been told by Mr Cooper. Mr Cooper had received legal advice regarding whether the method used by AWB to collect the Tigris debt by inflating the price of wheat breached UN sanctions or Australian laws. Mr Lindberg informed the Boards that, in respect of the payment by AWB to Tigris, he had 'checked compliance with all necessary laws and confirmed that there had been no breaches'. The Boards were informed of the substance of the advice.

By recovering US$8.375 per tonne on 1,057,197 tonnes under contracts A1670 and A1680, AWB recovered US$8,854,024. This was US$497,024 more than the supposed debt the IGB had agreed to pay.

AWB decided to retain that sum of USD497,024 rather than return it to Iraq. That decision was taken after the lifting of sanctions, when there was no restriction on payment to the IGB or Iraq. Both senior management and AWB Legal were aware of or participated in this decision. The money is still held by AWB (International). Nor

has AWB or AWB (International) paid to Iraq or the IGB the US$2.17 million agreed as iron filings compensation.

## AWB payments to Alia

Between November 1999 and March 2003 AWB paid to Alia by way of transportation fees US$224,128,189.98. That sum comprised US$146,101,906.59 in respect of transportation fees and US$78,026,283.39 attributable to the 10 per cent after-sales-service fee.

After deducting a commission of 0.25 per cent, Alia transferred the funds to the General Maritime Transportation Company, the Iraq Public Ports Company or the ISCWT. From there the funds were distributed to various Iraqi government ministries, with approximately two-thirds being paid to the Ministry of Finance, 18 per cent to 'land' (presumably being for land transportation), approximately 4 per cent to 'ports' and 1 per cent to 'water'.

## March to September 2003: post-hostilities

At the outbreak of hostilities on 20 March 2003 AWB had two ships on the water heading for Iraq. They were the *Pearl of Fujairah* and the *Andromeda*. On 14 March 2003, in anticipation of the arrival of the *Pearl of Fujairah* at Umm Qasr, AWB paid a €2,471,522.25 inland transportation fee to Alia. However, on arrival off Umm Qasr, the shipowners declined to permit the vessel to enter Umm Qasr because of the war risk.

AWB was concerned to recover the €2.47 million it had paid to Alia. It sought return of the funds from Alia, which advised that the monies it had received were no longer in an account controlled by Alia. They had, in accordance with the established practice, been transferred by Alia to Iraq. In May 2003 Mr Whitwell and Mr Edmonds-Wilson travelled to Jordan and met representatives of Alia, including its Chairman. Their report stated:

> Importantly, the matter of the eur2.5m inland transport paid for the MV Pearl of Fujairah was brought up with both Othman and the Chairman. Both Othman and the Chairman said the matter had previously been tabled between Alia and Mr Yusef (IGB). Alia said that as soon as there was someone with authority to sign the appropriate documentation from the Iraq side, the money would be returned to Alia and then to the companies in question (this affected about 10 companies other than AWB).
>
> Alia had the appropriate documentation showing the money had been remitted so we will now have to wait until hierarchy in Iraq is set up and running to chase. The Chairman had much faith and trust that the $$ owing would be returned in due course and said he would do everything possible to access the funds from the frozen account ASAP. Alia had recently

> sent a letter to Iraq (around 20/03) re funds that had been paid but services not provided
> and therefore needed to be returned.

AWB obviously knew the monies had been passed to Iraq, that Alia was not responsible for trucking the wheat, and that payments made to Alia were not for that purpose.

On 21 March 2003 the Australian Government decided to provide 100,000 tonnes of wheat to Iraq in the form of humanitarian food assistance. That was the grain on board the *Pearl of Fujairah* and the *Andromeda*. The Australian Government purchased those cargoes from AWB for A$35 million. The United Nations requested that the two shipments revert to the World Food Programme. After some negotiations, agreement was reached between AWB and the World Food Programme concerning price and terms of delivery. AWB repaid the Australian Government the AUD$35 million.

The sales to the World Food Programme in respect of the *Andromeda* and the *Pearl of Fujairah* resulted in reduced prices. The amended contract terms provided for delivery CIF free out, rather than CIF free in truck, so there was no inland transportation fee component in the price. Having reached that agreement, AWB then sought compensation for various expenses in the nature of deviations, demurrage, port charges and agency charges. It was subsequently agreed with the World Food Programme that the price for the grain on the *Pearl of Fujairah* and on the *Andromeda* would be increased to accommodate the compensation claims.

Mr Long was appointed by the Australian Government to assist with the rebuilding of Iraq after the incursion. He worked with the Coalition Provision Authority Ministry of Trade. One of his tasks was to prioritise contracts. His immediate superior was a former US Ambassador who was aware of Mr Long's position at AWB. He asked Mr Long to consider prioritisation of food contracts. Decisions in that regard were made by the Coalition Provisional Authority in conjunction with Iraqi Ministry officials. In conjunction with Iraqi Ministry of Trade officials, and with the support of his American counterparts, Mr Long prioritised AWB contracts A1670 and A1680. That meant they could be included in the Oil-for-Food Programme which, notwithstanding the United Nations indicating it would cease on 20 March 2003, continued. The contracts were passed to the World Food Programme for renegotiation with AWB.

In September 2003 United Nations approval for contract A1670 was issued. The same month the World Food Programme commenced negotiations with AWB to renegotiate the price. The terms it proposed were:

> Cargo will be delivered at supplier cost, insurance and freight (CIF), Free on Trucks all
> governorates' warehouse/Iraq. As the Water Supply Company is no longer functional, it
> will be the supplier's responsibility to arrange private transportation from the contract
> stipulated Point of Entry to the final delivery point, as advised by the Ministry of Trade.
> The value of tonnage renegotiated will be reduced 10 per cent (10%).

