UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

SAADYA MASTAFA and KAFIA ISMAIL,

                      Plaintiffs,

        - against -

AUSTRALIAN WHEAT BOARD LIMITED a/k/a
AWB LIMITED and AWB (U.S.A.) LIMITED; and
BNP PARIBAS,

                    Defendants.

:
:
:
:
:
:
:
:

Civil Action No.
07-CV-7955 (GEL)

ECF CASE

-------------------------------------------------------------- x

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF
DEFENDANT BNP PARIBAS TO DISMISS PLAINTIFFS'
CLASS ACTION COMPLAINT**

Robert S. Bennett
Alan Kriegel
Jennifer L. Spaziano (pro hac vice)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Avenue NW
Washington, DC 20005
(202) 371-7000
Email:  jen.spaziano@skadden.com

William J. O'Brien, III
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Email:  wobrien@skadden.com

Attorneys for Defendant BNP Paribas

## TABLE OF CONTENTS

TABLE OF AUTHORITIES....................................................................................iii

PRELIMINARY STATEMENT ........................................................................ 1

FACTUAL BACKGROUND ............................................................................ 5

    A.    The Parties.............................................................................. 5

    B.    The Programme ...................................................................... 6

    C.    The Alleged Payments to the Hussein Regime .................................... 7

ARGUMENT ................................................................................................ 8

I.    THE COMPLAINT SHOULD BE DISMISSED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1) FOR LACK OF SUBJECT MATTER JURISDICTION BECAUSE PLAINTIFFS DO NOT HAVE CONSTITUTIONAL STANDING ................................................................ 8

    A.    Plaintiffs' Alleged Injuries Resulted From The Independent Acts Of The Hussein Regime ............................................................... 11

    B.    Plaintiffs Do Not Specify How The Alleged Payments To The Hussein Regime Contributed To Their Asserted Injuries ................................. 11

    C.    Plaintiffs Do Not Allege Facts From Which It Reasonably Could Be Inferred That They Would Not Have Been Injured Absent Defendants' Alleged Conduct ................................................................... 12

II.    PLAINTIFFS' CLAIMS UNDER THE ALIEN TORT STATUTE SHOULD BE DISMISSED PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6) BECAUSE PLAINTIFFS FAIL TO ALLEGE THAT THE BANK VIOLATED CUSTOMARY INTERNATIONAL LAW OR A SELF-EXECUTING TREATY OF THE UNITED STATES........................................ 16

    A.    The Complaint Does Not Allege That The Bank Engaged In Conduct That Violated Customary International Law ............................................... 17

        1.    Plaintiffs do not—and cannot—allege that the Bank aided and abetted the Hussein Regime's alleged violations of international law ................................................................... 17

        2.    Plaintiffs do not—and cannot—allege that the Bank conspired to commit a violation of international law ................................. 22

B.      The Complaint Does Not Allege That The Bank Engaged In Conduct That Violated A Treaty Of The United States............................................................. 23

III.    PLAINTIFFS' CLAIMS UNDER THE TORTURE VICTIM PROTECTION ACT SHOULD BE DISMISSED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) FOR FAILURE TO STATE A CLAIM AGAINST THE BANK............................................................................................................................ 24

IV.     PLAINTIFFS' SUPPLEMENTAL TORT CLAIMS FAIL AS A MATTER OF LAW ......................................................................................................................... 26

        A.      Plaintiffs Do Not Allege That The Bank Is Primarily Liable To Them For The Supplemental Tort Claims........................................................................... 26

                1.      Plaintiffs' failure to allege a causal connection between the Bank's conduct and their alleged injuries is fatal to all of the Supplemental Tort Claims ........................................................................................... 26

                2.      Plaintiffs' failure to allege a specific duty owed by the Bank is fatal to their claims for wrongful death, negligence and negligent infliction of emotional distress.................................................................. 27

        B.      Plaintiffs Do Not Allege Facts Sufficient To State A Claim Against The Bank For Aiding And Abetting Any Of The Supplemental Tort Claims ............. 29

        C.      Plaintiffs' Supplemental Tort Claims Are Barred By The Applicable Statutes Of Limitations ....................................................................................... 30

CONCLUSION ................................................................................................................ 31

# TABLE OF AUTHORITIES

**Cases**

Akins v. Glens Falls City School Dist., 53 N.Y.2d 325 (N.Y. 1981)...........................................26

Allen v. Wright, 468 U.S. 737 (1984).............................................................................. 10, 11-12

Almog v. Arab Bank PLC, 471 F. Supp. 2d 257 (E.D.N.Y. 2007) ..................................19-20, 21

Arndt v. UBS AG, 342 F. Supp. 2d 132 (E.D.N.Y. 2004)......................................................16, 25

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007)..........................................8

Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955 (2007) .....................................2, 8, 17, 19

Bigio v. Coca-Cola Co., 239 F.3d 440 (2d Cir. 2001) ..........................................................12, 16

Corrie v. Caterpillar, Inc., 403 F. Supp. 2d 1019 (W.D. Wash. 2005),
    aff'd, 503 F.3d 974 (9th Cir. 2007)...........................................................................14, 25

Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42 (2d Cir. 1991)...........................................5

D'Amico v. Christie, 71 N.Y.2d 76 (N.Y. 1987)........................................................................28

DaimlerChrysler Corp. v. Cuno, 126 S. Ct. 1854 (2006) ...................................9, 10, 11

Dalton Farms Assocs. v. Baker, 704 F. Supp. 460 (S.D.N.Y. 1989)..........................................15

Dellums v. United States Nuclear Regulatory Comm'n,
    863 F.2d 968 (D.C. Cir. 1988) .......................................................................13, 14, 15

Demjanjuk v. Meese, 784 F.2d 1114 (D.C. Cir. 1986)................................................................23

First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 (2d Cir. 1994) .................................8

Flores v. S. Peru Copper Co., 414 F.3d 233 (2d Cir. 2003)..................................................16, 23

Freihofer v. Hearst Corp., 480 N.E.2d 349 (N.Y. 1985)...........................................................27

Fund for Animals v. Babbitt, 2 F. Supp. 2d 570 (D. Vt. 1997)...................................................14

Greenberg v. Bush, 150 F. Supp. 2d 447 (E.D.N.Y. 2001) .........................................9, 12, 14, 15

Hamdan v. Rumsfeld, 126 S. Ct. 2749 (2006) ..........................................................................22

Hamilton v. Beretta U.S.A. Corp., 96 N.Y.2d 222 (N.Y. 2001) .................................................27

Higgins v. Hamilton, 794 N.Y.S.2d 421 (N.Y. App. Div. 2005)................................................26

In re African-American Slave Descendants Litig., 304 F. Supp. 2d 1027 (N.D. Ill. 2004),
    aff'd in part, 471 F.3d 754 (7th Cir. 2006) ...................................................................... 15

In re Bayou Hedge Funds Inv. Litig., 472 F. Supp. 2d 528 (S.D.N.Y. 2007) ............................. 29

In re Sinaltrainal Litig., 474 F. Supp. 2d 1273 (S.D. Fla. 2006) ................................................ 23

In re South African Apartheid Litig., 346 F. Supp. 538 (S.D.N.Y. 2004) ................................... 25

Khulumani v. Barclay Nat'l Bank Ltd., 504 F.3d 254 (2d Cir. 2007) ................................. passim

Khulumani v. Barclay Nat'l Bank Ltd., Nos. 05-2141, 05-2326,
    2007 U.S. App. LEXIS 27351 (2d Cir. Nov. 27, 2007) .................................................. 18

Kramer v. Time Warner, Inc., 937 F.2d 767 (2d Cir. 1991) ......................................................... 5

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ........................................................... 9, 11

Lunney v. United States, 319 F.3d 550 (2d Cir. 2003) ................................................................. 8

Makarova v. United States, 201 F.3d 110 (2d Cir. 2000) ............................................................ 8

Mason v. Am. Tobacco Co., 346 F.3d 36 (2d Cir. 2003) ............................................................ 5

McCarthy v. Olin Corp., 119 F.3d 148 (2d Cir. 1997) ............................................................... 28

McGehee v. Albright, 210 F. Supp. 2d 210 (S.D.N.Y. 1999) ..................................................... 14

Mortise v. United States, 102 F.3d 693 (2d Cir. 1996) .............................................................. 27

Papasan v. Allain, 478 U.S. 265 (1986) .................................................................................... 19

Perl v. Burkes, 14 Misc. 3d 1237(A), 2007 WL 673662 (N.Y. Sup. Ct. 2007) .......................... 27

Presbyterian Church of Sudan v. Talisman Energy, Inc.,
    244 F. Supp. 2d 289 (S.D.N.Y. 2003) .................................................................... 20-21

Presbyterian Church of Sudan v. Talisman Energy, Inc.,
    453 F. Supp. 2d 633 (S.D.N.Y. 2006) .................................................................... 21, 22

Prescient Acquisition Group, Inc. v. Perfect Circle Entm't, Inc., No. 05 Civ. 6298 (PKC),
    2006 WL 2136293 (S.D.N.Y. July 31, 2006) .................................................................. 5

