IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE KAPLAN

| | | |
|---|---|---|
| Saadya Mastafa | ) | Case N~~07 CIV 7955~~ |
| | ) | |
| and | ) | Judge: |
| | ) | |
| Kafia Ismail | ) | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | ) | |
| | ) | **Jury Trial Demanded** |
| v. | ) | |
| | ) | |
| Australian Wheat Board Limited aka AWB | ) | |
| Limited and AWB (U.S.A.) Limited | ) | |
| ODS Tower | ) | |
| 601 SW Second Avenue, Suite 1510 | ) | |
| Portland, Oregon 97204 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Banque Nationale de Paris Paribas | ) | |
| BNP Paribas | ) | |
| 787 Seventh Avenue | ) | |
| New York, NY 10019 | ) | |
| | ) | |
| Defendants. | ) | |

## I.  Introduction

The Defendants in this action provided support and aid for Saddam Hussein and the

individuals who carried out the atrocities hereafter complained of ("Saddam Hussein regime")

during a period of time when such support and aid was used to commit massive instances of

torture, cause widespread disappearances, and the unlawful killings of the Plaintiffs' spouses and

the members of their class.  The claims herein arise out of the Defendants' support and aid of the

Saddam Hussein regime which openly and routinely committed torture, caused forced

disappearances, and committed widespread extrajudicial killings during the period in which the Defendants were supporting the Saddam Hussein regime through kickbacks and other unlawful payments.

The Defendants negligently and/or knowingly aided and abetted the most egregious abuses of human rights by paying kickbacks and other unlawful payments to the Saddam Hussein regime in violation of international law under the United Nations Oil-for-Food Program which was instituted through Security Council Resolution 986. **Exhibit 1.** The Defendants conspired with the Saddam Hussein regime to maintain control and power over Iraq in order to secure mutual financial benefits through the egregious affronts on the human rights of the Plaintiffs and the members of their class. The Defendants were accomplices in the egregious human rights violations complained of herein. These claims arise out of common law tort under the Alien Tort Statute 28 U.S.C. §1350, the Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. §1350 (2000), and the common law of New York.

## II. Jurisdiction and Venue

### A. Subject Matter Jurisdiction

1.    Defendants are liable for the egregious human rights abuses that they participated in, including extrajudicial killings, torture, and/or the other actions complained of herein as prohibited by customary international law and Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. §1350 (2000)) (hereinafter "TVPA").

2.    The international community, including Nation-States, non-governmental organizations, and International Organizations, have arrived at a universal consensus prohibiting acts of torture,

extrajudicial killings, inhumane and degrading treatment, acts of terrorism, and other actions included in the crimes of genocide, war crimes, and crimes against humanity.

3.    Defendants are liable for violations of customary international law and treaty law prohibiting the commission of crimes against humanity and/or human rights violations.

4.    This Court has jurisdiction based upon Alien Tort Claims Act 28 U.S.C. §1350 (hereinafter "Alien Tort Statute"); 28 U.S.C. §1331; and §28 U.S.C. §1332. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

5.    No Nation-State (hereinafter "State") condones the acts of torture, extrajudicial killings, inhumane and degrading treatment, acts of terrorism, and other acts included in the crimes of genocide, war crimes, and crimes against humanity.

6.    The prohibition against acts of torture, extrajudicial killings, inhumane and degrading treatment, acts of terrorism, and other acts included in the crimes of genocide, war crimes, and crimes against humanity is non-derogable and therefore binding at all times against all actors.

7.    The prohibition against acts of torture, extrajudicial killings, inhumane and degrading treatment, acts of terrorism, and other acts included in the crimes of genocide, war crimes, and crimes against humanity are jus cogens violations and are thus subject to universal jurisdiction.

8.    The egregious nature of the acts, including but not limited to acts of torture, extrajudicial killings, inhumane and degrading treatment, acts of terrorism, and other acts included in the crimes of genocide, war crimes, and crimes against humanity and the extensive documentation of such acts is sufficient criteria to determine that the acts indeed amount to the prohibited acts and those acts do violate the law of nations, the Alien Tort Statute, and the TVPA.

**B. Personal Jurisdiction**

9.    This Court has personal jurisdiction over all of the named Defendants as each of the Defendants availed itself to this Court's jurisdiction by conducting the bulk of the underlying transaction at issue in this case within the Southern District of New York. Both of the Defendants maintained and operated offices within the Southern District of New York during all times relevant to this complaint.

10.    Each of the Defendants was doing business in New York and is therefore subject to the jurisdiction of this forum.

**C. Venue**

11.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§1391(b)(3) and (d) because a substantial part of the actions and omissions giving rise to the claims herein complained of occurred in this District. Specifically, at all times relevant, AWB maintained a bank account in New York through which it made unlawful payments to the Saddam Hussein regime. Also, AWB maintained an office in New York which it used to plan, monitor, and effect the scheme of shipments and payments to the Saddam Hussein regime under the guise of, but outside the scope of, the UN Oil For Food Program (which was headquartered in New York City). The General Manager of the AWB New York Office knowingly and actively participated in the illegal payment scheme to the Saddam Hussein regime which served to aid and abet the torture and murder of the Plaintiffs' spouses and the members of their class.

12.    BNP Paribas maintained and operated an office within the Southern District of New York during all times relevant which it used to conduct activity related to the escrow account complained of herein.

4

## D.  Standing

13.    The Plaintiffs' causes of action are for personal injury, specifically the wrongful death of spouses and their pain and suffering.

14.    The Plaintiffs' damages were directly and proximately caused by the actions of the Defendants.   The Defendants acting together with the Saddam Hussein regime, supported, assisted, bolstered, and aided the Saddam Hussein regime in violation of international law, with full knowledge of the acts of torture, extrajudicial killings, inhumane and degrading treatment, acts of terrorism, and other acts included in the crimes of genocide, war crimes, and crimes against humanity.

15.    The injuries which the Plaintiffs and the members of their class have sustained are properly subject to redress from the Defendants through the causes of action herein asserted

## E.  Forum Non Conveniens

16.    Due to the nature of the alleged acts, including but not limited to the fact that there are several jus cogens violations at issue, the United States has a substantial interest in affording alleged victims of atrocities a method by which they may vindicate their rights.

17.    Due to the special relationship between the United States and Iraq, the United States has a substantial interest in affording victims of the atrocities conducted by the Saddam Hussein regime a method by which they may vindicate their rights.

18.    Due to the current and past state in security, instability, and lack of rule of law, there is no better or more convenient forum for the Plaintiffs and the members of their class to have their case heard.

19.    Due to the unique circumstances of the United Nations involvement in the issues of this matter and the fact that they are headquartered and that much of the documentation and

5

interest and is a uniquely convenient location for the adjudication of this matter.

## F. Act of State Doctrine Does Not Apply

20.    Iraq has a new government and new Constitution. The adjudication of this case in this Court will not interfere with United States/Iraqi relations. The new government of Iraq has and will repudiate the actions of the Saddam Hussein regime. Specifically, the Iraqi government tried, convicted, and executed the former head of the regime, Saddam Hussein, for some of the atrocities that the Plaintiffs and the members of their class complain of herein.

## G. Statute of Limitations

21.    The conduct of the Defendants complained of herein is part of a joint action which constitutes crimes against humanity, war crimes, and genocide. Therefore, no statute of limitations applies to the claims of the Plaintiffs and the members of their class.

22.    Any claims that may be determined to be subject to a statute of limitations were tolled until the Plaintiffs and the members of their class were on notice of their potential claims which did not occur until after the Saddam regime fell and the investigations into to Oil For Food Program were disclosed to the public.

## H. Equitable Tolling Doctrine

23.    The Plaintiffs and members of their class could not have learned of their claims against the Defendants any earlier than 2003, when the conduct of the Defendants was discovered by the public. The Plaintiffs and the members of their class did not know what had become of their spouses or loved ones and/or did know of AWB's and BNP's Paribas involvement.

6

24.    The Plaintiffs had no ability to bring their claims before a court of law until some point

after the fall of the Saddam Hussein regime.  They had no access to justice within Iraq and no

means of bringing their claims outside of Iraq.

### III.    Parties

#### A. Plaintiffs

25.    Plaintiff Saadya Unis Mastafa ("Mastafa")is a Kurdish woman who has lived and

continues to live in Erbil, Iraq.  Her husband, Khalid Ibrahim Ahmed was a nurse in Northern

Iraq until September 1, 1996 when he was captured by the Saddam Hussein regime and held

until July 24, 1997 when the Saddam Hussein regime hung him along with fourteen other

individuals.  Mastafa's place of residence has been withheld for her own protection.  It will be

disclosed to the parties of this case when  protective agreements are in place.

26.    Plaintiff Kafia Tahir Ismail ("Ismail")is a Kurdish woman who has lived and continues to

live in Erbil, Iraq.  Her husband was imprisoned and tortured by the Saddam Hussein regime

from 2002 until he died on December 6, 2003 as a direct result of such torture.  Ismail's place of

residence has been withheld for her own protection.  It will be disclosed to the parties of this case

when  protective agreements are in place.

#### B. Defendants in the Food Stuff Industry who paid kickbacks and illegal surcharges in the Humanitarian Relief Program

27.    Defendant Australian Wheat Board Limited aka AWB Limited is an Australian

corporation with headquarters located at 380 La Trobe Street, Melbourne, 2000, Victoria,

Australia.  AWB (U.S.A.) Limited is a Delaware corporation with its headquarters located at

ODS Tower, Suite 1510, 601 SW Second Avenue, Portland, Oregon 97204.  AWB (U.S.A.)

Limited is a wholly owned subsidiary of AWB Limited.  AWB Limited owns and controls its

U.S.A. subsidiary.  (The AWB Defendants as defined in this paragraph will be referred to

7

collectively as "AWB"). AWB is one of the largest wheat managers and marketers in the world. It controls all of the wheat production in Australia and manages and markets such wheat as an export throughout the world.

## C. Defendant who was the Escrow Bank, issued Letters of Credit, and Monitored Financial Transactions

28.    Defendant Banque Nationale de Paris Paribas S.A. ("BNP Paribas") is a French bank headquartered at 16 Boulevard des Italiens, 75009 PARIS, France and has a United States location at BNP Paribas, 787 Seventh Avenue, New York, NY 10019. BNP Paribas is one of the ten largest banks in the world. It has about 150,000 employees and operates in over 85 countries. It is a full service bank with core businesses including, Corporate and Investment Banking, Retail Banking, Asset Management and Services, Real Estate Investment Company, and Capital Investment Group.

## IV. Factual Allegations

29.    The Defendant Australian Wheat Board engaged in a pattern and practice of corruption with utter disregard for the consequences of their actions beyond that of retaining market share in one of their largest profit centers in the world, Iraq.

30.    Defendants AWB and BNP Paribas conducted itself with utter disregard for the law and the sanctity of human life.

31.    As cited in the *Report of the Inquiry into Certain Australian Companies in Relation to the UN Oil-For-Food Programme, Prologue,* pages xi-lxxix of 260 **(Exhibit 3)** ("Cole Inquiry"), the independent investigation conducted by the Australian government into the AWB Oil For Food scandal, AWB had a corporate culture which promoted the aid and substantial support of the Saddam regime in order to reap substantial corporate profits. The Report states:

> The conduct of AWB and its officers was due to a failure in corporate culture. The question posed within AWB was:  What must be done to

8

maintain sales to Iraq? The answer given was: Do whatever is necessary to retain the trade. Pay the money required by Iraq. It will cost AWB nothing because the extra costs will be added into the wheat price and recovered from the UN escrow account. But hide the making of those payments for they are in breach of sanctions. (Cole Inquiry, Volume 1, Summary, recommendations, and background, Prologue, page xii.)

32.     The Saddam regime introduced an inland transportation fee of $12.00 per metric ton of imported wheat. This kickback was purportedly to transport the wheat from Umm Qasr to the destination silo. This fee was not allowed under the UN Oil For Food Program.

33.     The Cole Inquiry enumerates the actions and knowledge of Defendant AWB in the kickback scheme to the Saddam regime, specifically to the Iraqi Grain Board ("IGB"):

> Mr. Emons, AWB's Regional Manager for Middle East and Africa, and Mr Hogan, from AWB's office in Cairo, went to Iraq in June 1999 to discuss the terms of tender with the IGB Director General, Mr Daoud. AWB learnt that the US$12.00 per metric tonne was to be included in the price quoted by AWB and thus recouped from the UN escrow account. It also learnt that the money was to be paid to 'maritime agents' in Iraq but that the payment could be made to an Iraqi bank in Amman, Jordan. The IGB was to provide to AWB details of the bank account into which the 'discharge and land transport' fee could be paid in Jordan. AWB understood from the June meeting that the US$12.00 fee was a payment going back to the Iraqi Government. (Cole Inquiry, Volume 1, Summary, recommendations, and background, Prologue, xiv.)

34.     According to the *Independent Inquiry Committee into the United Nations Oil-For-Food Programme* ("Volcker Report") **(Exhibit 4, Table VII-Actual and Projected Illicit payments on Contracts for Humanitarian Goods – Summary by Supplier. (www.iic-offp.org)**, AWB paid $221,757,242 in kickbacks directly to the Saddam regime.

