## Delays and demurrage

By April 2000 AWB was suffering significant costs in consequence of delays in discharging ships at Umm Qasr. As a result, AWB was obliged to make substantial payments of demurrage to shipowners. Under the terms of its contracts with Iraq, there was no provision for payment of demurrage and despatch, and thus the demurrage AWB was obliged to pay to shipowners was not recoverable by AWB from Iraq. The United Nations would not approve a demurrage and despatch clause in contracts because it had the potential to result in payments of US dollars to Iraq, which was prohibited by the sanctions.

A delegation from AWB wished to discuss these problems, and possible solutions, with the new Director General of the IGB, Dr Rahman, but could not make appropriate arrangements to do so since Dr Rahman was avoiding meetings. In addition, the IGB had advised that the future trucking fee would be US$15.00 per tonne, rather than the US$12.00 AWB had been paying.

Mr Emons discussed these problems with Mr Flugge in late March 2000 and emailed Mr Watson, AWB's Chartering Manager, on 4 April 2000:

> Couple of issues before we take off for Iraq at the weekend
>
> 1. We need to clarify when we get to Baghdad that the fee on the new contract is USD15 that the method of payment remains the same to Alia etc and in what amounts. This is an increase on the last phase which was USD12 you will recall. I suspect we will be confronted with proposals that will be complicated but we will cross that bridge when we get to it. For your information I had a discussion with Trevor Flugge last week to discuss some of the finer points of the trucking fee. He is happy for us to carry on in fact he is determined that we should be accommodating to the Iraqi's so that our business does not come under threat from our US or CWB friends.

On 5 April 2000, following his discussion with Mr Flugge the previous week, Mr Emons emailed Dr Rahman:

> Our Chairman has asked me to discuss with you while I am in Baghdad the issue of the position of the United Nations on trucking fee and also future phases of the Food-for-Oil programme.

On the same day Mr Emons drafted a letter for signature by Mr Flugge. It restated the position agreed between Mr Flugge and Mr Emons in their discussion in late March—that AWB should accommodate Iraq's requirements to ensure preservation of the Iraqi trade, even if that involved acting contrary to UN sanctions. Mr Emons' letter, signed by Mr Flugge, stated in part:

> While in Baghdad I will ask AWB to discuss the recent communications from United Nations concerning trucking fees. As you are aware both the Canadian and American Governments have raised this issue with the United Nations. It is our intention to remain

committed to the terms of trade agreed between IGB and AWB. The Australian Government equally supports this commitment to our trade.

The 'recent communications from United Nations concerning trucking fees' was the UN inquiry of AWB following the Canadian complaint regarding whether AWB was making any payment to Iraq outside the Oil-for-Food Programme. The passage quoted is an acknowledgment by AWB that it knew of that inquiry, that it knew the United Nations and the Canadian and American Governments had raised with the United Nations the issue of whether such payments were contrary to sanctions but that, notwithstanding this, AWB intended to continue making the trucking fee payments to Iraq in breach of sanctions, as it had previously agreed.

With the IGB prevaricating about a meeting, AWB decided to use the knowledge of both AWB and the IGB that payment of the trucking fee was contrary to UN sanctions as a 'direct threat' to force a meeting. The threat was effective only because both AWB and the IGB knew the trucking fee was a payment to Iraq. AWB knew Iraq would not want disclosure of the trucking fee arrangements to the United Nations because it would be likely to result in the whole transportation fee structure being disclosed and dismantled. Accordingly, AWB wrote to the IGB on 7 April 2000:

> For good order we had wished to discuss the following issues:
>
> 1. We had hoped to discuss at our meeting the issue of the payment of the trucking fee. You will be aware of the restrictions that the UN has placed on such payments and as you are aware this now means that we must halt further payments. We have endeavoured to meet the requirements of the IGB but without direct consultation we are now restricted to the accepted methods of payment to be used. We had hoped that we could discuss personally with your good selves this issue due to the sensitivity however if you would prefer we can discuss with the UN as to the appropriate method of paying for the trucking fee? Please respond by Monday 10th April so an alternative action can be undertaken that does not result in the delay of vessels.

Mr Emons addressed this issue in evidence:

> Q: Quite directly, you were using the fact of the illegality as a threat.
>
> A: Quite; correct.
>
> Q: You knew at that time, from the evidence you've given to this point-I think we can infer-that the Iraqi's were imposing similar conditions on other traders.
>
> A: That's correct.
>
> Q: And if you wanted to trade with Iraq-that is, export goods to Iraq-you had to pay such a fee. So what you were threatening was the reporting in effect of the whole system?
>
> A: Correct. Mr Agius, to put it in context, I mean, AWB had two choices: we either complied with the IGB's requirements under their contracts; or we allowed the wheat market to disappear altogether to other companies. We wouldn't allow that to happen without taking some action against the Iraqi's, and this is where the suggestion would come through, that

we would make the UN aware completely of the trucking arrangements for everybody.
Therefore, hopefully, we might be able to have a more reasonable response.

On the way to the resulting meetings to discuss discharge improvements at Umm
Qasr, AWB met with Alia. Alia advised the appointment of a 'protective agent' at
Umm Qasr to improve discharge. The cost was US$9,000 per vessel. AWB entered into
a written agreement with Alia for provision of that service. In contrast, there was no
written agreement with Alia is relation to any provision of trucking services involving
the payment of millions of dollars. This was because AWB knew it was not in fact
responsible for providing trucking services under its contracts with the IGB and that
Alia in fact did not provide trucking services to transport its wheat. At the meetings in
April 2000 with Alia, at which the provision of a 'protective agent' was agreed, there
was no discussion of trucking by Alia or the trucking fee.

In April and May 2000 there were meetings between AWB and Alia to discuss
discharge problems. Messrs Emons and Watson stated, in an email describing the
meetings:

> 13. IGB recognise current demurrage pain, however in Zuhair's words 'we have had a long
> term relationship with AWB whereby in past years AWB has earned dispatch and IGB has
> never asked for reduction'. IGB fully prepared to assist in some form of compensation in
> future contracts, either by reduction of trucking fee or increase in prices and have asked for
> supply of further 1 million tonnes.

And Mr Emons, in a file note on the meeting, wrote:

> During discussion with IGB the AWB proposed that a method of recovering the cost of
> demurrage would be to hold part or all of the trucking fee or as an alternative there could
> be a reduction for future contracts. Discussion to a degree took place however it was clear
> that the option of AWB holding part or all of the trucking fee would not be acceptable to the
> Minister (and therefore the Regime). It became clear that there was some confusion in the
> IGB as to the amount of trucking due, with explanations that the rate on the AWB contracts
> was different to that charged to some Russian, Thai and Algerian companies. Comment was
> made that the Minister had proposed to increase the trucking fee to USD18 per tonne for
> phase 8 contracts but at the time of the meeting no approval had been received from the
> President.

Both these reports recognise that the so-called trucking fee was known by AWB to be
an impost imposed by the Iraq regime and to be paid to Iraq. Both documents spoke
of compensation to AWB for future delays in discharge being met by 'reduction of
trucking fees'. This would not be possible if the trucking fees were the true cost of
trucking. Nor would it be possible if the fee was a genuine fee negotiated with the
supposed trucking company in Jordan, Alia. An Iraqi Minister of State would not be
involved in determining the quantum of a genuine trucking fee between an Australian
company and a Jordanian company.

In June 2000 the IGB rejected a part shipment alleging contamination. In July a further
AWB delegation visited Iraq to discuss that rejection and matters related to improving

discharge rates. It was not suggested that insufficient trucks were a cause of discharge delays. In July Mr Stott had rejoined AWB. He was aware of the discharge problems and of the prohibition on paying US dollars to Iraq. On 31 July he wrote:

> Iraq does not guarantee discharge rates at Umm Qasr, nor do they pay demurrage/dispatch at discharge port. The argument is that it is a US$ transaction which is not allowed by the UN. The effect is, that the Iraqi's discharge our vessels at low rates and we get hit with massive demurrage bills. Solution, change contract to guarantee discharge rate with Iraq being obliged to pay Dem and earn dispatch. AWB to keep the Dem/despatch account for Iraq and settle with owners on behalf of Iraq's surplus funds if and when available to be refunded in Iraq.

Thus Mr Stott knew of the UN sanctions prohibiting payment of monies to Iraq, and thus payment of despatch to Iraq, and suggested a means of circumventing those sanctions by maintaining a demurrage and dispatch account in Australia. As noted below, the proposal was put to DFAT, which rejected it as being a breach of the sanctions.

In August 2000 AWB wrote to DFAT asking if contractual terms with Iraq could be amended to impose a demurrage and despatch provision. AWB proposed it would operate a trust account into which any despatch earned by Iraq would be paid, such funds to be used to provide grain-handling equipment and technical training. This would avoid AWB paying money to Iraq contrary to sanctions. AWB did not spell out how Iraq would pay to AWB demurrage for slow unloading.

DFAT responded that such a trust account would breach the UN sanctions because 'money paid to Iraq must be paid into an escrow account established by SCR 707 and 712 or in accordance with SCR 986'. However, it advised:

> The AWB's proposal to establish a trust account for Iraq as an incentive to unload shipments more quickly breaches current UN sanctions. It may be possible to discuss with the UN Treasury other methods of encouraging Iraq to unload wheat shipments more quickly without breaking the sanctions regime, for example, an incentive payments scheme operating within the escrow account.

AWB was thus told, in terms, that it could not pay monies to Iraq. The demurrage problem remained.

## Restructuring

In April 2000, upon Mr Rogers' resignation, Mr Lindberg was appointed Managing Director of AWB. This resulted in management changes. Messrs Officer and Emons resigned in June. Mr Stott was appointed in July.

Before his resignation Mr Officer required a release in the following terms:

> 8. AWB acknowledges that it (by its Board and Chief Executive Officer) authorised agency payment during the period 15 December 1999 to 9 June 2000 to overseas agents for sales.

He required that release because of concern about the legality of the payment of agency fees in Pakistan and because he began to realise that the payments of inland transport fees in Iraq might be 'questionable as a matter of law' as being 'facilitation fees'.

Mr Lindberg agreed to the release after discussing it with Mr Flugge. In that discussion Mr Lindberg did not refer to the payment of the transportation fees to Alia.

Mr Emons required and received a similar release.

In July 2000 Mr Stott terminated the use of Ronly and Tse Yu Hong Metal Limited as a conduit for the payment of both shipping freight and inland transportation fees. Mr Stott said he was told the trucking fee had been approved by the United Nations but that AWB nonetheless wished to distance itself from the payment and so used Ronly as an intermediary. He said he accepted the first part of what he was told but not the latter part, believing that the use of Ronly was to benefit Ronly and to allow, in some unexplained way, AWB employees to steal from AWB. Although he ceased the use of Ronly and Tse Yu Hong Metal Limited, he paid the latter company the US$0.20 per tonne for the whole 1.5 million tonnes referred to in AWB's contract with Ronly.

Mr Stott decided that all payments to Alia were to be made directly by AWB. This also meant that payment of inland transport fees through shipowners ceased.

## Contracts A0265, A0266 and A0267

In July 2000 AWB concluded contracts A0265, A0266 and A0267 with the IGB for the sale of 1 million tonnes of wheat. These contracts were under phase VIII of the Programme. The Iraqi tender was in essentially the same terms as the phase VII tender, in that it required the supplier to pay US$14.00 per tonne to the ISCWT. As with contracts A4970, A4971 and A4972, the short- and long-form contracts for A0265, A0266 and A0267 that AWB submitted to DFAT and the United Nations did not contain any reference to an obligation on the part of AWB to pay a 'discharge cost' or fee of any sort or that this fee was added to or included in the contract price. It is clear, however, that the arrangements between the IGB and AWB did include the payment of a fee: fees of US$14.00 per tonne were paid in respect of each of the shipments made by AWB under these contracts. All the fees were paid by AWB Chartering, direct to Alia.

## The October 2000 delegation to Iraq

In October 2000 Messrs Stott and Hogan met the IGB in Iraq. The objectives were to examine the continuing constraints on discharge rates and to endeavour to improve contractual performance, including the promptness of payment processing. Discharge rates and consequential demurrage claims remained an issue. Mr Hogan noted in his trip report, as a minor aspect of factors of delay, that the protective agent at Umm Qasr had reported that 'lack of transports' had reduced the rate of discharge. This was rejected by the IGB. AWB was to seek details from the protective agent, Alia, but it received no information before November 2000 that absence of trucks was a factor in the delays. The real reasons for discharge delays were new testing procedures introduced by Iraq, the time taken to obtain test results and to fumigate cargo if necessary, and the inability of available equipment to discharge grain at the contractual rate.

The IGB claimed that there remained outstanding unpaid trucking fees. It also advised that for the next phase of the Oil-for-Food Programme the trucking fee would be increased to US$35.00.

The Iraqi Minister of Trade also discussed with Mr Stott and Mr Hogan Russian contracts with the IGB for provision of Australian wheat. Russian traders had concluded contracts with the IGB for delivery of Australian wheat. The traders did not have contracts with AWB to supply to them that wheat. Since the traders had concluded the contracts with the IGB the world price of wheat had risen. Thus the Russian traders faced severe losses. The Minister of Trade requested that AWB supply the Russian traders with wheat at a price that would provide them with a profit of US$1.00 per tonne. The Minister said that if AWB was unable to do this, Iraq may only be able to buy 800,000 metric tonnes of wheat from AWB, rather than the 1.3 million tonnes planned. AWB rightly interpreted this as a threat: if AWB wished to remain the dominant supplier to Iraq it would need to accommodate the Russian trader's position, Russia being a favoured nation politically with Iraq.

The response of AWB was twofold. The first was to propose a reduction in the grade of Australian wheat delivered to Russian traders. The second was for Iraq to remove the trucking fee. This latter proposal would make sense only if AWB knew that the trucking fee was not in truth used for trucking but was a payment to Iraq. The proposal meant that, instead of the trucking fee being paid to Iraq, it would be retained by AWB. The increase in the world wheat price would be accommodated by the trucking fee being retained by the seller, rather than by the sum being paid to Iraq. The advancing of this proposal by AWB necessarily meant that Messrs Stott and Hogan knew the trucking fee was a payment to Iraq.

On returning to Australia, Mr Stott caused there to be investigated whether there were outstanding trucking fees, as IGB had alleged. This led to considerable email

correspondence between many AWB officers. AWB was satisfied that it had paid to Alia all trucking fees due. Accordingly, it was suggested that 'we simply advise IGB of the above and have them check with their trucking company'. AWB checked with Alia whether it had received all the trucking fees. Mr Watson noted, 'Trucking company has also confirmed they have received 100% trucking fees and have paid IGB'.

Thus AWB knew that Alia was a conduit for payments of US dollars to IGB. Having confirmed that AWB had paid all trucking fees, sometimes directly and sometimes through intermediaries, Mr Cowan of AWB wrote, 'The obvious one ... we can't confirm ... is whether the intermediate parties paid in full to Alia, or whether Alia has paid in full to IGB'.

## An 'eloquent solution'

Both Mr Long and Mr Whitwell in March 2004, and Mr Long in late 2004, at a time when the payment of inland transportation fees was being investigated, sought to rely on the asserted fact that AWB had advised DFAT in 2000 of 'the arrangement with the Jordanian trucking company'. It was said, in relation to the payment of the 10 per cent surcharge, that there was 'a letter in existence from DFAT which gave approval for AWB's arrangements under OFF'.

