UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SAADYA MASTAFA and KAFIA ISMAIL,

                                    Plaintiffs,

                    v.

AUSTRALIAN WHEAT BOARD LIMITED aka
AWB LIMITED, AWB (U.S.A.) LIMITED, and
BANQUE NATIONALE DE PARIS PARIBAS

                                    Defendants.

ECF CASE

No. 07 CIV 7955 (GEL)

---

## DECLARATION OF CRAIG PHILLIPS IN SUPPORT OF DEFENDANTS AWB LIMITED'S AND AWB (U.S.A.) LIMITED'S MOTION TO DISMISS THE CLASS ACTION COMPLAINT WITH PREJUDICE

Craig Phillips hereby declares as follows:

1.      I am a member of the Australian law firm Allens Arthur Robinson ("AAR") and have been a partner since 1986. I was admitted to practice in the State of Victoria, Australia, in 1980, as an Australian Legal Practitioner, and I am also admitted to practice in the Australian States of New South Wales and Queensland. AAR currently represents AWB Limited ("AWB") in certain court proceedings pending in the Federal Court of Australia, and in relation to other matters.

2.      I submit this declaration in support of Defendants AWB's and AWB (U.S.A.) Limited's ("AWB USA") motion to dismiss the Class Action Complaint filed in the above-captioned matter, dated September 11, 2007 (the "Complaint", cited as "Mastafa ¶ ___"). I have carefully reviewed the Complaint, and the claims asserted therein against AWB and AWB USA.

3.      In this Declaration, I address the following matters:

I.  The history of AWB and its relationship with the Australian Government (paras. 6 to 32);

II.  The Australian judicial system (including (a) Australia's adequacy as an alternative forum to the U.S. for the Mastafa litigation; and (b) the fact that the Mastafa plaintiffs would be able to sue the defendants in that case – namely, AWB, AWB USA and BNP Paribas ("BNP") – in Australia) (paras. 33 to 57);

III.  Australian investigations and proceedings relating to AWB's participation in the U.N. Oil-For-Food Programme ("OFFP") (paras. 58 to 76); and

IV.  The location of documents and witnesses relevant to the issues raised by the Complaint (paras. 77 to 82).

4.  The following is true of my own personal knowledge and if called as a witness, I could and would testify competently thereto.

5.  References to Acts, Regulations, Rules and Bills are to Australian Acts, Regulations, Rules and Bills unless otherwise indicated.

## I.  THE HISTORY OF AWB AND ITS RELATIONSHIP WITH THE AUSTRALIAN GOVERNMENT.

### A.  AWB's Origins.

6.  AWB evolved from an Australian government statutory authority, the Australian Wheat Board (the "Board"). The Board was formed in 1939 by the Wheat Acquisitions Regulations, contained in the National Security Act 1939. From 1939 until July 1999, the Board functioned as a statutory body of the Government of Australia.

7.  The Board was permanently established as a government-controlled marketing authority in 1948 under the Wheat Industry Stabilization Act 1948. Under that legislation, the Board had a sole right to market Australian wheat domestically and internationally on behalf of Australian growers. That monopoly on the export of wheat from Australia was termed the "Single Desk Policy".

**B.    The Wheat Marketing Act 1989.**

8.    In 1989, the Wheat Marketing Act 1989 deregulated the domestic Australian wheat market. Consequently, from 1989 onwards, any traders, millers or growers could buy and sell wheat in the domestic market. The Board remained a statutory authority and, as such, "continue[d] to be accountable to the minister and the parliament". Second Reading Speech, Wheat Marketing Bill 1989.

9.    The Board retained the sole right to export Australian wheat under the Wheat Marketing Act 1989. Under Section 57(1) of that Act, no person could export wheat from Australia without written consent from the Board.

10.    The Wheat Marketing Act 1989 also established a Wheat Industry Fund (the "WIF") via a new levy on wheat sales. The WIF was intended to finance various activities of the Board.

**C.    The Transfer of Activities of the Board to AWB.**

11.    Amendments in 1997 and 1998 to the Wheat Marketing Act 1989 provided for a transfer of the Board's commercial functions to three nominated companies. The Wheat Marketing Amendment Act 1997 (the "1997 Act") (a true copy of which is annexed hereto as Exhibit 1) provided for the creation of a nominated holding company – "Nominated Company A" – which was a wholly-owned subsidiary of the Board. The objects of "Nominated Company A" were:

(a)    to trade in wheat for various purposes;

(b)    to export grain other than wheat and trade in such grain for various purposes;

(c)    to export grain products and trade in such grain products for various purposes;

(d)    to engage in value-adding activities for various purposes;

- 3 -

(e)     to promote, fund or undertake research in relation to marketing grain or value-adding activities; and

(f)     to do anything incidental or conducive to these objects.

12.    The 1997 Act also established two subsidiaries of "Nominated Company A", named "Nominated Company B" and "Nominated Company C". The objects of "Nominated Company B" were:

(a)     to maximize the net returns to Australian wheat growers who sell pool return wheat to the company by securing, developing and maintaining markets for wheat and wheat products and by minimising costs as far as is practicable;

(b)     to export new season wheat from Australia;

(c)     to trade in new season wheat for various purposes;

(d)     to make arrangements for the growing of wheat for various purposes;

(e)     to promote or fund wheat marketing;

(f)     any object approved in writing by the Minister for the above purposes; and

(g)     to do anything incidental or conducive to those objects.

