EXHIBIT 7

PACIFIC CARRIERS LTD....................................... APPELLANT;
PLAINTIFF,

AND

BNP PARIBAS ........................................................ RESPONDENT.
DEFENDANT,

[2004] HCA 35

ON APPEAL FROM THE SUPREME COURT OF NEW SOUTH WALES

*Contract — Letters of indemnity — Letters provided to sea carrier by seller of cargo to facilitate delivery without production of bill of lading — Letters signed by seller and signed and stamped by officer of seller's bank — Whether reasonable person in position of carrier would understand letters to bind bank as an indemnifier.*

HC of A
2004
~~
May 20, 21;
Aug 5
2004
———
Gleeson CJ,
Gummow,
Hayne,
Callinan and
Heydon JJ

*Principal and Agent — Ostensible authority of agent — Letter of indemnity signed by bank officer — Officer authorised by bank to sign letters to verify customer's signatures but not to bind bank to terms — Assumption of recipient that bank to be an indemnifier — Whether assumption induced or assisted by representation by bank so as to make departure from assumption unjust.*

Letters of indemnity to facilitate the delivery of cargo without the production of a bill of lading were provided by the seller of that cargo to a sea carrier. The letters were executed by the seller and its bank. The bank officer who signed the letters and attached the bank's stamp was authorised to verify customers' signatures on letters of indemnity but not to bind the bank as an indemnifying party. The carrier suffered loss in connection with the delivery of the cargo and sought to recover its loss from the bank.

*Held*, (1) that in light of the surrounding circumstances known to the carrier and to the bank, the purpose and object of the transaction, and the market in which the parties were operating, a reasonable reader in the position of the carrier would have understood the letters of indemnity to give rise to a liability on the part of the bank as an indemnifying party in support of a similar undertaking by the seller of the cargo.

*Gissing v Gissing* [1971] AC 886 at 906; *Christopher Hill Ltd v Ashington Piggeries Ltd* [1972] AC 441 at 502; *Codelfa Constructions Pty Ltd v State Rail Authority of NSW* (1982) 149 CLR 337 at 350; and *ABC v XIVth Commonwealth Games Ltd* (1988) 18 NSWLR 540, referred to.

(2) That it would be unjust to permit the bank to depart from the carrier's assumption that the letters of credit had been executed with the bank's authority in circumstances where the bank had placed the officer who dealt with requests for letters of indemnity in a position to sign and stamp them.

*Thompson v Palmer* (1933) 49 CLR 507 at 547; *Tobin v Broadbent*
(1947) 75 CLR 378 at 407; and *Crabtree-Vickers Pty Ltd v Australian
Direct Mail Advertising & Addressing Co Pty Ltd* (1975) 133 CLR 72
at 80, considered.

Decision of the Supreme Court of New South Wales (Court of Appeal)
reversed.

APPEAL from the Supreme Court of New South Wales.

A cargo of legumes was shipped from Australia to India by Pacific
Carriers Ltd (Pacific). The ship arrived in Calcutta on 24 January
1999. The seller asked Pacific to deliver the cargo to such persons as
might be directed by the purchaser. On 28 January 1999 the seller's
brokers sent a form of letter of indemnity to Pacific in respect of loss
and damage that Pacific might suffer by discharging the cargo to
receivers without bills of lading. The letter of indemnity was signed by
the seller's bank which disclaimed any liability and merely confirmed
the purchaser's signature. Pacific rejected that letter of indemnity and
this was known to the seller. On 28 January 1999 the seller asked an
officer of its bank, BNP Paribas (BNP), to sign a letter of indemnity in
a similar form to the letter which had been rejected by Pacific but
without the disclaimer. That letter of indemnity was in respect of part
of the cargo. The officer signed the letter and affixed a stamp of BNP
to it and then sent it to the seller. The seller transmitted a copy of the
letter to Pacific by facsimile. On 18 February 1999 the seller sent to
BNP for execution a similar letter of indemnity in respect of a further
part of the cargo. That letter had already been signed by the seller. It
was then signed and stamped by the same officer of BNP who had
signed the first letter of indemnity. That officer transmitted the letter
by facsimile directly to Pacific. The officer was authorised to verify
customers' signatures on letters of indemnity but not to bind the bank
to any indemnity. That limitation on the officer's actual authority was
not known by Pacific. Pacific subsequently suffered loss as a result of
its having delivered the cargo without the bills of lading. Pacific sued
BNP in the Supreme Court of New South Wales to enforce the letters
of indemnity, the seller being insolvent. Hunter J found that by signing
the letters of indemnity BNP had represented that the seller had the
financial capacity to honour the obligations under the letters of
indemnity. The Court of Appeal of the Supreme Court (Sheller,
Handley and Giles JJA) held that BNP was not liable under the letters
because its officer had neither actual nor ostensible authority to bind
the bank to an indemnity. Pacific appealed to the High Court from the
decision of the Court of Appeal by special leave granted by McHugh,
Kirby and Callinan JJ.

*D F Jackson* QC (with him *A W Street* SC and *G J Nell*), for the
appellant. BNP is bound by the objective consequences of the
purported performance of the authorised act of its officer in executing
the letters of indemnity. The officer had signed the letters within the

scope of her employment; the negligent mode of performance did not sever that nexus (1). [He also referred to *Barwick v English Joint Stock Bank* (2); *Colonial Mutual Life Assurance Society Ltd v Producers & Citizens Co-operative Assurance Co of Australia Ltd* (3); *Scott v Davis* (4); *Hollis v Vabu Pty Ltd* (5).] The scope of the officer's authority left the manner of its performance to that officer (6). [He also referred to *Royal British Bank v Turquand* (7) and *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd* (8).] *Crabtree-Vickers Pty Ltd v Australian Direct Mail Advertising & Addressing Pty Ltd* (9) is consistent with the proposition that the act of signing the letters was only for the purpose of verification. *Northside Developments Pty Ltd v Registrar-General* (10) is distinguishable: the agent here was authorised to sign the letters of indemnity but not to bind the bank to their terms. *British Thomson-Houston Co Ltd v Federated European Bank Ltd* (11) was concerned with a wholly unauthorised act. There was no finding of any matter that put Pacific on inquiry. The finding of reasonable reliance contradicts a need for inquiry. [He referred to *Brocklesby v Temperance Permanent Building Society* (12) and *Fry v Smellie* (13).] Further, it would be unjust to permit BNP to depart from the assumption that the officer was acting within the scope of her authority (14).