The 10 per cent reduction in price requested was a reduction of the 10 per cent after-sales-service fees, which the United Nations correctly believed had been included in all supply contracts under the Oil-for-Food Programme. Mr Long, still in Baghdad, advised AWB that if it wished to continue with the contracts it had no option but to agree to the 10 per cent reduction. AWB did so 'as long as its associated extra costs resulting from the delay in executing this contract are taken into account'. However, AWB ultimately agreed to a price of €254.88 per metric tonne, a decrease of €25.49 per tonne, or 10 per cent, from the price initially agreed with the IGB. That price still included the component for the inland transport fee, excluding the 10 per cent after-sales-service fee, but AWB now had in truth to arrange transport to all governorates of Iraq. It did so by entering into a contract with Alia for the trucking of grain. It had never previously done so. The contract was signed on 21 October 2003 and included all the usual terms with a trucking company. However, it contained one exceptional clause. Clause 4 provided:

> In respect of transport charges AWBS to deduct US$1 per metric tonne representing a part repayment of a previous inland transport payment which was not executed. In the event that AWBS do receive acceptable repayment from the appropriate Iraqi authority then AWBS will remit the total value repaid by the contractor under this repayment scheme to the contractor.

This was a reference to the €2.47 million paid in advance to Alia in respect of transportation fees for the *Pearl of Fujairah*, which fees remained unrecovered from Iraq.

On 22 November 2003, pursuant to UN Security Council Resolution 1483, responsibility for the Oil-for-Food Programme was transferred to the Coalition Provisional Authority. In December 2003 contract A1670 was amended by increasing the contract value by €3,912,830.00 'to support the accelerated delivery of approximately 220,000 metric tonnes (+/−5%) of wheat'. The increase was to cover 'the cost and charges for deviation, diversion, detention, demurrage, stranding and other costs associated with delivery of goods'.

## Allegation and inquiries: March 2003 to date

In May 2003 AWB learnt of rumours circulating that it had deposited funds into a Jordanian account in order to secure wheat sales under the Oil-for-Food Programme. It was rumoured that the monies ultimately benefited Saddam Hussein. AWB prepared talking points to be used in rebutting the rumours. The talking points agreed by Mr Whitwell and Mr Hockey, and subsequently used in substance to brief the Australian Government and to respond to inquiries, were:

- we did pay money into a Jordanian account for the inland transportation component of our contract

- this method was approved by the UN and signed off by the 661 Committee

- we are led to believe this was the same arrangement for all companies supplying wheat under OFF

- the method asked for by the Iraqis and agreed by the UN gave us no discretion with regard to inland transport

- the 20% 'kickback' is completely untrue – it is not in our contract and we do not pay a 20 percent deposit

- the payment is linked to vessel arrival in Umm Qasr and payments were correctly described and transparent

- we are led to believe it was monitored by the UN through the Office of Iraq Program

- it was consistent with the requirements of the UN resolution

- payment for the whole transaction was received through a UN approved LC.

In June 2003 US Wheat Associates wrote to the US Secretary of State, alleging that AWB was overcharging for wheat in contracts with Iraq. AWB responded by issuing a media release describing the allegations of inflated prices resulting in benefits to the Hussein family as 'absurd, with no foundation, and … an insult to Australian wheat farmers and damaging to our reputation'. AWB also wrote to US Wheat Associates denying the allegations. Copies of the press statement and letter were provided to the Australian Government, which conveyed to the US administration its concerns regarding the allegations by US Wheat Associates.

In June 2003 AWB received, initially from Mr Long in Baghdad and subsequently from DFAT, a copy of a memorandum from a Captain Puckett, a US officer working with the Coalition Provisional Authority. He indicated that work was being undertaken to identify contracts which had a 'kickback or surcharge (often 10%)' for the supply of goods to Iraq under the Oil-for-Food Programme. AWB responded to all inquiries in Captain Puckett's memorandum, except that identifying kickbacks or surcharges in its contracts. AWB knew, and had known since November 2000, that an additional, unexplained 10 per cent fee had been included in its wheat contracts, as required by the IGB.

## Project Rose

In June 2003, following the US Wheat Associates complaints, AWB established an internal investigation that became known as Project Rose. Mr Cooper, AWB's corporate counsel, was charged with leading the investigation. He engaged Mr Quennell, then of Messrs Blake Dawson Waldron, to conduct the inquiry. Mr Quennell was given instructions to conduct a factual review designed to gather

together all information within AWB relating to its dealings under the Oil-for-Food Programme and subsequently to provide advice regarding certain legal issues relating to those dealings. Mr Quennell gathered together some 30,000 emails, interviewed witnesses, accumulated documents, and from time to time briefed Mr Cooper, the Executive Leadership Group, and the joint Boards of AWB and AWB (International) regarding the factual matters so discovered and gave advice regarding certain legal issues. He briefed the Board on at least 16 occasions. He separately briefed the Chairman and Deputy Chairman. He provided draft advices, and he obtained advice from senior counsel. The Chairman, Deputy Chairman and Board of AWB claimed legal professional privilege in relation to the factual findings made by Mr Quennell and his briefings to the Executive Leadership Group, the joint Boards, and the Chairman and Deputy Chairman. Ultimately the Federal Court of Australia rejected the substance of that claim.

In May 2004 Mr Quennell briefed Mr Tracey QC concerning Project Rose. The brief noted the terms of the June 1999 tender called for by the IGB, which called for a price:

> CIF Free on Truck to silo at all governorate. Cost of discharge at Umm Qasr and land transport will be USD12.00 per metric tonne to be paid to the land transport co. For more details contact Iraqi Maritin in Basrah.