Ramos v. Patrician Equities Corp., 765 F. Supp. 1196 (S.D.N.Y. 1991) ...................................... 9

Ryan v. Hunton & Williams, No. 99-CV-5938,
    2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ............................................................... 29

Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26 (1976) ................................................ 9, 10, 11

iv

Sterling Nat'l Bank v. Ernst & Young, LLP, 2005 WL 3076341 (N.Y. Sup. Ct. 2005)...............29

Stutts v. De Dietrich Group, 03-CV-4058,
    2006 WL 1867060 (E.D.N.Y. June 30, 2006) ........................................................ passim

Universal Licensing Corp. v. Paola del Lungo S.p.A., 293 F.3d 579 (2d Cir. 2002)...................16

Warth v. Seldin, 422 U.S. 490 (1975)..........................................................................9, 10, 12, 14

Weizmann Inst. of Sci. v. Neschis, 229 F. Supp. 2d 234 (S.D.N.Y. 2002) ....................................8

**Statutes and Rules and Other Authorities**

28 U.S.C. § 1331.............................................................................................................................16

28 U.S.C. § 1332.............................................................................................................................16

28 U.S.C. § 1350...................................................................................................................... passim

28 U.S.C. § 1367.............................................................................................................................17

Torture Victim Protection Act of 1991, Pub. L. No. 102-256,
    106 Stat. 73 (March 12, 1992) .......................................................................................24

Fed. R. Civ. P. 12....................................................................................................................... passim

136 Cong. Rec. S17,486-92 (Daily Ed. Oct. 27, 1990) ...............................................................23

S. Rep. No. 102-249 (1991) ..........................................................................................................25

N.Y. C.P.L.R. § 203.......................................................................................................................30

N.Y. C.P.L.R. § 214.......................................................................................................................30

N.Y. C.P.L.R. § 215.......................................................................................................................30

N.Y. Est. Powers & Trusts Law § 5-4.1(1) ..................................................................................30

Lee S. Kreindler et al., N.Y. Practice Series − N.Y.L. of Torts § 15:6 (4th ed. 2007)................26

Restatement (Second) of Torts § 46(1)..........................................................................................27

Defendant BNP Paribas (the "Bank") respectfully submits this memorandum of law in support of its Motion to Dismiss Plaintiffs' Class Action Complaint (the "complaint") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## PRELIMINARY STATEMENT

As a result of Iraq's invasion of Kuwait in August 1990, the United Nations ("U.N.") Security Council adopted Resolution 661, a sanctions regime that severely restricted transactions between U.N. member states and Iraq. On April 14, 1995, the Security Council passed Resolution 986, which established the Oil-for-Food Programme (the "Programme"), as a limited exception to the sanctions regime. In essence, the Programme permitted the Saddam Hussein-led Iraqi Government (the "Hussein Regime"), under the auspices of the Security Council, to enter into contracts for the sale of state-owned oil, and for the purchase of humanitarian supplies and certain other goods and services to be paid for from the proceeds of its oil sales. In order to implement the Programme, the U.N., among other things, entered into an agreement with the Bank, pursuant to which the Bank provided non-discretionary banking services to the U.N. These services included the establishment of the U.N. Iraq Account, into which the proceeds of Iraqi oil sales were deposited and from which suppliers of goods pursuant to the Programme were paid.

The complaint asserts that Plaintiffs are Kurdish women residing in Erbil, Iraq, whose husbands were imprisoned, and ultimately killed, by the Hussein Regime. Plaintiffs purport to bring this action on behalf of "[a]ll persons or their surviving immediate family members who were victims of torture, extrajudicial killings, disappearances, rape and/or murder by and through the actions of the Hussein Regime within the territory of Iraq from 1996 through March 2003." (Compl. ¶ 69.) Through this action, Plaintiffs seek to hold the Bank responsible for these alleged

atrocities committed by the Hussein Regime. Notwithstanding the horrific nature of their claims, Plaintiffs' complaint contains few factual allegations; the vast majority of its paragraphs recite "labels and conclusions" that do not satisfy a plaintiff's pleading obligations under <u>Bell Atl. Corp.</u> <u>v. Twombly</u>, 127 S. Ct. 1955, 1965 (2007).

Plaintiffs allege in conclusory terms that the Hussein Regime violated international law by openly and routinely committing torture, causing forced disappearances, and committing widespread extrajudicial killings. They further allege that, to secure its participation in the Programme, defendant AWB Limited ("AWB") paid hard currency in the form of "inland transportation" and "after sales service" fees to the Hussein Regime in violation of U.N. sanctions. Plaintiffs then conclude, without any factual support, that AWB's payment of such currency constituted substantial assistance and encouragement to the Hussein Regime sufficient to hold AWB—and the Bank—liable to Plaintiffs (and the purported class) for violations of international law allegedly committed by the Hussein Regime.

Plaintiffs do not allege that the Bank committed any acts of torture, forced disappearances or extrajudicial killings. Nor do they allege that the Bank paid hard currency to the Hussein Regime. Plaintiffs do not even allege that the Bank knew that payments of hard currency were being made to the Hussein Regime. In fact, in its 198 paragraphs and its 87 pages of exhibits, all that the complaint alleges with respect to the Bank is the following:

- "BNP Paribas maintained and operated an office within the Southern District of New York during all times relevant which it used to conduct activity related to the escrow account complained of herein." (Compl. ¶ 12.)

- "Defendant Banque Nationale de Paris S.A. ('BNP Paribas') is a French Bank headquartered at 16 Boulevard des Italiens, 75009 PARIS, France and has a United States location at BNP Paribas, 787 Seventh Avenue, New York, NY 10019. BNP Paribas is one of the ten largest banks in the world. It has about 150,000 employees and operates in over 85 countries. It is a full service bank with core businesses including, Corporate and Investment Banking, Retail

2

Banking, Asset Management and Services, Real Estate Investment Company, and Capital Investment Group."  (Compl. ¶ 28.)

- "Defendants AWB and BNP Paribas conducted itself [sic] with utter disregard for the law and the sanctity of human life."  (Compl. ¶ 30.)

- "All illicit payments made by Defendant AWB to the Saddam regime were made possible by the Defendant BNP Paribas."  (Compl. ¶ 37.)

- "All illicit payments by Defendant AWB were made directly to the UN escrow account which was exclusively [sic] by BNP Paribas."  (Compl. ¶ 38.)

- "The Defendant BNP Paribas aided and abetted the Saddam Hussein regime by knowingly providing knowing practical assistance and/or encouragement through offering and providing an escrow account where the funds were held, analyzed for compliance with the Security Counsel [sic] Resolution 986, and nevertheless disbursed to the Saddam Hussein Regime and used in furtherance of the actions herein complained of."  (Compl. ¶ 85; see also id. ¶¶ 94, 101, 111, 120, 130, 139, 158, 167, 175, 186, 195.)

When stripped of their legal conclusions, all that these paragraphs allege is that the Bank administered the U.N. Iraq Account under its agreement with the U.N.  Thus, Plaintiffs seek to hold the Bank vicariously liable for the Hussein Regime's conduct based solely on the Bank's contractual role in administering the U.N. Iraq Account.

As discussed in detail herein, Plaintiffs' claims against the Bank should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for the following reasons:

- Plaintiffs lack standing to invoke the jurisdiction of this federal Court because the complaint fails to allege that Plaintiffs' asserted injuries are "fairly traceable" to Defendants' alleged conduct.  (See Section I, infra.) The alleged causal nexus between the purported injury and the conduct complained of—that the Hussein Regime would not have injured Plaintiffs' spouses if AWB had not provided it with hard currency—is impermissibly speculative and contradicted by the documents appended to the complaint as to AWB, and non-existent as to the Bank.

- Indeed, Plaintiff Mastafa alleges that her husband was captured by the Hussein Regime in 1996 and killed by that Regime in July 1997; whereas Exhibit 3 to the complaint demonstrates that AWB's alleged payment of hard currency to the Hussein Regime did not begin until 1999.  This fact alone defeats Plaintiff Mastafa's claims and illustrates the irrationality of Plaintiff Ismail's claim that the Hussein Regime would not have harmed her husband in the absence of AWB's payment of hard currency.  (See id.)

3

- Plaintiffs have failed to state a claim against the Bank under the Alien Tort Statute ("ATS") because Plaintiffs have not alleged that the Bank violated customary international law or a self-executing treaty of the United States. (See Section II, infra.) In particular, Plaintiffs have not alleged facts to support their conclusory assertion that the Bank somehow aided and abetted the Hussein Regime in its alleged violations of international law. Plaintiffs' complaint therefore should be dismissed for lack of subject matter jurisdiction, and their claims for crimes against humanity, war crimes, genocide, torture, extrajudicial killings, forced disappearances of persons, or cruel, inhuman, and/or degrading treatment and/or punishment (claims one through seven) should be dismissed for failure to state a claim. (See id.)