35.     Of that amount $ 139,274,494 was paid in the form of inland transportation fees. (Volcker Report)

36.     The rest, $82,482,748, was paid in the form of After Sales Service Fee (a fee which usually constituted 10% of the contract price and was paid to the Saddam regime.) (Volcker

Report.)  The After Sales Service Fee was strictly enforced to all humanitarian goods providers by the Saddam regime.

37.    All illicit payments made by Defendant AWB to the Saddam regime were made possible by the Defendant BNP Paribas.

38.    All illicit payments by Defendant AWB were made directly to the UN escrow account which was exclusively by BNP Paribas.

39.    The payments made from the escrow account were made to the Saddam regime.

40.    Defendant AWB knew the payments were being made to the Saddam regime and that the purpose of the scheme was for the Saddam regime to obtain hard currency.

41.    The Saddam regime was under sanctions under Security Council Resolution 661 **(Exhibit 2)** which prohibited foreign corporations from transferring hard currency to the Saddam regime.

42.    Defendant AWB understood that payments of hard currency to the Saddam regime was prohibited by UN sanctions.

43.    Defendant AWB understood that it did not have to arrange for the transportation of the wheat from Umm Qasr to the final silo destination.  Defendant AWB knew that it was not responsible for the internal transportation of wheat within Iraq.

44.    Defendants gave substantial assistance and encouragement to the Saddam regime through their illicit payments of hard currency.

45.    Defendants agreed with the Saddam regime to violate international law in order to mutual benefit from the kickback scheme.

### V.    General Allegations

46.    Plaintiffs' causes of action arise under the violation of international and domestic law as defined in statutes, common law, agreements, declarations, conventions, resolutions and treaties,

including but not limited to the following: customary international law; treaties of the United States; resolutions of the Security Counsel of the United Nations; statutes and the common law of the United States; statutes and the common law of New York; and other applicable domestic, foreign and/or international laws.

47.    The claims herein under the law of nations are based on norms that are definable, obligatory, and universally accepted.

48.    The Defendants have breached their obligations to which they are bound by applicable international law, including but not limited to the following: Security Counsel resolutions; contractual obligations; violations of jus cogens norms; violations of international law; generally and widely accepted principles by the international community as attaching to non-state actors; customary international law; under the principles of agency law; under the principles of joint enterprise theory; and under the principles of civil conspiracy.

49.    The Defendants have breached non-derogable standards that apply to non-state actors including the jus cogens violations complained of here and are liable because they conspired and aided and abetted the Saddam Hussein regime in the commission of atrocities that amounted to crimes against humanity, war crimes, and genocide as defined by customary international law, jurisprudence of international courts and tribunals, and laws and treaties of the United States, including but not limited to the Convention Against Torture, Common Article III of the Geneva Conventions of 1949 and Protocol II of the Geneva Conventions, and the Convention on the Prevention and Punishment of the Crime of Genocide of 1948.

50.    The acts complained of herein were undertaken under color of law.

51.    The acts and injuries to Plaintiffs and to the members of their class, were part of a pattern and practice of systematic human rights violations designed, ordered, implemented and directed

11

with the knowledge, participation, and support of the Defendants and carried out by personnel acting at the direction of the Saddam Hussein regime and/or with their encouragement or acquiescence.

52.     The acts of torture, extrajudicial killings and other actions herein complained of were perpetrated as a part of a campaign of war crimes, crimes against humanity, and genocide conducted by the Saddam Hussein regime, and specifically the police, military and other persons under the control of the Saddam Hussein regime.

53.     The Defendants are vicariously liable to the Plaintiff under the ATS.  The Defendants acted as a part of a conspiracy with the Saddam Hussein regime, aided and abetted the regime, and they acted as an accomplice to the regime.

54.     The Defendants acted as part of a conspiracy to profit from violating the law of nations, specifically the Security Council Resolution 986 in an effort and with the intent to profit from such violations.

55.     The Defendants created an unlawful association with the Saddam Hussein regime in violation of the Security Council Resolution 986.

56.     The Defendants had the unlawful objection of profiting from violations of the Security Council Resolution 986 which was intended to bring the Saddam Hussein regime into compliance with international standards.

57.     An agreement, understanding and/or meeting of the minds existed between each Defendant and the Saddam Hussein regime in that each Defendant regularly transacted with the Saddam Hussein regime in violation of the Security Council Resolution 986 for mutual illicit profit.

58.    The Defendants committed a series of illegal acts by paying kickbacks to the Saddam Hussein regime in violation of the Security Council Resolution 986.

59.    The direct and proximate results of the violations of Security Council Resolution 986 were the injuries suffered by the Plaintiffs and the members of their class.

60.    The Defendants knowingly gave practical assistance and encouragement to the former regime of Iraq which had a substantial effect on the perpetration of the crimes.  The significant aid and financial support of the Defendants gave and/or boosted the means of the former regime of Iraq to continue its campaign of violence, crimes against humanity, war crimes, and genocide.

61.    The Defendants acted in concert with the Saddam Hussein regime to profit illicitly from the United Nations Oil for Food Program which was a direct and proximate cause of the harm suffered by the Plaintiffs and the members of their class.

62.    The Defendants acted as part of a common design with the Saddam Hussein regime to violate international law and receive illicit profits which was a direct and proximate cause of the harm suffered by the Plaintiffs and the members of their class.

63.    The Defendants knew that the Saddam Hussein regime was using the funds of the Oil for Food Program and the illicit payments paid by the Defendants to the Saddam Hussein regime to violate the law of nations and commit egregious human rights abuses including but not limited to jus cogens violations.

64.    Defendants gave substantial assistance and/or encouragement to the Saddam Hussein regime and its conduct of the campaign of genocide, crimes against humanity, and war crimes.

65.    The Defendants gave substantial assistance to the Saddam Hussein regime through the form of kickbacks and/or financial assistance in violation of the Security Council Resolution 986 which constitutes a breach of their duty to the Plaintiffs and the members of their class.  The

13

Security Council Resolution was designed and intended to weaken the Saddam Hussein regime to a point that it would be apt to follow and comply with international standards. The substantial assistance for the Saddam Hussein regime, in violation of the Security Council resolutions, thwarted the design and was a direct and proximate cause of the harm done to the Plaintiffs and the members of their class.

66.     The Defendants contributed to the injuries and damages sustained by the Plaintiffs and the members of their class in a material way by giving substantial assistance, encouragement, and funding in violation of the law of nations for the egregious atrocities committed by the Saddam Hussein regime, specifically the injuries suffered by the Plaintiffs and members of their class.

67.     The Defendants were reckless and indifferent as to the commission of the acts of torture, extrajudicial killings, inhumane and degrading treatment, acts of terrorism, and other acts included in the crimes of genocide, war crimes, and crimes against humanity.

## VI.    Class Allegations

68.     The Plaintiffs bring this action on their own behalf and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23 (b)(3) on behalf of the following Class:

69.     All persons or their surviving immediate family members who were victims of torture, extrajudicial killings, disappearances, rape and/or murder by and through the actions of the Saddam regime within the territory of Iraq from 1996 through March 2003.

70.     Plaintiffs do not know the exact number of members of their class.  However, the members of their class are at least in the thousands based on the multitude of reports by international organizations and non-governmental organizations which document the Saddam

14

and are so geographically dispersed, across Iraq and the world, that joinder is impracticable.

Case 1:07-cv-07935-GEL    Document 23-2    Filed 12/14/2007    Page 15 of 70

71.    Plaintiffs' claims are typical of the claims of the other Class members.

72.    There are questions of law and fact common to all their class members, including but not

limited to:

      a)    Whether AWB's and BNP Paribas's conduct constitutes aiding and abetting the Saddam Hussein regime in their violent campaign to maintain power;

      b)    Whether AWB and  BNP Paribas's participation in the conspiracy was the proximate cause of the death and suffering the of Plaintiffs and their families;

      c)    Whether the Saddam Hussein regime's actions during the relevant time period constitute war crimes;

      d)    Whether the Saddam Hussein regime's actions during the relevant time period constitute crimes against humanity;

      e)    Whether the Saddam Hussein regime's actions during the relevant time period constitute genocide;

      f)    Whether the Saddam Hussein regime's actions during the relevant time period constitute extrajudicial killings;

      g)    Whether the Saddam Hussein regime's actions during the relevant time period constitute forced disappearances;

      h)    Whether the Saddam Hussein regime's actions during the relevant time period constitute cruel, inhuman, and/or degrading treatment and/or punishment;

      i)    Whether the Saddam Hussein regime's actions during the relevant time period constitute violations of the TVPA;

      j)    Whether the Defendants are liable under the wrongful death statute, N.Y. Estates, Powers and Trusts Laws §5-4.1 (McKinney 2007) ;

      k)    Whether the Saddam Hussein regime's actions during the relevant time period constitute negligence;

      l)    Whether the Saddam Hussein regime's actions during the relevant time period constitute battery;

      m)    Whether the Saddam Hussein regime's actions during the relevant time period constitute intentional infliction of emotional distress;

the Saddam Hussein regime's actions during the release time period constitute negligent infliction of emotional distress;

o)	Whether AWB, the Saddam Hussein regime and its agency the IGB, and BNP Paribas agreed to participate in an unlawful act; and

p)	Whether AWB and BNP Paribas acted intentionally, recklessly, or negligently in its unlawful support and aid of the Saddam regime.

73.	The common questions of law and fact predominate over any questions that may affect only individual members.

74.	Plaintiffs are represented by counsel competent and experienced in the prosecution of class action litigation, and will fairly and adequately protect he interests of the members of their class.

75.	Plaintiffs' interests are aligned with, and not antagonistic to, the interests of the other members of their class with respect to the subject matter of this litigation.

76.	A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

### First Claim For Relief
### Crimes Against Humanity

77.	Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 76 as if fully set forth herein.

78.	The abuses committed against the Plaintiffs and the members of their class by the Defendants constitute crimes against humanity.

79.	Defendants supported, contributed to, aided and abetted, and participated in the furtherance of the murder and torture of the spouses of the Plaintiffs and the members of their class.

16

systematic and/or widespread attack against the Plaintiffs and the members of their class, all of whom were a part of a civilian population.

81.     The Plaintiffs' spouses and the members of their class did not bear arms, were not part of a militia or fighting force, and did wear a uniform of a fighting faction. The spouses of the Plaintiffs and the members of their class were civilians.

82.     Defendants, by participating in the furtherance of those inhuman actions, caused great suffering, serious bodily injury, death and serious mental and emotional suffering for the Plaintiffs and the members of their class.

83.     Defendants' acts and omissions constitute "torts committed in violation of the law of nations or a treaty of the United States" under 28 U.S.C. §1350 and also customary international law prohibiting crimes against humanity as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

84.     The Defendant Australian Wheat Board aided and abetted the Saddam Hussein regime by knowingly providing practical assistance and/or encouragement through direct payments in violation of international law which had the substantial effect on the perpetration of the torture, genocide and other actions herein complained of.

85.     The Defendant BNP Paribas aided and abetted the Saddam Hussein regime by knowingly providing knowing practical assistance and/or encouragement through offering and providing an escrow account where the funds were held, analyzed for compliance with the Security Counsel Resolution 986, and nevertheless disbursed to the Saddam Hussein Regime and used in furtherance of the actions herein complained of.

17

86. The acts and omissions constituting crimes against humanity caused Plaintiffs and the
members of their class to suffer damages, including severe physical and mental pain, suffering and death, in amounts to be determined at trial.

87. Defendants' acts and omissions were deliberate, willful, intentional, wanton, malicious, and/or oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

### Second Claim for Relief
### War Crimes

88. Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 87 as if fully set forth herein.

89. The Saddam Hussein regime with the aid, support, and participation of the Defendants committed acts of violence against persons taking no active part in the hostilities, including:

   a) violence to the Plaintiffs' spouses, in particular, murder, mutilation, cruel treatment and torture;

   b) committed outrages upon personal dignity, in particular humiliating and degrading treatment; and/or

   c) the carrying out of executions without previous judgments pronounced by any regularly constituted court, affording no judicial processes which are universally recognized as indispensable.

90. The actions of the Saddam Hussein regime were more than a discrete disturbance or tension, such as a riot. The continued violence against the Plaintiffs and the members of their class were not isolated and/or sporadic acts of violence. The continued campaign against the members of their class constituted an internal armed conflict.

91. As an example of the actions herein complained of, the Saddam Hussein regime captured, tortured, and murdered Saadya Mustafa's spouse, Khalid Mustafa, a nurse, caring for individuals who had been wounded in Saddam Hussein regime's attacks on the Kurdish people. He was a

civilian working in a humanitarian capacity and was intentionally targeted by the Saddam Hussein regime in its attempts to oppress and maintain control over the Kurdish people.

92.    Another example was the capture, unlawful incarceration, forced disappearance, torture, and murder of Kafia Ismail's spouse.

93.    The Defendant Australian Wheat Board aided and abetted the Saddam Hussein regime by knowingly providing practical assistance and/or encouragement through direct payments in violation of international law which had the substantial effect on the perpetration the actions herein complained of.

94.    The Defendant BNP Paribas aided and abetted the Saddam Hussein regime by knowingly providing practical assistance and/or encouragement through offering and providing an escrow account where the funds were held, analyzed for compliance with the Security Counsel Resolution 986, and nevertheless disbursed to the Saddam Hussein regime to be used in furtherance of the actions herein complained of.