In truth, AWB never advised DFAT of 'the arrangement with the Jordanian trucking company'. Nor was there a letter in existence from DFAT that gave approval to AWB's 'arrangements under OFF' in relation to payment of trucking fees to Alia or payment of the 10 per cent surcharge.

The letter to which they were referring was a letter dated 2 November 2000 from DFAT in reply to a letter from AWB dated 30 October 2000. The letter from AWB, signed by Mr Stott, stated:

> Dear Jill,
>
> The purpose of writing is to ensure that DFAT is comfortable with AWB proceeding with the approach outlined below. As previously discussed we are currently experiencing problems managing our Iraq business. The first problem concerns United Nations procedural issues, which we will document in a separate note.
>
> The second issue is, vessels discharging at Umm Qasr suffer long delays and as a consequence AWB incurs substantial demurrage bills. Our recent mission identified that the slow discharge of vessels is caused by a lack of trucks at discharge port.
>
> For your guidance, Jordan based trucking companies are responsible for arranging trucks at discharge port. To rectify the problem, we propose entering into discussions with the Jordan trucking companies with a view to agreeing a commercial arrangement in order to

ensure that there are enough trucks to enable the prompt discharge of Australian wheat cargoes.

We believe the proposed solution will eloquently solve our problem and look forward to receiving your response.

Thank you in anticipation.

Best regards,
Charles Stott
General Manager
International Marketing

The letter from DFAT, signed by Ms Drake-Brockman, stated:

Dear Mr Stott,

Thank you for your communication outlining the manner in which you propose to proceed to deal with problems you have encountered in discharging vessels of your wheat exports to Iraq at Umm Qasr port. As you have explained to us the delays in discharge were causing you to incur substantial demurrage costs and affecting the viability of your trade.

We understand that, on your recent visit to Baghdad, you identified the source of the problem as being a lack of trucks at the discharge point. These trucks are supplied by Jordan-based companies. You therefore propose to enter into discussions with the Jordan trucking companies with a view to agreeing to a commercial arrangement in order to ensure that there are enough trucks available to enable the prompt discharge of Australian wheat cargoes when they arrive.

We have examined, at your request, this proposed course of action and can see no reason from an international legal perspective why you should not proceed. That is, this would not contravene the current sanctions regime on Iraq.

International Legal Division has been consulted in the preparation of this response.

I trust this is of assistance to you.

The letter from AWB signed by Mr Stott was a charade, for a variety of reasons:

- The recent mission to Iraq had not identified that the slow discharge of vessels was caused by a lack of trucks at the discharge port.

- The AWB letter did not inform DFAT of the true arrangements known to AWB—namely, that AWB was not in fact responsible for arranging trucking but only for payment of a trucking fee, that AWB had made no commercial arrangements with any Jordanian trucking company, that AWB had been paying monies to Alia for approximately 12 months, or that Alia was a conduit for payment of monies to Iraq.

- After receipt of DFAT's reply, AWB made no inquiries of, or arrangements with, Jordanian trucking companies for the provision of trucks, let alone additional

*Report of the Oil-for-Food Inquiry*

trucks. Indeed, the only change in pre-existing arrangements made in November 2000 was that AWB agreed with the IGB to pay an increased trucking fee of US$25.00 per tonne and to pay a further surcharge or 'after-sales-service fee' equivalent to 10 per cent of the agreed price for the wheat, which 10 per cent increment was incorporated in the so-called trucking fee and thus into the contract price received by AWB from the UN escrow account and returned to the IGB via Alia.

The real reason AWB, through its General Manager International Marketing, Mr Stott, wrote the letter of 30 October 2000 was an attempt by AWB to obtain correspondence from DFAT that would justify, or appear to justify, the establishment of a despatch and demurrage system operating through the trucking fee mechanism, it being known by AWB that neither DFAT nor the United Nations would approve a demurrage and despatch mechanism with Iraq. The letter of 30 October did not truly state AWB's intentions, nor did it inform DFAT of the absence of contractual relationships for trucking services with Alia or, indeed, any other trucking company.

## An after-sales-service fee of 10 per cent

Between 1998 and 2000 AWB made various donations of equipment to Iraq. In 1998 it obtained UN approval to donate a bobcat. In 1999 it contemplated a donation of laboratory equipment and intended to send the equipment to the Iraqi Embassy 'as we have successfully done previously'. AWB advised Austrade of this intention; Austrade advised DFAT, which warned AWB against forwarding equipment to Iraq without UN approval. AWB agreed to notify DFAT of any future export of equipment and materials to Iraq.

In April and May 2000 the IGB approached AWB to provide 'after-sales-service'. AWB noted that it needed to 'determine' what 'after sales service required i.e. equipment/cash (Board approval may be required for this)'. In July, Mr Hogan noted, 'how do we get equipment in. I assume reagents are problem. Speak with IGB regarding this issue'. In the same month Mr Borlase wrote:

> We are donating $20k of laboratory equipment, however need UN approval. I haven't approached DFAT or UN for this to date as waiting to get approval for bobcats first before hammering them on lab.. equipment.

Following the visit to Iraq by Mr Stott and Mr Hogan in October 2000, a contract for the sale of wheat was agreed. It became contract A0430. On 1 November 2000, after the price for wheat had been agreed, including a 'trucking fee' of US$25.00 (an increase from the previous US$14.00), the IGB advised AWB that the price was to have added to it a 'handling fee' equivalent to 10 per cent of the price and such 10 per cent was to be included in the 'transportation fee'. The transportation fee thus became US$44.50 per tonne. Mr Hogan agreed this contract, having been informed by the IGB

that the transport fee of US$44.50 per tonne had been approved by the United Nations. He intended to get confirmation of that from the IGB in writing. He did not ever do so. He asked the IGB to 'forward the conditions especially regarding the UN approved Trucking fee and percentage increase'.

The IGB had confirmed the sale in an email to AWB stating the sale price in US dollars 'CIF Iraq via Umm Qasr all governorates including 44.5 inland transportation to be paid to the water transport co'. The inland transportation fee was thus not to be paid to a trucking company, but to the ISCWT, an Iraqi entity at Umm Qasr. In fact it was paid to Alia.

Mr Hogan cleared the agreement he had reached with Mr Stott. Mr Stott said be obtained approval for it from his superiors, Mr Goodacre and Mr Geary. However, Mr Stott gave evidence that he instructed Mr Hogan that he would accept the US$44.50 'as a trucking fee—but you have to show me—the IGB has to present me with proof that this is indeed approved by the UN, and I need that in writing'. Mr Stott said he was shown the finalised version of the Iraqi contract with the seals of the IGB on it, which, on its face, showed separately identified the Iraqi transport component of US$44.50 per tonne.

The Inquiry had both the short-form and long-form contracts signed by the parties. Neither so identifies the Iraqi transport component of US$44.50. No contract documents signed by Iraq and produced to this Inquiry by AWB, DFAT, the United Nations or Mr Stott show that information. This evidence of Mr Stott was a fabrication designed to establish that he had a sensible reason for approving a transport fee inflated by 10 per cent of the contract value at the request of the IGB, for which there could be no proper explanation as a transport fee and which he knew was a payment to Iraq.

On 2 November 2000 Mr Hogan circulated an email widely within AWB, advising of the sale, showing how the price was broken down, and showing the trucking fee of US$25.00 per tonne but noting:

> 10% will be added to PX and included into trucking fee–i.e. IGB will confirm US$ and T/fee will be US$44.50 ... this has been approved by UN (as per IGB—I will get this in writing.)

No one within AWB queried this information or questioned why the transportation fee had increased from US$14 to US$25 or why it was to be further inflated by a sum equivalent to 10 per cent of the contract price.

The 'inland transport fee' had to that time been paid prior to the arrival of the vessel in Iraq. AWB funded the fees between the time of payment to Alia and the receipt of payments from the UN escrow account. With the increase of such fees from US$14.00 to US$44.50 per tonne, this holding charge became significant. Accordingly, AWB reached agreement with the IGB that AWB would pay US$14.00 per tonne prior to the

arrival of the vessel in Iraq and the remaining US$30.50 per tonne within one week of payment by the United Nations from the escrow account.

A 'Notification or request to ship goods to Iraq' form was forwarded to DFAT in respect of contract A0430, accompanied by both the short- and long-form contracts for submission to the United Nations. Neither contract referred to a 'transport fee' or an 'after-sales-service fee' or any US dollar payment to any company. The United Nations received the documents on 8 November and an approval was issued on 5 January 2001. The checking officer on behalf of the UN customs office was Ms Johnston.

## The Arthur Andersen report

In August 2000 Arthur Andersen was engaged because 'AWB has concerns about the integrity about international business transactions conducted by the International Marketing group. You are seeking independent assistance in determining the existence of any illegal or unethical behaviour and any failure of control systems'.

Arthur Andersen produced a report dated December 2000. Its overall conclusion was:

> The concerns initially raised by AWB management were supported by the identification of red flags/risk factors for illegal and improper acts. A number of the red flags were shown to be explainable and reasonable, however, other red flags remain significant risks to AWB. The control of these risks is important to the organisation and to the protection of its employees.
>
> The Integrity Risk Review has uncovered a number of areas that could be improved. There are opportunities to create a better culture within the organisation that will reduce the likelihood of the incidence of integrity risks.
>
> The ethics of AWB staff is critical to the reputation and integrity risks of AWB. Particular higher risk areas such as the marketing of products, shipping and finance were assessed at a high level through this review. We found incidents that created ethical questions such as the offer of gifts, entertainment and money were encountered by your employees. We found that the incidents while not frequent did cause concern to your staff. Reduction of these risks can be achieved through education, improved communication, a consistent AWB policy and the enforcement of that policy. Other methods can be implemented to review and prevent incidents such as rotation of staff, audits, awareness of ethical issues and dilemmas that may be encountered.
>
> 1.6 Key Recommendations
>
> It is recommended that AWB:
>
> • Conduct an assessment of the ethical culture at AWB.
>
> • Create a transparent environment where employees are encouraged to report incidents, risks and improper conduct;

- Construct controls that will prevent and deter illegal or improper conduct;

- Educate staff in relation to risk, controls and expectations of AWB.

In relation to inland transportation fees, Arthur Andersen wrote:

Iraq – Inland Trucking:

During our review we found a number of email records that related to Iraq. These records contained indicators of integrity risks or red flags. We conducted a review of the Iraq dealings. The main aspect of these findings is the state of mind, knowledge and involvement of AWB employees.

Mr Watson informed us that approximately two years ago a UN tender for 'Free on Truck' was in place. IGB (Iraq Grain Board) would pay the trucking fee to AWB together with the C and F value. AWB would remit the trucking fee to the Jordanian trucking company transporting the grain.

AWB received information that apparently originated from the AWB New York Office that the UN were asking about the payment to the trucking company. The information was that the Canadians had asked for an inquiry into the arrangements.

Mr Watson informed us that this raised concerns at AWB about future sales to Iraq. There was AWB management pressure to maintain the sales to Iraq. He advised that Mr Emons and Mr Officer wanted to find ways to avoid attracting the attention of the UN.

We were informed by Mr Aucher and Mr Owen of Trade Finance that they were approached by Mr Emons to assist in structuring payments. They declined to have anything to do with it.

The next solution to the situation was to have the shipping company's owner make the payments to the trucking company on behalf of AWB. Mr Watson approached some ship companies such as SANKO who refused to conduct the payment. He stated that they advised him that they did not wish to break UN laws. One company asked why AWB did not wish to make the payments themselves. Mr Watson then approached another company who did make the payments. This company made two payments to the Jordanian trucking company. They withdrew from making any other payments to the trucking company after inquiries were made by the Singapore Monetary Authority for suspicion of money laundering. AWB were asked to support the transactions with a letter.

Ronly then provided the mechanism to make the payments to the trucking company. Two methods were utilised. The first was that AWB make two payments, one to Ronly for the trucking fees and the second to the ship owner for the freight. The second method was to make a single payment to Ronly. Ronly would then make two payments one to the ship owner and the other to the Jordanian trucking company. Mr Watson authorised the payments to Ronly. These payments were made through a Liechtenstein company. Mr Watson said that there was concern that payments made by Ronly in the UK would attract UN interest. Ronly for its part in the transactions received a payment per metric tonne (20 cents). We were informed that Ronly held the full amounts of these payments in their accounts for 20 days or more.

Mr Emons was the one who spoke to Mr Watson about the structure of the payments in the first instance. It was Mr Officer who instructed him to conduct the payments through the

shipping companies and then through Ronly. Mr Watson arranged the trucking payments as part of the freight.

The payment of the freight is paid at 90% until the confirmation of the letter of credit came through then the final 10% is paid. There has recently been an issue with the payments as to whether AWB has paid the full amount. Iraq has claimed that only 90% has been paid. Mr Watson informed us that the Iraq systems are poor. The death of the Iraqi official responsible for the grain contracts, a person known as Zuhair, may have affected the Iraq knowledge of the payments.

There are a number of red flags that the employees were faced with in relation to these payments. This type of arrangement could be misinterpreted as a money laundering process. There were a number of clear warning signs in relation to these transactions that were not fully explored by AWB in legal or commercial terms. For example the issue of trying to use ship owners to make payments on behalf of AWB potentially damaged the reputation of AWB as would the attempt to disguise the transactions.

The current management have removed this payment process through Ronly. There has been a recent increase in the trucking cost to $45MT. This appears to be high. There may be a risk that this money is being diverted to other purposes. There may be a risk to AWB of excessive trucking fees.

Those passages make clear at least the following:

- The culture of AWB, and its employees, required review and attention, so far as ethical dealing was concerned.

- Payment of inland trucking fees in Iraq was a concern. The concern arose because

  - There had been a UN inquiry about AWB's payment of trucking fees.

  - AWB had sought to hide or disguise the payment of the trucking fees.

  - There had been AWB management pressure to maintain sales to Iraq, and avoidance of UN scrutiny of trucking fees was necessary if such sales were to be maintained.

  - Entities requested by AWB to make payments of trucking fees on its behalf had declined because of fears such payments may have been in breach of UN sanctions or may have constituted money laundering.

  - Increases in trucking fees appeared excessive, with the risk that some portion of the fees may be diverted to purposes other than trucking.

Two meetings with AWB were held to discuss the Arthur Andersen report. The first, on 15 February 2001, was between the author of the report Mr Tuohy and Mr Goodacre and Mr Stott. The second, on 23 February 2001, was between Mr Tuohy and Messrs Lindberg, Goodacre and Stott and a lawyer from AWB. Each person had a copy of the report. Mr Tuohy gave a PowerPoint presentation. The important

components in each section of the report were discussed. Management was asked by Mr Lindberg to implement the recommendations.

The report was discussed at a meeting of the Executive Leadership Group on 23 February 2001 but in less detail.

It necessarily follows from the report and the meetings to discuss it that Messrs Lindberg, Goodacre and Stott knew that steps had been taken by AWB to disguise inland trucking payments and that there was the possibility, because of the increased trucking fees, that some of those fees were being paid to the Iraqi regime. There is nothing to suggest in the evidence that Mr Stott disclosed to Arthur Andersen or Mr Lindberg that he knew from 1 November 2000 that the increase in trucking fees to US$44.50 was due in part to a 10 per cent surcharge imposed by Iraq.