13.    The objects of "Nominated Company C" were:

(a)     to trade in wheat for various purposes;

(b)     to export grain other than wheat and trade in such grain, for various purposes;

(c)     to export grain products, and to trade in such products, for various purposes;

(d)     to promote, fund or undertake research into matters relating to the marketing of grain or value-adding activities; and

(e)     to do anything incidental to or conducive to the above objects.

14.    AWB, AWB (International) Limited ("AWBI") and AWB (Australia) Limited ("AWBA") were all incorporated and registered with the Australian Securities and Investments Commission ("ASIC") on March 12, 1998.

15.    On June 1, 1998, AWB, AWBI and AWBA were declared to be "Nominated Company A", "Nominated Company B" and "Nominated Company C", respectively. Commonwealth of Australia Gazette, No. S 274, June 12, 1998 (a true copy of which is annexed hereto as Exhibit 2).

16.    Between June 1, 1998, and July 1, 1999, AWB, AWBI and AWBA were wholly-owned subsidiaries of the Board, which remained a statutory body of the Australian Government.

17.    Immediately before July 1, 1999, all shares in AWB were cancelled by the Wheat Marketing Legislation Amendment Act 1998. On that date, the WIF was transferred to AWB.

18.    On July 1, 1999, AWB was privatized and became an unlisted public corporation, with two wholly-owned subsidiaries, AWBI and AWBA. "B-class" shares in AWB were issued to holders of units in the WIF. "A-class" shares were issued to persons who met the definition of "growers" in AWB's Constitution.

19.    The Board, separated from AWB, continued in existence and was renamed the Wheat Export Authority (the "WEA"), now known as the Export Wheat Commission. It remained, and remains, a statutory authority of the Australian Government with an ongoing regulatory function in respect of the export of wheat.

20.    From July 1, 1999, onwards, AWBA became responsible for domestic wheat and grain trading, and the export of grains. AWBI's role was to manage the national

- 5 -

wheat pool for export purposes. Under the <u>Wheat Marketing Act 1989</u>, AWBI had the statutory

right to export wheat without obtaining the consent of the WEA. Further, under the <u>Wheat</u>

<u>Marketing Act 1989</u>, the WEA could not grant consent for the bulk export of wheat by any other

party without first obtaining the approval of AWBI. AWB performed those roles on behalf of

AWBI pursuant to a service agreement. The WEA retained the regulatory functions of the

Board, issuing export permits and scrutinising AWBI's performance.

      21.    AWB became a publicly listed corporation on the Australian Stock

Exchange ("ASX") on August 22, 2001.

**D.    The Transfer of the Assets, Contracts, Liabilities and Staff of the Board to AWB.**

      22.    The 1997 Act allowed the Board to transfer its assets, contracts, liabilities

and staff from the Board to the nominated companies at a specified date. Under Sections 9 to 18

of that Act, the Board could declare such transfers in writing. Such declarations would be

published in the Commonwealth of Australia Gazette and take effect on the specified date of

transfer. The 1997 Act also provided for the transfer of identities in respect of any pending legal

proceedings under Section 32.

      23.    Transfers of the Board's assets, contracts, liabilities and staff occurred in

two stages: on June 1, 1998 (the "1998 Transfers"), and on July 1, 1999 (the "1999 Transfers").

      24.    The 1998 Transfers were made by declarations published in the

<u>Commonwealth of Australia Gazette</u>, No. GN 25, June 24, 1998 (a true copy of which is annexed

hereto as Exhibit 3). The declarations took effect on June 1, 1998.

      25.    Under those transfers, AWB acquired, and became the successor in law of

the Board in relation to:

- 6 -

(a)  each liability under or in connection with a borrowing transaction entered into by the Board before June 1, 1998, for specified purposes;

(b)  each liability under or in connection with a borrowing transaction entered into by the Board before June 1, 1998, in connection with trading in grains other than under Division 2 or 3 of Part 4 of the Wheat Marketing Act 1989;

(c)  each liability in connection with the business carried on as "Academy of Grain Technology";

(d)  the obligations and rights under each contract entered into or dealt with by the Board under Section 74 of the Wheat Marketing Act 1989 before June 1, 1998, and in connection with new season pool returned wheat relating to specified borrowing transactions; and

(e)  the obligations and rights under each contract creating assets or liabilities, all of which were transferred to AWB by the 1998 Transfers.

26.  AWBI acquired, and became the successor in law of the Board in relation to:

(a)  each liability of the Board under or in connection with the purchase, marketing or sale of new season pool return wheat other than the liabilities relating to borrowing transactions or contracts transferred to AWB;

(b)  the obligations and rights under each contract entered into by the Board under Section 74 of the Wheat Marketing Act 1989 before June 1, 1998, in connection with new season pool return wheat that does not relate to a borrowing transaction covered by subsection 22(1) of the 1997 Act; and

(c)  the obligations and rights under each contract creating assets or liabilities all of which were transferred to AWBI by the 1998 Transfers.

27.  AWBA acquired, and became the successor in law of the Board in relation to:

(a)  each liability of the Board incurred before June 1, 1998, as a result of anything done by or in relation to the Board in connection with trading in grains other than liabilities under or in relation to

- 7 -

borrowing transactions or contracts entered into by the Board before June 1, 1998, that relate to a borrowing transaction;

(b)    the obligations and rights under each contract entered into by the Board in connection with trading in grains other than borrowing transactions or contracts entered into which relate to a borrowing transaction; and

(c)    the obligations and rights under each contract creating assets or liabilities all of which were transferred to AWBA by the 1998 Transfers.