*B W Rayment* QC (with him *I E Davidson*), for the respondent. The officer of BNP who signed did not have actual authority to bind the bank (15). The officer's signature on the letters of indemnity signified that the bank verified the seller's execution of them. [He referred to *NCR Australia Pty Ltd v Credit Connection Pty Ltd* (16).] The surrounding circumstances make it clear that only the seller of the

---

(1)   *Kooragang Investments Pty Ltd v Richardson & Wrench Ltd* [1982] AC 462; *Lister v Hesley Hall Ltd* [2002] 1 AC 215 at 223-224 [15], 226 [20], 230 [28], 232 [36], [37], 241 [59], 245 [69]; *Dubai Aluminium Co Ltd v Salaam* [2003] 2 AC 366.
(2)   (1867) LR 2 Exch 259 at 266.
(3)   (1936) 46 CLR 41 at 46, 50.
(4)   (2000) 204 CLR 333.
(5)   (2001) 207 CLR 21 at 40 [42], 59-60 [99].
(6)   *Australasian Brokerage Ltd v Australian and New Zealand Banking Corporation Ltd* (1934) 52 CLR 430 at 450-451.
(7)   (1856) 6 E & B 327 [119 ER 886].
(8)   [1964] 2 QB 480.
(9)   (1975) 133 CLR 72 at 78.
(10)  (1990) 170 CLR 146.
(11)  [1932] 2 KB 176.
(12)  [1895] AC 173 at 178, 183, 184.
(13)  [1912] 3 KB 282 at 287, 296.
(14)  *Thompson v Palmer* (1933) 49 CLR 507 at 547.
(15)  *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd* [1964] 2 QB 480 at 502-503.
(16)  [2004] NSWSC 1 at [136].

cargo was to be bound by the letters of indemnity (17). [He also referred to *Coulls v Bagot's Executor and Trustee Co Ltd* (18).] BNP did not participate in the drafting of the letters. Hence they should be construed strictly in favour of the indemnifier (19). [He also referred to *Donaldson v Noble* (20).]

*D F Jackson* QC, in reply.

*Cur adv vult*

5 August 2004

THE COURT delivered the following written judgment: —

1    The issues in this appeal are narrower than the claims and cross-claims litigated before Hunter J in the Supreme Court of New South Wales (21), or those aspects of the matter that went to the Court of Appeal (22).

2    The proceedings arose out of the sale of a cargo of legumes, comprising 10,000 metric tonnes of chick peas and 10,000 metric tonnes of dun peas, by an Australian grain trader, New England Agricultural Traders Pty Ltd (NEAT), to Royal Trading Co (Royal), an Indian grain trader operating out of Calcutta. The respondent, BNP Paribas (BNP), was NEAT's Sydney banker, and was financing the export transaction. A company based in Singapore, Swiss Singapore Overseas Enterprises Pte Ltd (SSOE), was Royal's financier. The appellant, Pacific Carriers Ltd (Pacific), was the time charterer of the MV *Nelson*, the vessel on which the cargo was carried.

3    The venture was something of a disaster. There was confusion about the letters of credit and bills of lading. While the cargo was between Australia and India there was a fall in the market for legumes. Hunter J found that Royal dishonestly delayed accepting the cargo, and failed to pay the purchase price. The carrier experienced problems with discharging in India, partly because of difficulties with the size of the vessel and the port draught. The cargo was delivered without production of the relevant bills of lading. The vessel was arrested. Claims made by SSOE against Pacific went to arbitration, and were settled on the basis that Pacific paid substantial damages and interest. NEAT became insolvent.

---

(17)  *Scottish Amicable Life Assurance Society v Reg Austin Insurances Pty Ltd* (1985) 9 ACLR 909 at 924.
(18)  (1967) 119 CLR 460.
(19)  *Smith v South Wales Switchgear Ltd* [1978] 1 WLR 165; [1978] 1 All ER 18; *Scottish Amicable Life Assurance Society v Reg Austin Insurances Pty Ltd* (1985) 9 ACLR 909 at 915.
(20)  (1888) 14 VLR 1021.
(21)  *Pacific Carriers Ltd v Banque Nationale de Paris* [2001] NSWSC 900 and [2001] NSWSC 963.
(22)  *BNP Paribas v Pacific Carriers Ltd* [2002] NSWCA 379.

4      The particular matter giving rise to this appeal concerns two letters of indemnity which were signed, or purportedly signed, by NEAT and BNP, and addressed and delivered to Pacific. Pacific claimed, pursuant to those letters of indemnity, to be entitled to be indemnified by BNP in respect of the losses it suffered by reason of delivering the cargo in the absence of bills of lading. BNP's defence to that claim was based mainly on two contentions: first, that on the true construction of the letters of indemnity BNP did not agree to indemnify Pacific (the construction issue); secondly, that the letters of indemnity were signed without BNP's authority and were therefore not binding (the authority issue).