It noted that in the three contracts in July 1999 and in contract A4822 in October 1999 there was reference to 'the discharge cost will be a maximum US$12.00 and shall be paid by sellers to the nominated maritime agents in Iraq. This clause is subject to UN approval of the Iraq distribution plan'. Further, it noted that subsequent contracts included a clause similar to that last noted, however 'the signed contracts as submitted to the UN … did not include the above provision. Instead, the shipment clause made no reference to the discharge costs'. It noted the increase in the trucking fee from US$12.00 to US$47.45 and that prior to July 2000 payments of the trucking fee had been made by shipping companies. It referred to Mr Stott's letter of 30 October 2002 and DFAT's reply of 2 November 2000 but noted that AWB's letter had made no reference to the fact that 'as at 30 October 2000 the arrangements for payment of the trucking fee had already been in place for approximately eight months'. The brief instructed Mr Tracey:

> The documents which instructing solicitors have examined do not indicate whether the trucking fees paid by AWB to Alia can be regarded as a genuine payment for the provision of inland freight services actually provided by Alia. We have not seen any contract between AWB and Alia. We have seen no evidence to indicate whether or not the trucks used to transport wheat after its discharge at Umm Qasr were provided by Alia. We have seen no explanation as to how the trucking fee was calculated or the basis upon which the trucking fee was subsequently increased. The trucking fee does not appear to have been calculated with regard to the differing distances between Um Qasr and the various Governorates …

Mr Tracey gave oral advice on 25 May 2004. The same day Messrs Cooper and Quennell briefed the joint information session of both Boards. The minutes, for which

legal professional privilege was initially claimed but subsequently accepted by AWB to have been waived, stated:

  c)   The findings to date of the Project Rose investigation are as follows:

    1.   all AWB contracts were approved by the Office of the Iraq Program at the United Nations;

    2.   no evidence has been identified of any AWB knowledge that money paid to the Jordanian transport firm, Alia, was onpaid to the Iraq regime;

    3.   no evidence has been identified of payment of funds by AWB to any other person in relation to the OFF shipments; and

    4.   no evidence has been identified of payment of funds to any AWB employee by any other person in relation to OFF shipments.

  d)   That the Board would be kept informed of any additional findings that may emerge from the Project Rose investigations.

The following day the AWB Board was advised that:

  Legal advice

  Richard Tracey QC has been briefed and advised in conference today:

  (1)   No evidence of breach of relevant UN Resolution on sanctions (661)

  (2)   No evidence of breach of Australian domestic law

It is to be noted no mention was made in the brief that the first contract AWB had entered into with Alia regarding trucking of grain was in October 2003. Nor was there mention of the 10 per cent after-sales-service fee imposed from November 2000, the inflation of contracts A1670 and A1680 to recover the Tigris debt, or the proposal to repay the iron filings claim compensation to Iraq by means of the 'trucking mechanism'.

However, in June 2004 Mr Quennell provided a further memorandum of instructions to Mr Tracey, advising that Mr Quennell now understood the increase in trucking fees after November 2000. He advised that the increased trucking fee from that date was due to adding 10 per cent of the price per tonne by way of addition to the trucking fee. He also advised that the reason for the sharp reduction in the trucking fee payable in respect of contracts A1670 and A1680 was that they were executed after the fall of the Iraqi regime, and the reduction in price was agreed by AWB.

Mr Tracey, who had seen a memorandum prepared by Mr Hogan that indicated the inclusion of inland transport costs in the wheat price, was inquisitive. He asked whether that breakdown had been disclosed in contracts to the United Nations. He also asked whether there was commercial justification for the 10 per cent increase and

*Report of the Oil-for-Food Inquiry*

why AWB had agreed to reduce the price for contracts A1670 and 1680. Mr Quennell informed him that the contracts forwarded to the United Nations did not disclose the transportation fee, that there was no apparent commercial justification for the 10 per cent increase, and that it was thought that the Coalition Provisional Authority had required a reduction in post-conflict contracts.

With this information, Mr Tracey advised on 8 June 2004:

> In the absence of commercial justification for the introduction, increases and decreases in the trucking fee and the lack of specific approval for the fee and its quantum by the UN there is reason to suspect that the fee (or part of it) was used as a kick-back to the IGB or persons associated with it. Whether the money was so used can only be determined by an investigation of the finances of the Jordanian trucking company which was the recipient of the trucking fees.
>
> A further reason for suspecting the efficacy of the fee is Hogan's assertion that UN approval for its payment had been obtained. If this was not the case then a question arises as to why the assertion was made. Was it a deliberate attempt to mislead AWB management or did he make an honest mistake?
>
> None of this establishes that AWB or any of its employees is guilty of any offence or of breaching UN resolutions. What it does suggest is the need for further enquiries (if this is possible) to determine all the facts surrounding the payment of the trucking fee and, in particular, whether any part of it found its way to the IGB or any Iraqi officials.

It is likely that in June or July 2004 the Boards of AWB and AWB (International) learnt of Mr Tracey's advice. It is not known if they were informed of his reservations.