- Plaintiffs have failed to state a claim against the Bank under the Torture Victim Protection Act ("TVPA") (claim eight) because the TVPA does not apply to corporations and because Plaintiffs do not allege that the Bank engaged in conduct prohibited by the TVPA. (See Section III, infra.)

- Plaintiffs have failed to state a claim against the Bank for wrongful death, negligence, battery, intentional infliction of emotional distress and negligent infliction of emotional distress (claims nine through thirteen) (the "Supplemental Tort Claims") because Plaintiffs do not allege that the Bank engaged in any conduct that would give rise to liability under these common law tort theories and because their claims are time-barred by the applicable statutes of limitations.

Because these defects in Plaintiffs' complaint cannot be cured, amendment would be futile. Like the related RICO class action complaint pending before this Court in Karim v. AWB Limited, No. 06-CV-15400 (S.D.N.Y.), which also is based on the Bank's provision of non-discretionary banking services to the U.N. in connection with the Programme, Plaintiffs' complaint against the Bank patently is abusive and should be dismissed without leave to amend.[1]

---

[1] The complaint also should be dismissed for the reasons discussed in the Memorandum of Law in Support of Defendants AWB Limited's and AWB (U.S.A.) Limited's Motion to Dismiss the Class Action Complaint in this matter (the "AWB Memorandum of Law").

# FACTUAL BACKGROUND[2]

## A.      The Parties

Plaintiffs assert that they are residents of Erbil, Iraq.  (Compl. ¶¶ 25-26.)  Plaintiff

Mastafa alleges that the Hussein Regime captured her husband on September 1, 1996, and

hanged him, along with fourteen other individuals, on July 24, 1997.  (Id. ¶ 25.)  Plaintiff Ismail

alleges that the Hussein Regime imprisoned and tortured her husband from 2002 until his death

on December 6, 2003.  (Id. ¶ 26.)

Defendant AWB is an Australian corporation that allegedly "controls all of the wheat

production in Australia and manages and markets such wheat as an export throughout the world."

(Id. ¶ 27.)  Defendant AWB (U.S.A.) Limited ("AWBUSA") is a Delaware corporation and a

wholly-owned subsidiary of AWB.  (Id.)

The Bank is an international bank that held the U.N. Iraq Account, on the U.N.'s behalf,

in connection with the Programme.  (Id. ¶¶ 28, 38.)

---

[2]    The following summary is based on the allegations contained in the complaint ("Compl."),
the factual averments of which necessarily are assumed to be true for the purposes of this
motion only.  Mason v. Am. Tobacco Co., 346 F.3d 36, 39 (2d Cir. 2003).  Additional
background information is drawn from U.N. Resolutions 661 and 986 (described in and
appended to the complaint) and the Memorandum of Understanding between the United
Nations and Iraq, all of which are attached to the declaration of Jennifer L. Spaziano (the
"Spaziano declaration") submitted herewith.  Cortec Indus., Inc. v. Sum Holding L.P., 949
F.2d 42, 47 (2d Cir. 1991) (documents integral to complaint are properly considered in ruling
on a motion to dismiss); Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991)
(documents that can be judicially noticed are properly considered in ruling on a motion to
dismiss); Prescient Acquisition Group, Inc. v. Perfect Circle Entm't, Inc., No. 05 Civ. 6298
(PKC), 2006 WL 2136293, at *3 (S.D.N.Y. July 31, 2006) (the court "may consider
documents integral to the complaint" on a motion to dismiss and "may take account of the
entirety" of a legal agreement where the complaint "relies heavily upon its terms and effect")
(quotations omitted).  Alphabetic exhibit references are to the exhibits attached to the
Spaziano declaration.  Numeric exhibit references are to the exhibits attached to the
complaint.

### B.    The Programme

U.N. Resolution 661 was adopted in August 1990.  (Exh. A.)  It imposed on Iraq significant economic sanctions, generally requiring that U.N. member states prevent the import and export of goods to and from Iraq.  (See generally Exh. A.)  The U.N. Security Council created the Programme as a limited exception to the sanctions regime.  (See Exh. B.)  Under the Programme, the Iraqi Government was permitted to sell its oil to purchasers of its choice subject to U.N. approval.  (Exh. B ¶ 1.)  Proceeds of the oil sales then were available to pay for certain types of goods and services obtained by the Iraqi Government from suppliers of its choice subject to U.N. approval of the supply contracts.  (Exh. B ¶ 8.)  Resolution 986, which created the Programme, affirmed that "nothing in this resolution should be construed as infringing the sovereignty or territorial integrity of Iraq."  (Exh. B ¶ 18.)

In fact, suppliers under the Programme were selected by, and contracted directly with, Iraqi Government ministries.  While the contracts were subject to U.N. approval, their terms and conditions were negotiated solely between the Iraqi Government and the suppliers it selected. This arrangement was reflected in a memorandum of understanding ("MOU") between the U.N. and the Government of Iraq dated May 20, 1996.  (Exh. C.)

Upon execution of a contract with the Iraqi Government, the suppliers were required to submit to the U.N. all relevant documentation, including contracts, through their respective U.N. missions.  (Exh. C ¶ 22.)  The U.N. then informed the Government of Iraq, the U.N. Secretary-General, and the requesting member state of its decision whether to permit the contract.  (Exh. C ¶ 23.)  Only after the U.N. had approved the contract was the Central Bank of Iraq authorized to request that the Bank, as holder of the U.N. Iraq Account, open irrevocable letters of credit in favor of the supplier of the goods.  (Exh. C ¶ 24.)  The Bank then was required to refer such requests to the U.N. Secretariat for approval of the opening of the letter of credit.  (Exh. C ¶ 24.)

6

If the U.N. Secretariat approved the request, the Bank was required to open the letter of credit. (See Exh. C ¶ 24.)  Payment from the U.N. Iraq Account to suppliers of goods under a letter of credit was required "upon presentation of credit-conform [sic] documents," and the Bank had no discretionary authority to make payment otherwise.  (Exh. C ¶ 24.)  Thus, the Bank's role with respect to goods delivered to Iraq under the Programme commenced only after the contract negotiation and approval process had been completed, and was limited to (i) the non-discretionary issuance of letters of credit in favor of Iraq's chosen suppliers for the U.N.-approved contract price, and (ii) non-discretionary payment of those letters of credit upon presentation of documents specified therein.

## C.    The Alleged Payments to the Hussein Regime

According to the complaint, in June 1999, the Hussein Regime introduced an inland transportation fee of $12.00 per metric ton of imported wheat that was not allowed under the Programme.  (Compl. ¶ 32; Exh. 3 at p. xiv.)  Plaintiffs allege that AWB "paid $221,757, 242 in kickbacks directly to the [Hussein Regime]."  (Compl. ¶ 34 (emphasis added).)  Plaintiffs further allege that AWB concealed its payment of fees to the Hussein Regime.  (Id. ¶ 31.)

Plaintiffs do not allege that the Bank paid any money to the Hussein Regime, or that the Bank knew that AWB allegedly paid money to the Hussein Regime.  Rather, Plaintiffs allege that the Bank "aided and abetted the [Hussein Regime] by knowingly providing knowing practical assistance and/or encouragement through offering and providing an escrow account where the funds were held, analyzed for compliance with the Security Counsel [sic] Resolution 986, and nevertheless disbursed to the [Hussein Regime] and used in furtherance of the actions herein complained of."  (Compl. ¶ 85; see also id. ¶¶ 94, 101, 111, 120, 130, 139, 158, 167, 175, 186, 195.)  Thus, all Plaintiffs allege with respect to the Bank is that it administered the U.N. Iraq Account under its agreement with the U.N.

**ARGUMENT**

In evaluating a motion to dismiss under Rules 12(b)(1) and 12(b)(6), the Court must accept the well-pleaded factual allegations in the complaint as true; however, conclusions of law or unwarranted deductions of fact are not admitted. Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003); First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994); Weizmann Inst. of Sci. v. Neschis, 229 F. Supp. 2d 234, 245 (S.D.N.Y. 2002).[3] "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (emphasis added) (quoting Twombly, 127 S. Ct. at 1965).

**I.    THE COMPLAINT SHOULD BE DISMISSED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1) FOR LACK OF SUBJECT MATTER JURISDICTION BECAUSE PLAINTIFFS DO NOT HAVE CONSTITUTIONAL STANDING**

A motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) should be granted "when the district court lacks the statutory or constitutional power to adjudicate [the case]." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."

---

[3]    Notably, the vast majority of the complaint consists of such conclusions of law. (See Compl. ¶¶ 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 29, 30, 37, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 71, 72, 73, 74, 75, 76, 78, 79, 82, 83, 84, 85, 86, 87, 89, 90, 93, 94, 95, 96, 97, 99, 100, 101, 102, 103, 104, 106, 107, 108, 109, 110, 111, 112, 113, 114, 116, 117, 118, 119, 120, 121, 122, 123, 126, 128, 129, 130, 131, 132, 133, 136, 137, 138, 139, 140, 141, 142, 144, 145, 146, 147, 148, 150, 151, 152, 153, 154, 155, 157, 158, 159, 160, 161, 163, 164, 165, 166, 167, 168, 169, 170, 172, 173, 174, 175, 176, 177, 178, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 191, 192, 193, 194, 195, 196, 197, 198.)