95.    Defendants' acts and omissions constitute "torts committed in violation of the law of nations or a treaty of the United States" under 28 U.S.C. §1350 and also customary international law prohibiting crimes against humanity as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

96.    The acts and omissions constituting crimes against humanity caused Plaintiffs and the members of their class to suffer damages, including severe physical and mental pain and suffering, in amounts to be determined at trial.

19

97. Defendants' acts and omissions were deliberate, willful, intentional, wanton, malicious,

and/or oppressive, and should be punished by an award of punitive damages in an amount to be

determined at trial.

### Third Claim for Relief
### Genocide

98. Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1

through 97 of this Complaint as if fully set forth herein.

99. The Saddam Hussein regime acted with the intent to destroy, in whole or in part, the

national, ethnic, and/or religious groups including the Kurdish people, the Shiite people, and the

Marsh Arabs in the territory of Iraq by committing the following acts:

  a)   killed members of the national, ethnic, and/or religious groups including the Kurdish people, the Shiite people, and the Marsh Arabs;

  b)   caused serious bodily and/or mental harm to the national, ethnic, and/or religious groups including the Kurdish people, the Shiite people, and the Marsh Arabs; and/or

  c)   deliberately inflicted on the national, ethnic, and/or religious groups including the Kurdish people, the Shiite people, and the Marsh Arabs conditions of life calculated to bring about its physical destruction in whole or in part.

100. The Defendant Australian Wheat Board aided and abetted the Saddam Hussein regime by

knowingly providing practical assistance and/or encouragement through direct payments in

violation of international law which had the substantial effect on the perpetration of the actions

herein complained of.

101. The Defendant BNP Paribas aided and abetted the Saddam Hussein regime by knowingly

providing practical assistance and/or encouragement through offering and providing an escrow

account where the funds were held, analyzed for compliance with the Security Counsel

Resolution 986, and nevertheless disbursed to the Saddam Hussein regime to be used in

furtherance of the actions herein complained of.

102.   Defendants' acts and omissions constitute "torts committed in violation of the law of nations or a treaty of the United States" under 28 U.S.C. §1350 and also customary international law prohibiting crimes against humanity as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

103.   The acts and omissions constituting crimes against humanity caused Plaintiffs and the members of their class to suffer damages, including severe physical and mental pain and suffering, in amounts to be determined at trial.

104.   Defendants' acts and omissions were deliberate, willful, intentional, wanton, malicious, and/or oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

### Fourth Claim For Relief
### Torture

105.   Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 104 as if fully set forth herein.

106.   The Plaintiffs' spouses and the members of their class were tortured by Saddam Hussein regime under the color of law.

107.   The torture committed against the Plaintiffs' spouses and the members of their class were part of the campaign of violence against the Iraqi people that constituted crimes against humanity, genocide, and war crimes conducted by the Saddam Hussein regime and furthered by the actions of the Defendants.

108.   The Plaintiffs' spouses and the members of their class suffered the intentional infliction of severe pain or suffering, physical or mental, while in custody and/or under the control of the Saddam Hussein regime.

21

109.    The suffering of the Plaintiffs and the members of their class did not result from lawful sanctions.

110.    The Defendant Australian Wheat Board aided and abetted the Saddam Hussein regime by knowingly providing practical assistance and/or encouragement through direct payments in violation of international law which had the substantial effect on the perpetration of the torture.

111.    The Defendant BNP Paribas aided and abetted the Saddam Hussein regime by knowingly providing practical assistance and/or encouragement through offering and providing an escrow account where the funds were held, analyzed for compliance with the Security Counsel Resolution 986, and disbursed to the Saddam Hussein regime to be used in furtherance of the actions herein complained of.

112.    Defendants' acts and omissions constitute "torts committed in violation of the law of nations or a treaty of the United States" under 28 U.S.C. §1350 and also customary international law prohibiting crimes against humanity as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

113.    The acts and omissions constituting crimes against humanity caused Plaintiffs and the members of their class to suffer damages, including severe physical and mental pain and suffering, in amounts to be determined at trial.

114.    Defendants' acts and omissions were deliberate, willful, intentional, wanton, malicious, and/or oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

**Fifth Claim For Relief**
**Extrajudicial Killings**

115.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 114 of this Complaint as if fully set forth herein.

116.    The Plaintiffs' spouses and the members of their class were deliberately killed under the color of law by the Saddam Hussein regime without the authority of a previous judgment of a regularly constituted court and had not been afforded any of the judicial processes which are recognized as indispensable to civilized peoples.

117.    These killings were unlawful under international law.

118.    No adjudication occurred prior to the intentional killing of the Plaintiffs' spouses and the members of their class.

119.    The Defendant Australian Wheat Board aided and abetted the Saddam Hussein regime by knowingly providing practical assistance and/or encouragement through direct payments in violation of international law which had a substantial effect on the perpetration of the extrajudicial killings and the other actions herein complained of.

120.    The Defendant BNP Paribas aided and abetted the Saddam Hussein regime by providing knowing practical assistance and/or encouragement through offering and providing an escrow account where the funds were held, analyzed for compliance with the Security Counsel Resolution 986, and nevertheless disbursed to the Saddam Hussein Regime to be used in furtherance of the actions herein complained of.

121.    Defendants' acts and omissions constitute "torts committed in violation of the law of nations or a treaty of the United States" under 28 U.S.C. §1350 and also customary international law prohibiting crimes against humanity as reflected, expressed, and defined in multilateral

23

Case 1:17-cv-00597 Document 1 Filed 04/04/07 Page 24 of 70
other authorities.

122.     The acts and omissions constituting crimes against humanity caused Plaintiffs and the members of their class to suffer damages, including severe physical and mental pain and suffering, in amounts to be determined at trial.

123.     Defendants' acts and omissions were deliberate, willful, intentional, wanton, malicious, and/or oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

### Sixth Claim For Relief
### Forced Disappearances of Persons

124.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 123 as if fully set forth herein.

125.     The Plaintiffs' spouses and the members of their class were arrested, detained or otherwise abducted by the Saddam Hussein regime.

126.     The Saddam Hussein regime failed and refused to acknowledge that deprivation of freedom.

127.     The Saddam Hussein regime failed and refused to give information on the fate or whereabouts of the Plaintiffs' spouses and the members of their class.

128.     The Saddam Hussein regime had the intention of removing Plaintiffs' spouses and the members of their class from the protection of the law for a prolonged period of time.   By example, Plaintiff, Saadya Mustafa did not learn that her spouse had been killed until 2003 when the lists of victims of the Saddam Hussein regime were released.   Another example is Kafia Ismail's spouse who was held and tortured for over a year in prison.

24

129. The Defendant Australian Wheat Board aided and abetted the Saddam Hussein regime by

providing knowing practical assistance and/or encouragement through direct payments in violation of international law which had the substantial effect on the perpetration of the actions herein complained of.

130. The Defendant BNP Paribas aided and abetted the Saddam Hussein regime by providing knowing practical assistance and/or encouragement through offering and providing an escrow account where the funds were held, analyzed for compliance with the Security Counsel Resolution 986, and disbursed to the Saddam Hussein Regime to be used in furtherance of the actions herein complained of.

131. Defendants' acts and omissions constitute "torts committed in violation of the law of nations or a treaty of the United States" under 28 U.S.C. §1350 and also customary international law prohibiting crimes against humanity as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

132. The acts and omissions constituting crimes against humanity caused Plaintiffs and the members of their class to suffer damages, including severe physical and mental pain and suffering, in amounts to be determined at trial.

133. Defendants' acts and omissions were deliberate, willful, intentional, wanton, malicious, and/or oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## Seventh Claim For Relief
### Cruel, Inhuman, and/or Degrading Treatment and/or Punishment

135. Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 134 as if fully set forth herein.

25

136.    The abuses committed against Plaintiffs and the members of their class described herein each separately constitute cruel, inhuman, degrading treatment or punishment.  These acts include, but are not limited to the actions set forth in paragraph 116.

137.    Defendants' acts also constitute torts committed in violation of the law of nations, and thus of the United States, as reflected in federal common law which incorporates cruel, inhuman, or degrading treatment or punishment, pursuant to 28 U.S.C. §§1331 and 1350.  Thus, the conduct constitutes a violation of the law of nations and customary international law prohibiting Cruel, Inhuman, Degrading Treatment or Punishment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities.  Cruel, inhuman, or degrading treatment or punishment is similarly reflected, expressed, defined and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities, and is thus actionable.

138.    The Defendant Australian Wheat Board aided and abetted the Saddam Hussein regime by knowingly providing practical assistance and/or encouragement through direct payments in violation of international law which had the substantial effect on the perpetration of the actions herein complained of.

139.    The Defendant BNP Paribas aided and abetted the Saddam Hussein regime by knowingly providing practical assistance and/or encouragement through offering and providing an escrow account where the funds were held, analyzed for compliance with the Security Counsel Resolution 986, and nevertheless disbursed to the Saddam Hussein Regime to be used in furtherance of the actions herein complained of.

140.    Defendants' acts and omissions constitute "torts committed in violation of the law of nations or a treaty of the United States" under 28 U.S.C. §1350 and also customary international law prohibiting crimes against humanity as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

141.    Defendants' acts and omissions described herein caused Plaintiffs and the members of their class to suffer damages, including severe mental and emotional pain and suffering in an amount to be proven at trial.

142.    Defendants' acts and omissions were deliberate, willful, intentional, wanton malicious and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

### Eighth Claim For Relief
### Violations of the Torture Victims Protection Act of 1991 (TVPA)

143.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 142 as if fully set forth herein.

144.    Plaintiffs' spouses and the members of their class were tortured by the persons under the control and authority of the Saddam regime.  The persons who carried out the atrocities were acting under the color of law and/or with apparent or actual authority from the Saddam regime.

145.    Plaintiffs' spouses and the members of their class were subject to extrajudicial killings by persons under the control of or who represented the Saddam regime.

146.    The Plaintiffs' spouses and the members of their class were subject to violence directed against them in the custody and/or physical control of the Saddam regime, by which severe pain or suffering

27

147.    The actions of the Saddam regime were intentionally inflicted on Plaintiffs' spouses and the members of their class for such purposes as obtaining from them or a third person information or a confession, punishing them for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing them or a third person, or for any reason based on discrimination of any kind.

148.    The Plaintiffs' spouses and the members of their class suffered prolonged mental harm as a direct and proximate result of the intentional infliction and/or threatened infliction of severe physical pain or suffering, the administration or application, and/or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality, the threat of imminent death, and/or the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

### Ninth Claim For Relief
### Wrongful Death
### N.Y. Estates, Powers and Trusts Laws §5-4.1 (McKinney 2007)

149.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 148 as if fully set forth herein.

150.    Defendants owed a duty to the Plaintiffs and the members of their class to refrain from intentional and wantonly harmful or outrageous conduct. Defendants owed a duty to Decedents because they were foreseeable victims in the regular, routine, and continuous campaign by the Saddam Hussein regime against particular groups of civilians throughout Iraq.

151.    Defendants owed a duty to the Plaintiffs and the members of their class to refrain from the support, aid, and financing of the Saddam Hussein regime through the Security Council

28

Resolution 986 which prohibited payment to the regime outside of the approved UN Oil-for-Food Program.

152.    Defendants had a duty under their contractual obligation with the United Nations to avoid payments to the Saddam Hussein regime outside of the UN Oil-for-Food Program because such payments contributed to the furtherance of crimes against humanity and egregious human rights abuses that Saddam Hussein was committing openly, regularly, and notoriously against the Iraqi people.

153.    Defendants also had a duty under customary international law, including but not limited to the torture convention and relevant international criminal statutes, which contribute to the body of the law of nations.

154.    Defendants breached those duties by aiding and abetting, contributing, participating, and financing the attack on Erbil through the illegal payments made to the Saddam Hussein regime in direct violation of the Security Council Sanctions and UN Oil-For-Food Program.

155.    As a direct and proximate cause of Defendants' breach of duty, Plaintiffs' spouses and the members of their class were killed.    It was reasonably foreseeable that the support, contribution, and participation in the furtherance of the criminal campaign would result in such deaths.

156.    Plaintiff Saadya Mustafa is the legal and personal representative of her deceased husband and brings this suit on behalf of her next of kin, Khalid Ahmed.

157.    The Defendant Australian Wheat Board aided and abetted the Saddam Hussein regime by knowingly providing practical assistance and/or encouragement through direct payments in violation of international law which had the substantial effect on the perpetration of the actions herein complained of.

158.    The Defendant BNP Paribas aided and abetted the Saddam Hussein regime by knowingly providing practical assistance and/or encouragement through offering and providing an escrow account where the funds were held, analyzed for compliance with the Security Counsel Resolution 986, and nevertheless disbursed to the Saddam Hussein Regime to be used in furtherance of the actions herein complained of.

159.    Defendants' acts and omissions constitute "torts committed in violation of the law of nations or a treaty of the United States" under 28 U.S.C. §1350 and also customary international law prohibiting crimes against humanity as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

160.    Defendants' acts and omissions described herein caused the Plaintiffs and the members of their class, to suffer damages, including pecuniary damages, in an amount to be proven at trial.