Mr Stott was delegated the task of implementing the Arthur Andersen recommendations. At some later time he informed Mr Goodacre:

> He had made inquiries with both the IGB and DFAT as part of his investigations into the issues relating to the trucking payments and was satisfied that the level of trucking fees was justified and that the trucking company (Alia) was legitimate.

He also told Mr Goodacre that the increase in the payments to Alia had been authorised by the United Nations. Neither statement was true.

On 27 February 2001 the Board of AWB noted from the Chief Executives Officer's report that:

> Chartering is currently in the process of reviewing every component of its business. Integral to this review is a detailed process and procedure audit being conducted by Arthur Andersen and an internal staff capability audit.
>
> A revised business plan, risk reporting framework and legal procedures are also being reviewed and re-developed.

On 30 May 2001 the Chief Executive Officer's report to the Board again advised that effort was being put into revising policies and procedures in the chartering department and addressing risks identified in the Arthur Andersen audit report. Apart from this, the Board was not given any summary of Arthur Andersen's findings.

The Arthur Andersen report was made available to those conducting Project Rose in June 2003.

Following the Arthur Andersen report there was no inquiry into the culture at AWB, why AWB had thought it necessary to disguise payments of trucking fees, the circumstances relating to the payment of trucking fees to a Jordanian company, the

reason for the significant increase in trucking fees, or why AWB had agreed to pay such increased fees or trucking arrangements generally.

## Sales to Iraq: January 2001 to June 2002

In January 2001 the Iraqi Ministry of Trade issued a wheat tender for phase IX of the Oil-for-Food Programme. It sought offers on a price:

> CIF FOT to silo to all governorates of Iraq cost of discharge at Umm Qasr and land transport will be equivalent to US$25.00 per metric tonne to be paid for each shipment in any exchangeable currency to the water transport company before arrival of the vessel to Umm Qasr Port. For more details contact Iraqi Maritime in Basrah (Iraqi State co. for water transport—Basrah).

The tender did not mention any obligation to pay an additional 10 per cent service or after-sales-service fee.

By 2 February 2001 a contract had been agreed for the sale of 1 million tonnes divided into two contracts, each of 500,000 tonnes. They became contracts A0552 and A0553. The export sales note was dated 2 February 2001, as were the long- and short-form contracts. Each specified a price of US$217.80 per tonne. That price included a trucking fee component of US$25.00 per tonne plus a 10 per cent surcharge of US$19.80, representing 10 per cent of the contract price. The calculation sheet prepared by Mr Lister for each of these two contracts showed the breakdown of ingredient costs, including US$25.00 for 'trucking' and a further '10%—19.80'. On 2 February Mr Hogan confirmed the terms of sale to the IGB and noted:

> AWB will pay US$14.00 pmt in equivalent agreed currency for partial payment of transport fee prior to the vessel arriving in Umm Qasr. Balance of USD30.80 pmt will be paid as final payment of transport fee within one week of receipt of UN payment being received by sellers. Total transport fee payable is USD44.80 pmt in equivalent agreed currency.

Although the export sales note, the contracts and the telexes referred to the contract price of US$217.80, none referred to the fact that that sum included the additional 10 per cent after-sales-service fee. Only the email to the IGB noted that that additional 10 per cent would be paid as part of the transport fee, through the transport fee payment mechanism by payment to Alia.

Notwithstanding that, on 5 February 2001 Mr Borlase circulated an email confirming the sale and providing a benchmark analysis of the price. The price he analysed in the email was not $217.80: it was $198.00. The benchmarking noted the freight cost, the trucking fee of US$25.00 and other costs. It made no reference to the 10 per cent surcharge and excluded it from the commencing price from which the benchmark FOB price was derived.

The same day Mr Stott sent an email to Mr Goodacre and Mr Lindberg, advising them of the sale and providing them with the same information in Mr Borlase's email. Again, Mr Stott showed the price as US$198.00 when in truth it was US$217.80.

The additional 10 per cent figure was not included in the trucking price in the analysis because AWB knew it was unrelated to the trucking price. It was, as Mr Borlase indicated in his trip report, 'a mechanism for extracting more dollars from the escrow account'. His trip report stated:

> Trucking fee/services fee—the trucking fee is now US$25.00 pmt all governorates of Iraq with a 10% service fee on the entire FIT value of the contract. We believe the increase in trucking fee and addition of the service charge is a mechanism of extracting more dollars from the escrow account.

As Mr Hogan said in relation to a note he took in May 2001:

> Q: This would then have confirmed to you your earlier suspicions that the money that was being paid albeit the 10% or the US$25.00 transport trucking fee, was finding its way to the Iraqis.
>
> A: I never had a doubt—well, the money was always going into Iraq whether it was $12.00, $14.00 or $15.00.'

Mr Borlase's trip report was widely circulated within AWB. By February 2001 it was widely known within AWB that those dealing with the Iraqi trade believed payments that AWB was making by way of transport fees or 10 per cent surcharge fees were payments being made to Iraq via Alia and that they were not going to Alia for trucking services.

On 5 February 2001 the IGB asked AWB to increase the price for these contracts by US$1.00 per tonne. AWB agreed to that on 12 February, noting:

> Iraq have requested transport fee to be altered to US$26.00 pmt. As this does not effect AWB costings, as the contract price will be increased, I have agreed to do this with IGB.

This agreement is consistent only with a recognition that the additional dollar per tonne was to be extracted from the escrow account in payment of the wheat contract and paid not to Alia for transport but to the IGB via Alia.

On 27 February 2001 AWB forwarded both the short-form and the long-form contracts to DFAT for forwarding to the United Nations. Neither of those contracts referred to the trucking fee of $25.00 per tonne or the additional 10 per cent surcharge. As the contracts submitted had been, by agreement, converted into Deutschmarks, the increase of US$1.00 per tonne was not apparent. On 15 March 2001 the United Nations issued approvals dated 13 March 2001 for each contract.

In March 2001 the ISCWT sought to impose a fee of US$0.50 per tonne to cover 'agencies expenses and services for vessels calling Umm Qasr'. Mr Hogan was of the

opinion that 'this charge contravenes the UN sanctions on Iraq as nobody is meant to be able to transfer US dollars into or out of Iraq without UN approval'. He asked for AWB's US office to raise the issue and 'confirm this is correct and that this charge is in effect illegal under the current sanctions'. The AWB's US office contacted the Australian mission to the United Nations, advising that AWB had been told by the 'Iraq state port agents' that it could not discharge its vessels until a port fee of US$0.50 per tonne was paid in cash to the port agents. The Australian mission consulted the Chief Customs Officer from the Office of the Iraq Programme (Ms Johnston) and the Norwegian mission to the UN in its capacity as Chairman of the Iraq Sanctions Committee (the 661 Committee). The advice the Australian mission received was that the Office of the Iraq Programme could not give a proper answer. The best available answer was that such fees were not inconsistent with the sanctions regime provided they were reasonable in amount and paid in Iraqi dinars, not US dollars. The United Nations recognised this presented practical difficulties because Iraqi dinars could not be purchased outside Iraq and if they were purchased inside Iraq they would normally be bought with US dollars, thus effectively transferring US dollars to Iraq in breach of sanctions. The Office of the Iraq Programme also advised that if the cost was factored into the price and was not obvious it would likely pass UN scrutiny. If the payment was apparent on the face of the contract, it would likely be put on hold. This information was conveyed to AWB by the Australian mission. It confirmed its advice that, pending further advice from the 661 Committee, the only course, if the fee was to be paid, was to pay it in dinars. As Mr Snowball's note recorded, 'Any USD to Iraq gov't is a definite No'.

Throughout March and April 2001 AWB refused to pay the fee on the basis that it was illegal. Mr Borlase, in an email to the Australian Embassy in Amman, said, 'We assume it is another method of claiming more dollars from escrow account'. There was correspondence with the ISCWT, Alia and the IGB. AWB maintained its position that such a US dollar payment would 'fall outside the United Nations terms and conditions for the shipment of wheat to Iraq'. In the meantime AWB advised the Australian mission to the United Nations that two ships had not been allowed to berth and discharge cargo because the port fees had not been paid. Ultimately it was agreed between the IGB and AWB that the 50 cents per tonne would not be required to be paid to the ISCWT.

The reason AWB refused to pay the US$0.50 per tonne in respect of the shipment was that it had not been factored into the price and would have been a cost to AWB.

In May 2001 Messrs Hogan, Jones and Roland travelled to the Middle East, including Iraq. They met with the Chairman of Alia in Amman and representatives of the IGB in Baghdad. They travelled to Umm Qasr and met with Alia's representative and the UN inspection agents. During that trip the operation of the transportation of grain was explained to the group. Mr Hogan made a diagram of that explanation.



Explaining that diagram Mr Hogan said:

> 75% of the trucks were from the Iraqi Ministry of Trade. My understanding was that the IGB controlled those trucks. I do not know who controlled the other 25% of the trucks but was told that Alia had no influence on the trucks. I had made these enquiries as to how the transport arrangements worked because AWB was concerned about the excessive demurrage costs and delays at the port. I believe that this was the first time that I became aware that Alia had no influence over the trucking arrangements.

Mr Hogan said in evidence it became apparent to him that Alia played no role in transportation of grain other that to receive a commission for receiving the funds for inland transportation. He said:

> A: I never had a doubt—well, the money was always going into Iraq, whether it was $12, $14 or $15.
>
> Q: But here we have a note with your evidence that Alia was simply taking a commission?
>
> A: Correct—acting as the conduit for the mechanism to get the payments into Iraq because of frozen accounts, et cetera, as we raised right from the start. So that confirms that system. My issue was with the 10 per cent—the loading. I always was of the belief that there was a true transport cost in Iraq. You have to move grain somehow, and this is the mechanism of how this was working.
>
> Q: But now what was confirmed to you was that all of the money was going to the ISCWT?

And later:

> ... it was my, I think, interpretation that the 10 per cent, after the—what they call this after sales service fee was introduced, it seemed to be my thinking well, that service fee is being used—what we called the siphoning of the escrow account, was what they were using for this.

From May 2001 at the latest there is no doubt that AWB was aware that Alia was not engaged in the transport of grain; was aware that Alia was used as a conduit to pass funds to either the IGB or the ISCWT, both being Iraqi entities; was aware that the 10 per cent surcharge was a method of extracting funds from the UN escrow account; and was aware that the payment of US dollars to Iraq or Iraqi entities was contrary to the UN sanctions.

In June 2001 AWB and the IGB agreed the sale of a further 1 million tonnes of wheat. This sale became contracts A0784 and A0785, each of 500,000 tonnes. The agreed inland transportation fees were US$46.70 and US$46.90 per tonne, each of which included the 10 per cent after-sales-service fee and an allowance of US$0.50 for port fees. The inland transportation fees were payable before vessel discharge. Any necessary crane hire for unloading was included in the transportation fee. Thus the payment of port fees in US dollars, which AWB had argued and knew could not be paid because it was contrary to the sanctions, was made by including such fees in the 'transportation fee'. In that way AWB knowingly breached the sanctions.

Each of the short- and long-form contracts provided for a CIF Free in Truck price to all silos within all governorates of Iraq. Neither contained a reference to the obligation to pay inland transportation fees, the additional 10 per cent after-sales-service fee or the amount of either of those fees. Nor did they contain a notification that the price included US$0.50 in port fees that AWB was to pay to Iraq through the transportation fee system. Those fees were, however, recorded on Mr Lister's cover sheet for the files for each contract. The contracts were submitted to the United Nations for approval. The approval for A0784 was issued by the United Nations on 31 July 2001 and that for A0785 on 30 August 2001.

The three types of impost imposed by Iraq were well known amongst the shipping trade. In November 2001 AWB received an email from ship brokers conveying a message the shipowners had received from their agent in Iraq:

> re: inland transport/ass/agency fee.
>
> ...
>
> Kindly noted that our office in Basrah informed us day that m/s, ISCWT informed them that the inland transport charges as well as the A.S.S. charges and the agency fees on cargo of USD0.50 per tonne have not been paid yet ...

Thus, the so-called inland transport fee was distinguished from the 'A.S.S.' fee of 10 per cent of contract value, in turn distinguished from the 50 cents per tonne imposed as port charges. AWB was well aware of these three separate ingredients. It did not inform DFAT or the United Nations of its agreement to pay them.

## The December 2001 sale

Negotiations for a contract in December 2001 make clear two matters: first, AWB knew the inland transportation fee ingredient in contracts was a mechanism for payment of monies to Iraq; second, the inland transport company, the ISCWT, being an Iraqi government enterprise within Iraq, was to be the recipient of the inland transportation fees.

By a tender dated 12 December 2001, the IGB sought a price for the supply of 500,000 tonnes of Australian wheat. A price was sought:

> CIF free out Umm Qasr on truck to warehouses at all governorates of Iraq cost of discharge at Umm Qasr and land transport will be equivalent to USD$26.50 per metric tonne to be paid in any exchangeable currency to the water transport company.
>
> For more details contact Iraqi Maritime in Basrah Iraqi State co. for Water Transport—Basrah.

AWB was concerned about the war risk insurance premium approximating US$10.00 per tonne. It proposed that, as the price of the premium and whether any premium would be imposed would not be known until ships carrying grain reached the Gulf, the IGB, not AWB, should pay that premium. In that way, if the premium was not imposed, Iraq would not pay it. Accordingly, AWB proposed, 'Due to the limitations imposed by the sanctions, settlement of the additional war risk insurance premium will need to be managed via the inland transport fee'.

The reasoning for this proposal was:

> If the above is not acceptable to Iraq, then an additional amount will be added to our offer to cover any potential losses due to War Risk Premiums. Based on our current estimates, the War Risk Premiums are around US$10.00 pmt. In this case, AWB will absorb the risk of increased premiums, or benefit if premiums are reduced or abolished. However, this is not the desired outcome, as Iraq should be the holder of this risk/benefit. Hence I suggest the management via the inland transport system is the most appropriate method.

On 20 December 2001 AWB sent to the IGB an email entitled 'inland transport for tender'. It noted that the IGB required 100 per cent of the transportation fee to be paid before a ship's arrival in Iraq. AWB proposed a payment of 10 per cent by that time, with the remaining 90 per cent to be paid within seven days of receipt of proceeds from the UN escrow account. It objected to paying 100 per cent in advance because, were the port blockaded or the UN inspectors removed, or if for some other reason the

ship could not unload, AWB would be 'unable to recover the money from the transport company'. For that reason the split payment method was said to be reasonable. AWB wrote, 'As far as we can see the only risk that the inland transport company (ISWTC) has is that our company does not make the second payment'. AWB knew the transport fees were going not to Alia but to the ISCWT, an Iraqi entity.

In December 2001 a sale of 1 million tonnes of wheat was agreed, split into two equal contracts known as A1111 and A1112. The inland transportation fee was €55.17 per tonne for the former and €55.40 per tonne for the latter. This sale was under phase XI. Details of the sale, including the amount of the 'inland transport fee' were widely known within AWB because an email containing its details was circulated. Mr Lindberg noted on such an email the comment 'a great result'.

The IGB sought in December 2001 and January 2002 to renegotiate the price of these contracts. AWB would not agree to change the confirmed contracts unless four conditions were fulfilled. The first was that there be a guaranteed rate of discharge, with demurrage and despatch payable and to be settled at the completion of each shipment 'by an adjustment to the final inland transport payment'. The second was that the IGB accept the additional war risk premium, with this to 'be settled by an adjustment to the final inland transport payment'. The third was splitting of the inland transportation payments by a first payment of US$14.00 per tonne prior to the ship's arrival, with the balance on payment by the United Nations to AWB. The fourth was an agreed US$–€ exchange rate.