28.    Assets of the Board were also transferred on June 1, 1998, to AWB, AWBI and AWBA.

29.    The 1999 Transfers were made by declarations published in the Commonwealth of Australia Gazette, No. GN 27, July 7, 1999 (a true copy of which is annexed hereto as Exhibit 4). The declarations took effect on July 1, 1999.

30.    Under the 1999 Transfers, employees of the Board became employees of AWB. AWB acquired, and became the successor in law of the Board in relation to:

(a)    all remaining liabilities of the Board not transferred to AWBI on July 1, 1999, including:

i.    liabilities arising from the employment of each employee of the Board;

ii.    liabilities arising under or in relation to a borrowing transaction that relates to pool return old season wheat;

iii.    liabilities arising under or in relation to a contract entered into relating to pool return old season wheat;

iv.    contingent liabilities which arise under any proceedings in which the Board is a party; and

v.    liabilities relating to the WIF; and

(b)    the obligations and rights under each contract entered into or dealt with by the Board in relation to an employee of the Board including contracts of employment and contracts dealing with terms and conditions of employment, accrued employment benefits or mobility rights of employees; and

- 8 -

    (c)    the obligations and rights under each contract creating rights or obligations all of which were transferred to AWB by the 1999 Transfers.

31.    Under the 1999 Transfers, AWBI acquired, and became the successor in law of the Board in relation to:

    (a)    the liabilities of the Board under or in connection with anything done by or in relation to the Board under Division 2 or 3 of Part 4 of the <u>Wheat Marketing Act 1989</u> in connection with pool return wheat; and

    (b)    each contract creating rights or obligations all of which were transferred to AWBI by the 1999 Transfers.

32.    On July 1, 1999, various assets of the Board were also transferred to AWB and AWBI. Finally, AWBA acquired each contract creating assets or liabilities all of which were transferred to AWBA by the 1999 Transfers.

## II.    <u>THE AUSTRALIAN JUDICIAL SYSTEM.</u>

### A.    <u>Overview.</u>

33.    The judicial system of Australia is fair, independent and operates according to the rule of law.

34.    Like the judicial system of the United States of America (the "U.S."), the Australian judicial system is a federal system with national or federal courts and separate judicial systems for each Australian state and the two self-governing Territories (the Australian Capital Territory and the Northern Territory) (hereafter, references to states include references to the Territories). The superior trial court in each state system is the Supreme Court of that state. The superior trial court in the federal system is the Federal Court of Australia (the "Federal Court"), established by the <u>Federal Court of Australia Act 1976</u> (the "FCA"). The High Court of Australia, established by the Australian Constitution, is the highest court of appeal in each of the state systems and the federal system.

35.    In the federal system, the Australian Constitution has been held impliedly to mandate an independent judiciary, requiring that there be a separation between federal judicial, legislative and executive power.  There is no such constitutional requirement in respect of the state systems.  However, in my experience, both at the state and federal levels, courts in Australia do in fact operate independent of direction or interference from the executive or any other part of government.

**B.    Procedure.**

36.    Like the U.S. judicial system, the Australian judicial system, both at the federal and state levels, is based on the English adversarial common law system.

37.    Plaintiffs (or "applicants" in the Federal Court) who are not resident in Australia may invoke the assistance of Australian superior trial courts by instituting proceedings in those courts.  Personal jurisdiction over the defendant (the "respondent" in the Federal Court) is based on service of the originating process on the defendant within Australia or, subject to relatively permissive rules for service outside of Australia, service outside of Australia.  The Supreme Courts of the states have plenary subject-matter jurisdiction.  The Federal Court has more limited subject-matter jurisdiction.

38.    As in the U.S., the Australian judicial system, whether at the state or federal level, has (a) a pleading phase (where plaintiffs are required to set forth in writing their claims against defendant(s)); (b) mechanisms for dismissal of groundless claims; (c) fact-gathering processes to establish the relevant facts; (d) an adjudicative process in which the court determines and applies the appropriate substantive law based on the evidence before it; (e) an array of remedies to vindicate protected interests; and (f) appellate review to correct error.  I address this in more detail below.

39.    Australian civil procedure thus permits:

- 10 -

(a)  Discovery:  Litigants have the right to compel the production from each other of relevant oral and documentary evidence.  The laws of discovery, as applied in the state or federal courts in Australia would, in my view, be effective to compel production to the parties of all documents relevant to plaintiffs' allegations in the Mastafa litigation.

(b)  Non-party discovery and subpoenas:  Litigants have a more limited, but nevertheless expansive, right to compel the production from non-parties of relevant oral and documentary evidence.

(c)  Evidence at trial:  Litigants have the right to present relevant evidence, and to present and cross-examine witnesses, at trial.

(d)  Interrogatories:  The rules of court provide a process for parties to administer interrogatories.

(e)  "Class action" procedures:  I address these in more detail below, at paragraphs 40 to 42.

(f)  Public hearings:  Court proceedings are generally held in public, except in rare instances when the court orders that the proceedings be closed to the public.