*The letters of indemnity*

5      The two letters of indemnity were dated respectively 28 January and 19 February 1999.

6      This was not the first occasion on which BNP had co-signed, with NEAT, a letter of indemnity, addressed to carriers, agreeing to indemnify them in respect of any liability or loss or damage the carriers may sustain by reason of delivering cargo without production of bills of lading by the receiver. In September 1997, NEAT arranged for BNP to join in signing such a letter of indemnity addressed to the "Owners/Managers/Masters/Agents of the SS/MV *Alam Tangkas*". That letter of indemnity was procured by an employee of the Pacific group, who described it as a "bank letter of indemnity" and asked the brokers for the *Alam Tangkas* to "confirm the names and designations of the persons who have signed on behalf of the bankers". The brokers replied: "Signatories to LOI from [BNP] are Ms Era Dhiri — Manager Trade Finance — and Mr Phil Arndell — Senior Trade Officer." The document bore the signatures of Ms Dhiri and Mr Arndell and the same bank stamp, or "chop", as was to be used on the 1999 documents. There is no evidence that the indemnity was enforced, or that it was adverted to in 1999.

7      There was some other evidence of commercial practice. The 1999 documents were based on a standard form of letter of indemnity, described by the authors of a text on bills of lading (23) as being "designed ... to be provided by those who want to have the cargo delivered to them but do not have the bill. It provides protection for the carrier up to a certain figure ... It will normally be backed by a bank." The reasons why carriers might seek such an indemnity are obvious. There could be a number of circumstances in which, upon the arrival of cargo, delivery is sought without the production of bills of lading. In that event, a carrier will seek an indemnity before delivery. Since the indemnifying party may be an entity whose credit is unknown to the carrier, the carrier may require that a bank join in the indemnity. The editors of an Australian text on the law relating to

(23)  Gaskill, Asariotis & Baatz, *Bills of Lading: Law and Contracts* (2000), p 426.

banker and customer refer (24) to "undertakings relating to the delivery of goods by a ship's master without surrender of the bill of lading" as a recognised form of guarantee given by a bank. In his evidence, Mr Ryan, the State Manager of BNP, referred to "a bank endorsed absent bill of lading guarantee". Substituting "indemnity" for "guarantee", that is what Pacific says it sought, and obtained, in September 1997, and again in January and February 1999.

8      A carrier ordinarily will not know the details of the financial and other arrangements between the primary party to such an indemnity and the bank which endorses it. There was evidence that a bank would normally charge a substantial fee for joining in such an indemnity. It is likely that a carrier would not know whether such a fee had been paid, or what, if any, security the bank held. In the present case, no fee was charged by BNP, and no adequate security to cover any potential liability as an indemnifier was held, but Pacific was not aware, and could not reasonably have been expected to be aware, of that.

9      The legumes were sold by NEAT to Royal under four contracts made in July and August 1998. Shipment was to be made between dates in November and December 1998. The discharge port was Calcutta. Payment was to be by letters of credit to be opened and payable in Sydney with BNP. SSOE arranged for letters of credit to be opened. In December 1998, Pacific entered into a time charter of the MV *Nelson*, and NEAT entered into a voyage charter. Loading was completed in January 1999.

10     On 24 January 1999, the vessel arrived in India. It is unnecessary to go into the problems then encountered. The initial bills of lading covering the cargo were switched and split. There were delays in discharge. NEAT sent a facsimile message to a firm of brokers saying:

"To avoid delay in discharge we have prepared LOI text for Royal to open to shipping company to commence discharging against LOI pending B/L's arrival. This needs to be signed by Royal Trading's bank and original lodged with shipowner's agent in Calcutta."

On 28 January, the brokers sent to NEAT a form of letter of indemnity signed by Royal, but with an endorsement by a bank which disclaimed any liability on the part of the bank and merely confirmed Royal's signature. This was rejected by Pacific. It may be noted, however, that the text prepared by NEAT for Royal and its bank to sign was in the form of a receivers' indemnity, not a shippers indemnity. As will appear, the same form was used later when NEAT itself signed the two letters of indemnity now in question. The bank involved in the original attempt to satisfy the requirements of Pacific made clear that it was not undertaking liability as an indemnifier. NEAT knew that

(24) Weaver and Craigie, *The Law Relating to Banker and Customer in Australia*, 3rd ed (2003), vol 3, para [15.7450].

Royal's letter of indemnity had been rejected. This occurrence illustrates the commercial importance of the capacity in which a bank signs a letter of indemnity of the kind in question. Royal's bank specified and limited the capacity in which it signed, for the obvious purpose of avoiding potential liability as an indemnifying party.

11    On 25 January 1999, an officer of NEAT had spoken to Ms Dhiri of BNP. He referred to the possibility of "a back to back LOI". On 28 January, NEAT sent a facsimile to Ms Dhiri referring to the "need to get LOI in place at Calcutta to allow vessel to commence lightening …". He attached the first of the two relevant letters of indemnity. Ms Dhiri was requested to have it signed and sent to Pacific. Ms Dhiri signed it in the space reserved for "Banker's signature" and affixed BNP's stamp.

12    The document sent by NEAT to Ms Dhiri for signature by BNP was in the following form:

"STANDARD FORM OF UNDERTAKING TO BE GIVEN BY CARGO RECEIVERS IN RETURN FOR RECEIVING CARGO WITHOUT PRODUCTION OF THE BILLS OF LADING

TO    PACIFIC CARRIERS LTD
The owners of the M/V Nelson
        c/- MULTIMODE MARITIME PVT LTD
        53-A MIRZA GHALIB STREET
        CALCUTTA 700016
        TEL: (9133) 229 4314/7312/7339/5298
        FAX: (9133) 226 9081/5353
        MR BIBLAP RAY
FROM
        NEW ENGLAND AGRICULTURAL TRADERS PTY LTD
        PO BOX 770
        ARMIDALE NSW 2350
        TEL: 61 2 67 725588
        FAX: 61 2 67 728004

Dear Sirs,
SHIP: SS.M/V NELSON
VOYAGE:  FREMANTLE/ESPERANCE/BRISBANE,    AUSTRALIA    TO
        CALCUTTA, INDIA
CARGO & ORIGINAL BILLS OF LADING NUMBERS:
        10,469.23 METRIC TONNES
        AUSTRALIAN FIELD (DUN)
        PEAS FARMER DRESSED
BILLS OF LADING NOS:  1 DATED 24/12/98
                      2 DATED 27/12/98
                      3 DATED 27/12/98
    The above goods were shipped on the above vessel by Mssrs NEW ENGLAND AGRICULTURAL TRADERS PTY LTD (and consigned to order) for delivery at the port of CALCUTTA, INDIA, but the Bills

of Lading have not yet arrived and we, NEW ENGLAND AGRICUL-
TURAL TRADERS PTY LTD hereby request you to give delivery of the
said cargo to:

RECEIVERS AS DIRECTED BY
M/S ROYAL TRADING COMPANY
NO 2, CLIVE GHAT STREET
5TH FLOOR, ROOM NO 8
CALCUTTA 700 001 (WB)

without production of the original Bills of Lading.