## Commencement of the Independent Inquiry Committee investigation

In March 2004, with the Independent Inquiry Committee investigation in the offing, Ms Armstrong of DFAT spoke to Mr Whitwell regarding AWB's contracts under the Oil-for-Food Programme. He told her 'AWB paid the Jordanian trucking company. The Jordanian trucking company might have made payments to the Iraqi's of their own volition'. Ms Armstrong wrote a ministerial memorandum to the Ministers for Foreign Affairs and Trade, in which she noted:

> AWB Ltd has strenuously denied US Wheat Associates' allegations that it paid kickbacks to the regime, advising that the relatively high prices for OFF-contracted wheat reflected the costs of insurance, on-the-ground distribution and technical support not just the cost of acquiring and shipping the grain. The Iraqi Grains Board delegation currently in Australia has advised that AWB Ltd has acted with propriety at all times in Iraq. The company concedes however that the Jordanian company handling local transport might, of its own volition, have provided kickbacks to the regime. Given the gravity of the allegations we have suggested to AWB Ltd that they may wish to provide more formal advice on their position to the Government. AWB Ltd is bound by the Commonwealth Criminal Code

which contains offences relating to bribery and corruption by Australian companies and their officials overseas.

Ultimately, in June 2004, a few days after Mr Tracey had provided the advice quoted, AWB, through Mr Lindberg, wrote to Minister Downer. The letter was settled by Messrs Cooper and Quennell, both of whom were aware of Mr Tracey's advice. The letter reiterated AWB's denial of wrongdoing. It made no mention of the reservations of Mr Tracey's advice or the then known fact that AWB had since November 2000 been paying an additional unexplained fee equivalent to 10 per cent of the contract price to Alia as a supposed trucking fee. AWB knew the 10 per cent was not in truth related to trucking.

## The Permanent Subcommittee on Investigations inquiry

In June 2004 AWB learnt of a proposed US Senate Permanent Subcommittee on Investigations inquiry into the Oil-for-Food Programme. It briefed US lawyers. A task force was established, which comprised, in addition to Australian and US lawyers, AWB staff from the Stakeholders Relations Division. About 20 meetings were held between June and November 2004. Privilege was claimed for all documents relating to those meetings. AWB sought Australian government help in putting representations to the PSI that AWB ought to be treated fairly in any such inquiry. Such representations were made in August and September 2004, following the provision of talking points to Australian officials by AWB.

The allegations regarding inflated payments to Iraq caused concern within the Wheat Export Authority, which perceived its function as being to ensure that the interests of wheat growers in the wheat pool were protected. In March 2004 the WEA had sought copies of contracts under the Oil-for-Food Programme and other information. This request had not been met. There was a joint meeting of the Boards of the WEA and AWB (International) on 27 July 2004. The AWB (International) Board did not inform the WEA of any matters it had learnt as a result of its briefings on Project Rose during the preceding 12 months or of any advice it had received from Mr Tracey.

On 28 July 2004 there was a joint information session for the Boards of AWB and AWB (International). By then, Mr Cooper had become aware that Alia was 49 per cent owned by the Iraqi Ministry of Transport. In preparation for a briefing of the joint Boards, slides were prepared to update the Boards with the then current knowledge gleaned from Project Rose. At the prior Board meeting it had been suggested that there be an investigation of the 'Alia structure, shareholding etc'. Management had decided not to conduct the investigation sought by the Board. Mr Quennell suggested to Mr Cooper that a slide be prepared showing what was known about Alia. Mr Cooper prepared such a slide. He reviewed his presentation with Mr Lindberg, who directed him to remove the slide from those to be presented to the Board. Whether Mr

Cooper informed the Board of the Ministry of Transport ownership of 49 per cent of the shareholding in Alia is not known. Mr Cooper's evidence was equivocal: the weight of evidence is that he did not.

In response to the WEA's request, AWB prepared a briefing paper in August 2004. That paper did not disclose the fact that the amount of payments for trucking fees was not disclosed on the face of any of the contracts. It did not disclose the unexplained 10 per cent increase in trucking fees, or the pre-payment of transportation fees, or that such fees were to be forwarded to the Ministry of Transport. Nor did it disclose that AWB knew that Alia was 49 per cent owned by the Ministry of Transport. Nor did it disclose the inflation of contracts A1670 and A1680 to recover the Tigris debt.

The WEA inspected and reviewed the contracts. Its concern was to determine whether the FOB price was at least that which it had been advised by AWB. That involved a netback calculation. The WEA satisfied itself that the prices were consistent with those previously notified to it, although it was accepted in evidence by the Chairman of the WEA that the WEA did not have the information necessary to enable it to do the netback calculation. The WEA was informed by AWB that the Coalition Provisional Authority had forced a 10 per cent reduction on all supplies of food imports to Iraq because it wanted to gain credibility with the Iraqis. In truth AWB knew that the 10 per cent reduction initially required was a removal of the after-sales-service fee, as had been highlighted in the brief delivered to Mr Tracey QC in June 2004. The WEA subsequently sought a written explanation of the 10 per cent reduction, but AWB failed to provide that information, notwithstanding that internally it prepared responses. Whilst those responses referred to the commercial reasons why AWB decided to accept the reduction, they did not address the true circumstance known to AWB—that the reduction was a removal of the 10 per cent after-sales-service fee.

In September 2004 the AWB (International) Board was given an update on Project Rose on two occasions. What was said is not known.

## Cooperation with the Independent Inquiry Committee

In November and December 2004 there were discussions between AWB and the Independent Inquiry Committee regarding the basis on which AWB would 'cooperate' with the IIC. The Australian Government encouraged AWB to cooperate fully, but AWB required that, before any interviews or provision of documents, there be an agreed protocol with the IIC. Such a protocol was agreed by February 2005. During negotiations for that protocol AWB was able to negotiate down its obligation of production to the IIC from 'all relevant documents' to an obligation to produce documents in specific categories the IIC sought. The IIC also sought interviews with 'AWB staff who were involved in discussions with Iraqi authorities including Andrew Lindberg, Michael Long, Trevor Flugge and Dominic Hogan'. Messrs Lindberg, Long

and Flugge were interviewed but Mr Hogan was not, he no longer being an employee of AWB. In April 2005 the IIC sought interviews with Messrs Whitwell, Watson, Emons, Stott and Edmonds-Wilson, but those interviews did not occur. Mr Hockey was interviewed in relation to his role as an AusAID adviser in Iraq.