DaimlerChrysler Corp. v. Cuno, 126 S. Ct. 1854, 1861 (2006) (quotations omitted); accord Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 37 (1976) (same). "The 'core component' of the requirement that a litigant have standing to invoke the authority of a federal court 'is an essential and unchanging part of the case-or-controversy requirement of Article III.'" Cuno, 126 S. Ct. at 1861 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).

"[T]he irreducible constitutional minimum" of standing comprises three elements that the party invoking federal jurisdiction bears the burden of establishing:

> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan, 504 U.S. at 560-61 (internal citations and quotations omitted; emphasis added).  Courts are to "presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." Cuno, 126 S. Ct. at 1861 n.3 (quotation omitted).  "[P]laintiffs, as the parties seeking to establish federal jurisdiction, must make the showings required for standing." Id. Additionally, "[a] plaintiff, including one who is seeking to act as class representative, must have individual standing to assert the claims in the complaint against each defendant." Ramos v. Patrician Equities Corp., 765 F. Supp. 1196, 1199 (S.D.N.Y. 1991).

In order to satisfy the second, "causal connection" element of standing, plaintiffs "must allege facts from which it reasonably could be inferred that, absent [the defendants' alleged conduct], there is a substantial probability" that they would not have been injured.  Warth v. Seldin, 422 U.S. 490, 504 (1975); see also Greenberg v. Bush, 150 F. Supp. 2d 447, 455 (E.D.N.Y. 2001) (same) (citing Warth).  Plaintiffs may not "rely on little more than the remote

possibility, unsubstantiated by allegations of fact, that their situation might have been better had [defendants] acted otherwise." Warth, 422 U.S. at 507. Similarly, plaintiffs lack standing where their "injuries might have occurred even in the absence of" defendants' conduct and "whether the injuries fairly can be traced to that [conduct] depends upon unalleged and unknown facts." Simon, 426 U.S. at 45 n.25.

The Supreme Court has long held that standing does not exist where "speculative inferences are necessary to connect [plaintiffs' alleged] injury to the challenged actions of [defendants]" or where the alleged injury "results from the independent action of some third party not before the court." Simon, 426 U.S. at 41-42, 45-46 (indigent beneficiaries of medical assistance program lacked standing to challenge hospital tax credit because their inability to obtain program medical care depended on the policy decisions of individual hospitals); see also Cuno, 126 S. Ct. at 1862-65 (state taxpayers lacked standing to challenge a tax exemption that allegedly depleted the public fisc since the economic effects of the exemption depended upon government policy decisions); Allen v. Wright, 468 U.S. 737, 757-58 (1984) (parents of minority schoolchildren lacked standing to challenge government tax policy with respect to segregated private schools since the effect of the policy depended on the responses of individual schools); Warth, 422 U.S. at 507 (low-income persons lacked standing to challenge a town's restrictive zoning ordinance because they failed to show that their inability to obtain adequate housing was attributable to the ordinance rather than to other intervening factors).

For the reasons set forth below, Plaintiffs have not met these fundamental standing requirements.

### A.    Plaintiffs' Alleged Injuries Resulted From The Independent Acts Of The Hussein Regime.

The complaint on its face demonstrates that Plaintiffs' alleged injuries are "the result of the independent action of some third party not before the court," namely the Hussein Regime. Lujan, 504 U.S. at 560-61; see also Simon, 426 U.S. at 41-42, 45-46. Plaintiffs do not allege that Defendants directly inflicted any harm on the Plaintiffs or their families. (Compl. ¶¶ 52, 91-92, 99, 106, 108, 116, 125-28, 144-47.) They do not allege that Defendants directed or participated in any action that caused harm to them or the purported class. Nor do they allege that Defendants provided the Hussein Regime with weapons, dangerous goods, or the instrumentalities used to harm their husbands. Plaintiffs allege only that Defendant AWB paid "kickbacks directly to the [Hussein Regime]." (Compl. ¶ 34.) Plaintiffs' hypothesis that Defendants' alleged conduct somehow can be linked to Plaintiffs' asserted injuries thus "depends on the unfettered choices made by independent actors not before the courts," which "courts cannot presume either to control or to predict." Lujan, 504 U.S. at 562 (quotation omitted); see also Cuno, 126 S. Ct. at 1863 (same).

### B.    Plaintiffs Do Not Specify How The Alleged Payments To The Hussein Regime Contributed To Their Asserted Injuries.

Plaintiffs do not specify how the Hussein Regime used the hard currency allegedly paid by AWB, nor how any such use contributed to their alleged injuries. In fact, Plaintiffs do not even allege that AWB's payments of hard currency were designed or intended to cause harm to them (or anyone else). Instead, Plaintiffs affirmatively allege that "the purpose of the scheme was for the Saddam [Hussein] regime to obtain hard currency." (Compl. ¶ 40.) Plaintiffs' conclusory assertion that these funds somehow contributed to the imprisonment, torture and murder of innocent civilians (see id. ¶ 14), is thus "unadorned speculation" which "depends upon unalleged and unknown facts." Simon, 426 U.S. at 44, 45 n.25; see also Allen, 468 U.S. at 757-

58 (in order to prevail in response to motion to dismiss on standing grounds, plaintiff must allege facts constituting all elements of the causal chain).[4]

### C. Plaintiffs Do Not Allege Facts From Which It Reasonably Could Be Inferred That They Would Not Have Been Injured Absent Defendants' Alleged Conduct.

Plaintiffs allege no facts "from which it reasonably could be inferred that, absent [the Defendants' alleged conduct], there is a substantial probability" that they would not have been injured. <u>Warth</u>, 422 U.S. at 504. In an attempt to assert their entitlement to standing, Plaintiffs allege in conclusory fashion that AWB's purported payments of hard currency "supported, assisted, bolstered, and aided" the Hussein Regime in its violation of international law. (Compl. ¶ 14.) Article III, however, requires more. Plaintiffs must allege <u>facts</u> which allow the Court to infer that, absent AWB's payments, there is a "substantial probability" that Plaintiffs would not have been injured, <u>i.e.</u>, that the Hussein Regime would have been unwilling or unable to persecute Plaintiffs' husbands. <u>Warth</u>, 422 U.S. at 504; <u>see also</u> <u>Greenberg</u>, 150 F. Supp. 2d at 455. This proposition not only is sheer speculation—it is decidedly implausible; it is contradicted by the documents appended to the complaint; and it is totally divorced from the allegations in the complaint with respect to the Bank.

The incremental impact, if any, of AWB's alleged payments—which are not alleged to have involved the Bank—on the Hussein Regime's various policies is unknown and likely unknowable. It nevertheless strains credulity to suggest that Saddam Hussein's "systemic" "campaign" of persecution against ethnic minorities and political dissidents in Iraq (Compl. ¶¶ 51, 52), and more specifically its alleged actions against Plaintiffs' husbands, is traceable to alleged

---

[4]    <u>Cf.</u> <u>Bigio v. Coca-Cola Co.</u>, 239 F.3d 440, 449 (2d Cir. 2001) (affirming dismissal of claims for lack of subject matter jurisdiction under the ATS where "[t]he causal chain" linking plaintiffs' injury and defendants' alleged conduct "is not articulated").

payments from a single Programme aid supplier, much less a bank that issued a letter of credit to that supplier at the direction of the U.N.  In fact, according to documents appended to the complaint, AWB's alleged payments of fees to the Hussein Regime began three years <u>after</u> Plaintiff Mastafa's husband is said to have been captured by the Hussein Regime and two years <u>after</u> he is said to have been hanged.  (<u>Compare</u> Ex. 3 at xiv (noting that Iraq began demanding kickbacks in June 1999) <u>with</u> Compl. ¶ 25 (alleging that Plaintiff Mastafa's husband was captured on September 1, 1996 and hanged on July 24, 1997).)  This fact conclusively precludes Plaintiff Mastafa from pursuing her claims, and it defeats any argument that the Hussein Regime would have acted differently in the absence of the alleged payments.

Multiple courts have rejected analogous claims of causation under Article III.  In <u>Dellums v. United States Nuclear Regulatory Comm'n</u>, 863 F.2d 968 (D.C. Cir. 1988), a South African plaintiff who had suffered injury at the hands of the apartheid regime in South Africa alleged that the U.S. Nuclear Regulatory Commission's grant of import licenses for South African uranium "blunted the effectiveness" of sanctions against South Africa, "perpetuated the existence of apartheid in South Africa and therefore inflicts injury on [him]."  <u>Id.</u> at 974-75.  The Court held that the plaintiff lacked standing, holding that plaintiff had not established causation or redressability as required by Article III.  The Court stated that a "change in economic incentives alone . . . is not sufficient to establish the required causal nexus," and that "[o]n its face it seems implausible" that the perpetuation of the apartheid regime—and plaintiff's attendant injuries— could be fairly traced to the grant of import licenses.  <u>Id.</u> at 974-76.  The Court observed that "when numerous third parties and independent variables lead to an injury, the complainant has the burden of showing that but for the particular . . . action that he is challenging, the injury

would abate," and that the challenged action "is more than only one of the many factors whose relative influence may affect the third parties' behavior." Id. at 980 (quotation omitted).