161.    Defendants' acts and omissions were deliberate, willful, intentional, wanton, malicious, and/or oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

### Tenth Claim For Relief
### Negligence

162.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 161 as if fully set forth herein.

163.    Defendants owed a duty to Plaintiffs and the members of their class because they were foreseeable victims of the support, contribution, aid, and participation of the furtherance of the murder and torture by the Saddam Hussein regime.

164.    Furthermore, Defendants owed a duty to Plaintiffs and the members of their class to refrain from intentionally and wantonly harmful or outrageous conduct.

165.    Defendants breached those duties by supporting, contributing to, aiding and abetting, and participating in the furtherance of the murder, torture, and other actions complained of herein of the Plaintiffs' spouses and the members of their class.

166.    The Defendant Australian Wheat Board aided and abetted the Saddam Hussein regime by knowingly providing practical assistance and/or encouragement through direct payments in violation of international law which had the substantial effect on the perpetration of the actions herein complained of.

167.    The Defendant BNP Paribas aided and abetted the Saddam Hussein regime by knowingly providing practical assistance and/or encouragement through offering and providing an escrow account where the funds were held, analyzed for compliance with the Security Counsel Resolution 986, and disbursed to the Saddam Hussein regime to be used in furtherance of the actions herein complained of.

168.    Defendants' acts and omissions constitute "torts committed in violation of the law of nations or a treaty of the United States" under 28 U.S.C. §1350 and also customary international law prohibiting crimes against humanity as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

169.    As a direct and proximate result of Defendants' negligence, Plaintiffs and the members of their class suffered serious damages. It was reasonably foreseeable that the support, contribution to, aid, and participation in the furtherance of the criminal campaign of the Saddam Hussein regime would cause this harm.

31

170.    Beyond mere negligence, Defendants' acts were deliberate, willful, intentional, wanton, malicious, and/or oppressive, and should be punished by an award of punitive damages in addition to compensatory damages, in respective amounts to be determined at trial.

### Eleventh Claim For Relief
### Battery

171.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 170 as if fully set forth herein.

172.    Defendants, by purposefully and/or knowingly and/or intentionally supporting, contributing to, aiding and abetting, and participating in the furtherance of the murder, torture, and other action complained of herein of the Plaintiffs' spouses and the members of their class which constitute offensive and/or harmful contact Plaintiffs' spouses and the members of their class which constituted battery.

173.    Defendants furthered the conduct that was intended to bring about this unlawful conduct.

174.    The Defendant Australian Wheat Board aided and abetted the Saddam Hussein regime by knowingly providing practical assistance and/or encouragement through direct payments in violation of international law which had the substantial effect on the perpetration of the actions herein complained of.

175.    The Defendant BNP Paribas aided and abetted the Saddam Hussein regime by knowingly providing practical assistance and/or encouragement through offering and providing an escrow account where the funds were held, analyzed for compliance with the Security Counsel Resolution 986, and nevertheless disbursed to the Saddam Hussein Regime to be used in furtherance of the actions herein complained of.

176.    Defendants' acts and omissions constitute "torts committed in violation of the law of nations or a treaty of the United States" under 28 U.S.C. §1350 and also customary international

32

treaties and other international instruments, international and domestic judicial decisions, and

other authorities.

177.    As a direct and proximate result of Defendants' battery, Plaintiffs and the members of

their class suffered serious damages.  It was reasonably foreseeable that the actions complained

of herein would cause this harm.

178.    Defendants' acts and omissions were deliberate, willful, intentional, wanton, malicious

and/or oppressive, and should be punished by an award of punitive damages in an amount to be

determined at trial.

### Twelfth Claim For Relief
### Intentional Infliction of Emotional Distress

179.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1

through 178 as if fully set forth herein.

180.    The Defendants acted intentionally and/or recklessly in their actions to support, aid and

abet the Saddam Hussein regime as it killed, tortured, and caused the disappearances of the

Plaintiffs' spouses and the members of their class.

181.    The Defendants' conduct was extreme and outrageous in that they knowingly perpetuated

the campaign of violence against the Plaintiffs, their spouses, and the members of their class.

182.    The Defendants made illegal payments which they knew were used to kill and torture

individuals in order for the Saddam Hussein regime to maintain power.

183.    The Defendants' conduct was the direct and proximate cause of the emotional suffering

of the Plaintiff and all individuals similarly situated.  The Defendants intentionally violated laws

of the UN Oil For Food Program which were created to protect the lives and human rights of the

Iraqi people.  The intentional violations were done to ensure increased profits in Iraq by and

33

through a strong Saddam Hussein regime. The entire scheme was based on maintaining the status quo, which included the Saddam Hussein regime exerting its power over the nation-state through killings, torture and the other actions herein complained of.

184.    The Plaintiffs and the members of their class suffered severe emotional distress including but not limited to despair, depression, and extreme grief.

185.    The Defendant Australian Wheat Board aided and abetted the Saddam Hussein regime by knowingly providing practical assistance and/or encouragement through direct payments in violation of international law which had the substantial effect on the perpetration of the actions herein complained of.

186.    The Defendant BNP Paribas aided and abetted the Saddam Hussein regime by knowingly providing practical assistance and/or encouragement through offering and providing an escrow account where the funds were held, analyzed for compliance with the Security Counsel Resolution 986, and nevertheless disbursed to the Saddam Hussein regime to be used in furtherance of the actions herein complained of.

187.    Defendants' acts and omissions constitute "torts committed in violation of the law of nations or a treaty of the United States" under 28 U.S.C. §1350 and also customary international law prohibiting crimes against humanity as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

188.    The acts and omissions constituting crimes against humanity caused Plaintiffs and the members of their class to suffer damages, including severe physical and mental pain and suffering, in amounts to be determined at trial.

34

189.    Defendants' acts and omissions were deliberate, willful, intentional, wanton, malicious,

and/or oppressive, and should be punished by an award of punitive damages in an amount to be

determined at trial.

### Thirteenth Claim For Relief
### Negligent Infliction of Emotional Distress

190.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1

through 189 as if fully set forth herein.

191.    The Defendants' conduct was the direct and proximate cause of the emotional suffering

of the Plaintiffs and the members of their class.  The Defendants intentionally violated laws of

the UN Oil For Food Program which were created to protect the lives and human rights of the

Iraqi people.  The intentional violations were done to ensure increased profits in Iraq by and

through a strong Saddam Hussein regime.  The entire scheme was based on maintaining the

status quo, which included the Saddam Hussein regime exerting its power over the Iraqi people,

specifically the groups identified in paragraph 79 of the Complaint, through killings, torture and

the other actions herein complained of.

192.    The emotional distress suffered by the Plaintiffs and the members of their class was the

result of them being in the psychic-zone of danger.  The Defendants knew that their illegal

payments were being used to murder individuals who had family and loved ones.  Their conduct

was negligent as toward the families of the victims of killings, torture, and disappearances by the

Saddam Hussein regime.

193.    The Plaintiffs and the members of their class suffered severe emotional distress including

but not limited to despair, depression, and extreme grief.

194.    The Defendant Australian Wheat Board aided and abetted the Saddam Hussein regime by

knowingly providing practical assistance and/or encouragement through direct payments in

35

violation of international law which had the substantial effect on the perpetration of the extrajudicial killings.

195.    The Defendant BNP Paribas aided and abetted the Saddam Hussein regime by knowingly providing practical assistance and/or encouragement through offering and providing an escrow account where the funds were held, analyzed for compliance with the Security Counsel Resolution 986, and nevertheless disbursed to the Saddam Hussein regime to be used in furtherance of the Genocide.

196.    Defendants' acts and omissions constitute "torts committed in violation of the law of nations or a treaty of the United States" under 28 U.S.C. §1350 and also customary international law prohibiting crimes against humanity as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

197.    The acts and omissions constituting crimes against humanity caused Plaintiffs' and the members of their class to suffer damages, including severe physical and mental pain and suffering, in amounts to be determined at trial.

198.    Defendants' acts and omissions were deliberate, willful, intentional, wanton, malicious, and/or oppressive, and were also negligent should be punished by an award of punitive damages in an amount to be determined at trial.

**WHEREFORE,** Plaintiffs pray for judgment against Defendants as follows:

a)    For compensatory damages in an amount to be determined at trial;

b)    For certification of the class as defined herein;

c)    For punitive damages and exemplary damages in an amount to be determined at trial;

d)    For reasonable attorneys' fees and costs of suit;

e)    For a declaratory judgment that Defendants' conduct was in violation of the law of nations, the common law of New York, N.Y. Estates, Powers and Trusts Laws §5-4.1 (McKinney 2007), and/or Torture Victim Protection Act of 1991 (TVPA);

f)    For pre-judgment and post-judgment interest; and

g)    For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

A jury trial is endorsed herein.

Respectfully submitted,

_Mary S Birkett_

MURRAY & MURRAY CO., L.P.A.
Mary S. Birkett
Direct Dial: (419) 626-7003
mso@murrayandmurray.com


OF COUNSEL:
MURRAY & MURRAY CO., L.P.A.
Dennis E. Murray Sr.
dennis@murrayandmurray.com
John T. Murray
Direct Dial: (419) 624-3125
jotm@murrayandmurray.com
Leslie O. Murray
Direct Dial: (419) 624-3010
leslie@murrayandmurray.com
111 East Shoreline Drive
Sandusky, Ohio 44871-0019
Facsimile:     (419) 624-0707

Attorneys for Plaintiffs

37





**United Nations**

S/RES/986 (1995)

14 April 1995

# RESOLUTION 986 (1995)

*Adopted by the Security Council at its 3519th meeting,*

*on 14 April 1995*

*The Security Council,*

*Recalling* its previous relevant resolutions,

*Concerned* by the serious nutritional and health situation of the Iraqi population, and by the risk of a further deterioration in this situation,

*Convinced* of the need as a temporary measure to provide for the humanitarian needs of the Iraqi people until the fulfilment by Iraq of the relevant Security Council resolutions, including notably resolution 687 (1991) of 3 April 1991, allows the Council to take further action with regard to the prohibitions referred to in resolution 661 (1990) of 6 August 1990, in accordance with the provisions of those resolutions,

*Convinced also* of the need for equitable distribution of humanitarian relief to all segments of the Iraqi population throughout the country,

*Reaffirming* the commitment of all Member States to the sovereignty and territorial integrity of Iraq,

*Acting* under Chapter VII of the Charter of the United Nations,

1. *Authorizes* States, notwithstanding the provisions of paragraphs 3 (a), 3 (b) and 4 of resolution 661 (1990) and subsequent relevant resolutions, to permit the import of petroleum and petroleum products originating in Iraq, including financial and other essential transactions directly relating thereto, sufficient to produce a sum not exceeding a total of one billion United States dollars every 90 days for the purposes set out in this resolution and subject to the following conditions:

(a)Approval by the Committee established by resolution 661 (1990), in order to ensure the transparency of each transaction and its conformity with the other provisions of this resolution, after submission of an application by the State concerned, endorsed by the Government of Iraq, for each proposed purchase of Iraqi petroleum and petroleum products, including details of the purchase price at fair market value, the export route, the opening of a letter of credit payable to the escrow account to be established by the Secretary-General for the purposes of this resolution, and of any other directly related financial or other essential transaction;

(b)Payment of the full amount of each purchase of Iraqi petroleum and petroleum products directly by the purchaser in the State concerned into the escrow account to be established by the Secretary-General for the purposes of this resolution;

2.*Authorizes* Turkey, notwithstanding the provisions of paragraphs 3 (a), 3 (b) and 4 of resolution 661 (1990) and the provisions of paragraph 1 above, to permit the import of petroleum and petroleum products originating in Iraq sufficient, after the deduction of the percentage referred to in paragraph 8 (c) below for the Compensation Fund, to meet the pipeline tariff charges, verified as reasonable by the independent inspection agents referred to in paragraph 6 below, for the transport of Iraqi petroleum and petroleum products through the Kirkuk- Yumurtalik pipeline in Turkey authorized by paragraph 1 above;

3.*Decides* that paragraphs 1 and 2 of this resolution shall come into force at 00.01 Eastern Standard Time on the day after the President of the Council has informed the members of the Council that he has received the report from the Secretary-General requested in paragraph 13 below, and shall remain in force for an initial period of 180 days unless the Council takes other relevant action with regard to the provisions of resolution 661 (1990);

4.*Further decides* to conduct a thorough review of all aspects of the implementation of this resolution 90 days after the entry into force of paragraph 1 above and again prior to the end of the initial 180 day period, on receipt of the reports referred to in paragraphs 11 and 12 below, and *expresses its intention*, prior to the end of the 180 day period, to consider favourably
renewal of the provisions of this resolution, provided that the reports referred to in paragraphs 11 and 12 below indicate that those provisions are being satisfactorily implemented;

5.*Further decides* that the remaining paragraphs of this resolution shall come into force forthwith;

6.*Directs* the Committee established by resolution 661 (1990) to monitor the sale of petroleum and petroleum products to be exported by Iraq via the Kirkuk-Yumurtalik pipeline from Iraq to Turkey and from the Mina al-Bakr oil terminal, with the assistance of independent inspection agents appointed by the Secretary-General, who will keep the Committee informed of the amount of petroleum and petroleum products exported from Iraq after the date of entry into force of paragraph 1 of this resolution, and will verify that the purchase price of the petroleum and petroleum products is reasonable in the light of prevailing market conditions, and that, for the purposes of the arrangements set out in this resolution, the larger share of the petroleum and petroleum products is shipped via the Kirkuk-Yumurtalik pipeline and the remainder is exported from the Mina al-Bakr oil terminal;