The first two conditions make plain the understanding that the 'inland transportation payment' was a mechanism for channelling funds to Iraq, which was available to be used for contractual monetary adjustments of payments to or from Iraq. AWB was aware that demurrage and despatch payments to or from Iraq were not permissible because of the UN sanctions. Use of the inland transportation mechanism was a means of circumventing those sanctions.

Iraq did not agree to the conditions. Ultimately, Mr Flugge, the AWB Chairman, wrote to the Minister of Trade requesting confirmation of the agreement as reached on 20 December 2001. The Minister subsequently confirmed the sale.

Short-form and long-form contracts were prepared. The contracts submitted to DFAT and the United Nations did not reflect the true arrangements between AWB and the IGB. Neither mentioned the inland transportation fee, the obligation to pay the additional 10 per cent after-sales-service fee incorporated in the inland transportation fee, or the amounts of either fee. The contracts were expressed to be 'CIF F.O.T. to silo all governorates of Iraq via Umm Qasr Port', or equivalent. They did not indicate that in truth AWB had no obligation to discharge or transport grain. The contracts were submitted with an application to export to Iraq to the United Nations on 23 January

2002. Approvals under phase XI were issued by the United Nations on 5 February 2002.

## The June 2002 contract

In June 2002 Mr Long and Mr Hogan visited Iraq. They negotiated a sale of 500,000 tonnes on terms similar to those in contract A1111 dated December 2001. This contract became A1441. The inland transportation fee was US$47.75 per tonne in euro equivalent, including the 10 per cent after-sales-service fee. Short- and long-form contracts were signed, and approvals by the United Nations, dated 13 August 2002, were issued on 8 October 2002. Neither the short-form nor the long-form contracts made reference to the amount of inland transportation fee, the additional 10 per cent after-sales-service fee, or the amount of either fee or its payment by AWB to Iraq.

During negotiation of this contract in June 2002 the Iraqi Minister of Trade made clear that the contract had been reduced from 1 million tonnes to 500,000 tonnes because of what Iraq described as the 'aggressive policy and attitude that the Australian Prime Minister has towards Iraq and his public display of support for Bush and the USA government'. The trip report noted that because of that 'Iraq can no longer justify the significant purchases of Australian wheat'. The report also noted that 'the Minister has reserved a further 500,000 tonnes for AWB under this existing phase (12), if we provide a positive response'. Accordingly, on 1 July 2002 Mr Lindberg wrote a letter to the Prime Minister, recording the Iraqi Minister's concerns and the consequences for the wheat trade. The importance to AWB of the wheat trade in Iraq is indicated by the note in the AWB trip report: 'If negative (Aust gov is not going to provide retraction), then we need to seriously consider the political angle we need to take to ensure we continue sales to Iraq'. The Australian Government did not change its attitude to Iraq.

## Recovery of the Tigris debt

In 1995 BHP Petroleum (BHPP) agreed to make a 'humanitarian' donation of a US$5 million shipload of wheat to Iraq. Iraq was not told the shipment, delivered in 1996, was a donation. Mr Davidson Kelly of the Tigris Petroleum Corporation Limited and Mr Stott of AWB represented to Iraq that the shipment was paid for by a loan by BHPP to Iraq of US$5 million. In September 2000 BHPP assigned to Tigris any rights it had flowing from the 1996 shipment, subject to Tigris paying to it 25 per cent of any recovery. Throughout 2001 and 2002 AWB assisted Tigris in obtaining Iraq's agreement to repay the 'loan'.

In July 2002 the IGB claimed that delivered shipments of wheat were contaminated with iron filings. It sought compensation of approximately US$2 million from AWB.

*Report of the Oil-for-Food Inquiry*

In August 2002 a delegation comprising Messrs Flugge, Lindberg, Long and Cracknell travelled to Iraq to resolve the iron filings compensation claim. Agreement was reached that AWB would pay compensation of US$6.00 per tonne in respect of the contaminated wheat. This required a payment of US$2.017 million. Mr Hogan wrote, 'We need to think how we 'legally' pay Iraq'.

In September 2002 the IGB requested that representatives of AWB and Tigris attend Baghdad to seek to resolve the Tigris 'debt'. AWB obtained legal advice regarding whether it could negotiate on Tigris' behalf to effect such recovery. In a memorandum dated 16 September 2002, sent to all members of the AWB Risk Committee, as well as AWB Legal and the AWB (International) pool, Mr Long wrote:

> During 1995/1996 BHP agreed to provide USD 5m worth of Australian wheat to the IGB as a gesture of good faith in view of BHP's desire to enter the Iraqi oil market.
>
> AWB shipped the wheat on board MV Ikan Sempat in Jan. 1996 and were paid by BHP Petroleum.
>
> IGB have acknowledged the outstanding debt owed to BHP who subsequently assigned their rights to Tigris Petroleum. The current debt including interest stands at some USD 8.8m.
>
> AWB has always acknowledged that it would assist in this debt recovery process. This issue has been raised by AWB personnel with the Minister of Trade, HE Mohamed Medhi Saleh on a few occasions since the debt became due on 26 January 2001. The Minister has always acknowledged this debt.
>
> AWB has agreed to pay IGB USD 6 per tonne on approximately 300 000mt under Contract Number A1111/A1112 as settlement for the 'iron filings' quality issues amounting to some USD1.8m. AWB raised the possibility of settlement of this quality claim by AWB paying Tigris as settlement of the Iraqi debt to Tigris. UN Regulations prohibit direct payment of funds to Iraq whilst Iraq is under UN sanctions.
>
> The IGB has recently invited representatives from AWB and Tigris to visit Baghdad to discuss this issue.

The advice sought was as follows:

> 1.  ISM request AWB Legal to review the file attached and to advise CRRC if ISM is authorised to negotiate with IGB/Tigris the settlement of the Iraqi debt to Tigris. Specifically it would involve AWB I paying monies to Tigris Petroleum subject to all the correct paperwork being received from both IGB and Tigris. <u>Advice to go to CRRC for meeting Thursday 19 Sept 2002.</u>

Although the matter was discussed, it is not clear whether any legal advice was provided.

In October 2002 Tigris proposed, and AWB accepted, that AWB receive a fee of US$500,000 for its assistance in recovering the Tigris debt. Mr Davidson Kelly wrote,

'In relation to the recovery of the loan, I suggest that we settle on a fee payable in line with repayment of the loan. I expect this to be based upon deliveries of grain to you'.

Thus, it was apparent to senior management within AWB, and to lawyers advising them, that there was a proposal for AWB or AWB (International) to receive monies from Iraq in settlement of the Tigris 'debt', that AWB would receive a US$500,000 fee for its assistance, and that thereafter AWB or AWB (International) would pay the received monies to Tigris.

On 27 October 2002 Tigris wrote to Mr Jumah, a senior official in the Iraqi Oil Ministry and an agent of Tigris. It discussed the amount outstanding under the so-called debt being US$9.519 million with compound interest or US$8.375 million with simple interest. It stated:

### 2. AWB Position

AWB have a contractual dispute concerning cargo quality, under which they owe the IGB US$ 1.6 million approximately. After detailed review they are of the opinion that they can only do one of two things. They can either return this amount to the escrow account, or make the payment to Tigris in an agreed front-end payment in relation to our transaction.

They have communicated this to the IGB. But 'in code', not directly.

The balance could be attached to 'new business', i.e. a new contract of say 500,000 tons with an agreed payment as Commission. I suggested that this Commission would relate to the hard work we have done in turning round the Australian Government's hard line position, which led to the suspension of business with Australia.

### 3. Mechanics

We would agree a payment per ton. Any underpayment would be dealt with in a subsequent contract, and any overpayment would be accounted for in full by Tigris to the authorities.

It was recommended that we agree the amounts outstanding as part of the commercial negotiations. We would then translate Tigris' US Dollar amount into Euros.

### 4. Authority

AWB have my authority to deal with all these issues. They will communicate the result to you, and seek your assistance if they require. You know how to contact me if required.

Dominic Hogan, Regional Manger Middle East, heads the delegation. Chris Whitwell, Account Manager, accompanies him. They are staying at the Al Mansur hotel, and are currently planning to leave on Royal Jordanian on Tuesday evening.

Tigris did nothing to 'turn around the Australian Government's hardline position'.

Before Mr Hogan and Mr Whitwell travelled to Baghdad there was prepared an Iraq brief. It noted in relation to the iron filings compensation payment:

Due to the inability to make payments direct to IGB because of the long standing UN sanctions, we will propose that these amounts will be paid to BHP to offset the Tigris debt owed by IGB to BHP dating back to January 1996.

Mr Hogan and Mr Whitwell put certain propositions to the IGB at their meetings in Baghdad in October 2002. They reported their proposals widely to senior executives in AWB and AWB (International). Their meeting report recorded discussion of the following proposals:

1.  Offsetting vessel claims (iron filings) against Tigris (BHP) debt — approx USD2 million.

2.  Balance of debt to be recovered against new business (load up contract). — approx USD7.5 million (if using compound)

3.  No further vessel claims would be used as offset — but would need to be redirected through UN account.

IGB — confused abt amount and offer made by Tigris — Jan 2001, where Tigris would accept simple interest amount.

AWB advised we were not involved in the actual amount, but only the mechanism. Actual amount would be agreed between Tigris and relevant authority.

IGB — referred any decisions to the Minister.

AWB to get copy of letter sent by Tigris in Jan this year.

Thus AWB proposed to 'load-up' contracts with the IGB to recover the supposed debt, after offsetting the iron filings compensation claim. That proposal was known to senior management within AWB. The quoted paragraph numbered 3 makes clear that AWB knew that any quality claim payments due by AWB to the IGB should be paid into the UN escrow account.

The report of this trip also recorded a meeting on 28 October 2002 with Minister Saleh. It noted:

Simple Interest amount to be recovered by Tigris through loading up the next Phase 13 wheat business. This has received Cabinet approval.

Vessel rejection claims as per original agreement to be paid through inland transport system against next contract — phase 13 …

AWB to advise re payment mechanism of rebate and to brief Tigris re Iraqi position on their debt. Tigris to have arranged figures and agreed prior to AWB visit to Iraq in December.

The second quoted paragraph makes plain that Minister Saleh and Mr Hogan and Mr Whitwell understood that the 'transport system' was a mechanism for passing monies to Iraq. That must also have been apparent to each of the senior AWB executives who read the report.

Whilst in Iraq, Mr Hogan and Mr Whitwell also met with Mr Sabah, whom they believed was the Director General of the Iraqi Oil Board and a man of influence. They discussed with him whether loading-up the full amount of the Tigris debt on a 500,000-tonne contract would mean the inflation of the price would be obvious to the United Nations and suggested an increased tonnage 'to make things easier to pass through UN'. The trip report noted:

> We discussed possible difficulties in raising the price significantly to incorporate the entire debt into one 500K contract. Suggested some alternate pressure could be brought to bear on the Iraqi government to increase the tonnage of next contract to make things easier to pass through UN. He said he would look into it.

Thus AWB sought to disguise and hide the loading-up of the contract from the United Nations. No recipient of the trip report expressed disagreement with the proposal.

On 7 November 2002 Mr Whitwell advised all members of the Executive Leadership Group that at the meetings in Baghdad the Minister had advised that the iron filings compensation claim of US$6.00 per tonne was to be treated separately from other debt issues—that is, not offset against the Tigris debt—and that the Minister 'has asked for repayment through inland transport mechanism'. He also advised, 'Tigris debt has cabinet approval for repayment—final amount to be agreed during the next month by Tigris/Iraqis and then mechanism for repayment to be agreed during next visit'.

The 'inland transport mechanism' was apparently a well-understood concept in AWB: no member of the Executive Leadership Group inquired what it meant.

In mid-November there was an exchange of correspondence between Tigris and the IGB. The proposal in each letter included the following:

1. Tigris would waive its right to compound interest on the debt owed, provided that repayment of the debt be tied to the next contract for the shipment of Australian grain and a calculation based on simple interest would leave the amount owing at US$ 8,375,000;

2. Interest would run at US$41,666 per month until settlement;

3. Tigris would be willing to convert the US$ amounts outstanding to Euros at the exchange rate ruling on the date of the agreement of the contract with AWB

4. The mechanism for repayment would involve a surcharge per ton, to be agreed with AWB in relation to the forthcoming contracts for the supply of Australian grains;

5. Any overpayment due to variations in quantities delivered under the contract would be accounted for by Tigris immediately to Iraq; and

6. The AWB delegation was authorised by Tigris Petroleum to discuss this proposal in detail and to agree the necessary mechanism for repayment of the loan.

In a further letter of 17 November 2002, to Mr Jumah, Mr Davidson Kelly also authorised him to act on Tigris' behalf to agree on repayment terms.

Later in November, Mr Long and Mr Whitwell met with the IGB in Baghdad. Mr Long inquired whether 'for corporate governance reasons' the payment of the iron filings compensation could be passed through Tigris or through the provision of equipment by AWB rather than through Alia. The IGB agreed to refer the matter to the Minister.

It is undoubted that AWB knew that payment through the 'inland transport mechanism' was a payment to Iraq that was neither approved by nor would be permitted by the United Nations because of the sanctions regime. That was because it was a payment to Iraq. Using the 'inland transport mechanism' was a means of avoiding the prohibition, as AWB well knew. The 'corporate governance reasons' to which Mr Long referred was AWB's knowledge that to pay monies to Iraq through the inland transport mechanism was a breach of UN sanctions.

AWB consulted DFAT in November 2002 regarding how the US$2.17 million iron filings compensation could be paid to Iraq. After consulting the United Nations, DFAT advised AWB on 27 November 2002:

1. If there are additional shipments of wheat to go to Iraq under the contract in question, AWB can give a discount to Iraq when it receives its next invoice for those additional shipments.

2. If there are no further shipments under the contract, AWB can transfer funds to the Iraq escrow account operated by BNP Paribas. Any such transfer would have to clearly acknowledge the LC number (and any other relevant details) that would tie the refund explicitly to the AWB contract and would enable Treasury and BNP to ensure that the money is assigned back to the relevant phase and sector.

Notwithstanding this, on 28 November 2002, the day following the receipt of advice from DFAT and the United Nations, Mr Whitwell wrote to the IGB asking whether the Minister had reconsidered 'his position to repay it [the iron filings compensation] directly to Alia transport' and instead asked 'whether it would be possible to offset it against Tigris for reasons already advised'.

The 'reasons already advised' were the corporate governance reasons that payment to Iraq via Alia was a breach of UN sanctions, as AWB well knew.

On 4 December 2002 a sale of 1 million tonnes of wheat to Iraq was confirmed. The agreed price did not include an inland transport fee, which was to be later mutually agreed. The contract was to be in euros.

On 5 December 2002 Tigris emailed AWB a letter prepared for the IGB. It advised that Tigris would accept US$8.375 million and would not require payment of further

interest on the basis that repayment of the debt was tied to the next contract for a shipment of Australian wheat.

On 9 December 2002 AWB emailed the IGB in the following terms:


AWB.0147.0119

Chris Whitwell
09/12/2002 11:17
To: grain@warksa.net
cc: (bcc: Nigel Edmonds-Wilson/HO/AWB)
Subject: OUR SALE A1670 1 MILLION MT TO IRAQ.