(g)  Transcription of court proceedings:  As in U.S. courts, the testimony of witnesses and the description of any other evidence is recorded, and is available to the parties.

(h)  Evidence from persons outside Australia:  Part 2 of the Australian Foreign Evidence Act 1994 provides a process for the making of orders providing for the taking of evidence from persons outside Australia.

(i)  Timely decisions:  Court proceedings are heard and decided within a reasonable time.  Both in the federal and state systems, proceedings are subject to judicial supervision through interlocutory processes.  In the Federal Court, proceedings are allocated to the docket of a Justice of the Federal Court at commencement.  In the ordinary course, that Justice is responsible for supervising the proceeding through all interlocutory steps and any trial.

(j)  Discretionary award of attorneys' fees and/or costs:  Under the FCA, the respective Supreme Court Acts of each state and/or the Rules of Court, state and Federal Courts in Australia have the power to make orders for the payment of attorneys' fees and costs, and this is commonly done.  As a general rule, it is usual for a

- 11 -

costs order to "follow the event" – i.e., costs are usually awarded to the successful party.

(k)    <u>Right of appeal</u>:  Litigants have the right to appeal trial decisions from the Supreme Courts of the states or Federal Court to the appellate court within the relevant jurisdiction.  To appeal from the appellate court to the High Court, litigants must seek special leave from the High Court.  As in the case of the U.S. Supreme Court, special leave is generally only granted in cases of public importance.

(l)    <u>Written rulings</u>:  All decisions of the Supreme Courts of the states and the Federal Court are set forth in writing and must be accompanied by a statement of the reasons for the court's decision.

## C.    <u>"Class Action" Procedures in Australia.</u>

40.    All Australian jurisdictions have procedures which allow individuals to bring representative actions on behalf of themselves and others.  In the Supreme Court of Victoria, those procedures are embodied in Order 18 of the Supreme Court (General Civil Procedure) Rules 2005.

41.    In addition, a "class action" procedure analogous to Rule 23 of the U.S. Federal Rules of Civil Procedure is available in the Supreme Court of Victoria, Victoria being the state in which AWB is headquartered (embodied in Part 4A of the <u>Supreme Court Act 1986</u> (Victoria) (the "Supreme Court Act") and the Federal Court (embodied in Part IVA of the FCA). The key features of that procedure are as follows (with section references to the Supreme Court Act):

(a)    where seven or more persons have claims against the same person which are in respect of, or arise out of, the same, similar or related circumstances and give rise to a substantial common issue of law or fact, one or more of those persons may commence a "representative proceeding" as representing some or all of them (Section 33C(1));

(b)    a representative proceeding may be commenced where the remedy sought is or consists of damages, even where the damages claims

of each group member requires individual assessment (Section 33C(2));

(c)  as in the U.S., the procedure is an opt-out procedure, in that, subject to limited exceptions not relevant to the Complaint, if a person falls within the class of group members as defined in the originating process at the commencement of the representative proceeding, that person is deemed to be a group member and is bound by any judgment in the proceeding unless they opt-out of the proceeding before a date fixed by the court (Sections 33E, 33H, 33J, 33ZB);

(d)  the court has discretion, on its own motion or on application by the respondent, to order that representative proceedings no longer continue as representative proceedings in various circumstances, including where the court considers that it is in the interests of justice (Sections 33M, 33N);

(e)  the court has power to substitute a group member for the representative party where it considers the representative party not to be able adequately to represent the interests of group members (Section 33T(1));

(f)  a representative proceeding cannot be settled or discontinued without leave of the court (Section 33V);

(g)  subject to a contrary order of the court, notice must be given to group members of various matters, including the right of group members to opt out and an application for approval of a settlement (Section 33X);

(h)  upon the commencement of a representative proceeding, the running of any statutory limitation period that applies to a claim of a group member is suspended (Section 33ZE(1)); and

(i)  in addition to the usual ability of the representative party to recover their costs from the respondent in the event that the representative proceeding is successful and the court makes an award of damages, if the representative party's reasonable costs are likely to exceed the costs recoverable from the respondent, the court has the power to order that the whole or part of the excess be paid from the award of damages (Section 33ZJ).

42.    One difference between the procedure established by Part 4A of the Supreme Court Act and the procedure under Rule 23 of the U.S. Federal Rules of Civil Procedure is that, under the Supreme Court Act, there is no certification procedure at the

- 13 -

commencement of a representative proceeding. However, as noted above, the Court has the

power, of its own motion or on an application by the respondent, to order that a proceeding no

longer continue as a representative proceeding. Further, in the event that a respondent considers

that the requirements for commencing a representative proceeding are not satisfied, the

respondent can apply for a declaration to that effect.

### D.   Obtaining Documents and Witness Testimony in Australia for Legal Proceedings in the U.S.

43.   Unless a witness resident in Australia agrees voluntarily to travel to the

U.S. to provide testimony (either in a U.S.-style deposition or at trial in a U.S. court), the only

way for U.S. litigants to obtain testimony from persons resident in Australia is through the

Hague Convention on the Taking of Evidence in Civil or Commercial Matters of March 18, 1970

(the "Hague Convention"). Likewise, the only way to compel the production of documents for

use in U.S. litigation, from persons or entities located in Australia, is pursuant to the procedures

of the Hague Convention. However, Australia has imposed certain restrictions on the use of the

Hague Convention in Australia for such purposes. First, for purposes of testimony sought under

Chapter II of the Hague Convention, Australia has made a declaration pursuant to Articles 15

and 16 of the Convention that testimony by an Australian witness may only be taken before an

American diplomatic or consular agent with permission from Australia's Central Authority (for

the purposes of the Hague Convention, the Secretary of the Attorney-General's Department of

the Commonwealth of Australia is Australia's Central Authority). Second, a declaration

implemented by Australia pursuant to Article 23 of the Convention states that Australia will not

execute letters of request issued under the Hague Convention for the purpose of obtaining pre-

trial discovery of documents.