In consideration of your complying with our above request we
hereby agree as follows:

1. To indemnify you, your servants and agents and to hold all of
you harmless in respect of any liability loss or damage of
whatsoever nature which you may sustain by reason of delivering
the goods to RECEIVERS AS DIRECTED BY

M/S ROYAL TRADING COMPANY
NO 2, CLIVE GHAT STREET
5TH FLOOR, ROOM NO 8
CALCUTTA 700 001 (WB)

in accordance with our request.

2. In the event of any proceedings being commenced against you or
any of your servants or agents in connection with the delivery of the
goods as aforesaid to provide you or them from time to time with
sufficient funds to defend the same.

3. If, in connection with the delivery of the cargo as aforesaid, the
ship or any other vessel or property belonging to/chartered by you
should be arrested or detained or if the arrest or detention thereof
should be threatened, to provide on demand such bail or other
security as may be required to prevent such arrest or detention or to
secure the release of such vessel or property and to indemnify you
in respect of any liability, loss, damage or expenses caused by such
arrest or detention or threatened arrest or detention whether or not
such arrest or detention or threatened arrest or detention may be
justified.

4. As soon as all original bills of lading for the above goods shall
have come into our possession, to produce and deliver the same to
you whereupon our liability hereunder shall cease.

5. The liability of each and every person under this indemnity shall
be joint and several and shall not be conditional upon your
proceeding first against any person, whether or not such person is
party to or liable under this indemnity.

6. The liability of each and every person under this indemnity shall
in no circumstances exceed 200% of the CIF value of the above
cargo.

7. This indemnity shall be construed in accordance with English law
and each and every person liable under this indemnity shall at your
request submit to the jurisdiction of the High Court of Justice of
England.

218 CLR 451]     PACIFIC CARRIERS LTD v BNP PARIBAS          459
Gleeson CJ, Gummow, Hayne, Callinan and Heydon JJ

[stamp:  [NEW ENGLAND AGRICULTURAL          ]
         [TRADERS PTY LTD                    ]
         [PO BOX 770                         ]
         [ARMIDALE NSW 2350
         [ACN 003 271 841]

Yours Faithfully,
[signature of]              [signature of]
[Peter Sniekers]           [Peter Howard]
..................................................................

For and on Behalf of
      NEW ENGLAND AGRICULTURAL TRADERS PTY LTD
      PO Box 770
      ARMIDALE NSW 2350
      TEL: 61 2 67 725588
      FAX: 61 2 67 728004

Name(s): [printed PETER P SNIEKERS] [printed: PETER M HOWARD]

Designation(s):  [printed DIRECTOR]   [printed DIRECTOR]

For and on behalf of:   BANQUE NATIONALE DE PARIS
                        12 CASTLEREAGH ST
                        SYDNEY NSW 2000
                        AUSTRALIA
                        (insert name of bank)

Banker's    [signature of]    [bank stamp]
signature   [Era Dhiri]       [or 'chop']''

13    Ms Dhiri signed her name, and affixed the bank's stamp or "chop", next to the words "Banker's signature". She sent the document to NEAT, and NEAT sent it by facsimile to Pacific. It will be necessary to refer below to the evidence as to how Ms Dhiri came to sign the letter of indemnity.

14    In February 1999, further difficulties were experienced in relation to discharge and delivery of the cargo. By 16 February, discussions had taken place between NEAT and Ms Dhiri about the issue of another letter of indemnity, this time in respect of part of the cargo of chick peas. In a facsimile message, a copy of which went to Ms Dhiri, NEAT said: "Shipping company have once again advised they will not discharge cargo on to lighters without BNP counter signed NEAT LOI." On 18 February 1999, NEAT sent to BNP an "attached LOI in readiness for bank's signature to allow MV Nelson to recommence discharging grain at Calcutta". The letter of indemnity had already been executed by NEAT. The cargo referred to was 3,800 metric tonnes of Australian chick peas. Four bills of lading were mentioned. Otherwise the form was the same as the first letter of indemnity. Ms Dhiri was requested by NEAT to "fax it directly" to the shipping agent so that he "can then pass it directly onto vessel owners so discharging of vessel can commence as soon as possible". On

19 February 1999, Ms Dhiri signed the second letter of indemnity in the space reserved for "Banker's signature" and affixed BNP's stamp to it. The document was sent by facsimile to Pacific, which then informed its agent in Calcutta that, since Pacific was in possession of the letter of indemnity, the agent had authority to release 3,800 metric tonnes of chick peas to Royal. Hunter J found that Ms Dhiri "was made well aware of the purpose for which NEAT required BNP's execution of the second NEAT LOI and that it would be forwarded directly to [Pacific] once signed by the bank so discharging could commence". He found that the use to be made of both letters of indemnity, once signed on behalf of BNP, was made clear by NEAT to Ms Dhiri.

15      Once the second letter of indemnity reached Pacific, lightening resumed. Discharge of cargo occurred in stages until 10 March 1999, when it stopped. The vessel was arrested on 31 March 1999 on SSOE's application. At that time a quantity of chick peas and dun peas remained on board.