AWB established a data room for use by the IIC. It contained 24,000 pages of documents falling within categories formulated in the memorandum of understanding with the IIC. Those were the documents initially made available to this Inquiry. They omitted many relevant documents briefed to Mr Tracey as being important. They did not contain any of the results of the investigations conducted by AWB in Project Rose.

In February 2005 AWB established a Working Group comprising the Chairman (Mr Stewart), Mr Lindberg, Mr Barry (Deputy Chairman and Chairman of the Audit Committee), Mr Polson (Chairman of the Group Corporate Risk Committee) and Mr Starr (Chairman, Compliance Committee). The Working Group was to 'oversee Project Rose matters and receive legal advice on an ongoing basis'. AWB claimed legal professional privilege relating to the briefing of the Working Committee on Project Rose. However, it must be assumed that that Committee, comprising all the senior Board members and the Chief Executive Officer, were fully briefed on the inquiries conducted by Project Rose, the factual findings it had made, and the advice it had received from Mr Tracey and other lawyers. Whilst privilege was claimed in relation to the minutes, Dr Fuller's notes of that meeting were tendered without objection. They refer to:

- Alia
- Trucking fees — reasonable
- Compliance UN conventions circumvented
- Iron Filings. Negotiation of quality claims — $6/tonnes — $5 tonne
- Tigris
- Governance–past/future
- Issues mg't — Geoff Owen
- Board oversight

His notes also record a Director, Mr Thame, indicating that, with the 'wisdom of hindsight. Wished hadn't done that', and his requesting that notification be given under the Directors and Officers insurance policy. They also record that Mr Lindberg apparently described the conduct of employees and documents discovered in Project Rose as containing 'blemishes' and 'there are some emails that could be misinterpreted or would not look good'.

After the IIC interviews in late February and early March 2005 there were discussions within the Project Rose Committee on 4 March and 10 March. Following briefing of the Boards of AWB and AWB (International) on 10 March 2005, Mr Quennell asked Mr Tracey for further advice in the light of 26 documents apparently referred to by the IIC investigators.

Later in March 2005 AWB prepared documents to brief DFAT on the IIC meetings. It appears from the briefing that AWB had informed the IIC that AWB had conducted its own legal review, which had found no evidence of corruption by AWB or officials, no side payments or after-sales payments to individuals of the former regime, and no payments by the regime to former or existing AWB representatives. It made no mention of the 10 per cent after-sales-service fees, the Tigris transaction, the agreed arrangement for payment of the iron filings compensation through the inland transportation mechanism, or knowledge that Alia was 49 per cent owned by the Iraqi Ministry of Transport. Before AWB gave its presentation to DFAT, the content of that to be disclosed was cleared by AWB's lawyers.

In April 2005 the Wheat Export Authority Board was advised that the WEA had been unable to cooperate with the IIC because AWB declined to allow it to provide documents to the IIC. In those circumstances confidentiality constraints restricted it from doing so.

In April 2005 there were meetings between AWB, Mr Hargreaves, who was the Manager of Project Rose, and AWB's US lawyers. AWB also met with Ambassador Thawley and other Australian diplomats in the United States. Those diplomats were given an assurance by Mr Hargreaves that 'AWB had not done anything wrong under the OFFP Programme'.

On 22 April 2005 there was a Joint Board Committee meeting on the subject of Project Rose. The meeting was said to be 'a forum of directors of AWB Limited and AWB (International) Limited to discuss Project Rose, to receive legal advice in relation to Project Rose, and if necessary, to provide advice to the respective Boards'. Privilege was claimed concerning those discussions and the discussions at subsequent meetings, on 27 April and 24 May. However, Dr Fuller's notes of the meeting on 27 April record, 'Major exposure. Strong defences—but the headlines. Major implications for our business overseas and whether this company is fit to hold the Single Desk'.

On 1 June 2005 AWB briefed the Australian Government concerning the IIC Inquiry. It maintained its position that it had been obliged to use Alia and had not been aware of it being part-owned by the Iraqi Ministry of Transport until 2004.

In June 2005 AWB representatives travelled to Washington DC, where they updated Australian Embassy staff on the progress on the IIC report, was then expected in July or August. They also appointed advisers to manage AWB's media profile following

publication of the report. The embassy agreed to talk with AWB and recommend consultants in media management, but only on the basis that it had a firm assurance from AWB that it 'had not been involved in any kickbacks or wrong doing, and that it is being completely upfront with us and not hiding anything'. The embassy was given that assurance. It was said that AWB had conducted its own internal audit and legal review and no wrongdoing had been found. AWB denied it was aware that Alia was channelling money to Iraq, denied that Alia was a front company, and denied that it had not been providing trucking services. It also denied any overpricing.

However, at a later meeting with an embassy official, Mr Hargreaves said, 'I have also learnt that Alia had asked for an increase in the trucking fees of 10% in 2000 which AWB had agreed to pay. This increased progressively to 35–45% of the trucking fees by the end of the Oil-for-Food Programme. Alia is a Jordanian company. AWB had paid Alia in Jordan. AWB did not pay any money to Iraq'.