Similarly, in Greenberg, Jewish Israelis filed a class action against American public officials, claiming that these officials supported "the enemies of the Jewish inhabitants of Palestine" through foreign policy decisions and other actions, causing them to be injured by "gunshots and other violence" perpetrated by Palestinians. 150 F. Supp. 2d at 450, 455 (quotation omitted). The Court held that plaintiffs lacked standing to bring such claims. It observed that "it would be difficult to imagine a clearer example of a third party's actions breaking the causal chain. The gunshots and other violence complained of are fairly traceable to neither Defendants' foreign policy decisions nor actions taken in accordance with those decisions." Id. at 455. The Court ruled that plaintiffs had failed to "satisfy the[ir] burden of alleging facts from which it could be reasonably inferred that, absent Defendants' unlawful acts, there is a substantial probability that Plaintiffs would not have been shot at by a third party." Id. (citing Warth, 422 U.S. at 504). Accord McGehee v. Albright, 210 F. Supp. 2d 210, 214-16 (S.D.N.Y. 1999) (plaintiff alleging wrongful termination by the U.N. lacked standing to challenge certifications for U.S. financial contributions to the U.N. since the termination could not be fairly traced to U.S. funding); Fund for Animals v. Babbitt, 2 F. Supp. 570, 574-75 (D. Vt. 1997) (plaintiff lacked standing to challenge procedures for granting federal funds to state ecological project since state indicated it would proceed with the project even in the absence of federal funding).[5]

---

[5]    Cf. Corrie v. Caterpillar, Inc., 403 F. Supp. 2d 1019, 1029 (W.D. Wash. 2005), aff'd, 503 F.3d 974 (9th Cir. 2007) (American corporation's sale of bulldozers to the Israeli Defense Forces (IDF) was not the but-for or proximate cause of injuries to plaintiff peace activist who was run over by one of the bulldozers, even where the corporation was aware that the IDF

*(cont'd)*

14

Plaintiffs' theory of causation here is even less plausible than those rejected in <u>Dellums</u> and <u>Greenberg</u>. It rests on nothing more than allegations that AWB gave general financial support to a third party government who, acting independently and pursuant to its own policies, injured the Plaintiffs, and that the Bank incidentally had issued letters of credit to AWB under the Programme at the direction of the U.N. The alleged causal relationship between Plaintiffs' injuries and AWB's payments of cash to the Hussein Regime, much less the Bank's incidental Programme activities, is sheer speculation that is contradicted by the facts presented, and thus does not give rise to a case or controversy under Article III.

It bears emphasis that the Bank is even further removed from Plaintiffs' ultimate injuries than AWB. The Bank is not alleged to have made any direct payments to the Hussein Regime whatsoever. It is accused only of "offering and providing an escrow account where the funds were held, analyzed for compliance with the [U.N.] Security Counsel [sic] Resolution 986, and nevertheless disbursed to the Saddam Hussein regime." (Compl. ¶ 94; <u>see also</u> <u>id.</u> ¶¶ 101, 111, 120, 130, 139, 158, 167, 175, 186, 195.) There is simply no causal relationship between Plaintiffs' injuries and the Bank's contractual role in administering the U.N. Iraq Account.

The complaint should be dismissed pursuant to Rule 12(b)(1) for lack of standing.

_____

*(cont'd from previous page)*
used the bulldozers to demolish civilian homes); <u>In re African-American Slave Descendants Litig.</u>, 304 F. Supp. 2d 1027, 1048 (N.D. Ill. 2004), <u>aff'd in part</u>, 471 F.3d 754 (7th Cir. 2006) (plaintiffs lacked standing to sue corporations for damages associated with the institution of slavery where plaintiffs "fail[ed] to allege that their ancestors were enslaved by any of the eighteen specifically named Defendants" and plaintiffs' allegations that defendant corporations were part of "co-dependent industries" that benefited from slavery were insufficient to establish the requisite "causal connection between the injury and the conduct complained of") (quotation omitted); <u>Dalton Farms Assocs. v. Baker</u>, 704 F. Supp. 460, 462-65 (S.D.N.Y. 1989) (plaintiff developers lacked standing to challenge tax exempt status of organization that opposed developers' project where it was "entirely too speculative" whether organization could have opposed the project in the absence of the exemption).

## II.    PLAINTIFFS' CLAIMS UNDER THE ALIEN TORT STATUTE SHOULD BE DISMISSED PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6) BECAUSE PLAINTIFFS FAIL TO ALLEGE THAT THE BANK VIOLATED CUSTOMARY INTERNATIONAL LAW OR A SELF-EXECUTING TREATY OF THE UNITED STATES.

Under the ATS, district courts "have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350; Flores v. S. Peru Copper Co., 414 F.3d 233, 242 (2d Cir. 2003).[6]  Subject matter jurisdiction exists under the ATS only where the complaint adequately pleads a violation of international law or a treaty of the United States.  Bigio, 239 F.3d at 447.  As set forth below, Plaintiffs have not alleged—and cannot allege—that the Bank violated, or was complicit in violating, customary international law or a treaty of the United States.  Therefore, this Court should dismiss Plaintiffs' ATS claims both for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.  See, e.g., Flores, 414 F.3d at 266 (affirming dismissal of ATS claims pursuant to Rules 12(b)(1) and 12(b)(6) because the complaint failed to adequately allege a violation of customary international law or a treaty of the United States).[7]

---

[6]    The ATS is alternatively known as the "Alien Tort Claims Act" or the "Alien Tort Act."

[7]    The other bases for jurisdiction asserted in the complaint also are inadequate.  (See Compl. ¶ 4.)  The Court does not have subject matter jurisdiction pursuant to the diversity statute, 28 U.S.C. § 1332, because the presence of aliens on both sides of the case (Plaintiffs Mastafa and Ismail and Defendants AWB Limited and BNP Paribas) destroys diversity jurisdiction. Universal Licensing Corp. v. Paola del Lungo S.p.A., 293 F.3d 579, 581 (2d Cir. 2002) ("[D]iversity is lacking within the meaning of [28 U.S.C. § 1332] where the only parties are foreign entities, or where on one side there are citizens and aliens and on the opposite side there are only aliens.").  Plaintiffs also cite to the federal question statute, 28 U.S.C. § 1331, presumably based on their purported claim under the TVPA.  As discussed in Section III, infra, Plaintiffs have failed to state even a colorable claim under the TVPA, and jurisdiction therefore does not lie under 28 U.S.C. § 1331.  See Arndt v. UBS AG, 342 F. Supp. 2d 132, 142 (E.D.N.Y. 2004) (dismissing TVPA claim against corporation for lack of subject matter jurisdiction).  Finally, since Plaintiffs have failed to invoke the Court's federal subject matter jurisdiction, this Court cannot exercise supplemental jurisdiction over Plaintiffs' *(cont'd)*

A.    **The Complaint Fails To Allege That The Bank Engaged In Conduct That
Violated Customary International Law.**

Plaintiffs do not purport to allege that the Bank or its employees or agents physically
committed, assisted or were present for the international law violations allegedly committed by
the Hussein Regime.  Rather, Plaintiffs allege in conclusory fashion that the Bank aided and
abetted and conspired with the Hussein Regime to commit such violations.  The few factual
allegations in the complaint, however, simply are not sufficient to state a claim against the Bank
under theories of vicarious liability.[8]

1.    **Plaintiffs do not—and cannot—allege that the Bank aided and
abetted the Hussein Regime's alleged violations of international law.**

In the Second Circuit's recent decision in <u>Khulumani v. Barclay Nat'l Bank Ltd.</u>, Judges
Katzmann and Hall agreed that "in this Circuit, a plaintiff may plead a theory of aiding and
abetting liability under the [ATS]." 504 F.3d 254, 260 (2d Cir. 2007) (per curiam).  They
disagreed, however, as to whether federal courts should look to international law or federal law
in deciding whether a plaintiff sufficiently stated a claim for aiding and abetting.  Looking to
international law, Judge Katzmann concluded that a defendant may only incur liability for aiding
and abetting another's violation of that law "when the defendant (1) provides practical assistance
to the principal which has a substantial effect on the perpetration of the crime, and (2) does so
with the purpose of facilitating the commission of that crime."  <u>Id.</u> at 277 (Katzmann, J.,

_____
*(cont'd from previous page)*
    Supplemental Tort Claims under 28 U.S.C. § 1367, and those claims too must be dismissed
    for lack of jurisdiction.