7.*Requests* the Secretary-General to establish an escrow account for the purposes of this resolution, to appoint independent and certified public accountants to audit it, and to keep the Government of Iraq fully informed;

8.*Decides* that the funds in the escrow account shall be used to meet the humanitarian needs of the

(a)To finance the export to Iraq, in accordance with the procedures of the Committee established by resolution 661 (1990), of medicine, health supplies, foodstuffs, and materials and supplies for essential civilian needs, as referred to in paragraph 20 of resolution 687 (1991) provided that:

(i) Each export of goods is at the request of the Government of Iraq;

(ii)Iraq effectively guarantees their equitable distribution, on the basis of a plan submitted to and approved by the Secretary-General, including a description of the goods to be purchased;

(iii) The Secretary-General receives authenticated confirmation that the exported goods concerned have arrived in Iraq;

(b)To complement, in view of the exceptional circumstances prevailing in the three Governorates mentioned below, the distribution by the Government of Iraq of goods imported under this resolution, in order to ensure an equitable distribution of humanitarian relief to all segments of the Iraqi population throughout the country, by providing between 130 million and 150 million United States dollars every 90 days to the United Nations Inter-Agency Humanitarian Programme operating within the sovereign territory of Iraq in the three northern Governorates of Dihouk, Arbil and Suleimaniyeh, except that if less than one billion United States dollars worth of petroleum or petroleum products is sold during any 90 day period, the Secretary-General may provide a proportionately smaller amount for this purpose;

(c)To transfer to the Compensation Fund the same percentage of the funds deposited in the escrow account as that decided by the Council in paragraph 2 of resolution 705 (1991) of 15 August 1991;

(d)To meet the costs to the United Nations of the independent inspection agents and the certified public accountants and the activities associated with implementation of this resolution;

(e)To meet the current operating costs of the Special Commission, pending subsequent payment in full of the costs of carrying out the tasks authorized by section C of resolution 687 (1991);

(f)To meet any reasonable expenses, other than expenses payable in Iraq, which are determined by the Committee established by resolution 661 (1990) to be directly related to the export by Iraq of petroleum and petroleum products permitted under paragraph 1 above or to the export to Iraq, and activities directly necessary therefor, of the parts and equipment permitted under paragraph 9 below;

(g)To make available up to 10 million United States dollars every 90 days from the funds deposited in the escrow account for the payments envisaged under paragraph 6 of resolution 778 (1992) of 2 October 1992;

9.*Authorizes* States to permit, notwithstanding the provisions of paragraph 3 (c) of resolution 661 (1990):

(a)The export to Iraq of the parts and equipment which are essential for the safe operation of the Kirkuk-Yumurtalik pipeline system in Iraq, subject to the prior approval by the Committee established by resolution 661 (1990) of each export contract;

(b)Activities directly necessary for the exports authorized under subparagraph (a) above, including

precluded by paragraph 4 of resolution 661 (1990) and by paragraph 11 of resolution 778 (1991) from being raised in funds in accordance with these provisions, the cost of such exports and activities may, until funds begin to be paid into the escrow account established for the purposes of this resolution, and following approval in each case by the Committee established by resolution 661 (1990), exceptionally be financed by letters of credit, drawn against future oil sales the proceeds of which are to be deposited in the escrow account;

11.*Requests* the Secretary-General to report to the Council 90 days after the date of entry into force of paragraph 1 above, and again prior to the end of the initial 180 day period, on the basis of observation by United Nations personnel in Iraq, and on the basis of consultations with the Government of Iraq, on whether Iraq has ensured the equitable distribution of medicine, health supplies, foodstuffs, and materials and supplies for essential civilian needs, financed in accordance with paragraph 8 (a) above, including in his reports any observations he may have on the adequacy of the revenues to meet Iraq's humanitarian needs, and on Iraq's capacity to export sufficient quantities of petroleum and petroleum products to produce the sum referred to in paragraph 1 above;

12.*Requests* the Committee established by resolution 661 (1990), in close coordination with the Secretary-General, to develop expedited procedures as necessary to implement the arrangements in paragraphs 1, 2, 6, 8, 9 and 10 of this resolution and to report to the Council 90 days after the date of entry into force of paragraph 1 above and again prior to the end of the initial 180 day period on the implementation of those arrangements;

13.*Requests* the Secretary- General to take the actions necessary to ensure the effective implementation of this resolution, authorizes him to enter into any necessary arrangements or agreements, and *requests* him to report to the Council when he has done so;

14.*Decides* that petroleum and petroleum products subject to this resolution shall while under Iraqi title be immune from legal proceedings and not be subject to any form of attachment, garnishment or execution, and that all States shall take any steps that may be necessary under their respective domestic legal systems to assure this protection, and to ensure that the proceeds of the sale are not diverted from the purposes laid down in this resolution;

15.*Affirms* that the escrow account established for the purposes of this resolution enjoys the privileges and immunities of the United Nations;

16.*Affirms* that all persons appointed by the Secretary-General for the purpose of implementing this resolution enjoy privileges and immunities as experts on mission for the United Nations in accordance with the Convention on the Privileges and Immunities of the United Nations, and *requires* the Government of Iraq to allow them full freedom of movement and all necessary facilities for the discharge of their duties in the implementation of this resolution;

17.*Affirms* that nothing in this resolution affects Iraq's duty scrupulously to adhere to all of its obligations concerning servicing and repayment of its foreign debt, in accordance with the appropriate international mechanisms;

18.*Also affirms* that nothing in this resolution should be construed as infringing the sovereignty or territorial integrity of Iraq;

19.Decides to remain seized of the matter.





**United
Nations**

S/RES/0661 (1990)
6 August 1990

# RESOLUTION 661 (1990)

### Adopted by the Security Council at its 2933rd meeting on 6 August 1990

The Security Council,

Reaffirming its resolution 660 (1990) of 2 August 1990,

Deeply concerned that that resolution has not been implemented and that the invasion by Iraq of Kuwait continues with further loss of human life and material destruction,

Determined to bring the invasion and occupation of Kuwait by Iraq to an end and to restore the sovereignty, independence and territorial integrity of Kuwait,

Noting that the legitimate Government of Kuwait has expressed its readiness to comply with resolution 660 (1990),

Mindful of its responsibilities under the Charter of the United Nations for the maintenance of international peace and security,

Affirming the inherent right of individual or collective self-defence, in response to the armed attack by Iraq against Kuwait, in accordance with Article 51 of the Charter,

Acting under Chapter VII of the Charter of the United Nations,

1. Determines that Iraq so far has failed to comply with paragraph 2 of resolution 660 (1990) and has usurped the authority of the legitimate Government of Kuwait;

2. Decides, as a consequence, to take the following measures to secure compliance of Iraq with paragraph 2 of resolution 660 (1990) and to restore the authority of the legitimate Government of Kuwait;

3. Decides that all States shall prevent:

(b) Any activities by their nationals or in their territories which would promote or are calculated to promote the export or trans-shipment of any commodities or products from Iraq or Kuwait; and any dealings by their nationals or their flag vessels or in their territories in any commodities or products originating in Iraq or Kuwait and exported therefrom after the date of the present resolution, including in particular any transfer of funds to Iraq or Kuwait for the purposes of such activities or dealings;

(c) The sale or supply by their nationals or from their territories or using their flag vessels of any commodities or products, including weapons or any other military equipment, whether or not originating in their territories but not including supplies intended strictly for medical purposes, and, in humanitarian circumstances, foodstuffs, to any person or body in Iraq or Kuwait or to any person or body for the purposes of any business carried on in or operated from Iraq or Kuwait, and any activities by their nationals or in their territories which promote or are calculated to promote such sale or supply of such commodities or products;

4. Decides that all States shall not make available to the Government of Iraq or to any commercial, industrial or public utility undertaking in Iraq or Kuwait, any funds or any other financial or economic resources and shall prevent their nationals and any persons within their territories from removing from their territories or otherwise making available to that Government or to any such undertaking any such funds or resources and from remitting any other funds to persons or bodies within Iraq or Kuwait, except payments exclusively for strictly medical or humanitarian purposes and, in humanitarian circumstances, foodstuffs;

5. Calls upon all States, including States non-members of the United Nations, to act strictly in accordance with the provisions of the present resolution notwithstanding any contract entered into or licence granted before the date of the present resolution;

6. Decides to establish, in accordance with rule 28 of the provisional rules of procedure of the Security Council, a Committee of the Security Council consisting of all the members of the Council, to undertake the following tasks and to report on its work to the Council with its observations and recommendations:

(a) To examine the reports on the progress of the implementation of the present resolution which will be submitted by the Secretary-General;

(b) To seek from all States further information regarding the action taken by them concerning the effective implementation of the provisions laid down in the present resolution;

7. Calls upon all States to co-operate fully with the Committee in the fulfilment of its task, including supplying such information as may be sought by the Committee in pursuance of the present resolution;

8. Requests the Secretary-General to provide all necessary assistance to the Committee and to make the necessary arrangements in the Secretariat for the purpose;

9. Decides that, notwithstanding paragraphs 4 through 8 above, nothing in the present resolution shall

(a) To take appropriate measures to protect assets of the legitimate Government of Kuwait and its agencies;

(b) Not to recognize any regime set up by the occupying Power;

10. Requests the Secretary-General to report to the Council on the progress of the implementation of the present resolution, the first report to be submitted within thirty days;

11. Decides to keep this item on its agenda and to continue its efforts to put an early end to the invasion by Iraq.



# Report of the Inquiry into certain Australian companies in relation to the UN Oil-for-Food Programme

## Volume 1

## Summary, recommendations and background



Commissioner
The Honourable Terence RH Cole AO RFD QC

November 2006

© Commonwealth of Australia 2006

This work is copyright. Apart from any use as permitted under the *Copyright Act 1968*, no part may be reproduced by any process without prior written permission from the Commonwealth. Requests and inquiries concerning reproduction and rights should be addressed to the Commonwealth Copyright Administration, Attorney General's Department, Robert Garran Offices, National Circuit, Barton ACT 2600 or posted at http://www.ag.gov.au/cca

Report of the Inquiry into certain Australian companies in relation to the UN Oil-for-Food Programme

**ISBN**

| | |
|---|---|
| Volume 1 | 0-9803082-0-8 |
| Volume 2 | 0-9803082-1-6 |
| Volume 3 | 0-9803082-2-4 |
| Volume 4 | 0-9803082-3-2 |
| Volume 5 | 0-9803082-4-0 |
| CD-ROM | 0-9803082-5-9 |

**Special note**

In quoted material—particularly in translated material and in correspondence—there is often variation in the spelling of the names of people, places and other things. The Inquiry accepted the spelling used in the original material.

www.oilforfoodinquiry.gov.au



*Inquiry into certain Australian companies in relation to the*
*UN Oil-for-Food Programme*

24 November 2006

His Excellency Major General Michael Jeffery AC CVO MC
Governor-General of the Commonwealth of Australia
Government House
CANBERRA ACT 2600

Your Excellency

In accordance with the Letters Patent issued to me on 10 November 2005, as amended by Letters Patent dated 6 February 2006, 10 March 2006, 17 March 2006, 22 June 2006 and 21 September 2006, I have inquired into and prepared a report on certain Australian companies in relation to the UN Oil-for-Food Programme.

I have the honour to present to you my report. I return my Letters Patent.