ATTN : MR YOUSIF M ABDUL RAHMAN
GRAIN BOARD OF IRAQ

CC  : MISS MOONA

REF  : A1670 OUR SALE TO YOU OF 1,000,000 MT +/- 5 %

DEAR MR YOUSIF

THANK YOU FOR YOUR CONFIRMATION OF BUSINESS WHICH WAS RECEIVED WITH THANKS. AS DISCUSSED IN OUR PREVIOUS CORRESPONDENCE WE ARE LOOKING TO ORGANISE INLAND TRANSPORT AND EURO CONVERSION AT YOUR CONVENIENCE.

FOLLOWING OUR EMAIL DTD 28/11/02 REF ' QUALITY ISSUES ' WHERE WE ASKED HIS EXCELLENCY, THE MINISTER FOR TRADE, TO CONSIDER AGAIN THE ISSUE OF OFFSETTING THE QUALITY ISSUE PAYMENTS AGAINST THE TIGRIS ISSUE WE WOULD RESPECTFULLY ASK WHETHER THE MINISTER HAS REACHED A FINAL DECISION IN THIS REGARD.

IN THE EVENT THAT THE MINISTER IS AGREEABLE TO AN OFFSET SITUATION THEN WE WOULD ASK FOR YOUR CONFIRMATION OF THE PRICING OPTION A.

OTHERWISE PLEASE CONFIRM YOUR ACCEPTANCE TO OPTION B.

OPTION A
--------

COST INSURANCE FREIGHT UMM QASR     USD 220 PMT
INLAND TRANSPORT                    USD 51.15 PMT
TIGRIS DEBT                                USD 8.375 PMT (USD 8,375,000 DIVIDED
BY 1 MILLION MT)

LESS QUALITY ISSUE REBATE                     TOTAL TONNAGE 335,648.85 MT
DISCHARGED X 6 PMT

                                              = USD 2,013,891.9

                                              DIVIDED BY 1 MILLION MT

                                              = USD 2.01389 PMT

FINAL CONTRACT PRICE IN USD              USD  277.51 PMT
                                         ═══════════════

OPTION B
--------

COST INSURANCE FREIGHT UMM QASR     USD 220 PMT
INLAND TRANSPORT                    USD 51.15 PMT
TIGRIS DEBT                                USD 8.375 PMT (USD 8,375,000 DIVIDE
BY 1 MILLION TONNES)

FINAL CONTRACT PRICE IN USD              USD 279.53 PMT
                                         ═══════════════



AWB.0147.0120

QUALITY ISSUE REBATE TO BE SETTLED AS PREVIOUSLY DISCUSSED.

WE RESPECTFULLY AWAIT HIS EXCELLENCY'S DECISION IN THIS REGARD SO AS TO
PROCEED WITH EURO CONVERSION.

WARMEST REGARDS

CHRIS WHITWELL
ACCOUNT MANAGER

Thus AWB advanced two alternative methods of inflating the contract price to hide both the inland transport fee, including the 10 per cent after-sales-service fee, and the recovery of the Tigris debt in the wheat price. Option A, involving an offset of the iron filings compensation against the Tigris debt, was contrary to the clear advice conveyed to AWB by DFAT after consultation with the United Nations 12 days earlier.

Mr Long thought it important to raise the iron filings rebate payment and the Tigris debt recovery with the most senior management. He directed Mr Whitwell to prepare a memorandum to be circulated. The memorandum went through seven iterations and was discussed between Mr Whitwell, Mr Long and Mr Geary, the Group General Manager Trading. Notwithstanding this, contracts were entered into on 12 December 2002, being contracts A1670 and A1680, each for 500,000 tonnes. No reference was made in either the short-form or the long-form contracts, approved by both Mr Long and Mr Geary, of the inflation of the prices by either the inland transportation fee, including the 10 per cent surcharge, or the Tigris debt recovery figure of US$8.375 per tonne in euros. The price in the contracts accorded with Option B. The iron filings compensation was to be paid through the 'inland transport mechanism'.

On 12 December 2002 there was circulated widely throughout AWB an email setting out the final details of pricing of those contracts to produce a netback FOB price to AWB. In that netback calculation a deduction of €51.30 for the inland transportation fee was made, as was an identified figure of €8.40 in respect of the Tigris debt. No one within senior management raised any query about or objection to the Tigris factor in the wheat contracts, which was said to be 'common knowledge' amongst Executive Leadership Group members.

On 17 December 2002 the IGB advised AWB that the US$2.017 was to be added to the inland transport payment to be made in respect of each of contracts A1670 and A1680 to effect repayment of the iron filings compensation claim.

On 7 February 2003 the final iteration of Mr Whitwell's memorandum, commenced in December and signed by Mr Long, was circulated. It read:

LPL.105.111

## AWB Limited Memorandum

| | |
|---|---|
| **To:** | P Geary, M Long |
| **CC:** | S Scales, D Johnson, D Hogan, D Johnstone, J Cooper, J Lyons, D Hockey, M Thomas |
| **From:** | C Whitwell |
| **Date:** | 7 February 2003 |
| **Subject:** | Iron filing rebate payment and Tigris Petroleum fee |

AWB.9001.0016

### PRIVATE AND CONFIDENTIAL

This memo is in respect to refunding the Grain Board of Iraq the quality rebate of approx USD 2,016,133 through the inland transport payments for the new contract as requested by the Minister of Trade, Iraq. In addition, for the record IS & M has negotiated (through an uplift in price the recovery of a USD 8.375 million outstanding debt to Tigris by IGB through this contract. AWB will repay this debt back to Tigris less an agreed recovery fee of USD 500 K on a pro rata basis as tonnage is shipped.

#### Overview

Delegation led by Andrew Lindberg (August 2002) to Baghdad agreed to settle the contamination of the 'Iron Filings' vessels by paying them USD 6 pmt for each vessel total ≈ USD 2,016,133

After being approached by Tigris Petroleum AWB and IGB have agreed to allow the new contract to be the conduit for a repayment of USD 8,375,000 owed to Tigris by IGB for a cargo of wheat shipped in 1996. IGB have agreed to raising the contract price by the debt amount and when payments are made under the Letter of Credit AWB will pay Tigris its debt less AWBs recovery fee.

We have suggested the following during our last two visits.

- Offsetting the debt against the Outstanding debt to 'Tigris petroleum' (approx USD 8.35 million)

- Reducing the any new contract price by the amount of the rebate on a pmt basis

- Repaying the debt through the provision of aid in some form – Wheat, Health supplies etc.

However, in discussion with the Minister of Trade he has continually insisted on repayment directly as an addition to the inland transport and said that this was his understanding of the agreement with Andrew Lindberg – Michael Long was present and confirms that this was discussed. Now that the new contract has been concluded ISM need a sign off to organise this payment when shipments start.

#### Issues

- Possible implications for AWB on a corporate governance basis ie/ direct payment to a company with links to the Iraqi regime may be construed to be in contravention of the UN Sanctions.

  The relevant UN Security Council Resolution is 661 (1990). This resolution provides at clause 4: -

  "...All States shall not make available to the **Government of Iraq** or to any commercial, industrial or public utility undertaking **in Iraq** any funds or any other financial or economic resources and shall prevent their nationals and any persons within their territories from removing from their territories or otherwise making available to that Government or to any such undertaking any such funds or resources and from remitting any other funds to persons

## AWB Limited Memorandum



LPL.105.112

AWB.0001.0017

or bodies within Iraq.... except payments exclusively for strictly medical or humanitarian purposes and, in humanitarian circumstances, foodstuffs."

In summary, this means that the Government of the Commonwealth of Australia would be obliged to prevent AWB Limited from making any remittance of funds to the IGB.

AWB Legal opinion in this regard is set out below.

This does not mean, however, that a payment might not be able to be made which will comply with the terms of the UN Resolutions.  As a minimum, if AWB management determines to make the payment, then it should be made in the following circumstances:

1. The payment is made in installments over time and coincides with payments for future shipments of wheat (ie not a lump sum payment);

2. The payments preferably be made to a company other than the IGB and in a jurisdiction other than Iraq; and

3. The payments be recorded as being made as a part of a settlement reached between AWB and IGB, the terms of which contemplated that IGB would agree not to take any action against AWB for the alleged contamination of the 8 vessels in 2002 with iron filings AND would agree to enter into contracts for the purchase of Australian bulk wheat in the future <u>in exchange for</u> a renegotiation of the price on the 8 vessels.

If we ensure that the above requirements are met, then Legal consider it will be at least arguable that we are not 'making funds or financial resources available' to the Iraqi Government. Instead, we are repaying part of the contract price for the 8 vessels following a re-negotiation of the sale price due to a downgrading of the grain (which potentially contained iron filings).

In addition to the above the UN Security Council resolutions also require (resolution 986 (1995) clause 8) that the cost of food exports to Iraq must be met by draw down from the UN "escrow account". Furthermore draw down from the escrow account is only allowable under strict conditions.  Those conditions include, at clause 8(a)(iii) that the goods to which payment is referable shall have arrived in Iraq. In this case, the goods have already arrived in Iraq and HAVE been paid for in full. However, the Resolutions are SILENT on the procedure for any repayment of part of the price in circumstances where there has been a quality complaint (and a subsequent renegotiation of price).

This may therefore give us more scope to make the repayment to IGB.

**Even if we make payment as outlined above, there is still a risk that the Australian Government and/or the United Nations will take a contrary view on the interpretation of the above mentioned resolutions and declare that AWB has breached the terms of those resolutions by making the payment. This is a commercial and political issue, which AWB's management will need to consider.**

- According to an informal discussion with DFAT any repayment of a quality rebate should be either re-payed through UN ESCROW account or as a contract price reduction however they have not had a full legal argument put in front of them or been told officially. In Public Affairs opinion as long as the repayment is legal and could not be seen to be breaking UN Sanctions then we should proceed (with the proviso that we have an independent legal opinion to that effect – see above legal opinion).

Public Affairs also expressed concern that this would not be well received by the UN OIP office and that there was a reasonable chance of them finding out. IS & M on the other hand do not want them involved and feel confident that this issue could be handled without the need for the OIP to be consulted. It has been articulated to us and we have circumstantial

**AWB Limited Memorandum** 

LPL.105.113

AWB.8901.0018

evidence that other participants in the OIP program (Russian and Pakistani companies) have had to sort out quality problems in a similar way and it is unlikely either their national governments or the OIP were consulted

- IS & M feel strongly that a failure to repay the IGB as discussed will lead to serious consequences for AWBs relationship with the IGB. IS & M also believe that failure to refund this agreed debt in this way would have serious implications for the execution of the new contracts. AWB are aware of all the issues laid out above and in light of the commercial imperative of this situation agree with the recommendation as laid out below. They do however insist that the Managing Director is appraised of the situation.

**Actions**

Whilst IS & M have received a number of different opinions from different areas of AWB and an informal opinion from DFAT we still feel this issue is a grey area with no prescriptive answers. Based on the opinions we do have and the commercial circumstances surrounding this issue IS & M recommend and seek approval for the following:

- IS & M is to repay debt as per method outlined in AWBs legal opinion (and requested by the Minister of Trade) directly to Alia Transport in Jordan in instalments. IS & M will also look to obtain written agreement from IGB to the payment in the format agreed by legal however it is not guaranteed.

- Managing Director only to convey our intentions to the Australian Government at the appropriate time prior to Shipment. The timing of such a disclosure is important and we would recommend that nothing be done until at least Letters of Credit are in place for these contracts. Given that this is unlikely to happen until after a war with Iraq it may allow us a further chance of renegotiation with a new regime.

- IS & M to finalise as soon as possible a written agreement with Tigris with regard to the settlement of their debt.

Recommended

M Long

General Manager International Sales and Marketing.

..............................

Approved

P Geary

Group General Manager – Trading

Page 3 of 3

The so-called legal opinion was nothing of the sort. It was an attempt to devise a method whereby the payments to Iraq would not be obvious by spreading them thinly over future shipments (paragraph 1), to hide the fact of payment to Iraq by making the payment to an intermediary rather than IGB direct and in a country other than Iraq (paragraph 2), and to falsify the nature of the transaction by recording it as a

transaction different from payment of compensation (paragraph 3). This, AWB's lawyers thought, might make it 'at least arguable' that AWB was not 'making funds or financial resources available' to the Iraqi Government, which AWB and its lawyers knew was prohibited by the UN sanctions. This advice was contrary to the clear, specific advice given to AWB by DFAT after consultation with the United Nations in November 2002.

The memorandum recognised corporate governance issues associated with making a direct payment to a company with links to the Iraqi regime. The only company to whom a payment was to be made was Alia. Obviously AWB—at a very senior management level—knew Alia was linked to the Iraqi regime by at least December 2002. AWB also knew that the Australian Government, were it aware of the contemplated payments, would be obliged to stop such payments. It also knew that DFAT had, on UN advice, indicated that any iron filings compensation should be paid to the escrow account or deducted from the price in future sales. Nonetheless, AWB decided both to load-up two contracts to recover $8.375 million for Tigris (and thus earn a fee of US$500,000) and to pay the iron filings compensation 'as per method outlined in AWB's legal opinion (and requested by the Minister of Trade) directly to Alia Transport in Jordan in instalments'. AWB was also to look to 'obtain written agreement from IGB to the payment in the format agreed by legal however it is not guaranteed'.

The course of action referred to was recommended by the General Manager International Sales and Marketing and the Group General Manager Trading. AWB (International), the grains pool, being aware of all the corporate governance and legal issues, agreed with the recommendation 'in light of the commercial imperative of this situation'. That imperative was to retain the Iraqi grain trade, which it feared would be lost if the compensation claim was not paid.

The memorandum was forwarded to Mr Geary, who in turn forwarded it with his approval to Mr Lindberg's office. Mr Lindberg did not receive the document. The intention of AWB was to hide from the Australian Government these transactions— that is, the inflation of the contract price to recover the Tigris debt and the repayment of the iron filings compensation via the inland transport mechanism to Alia. AWB did not ever inform the Australian Government of either matter.

Long- and short-form contracts for A1670 and A1680 were signed and dated 12 December 2002. They were submitted to DFAT for transmission to the United Nations for approval; the approvals were issued in January 2003. Permissions to export wheat under the Customs (Prohibited Exports) Regulations were granted by the Minister between 10 February 2003 and 27 May 2003. Delivery of the cargoes occurred throughout 2003.

The contracts submitted by AWB to DFAT and the United Nations did not reflect the true agreement for the sale of wheat. The contracts did not disclose:

- the inflation of the price to recover the Tigris debt

- the agreement to pay an inland transportation fee to Iraq via Alia

- the agreement to pay a 10 per cent after-sales-service fee, to be included in the transportation fee

- the agreement to pay an additional US$2.01 per tonne to Iraq via the inland transportation fee mechanism in payment of the iron filings compensation

- the fact that AWB had no obligation to transport grain to all governorates of Iraq, its obligation being only to pay a fee to an Iraqi entity via Alia.

In May 2003 the Executive Leadership Group received a report stating:

> Tigris Petroleum (BHP) has asked for an update of status of their agreement in light [of] current contract execution and when they will begin receiving payments. They intimated a number of influential people will need to start receiving funds and that further delays may cause difficulties going forward.