**E.    Adequacy of Australia as an Alternate Forum for the Mastafa Litigation.**

44.    I understand from my review of the Complaint that the Mastafa suit is a putative class action filed in U.S. federal court, brought on behalf of "[a]ll persons or their surviving immediate family members who were victims of torture, extrajudicial killings, disappearances, rape and/or murder by and through the actions of the Saddam regime within the territory of Iraq from 1996 through March 2003". (Mastafa ¶ 69.) The named plaintiffs are two Kurdish women from Erbil, Iraq, whose husbands were allegedly captured, tortured and killed by the Hussein regime. (Id. ¶¶ 25-26.) The Mastafa plaintiffs allege that the defendants in that case – AWB, AWB USA and BNP – "negligently and/or knowingly aided and abetted the most egregious abuses of human rights by paying kickbacks and other unlawful payments to the Saddam Hussein regime in violation of international law under the United Nations Oil-for-Food Program which was instituted through Security Council Resolution 986". (Id. at 2.)

45.    The Mastafa plaintiffs bring claims under two U.S. statutes: (a) the Alien Tort Statute, 28 U.S.C. § 1350, for crimes against humanity; war crimes; genocide; torture; extrajudicial killings; forced disappearances of persons; and cruel, inhuman, and/or degrading treatment and/or punishment; and (b) under the Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 (note). In addition, the Mastafa plaintiffs bring claims under New York state law for wrongful death; negligence; battery; intentional infliction of emotional distress; and negligent infliction of emotional distress.

**1.    Possible Claims in Australia.**

46.    If a proceeding equivalent to the suit filed by the Mastafa plaintiffs in the U.S. were sought to be brought in Australia, in my opinion, there would be a number of possible causes of action upon which members of the proposed class could rely in seeking to prosecute the claims made in the Complaint in Australia.

47.    In my opinion, under the laws in force in the State of Victoria, the Supreme Court of Victoria could entertain claims for damages based on the alleged causes of action set out in the Complaint. Such claims could be actionable in the State of Victoria based upon common law causes of:

(a)    negligence (Jaensch v Coffey (1984) 155 CLR 549, Tame v New South Wales (2002) 211 CLR 317);

(b)    battery (Bunyan v Jordan (1937) 57 CLR 1);

(c)    assault (Id.);

(d)    false imprisonment (Myer Stores Ltd v Soo [1991] 2 VR 597); and

(e)    wrongful death (Part III, Wrongs Act 1958 (Victoria)).

48.    The common law of Australia, as in force in the State of Victoria, recognizes the concept of accessorial liability in respect of civil causes of action such as those set out in paragraph 47. If two or more people are responsible in law for the commission of a tort, or act together in furtherance of a common design to commit a tort, they will be responsible as joint tortfeasors collectively for the resulting harm, regardless of who has inflicted the actual damage (see, for example, Johnson Matthey (Aust) Ltd v Dascorp Pty Ltd & Ors [2003] VSC 291).

49.    In addition, it is arguable that a civil claim for damages at common law for genocide could be actionable under the laws in force in the State of Victoria. The question as to whether a claim, if established, may give rise to civil liability or civil remedies appears to remain unresolved under Australian law (Nulyarimma v Thompson [1999] FCA 1192).

50.    Further, a cause of action that vested in the plaintiffs' spouses may survive for the benefit of the spouses' estates (Section 29, Administration and Probate Act 1958 (Victoria)).

### 2.    Availability of Aggravated and Exemplary Damages

51.    Superior Courts in Australia, including the Supreme Court of Victoria, have the power to award (a) aggravated damages where the harm done to the plaintiff was aggravated by the manner in which the act was done (Gray v Motor Accident Commission (1998) 196 CLR 1); and (b) exemplary or punitive damages where the "conduct of the defendant exhibited a contumelious disregard of the plaintiff's rights" (Uren v John Fairfax & Sons Pty Ltd (1966) 117 CLR 118). Australian courts may award aggravated or punitive damages for negligence, as well as intentional torts, such as assault, battery and conspiracy (XL Petroleum (NSW) Pty Ltd v Caltex Oil (Australia) Pty Ltd (1985) 155 CLR 448, Lamb v Cotogno (1987) 164 CLR 1).

52.    Exemplary damages are barred for any action brought under section 29 of the Administration and Probate Act 1958 (Victoria).

### 3.    The Viability of a Class Action in Australia.

53.    As discussed above, the procedure available under Part 4A of the Supreme Court Act, is analogous to the procedure under Rule 23 of the U.S. Federal Rules of Civil Procedure. Accordingly, a proceeding equivalent to the Complaint brought in Australia could be brought utilizing a class action procedure analogous to the U.S. Rule 23 procedure. In my view, the Australian class action provisions would enable the plaintiffs as group representatives to initiate claims against AWB, notwithstanding that the plaintiff class appears to be resident outside Australia.