*Pacific's loss*

16      It is unnecessary to explain the nature or the amount of the loss suffered by Pacific in consequence of delivery of cargo to, or in accordance with the direction of, Royal. There was no issue before this Court about that matter. Hunter J, who, for reasons to be mentioned below, awarded damages to Pacific against BNP, not in contract but in tort, assessed damages at US$4,237,207.47 together with interest. A number of BNP's grounds of appeal to the Court of Appeal related to the calculation of damages, but the Court of Appeal did not reach that question. It allowed BNP's appeal on liability.

*The decisions of Hunter J and the Court of Appeal*

17      Pacific's primary claim against BNP, NEAT being insolvent, was that BNP was liable in contract as a party to the two letters of indemnity. BNP's defence was that, on the true construction of the letters of indemnity, only NEAT was bound to indemnify Pacific, and BNP's role was merely to verify or authenticate NEAT's execution of the documents. In addition, BNP argued that, if it failed on the construction issue, then it was not liable on the letters of indemnity because Ms Dhiri had no authority to bind the bank to an indemnity. Those competing arguments were maintained in the Court of Appeal and in this Court.

18      Hunter J took a view of the construction of the documents which was not advanced by either party, and which was not supported by either party on appeal. He concluded that BNP's role was that, by signing the letters of indemnity, it was representing to Pacific that NEAT had the financial capacity to honour its obligations under the letters of indemnity. Pacific made alternative claims against BNP in negligence, and for misleading conduct in contravention of s 52 of the *Trade Practices Act* 1974 (Cth). Hunter J held that the negligence

case, though argued on a different basis, was wide enough to cover negligent misrepresentation as to NEAT's financial strength. He held that NEAT's conduct amounted to actionable negligence, and assessed and awarded damages as mentioned above.

19    In the Court of Appeal, Sheller JA, with whom Handley JA and Giles JA agreed, accepted the construction of the letter of indemnity for which Pacific contended. He said that the contest was "between, on the one hand, language which might be read so as to limit to one party, the requestor [NEAT] alone, an agreement to indemnify, and on the other hand, the clear purpose of the ... standard form to be used as a joint indemnity by the requestor and a bank". He rejected the construction contended for by BNP, and also the alternative construction preferred by Hunter J. However, he upheld BNP's defence based on lack of authority. He held that Ms Dhiri had neither actual nor ostensible authority to bind the bank to an indemnity. He also rejected the claims in negligence and under the *Trade Practices Act*. If Pacific's appeal to this Court succeeds on the contract issue, it will be unnecessary to consider those alternative claims.

*The construction issue*

20    The nature of the obligations undertaken by BNP in consequence of the signature and transmission to Pacific of the letters of indemnity depends upon the meaning of the documents, the particular problem being the capacity in which, on the true construction of the documents, the bank was involved in the transaction. That question has a factual relationship to the question of Ms Dhiri's authority, in that both she, and her superior, Mr Kavanagh, gave evidence that it was their understanding that all that BNP was doing was authenticating NEAT's execution of the letters of indemnity.

21    Ms Dhiri gave evidence that she told NEAT that execution by BNP was only for verification of the signatures. That evidence was denied. Hunter J said he had great difficulty in deciding where the truth lay. He accepted that "something must have been said by [Ms Dhiri] at one time or another to a NEAT representative that, in her mind, conveyed the message that she was signing the NEAT LOIs merely for verification of signatures", but he did not accept that any such limitation was effectively communicated to NEAT. More significantly, it was never communicated to Pacific.

22    What is important is not Ms Dhiri's subjective intention, or even what she might have conveyed, or attempted to convey, to NEAT about her understanding of what she was doing. The letters of indemnity were, and were intended by NEAT and BNP to be, furnished to Pacific. Pacific did not know what was going on in Ms Dhiri's mind, or what she might have communicated to NEAT as to her understanding or intention. The case provides a good example of the reason why the meaning of commercial documents is determined objectively: it was only the documents that spoke to

Pacific (25). The construction of the letters of indemnity is to be determined by what a reasonable person in the position of Pacific would have understood them to mean (26). That requires consideration, not only of the text of the documents, but also the surrounding circumstances known to Pacific and BNP, and the purpose and object of the transaction (27). In *Codelfa Constructions Pty Ltd v State Rail Authority of NSW* (28), Mason J set out with evident approval the statement by Lord Wilberforce in *Reardon Smith Line Ltd v Hansen-Tangen* (29):

> "In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating."

23    It is not suggested that there is any material difference between the two letters of indemnity. It is convenient to deal with the construction question by reference to the first.

24    The heading of the document describes it as a "standard form of undertaking" to be given in connection with delivery of cargo "without production of the bills of lading". The reason why a carrier would seek such an undertaking has already been explained. The heading contains a misdescription. It describes the undertaking as being "given by cargo receivers". The body of the document contains an undertaking by the shippers. The explanation is fairly obvious. An abortive attempt had been made earlier by NEAT to provide Pacific with a bank endorsed indemnity from Royal. The same "standard form" was used for NEAT's indemnity. That also accounts for the terms of cl 4.

25    The primary indemnifying party is NEAT. The question concerns the effect of BNP's signature and stamp (leaving to one side the issue of authority). Pacific argues that it was a bank endorsement under which BNP also accepted liability as an indemnifier. The commercial purpose was plain. Pacific was being requested by NEAT to take a risk by delivering cargo to receivers who could not produce the appropriate bills of lading. Pacific informed NEAT, and NEAT informed BNP, that Pacific would not agree to take that risk unless NEAT's bank also

(25) *Wilson v Anderson* (2002) 213 CLR 401 at 417-419 [7]-[10].
(26) *Gissing v Gissing* [1971] AC 886 at 906; *Christopher Hill Ltd v Ashington Piggeries Ltd* [1972] AC 441 at 502; *ABC v XIVth Commonwealth Games Ltd* (1988) 18 NSWLR 540.
(27) *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896; [1998] 1 All ER 98.
(28) (1982) 149 CLR 337 at 350. See further *Royal Botanic Gardens and Domain Trust v South Sydney City Council* (2002) 76 ALJR 436 at 445 [39]; 186 ALR 289 at 301.
(29) [1976] 1 WLR 989 at 995-996; [1976] 3 All ER 570 at 574.