There were briefings to the Board on Project Rose and meetings with government in Canberra in June 2005 and embassy officials in Washington in July 2005. On 12 August 2005 Mr Tracey QC provided a memorandum said to confirm his prior oral advice given in May 2004. After noting that there were passages in various documents with which he had been briefed that were suggestive of the possibility that the trucking fee was, in fact, a payment by AWB to the IGB in contravention of Resolution 661, Mr Tracey concluded that the material was insufficient to establish such a conclusion. He advised:

> 22. … The absence of any documentation evidencing the commercial basis for the fixing of the trucking fee at various rates and the absence of any contract with Alia may be taken as suggesting the existence of a bogus arrangement under which money was paid through Alia to Iraqi authorities for a purpose other than payment for the provision of trucking services. On the other hand, it may be that the payments were in the nature of an incentive to make it worth the while of Alia to provide more trucks to clear the wheat. … That said, the absence of a contract between AWB and Alia is surprising. However, the evidence does not go so far as to suggest that none was ever entered into.

> 23. It is also of concern that the Department of Foreign Affairs and Trade was not told, when its advice was sought in late 2000, about these pre-existing events. The AWB gave the Department the impression that the demurrage problem had only recently arisen and that the trucking fee solution was about to become the subject of negotiations with Alia. …

> 24. Ultimately, however, the question that I was asked to advise on was whether there was evidence that AWB may have contributed to a contravention by Australia of its obligations under Resolution 661. A breach of that resolution would only have occurred if the trucking fees had been paid to the IGB or the Iraqi Government and then only if it was not paid for a legitimate commercial purpose. Whilst some of the material with which I have been briefed raises suspicions that there may have been a perception within the AWB that any payment of the trucking fee may have contravened Resolution 661 and that it was necessary to make the payment to Alia in order to avoid any suggestion that the payments, if made directly to the IGB, would have been in breach of the Resolution, there is absolutely no evidence in the material provided to me that any of the money paid by the AWB to Alia was ever

forwarded to the IGB or any other arm of the Iraqi Government. It was for this reason, that, despite some misgivings I answered the question posed for advice in the negative.

It is to be observed that, in relation to quoted paragraph 22, it was well known within AWB that there was no agreement with Alia prior to October 2003: had there been such an agreement there would have been no need to enter into one at that time. Further, in relation to paragraph 23, Mr Tracey rightly noted the misleading nature of Mr Stott's letter of 30 October 2000. Further, in relation to paragraph 24, whilst Mr Tracey may not have been briefed with the evidence, the material before this Inquiry makes clear that Mr Hogan and other senior officials of AWB had no doubt that the monies paid to Alia were in truth being paid to the IGB or another arm of the Iraqi Government. Further, as was noted in the trip report of January 2001, it was recognised within AWB that the additional 10 per cent surcharge was a method of syphoning off funds from the UN escrow account to be paid to Iraq.

On 8 September 2005 Dr Fuller sent a memorandum to the directors and members of the Executive Leadership Group addressing the forthcoming IIC report. It stated, 'AWB paid a legitimate transport company, based in Jordan and that company provide a genuine service that was critical in successfully distributing wheat to people throughout Iraq'; and, further, that DFAT had expressed to AWB in November 2000 the view that payment of trucking fees at the direction of the IGB to enable distribution of wheat to the Iraqi people was consistent with Resolution 661.

Each of those statements was erroneous. AWB had known at least since Mr Hogan's note, made in May 2001, of how the transportation system worked, and that Alia did not provide a genuine trucking service. It had been known since at least January 2001 that the additional 10 per cent surcharge was a method of syphoning monies from the UN account for payment to Iraq. DFAT's letter of 2 November 2000 did not say that payment of trucking fees at the direction of the IGB to enable distribution of wheat was consistent with Resolution 661. It was not asked to express a view on that issue and it had not done so. The letter of November 2000 was a response to Mr Stott's letter of 30 October 2000, which sought to set up a position where AWB could claim DFAT had approved its trucking arrangements in Iraq—without truthfully telling DFAT what those arrangements were—when in fact DFAT had not.

In September 2005 AWB's present lawyers, Arnold Bloch Leibler, sought an opinion from Sir Anthony Mason, a former Chief Justice of Australia. Advice was sought in relation to:

(i) Did the inclusion, on the insistence of the Iraqi Grain Board (IGB), of an inland delivery payment term in its wheat contracts with AWB violate the UN sanctions against Iraq that started with Resolution 661 in 1990 and continued until the Oil-for-Food Program ended in 2003?

**Answer:** No, so long as the price stipulated was reasonable.

(ii)  Did the UN Sanctions Resolutions prohibit AWB from paying fees for the inland delivery of wheat to a transport company?

**Answer:** So long as the fees were reasonable AWB could reasonably conclude that the payment of such fees was consistent with the Sanctions Resolutions.

(iii)  Whether the payment of inland transport fees by AWB could fall within cl. 4 of Resolution 661.

**Answer:** The payment of unreasonable fees could fall within the prohibition contained in cl. 4 of Resolution 661.

(iv)  Do the materials presented to me support a finding that AWB knew or ought to have known that the payments of inland transportation fees which it made were illicit payments to, or for the benefit of, the Iraqi Government?

**Answer:** As to actual knowledge, no. As to "ought to have known", the position is not as clear. Although the evidence of steep increases in transportation fees invites suspicion, there are strong arguments that it should not be inferred that AWB ought to have known that the payments were being channelled to the Iraqi Government.

The answers were delivered on 24 October 2005. AWB knew that the fees paid to Alia for transportation services were unreasonable. They had increased from US$12.00 per tonne to US$55.00 per tonne without explanation or query. They included a 10 per cent factor unrelated to transport.

In September 2005 AWB sought a meeting with Mr Volcker, the Chairman of the Independent Inquiry Committee. Mr Downer, the Minister for Foreign Affairs, met Mr Volcker on 22 September 2005, when he advanced the position of AWB as it had advised it to him.