[8]    Because Plaintiffs have failed to allege facts to support their conclusory allegations of
    secondary liability, the Court need not answer the question whether the complaint adequately
    alleges that the Hussein Regime violated international law.  Although the Bank maintains
    that Plaintiffs' conclusory allegations are insufficient under <u>Twombly</u> to state a primary
    violation of international law by the Hussein Regime, it assumes for the sake of argument
    that the complaint has done so.

concurring).  Looking to federal common law, Judge Hall concluded that a defendant may be liable for aiding and abetting if he "knowingly and substantially assist[s] a principal tortfeasor, such as a foreign government or its proxy, to commit an act that violates a clearly established international law norm."  Id. at 288 (Hall, J., concurring).[9]  The differences between these standards are of no consequence here because Plaintiff has not stated an aiding and abetting claim against the Bank under either standard.[10]

In this regard, both standards require that the defendant provide knowing and substantial assistance to the perpetrator of the primary violation.  All that the complaint alleges with respect to the Bank, however, is that:

> The Defendant BNP Paribas aided and abetted the Saddam Hussein regime by knowingly providing knowing practical assistance and/or encouragement through offering and providing an escrow account where the funds were held, analyzed for compliance with the Security Counsel [sic] Resolution 986, and nevertheless disbursed to the Saddam Hussein regime to be used in furtherance of the actions herein complained of.

(Compl. ¶ 85 (crimes against humanity); see also id. ¶ 94 (war crimes); ¶ 101 (genocide); ¶ 111 (torture); ¶ 120 (extrajudicial killings); ¶ 130 (forced disappearances of persons); ¶ 139 (cruel,

---

[9]  Judge Hall also concluded that a defendant could aid and abet a violation of international law by "encouraging, advising, contracting with, or otherwise soliciting a principal tortfeasor to commit an act while having actual or constructive knowledge that the principal tortfeasor will violate a clearly established customary international law norm in the process of completing that act" or "by facilitating the commission of human rights violations by providing the principal tortfeasor with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services will be (or only could be) used in connection with that purpose."  Id. (Hall, J., concurring).  The complaint does not appear to assert claims against the Bank based on such theories of liability and does not allege facts sufficient to state a claim on these grounds.

[10]  The defendants in Khulumani already have expressed their intent to seek review of this fractured opinion in the Supreme Court.  See Khulumani v. Barclay Nat'l Bank Ltd., Nos. 05-2141, 05-2326, 2007 U.S. App. LEXIS 27351, at *1 (2d Cir. Nov. 27, 2007) (denying defendants' motion to stay issuance of mandate pending their petition for certiorari to the Supreme Court).

inhuman, and/or degrading treatment and/or punishment).)  Although Plaintiffs purport to recite the elements of an aiding and abetting claim in this single paragraph, they do not plead facts that would plausibly suggest that they have a right to relief.  See Twombly, 127 S. Ct. at 1964-65 ("a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do") (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Indeed, the only fact pled in the complaint with respect to the Bank's alleged conduct is that the Bank administered the U.N. Iraq Account.  (See discussion supra at 3.)  There are no allegations as to how this conduct assisted—substantially or otherwise—the Hussein Regime in carrying out its alleged violations of international law.  Nor are there any facts alleged regarding the Bank's knowledge of its role in those violations.  Aside from the bald assertion that the Bank "knowingly provid[ed] knowing practical assistance" (Compl. ¶ 85), Plaintiffs fail to allege—even in conclusory terms—that the Bank knew of the Hussein Regime's alleged violations of international law or that it knew of AWB's alleged payments to the Hussein Regime.  To the contrary, the allegations in the complaint suggest the opposite.  Plaintiffs assert that the "Defendants were reckless and indifferent" to the international law violations committed by the Hussein Regime (id. ¶ 67), and that AWB concealed its payment of hard currency to the Hussein Regime (id. ¶ 31).

The minimal, innocuous facts alleged here stand in stark contrast to those alleged in cases where courts have permitted plaintiffs to pursue claims against alleged secondary actors under the ATS.  For example, in Almog v. Arab Bank PLC, 471 F. Supp. 2d 257 (E.D.N.Y. 2007), the court allowed individuals injured, and the survivors of those injured or killed, in terrorist attacks in Israel to pursue claims under the ATS against a Jordanian bank alleged to have knowingly

19

provided banking and other services that facilitated the actions of HAMAS and other terrorist organizations. In denying Arab Bank's motion to dismiss, the court determined that the complaint contained sufficient allegations "regarding the <u>knowing and intentional nature</u> of the Bank's activities" and "with respect to the substantial effect of Arab Bank's conduct in bringing about the underlying violations of a norm of international law." <u>Id.</u> at 291 (emphasis added). On this latter point, the court recounted the following factual allegations presented in the complaint:

> Arab Bank played an integral role in the structured financial path through which the funds in the "Account 98" accounts—accounts set up by the Saudi and Mujahideen Committees to raise funds for the families of "martyrs"—were transferred to their intended beneficiaries. Arab Bank allegedly consulted with the Saudi Committee and local representatives of HAMAS to finalize the lists of eligible beneficiaries. It also provided instructions to the general public on how beneficiaries could qualify and collect money. Arab Bank held accounts in the beneficiaries' names to which funds contained in the "Account 98" accounts were transferred. Not only did Arab Bank collect and maintain those funds, but it facilitated the conversion of such funds from Saudi Riyals to Israeli currency by routing the transfers through its New York branch, where the funds were converted to U.S. dollars and then to Israeli currency. Arab Bank distributed the money to beneficiaries who presented a Palestinian Authority-issued registration card establishing the bona fides of the "martyr."

<u>Id.</u> at 292. The court further determined that the plaintiffs adequately had alleged "a direct correlation between the number of attacks, including suicide bombings, and the amount of Mujahideen Committee and Saudi Committee funds, some of which were eventually paid to the beneficiaries through Arab Bank." <u>Id.</u> The court concluded that plaintiffs "sufficiently alleged <u>facts</u> giving rise to Arab Bank's liability for aiding and abetting the violations of the law of nations alleged here." <u>Id.</u> at 294 (emphasis added).

Similarly, in <u>Presbyterian Church of Sudan v. Talisman Energy, Inc.</u>, 244 F. Supp. 2d 289 (S.D.N.Y. 2003) (<u>Talisman I</u>), the court permitted current and former residents of the Republic of the Sudan to pursue claims under the ATS against a Canadian energy company (Talisman) alleged to have collaborated with the Sudanese government in a policy of ethnically

cleansing civilian populations to facilitate the company's oil exploration activities. There, plaintiffs had alleged that defendants, among other things, "had a 'well-known and established relationship with the Sudanese military,'" "repaired Government military trucks and supplied basic utilities to nearby Government military bases," "worked with the Government to devise a plan of security for the oil fields and related facilities," had "regular meetings with Sudan's army intelligence unit and the Ministry of Energy and Mining during which the parties would discuss 'how to dispose of civilians' in areas in which Talisman intended to operate," "built a network of all-weather roads" that "were used by Government forces to launch military offensives against civilian targets," "expanded an existing dirt runway" that "was later regularly used, with Talisman's knowledge, for military purposes, including bombing and strafing attacks on civilian areas," and "provided vehicles for use by the Government in its war against ethnic and religious minorities in the south." Id. at 300-01. Based on these alleged facts, the court concluded that the complaint properly alleged a claim against Talisman for aiding and abetting. Id. at 324.[11]

Plaintiffs advance nothing remotely comparable to the specific factual allegations found to be sufficient in both Almog and Talisman I and thus do not satisfy the pleading burden under either international or federal law.[12] Moreover, given the limited nature of the Bank's role in the

---

[11] Three years later, the district court granted summary judgment in favor of defendant Talisman, concluding that plaintiffs had failed to present admissible evidence that Talisman had violated international law. Presbyterian Church of Sudan v. Talisman Energy, Inc., 453 F. Supp. 2d 633, 639 (S.D.N.Y. 2006) (Talisman II).

[12] Almog and Talisman I, which were decided before the Second Circuit's decision in Khulumani, applied an aiding and abetting standard similar to that endorsed by Judge Katzmann. Because that standard and the standard endorsed by Judge Hall both require knowing and substantial assistance, the courts' analyses of knowledge and substantial assistance are relevant irrespective of which standard is applied here. Notably, Plaintiffs do not even assert that the Bank acted with the purpose of facilitating the Hussein Regime's alleged violations of international law.

Programme and the fact that the Bank worked solely at the direction of the U.N. (as described supra and in U.N. Resolution 986 and the MOU), Plaintiffs cannot allege facts regarding the Bank's conduct that could satisfy their pleading burden.  Cf. Stutts v. De Dietrich Group, No. 03-cv-4058 (ILG), 2006 WL 1867060, at *2 (E.D.N.Y. June 30, 2006) (dismissing aiding and abetting claim under the Anti-Terrorism Act where plaintiff failed to sufficiently allege that the defendant banks "knew about any connection between the letters of credit they issued and Saddam Hussein's stockpiling and use of chemical weapons").[13]

### 2. Plaintiffs do not—and cannot—allege that the Bank conspired to commit a violation of international law.

Plaintiffs' attempts to allege liability under a conspiracy theory likewise must fail.  As a threshold matter, customary international law does not recognize conspiracy liability for most of the primary violations alleged in the complaint.[14]  In any event, the complaint does not allege—even in conclusory terms—that Defendants conspired to commit the international law violations on which Plaintiffs base federal court jurisdiction.  (See Compl. ¶ 54 (alleging that "Defendants acted as part of a conspiracy to profit from violating the law of nations, specifically the Security Council Resolution 986[,] in an effort and with intent to profit from such violations.").)  It

---

[13]  The Stutts court noted that where, as here (see Section I, supra), "a plaintiff fails to show a causal link between the alleged unlawful act and defendants' participation in the commission of that act, it is more difficult to demonstrate that the defendants knowingly and substantially assisted in the unlawful activity."  2006 WL 1867060, at *6.