Yours faithfully

*7. R. 4. Cole*

The Honourable TRH Cole AO RFD QC
Commissioner

# Contents

Prologue ..................................................................................................................xi

Summary of events regarding AWB ..................................................................xiii

Findings..................................................................................................................lxxxi

Recommendations ..........................................................................................lxxxiii

1     United Nations resolutions restricting trade with Iraq ........................1
      Procedures adopted by the 661 Committee to approve contracts....................11
      The Office of the Iraq Programme .....................................................................14
      Variation to procedures: Security Council Resolution 1284............................14
      Revised procedures: Security Council Resolutions 1409 and 1454 ..................16
      Interpretation of Security Council resolutions ....................................................21
      Construction of paragraph 3(c) of Resolution 661 ..............................................24
      UN Office of Legal Affairs advice..........................................................................25
      The practice of the 661 Committee and the Secretary-General.........................29
      Conclusion: interpretation of Security Council resolutions ..............................33
      UN procedures related to notification and financing of contracts....................35
      Contractual review by the United Nations............................................................51

2     Australian enforcement of United Nations resolutions ....................61
      The status of United Nations resolutions under Australian law......................61
      Implementation of United Nations resolutions in Australian law...................62
      The Customs (Prohibited Exports) Regulations 1958.........................................63
      The Banking (Foreign Exchange) Regulations 1959 ...........................................68

3     Imposition of inland transportation fees and after-sales-service
      fees: Iraq documentation ....................................................................83
      Inland transportation fees ...................................................................................84
      The after-sales-service fee ...................................................................................85

4      United Nations knowledge of breaches of sanctions: 1999 to 2003 ............. 101
       The Secretariat's state of knowledge ................................................................. 102
       The 661 Committee's state of knowledge .......................................................... 112
       Conclusion ............................................................................................................ 115

5      United Nations investigation into the Oil-for-Food Programme ................. 121
       The expressions 'illicit' and 'kickbacks' ........................................................... 124
       The manner of approval of purchasing contracts ............................................. 126
       Direct financial transactions with the Government of Iraq or Iraqi
       companies .............................................................................................................. 127
       The Government of Iraq's purchasing structure ............................................... 129
       Inland transportation costs ................................................................................. 131
       Introduction of mandatory transportation charges ......................................... 131
       Payment mechanisms for internal transportation fees .................................... 133
       Distribution of internal transportation fees ...................................................... 133
       The broadening of the kickback scheme ............................................................ 134
       Introduction of after-sales service fees .............................................................. 134
       Expansion of the transportation fee scheme ..................................................... 135
       Payment mechanisms for after-sales service fees ............................................. 136
       Front companies ................................................................................................... 136
       Alia for Transportation and General Trade ...................................................... 137
       The final report's findings in relation to AWB ................................................. 138
       AWB's response ................................................................................................... 148
       Alkaloids of Australia Pty Limited .................................................................... 148
       Rhine Ruhr Pty Limited ...................................................................................... 154

6      The Letters Patent ............................................................................................... 157
       Constitutional validity of the Letters Patent .................................................... 158
       Interpretation of the Letters Patent ................................................................... 159
       A commissioner's role: amendment of Letters Patent ...................................... 163

7      Conduct of the Inquiry: principles and procedures ....................................... 169
       Independence ........................................................................................................ 169
       Investigations and hearings ................................................................................ 171
       Assessment of evidence ...................................................................................... 182
       Legal professional privilege ............................................................................... 183

*Report of the Oil-for-Food Inquiry*

Reform of the Royal Commissions Act 1902 .......................................................189

Public interest immunity claims ..........................................................................190

Dissemination of public materials ......................................................................192

The requirements of procedural fairness..............................................................192

Notification of adverse evidence..........................................................................193

The nature of an adverse finding.........................................................................195

Publication of Counsel Assisting's submissions...............................................196

Costs .....................................................................................................................197

Appreciation ........................................................................................................198

8       AWB's approach to investigation and disclosure ...........................................201

        The Canadian complaint: January to March 2000 .............................................202

        The US Wheat Associates complaint: June 2003 ................................................204

        The UN Independent Inquiry Committee inquiry: 2004 and 2005 .................221

        This Inquiry: 2005 and 2006 ...............................................................................235

Glossary.............................................................................................................................249

Shortened forms .............................................................................................................256

**Volume 2**      **Negotiations and sales**
                  **July 1999 – December 2000**

9       AWB Limited and the AWB group of companies

10      AWB's sales to Iraq before July 1999

11      AWB's participation in the Oil-for-Food Programme

12      The role of the Department of Foreign Affairs and Trade

13      July to December 1999: Iraq introduces an inland transportation fee

14      October 1999: further sales of wheat to Iraq

15      January 2000: a deletion to the AWB short-form contract

16      January to March 2000: the Canadian complaint

17      April to July 2000: delays and demurrage

18      April to July 2000: changes within International Sales and Marketing

19      October 2000: a visit to Iraq and subsequent events

20      October 2000: an 'eloquent solution'

21      November 2000: introduction of the 10 per cent after-sales-service fee

22      December 2000: the Arthur Andersen report


**Volume 3**      **Sales, allegations and inquiries**
                  **January 2001 – December 2005**

23      January 2001 to June 2002: more sales to Iraq

24      June 2002 to March 2003: contracts A1670 and A1680

25      March to September 2003: renegotiation of AWB contracts

26      August 2000 to March 2003: inland transportation fees

27      BHPP, the Iron Filings Claim, and Tigris

28      May 2003 to December 2005: allegations and inquiries

*Report of the Oil-for-Food Inquiry*

**Volume 4        Findings**

29        The Wheat Export Authority

30        The knowledge of the Commonwealth

31        Findings: AWB and associated persons

32        Findings: Alkaloids of Australia Pty Ltd

33        Findings: Rhine Ruhr Pty Ltd


**Volume 5        Appendices**

# Prologue

> AWB knew that paying inland transportation fees to Alia was a means of making payments to the Iraqi Government. This plan was concealed from the United Nations.

> Justice Young, Federal Court of Australia, 18 September 2006

I have examined in detail the transactions between AWB Limited and Iraq and the relationship of those transactions to United Nations sanctions and the law in Australia. The facts are now not in doubt. It is not my function to make findings of breach of the law; my function is to indicate circumstances where it might be appropriate for authorities to consider whether criminal or civil proceedings should be commenced. I found such circumstances to exist. If proceedings are commenced, and are successful, the consequences for individuals might be great. However, for AWB, any monetary consequence of any proceedings prosecuting authorities might bring would be less significant.

The consequences of AWB's actions, however, have been immense. AWB has lost its reputation. The Federal Court has found that a 'transaction was deliberately and dishonestly structured by AWB so as to misrepresent the true nature and purpose of the trucking fees and to work a trickery on the United Nations'. Shareholders have lost half the value of their investment. Trade with Iraq worth more than A$500 million per annum has been forfeited. Many senior executives have resigned, their positions being untenable. Some entities will not deal with the company. Some wheat farmers do so unwillingly but are, at present, compelled by law to do so. AWB is threatened by law suits both in Australia and overseas. There are potential further restrictions on AWB's trade overseas. And AWB has cast a shadow over Australia's reputation in international trade. That shadow has been removed by Australia's intolerance of inappropriate conduct in trade, demonstrated by shining the bright light of this independent public Inquiry on AWB's conduct.

How could AWB have conducted itself in such a way as to produce such consequences? I asked Mr Lindberg, without any objection from AWB or its directors, 'Are you able to give me any understanding as to how you think this came about? How it happened in a company like AWB?' Mr Lindberg gave no answer other than to say that it should not have happened. AWB submitted that the question I asked was 'obviously a question the directors must consider and answer'.

I consider the answer obvious.

The conduct of AWB and its officers was due to a failure in corporate culture. The question posed within AWB was:

> What must be done to maintain sales to Iraq?

The answer given was:

> Do whatever is necessary to retain the trade. Pay the money required by Iraq. It will cost AWB nothing because the extra costs will be added into the wheat price and recovered from the UN escrow account. But hide the making of those payments for they are in breach of sanctions.

No one asked, 'What is the right thing to do?' Instead, much time and money was spent trying to determine if arrangements could be formulated in such a way as to avoid breaching the law or sanctions, whether conduct could be protected, by various subterfuges, from discovery or scrutiny, and whether actions were legal or illegal. There was a lack of openness and frankness in AWB's dealing with the Australian Government and the United Nations. At no time did AWB tell the Australian Government or the United Nations of its true arrangements with Iraq. And when inquiries were mounted into its activities it took all available measures to restrict and minimise disclosure of what had occurred. Necessarily, one asks, 'Why?'

The answer is a closed culture of superiority and impregnability, of dominance and self-importance. Legislation cannot destroy such a culture or create a satisfactory one. That is the task of boards and the management of companies. The starting point is an ethical base. At AWB the Board and management failed to create, instil or maintain a culture of ethical dealing.

A government grant, by legislation, of a monopoly power confers on the recipient a great privilege. It carries with it a commensurate obligation. That obligation is to conduct itself in accordance with high ethical stands. The reason such an obligation is imposed is because, by law, persons are denied choice with whom they may deal.

It is not my function to comment on the grant of monopoly power to part of the AWB group, and I do not do so. Nor is it my function to classify or judge the conduct of AWB against some indeterminate standard, and I do not do so. In my report I describe the conduct of AWB in its dealings with Iraq. It is for others to determine whether, as a matter of public policy, it is appropriate for the law to require persons to deal with a group that behaved in the manner I describe.

# Summary of events regarding AWB

This summary is prepared for the assistance of those who wish to gain a rapid understanding of the findings regarding AWB and the recommendations of the Inquiry. It does not explain the details of the findings or the reasoning behind the recommendations. That is contained in the balance of the report. A reading of this summary is not a substitute for a reading of the balance of the report.

## United Nations sanctions

In 1990, following the invasion of Kuwait, the United Nations imposed sanctions on Iraq. By Resolution 661 the United Nations required that all states prevent their nationals making available funds to the Government of Iraq, or to persons or bodies within Iraq. The resolution also required that states prohibit their nationals from trading with Iraq, except for the provision of supplies for medical purposes or, in humanitarian circumstances, foodstuffs.

Deprived of hard currency, Iraq was unable to purchase foodstuffs. Hardship was occasioned to its people. In consequence, in 1995 the Security Council adopted Resolution 986, which established the Oil-for-Food Programme. That permitted Iraq to sell oil under UN-approved contracts, with the proceeds of sale being paid into an escrow account controlled by the United Nations. Iraq was permitted to purchase humanitarian goods, including foodstuffs. Contracts for such purposes, if approved by the United Nations, were to be funded from the escrow account. Otherwise, the restrictions on dealings with Iraq imposed by Resolution 661 remained. In 1996 Iraq commenced purchasing foodstuffs under the Oil-for-Food Programme, including significant quantities of wheat from AWB.

By 1999 AWB was selling to Iraq about 10 per cent of Australia's annual wheat exports. It was a large and profitable market. AWB dealt with the Iraqi Grain Board (IGB), an Iraqi Government instrumentality. Sales of wheat were made on 'CIF Free out Umm Qasr terms'. This meant that AWB's contractual obligations terminated on delivery of the wheat to the port of Umm Qasr. Iraq was responsible thereafter for unloading and transporting the grain to the ultimate usage or distribution points.

## The introduction of an inland transportation fee

In June 1999, for phase VI of the Oil-for-Food Programme, Iraq, through the IGB, introduced as a condition of tender a requirement that sales of wheat be on terms 'CIF Free on Truck to the silo at all governorates. Cost of discharge at Umm Qasr and land transport will be USD12.00 per metric tonne. To be paid to the Land Transport Co. for more details contact Iraqi Maritin in Basrah'. This tender purported to impose on AWB for the first time an obligation to transport wheat to silos throughout Iraq and to pay a 'discharge and land transport' fee of US$12.00 per metric tonne to an Iraqi entity, 'the Land Transport Co.'

Mr Emons, AWB's Regional Manager for Middle East and Africa, and Mr Hogan, from AWB's office in Cairo, went to Iraq in June 1999 to discuss the terms of tender with the IGB Director General, Mr Daoud. AWB learnt that the US$12.00 per metric tonne was to be included in the price quoted by AWB and thus recouped from the UN escrow account. It also learnt that the money was to be paid to 'maritime agents' in Iraq but that the payment could be made to an Iraqi bank in Amman, Jordan. The IGB was to provide to AWB details of the bank account into which the 'discharge and land transport' fee could be paid in Jordan. AWB understood from the June meeting that the US$12.00 fee was a payment going back to the Iraqi Government.

AWB also understood that payment of hard currency to Iraq was prohibited by UN sanctions. There was much internal discussion in AWB about how the payment of US$12.00 per tonne could be made to Iraq through an Iraqi entity. AWB knew that if it declined to make the payment it would lose its Iraqi trade. Senior management decided to do what was necessary to retain that trade. Mr Officer spoke with Mr Flugge, the Chairman, about the new Iraqi requirement on the basis that:

> There was no option. There was no choice. It was $12 or not, or if you don't make that payment then, of course, there would be no business. That was made very clear. It was in that context that I discussed it with the Chairman, and that was the nature of those discussions.

In summary, following AWB's receipt of the wheat tender for phase VI of the Oil-for-Food Programme and the visit of Mr Emons and Mr Hogan to Iraq in June 1999, there were widespread communications amongst Messrs Flugge, Officer, Lister, Emons, Owen, Watson, Geary, Snowball and Hogan and Ms Scales regarding the terms of the new tender and how they could be met. It was understood by those discussing these terms within AWB that:

- The inland transportation fee (or trucking fee) was fixed by Iraq.

- It was being paid to Iraq.

- It was being paid for the benefit of the Iraqis.

- Imposition of the inland transportation fee was a method of obtaining US dollars from the UN escrow account.

- AWB did not have to arrange or effect the discharge of the wheat at Umm Qasr.

- AWB did not have to arrange or effect the transportation of the wheat within Iraq.

- AWB was not required to enter into a contract with any transport company.

- The Iraqis would continue to organise the discharge, transportation and distribution of wheat in Iraq, as they had under the earlier phases of the Oil-for-Food Programme and under their earlier contracts with AWB.

- AWB's obligation was limited to payment of the fee set by the Iraqis.

- The Iraqis had said they either had obtained or would obtain UN approval for the payment of the inland transportation fee.

- The method of payment of that fee had not been approved.

- It was up to AWB to find a method of payment that was acceptable to the Iraqis.

- One method of payment suggested by Iraq was payment to an Iraqi bank in Amman, Jordan.

- AWB was not prepared to raise with the United Nations the issue of the transportation fee for fear it might be prohibited by the United Nations, thus costing AWB its Iraq market.