This was code for payment of bribes. It raised no alarms within the Executive Leadership Group.

In May 2003 Mr Davidson Kelly of Tigris sent to AWB a draft agreement, called a 'service agreement', between AWB and Tigris. It recited that 'Tigris has been of material assistance in procuring for AWB a contract for the supply of Australian wheat to Iraq'. It provided that AWB would pay Tigris US$7.875 million as 'compensation' for the services said to have been provided by Tigris. That 'compensation' was to be at the rate of US$7.875 per tonne of grain delivered. Undoubtedly, US$7.875 million is the $8.375 million less the US$500,000 commission it had been agreed AWB would receive for recovering the Tigris debt of US$8.375 million.

This draft agreement was a sham. It did not represent the true agreement between Tigris and AWB, which was that AWB would inflate wheat contracts with Iraq, recover the Tigris 'debt', receive US$500,000 for so doing, and pay to Tigris the 'debt' so recovered.

The draft agreement was sent to AWB Legal and other senior executives, including AWB's Group Tax Manager.

Instead of retaining US$500,000 as commission for recovery of the Tigris debt and paying to Tigris the balance of US$7.875 million recovered as the Tigris debt, AWB

and Tigris agreed to recast the transaction so that the payment to Tigris of the recovered debt would appear as a payment by AWB (International) to Tigris of a commission earned by Tigris for assisting AWB (International) to obtain contracts for the sale of wheat to Iraq. The amount agreed to be paid by AWB as 'commission' was initially US$7.875 million, being the US$8.375 million debt recovered less the commission to AWB of US$500,000.

The recast agreement was a sham for three reasons:

- The monies being paid by AWB to Tigris were the recovered debt, not a commission.

- Tigris did not assist AWB (International) to obtain contracts for the sale of wheat with Iraq.

- The amount of the so-called commission was in truth the debt recovered less AWB (International)'s agreed fee of US$500,000.

The recasting of the transaction was done on the advice of, or with the concurrence of, internal and external lawyers for AWB.

The recasting of the agreement with Tigris was done with the knowledge within AWB of Messrs Whitwell, Stott, Long and Cooper. Ms Scales, on learning in 2004 that the contracts had been 'loaded up' to recover the Tigris debt but not disclosed in the contracts submitted to the United Nations, required that senior legal advice be obtained to determine if it was legally permissible to pay the money to Tigris.

Advice regarding aspects of the Tigris transaction, known as Project Water, was obtained from Mr Tracey QC, Mr Richter QC, Dr Donaghue, Mr Quennell, Mr Cooper and Ms Peavey. The final advice from Mr Richter QC was that it did not breach the law to pay the money to Tigris.

Mr Long persuaded Mr Davidson Kelly that, because AWB had been required to reduce its contract prices for contracts A1670 and A1680 in renegotiations with the Coalition Provisional Authority and the World Food Programme, the sum to be paid to Tigris should be reduced by 10 per cent to US$7.0375 million.

On 10 November 2004 Mr Cooper sought the approval of and advised Mr Lindberg and Ms Scales that a factual review of the Tigris transaction had been completed and signed off, that advice from senior counsel was that no breach of the law was involved, that the matter did not require Board approval, and that his view was that 'this transaction did assist AWBI in securing the Iraqi grain market'.

On 19 November 2004 Mr Lindberg approved payment in principle of monies to Tigris. This approval was sought by Dr Fuller at the request of Mr Cooper.

On 1 December 2004 Tigris faxed AWB (International) an invoice for US$7,537,500 for a 'service fee', less a 'success fee' of US$500,000, plus interest of US$55,224.72, less Australian withholding tax of US$5,522.46—making a total payable to Tigris of US$7,087,202.24. The invoice was a sham for the same reasons that the agreement was a sham.

Authorisation to pay Tigris was signed by Mr Cooper and Ms Scales. The payment of US$7,087,202.24 was made on 9 December 2004.

The Tigris transaction was executed on 10 December 2004, having an effective date of 12 December 2002, the date of contracts A1670 and A1680.

The Tigris transaction was discussed at an Executive Leadership Group meeting on 13 December 2004. What was said is not known.

The Tigris transaction was discussed at a joint information session and Board meetings of AWB and AWB (International) on 14 and 15 December. The agreement was presented to the Boards as a 'done deal'. It was said to be within Mr Lindberg's authority and presented to the Boards for information only. Approval was not sought. Several directors raised concerns. Mr Thame thought AWB was now 'tainted' and likened the transaction to 'James Hardie'. Mr Simpson sought a paper on the transaction for the next meeting. None was produced.

On 13, 14 and 15 December 2004 Messrs Stott, Long and Whitwell signed off on the factual summary of Project Water. That summary said nothing about Tigris securing the Iraqi grain market for AWB in 2002.

The true nature of the transaction, and the false nature of the agreement in fact signed, were not explained by Mr Lindberg or Mr Cooper to the Boards. Mr Lindberg conveyed to the Boards what he had been told by Mr Cooper. Mr Cooper had received legal advice regarding whether the method used by AWB to collect the Tigris debt by inflating the price of wheat breached UN sanctions or Australian laws. Mr Lindberg informed the Boards that, in respect of the payment by AWB to Tigris, he had 'checked compliance with all necessary laws and confirmed that there had been no breaches'. The Boards were informed of the substance of the advice.

By recovering US$8.375 per tonne on 1,057,197 tonnes under contracts A1670 and A1680, AWB recovered US$8,854,024. This was US$497,024 more than the supposed debt the IGB had agreed to pay.

AWB decided to retain that sum of USD497,024 rather than return it to Iraq. That decision was taken after the lifting of sanctions, when there was no restriction on payment to the IGB or Iraq. Both senior management and AWB Legal were aware of or participated in this decision. The money is still held by AWB (International). Nor

has AWB or AWB (International) paid to Iraq or the IGB the US$2.17 million agreed as iron filings compensation.

## AWB payments to Alia

Between November 1999 and March 2003 AWB paid to Alia by way of transportation fees US$224,128,189.98. That sum comprised US$146,101,906.59 in respect of transportation fees and US$78,026,283.39 attributable to the 10 per cent after-sales-service fee.

After deducting a commission of 0.25 per cent, Alia transferred the funds to the General Maritime Transportation Company, the Iraq Public Ports Company or the ISCWT. From there the funds were distributed to various Iraqi government ministries, with approximately two-thirds being paid to the Ministry of Finance, 18 per cent to 'land' (presumably being for land transportation), approximately 4 per cent to 'ports' and 1 per cent to 'water'.

## March to September 2003: post-hostilities

At the outbreak of hostilities on 20 March 2003 AWB had two ships on the water heading for Iraq. They were the *Pearl of Fujairah* and the *Andromeda*. On 14 March 2003, in anticipation of the arrival of the *Pearl of Fujairah* at Umm Qasr, AWB paid a €2,471,522.25 inland transportation fee to Alia. However, on arrival off Umm Qasr, the shipowners declined to permit the vessel to enter Umm Qasr because of the war risk.

AWB was concerned to recover the €2.47 million it had paid to Alia. It sought return of the funds from Alia, which advised that the monies it had received were no longer in an account controlled by Alia. They had, in accordance with the established practice, been transferred by Alia to Iraq. In May 2003 Mr Whitwell and Mr Edmonds-Wilson travelled to Jordan and met representatives of Alia, including its Chairman. Their report stated:

> Importantly, the matter of the eur2.5m inland transport paid for the MV Pearl of Fujairah was brought up with both Othman and the Chairman. Both Othman and the Chairman said the matter had previously been tabled between Alia and Mr Yusef (IGB). Alia said that as soon as there was someone with authority to sign the appropriate documentation from the Iraq side, the money would be returned to Alia and then to the companies in question (this affected about 10 companies other than AWB).
>
> Alia had the appropriate documentation showing the money had been remitted so we will now have to wait until hierarchy in Iraq is set up and running to chase. The Chairman had much faith and trust that the $$ owing would be returned in due course and said he would do everything possible to access the funds from the frozen account ASAP. Alia had recently

sent a letter to Iraq (around 20/03) re funds that had been paid but services not provided
and the excess had to be returned.

AWB obviously knew the monies had been passed to Iraq, that Alia was not responsible for trucking the wheat, and that payments made to Alia were not for that purpose.

On 21 March 2003 the Australian Government decided to provide 100,000 tonnes of wheat to Iraq in the form of humanitarian food assistance. That was the grain on board the *Pearl of Fujairah* and the *Andromeda*. The Australian Government purchased those cargoes from AWB for A$35 million. The United Nations requested that the two shipments revert to the World Food Programme. After some negotiations, agreement was reached between AWB and the World Food Programme concerning price and terms of delivery. AWB repaid the Australian Government the AUD$35 million.

The sales to the World Food Programme in respect of the *Andromeda* and the *Pearl of Fujairah* resulted in reduced prices. The amended contract terms provided for delivery CIF free out, rather than CIF free in truck, so there was no inland transportation fee component in the price. Having reached that agreement, AWB then sought compensation for various expenses in the nature of deviations, demurrage, port charges and agency charges. It was subsequently agreed with the World Food Programme that the price for the grain on the *Pearl of Fujairah* and on the *Andromeda* would be increased to accommodate the compensation claims.

Mr Long was appointed by the Australian Government to assist with the rebuilding of Iraq after the incursion. He worked with the Coalition Provision Authority Ministry of Trade. One of his tasks was to prioritise contracts. His immediate superior was a former US Ambassador who was aware of Mr Long's position at AWB. He asked Mr Long to consider prioritisation of food contracts. Decisions in that regard were made by the Coalition Provisional Authority in conjunction with Iraqi Ministry officials. In conjunction with Iraqi Ministry of Trade officials, and with the support of his American counterparts, Mr Long prioritised AWB contracts A1670 and A1680. That meant they could be included in the Oil-for-Food Programme which, notwithstanding the United Nations indicating it would cease on 20 March 2003, continued. The contracts were passed to the World Food Programme for renegotiation with AWB.

In September 2003 United Nations approval for contract A1670 was issued. The same month the World Food Programme commenced negotiations with AWB to renegotiate the price. The terms it proposed were:

> Cargo will be delivered at supplier cost, insurance and freight (CIF), Free on Trucks all governorates' warehouse/Iraq. As the Water Supply Company is no longer functional, it will be the supplier's responsibility to arrange private transportation from the contract stipulated Point of Entry to the final delivery point, as advised by the Ministry of Trade. The value of tonnage renegotiated will be reduced 10 per cent (10%).

The 10 per cent reduction in price requested was a reduction of the 10 per cent after-sales-service fees, which the United Nations correctly believed had been included in all supply contracts under the Oil-for-Food Programme. Mr Long, still in Baghdad, advised AWB that if it wished to continue with the contracts it had no option but to agree to the 10 per cent reduction. AWB did so 'as long as its associated extra costs resulting from the delay in executing this contract are taken into account'. However, AWB ultimately agreed to a price of €254.88 per metric tonne, a decrease of €25.49 per tonne, or 10 per cent, from the price initially agreed with the IGB. That price still included the component for the inland transport fee, excluding the 10 per cent after-sales-service fee, but AWB now had in truth to arrange transport to all governorates of Iraq. It did so by entering into a contract with Alia for the trucking of grain. It had never previously done so. The contract was signed on 21 October 2003 and included all the usual terms with a trucking company. However, it contained one exceptional clause. Clause 4 provided:

> In respect of transport charges AWBS to deduct US$1 per metric tonne representing a part repayment of a previous inland transport payment which was not executed. In the event that AWBS do receive acceptable repayment from the appropriate Iraqi authority then AWBS will remit the total value repaid by the contractor under this repayment scheme to the contractor.

This was a reference to the €2.47 million paid in advance to Alia in respect of transportation fees for the *Pearl of Fujairah*, which fees remained unrecovered from Iraq.

On 22 November 2003, pursuant to UN Security Council Resolution 1483, responsibility for the Oil-for-Food Programme was transferred to the Coalition Provisional Authority. In December 2003 contract A1670 was amended by increasing the contract value by €3,912,830.00 'to support the accelerated delivery of approximately 220,000 metric tonnes (+/–5%) of wheat'. The increase was to cover 'the cost and charges for deviation, diversion, detention, demurrage, stranding and other costs associated with delivery of goods'.

## Allegation and inquiries: March 2003 to date

In May 2003 AWB learnt of rumours circulating that it had deposited funds into a Jordanian account in order to secure wheat sales under the Oil-for-Food Programme. It was rumoured that the monies ultimately benefited Saddam Hussein. AWB prepared talking points to be used in rebutting the rumours. The talking points agreed by Mr Whitwell and Mr Hockey, and subsequently used in substance to brief the Australian Government and to respond to inquiries, were:

- we did pay money into a Jordanian account for the inland transportation component of our contract

- this method was approved by the UN and signed off by the 661 Committee

- we are led to believe this was the same arrangement for all companies supplying wheat under OFF

- the method asked for by the Iraqis and agreed by the UN gave us no discretion with regard to inland transport

- the 20% 'kickback' is completely untrue – it is not in our contract and we do not pay a 20 percent deposit

- the payment is linked to vessel arrival in Umm Qasr and payments were correctly described and transparent

- we are led to believe it was monitored by the UN through the Office of Iraq Program

- it was consistent with the requirements of the UN resolution

- payment for the whole transaction was received through a UN approved LC.

In June 2003 US Wheat Associates wrote to the US Secretary of State, alleging that AWB was overcharging for wheat in contracts with Iraq. AWB responded by issuing a media release describing the allegations of inflated prices resulting in benefits to the Hussein family as 'absurd, with no foundation, and … an insult to Australian wheat farmers and damaging to our reputation'. AWB also wrote to US Wheat Associates denying the allegations. Copies of the press statement and letter were provided to the Australian Government, which conveyed to the US administration its concerns regarding the allegations by US Wheat Associates.

In June 2003 AWB received, initially from Mr Long in Baghdad and subsequently from DFAT, a copy of a memorandum from a Captain Puckett, a US officer working with the Coalition Provisional Authority. He indicated that work was being undertaken to identify contracts which had a 'kickback or surcharge (often 10%)' for the supply of goods to Iraq under the Oil-for-Food Programme. AWB responded to all inquiries in Captain Puckett's memorandum, except that identifying kickbacks or surcharges in its contracts. AWB knew, and had known since November 2000, that an additional, unexplained 10 per cent fee had been included in its wheat contracts, as required by the IGB.

## Project Rose

In June 2003, following the US Wheat Associates complaints, AWB established an internal investigation that became known as Project Rose. Mr Cooper, AWB's corporate counsel, was charged with leading the investigation. He engaged Mr Quennell, then of Messrs Blake Dawson Waldron, to conduct the inquiry. Mr Quennell was given instructions to conduct a factual review designed to gather

together all information within AWB relating to its dealings under the Oil-for-Food Programme and subsequently to provide advice regarding certain legal issues relating to those dealings. Mr Quennell gathered together some 30,000 emails, interviewed witnesses, accumulated documents, and from time to time briefed Mr Cooper, the Executive Leadership Group, and the joint Boards of AWB and AWB (International) regarding the factual matters so discovered and gave advice regarding certain legal issues. He briefed the Board on at least 16 occasions. He separately briefed the Chairman and Deputy Chairman. He provided draft advices, and he obtained advice from senior counsel. The Chairman, Deputy Chairman and Board of AWB claimed legal professional privilege in relation to the factual findings made by Mr Quennell and his briefings to the Executive Leadership Group, the joint Boards, and the Chairman and Deputy Chairman. Ultimately the Federal Court of Australia rejected the substance of that claim.