### 4.    Ability of Plaintiffs to File Suit in Australia.

54.    As noted above (para. 37), plaintiffs who are not resident in Australia may invoke the assistance of Australian superior trial courts by instituting proceedings in those courts. A foreign plaintiff who institutes proceedings in an Australian court is, by that act, taken to have

expressly submitted to the in personam jurisdiction of the court. See National Commercial Bank v. Wimborne [1979] ACLD 478; see also Marlborough Harbour Board v. Charter Travel Co. Ltd. (1989) 18 NSWLR 223. A defendant who is not resident in Australia may voluntarily submit to a court's in personam jurisdiction by instructing attorneys to accept service on the defendant's behalf, see SCF Finance Co. Ltd. v. Masri (No 3) [1987] QB 1028; Tasmania v. Bennett [2004] TASSC 15, or by filing an unconditional appearance, see Perkins v. Williams (1900) 17 WN (NSW) 135; McManus v. Clouter (1980) 29 ALR 101. Consequently, despite the fact that they are Iraqi citizens, resident in Erbil, Iraq, the Mastafa plaintiffs would be able to file suit in Australia, to retain experienced counsel in Australia, and to utilize the Australian judicial system, just as if they were Australian citizens.

## 5.   Ability of Plaintiffs to Sue Defendants in Australia.

55.    AWB is a registered public company incorporated under the Australian Corporations Act 2001. It is amenable to the in personam jurisdiction of the Courts of the States of Australia and the Federal Court of Australia, and will accept service of process issued in those courts. Consequently, the Mastafa plaintiffs could bring suit against AWB in Australia.

56.    If the Mastafa litigation is dismissed in favor of Australia on grounds of forum non conveniens, AWB USA is prepared voluntarily to submit to the in personam jurisdiction of the state and federal courts in Australia, and will accept service of process issued in those courts, for purposes of any proceeding commenced in Australia by or on behalf of the Mastafa plaintiffs, based upon the same allegations pleaded by the Mastafa plaintiffs in the Complaint. Annexed hereto as Exhibit 5 is a letter from AWB USA that confirms that fact. Consequently, the Mastafa plaintiffs could bring suit against AWB USA in Australia.

57.    Like AWB, BNP is already subject to the in personam jurisdiction of the Courts of the States of Australia and the Federal Court of Australia. BNP has a substantial

presence in Australia. BNP is registered in Australia as a foreign company with a registered

office at 60 Castlereagh Street, Sydney in New South Wales (ABN 23 000 000 117). According

to BNP's Australian website (http://australia.bnpparibas.com), the predecessor entity to BNP

established its business in Australia in 1881; BNP currently has offices in Sydney, Melbourne

and Perth, employing approximately 700 staff; and BNP Paribas is the eighth largest foreign

bank by assets in the Australasian region. (True copies of the relevant print-outs from BNP's

Australian website are annexed hereto as Exhibit 6.) BNP has also been involved in proceedings

in Australia before, in which it was subject to the jurisdiction of various courts in Australia,

including, for example, the Supreme Court of Victoria and the High Court of Australia (see, e.g.,

Pacific Carriers Ltd v. BNP Paribas [2004] HCA 35; 218 CLR 451 (Exhibit 7); Banque

Nationale de Paris v. Cardil Pty. Ltd. [1995] 1 V.R. 229 (Supreme Court of Victoria) (Exhibit 8);

Killham v. Banque Nationale de Paris (Unreported, Supreme Court of Victoria, June 28, 1994,

Hedigan J) (Supreme Court of Victoria) (Exhibit 9)). Consequently, the Mastafa plaintiffs could

bring suit against BNP in Australia.

## III.    AUSTRALIAN INVESTIGATIONS AND PROCEEDINGS RELATING TO THE U.N. OIL-FOR-FOOD PROGRAMME.

### A.    The Watson Proceeding in Australia.

58.    AWB is currently a defendant in a legal proceeding pending before the

Federal Court, which puts in issue certain aspects of AWB's participation in the OFFP.

59.    By originating process filed on April 17, 2007, Mr. John Watson and

Ms. Kaye Watson commenced the proceeding NSD 659/2007 (the "Watson Proceeding") against

AWB in the Federal Court. I had the care and conduct of the Watson Proceeding on behalf of

AWB, and I represented AWB in that action.

60.     On June 15, 2007, the Watsons served on AWB an Amended Statement of Claim dated June 8, 2007.  By order made on August 22, 2007, Justice Gyles of the Federal Court granted leave to the Watsons to file a Further Amended Application and Further Amended Statement of Claim ("FASOC").  AWB filed a Defence to the FASOC on September 10, 2007.

61.     The Watson Proceeding as originally constituted was brought by the Watsons on behalf of themselves and a class of "Represented Persons" pursuant to Order 6, Rule 13 of the Federal Court Rules 1979.  The effect of an order made by Justice Gyles on August 22, 2007, was to "convert" the Watson proceeding into a representative proceeding (or class action) under Part IVA of the FCA.  AWB sought leave to appeal that order.

62.     On October 9, 2007 the Watsons filed a notice to discontinue the Watson Proceeding.  By originating process, filed on October 9, 2007, the Watsons then commenced proceeding NSD 2020/2007, a representative proceeding under Part IVA of the FCA ("the current Watson Proceeding").  I have the care and conduct of the current Watson Proceeding on behalf of AWB, and I represent AWB in that action.