signed the document. Pacific had only limited knowledge of the financial capacity of NEAT to meet its obligations under the indemnity. The terms of the document, understood in the light of the surrounding circumstances and the purpose and object of the transaction, and the market in which the parties were operating, meant that BNP was undertaking an obligation of indemnity. Relevant to the meaning of the document was not only what it said, but also what it did not say. There was nothing in the terms of the document to indicate that BNP was merely authenticating the execution by NEAT, and there was nothing in the surrounding circumstances to suggest that Pacific would accept such authentication only. A reasonable reader in the position of Pacific would have understood the document as a bank endorsed absent bills of lading indemnity, and would have understood that the bank was undertaking liability as an indemnifying party to support the liability undertaken by NEAT. The decision of the Court of Appeal on the construction issue was correct.

26    A subsidiary question of construction was raised before Hunter J. The Court of Appeal did not need to deal with it. BNP argued that because, by the time the letters of indemnity were invoked, the original bills of lading referred to had been cancelled (in consequence of switching and splitting), the letters of indemnity were spent, or incapable of having further effect. This argument was based principally upon the terms of cl 4. BNP was aware that the bills of lading were to be switched and split. The letters of indemnity were for the very purpose of dealing with a situation in which no bills of lading were produced by the person or persons seeking delivery of the goods. Given the knowledge of Pacific and NEAT, as at the execution of the letters of indemnity, that the initial bills would be cancelled, and switched bills issued, Hunter J held that it would be absurd to construe the document as producing the consequence that, upon cancellation of the original bills the obligation to indemnify would cease to operate. He was right to do so.

*The authority issue*

27    It is necessary to make further reference to the facts.
28    Ms Dhiri, who signed the letters of indemnity on behalf of BNP, and affixed BNP's stamp, was Manager of the Documentary Credit Department. It seems that this was also described as the Trade Finance Department. Her evidence was that her duties included supervising the day-to-day handling of import/export letters of credit, the day-to-day handling of import/export collections, and the staff of the Documentary Credit Department. That is how it came about that NEAT dealt with her in relation to the whole transaction, including Pacific's requests for letters of indemnity. BNP's Sydney office was of a relatively modest size, and there were only five people, including Ms Dhiri, in the Documentary Credit Department. The stamp was one that was used for the purposes of letters of credit.
29    The evidence showed that the issuing of indemnities and guarantees

by BNP in Sydney was the function of the Guarantee Loan Department, not the Documentary Credit Department. Guarantees and indemnities were to be signed under power of attorney. An internal bank instruction, provided also to agents and correspondents, dealt with authorisation to sign documents. All Commercial Bills of Exchange and Certificates of Deposit were to be signed by two persons, one of whom had to be an "A" Signatory. Other correspondence or documents to bind the bank had to bear two signatures. Ms Dhiri was an ordinary signatory, not an "A" signatory.

30    Hunter J found that Ms Dhiri did not have authority to bind the bank to a guarantee or indemnity. That finding is not contested.

31    It has already been noted that, in 1997, Ms Dhiri had signed, together with another BNP officer, and stamped, a letter of indemnity given by NEAT, in respect of delivery of cargo without bills of lading. Ms Dhiri's superior was Mr Kavanagh, the bank's "account manager" for NEAT. He was a "relationship manager" in "the Corporate Lending Department". Both Mr Kavanagh and Ms Dhiri said that, when NEAT asked Ms Dhiri to obtain BNP's signature to the first 1999 letter of indemnity, she spoke to Mr Kavanagh. Mr Kavanagh said it was his understanding that Ms Dhiri was seeking authority "to verify the letter of indemnity", and that he left it to her to decide the method of verification. He did not give her any instructions as to how to do that, as she "was the head of the department". He did not read the entire document but he acknowledged in his evidence that there was "a problem" in signing it if it was not made clear to the parties who requested it in the first instance in what capacity that was being done. Mr Ryan, the State Manager, said that, in January and February 1999, there was no established practice within the Sydney branch of BNP as to the procedure to be followed where the bank was asked by a third party to verify a customer's signature on a commercial document, but in-house counsel in March 1999 instituted such a procedure, which was "more explicit in terms of the capacity we would be signing". Hunter J found Mr Kavanagh's evidence of his communications with Ms Dhiri confusing, because of an apparent difficulty of recalling the sequence of events. The judge said he had difficulty in accepting Ms Dhiri as a reliable witness. He was prepared to accept that, in her mind, she believed she was signing merely for verification purposes. He found that she did not make that clear to NEAT. Certainly, nobody informed Pacific of that.

32    Hunter J found that Pacific regarded the letters of indemnity as carrying an indemnity from BNP and that, in all the circumstances, it was reasonable for Pacific to rely upon the letters as carrying a bank indemnity. Those circumstances included the rejection by Pacific of the Royal indemnity, and the absence of any limitation or notation on the letters of indemnity. Implicit in the finding that it was reasonable for Pacific to rely upon the documents as carrying an indemnity from BNP is a finding that it was reasonable for Pacific to rely on the signature and the stamp as binding the bank.

33    As to how NEAT and Ms Dhiri came to act as they did, Hunter J said:

"The evidence ... is strongly indicative of a state of confusion, if not near panic created by Royal's dishonesty in failing to meet its obligations of payment under the NEAT/Royal contracts, combined with SSOE's frustrating conduct in delaying acceptance of discrepant documents, due to unsatisfactory business relations with Royal. I think the reasoning of both NEAT and Dhiri, shortly stated, was that, once payment under the subject letters of credit was assured by acceptance of discrepant documents, the provision of an LOI was an expedient, risk free exercise.