On 27 September 2005 AWB met with DFAT officers, still maintaining it had actually used the transport services of Alia. It again stressed that its internal investigations and external legal advice showed it had not breached sanctions.

Having seen the draft findings of the IIC report, and in particular statements by Alia in that report, AWB sent Mr Long to Jordan to meet Alia. On 4 October 2005 the way in which the trucking system operated was explained to him. He was informed that, in relation to the trucking fee, AWB paid Alia, which in turn paid the monies to the Iraqi State Company for Water Transport, which in turn paid them to the Ministry of Transport within the Iraqi Government. This was conveyed by email to Arnold Bloch Leibler and Mr Lindberg. The same day, Mr Stewart and Mr Lindberg briefed Mr Downer in Canberra, presumably unaware of Mr Long's email. They maintained to Mr Downer that Alia was not a front company and had provided transportation services and that AWB had been unaware of any wrongdoing and had used Alia's services in good faith. Again, they advised of the results of the internal investigation. Mr Lindberg maintained that at every stage AWB had sought and received approval

to use Alia, and that the United Nations had known all the time about its use of Alia. Neither statement was true.

The Chairman and Chief Executive Officer of AWB, and AWB's legal advisers, met with Mr Volcker in New York on 12 October 2005. They provided a letter to Mr Volcker, asserting that:

- AWB did not view Alia to be a front company for the Iraqi Government.

- AWB was never informed of any after-sales-service fee and never made payments characterised as such.

Neither statement was true.

Ultimately, on 25 October 2005, two days before the issue of the IIC report, AWB wrote to the IIC suggesting that the fairest interpretation of the circumstances was that 'AWB was an unwitting participant in an elaborate scheme of deception devised by the regime'. In fact, from mid-1999, AWB had been a willing participant in the scheme with the full knowledge of then senior management and the then Chairman, such participation being known to be necessary to retain the Iraqi wheat trade.

On 26 October 2005 AWB advised the Australian Government of the findings the IIC would make and forwarded a copy of Sir Anthony Mason's opinion.

On 27 October 2005 the IIC issued its final report.

In November 2005 the Wheat Export Authority requested from AWBI a detailed brief on the 'operation of the escrow account for Australian wheat sales under the OFF Programme' and 'how the payments for transport made under the OFF Programme worked'. A brief was provided on 14 November 2005. However, that brief did not disclose:

- the 10 per cent after-sales-service fee or that it was paid through Alia

- that the IGB set the rate for transport and directed the use of Alia

- the inflation of contracts A1670 and A1680 to recover the Tigris debt

- that Alia on-paid transport fees to the Ministry of Transport

- that use of the inland transportation mechanism was one of the means discussed with Iraq for the payment to it of the iron filings compensation.

On 21 November 2005 there was a joint information session of both Boards. Project Rose was renamed Project Lilac to respond to this Inquiry, and a briefing regarding

this Inquiry was given. There was a further update given to the Boards on 13 December 2005. AWB claimed privilege over the minutes of those meetings.

In December 2005 AWB engaged Dr Sandman to provide crisis management and public relations advice regarding AWB's involvement in this Inquiry. Dr Sandman advised that AWB should 'essentially over apologise, to apologise for things that had happened, to cover the ground and in fact to go further than was necessary, and that it was in the interests of the corporation to do so in terms of its public reputation and recovery from events'. In considering that advice, Mr Lindberg drafted a document headed 'Cole Inquiry—Draft Statement of Contrition—Andrew Lindberg'. The document stated:

1. As a result of the Volker inquiry into the OFF program AWB accepts that in paying money for inland transportation and after sales service it paid money to the Iraq government in contravention of the UN sanctions.

2. Even though there were warning signs to some employees that this may have been occurring AWB did not challenge these payments and was not alert to the potential consequences of making these payments. For this we are truly sorry and deeply regret any damage this may have caused to Australia's trading reputation, the Australian government or the United Nations.

3. AWB in pursuing its constitutional requirement to maximise returns to the Australian farmer in selling their wheat took a commercial and technical compliance approach to the UN sanctions but failed to consider the broader purposes of the UN sanctions. This was a failure, at the time, of the culture, systems and procedures which the Company deeply regrets and is committed to continuing to improve.

4. Even though the transaction concerning BHP Petroleum in recovering payment for a prior wheat shipment was well intentioned and AWB believed complied with the UN sanctions, it should not have occurred without specific authorisation of the Australian government and the United Nations. AWB regrets this did not occur.

5. Even though AWB relied on the United Nation's supervision and authorisation of each contract the Company should have established its own internal systems of checks and balances such that it did not participate (and may have even aided stopping) the systematic and wide spread abuse of the OFF program. We deeply regret and apologise for not having done so.

6. While AWB can ex-post rationalise its participation in the OFF Program and claim it did not have the benefit of hindsight or the complete picture this does not excuse what occurred and is not offered as an excuse. We simply should have done better; and I am deeply sorry we didn't.

AWB claimed privilege for this document, asserting that it was delivered to the Inquiry by mistake. That claim was rejected by me and by the Federal Court of Australia. However, Mr Lindberg decided not to make the statement of contrition to the Inquiry.

On 12 January 2006, four days before the commencement of this Inquiry's public hearings, a joint information session was attended by AWB executives and legal advisers. AWB claimed privilege for Dr Fuller's notes of this meeting, although there was evidence given by directors concerning what, at least in part, was said.