[14]  Courts that have considered whether conspiracy is actionable under international law have found such liability to be very limited.  See Hamdan v. Rumsfeld, 126 S. Ct. 2749, 2784 (2006) (finding that international law war crimes tribunals, "whose jurisdiction often extends beyond war crimes proper to crimes against humanity and crimes against the peace[,]" currently have only recognized liability for "conspiracy to commit genocide and common plan to wage aggressive war."); Talisman II, 453 F. Supp. 2d at 644 (concluding that a defendant proven to have conspired to commit genocide or aggressive war can be held liable only for those acts committed within the agreed domain of the conspiracy).

certainly does not allege facts sufficient to state a claim against the Bank based on a conspiracy theory. <u>See</u> <u>In re Sinaltrainal Litig.</u>, 474 F. Supp. 2d 1273, 1296 (S.D. Fla. 2006) (dismissing "murky allegations of a vague conspiracy" for lack of subject matter jurisdiction under the ATS).

   **B.    The Complaint Does Not Allege That The Bank Engaged In Conduct That Violated A Treaty Of The United States.**

   Plaintiffs generally allege that all of their claims under the ATS are based upon "torts committed in violation of the law of nations <u>or a treaty of the United States</u>." (<u>See, e.g.</u>, Compl. ¶ 121 (emphasis added).) But they fail to specify any treaties upon which they purportedly base their ATS claims. Moreover, none of the treaties mentioned in passing in the complaint (<u>see</u> Compl. ¶ 49) are self-executing treaties that are judicially enforceable by private parties. <u>See</u> <u>Flores</u>, 392 F. Supp. 2d at 258 n.35 (alleged violation of non self-executing treaty could not support private cause of action under the ATS).[15] In any event, for the reasons discussed in Section II.A, <u>supra</u>, the complaint alleges no facts to support its conclusory assertions that the Bank violated any treaty of the United States.

*    *    *    *    *    *

---

[15]    <u>See</u> <u>Stutts</u>, 2006 WL 1867060 at *7   (Geneva Conventions are not self-executing); <u>Demjanjuk v. Meese</u>, 784 F.2d 1114, 1116 (D.C. Cir. 1986) (The Convention on the Prevention and Punishment of the Crime of Genocide is not self-executing); 136 Cong. Rec. S17,486-92 (Daily Ed. Oct. 27, 1990) (U.S. Senate Resolution of Advice and Consent to Ratification of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment) (U.N. Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment is not self-executing).

23

In sum, because Plaintiffs have alleged neither a violation of international law nor a violation of a treaty of the United States, they have not properly invoked this Court's jurisdiction under the ATS. Moreover, because Plaintiffs have not alleged facts to support their conclusory allegations that the Bank aided and abetted the Hussein Regime's alleged wrongful conduct, the complaint fails to state a claim against the Bank for crimes against humanity, war crimes, genocide, torture, extrajudicial killings, forced disappearances of persons, or cruel, inhuman, and/or degrading treatment and/or punishment.[16]

### III. PLAINTIFFS' CLAIMS UNDER THE TORTURE VICTIM PROTECTION ACT SHOULD BE DISMISSED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) FOR FAILURE TO STATE A CLAIM AGAINST THE BANK.

The TVPA provides a private cause of action for persons or their legal representatives who were subjected to official acts of torture and extrajudicial killing. Pub. L. No. 102-256, 106 Stat. 73 (codified as Note to 28 U.S.C. § 1350). Specifically, the TVPA provides:

> An individual who, under actual or apparent authority, or color of law, of any foreign nation--(1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

Id.

Here, Plaintiffs' claim under the TVPA is devoid of any allegations relating to the Bank (see Compl. ¶¶ 143-48), and it is therefore unclear whether Plaintiffs are asserting this cause of action against the Bank. Assuming arguendo that they are, the claim should be dismissed

---

[16] Plaintiff Mastafa's claims (including those discussed in Sections III and IV, infra) must be dismissed in any case because her injuries pre-date AWB's alleged first payment of hard currency to the Hussein Regime. (See Section I, supra.) Her ATS and TVPA claims also must be dismissed because they are time-barred. (See AWB Memorandum of Law at Section VII.)

because the TVPA applies only to natural persons and not to corporations.  See S. Rep. No. 102-249, at 7 (1991) ("The legislation uses the term 'individual' to make crystal clear that foreign states or their entities cannot be sued under this bill under any circumstances: only individuals may be sued."); Arndt v. UBS AG, 342 F. Supp. 2d 132 (E.D.N.Y. 2004) (corporation "cannot be sued under the TVPA").

Moreover, the complaint does not allege—as it must—that the Bank acted under color of law.  "For purposes of the TVPA, an individual 'acts under color of law … when he acts together with state officials or with significant state aid.'"  Khulumani, 504 F.3d at 260 (quotation omitted).  Here, the complaint does not allege that the Bank acted either with officials or with state aid and it therefore fails to state a claim against the Bank under the TVPA.  See Khulumani, 504 F.3d at 260 (affirming dismissal of TVPA claim where plaintiffs "failed to link any defendants to state aid or the conduct of state officials").

Finally, the complaint does not allege that the Bank tortured or killed Plaintiffs' spouses (or anyone else) or that the Bank aided or abetted the Hussein Regime in doing so (see Section II.A, supra).  Accordingly, the complaint does not allege the Bank engaged in any conduct in violation of the TVPA.[17]

---

[17]  An aiding and abetting claim, in any event, would be inconsistent with the TVPA's explicit requirement that a defendant must have acted under "color of law."  Corrie, 403 F. Supp. 2d at 1027; see also In re S. African Apartheid Litig., 346 F. Supp. 2d 538, 555 (S.D.N.Y. 2004) ("creating aider and abettor liability for private actors not acting under color of law would be inconsistent with" the TVPA), aff'd in part, Khulumani, 504 F.3d at 260 (affirming district court's dismissal of TVPA claims).

## IV.    PLAINTIFFS' SUPPLEMENTAL TORT CLAIMS FAIL AS A MATTER OF LAW.

Plaintiffs purport to assert claims under New York law for wrongful death, negligence, battery, intentional infliction of emotional distress and negligent infliction of emotional distress, claiming that Defendants are somehow responsible to Plaintiffs under these common law tort theories for the damages they allegedly suffered at the hands of the Hussein Regime.    As discussed below, Plaintiffs have not stated – and cannot state – a claim for violation of these common law torts.    The Supplemental Tort Claims must be dismissed.[18]

### A.    Plaintiffs Do Not Allege That The Bank Is Primarily Liable To Them For The Supplemental Tort Claims.

#### 1.    Plaintiffs' failure to allege a causal connection between the Bank's conduct and their alleged injuries is fatal to all the Supplemental Tort Claims.

Causation is an element of each of the Supplemental Tort Claims.[19]    As discussed in Section I, <u>supra</u>, the complaint alleges no facts to support its conclusory allegations (Compl. ¶¶

---

[18]    Plaintiffs assert in conclusory fashion that these torts were "'committed in violation of the law of nations or a treaty of the United States' under 28 U.S.C. § 1350 and also customary international law" (Compl. ¶¶ 159, 168, 176, 187, 196), thereby suggesting that they are invoking the ATS with respect to the Supplemental Tort Claims.    As discussed in the AWB Memorandum of Law at Section V, these claims are not a part of customary international law, and Plaintiffs therefore cannot bring them under the ATS.

[19]    The elements of wrongful death are:  "(1) the death of a human being born alive; (2) caused by the wrongful act or omission of a person or corporation who, by reason of the wrongful act or omission, would have been liable to the deceased for injury had death not ensued; (3) the existence at the time of death of statutory distributees who have sustained a pecuniary loss by reason of decedent's death; and (4) the appointment of a personal representative who alone may bring suit."  Lee S. Kreindler et al., N.Y. Practice Series – N.Y.L. of Torts § 15:6 (4th ed. 2007).  The elements of negligence are:  "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof."  <u>Akins v. Glens Falls City School Dist.</u>, 53 N.Y.2d 325, 333 (N.Y. 1981).  The elements of battery are:  "bodily contact, that the contact was offensive, i.e., wrongful under all of the circumstances, and intent to make the contact without the plaintiff's consent."  <u>Higgins v. Hamilton</u>, 794 N.Y.S.2d 421 (N.Y. App. Div. 2005).  The elements of intentional infliction

<i>(cont'd)</i>

155, 169, 177, 183, 197), that the Bank's alleged conduct—administering the U.N. Iraq Account—caused their alleged injuries. Each of the Supplemental Tort Claims thus fails for lack of causation.