Thus, from mid-1999 AWB knew it was not required to discharge the wheat and effect delivery to all governorates of Iraq, despite any tender or contractual terms to that effect. The obligation to transport the wheat to all governorates was to remain with the Iraqis, as it always had. Suggestions in the tender or contracts to the contrary were a sham designed to deceive the United Nations and extract hard currency from the UN escrow account for payment to Iraq. AWB's obligation was to deliver the wheat to Umm Qasr and to pay a fee in US dollars into an account nominated by the IGB.

## Contracts for the sale of wheat

Against this background AWB entered into three contracts in July 1999 and two in October 1999. For each, a short-form contract and a long-form contract were prepared, the short-form by AWB and the long-form by the IGB. The AWB short-form contract for each of contracts A4653, A4654 and A4655 contained the following clause:

> The cargo will be discharged Free into Truck to all silos within all Governates of Iraq at the average rate of 3,000 metric tons per weather working day of 24 consecutive hours. The discharge cost will be a maximum of USD 12.00 and shall be paid by Sellers to the nominated Maritime Agents in Iraq. This clause is subject to UN approval of the Iraq distribution plan.

The long-form contract expressed the price as being 'CIF F.O.T. to silo at all governorate of Iraq via Umm Quser port'. It made no mention of any discharge cost.

To obtain UN approval to export to Iraq and to receive payment from the escrow account it was necessary for there to be submitted to the United Nations a document called a 'Notification or request to ship goods to Iraq'. Apart from the short-form contracts themselves, the documents submitted for those three contracts made no reference to any 'discharge' or transportation cost. That form and the short- and long-form contracts were forwarded through the Department of Foreign Affairs and Trade (DFAT) and the Australian mission to the United Nations to the Office of Iraq Programme for approval. Approval was obtained from the United Nations, its customs inspectors overlooking the reference in the short-form contract to the provision that the US$12.00 'shall be paid by sellers to the nominated maritime agents in Iraq'. Under the UN procedures, the customs experts were to check all contracts for 'price and value' and to ensure the contracts did not offend the sanctions resolutions.

Subsequent to the granting of approvals by the United Nations, AWB sought and was granted permission to export wheat under these contracts in various shipments. The permission was granted by the delegate of the Minister for Foreign Affairs and Trade, pursuant to the Customs (Prohibited Exports) Regulations.

None of the documents submitted to DFAT or the United Nations, be they the short-form or long-form contracts, the notifications or request to ship goods to Iraq, or the application for export approval, stated the true contractual arrangements between AWB and the IGB. Shortly stated, the true contractual arrangements between AWB and IGB in relation to these contracts involved the supply of wheat on terms 'CIF Free Out Umm Qasr', with AWB to pay a fee of US$12.00 per tonne to an Iraqi entity or account nominated by the IGB and, further, that the US$12.00 fee was to be added to the CIF price and therefore effectively paid out of the escrow account. None of those provisions was disclosed in the documents submitted. Additionally, the short-form contract submitted stated AWB was obliged to pay nominated maritime agents in Iraq the cost of discharging the vessels, capped at US$12.00 per tonne, with that agent performing those services on behalf of AWB. There was no such obligation. The true arrangement was that the IGB would advise AWB of the account into which the US$12.00 fee was to be paid. Nor was AWB responsible for delivery 'Free into Truck to all silos within all Governorates of Iraq', as the short-form contract stated. AWB did not make any contractual arrangements for the discharge of the wheat at Umm Qasr or for its transportation within Iraq after discharge.

*Report of the Oil-for-Food Inquiry*

Thus AWB submitted to DFAT and the United Nations documents that AWB knew did not reflect the true contractual arrangements between it and the IGB in respect of the 3 July 1999 contracts.

In October 1999 two more contracts were signed on the same day. They were contracts A4821 and A4822. Contract A4822 was materially identical to the 3 July contracts, containing a clause in the short-form contract stating that 'the discharge cost will be a maximum of USD12.00 and shall be paid by the Sellers to the nominated Maritime Agents in Iraq'. The long-form contract said nothing of any discharge cost. In contrast, contract A4821 was treated as a contract under phase IV, not phase VI, and the US$12.00 fee was thus inapplicable. The price in A4821 was US$12.00 less than that in A4822. Neither the short- nor long-form contracts for A4821 provided for payment of any discharge or transportation fee.

For the reasons given, the documents submitted to DFAT and the United Nations for contract A4822 did not disclose the true arrangements between AWB and the IGB for that contract.

## Payment of the fee to Iraq

Following the discussions in June 1999, AWB knew that the IGB was to nominate the entity and the account into which the fee was to be paid. On 29 August 1999 the IGB faxed AWB, advising it to contact the Iraqi State Company for Water Transport (ISCWT) in Basrah regarding the 'transport charges' from Umm Qasr port to all governorates of Iraq. This confirmed AWB's knowledge that the payments it was to make were to go to an Iraqi government entity. AWB did not contact the ISCWT, nor by October 1999 had the IGB provided details of the bank accounts into which the US dollar fees were to be paid. Mr Emons spoke to Mr Daoud to resolve 'the payment of the trucking cost as per our contract back to the IGB'. This restated AWB's knowledge that the monies were to be paid to Iraq. On 9 October 1999 Mr Hogan was told by Mr Daoud that there were two shipping companies in Jordan that could receive the funds — namely, 'Alia Shipping Co.' and 'Water Transport Co.' He was also told President Hussein had directed all ministries that suppliers to Iraq must pay the US$12.00 per tonne before the ship carrying the cargo arrived otherwise the ship would not be unloaded. On 19 October 1999 AWB received a facsimile from 'Alia for Transportation and General Trade'. It stated that Alia was 'one of the Jordanian Establishment specialised on the fields of overland and ocean freight transportation moreover, our company is a member of the syndicate of shipping agents in Jordan also we are agents of the State company for Iraqi land transport and Iraq'. Alia wrote it had been advised officially that AWB had won a contract to supply wheat to Iraq and offered its services in the field of transport from Umm Qasr in Basrah to other governorates in Iraq. AWB ignored that and a later similar facsimile from Alia as it

was awaiting from the IGB the name and number of the bank account into which it should pay the fees.

By early November 1999 the MV *Pretty Ruby*, a vessel carrying Australian grain under a July contract, was approaching Umm Qasr. AWB had made no arrangements for the grain's discharge, or for the transportation of the grain to the governorates of Iraq, or for payment of the fee of US$12.00. It knew it had no obligation to arrange discharge or transportation and made no efforts to do so. It was simply awaiting details of the account to which the fee should be paid. On 10 and 11 November 1999 Alia faxed to AWB its bank account details at the Arab Land Bank in Amman, Jordan.

There were ongoing discussions between AWB and the IGB regarding whether the US$12.00 fee was payable on load weight or discharge weight. There was also discussion about amending the letters of credit to remove provisions that required AWB to provide proof of delivery of the grain to all governorates of Iraq (as the contracts stated was AWB's obligation) to obtain payment. AWB required removal of those provisions in the letter of credit because it knew it had no obligation to deliver to all governorates of Iraq and had no control over such delivery since it had made no arrangements for such delivery. Within AWB, executives had decided to seek to distance AWB from payment of the fee. It was agreed within AWB that the 'best means [by] which to arrange to refund the trucking fees to Iraq' was to use shipowners carrying the grain to Umm Qasr to make the fee payments. However, because those arrangements were not concluded and the MV *Pretty Ruby* was approaching Umm Qasr the payment had to be made by AWB direct to Alia. Mr Emons wrote to Mr Officer:

> I know this is a little direct but he [Mr Daoud] assured me it is a one off and that the full details will be supplied when we meet him or the company that will be handling the matter in the future.

It was also agreed that AWB would pay 90 per cent of the fee on load weight tonnage, with the balance to be paid after discharge weight was determined.

On 24 November 1999 Alia faxed AWB, stating it had received a fax from the ISCWT noting that the *Pretty Ruby* was to berth that day but that 'remittance in respect of overland transport charges amount to US$504,000 had not been received yet'. It urgently sought details of the remittance 'to enable us [to] follow up the matter with the appropriate bank here and the Grain Board of Iraq, Baghdad as well as aforesaid company accordingly and remit the subject funds to them'. This made clear that Alia was receiving the funds on behalf of the ISCWT and was to remit the funds so received to that Iraqi government entity. It made equally clear that Alia was not receiving the monies as a trucking fee for services to be provided by it. That confirmed the arrangements that AWB already knew. Mr Emons had confirmed with Mr Daoud that the monies should be paid to the Alia account, details of which Alia had faxed to AWB. The funds were remitted by AWB from its New York account on 26 November

1999. Thus AWB paid the fee to Alia knowing it would be remitted to the ISCWT. AWB made no arrangements for either discharge or transportation of the grain.

## Contracts with grain traders

In December 1999 AWB sold grain to grain traders Commodities Specialists Company (CSC) of the United States and Savas Grain & Commodities Limited of the British Virgin Islands. Those companies, which apparently had arrangements with Russian-based trading companies, had contracts with the IGB for the supply of Australian wheat to Iraq. Contract A4908 with CSC and contract A4906 with Savas each contained a clause:

> USD per tonne CIF FOT to silo at all governorates of Iraq via Umm Qasr port. This price includes a fee of US$12.00 per tonne to be paid directly by seller to Grain Board of Iraq advised account, for each shipment at latest three days prior to arrival of each shipment.

In contrast, contract A4907 was treated as a phase V contract and thus, as Savas advised AWB, 'The payment of US$12.00 per m tonne for inland transportation was not required'. In consequence, the price of the wheat in contract A4907 was US$12.00 per tonne less than the price in contract A4906, signed the same day for wheat of the same quality.

The clause quoted accurately described the US$12.00 fee as being a fee to be paid directly to the IGB-advised account. It was not described as a 'discharge' cost or a transportation cost. The clause in the two contracts is to be contrasted with the July and October contracts describing the fee as a 'discharge cost'.

UN approval to ship the grain under the contracts with CSC and Savas had been obtained by the Russian Federation. It was that approval that was submitted to DFAT when permissions to export under the Customs (Prohibited Exports) Regulations were sought. That meant the contracts between AWB and the Russian companies— which plainly stated AWB's obligation to pay a US$12.00 per tonne fee 'directly to the Grain Board of Iraq advised account'—were not submitted to DFAT when export approval was sought. AWB did not tell DFAT of the clause in its contract with the two Russian companies requiring it to pay a fee to the IGB-nominated account.

Thus between June and December 1999 AWB entered into eight contracts for the sale of grain to Iraq. Four of the short-form contracts referred to 'the discharge cost which will be a maximum of US$12.00 and shall be paid by the sellers to the nominated maritime agents in Iraq'. The four corresponding long-form contracts made no reference to any discharge cost or any payment of US dollars to any entity in Iraq. None of the short-form or long-form contracts in truth reflected the arrangements made between AWB and the IGB for the sale of grain under those contracts. Two contracts with the Russian grain traders accurately described one aspect of the true

arrangements to fulfil the obligation in A23 to pay the US$12.00 per tonne to be paid directly by seller to Grain Board of Iraq advised account for each shipment at least three days prior to arrival of each shipment'. However, those contracts were not shown to either DFAT or the United Nations. The remaining two contracts reflected sales under prior phases of the Oil-for-Food Programme and did not attract the US$12.00 fee. The prices were, accordingly, US$12.00 per tonne less than corresponding contracts entered into on the same day for grain of the same quality.

## Attempts to hide the payments to Iraq

AWB decided to try to hide the payments it was making to Iraq. It had been forced to make some payments to Alia directly because alternative arrangements were not in place and ships would not be unloaded until the fee had been paid. Unavoidably, the payments to Alia were 'a little direct'.

The reason AWB sought to hide the payments to Alia, knowing such payments were payments to Iraq, was it knew that payments to Iraq were contrary to UN sanctions and Australian government policy. That was made explicit in a 7 March 2000 email from Mr Emons to Mr Bali at Ronly Holdings Limited:

1. We have received approval from the United Nations to ship to Iraq 900,000 tonnes in March, April and May.

2. A requirement in the tender document and in our contract price is the inclusion of a payment of USD15 per tonne for trucking in Iraq. I have confirmed this figure with the Iraqi official I deal with but he has not as yet confirmed how he wants it paid specifically

3. This is the twist, under UN / Australian policy no payment can be made directly to Iraq however our contracts have been endorsed by both parties to pay this trucking fee to a third party. Under the last contracts we have instructed the shipping companies under the Charter party to make payment to a Jordanian trucking company. We did this to a) simplify the process from our point of view but b) To divorce clearly from the FOB price any connection with a shipping / logistics charge should the contracts come under scrutiny. The only difference is under our own Time charters we have made the payment ourselves.

4. Now this has been going quite smoothly until recently when two of our companies ran into internal problems with making the payment. One was obviously an issue where its offshore senior management ran scarred of getting caught up in sanctions etc. and everything that could entail for their business. The other companies problems stemmed from its banking route through Singapore where there are always serious concerns in that environment on money laundering and despite assurances from ourselves they obviously have more to lose than we can guess at.

5. Now why do we want to use Ronly? It would be ideal from our point of view if we have a third party that handles the freight and trucking as an item. This not only saves us time but does disguise the fee.

xx

*Report of the Oil-for-Food Inquiry*

This email makes clear that AWB knew:

- A fee for 'trucking in Iraq' was to be included in the wheat price.