In May 2004 Mr Quennell briefed Mr Tracey QC concerning Project Rose. The brief noted the terms of the June 1999 tender called for by the IGB, which called for a price:

> CIF Free on Truck to silo at all governorate. Cost of discharge at Umm Qasr and land transport will be USD12.00 per metric tonne to be paid to the land transport co. For more details contact Iraqi Maritin in Basrah.

It noted that in the three contracts in July 1999 and in contract A4822 in October 1999 there was reference to 'the discharge cost will be a maximum US$12.00 and shall be paid by sellers to the nominated maritime agents in Iraq. This clause is subject to UN approval of the Iraq distribution plan'. Further, it noted that subsequent contracts included a clause similar to that last noted, however 'the signed contracts as submitted to the UN … did not include the above provision. Instead, the shipment clause made no reference to the discharge costs'. It noted the increase in the trucking fee from US$12.00 to US$47.45 and that prior to July 2000 payments of the trucking fee had been made by shipping companies. It referred to Mr Stott's letter of 30 October 2002 and DFAT's reply of 2 November 2000 but noted that AWB's letter had made no reference to the fact that 'as at 30 October 2000 the arrangements for payment of the trucking fee had already been in place for approximately eight months'. The brief instructed Mr Tracey:

> The documents which instructing solicitors have examined do not indicate whether the trucking fees paid by AWB to Alia can be regarded as a genuine payment for the provision of inland freight services actually provided by Alia. We have not seen any contract between AWB and Alia. We have seen no evidence to indicate whether or not the trucks used to transport wheat after its discharge at Umm Qasr were provided by Alia. We have seen no explanation as to how the trucking fee was calculated or the basis upon which the trucking fee was subsequently increased. The trucking fee does not appear to have been calculated with regard to the differing distances between Um Qasr and the various Governorates …

Mr Tracey gave oral advice on 25 May 2004. The same day Messrs Cooper and Quennell briefed the joint information session of both Boards. The minutes, for which

legal professional privilege was initially claimed but subsequently accepted by AWB

Case 0:05 be 02002 chib. Document 23-3 Filed 12/14/2007 Page 42 of 52

c) The findings to date of the Project Rose investigation are as follows:

1. all AWB contracts were approved by the Office of the Iraq Program at the United Nations;

2. no evidence has been identified of any AWB knowledge that money paid to the Jordanian transport firm, Alia, was onpaid to the Iraq regime;

3. no evidence has been identified of payment of funds by AWB to any other person in relation to the OFF shipments; and

4. no evidence has been identified of payment of funds to any AWB employee by any other person in relation to OFF shipments.

d) That the Board would be kept informed of any additional findings that may emerge from the Project Rose investigations.

The following day the AWB Board was advised that:

Legal advice

Richard Tracey QC has been briefed and advised in conference today:

(1) No evidence of breach of relevant UN Resolution on sanctions (661)

(2) No evidence of breach of Australian domestic law

It is to be noted no mention was made in the brief that the first contract AWB had entered into with Alia regarding trucking of grain was in October 2003. Nor was there mention of the 10 per cent after-sales-service fee imposed from November 2000, the inflation of contracts A1670 and A1680 to recover the Tigris debt, or the proposal to repay the iron filings claim compensation to Iraq by means of the 'trucking mechanism'.

However, in June 2004 Mr Quennell provided a further memorandum of instructions to Mr Tracey, advising that Mr Quennell now understood the increase in trucking fees after November 2000. He advised that the increased trucking fee from that date was due to adding 10 per cent of the price per tonne by way of addition to the trucking fee. He also advised that the reason for the sharp reduction in the trucking fee payable in respect of contracts A1670 and A1680 was that they were executed after the fall of the Iraqi regime, and the reduction in price was agreed by AWB.

Mr Tracey, who had seen a memorandum prepared by Mr Hogan that indicated the inclusion of inland transport costs in the wheat price, was inquisitive. He asked whether that breakdown had been disclosed in contracts to the United Nations. He also asked whether there was commercial justification for the 10 per cent increase and

why AWB had agreed to reduce the price for contracts A1670 and 1680. Mr Quennell informed him that the contracts forwarded to the United Nations did not disclose the transportation fee, that there was no apparent commercial justification for the 10 per cent increase, and that it was thought that the Coalition Provisional Authority had required a reduction in post-conflict contracts.

With this information, Mr Tracey advised on 8 June 2004:

> In the absence of commercial justification for the introduction, increases and decreases in the trucking fee and the lack of specific approval for the fee and its quantum by the UN there is reason to suspect that the fee (or part of it) was used as a kick-back to the IGB or persons associated with it. Whether the money was so used can only be determined by an investigation of the finances of the Jordanian trucking company which was the recipient of the trucking fees.
>
> A further reason for suspecting the efficacy of the fee is Hogan's assertion that UN approval for its payment had been obtained. If this was not the case then a question arises as to why the assertion was made. Was it a deliberate attempt to mislead AWB management or did he make an honest mistake?
>
> None of this establishes that AWB or any of its employees is guilty of any offence or of breaching UN resolutions. What it does suggest is the need for further enquiries (if this is possible) to determine all the facts surrounding the payment of the trucking fee and, in particular, whether any part of it found its way to the IGB or any Iraqi officials.

It is likely that in June or July 2004 the Boards of AWB and AWB (International) learnt of Mr Tracey's advice. It is not known if they were informed of his reservations.

## Commencement of the Independent Inquiry Committee investigation

In March 2004, with the Independent Inquiry Committee investigation in the offing, Ms Armstrong of DFAT spoke to Mr Whitwell regarding AWB's contracts under the Oil-for-Food Programme. He told her 'AWB paid the Jordanian trucking company. The Jordanian trucking company might have made payments to the Iraqi's of their own volition'. Ms Armstrong wrote a ministerial memorandum to the Ministers for Foreign Affairs and Trade, in which she noted:

> AWB Ltd has strenuously denied US Wheat Associates' allegations that it paid kickbacks to the regime, advising that the relatively high prices for OFF-contracted wheat reflected the costs of insurance, on-the-ground distribution and technical support not just the cost of acquiring and shipping the grain. The Iraqi Grains Board delegation currently in Australia has advised that AWB Ltd has acted with propriety at all times in Iraq. The company concedes however that the Jordanian company handling local transport might, of its own volition, have provided kickbacks to the regime. Given the gravity of the allegations we have suggested to AWB Ltd that they may wish to provide more formal advice on their position to the Government. AWB Ltd is bound by the Commonwealth Criminal Code

which contains offences relating to bribery and corruption by Australian companies and their officials overseas.

Ultimately, in June 2004, a few days after Mr Tracey had provided the advice quoted, AWB, through Mr Lindberg, wrote to Minister Downer. The letter was settled by Messrs Cooper and Quennell, both of whom were aware of Mr Tracey's advice. The letter reiterated AWB's denial of wrongdoing. It made no mention of the reservations of Mr Tracey's advice or the then known fact that AWB had since November 2000 been paying an additional unexplained fee equivalent to 10 per cent of the contract price to Alia as a supposed trucking fee. AWB knew the 10 per cent was not in truth related to trucking.


## The Permanent Subcommittee on Investigations inquiry

In June 2004 AWB learnt of a proposed US Senate Permanent Subcommittee on Investigations inquiry into the Oil-for-Food Programme. It briefed US lawyers. A task force was established, which comprised, in addition to Australian and US lawyers, AWB staff from the Stakeholders Relations Division. About 20 meetings were held between June and November 2004. Privilege was claimed for all documents relating to those meetings. AWB sought Australian government help in putting representations to the PSI that AWB ought to be treated fairly in any such inquiry. Such representations were made in August and September 2004, following the provision of talking points to Australian officials by AWB.

The allegations regarding inflated payments to Iraq caused concern within the Wheat Export Authority, which perceived its function as being to ensure that the interests of wheat growers in the wheat pool were protected. In March 2004 the WEA had sought copies of contracts under the Oil-for-Food Programme and other information. This request had not been met. There was a joint meeting of the Boards of the WEA and AWB (International) on 27 July 2004. The AWB (International) Board did not inform the WEA of any matters it had learnt as a result of its briefings on Project Rose during the preceding 12 months or of any advice it had received from Mr Tracey.

On 28 July 2004 there was a joint information session for the Boards of AWB and AWB (International). By then, Mr Cooper had become aware that Alia was 49 per cent owned by the Iraqi Ministry of Transport. In preparation for a briefing of the joint Boards, slides were prepared to update the Boards with the then current knowledge gleaned from Project Rose. At the prior Board meeting it had been suggested that there be an investigation of the 'Alia structure, shareholding etc'. Management had decided not to conduct the investigation sought by the Board. Mr Quennell suggested to Mr Cooper that a slide be prepared showing what was known about Alia. Mr Cooper prepared such a slide. He reviewed his presentation with Mr Lindberg, who directed him to remove the slide from those to be presented to the Board. Whether Mr

*Report of the Oil-for-Food Inquiry*

Cooper informed the Board of the Ministry of Transport ownership of 49 per cent of the shareholding in Alia is not known. Mr Cooper's evidence was equivocal: the weight of evidence is that he did not.

In response to the WEA's request, AWB prepared a briefing paper in August 2004. That paper did not disclose the fact that the amount of payments for trucking fees was not disclosed on the face of any of the contracts. It did not disclose the unexplained 10 per cent increase in trucking fees, or the pre-payment of transportation fees, or that such fees were to be forwarded to the Ministry of Transport. Nor did it disclose that AWB knew that Alia was 49 per cent owned by the Ministry of Transport. Nor did it disclose the inflation of contracts A1670 and A1680 to recover the Tigris debt.

The WEA inspected and reviewed the contracts. Its concern was to determine whether the FOB price was at least that which it had been advised by AWB. That involved a netback calculation. The WEA satisfied itself that the prices were consistent with those previously notified to it, although it was accepted in evidence by the Chairman of the WEA that the WEA did not have the information necessary to enable it to do the netback calculation. The WEA was informed by AWB that the Coalition Provisional Authority had forced a 10 per cent reduction on all supplies of food imports to Iraq because it wanted to gain credibility with the Iraqis. In truth AWB knew that the 10 per cent reduction initially required was a removal of the after-sales-service fee, as had been highlighted in the brief delivered to Mr Tracey QC in June 2004. The WEA subsequently sought a written explanation of the 10 per cent reduction, but AWB failed to provide that information, notwithstanding that internally it prepared responses. Whilst those responses referred to the commercial reasons why AWB decided to accept the reduction, they did not address the true circumstance known to AWB—that the reduction was a removal of the 10 per cent after-sales-service fee.

In September 2004 the AWB (International) Board was given an update on Project Rose on two occasions. What was said is not known.

## Cooperation with the Independent Inquiry Committee

In November and December 2004 there were discussions between AWB and the Independent Inquiry Committee regarding the basis on which AWB would 'cooperate' with the IIC. The Australian Government encouraged AWB to cooperate fully, but AWB required that, before any interviews or provision of documents, there be an agreed protocol with the IIC. Such a protocol was agreed by February 2005. During negotiations for that protocol AWB was able to negotiate down its obligation of production to the IIC from 'all relevant documents' to an obligation to produce documents in specific categories the IIC sought. The IIC also sought interviews with 'AWB staff who were involved in discussions with Iraqi authorities including Andrew Lindberg, Michael Long, Trevor Flugge and Dominic Hogan'. Messrs Lindberg, Long

and Flugge were interviewed but Mr Hogan was not, he no longer being an employee of AWB. In April 2005 the IIC sought interviews with Messrs Whitwell, Watson, Emons, Stott and Edmonds-Wilson, but those interviews did not occur. Mr Hockey was interviewed in relation to his role as an AusAID adviser in Iraq.

AWB established a data room for use by the IIC. It contained 24,000 pages of documents falling within categories formulated in the memorandum of understanding with the IIC. Those were the documents initially made available to this Inquiry. They omitted many relevant documents briefed to Mr Tracey as being important. They did not contain any of the results of the investigations conducted by AWB in Project Rose.

In February 2005 AWB established a Working Group comprising the Chairman (Mr Stewart), Mr Lindberg, Mr Barry (Deputy Chairman and Chairman of the Audit Committee), Mr Polson (Chairman of the Group Corporate Risk Committee) and Mr Starr (Chairman, Compliance Committee). The Working Group was to 'oversee Project Rose matters and receive legal advice on an ongoing basis'. AWB claimed legal professional privilege relating to the briefing of the Working Committee on Project Rose. However, it must be assumed that that Committee, comprising all the senior Board members and the Chief Executive Officer, were fully briefed on the inquiries conducted by Project Rose, the factual findings it had made, and the advice it had received from Mr Tracey and other lawyers. Whilst privilege was claimed in relation to the minutes, Dr Fuller's notes of that meeting were tendered without objection. They refer to:

- Alia
- Trucking fees—reasonable
- Compliance UN conventions circumvented
- Iron Filings. Negotiation of quality claims—$6/tonnes—$5 tonne
- Tigris
- Governance–past/future
- Issues mg't—Geoff Owen
- Board oversight

His notes also record a Director, Mr Thame, indicating that, with the 'wisdom of hindsight. Wished hadn't done that', and his requesting that notification be given under the Directors and Officers insurance policy. They also record that Mr Lindberg apparently described the conduct of employees and documents discovered in Project Rose as containing 'blemishes' and 'there are some emails that could be misinterpreted or would not look good'.

After the IIC interviews in late February and early March 2005 there were discussions within the Project Rose Committee on 4 March and 10 March. Following briefing of the Boards of AWB and AWB (International) on 10 March 2005, Mr Quennell asked Mr Tracey for further advice in the light of 26 documents apparently referred to by the IIC investigators.

Later in March 2005 AWB prepared documents to brief DFAT on the IIC meetings. It appears from the briefing that AWB had informed the IIC that AWB had conducted its own legal review, which had found no evidence of corruption by AWB or officials, no side payments or after-sales payments to individuals of the former regime, and no payments by the regime to former or existing AWB representatives. It made no mention of the 10 per cent after-sales-service fees, the Tigris transaction, the agreed arrangement for payment of the iron filings compensation through the inland transportation mechanism, or knowledge that Alia was 49 per cent owned by the Iraqi Ministry of Transport. Before AWB gave its presentation to DFAT, the content of that to be disclosed was cleared by AWB's lawyers.

In April 2005 the Wheat Export Authority Board was advised that the WEA had been unable to cooperate with the IIC because AWB declined to allow it to provide documents to the IIC. In those circumstances confidentiality constraints restricted it from doing so.

In April 2005 there were meetings between AWB, Mr Hargreaves, who was the Manager of Project Rose, and AWB's US lawyers. AWB also met with Ambassador Thawley and other Australian diplomats in the United States. Those diplomats were given an assurance by Mr Hargreaves that 'AWB had not done anything wrong under the OFFP Programme'.

On 22 April 2005 there was a Joint Board Committee meeting on the subject of Project Rose. The meeting was said to be 'a forum of directors of AWB Limited and AWB (International) Limited to discuss Project Rose, to receive legal advice in relation to Project Rose, and if necessary, to provide advice to the respective Boards'. Privilege was claimed concerning those discussions and the discussions at subsequent meetings, on 27 April and 24 May. However, Dr Fuller's notes of the meeting on 27 April record, 'Major exposure. Strong defences — but the headlines. Major implications for our business overseas and whether this company is fit to hold the Single Desk'.