63.     A Statement of Claim in the current Watson Proceeding dated October 9, 2007 was served on AWB on October 11, 2007.  This Statement of Claim is the most current statement of the Watsons' claim as at the date of this declaration, and the description of the current Watson Proceeding which follows is based on the Statement of Claim dated October 9, 2007.  The Defence filed by AWB on September 10, 2007 in the Watson Proceeding is taken to be AWB's Defence in the current Watson Proceeding.

64.     Since August 22, 2001, AWB "B-class" shares ("AWB shares") have been quoted on the financial market ASX, operated by the Australian corporation now known as ASX Limited (trading as Australian Securities Exchange, and previously known as Australian Stock

Exchange Limited). In 2005, the Watsons purchased AWB Shares on the ASX. They allege that between March 11, 2002, and January 13, 2006 (the "Relevant Period"), AWB failed to inform the ASX of certain information which AWB allegedly was required to disclose pursuant to Section 674(2) of the Corporations Act 2001 and the listing rules of the ASX. The Watsons allege that because of that supposed non-disclosure, during the Relevant Period, among other things, the "market price" of AWB Shares was materially greater than their "true value". The Watsons allege that they sold the AWB Shares they had purchased during 2005 after January 13, 2006. They allege that they suffered loss and damage resulting from AWB's alleged non-disclosure, and they seek a declaration that AWB contravened Section 674(2) of the Corporations Act 2001, compensation for their loss and damage, interest on any compensation ordered and costs.

65.    The group members alleged to be represented by the Watsons are defined to be persons who, during the Relevant Period, obtained an interest in AWB Shares as the result of a purchase of AWB Shares on the ASX; at the close of business on January 13, 2006, held an interest in AWB Shares obtained during the Relevant Period and had, as at the date of commencement of the Proceeding, entered into a litigation funding agreement with IMF (Australia) Limited. The information which it is alleged AWB was required to, but did not, disclose relates to various contracts dated from July 14, 1999, to December 11, 2002 (the "Contracts"), pursuant to which it is alleged AWB exported wheat from Australia to the Republic of Iraq ("Iraq").

66.    As a proceeding in the Federal Court, the current Watson Proceeding is and remains subject to the ongoing monitoring and management of a Justice of the Federal Court, Justice Gyles. AWB has filed a Notice of Motion seeking to strike out certain paragraphs

of the Statement of Claim dated October 9, 2007. Justice Gyles has fixed the hearing of that Notice of Motion for 19 February 2008.

**B.    The Cole Royal Commission.**

67.    In a report dated October 27, 2005, entitled "Report on the Manipulation of the Oil-for-Food Programme" (the "Volcker Report"), an Independent Inquiry Committee appointed in April 2004 by the U.N. Secretary-General reported on its investigation of the administration and management of the U.N. Oil-For-Food Programme.

68.    Pursuant to the Royal Commissions Act 1902, by Letters Patent dated November 10, 2005, the Governor-General of Australia appointed the Hon. Terence Cole, AO RFD QC, as Commissioner to conduct an inquiry and report on whether decisions, actions, conduct or payments by Australian companies mentioned in the Volcker Report breached any Australian law. AWB was one of the Australian companies mentioned in the Volcker Report.

69.    Commissioner Cole delivered his report, entitled "Report of the Inquiry into certain Australian companies in relation to the U.N. Oil-for-Food Programme" (the "Cole Report"), to the Governor-General on November 24, 2006.

70.    According to the Cole Report, Commissioner Cole conducted public hearings into matters referred to in the Terms of Reference (as they stood from time to time) commencing on January 16, 2006, and concluding on September 29, 2006, occupying 70 sitting days. Commissioner Cole received oral evidence from approximately 30 current or former officers or employees of AWB. In addition, Commissioner Cole received oral evidence from approximately 40 other witnesses.

71.    The Cole Report also describes the documentary evidence received by Commissioner Cole as follows. Commissioner Cole received documents either in response to notices to produce, as general correspondence or as submissions. As well as receiving

- 22 -

documents from AWB, Commissioner Cole received documents from the following Australian

Government departments and instrumentalities:

(a)     the Department of Foreign Affairs and Trade ("DFAT");

(b)     the Department of Immigration and Multicultural Affairs;

(c)     the Wheat Export Authority;

(d)     Austrade;

(e)     the Australian Federal Police;

(f)     the Australian Secret Intelligence Service;

(g)     the Department of Agriculture, Forestry and Fisheries;

(h)     the Department of the Prime Minister and Cabinet;

(i)     the Department of Defence;

(j)     the Australian Treasury;

(k)     the Australian Security Intelligence Organisation;

(l)     the Defence Signals Directorate;

(m)     AusAid;

(n)     the Office of National Assessments;

(o)     the Attorney-General's Department; and

(p)     the Australian Customs Service.

72.     According to the Cole Report, all original documents were scanned

electronically and entered into a searchable electronic database. Some 121,000 documents were

held in the inquiry's database. At the conclusion of the inquiry, all original documents are said

to have been returned and the inquiry's records were passed to the Australian Department of the

Prime Minister and Cabinet and the National Archives of Australia.