In reality, with SSOE as the notify party under the initial bills, as shipper under the switched bills and as the party nominated in the NEAT/Royal contracts to open the requisite letters of credit, the risk was great in providing the LOIs where, in each instance, the bills of lading would be in the possession of SSOE under the letters of credit arrangements and where the passage of the bills into the hands of Royal depended upon the terms of the financial arrangements between SSOE and Royal: the precise terms of which were unknown to NEAT."

34    It was put to Mr Ryan, in the course of his evidence, that the bank knew that the letters of indemnity were going to a third party, and that the execution of such a document by the bank without any qualifying endorsement offered some form of assurance to that third party. His response was that he would have agreed to that proposition if the original of the document were going to the third party, but the position would be different if only a facsimile copy were going. This distinction is unconvincing in light of the fact that Pacific was calling for the letters of indemnity as a matter of urgency and it was contemplated by Pacific, NEAT and BNP that they would be sent by facsimile. However, Mr Ryan accepted that it was "not best practice" to sign documents like this for purposes of verification only without stating that this was the limited purpose. As has been noted, BNP's practice changed in March 1999. The absence of any practice within BNP for the guidance or instruction of Ms Dhiri as to communicating to the addressee of a letter of indemnity that the bank's signature on the document was only for the purpose of verifying the signature of the other party, in contrast to the procedure that had been adopted by Royal's banker, is part of the explanation of Ms Dhiri's conduct. There was no established procedure for qualifying or limiting the terms upon which the bank signed; Mr Kavanagh left Ms Dhiri to her own devices; and she signed and stamped the documents in an unqualified form.

35    On the facts found by Hunter J, there is no question of fraud on the part of Ms Dhiri, and there was nothing to put Pacific on notice or inquiry as to her lack of actual authority to bind the bank. Emphasis was placed in the argument for Pacific upon the fact that Ms Dhiri

was, in truth, authorised to sign and stamp the two documents on behalf of the bank. There is an ambiguity in that proposition. Mr Kavanagh knew and intended that Ms Dhiri would sign the documents, and send them to Pacific. Mr Kavanagh had no authority to bind the bank to an indemnity, and Ms Dhiri dealt with the documents as she did under a misapprehension as to their legal effect. The actual authority possessed by Ms Dhiri explains, as a matter of fact, how she came to sign and stamp the documents, and send them to Pacific. The unusual feature of the case is that Ms Dhiri had authority to sign the documents in one capacity but not in another, and the documents made no express reference to the capacity in which they were signed. To describe Ms Dhiri's conduct as unauthorised is true, but it is an over-simplification. It should be added that there is no suggestion that there is anything in the public documents of BNP inconsistent with the possibility that Ms Dhiri might have had actual authority to bind the bank. As a matter of administration she did not have such authority, but that was the consequence of the bank's internal procedures, not of its constitution.

36    In *Crabtree-Vickers Pty Ltd v Australian Direct Mail Advertising & Addressing Co Pty Ltd* (30), and in *Northside Developments Pty Ltd v Registrar-General* (31), this Court followed and applied *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd* (32) as to the general principles concerning the apparent or ostensible authority of an officer of a company dealing with a third party. Where an officer is held out by a company as having authority, and the third party relies on that apparent authority, and there is nothing in the company's constitution to the contrary, the company is bound by its representation of authority. "The representation, when acted upon by the contractor by entering into a contract with the agent, operates as an estoppel, preventing the principal from asserting that he is not bound by the contract." (33) It is not enough that the representation should come from the officer alone. Whether the representation is general, or related specifically to the particular transaction, it must come from the principal, the company (34). That does not mean that the conduct of the officer is irrelevant to the representation, but the company's conduct must be the source of the representation. In many cases the representational conduct commonly takes the form of the setting up of an organisational structure consistent with the company's constitution. That structure presents to outsiders a complex of appearances as to authority. The assurance with which outsiders deal with a company is

(30)  (1975) 133 CLR 72.
(31)  (1990) 170 CLR 146.
(32)  [1964] 2 QB 480.
(33)  *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd* [1964] 2 QB 480 at 503, per Diplock LJ.
(34)  *Northside Developments Pty Ltd v Registrar-General* (1990) 170 CLR 146 at 187, per Brennan J.

more often than not based, not upon inquiry, or positive statement, but upon an assumption that company officers have the authority that people in their respective positions would ordinarily be expected to have. In the ordinary case, however, it is necessary, in order to decide whether there has been a holding out by a principal, to consider the principal's conduct as a whole (35).

37    In the present case, BNP insisted that the necessary representation had to be one made to Pacific by BNP about Ms Dhiri, not merely one made by Ms Dhiri about herself. Again, this is true, but it is also an over-simplification. The point was regarded as decisive in the Court of Appeal. Sheller JA considered that "the only evidence of any representation by BNP to [Pacific] has to be found in Ms Dhiri's signature on the NEAT LOIs. In other words the argument has to be that Ms Dhiri by herself signing the document represented that she had authority to and did bind BNP to a contract to indemnify". There is more to the case than that.

38    A kind of representation that often arises in business dealings is one which flows from equipping an officer of a company with a certain title, status and facilities. In *Crabtree-Vickers Pty Ltd v Australian Direct Mail Advertising & Addressing Co Pty Ltd* (36), for example, the Court spoke of the representation that might flow from supplying a particular person with "a blank order form, thus arming him with a document which, when he signed it, would bear the hallmark of authenticity". The reference to corporate administrative procedures under which an officer is armed with a document to which he or she can, by signature, impart an appearance of authenticity is a reminder of the wider principle of estoppel which may be relevant to a question of ostensible authority (37). The holding out might result from permitting a person to act in a certain manner without taking proper safeguards against misrepresentation.