# EXHIBIT 4

Table 7

*Independent Inquiry Committee into the United Nations Oil-for-Food Programme*

## Actual and Projected Illicit Payments on Contracts for Humanitarian Goods
### Summary by Supplier (All Amounts in USD)

Referenced in the Report as "Committee humanitarian summary kickback table"

| Supplier | Mission Country | Goods Categories | Number of Qualifying Contracts | Contract Face Value | Contract Disbursements | Levied ASSF | Paid ASSF | Inland Transportation Fees | Company Response (see note) |
|---|---|---|---|---|---|---|---|---|---|
| ATLAS COPCO AIRPOWER | BELGIUM | AIR COMPRESSOR PARTS, AIR COMPRESSORS WITH ACCESSORIES AND SPARE PARTS, AIR COMPRESSORS, AIR COMPRESSORS W/AIR DRYERS & SPARES, AIR COMPRESSORS W/SPARES, AIR COMPRESSORS W/JACKHAMMERS W/ACCESSORIES, AIR COMPRESSORS WITH AIR DRYERS AND SPARES; AIR COMPRESSORS WITH SPARES; AIR COMPRESSORS/SPARE PARTS; ATLAS COPCO COMPRESSOR + DRYER, COMPRESSOR; PARTS, ATLAS COPCO COMPRESSORS/SPARE PARTS, COMPRESSOR SPARE PARTS, COMPRESSOR W/ ACCESSORIES AND SPARES, COMPRESSORS/ACCESSORIES; COMPRESSORS/PARTS, CRAWLER DOZER AND SPARE PARTS; DIESEL GENERATING SETS W/ SPARE PARTS & ACCESSORIES; DIESEL GENERATORS/SPARE PARTS, DIESEL TRUCKS MOUNTED COMPRESSORS/SPARE PARTS, ELECTRICAL EQUIPMENT & SPARES, EMERGENCY DIESEL POWER GENERATORS, JACK HAMMERS WITH PINS AND HOSES; LIGHTING EQUIPMENT AND ACCESSORIES; LIGHTING GENERATORS WITH SPARES; MACHINES & EQUIPMENT FOR WORKSHOPS W/SPARES; MAINTENANCE & OPERATION OF EXISTING FACILITIES; STORAGE & COOLING PLANT CONSIST OF SPARES FOR COMP.; MAINTENANCE TOOLS, MECHANICAL SPARES LPG FILLING PLANT.; MEDICAL MACHINES, MOBILE AIR COMPRESSO | 40 | 15,199,888 | 15,625,527 | 1,302,698 * | 1,305,515 * | † | B |
| ATLAS COPCO CMT | SWEDEN | GOODS FOR WATER SANITATION, HYDRAULIC CRAWLER DRILL; SPARE PARTS FOR RIG, WATER AND SANITATION SUPPLIES | 1 | 538,000 | 511,100 | * | - * | † | B |
| ATLAS INDUSTRIAL | JORDAN | MERCEDES BENZ SALOON, RIBBON; TRUCK WITH SPARES | 1 | 5,103,673 | 1,169,295 | 500,000 * | 114,553 | † | F |
| AUSTRALIAN WHEAT BOARD (AWB) LTD | AUSTRALIA | AUSTRALIAN WHEAT; WHEAT | 19 | 1,536,280,854 | 1,378,428,243 | 96,638,260 | 82,482,748 * | 139,274,494 | D |
| AUSTROPLAN - AUSTRIAN ENGINEERING CO. LTD. | AUSTRIA | CONSUMABLE MATERIALS FOR PRODUCTION OF LGP CYLINDERS; DIES FOR MANUFACTURE OF GUARD RINGS & CUTTERS; HEAVY EQUIPMENT, LPG FILLING PLANTS, MACHINE & EQUIPMENT FOR LPG CYLINDER REPAIR & TESTING; MANIPULATOR FOR CYLINDER PAINTING UNIT FOR LPG CYLINDERS; PRODUCTION LINES FOR LPG CYLINDERS, QUALITY CONTROL EQUIPMENT, SPARE PARTS FOR CYLINDER WORKSHOPS; SPARE PARTS FOR EQUIPMENT & MACHINES; SPARE PARTS FOR GAS CYLINDER; SPARE PARTS FOR KUIT MANUFACTURING PLANT; SPARE PARTS FOR LPG CYLINDER KUIT PLANT & DIES/PRESS; SPARE PARTS FOR LPG PLANTS, SPARE/EQUIPMENT FOR CYLINDERS FACTORY, SPARES FOR DIES FOR THE MAINTENANCE OF LPG CYLINDERS, SPARES FOR EQUIPMENT, SPARES FOR LPG CYLINDER KUIT MANUFACTURING PLANT (SPINDLE MACHINES); SPARES/EQUIPMENT FOR CYLINDERS; TOOLS & APPLIANCES FOR INSPECTION FOR CYLINDER WORKSHOPS W/SPARE PARTS; TOOLS & APPLIANCES WITH SPARE PARTS FOR FORMING BASE; VALVE/PARTS | 5 | 4,017,776 | 4,359,948 | 365,215 * | 336,373 * | † | F |
| AUTO DEVELOPMENT CO. LTD. | EGYPT | AGRICULTURAL VEHICLE W/SPARES, BRAKE DOWN CARS AND SPARE PARTS, TANKER, TRUCKS AND SPARE PARTS, VEHICLE, WATER TANKER, WATER TANKER W/SPARE PARTS | 1 | 60,782,640 | 71,449,740 | 5,742,000 * | 6,751,870 | † | F |

Note:  For a description of referenced and other information, refer to the explanation of Committee tables and the accompanying notes at the end of the table.

**Footnotes:**

∗ Represents contracts where the amount reported is based entirely on actual data.

† Represents contracts where inland transportation fee was required but no specific information was available.