> ## 2. Plaintiffs' failure to allege a specific duty owed by the Bank is fatal to their claims for wrongful death, negligence and negligent infliction of emotional distress.

Plaintiffs' claims for wrongful death, negligence and negligent infliction of emotional distress fail for the separate and independent reason that Plaintiffs have not alleged—and cannot allege—a specific duty that the Bank owed them. "The threshold question in any negligence action is: does defendant owe a legally recognized duty of care to plaintiff?" Hamilton v. Beretta U.S.A. Corp., 96 N.Y.2d 222, 232 (N.Y. 2001); see also Mortise v. United States, 102 F.3d 693, 696 (2d Cir. 1996). To satisfy this duty requirement, "[a]n injured plaintiff must show that the defendant owed not merely a general duty of care to society, but a specific duty that was owed to him or her, for without duty running directly to the injured person, there can be no liability in damages, however careless the conduct or foreseeable the harm." Stutts, 2006 WL 1867060, at *15 (quotations omitted). "Whether a duty exists is a question of law that is appropriately decided on a motion to dismiss." Id.

Stutts is particularly instructive here. In Stutts, American servicemen and contractors exposed to chemical weapons during the first Gulf War brought tort claims against the suppliers and banks that allegedly provided Saddam Hussein with the means to obtain these weapons. Id.

---

*(cont'd from previous page)*

of emotional distress are: "'extreme and outrageous conduct intentionally or recklessly caus[ing] severe emotional distress to another.'" Freihofer v. Hearst Corp., 480 N.E.2d 349, 355 (N.Y. 1985) (quoting Restatement (Second) of Torts § 46(1)). The elements of negligent infliction of emotional distress are: "breach of a duty owed to plaintiff which exposes him or her to an unreasonable risk of bodily injury or death." Perl v. Burkes, 14 Misc. 3d 1237(A), 2007 WL 673662 (N.Y. Sup. Ct. 2007). The complaint does not allege facts that would plausibly suggest that Plaintiffs have a right to relief under any of these causes of action.

at *1.  The plaintiffs in <u>Stutts</u> alleged, as Plaintiffs do here, that "despite the widespread knowledge of [Saddam] Hussein's illegal" activities, certain banks were liable under a negligence theory because they had allegedly facilitated Saddam Hussein's ability to engage in these unlawful activities.  <u>Id.</u> at *1, 15.  The <u>Stutts</u> court rejected this argument, dismissing plaintiffs' claims because the allegations failed to demonstrate that the banks owed plaintiffs a specific cognizable duty.  <u>Id.</u> at *16-18.  The court reasoned that "[a] defendant generally 'has no duty to control the conduct of third persons so as to prevent them from harming others, even where as a practical matter defendant can exercise such control.'"  <u>Id.</u> at *16 (quoting <u>D'Amico v. Christie</u>, 71 N.Y.2d 76, 88 (N.Y. 1987)).  In so holding, the court rejected as "meritless" plaintiffs' suggestion that defendants owed them a duty because it was foreseeable that the actions of the defendant banks would result in harm to plaintiffs.  <u>Id.</u>  The court stated, "[f]oreseeability alone, does not define duty—it merely determines the scope of the duty once it is determined to exist." <u>Id.</u> (quotation omitted); <u>see also</u> <u>McCarthy v. Olin Corp.</u>, 119 F.3d 148, 156 (2d Cir. 1997) (no duty imposed on gun manufacturer for plaintiffs' injuries even though it may have been foreseeable that gun would be misused criminally).

As in <u>Stutts</u>, the complaint does not allege facts from which the Court could conclude that the Bank owed Plaintiffs a specific cognizable duty.  Indeed, all that the complaint alleges is that Defendants owed them a duty because they were "foreseeable victims of the support, contribution, aid, and participation of the furtherance of the murder and torture by the Saddam Hussein Regime" and that Defendants owed a general duty to Plaintiffs to "refrain from intentionally and wantonly harmful or outrageous conduct."  (Compl. ¶¶ 163, 164.)  These are the same type of general allegations that properly were rejected in <u>Stutts</u>, and they should be rejected here.

**B.    Plaintiffs Do Not Allege Facts Sufficient To State A Claim Against The Bank For Aiding And Abetting Any Of The Supplemental Tort Claims.**

To assert a claim for aiding and abetting a tort under New York law, a plaintiff "must allege (1) the existence of an underlying tort; (2) defendant's actual knowledge of the underlying tort; and (3) defendant's provision of substantial assistance in the commission of the underlying tort." In re Bayou Hedge Funds Inv. Litig., 472 F. Supp. 2d 528, 532 (S.D.N.Y. 2007); see also Stutts, 2006 WL 1867060, at *12. To survive a motion to dismiss, a plaintiff must allege facts demonstrating that the defendant had actual knowledge of the underlying tort—allegations of constructive knowledge and conclusory allegations of actual knowledge are insufficient. See Sterling Nat'l Bank v. Ernst & Young, LLP, 9 Misc. 3d 1129(A), 2005 WL 3076341, at *7 (N.Y. Sup. Ct. 2005) (collecting cases); see also Stutts, 2006 WL 1867060, at *13 ("New York law requires a plaintiff asserting an aiding and abetting cause of action to allege actual knowledge, constructive knowledge is insufficient.").

As discussed in Section II.A., supra, Plaintiffs have not alleged—and cannot allege—facts demonstrating that the Bank had knowledge of or provided substantial assistance to any of the purported wrongful conduct of the Hussein Regime. Accordingly, for the same reasons that the Plaintiffs failed to assert aiding and abetting liability against the bank for crimes against humanity, war crimes, genocide, torture, extrajudicial killings, forced disappearances of persons and cruel, inhuman, and/or degrading treatment and/or punishment, they also fail to assert aiding and abetting liability against the Bank for the Supplemental Tort Claims. See Ryan v. Hunton & Williams, No. 99-CV-5938, 2000 WL 1375265, at *8-9 (E.D.N.Y. Sept. 20, 2000) (dismissing claims against bank for allegedly aiding and abetting a fraudulent "Ponzi" scheme where plaintiffs had not shown the bank had actual knowledge that its accounts were being used to perpetrate a fraud); Stutts, 2006 WL 1867060, at *14 (aiding and abetting claim found to be

29

insufficient where plaintiffs' "only allegation of conduct by the [banks] – that the [banks] acted as correspondent banks in issuing letters of credits – does not indicate that the [banks] in any way substantially assisted" the commission of the underlying torts by the Hussein Regime).

### C.    Plaintiffs' Supplemental Tort Claims Are Barred By The Applicable Statutes Of Limitations.

The statutes of limitations governing Plaintiffs' Supplemental Tort Claims range from one year to three years.[20] According to the complaint, Plaintiffs' husbands were captured by the Hussein Regime on September 1, 1996 and in 2002, and they died on July 24, 1997 and December 6, 2003—all of which occurred more than three years before the complaint was filed on September 11, 2007. Recognizing this fact, Plaintiffs allege that the "statute of limitations were [sic] tolled until the Plaintiffs . . . . were on notice of their potential claims" and that this did not occur until "after the Saddam regime fell and the investigations into to [sic] Oil for Food Program were disclosed to the public." (Compl. ¶ 22.) Plaintiffs allege that "the conduct of the Defendants was discovered by the public" in "2003" and that they could have learned of their claims against the Defendants at this time. (Id. ¶ 23.) If equitable tolling were appropriate—and it is not (see AWB Memorandum of Law at Section VII)—Plaintiffs were required to assert their claims "within two years after such actual or imputed discovery or within the period otherwise provided, computed from the time the cause of action accrued, whichever is longer." N.Y. C.P.L.R. § 203. Assuming Defendants' alleged conduct "was discovered by the public" on the last day of 2003—December 31, 2003—Plaintiffs did not file the complaint until three years and nine months after such discovery, and all their claims therefore are time-barred.

---

[20] See N.Y. C.P.L.R. § 214 (the statute of limitations for negligence and negligent infliction of emotional distress is three years); Id. § 215 (the statute of limitations for battery and intentional infliction of emotional distress is one year); N.Y. Est. Powers & Trusts Law § 5-4.1(1) (wrongful death action must be commenced within two years of decedent's death).

## CONCLUSION

Because Plaintiffs lack constitutional standing to pursue their claims, because this Court lacks subject matter jurisdiction to hear Plaintiffs' claims and because Plaintiffs, in any event, have failed to state a claim against the Bank upon which relief can be granted, the Bank's motion to dismiss should be granted.  Because the defects in the complaint cannot be cured through amendment, the complaint should be dismissed without leave to amend.

Dated:  December 14, 2007
      Washington, DC

 

/s/ Jennifer L. Spaziano
Robert S. Bennett
Alan Kriegel
Jennifer L. Spaziano (pro hac vice)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Avenue NW
Washington, DC 20005
(202) 371-7000
Email:  jen.spaziano@skadden.com

William J. O'Brien, III
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Email:  wobrien@skadden.com

Attorneys for Defendant BNP Paribas

31