- The fee was to be recovered by AWB from the UN escrow account by its inclusion in the wheat price.

- AWB was to pay the US dollar fee to Iraq.

- Iraq would tell AWB how the fee was to be paid to it.

- AWB knew that payment of such a fee to Iraq was prohibited by UN sanctions and Australian government policy.

- Accordingly, it was necessary to hide or disguise the payment of the fee to Iraq.

- AWB and Iraq, through the IGB, had agreed to the fee being paid to a 'third party' as part of the hiding of the payment.

It necessarily follows that AWB cannot maintain that payment of the trucking fee was approved by either the UN or the Australian Government because AWB had deliberately hidden or disguised the payment of the fee to Iraq and knew that neither the UN or the Australian Government was aware of it making payments to Iraq.

AWB sought to hide the payments and to distance itself from them in three ways. First, it amended the charterparties with willing shipowners so that it paid to the shipowner the ocean freight plus the US$12.00 fee, with the shipowner having the obligation to pay that fee to the ISCWT or Alia. In some instances AWB paid the shipowner a fee for so doing. In any event, the shipowner had the use of the money between sailing from Australia and arrival in Iraq. Thus AWB under that arrangement made no payment direct to Alia. Not all shipowners agreed to that arrangement. Some declined because they thought the payments were in breach of UN sanctions. Another declined when the transactions were investigated by Singaporean authorities as suspected money laundering. Others declined because there was no satisfactory reason forthcoming from AWB as to why it did not itself make the payments direct to Alia.

Second, AWB interposed an intermediary between itself and the shipowner. The intermediary was Ronly Holdings Limited, an English company, or its nominee. Ronly established a nominee company, called Tse Yu Hong Metal Limited in Liechtenstein. That company was used by AWB in two ways. First, Tse Yu Hong Metal Limited was interposed in charterparties AWB had entered into with shipping companies. AWB, Tse Yu Hong Metal Limited and the shipowner entered into back-to-back contracts of affreightment on voyage charterparty terms. AWB Chartering paid freight and inland transport fees to Tse Yu Hong Metal Limited under the terms

of the contract of affreightment between AWB and Tse Yu Hong Metal Limited; thereafter, under the back-to-back contracts with the shipowner, Tse Yu Hong Metal Limited paid the same freight and transport fee to the shipowner, which paid the inland transport fee to Alia. The second method was for AWB to pay the freight to the shipowner in the usual way but to pay the inland transport fee to Tse Yu Hong Metal Limited, which then paid it to Alia. Tse Yu Hong Metal Limited received a fee of US$0.20 per tonne for providing either service.

These methods were established in March 2000.

There was no sensible basis for making the payments to Tse Yu Hong Metal Limited, at a cost to AWB, rather than paying the fee directly to Alia, except to seek to disguise AWB's making of the payments to Alia.

According to a letter written by a director of Ronly to AWB in July 2002:

> I was present during the meetings and discussions which took place with Trevor Flugge, the then Chairman of AWB, Michael Watson, the then head of chartering and Nigel Officer and Mark Emons who, at that time were responsible for AWB's business with Iraq. Paul Ingleby head of AWB's finance department was also fully aware of and authorised these transactions ...

> In early 2000 the AWB became concerned at whether payments which they were making for inland trucking in Iraq were in breach of sanctions against Iraq. The AWB approached us for assistance.

Third, AWB changed the wording of its short-form contract to remove any reference to the payment of a US dollar fee for 'discharge' cost. The short-form contract then read, 'USD pmt CIF FOT to silo all governorates of Iraq via Umm Qasr port'.

It was said this was to align the terms of the AWB short-form contract with the IGB long-form contract, which omitted any reference to a monetary sum for a discharge cost. If the objective was to make the short- and long-form contracts compatible, the proper approach would have been to ask the IGB to amend the long-form contract because the short-form contract at least made reference to the payment of a discharge cost. Aligning the short-form contract with the long-form contract effectively removed from scrutiny all reference to payment of a US dollar sum to an Iraqi entity.

The true reason was, as Mr Emons said, 'We didn't want to advertise the fact that we were paying a fee'.

This change occurred in all AWB contracts signed with the IGB after October 1999.

## The Canadian complaint

In January 2000 the United Nations was advised by Canada of a requirement by the Iraqi Ministry of Trade that the Canadian Wheat Board deposit US$700,000 in a Jordanian bank account allegedly to cover transport costs of US$14.00 per tonne for wheat under a proposed contract. The Canadian Wheat Board refused to make the payment and did not get the contract. It was alleged that 'similar arrangements had been made with the Australian Wheat Board'.

The United Nations raised the matter with the Australian mission to the United Nations, which referred it to DFAT. DFAT inquired of AWB about the accuracy of the report. AWB, through Mr McConville, its Government Relations Officer, without inquiry of AWB officers, emphatically denied the allegations, describing them as 'bullshit'. DFAT so reported to the Australian mission, which advised the United Nations.

Ms Johnston, the Chief Customs Officer at the Office of Iraq Programme, in January and February 2000 checked AWB contracts to see if they disclosed any irregularity. In January she looked at contract A4821, which contained no reference to a 'discharge fee' or to US dollar payments, merely stating a CIF price per tonne. In February, she looked at contract A4822. It provided:

> The cargo will be discharged Free Into Truck to all silos within all Governorates of Iraq ... The discharge cost will be a maximum of USD12.00 and shall be paid by Sellers to the nominated Maritime Agents in Iraq. This clause is subject to UN approval of the Iraq distribution plan.

Ms Johnston overlooked this clause. However, she noted that the contract referred to:

> All other terms and conditions as per AWB Limited and Grain Board of Iraq standard terms and conditions for Australian wheat of which the parties admit they have knowledge and notice, to apply to this contract where not inconsistent with the above.

Ms Johnston raised with Mr Nicholas, of Austrade in New York, the issues of any 'irregularities in AWB contracts' and the issue of a parallel contract with 'standard terms and conditions'.

In March 2000 Mr Nicholas raised these matters at a meeting in Washington DC with AWB attended by Mr Flugge, the AWB Chairman, Mr McConville and Mr Snowball from AWB's US office. AWB assured Austrade there were no irregularities in its dealings with Iraq. It said it would provide a full response to the United Nations. Mr Snowball knew the complaint related to payment of trucking fees. On 15 March he spoke by telephone with Mr Emons, who faxed to the IGB, under the heading 'UN Enquiry concerning trucking fees':

> We wish to advise that the office of AWB Limited in New York has been approached by the Customs office of the United Nations who are questioning the payments by AWB to the Jordanian trucking company.
>
> We are very concerned to learn from the UN that the Canadian Government has taken action within the United Nations to discover the manner of AWB payments.
>
> We ask your assistance in this matter and would ask that no information of a confidential nature is released.

There could be no reason to keep confidential payments to a Jordanian trucking company if AWB believed the payment was for a genuine service. AWB knew it was not.

Also on 15 March 2000, Mr Snowball faxed Mr Emons:

> Alistair (Nicholas) mentioned that someone at the UN was asking him quietly/informally about payments AWB was making to Iraq for discharge/trucking. Alistair suggested to us that the request for information on the above contract clause was linked to this discharge/trucking payment issue.
>
> 3. We played down the issue and said that we'd look at the UN request...
>
> 5. Bronte (Moules) confirmed that the UN were asking for information on the contract clause above. She has put this request through to DFAT in Canberra and DFAT will contact you. If all the UN wants is some understanding on the standard terms and conditions in AWB contracts then I think we have nothing to worry about. We should ensure that we do provide something to DFAT when they contact you.

As Mr Snowball wrote, and Mr Emons said in evidence, if the UN inquiry was about the discharge or trucking fee, there was something to worry about; if it was about standard terms and conditions, there was not.

In April 2000 a copy of the 'standard terms and conditions' was provided to the United Nations. AWB advised that the standard terms and conditions did not apply where they were contrary to 'UN policy to trade with Iraq'. That was the case with the 'demurrage/despatch' clause. Nothing was said about discharge or trucking fees, although AWB knew this was the true cause of the United Nations' concern.

The United Nations dropped any further consideration of the Canadian complaint. Ms Johnston said that was because she thought that, although contract A4822 contractually required payment of a US dollar 'discharge fee', because payment of such a fee would be contrary to 'UN policy to trade with Iraq' she assumed such payment was not being made. She thought her view was reinforced by AWB's earlier emphatic denial of any irregular payments.

## Contracts A4970, A4971 and A4972

Contracts A4970, A4971 and A4972 were entered into with the IGB in February 2000. The contracts were under phase VII of the Oil-for-Food Programme. The relevant Iraqi tender for this phase included, in relation to the price:

> CIF Free on Truck to all silo to all governate of Iraq. Cost of discharge at Umm Qaser and land transport will be U.S.D. (14) per metric ton. To be paid to the Land Transport Co …

Following negotiations between the IGB and AWB, an agreement was reached that AWB would pay the IGB a fee of US$15.00 per tonne and that fee would be included in the price. AWB drafted short-form contracts that contained a clause in substance the same as the 'discharge costs' clause in the earlier contracts, except that the cost was specified as a maximum of US$15.00. However, by the time the short-form contract came to be executed, the clause had been deleted from the contract. The IGB-prepared long-form contracts made no reference to the payment by AWB of a discharge cost, transport cost or fee. Both forms of contract expressed the terms to be 'CIF Free on Truck to all silos within all governorates of Iraq'. Neither form of contract revealed that the CIF Free on Truck price had included in it the fee payable by AWB to Iraq.

The consequence was that the contracts submitted to DFAT and the United Nations did not reveal in any way AWB's obligation to pay a fee, or that the fee had been included in the price, or that the fee was payable to an Iraqi entity. By referring to the terms as 'CIF Free on Truck to all silos within all governorates of Iraq' the contracts suggested that AWB's contractual obligations included discharge and delivery. In truth, however, as with prior contracts, AWB had no obligation to discharge or transport the wheat to all governorates: its obligation was to pay the specified fee to the entity nominated by the IGB. The reason the reference to a 'discharge cost' was removed from the draft short-form contracts was to conceal from DFAT and the United Nations AWB's obligation to make the fee payment. The contracts were finalised within weeks of the Canadian complaint having been raised with AWB. AWB knew that the United Nations, and DFAT, were looking into the very matter of payments of US$14.00 per tonne of wheat 'outside the Oil-for-Food Programme' and to an account in Jordan. Any contract that contained a requirement to pay a US dollar sum would have been known to be likely to be subject to close scrutiny. As Mr Officer said, the removal of the clause was consistent with AWB's position of not highlighting the payment of the discharge or trucking fee.

The contracts submitted with the associated documents to DFAT and the United Nations did not record or reflect the true arrangements between AWB and the IGB. AWB was not responsible for delivering the wheat free in truck to all governorates, as the short-form contract provided; AWB was obliged to pay a fee of US$15.00 per tonne to an Iraqi entity, a matter not revealed by the contracts; and the fee payable by AWB to the Iraqi entity was included in the contract price, another matter not disclosed. These matters were deliberately and dishonestly concealed from DFAT and

the United Nations. Contemporaneously with the Canadian complaint, which made apparent that the United Nations and DFAT were investigating payments outside the Oil-for-Food Programme, AWB removed from the short-form contract with Iraq reference to payment of that fee, although it had been included in the draft contracts. Further, AWB disguised the payments to the Iraqi entity by the interposition of Ronly, Tse Yu Hong Metal Limited and Alia.

## More Russian contracts

In February, March and April 2000 AWB entered into three further Russian trade contracts, which became contracts A4993, A0662 and A0101. These contracts were negotiated contemporaneously with the documentation of contracts A4970, A4971 and A4972, from which there was removed in the short-form contract any reference to any payment of a 'discharge cost' or US dollar sum to any Iraqi entity. Yet the contracts AWB entered into with Savas Grain and CSC contained such a provision.

The formal contract for A4993 and A0662 with Savas provided for a price:

> CIF FOT to silo at all governorates of Iraq via Umm Qasr Port.
>
> This price includes a IGB nominated trucking fee to be paid directly by Sellers to trucking company advised account for each shipment at latest three days prior to arrival of each shipment.

This differed from the previous contract with Savas in that the fee was now described as 'a IGB nominated trucking fee', the amount of the fee was not disclosed, and the payment was now expressed to be to the 'trucking company advised account' rather than the 'Grain Board of Iraq advised account'. AWB paid a fee of US$15.00 per tonne. It did not obtain approval from the United Nations, relying on that obtained by the Russian Federation. Accordingly, the contract between AWB and Savas was not submitted to DFAT or the United Nations. In applying for permission to export from Australia, AWB relied on the United Nations approval obtained by the Russian Federation. Thus it did not advise DFAT of its agreement or obligation to pay 'a IGB nominated trucking fee'.

Contract A0101 with CSC was in similar terms, except it provided 'this price includes a fee of USD15.00 per tonne to be paid directly by Sellers to Grain Board of Iraq advised account'. This contract was also not submitted to DFAT or the United Nations, reliance for permission to export being placed on the UN 661 Committee approvals obtained by the Russian Federation. The contracts submitted by the Russian Federation to the United Nations to obtain approval in respect of the Savas and CSC contracts made no mention of discharge costs, transport fees or US dollar payments.