On 1 June 2005 AWB briefed the Australian Government concerning the IIC Inquiry. It maintained its position that it had been obliged to use Alia and had not been aware of it being part-owned by the Iraqi Ministry of Transport until 2004.

In June 2005 AWB representatives travelled to Washington DC, where they updated Australian Embassy staff on the progress on the IIC report, was then expected in July or August. They also appointed advisers to manage AWB's media profile following

publication of the report. The embassy agreed to talk with AWB and recommend consultants in media management, but only on the basis that it had a firm assurance from AWB that it 'had not been involved in any kickbacks or wrong doing, and that it is being completely upfront with us and not hiding anything'. The embassy was given that assurance. It was said that AWB had conducted its own internal audit and legal review and no wrongdoing had been found. AWB denied it was aware that Alia was channelling money to Iraq, denied that Alia was a front company, and denied that it had not been providing trucking services. It also denied any overpricing.

However, at a later meeting with an embassy official, Mr Hargreaves said, 'I have also learnt that Alia had asked for an increase in the trucking fees of 10% in 2000 which AWB had agreed to pay. This increased progressively to 35–45% of the trucking fees by the end of the Oil-for-Food Programme. Alia is a Jordanian company. AWB had paid Alia in Jordan. AWB did not pay any money to Iraq'.

There were briefings to the Board on Project Rose and meetings with government in Canberra in June 2005 and embassy officials in Washington in July 2005. On 12 August 2005 Mr Tracey QC provided a memorandum said to confirm his prior oral advice given in May 2004. After noting that there were passages in various documents with which he had been briefed that were suggestive of the possibility that the trucking fee was, in fact, a payment by AWB to the IGB in contravention of Resolution 661, Mr Tracey concluded that the material was insufficient to establish such a conclusion. He advised:

> 22. ... The absence of any documentation evidencing the commercial basis for the fixing of the trucking fee at various rates and the absence of any contract with Alia may be taken as suggesting the existence of a bogus arrangement under which money was paid through Alia to Iraqi authorities for a purpose other than payment for the provision of trucking services. On the other hand, it may be that the payments were in the nature of an incentive to make it worth the while of Alia to provide more trucks to clear the wheat. ... That said, the absence of a contract between AWB and Alia is surprising. However, the evidence does not go so far as to suggest that none was ever entered into.

> 23. It is also of concern that the Department of Foreign Affairs and Trade was not told, when its advice was sought in late 2000, about these pre-existing events. The AWB gave the Department the impression that the demurrage problem had only recently arisen and that the trucking fee solution was about to become the subject of negotiations with Alia. ...

> 24. Ultimately, however, the question that I was asked to advise on was whether there was evidence that AWB may have contributed to a contravention by Australia of its obligations under Resolution 661. A breach of that resolution would only have occurred if the trucking fees had been paid to the IGB or the Iraqi Government and then only if it was not paid for a legitimate commercial purpose. Whilst some of the material with which I have been briefed raises suspicions that there may have been a perception within the AWB that any payment of the trucking fee may have contravened Resolution 661 and that it was necessary to make the payment to Alia in order to avoid any suggestion that the payments, if made directly to the IGB, would have been in breach of the Resolution, there is absolutely no evidence in the material provided to me that any of the money paid by the AWB to Alia was ever

forwarded to the IGB or any other arm of the Iraqi Government. It was for this reason, that, despite some misgivings I answered the question posed for advice in the negative.

It is to be observed that, in relation to quoted paragraph 22, it was well known within AWB that there was no agreement with Alia prior to October 2003: had there been such an agreement there would have been no need to enter into one at that time. Further, in relation to paragraph 23, Mr Tracey rightly noted the misleading nature of Mr Stott's letter of 30 October 2000. Further, in relation to paragraph 24, whilst Mr Tracey may not have been briefed with the evidence, the material before this Inquiry makes clear that Mr Hogan and other senior officials of AWB had no doubt that the monies paid to Alia were in truth being paid to the IGB or another arm of the Iraqi Government. Further, as was noted in the trip report of January 2001, it was recognised within AWB that the additional 10 per cent surcharge was a method of syphoning off funds from the UN escrow account to be paid to Iraq.

On 8 September 2005 Dr Fuller sent a memorandum to the directors and members of the Executive Leadership Group addressing the forthcoming IIC report. It stated, 'AWB paid a legitimate transport company, based in Jordan and that company provide a genuine service that was critical in successfully distributing wheat to people throughout Iraq'; and, further, that DFAT had expressed to AWB in November 2000 the view that payment of trucking fees at the direction of the IGB to enable distribution of wheat to the Iraqi people was consistent with Resolution 661.

Each of those statements was erroneous. AWB had known at least since Mr Hogan's note, made in May 2001, of how the transportation system worked, and that Alia did not provide a genuine trucking service. It had been known since at least January 2001 that the additional 10 per cent surcharge was a method of syphoning monies from the UN account for payment to Iraq. DFAT's letter of 2 November 2000 did not say that payment of trucking fees at the direction of the IGB to enable distribution of wheat was consistent with Resolution 661. It was not asked to express a view on that issue and it had not done so. The letter of November 2000 was a response to Mr Stott's letter of 30 October 2000, which sought to set up a position where AWB could claim DFAT had approved its trucking arrangements in Iraq—without truthfully telling DFAT what those arrangements were—when in fact DFAT had not.

In September 2005 AWB's present lawyers, Arnold Bloch Leibler, sought an opinion from Sir Anthony Mason, a former Chief Justice of Australia. Advice was sought in relation to:

(i) Did the inclusion, on the insistence of the Iraqi Grain Board (IGB), of an inland delivery payment term in its wheat contracts with AWB violate the UN sanctions against Iraq that started with Resolution 661 in 1990 and continued until the Oil-for-Food Program ended in 2003?

Answer: No, so long as the price stipulated was reasonable.

to use Alia, and that the United Nations had known all the time about its use of Alia. Neither statement was true.

The Chairman and Chief Executive Officer of AWB, and AWB's legal advisers, met with Mr Volcker in New York on 12 October 2005. They provided a letter to Mr Volcker, asserting that:

- AWB did not view Alia to be a front company for the Iraqi Government.

- AWB was never informed of any after-sales-service fee and never made payments characterised as such.

Neither statement was true.

Ultimately, on 25 October 2005, two days before the issue of the IIC report, AWB wrote to the IIC suggesting that the fairest interpretation of the circumstances was that 'AWB was an unwitting participant in an elaborate scheme of deception devised by the regime'. In fact, from mid-1999, AWB had been a willing participant in the scheme with the full knowledge of then senior management and the then Chairman, such participation being known to be necessary to retain the Iraqi wheat trade.

On 26 October 2005 AWB advised the Australian Government of the findings the IIC would make and forwarded a copy of Sir Anthony Mason's opinion.

On 27 October 2005 the IIC issued its final report.

In November 2005 the Wheat Export Authority requested from AWBI a detailed brief on the 'operation of the escrow account for Australian wheat sales under the OFF Programme' and 'how the payments for transport made under the OFF Programme worked'. A brief was provided on 14 November 2005. However, that brief did not disclose:

- the 10 per cent after-sales-service fee or that it was paid through Alia

- that the IGB set the rate for transport and directed the use of Alia

- the inflation of contracts A1670 and A1680 to recover the Tigris debt

- that Alia on-paid transport fees to the Ministry of Transport

- that use of the inland transportation mechanism was one of the means discussed with Iraq for the payment to it of the iron filings compensation.

On 21 November 2005 there was a joint information session of both Boards. Project Rose was renamed Project Lilac to respond to this Inquiry, and a briefing regarding

13 December 2005. AWB claimed privilege over the minutes of those meetings.

In December 2005 AWB engaged Dr Sandman to provide crisis management and public relations advice regarding AWB's involvement in this Inquiry. Dr Sandman advised that AWB should 'essentially over apologise, to apologise for things that had happened, to cover the ground and in fact to go further than was necessary, and that it was in the interests of the corporation to do so in terms of its public reputation and recovery from events'. In considering that advice, Mr Lindberg drafted a document headed 'Cole Inquiry — Draft Statement of Contrition — Andrew Lindberg'. The document stated:

1.  As a result of the Volker inquiry into the OFF program AWB accepts that in paying money for inland transportation and after sales service it paid money to the Iraq government in contravention of the UN sanctions.

2.  Even though there were warning signs to some employees that this may have been occurring AWB did not challenge these payments and was not alert to the potential consequences of making these payments. For this we are truly sorry and deeply regret any damage this may have caused to Australia's trading reputation, the Australian government or the United Nations.

3.  AWB in pursuing its constitutional requirement to maximise returns to the Australian farmer in selling their wheat took a commercial and technical compliance approach to the UN sanctions but failed to consider the broader purposes of the UN sanctions. This was a failure, at the time, of the culture, systems and procedures which the Company deeply regrets and is committed to continuing to improve.

4.  Even though the transaction concerning BHP Petroleum in recovering payment for a prior wheat shipment was well intentioned and AWB believed complied with the UN sanctions, it should not have occurred without specific authorisation of the Australian government and the United Nations. AWB regrets this did not occur.

5.  Even though AWB relied on the United Nation's supervision and authorisation of each contract the Company should have established its own internal systems of checks and balances such that it did not participate (and may have even aided stopping) the systematic and wide spread abuse of the OFF program. We deeply regret and apologise for not having done so.

6.  While AWB can ex-post rationalise its participation in the OFF Program and claim it did not have the benefit of hindsight or the complete picture this does not excuse what occurred and is not offered as an excuse. We simply should have done better; and I am deeply sorry we didn't.

AWB claimed privilege for this document, asserting that it was delivered to the Inquiry by mistake. That claim was rejected by me and by the Federal Court of Australia. However, Mr Lindberg decided not to make the statement of contrition to the Inquiry.

Independent Inquiry Committee into the
United Nations Oil-For-Food Programme

## Actual and Projected Illicit Payments on Contracts for Humanitarian Goods
## Summary by Supplier (All Amounts in USD)

Referenced in this Report as "Committee humanitarian summary kickback table."

| Supplier | Mission Country | Goods Categories | Number of Qualifying Contracts | Contract Face Value | Contract Disbursements | Levies/ASF | Inland ASF | Total ASF |
|---|---|---|---|---|---|---|---|---|
| ATLAS COPCO AIRPOWER | BELGIUM | AIR COMPRESSOR PARTS; AIR COMPRESSOR WITH ACCESSORIES AND SPARE PARTS; AIR COMPRESSORS; AIR COMPRESSORS W/AIR DRYERS & SPARES; AIR COMPRESSORS W/SPARES AND ACCESSORIES; AIR COMPRESSORS WITH AIR DRYERS AND SPARES; AIR COMPRESSORS WITH SPARES; AIR COMPRESSORS/SPARE PARTS; ATLAS COPCO COMPRESSOR + DRYER; COMPRESSOR; COMPRESSOR SPARE PARTS; COMPRESSOR W/ ACCESSORIES AND SPARES; COMPRESSOR/ACCESSORIES; COMPRESSOR/PARTS; CRAWLER DOZER AND SPARE PARTS; DIESEL GENERATING SETS W/SPARE PARTS & ACCESSORIES; DIESEL GENERATOR/SPARE PARTS; DIESEL TRUCKS MOUNTED COMPRESSOR/SPARTS; ELECTRICAL EQUIPMENT; ELECTRICAL EQUIPMENT & SPARES; EMERGENCY DIESEL POWER GENERATORS; JACK HAMMERS WITH PINS AND HOSES; LIGHTING EQUIPMENT AND ACCESSORIES; LIGHTING GENERATORS WITH SPARES; MACHINES & EQUIPMENT FOR WORKSHOPS W/SPARES; MAINTENANCE & OPERATION OF EXISTING FACILITIES IN STORAGE & COMP; COOLING PLANT CONSIST OF SPARES FOR COMP; MAINTENANCE TOOLS; MECHANICAL SPARES; LPG FILLING PLANT.; MEDICAL MACHINES; MOBILE AIR COMPRESSO | 40 | 15,199,888 | 15,605,527 | | 1,302,698 * | 1,305,515 * † |
| ATLAS COPCO CMT | SWEDEN | GOODS FOR WATER SANITATION I HYDRAULIC CRAWLER DRILL; SPARE PARTS FOR RIG, WATER AND SANITATION SUPPLIES | 1 | 538,000 | 511,100 | | * | * † |
| ATLAS INDUSTRIAL | JORDAN | MERCEDES BENZ SALOON RIBBON; TRUCK WITH SPARES | 1 | 5,103,673 | 1,169,255 | 500,000 * | | 114,553 |
| AUSTRALIAN WHEAT BOARD (AWB) LTD | AUSTRALIA | AUSTRALIAN WHEAT; WHEAT | 19 | 1,536,280,954 | 1,378,428,243 | 95,630,260 | 82,462,748 * | 139,274,494 |
| AUSTROPLAN - AUSTRIAN ENGINEERING CO. LTD. | AUSTRIA | CONSUMABLE MATERIALS FOR PRODUCTION OF LGP CYLINDERS; DIES FOR MANUFACTURE OF GUARD RINGS & CUTTERS; HEAVY EQUIPMENT; LPG FILLING PLANTS: MACHINE & EQUIPMENT FOR LPG CYLINDER REPAIR & TESTING; MANIPULATOR FOR CYLINDER; PAINTING UNIT FOR LPG CYLINDERS; PRODUCTION LINES FOR LPG CYLINDERS; QUALITY CONTROL EQUIPMENT; SPARE PARTS FOR CYLINDER WORKSHOPS; SPARE PARTS FOR EQUIPMENT & MACHINES; SPARE PARTS FOR GAS CYLINDER; SPARE PARTS FOR KUT MANUFACTURING PLANT; SPARE PARTS FOR LPG CYLINDER KUT PLANT A DIES/PRESS; SPARE PARTS FOR LPG PLANTS; SPARES/EQUIPMENT FOR SYLINDERS FACTORY; SPARES FOR DIES FOR THE MAINTENANCE OF LPG CYLINDERS; SPARES FOR EQUIPMENT; SPARES FOR LPG CYLINDER KUT MANUFACTURING PLANT/SPINDLE MACHINES; SPARES/EQUIPMENT FOR CYLINDERS; TOOLS & APPLIANCES FOR INSPECTION FOR CYLINDER WORKSHOPS W/SPARE PARTS; TOOLS & APPLIANCES WITH SPARE PARTS FOR FORMING BASE; VALVE/PARTS | 5 | 4,017,776 | 4,359,948 | 365,215 * | | 336,373 * |
| AUTO DEVELOPMENT CO. LTD. | EGYPT | AGRICULTURAL VEHICLE W/SPARES; BRAKE DOWN CARS AND SPARE PARTS; TANKER; TRUCKS AND SPARE PARTS; VEHICLE; WATER TANKER; WATER TANKER W/SPARE PARTS | 1 | 60,782,940 | 71,449,740 | 5,742,000 * | | 6,751,870 † |

**Note:** For a description of references and other information, refer to the explanation of Committee tables and the accompanying notes at the end of this table.

**Footnotes:**

* Represents contracts where the amount reported is based entirely on actual data.

† Represents contracts where inland transportation fee was required but no specific information was available.