73.     Commissioner Cole recommended, among other things, that a joint Task

Force should be established, under the administrative responsibility of the Australian

Commonwealth Attorney-General, comprising the Australian Federal Police, Victoria Police, and the Australian Securities and Investments Commission to consider possible prosecutions in consultation with the Commonwealth and Victorian Directors of Public Prosecutions.

### C.   The Task Force in Australia.

74.     AWB's participation in the U.N. Oil-For-Food Programme remains the subject of ongoing review in Australia.  On December 20, 2006, the Australian Attorney-General announced the establishment of the Task Force as had been recommended by Commissioner Cole (see Exhibit 10), with Terms of Reference announced in February 2007 (see Exhibit 11). According to the Terms of Reference, after nine months of operation, the Task Force is to report to the Attorney-General on whether it needs to continue and, if so, for what period of time.  As at the date of this Declaration, the Task Force has not published any report.

75.     By letter dated August 28, 2007, the Australian Securities and Investment Commission ("ASIC") issued and served on AWB a notice under Section 30 of the Australian Securities and Investments Commission Act 2001 (the "ASIC Act").  The ASIC notice sought the production of various books, documents and records of AWB as specified therein, in relation to the supply of wheat to Iraq under six particular export contracts.  On September 4, 2007, ASIC informed AWB that the ASIC notice was withdrawn.  By letter dated September 27, 2007, ASIC served a further notice upon AWB under section 30 of the ASIC Act seeking production of certain documents and records in connection with AWB's supply of wheat to Iraq, with particular reference to six export contracts.  Subsequently, by letter dated October 5, 2007, ASIC served a further notice upon AWB under section 19 of the ASIC Act, requiring AWB to provide assistance to ASIC in the conduct of its investigation by supplying certain information to ASIC. ASIC subsequently served six notices upon AWB under section 30 of the ASIC Act on October 17, 2007 for production of certain documents and records in connection with AWB's supply of

wheat to Iraq, with particular reference to five export contracts. On October 22, 2007 AWB filed

a notice of motion and application in the Federal Court for an order of review of these six notices

in Proceeding VID 954/2007. AWB and ASIC subsequently agreed to Terms of Settlement on

October 29, 2007. ASIC withdrew the six notices previous issued and served new notices under

section 30 of the ASIC Act upon AWB on November 1, 2007 and on November 30, 2007 for

production of various books, documents and records of AWB in relation to the supply of wheat

to Iraq under five particular export contracts. ASIC also served an additional notice under

section 19 of the ASIC Act, requiring AWB to provide assistance to ASIC in the conduct of its

investigation by supplying certain information to ASIC.

      76.    AWB is aware that ASIC has served a number of document production

notices on other parties. AWB is also aware that ASIC has served notices requiring certain

individuals to attend examinations by ASIC and that ASIC has conducted a number of these

examinations.

## IV.    THE LOCATION OF DOCUMENTS AND WITNESSES RELEVANT TO THE MASTAFA LITIGATION.

      77.    AWB's registered office, and its business headquarters, is located at 380

LaTrobe Street, Melbourne, in the Australian State of Victoria.

      78.    With respect to documents in AWB's possession, custody or control that

might be potentially relevant to the claims asserted in the Mastafa litigation, the vast majority of

those documents are located in Australia. Not only are AWB's files for the relevant period

located in Australia, but all of the documents that AWB has previously collected for purposes of

Commissioner Cole's inquiry, the Watson Proceeding in the Federal Court, and AWB's dealings

with the Task Force and ASIC, are also located in Melbourne, Australia.

79. Moreover, as discussed above, the records of Commissioner Cole's inquiry, as well as documents pertaining to the Watson Proceeding and the activities of the Task Force and ASIC involving AWB, are predominantly located in Australia. The documents of the Australian entities listed in paragraph 70, above, who provided documentary evidence to Commissioner Cole, are also located in Australia.

80. I also believe that a large majority, if not all, of the persons with knowledge of, or relevant to, the conduct of AWB and AWB USA as alleged in the Complaint – including both current and former employees of AWB, employees and officers of the Australian Government, and the 70 witnesses who gave oral evidence to Commissioner Cole – are also resident in Australia.

81. Should it become necessary, either a state court, or the Federal Court of Australia, can compel (subject, of course, to claims such as privilege) the production of documents or testimony from the Australian Government, its agencies or instrumentalities. That would include, for example, DFAT and Ministers of the Australian Government.

82. Given the foregoing, it is enormously expensive and highly inconvenient for AWB, an Australian company, to defend itself against the Mastafa plaintiffs' claims in the U.S. AWB has already incurred, and will continue to incur, the cost of retaining U.S. counsel for purposes of this suit, in addition to Australian counsel (such as myself) who are already working on these matters in Australia. AWB also faces significant cost and inconvenience in having to ship documents from Australia to the U.S. for purposes of discovery and trial, and in either compelling or instructing witnesses (including third-party witnesses) to come from Australia to the U.S. for trial. Moreover, a potential difficulty may exist if documents relevant to the Mastafa proceeding are also required for production by AWB in Australia for purposes of complying with

any ASIC notice, or the current proceedings in the Federal Court of Australia. Were the <u>Mastafa</u> proceeding to be dismissed in favor of being re-filed in Australia, AWB would benefit significantly from economies of scale in terms of the cost of counsel and the costs and logistics involved in providing and taking documentary and oral evidence.

83.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 14, 2007.

Craig Phillips