39    In *Thompson v Palmer* (38), Dixon J said:

"The object of estoppel in pais is to prevent an unjust departure by one person from an assumption adopted by another as the basis of some act or omission which, unless the assumption be adhered to, would operate to that other's detriment. Whether a departure by a party from the assumption should be considered unjust and inadmissible depends on the part taken by him in occasioning its adoption by the other party. He may be required to abide by the assumption because it formed the conventional basis upon which the parties entered into contractual or other mutual relations, such as bailment; or because he has exercised against the other party rights

(35)  The *"Raffaella"* [1985] 2 Lloyd's Rep 36 at 41, per Browne-Wilkinson LJ.
(36)  (1975) 133 CLR 72 at 80.
(37)  *Northside Developments Pty Ltd v Registrar-General* (1990) 170 CLR 146 at 200, per Dawson J; at 212, per Gaudron J.
(38)  (1933) 49 CLR 507 at 547.

which would exist only if the assumption were correct ... or
because knowing the mistake the other laboured under, he refrained
from correcting him when it was his duty to do so; or because his
imprudence, where care was required of him, was a proximate cause
of the other party's adopting and acting upon the faith of the
assumption; or because he directly made representations upon which
the other party founded the assumption.''

40      Later, in *Tobin v Broadbent* (39), Dixon J referred to the conduct of
a party which ''induced or assisted'' an assumption from which that
party ought not to be permitted to depart. Commercial documents,
such as the letters of indemnity in the present case, are commonly
relied upon, and intended to be relied upon, by third parties who act
upon an assumption of authenticity created or reinforced by their mode
of execution, and by the fact and circumstances of their delivery.
Within a commercial enterprise, such as a bank, there will normally be
internal lines of authority, and procedures, designed to ensure that,
when documents issue to third parties, appearances are reliable. Such
an enterprise might induce or assist an assumption, not only by the
representation conveyed by its organisational structure, and lines of
communication with third parties, but also by a failure to establish
appropriate internal procedures designed to protect itself, and people
who deal with it in good faith, from unauthorised conduct.

41      Issuing a letter of indemnity which bound the bank (a bank endorsed
absent bills of lading indemnity) was a transaction forming part of the
ordinary course of business of a bank providing documentary credits in
connection with international sale of goods transactions. The letters of
indemnity now in question were sought from, and provided by, the
employee of the bank whom the bank described as the Manager of its
Documentary Credit Department. No question of the competence of
the bank under its constituent documents or the competence under
those constituent documents of particular organs or office holders of
the bank intrudes. Rather, documents evidencing transactions ancillary
to and in the ordinary course of the bank's business of providing
documentary credits in connection with international sale of goods
transactions were signed for and on behalf of the bank by the person
whom it described as its Manager of the Documentary Credit
Department.

42      Pacific's reliance upon the letters of indemnity was based upon their
form and contents, the signature of a person who appeared to be (and
was) an officer of the bank, the stamp or ''chop'', and the fact that
Pacific was sent copies of the documents, directly or indirectly, by
BNP. The stamp was probably more significant to Pacific than the
signature, which was indecipherable. It was designed for use on letters
of credit, and it allowed the person who was authorised to use it to

(39)  (1947) 75 CLR 378 at 407.

give an appearance of authenticity to documents to which it was applied. The organisational structure of BNP in Sydney at the time was such that Ms Dhiri was the bank officer to whom Pacific's request, would be, and was, communicated by NEAT. She was the person who dealt with the request, and who communicated BNP's response to Pacific. That response, involving her signature of the letters of indemnity and fixing the bank's stamp to them, would signify to a reasonable third party, and signified to Pacific, agreement to what was requested. The stamp was not BNP's common seal, but placing it on a commercial document which named the bank as a party strongly enhanced the appearance that the document was signed on behalf of BNP. Ms Dhiri was given the stamp without any instructions as to how she should use it.

43    The importance to a third party, such as Pacific, of the difference between a bank's signature to a letter of indemnity in the capacity of an indemnifying party, and a bank's signature by way of verification of the signature of another party, should have been, and was, obvious to Mr Ryan (although he was not personally involved in this transaction), Mr Kavanagh, and Ms Dhiri. They all accepted, in their evidence, the importance that attached to the capacity in which the bank was lending its name to the documents. Ms Dhiri was the natural and appropriate person to whom Pacific's request for signature of the documents by the bank was directed. If the role of the bank was to be merely that of authentication of NEAT's signature, then she was also the appropriate person to sign and stamp the documents on behalf of the bank. If the role of the bank was to be that of an indemnifying party, she was not the appropriate person. There were no procedures within BNP under which she was to seek legal advice about the manner and form of BNP's signature, or take other steps to see that it was communicated to Pacific that the only role the bank was willing to undertake was one of authentication. She was placed in a position to sign and stamp the documents, and send them to NEAT and Pacific, but without any internal check upon their final form and, in particular, without any qualification or limitation of the capacity in which the bank was participating in the transaction.

44    The assumption made by Pacific, found by the trial judge to have been reasonable, upon which Pacific acted to its detriment, was induced and assisted by the conduct of BNP in placing Ms Dhiri in a position which equipped her to deal with the letters of indemnity as requested by Pacific. It would be unjust to permit BNP to depart from the assumption.

*Conclusion and orders*

45    Pacific is entitled to succeed in its claim based on contract. The other causes of action do not require consideration. There were outstanding issues including calculation of damages that were not decided by the Court of Appeal.

46    The appeal should be allowed with costs. The orders of the Court of

Appeal should be set aside. The matter should be remitted to the Court of Appeal to deal with any outstanding issues in conformity with the reasoning of this Court.

1. *Appeal allowed with costs.*
2. *Set aside the orders of the New South Wales Court of Appeal made on 29 November 2002.*
3. *Remit the matter to the New South Wales Court of Appeal to deal with outstanding issues in conformity with the reasoning of this Court and to make orders disposing of the costs of the appeal to the Court of Appeal.*

Solicitors for the appellant, *Norton White.*

Solicitors for the respondent, *Corrs Chambers Westgarth.*

JER