EXHIBIT 9

TICK ACTION REQUIRED:
✓ Send for Reporting
✓ Copy to Info-One

## SUPREME COURT OF VICTORIA

### COMMERCIAL

19 AUG 1991

No. F4140

### ARMSTRONG WHITE KILLHAM

Plaintiff

v.

### BANQUE NATIONALE DE PARIS

Defendant

---

| | |
|---|---|
| JUDGE: | HEDIGAN, J. |
| WHERE HELD: | MELBOURNE |
| DATES OF HEARING: | 2, 6-7 June 1994 |
| DATE OF JUDGMENT: | 28 June 1994 |

---

CATCHWORDS: Guarantee - Mutual mistake as to limit of guarantee - Mutual mistake as to limit of guarantee - Whether or not payment made to bank caused or induced by mistake - Defences to claim for unjust enrichment - Restitution

---

| APPEARANCES: | Counsel | Solicitors |
|---|---|---|
| For the Plaintiff | Mr. L. Glick | Galbally & O'Bryan |
| For the Defendant | Mr. W. Houghton | Corrs Chambers Westgarth |

GT:SC          Independent Reporting Service          642 0946

HIS HONOUR:          The plaintiff company (formerly known as I.E.A.
Managing Agents Pty.Ltd. and hereinafter called "I.E.A.")
brings this proceeding against the Banque Nationale de Paris
(hereinafter called "the bank") and BNP Pacific (Australia)
Ltd. (a subsidiary of the bank and hereinafter called "BNP
Pacific") in respect of certain commercial transactions
effected between the parties in the months of November and
December 1987.

          I shall deal with the evidence in this proceeding
in more detail later, but now give a general description of
the principal features of the events which have occasioned
this litigation.  Until recently, Kenneth Armstrong was
managing director of the Insurance Exchange of Australia
Group Pty.Ltd.  According to its managing director and, as I
understand the evidence, its principal, that Group turned
over $40m. to $60m. through its activities and that of its
subsidiaries.  In February of 1986 I.E.A. acquired issued
shares in a company Jones Printing Service Pty. Ltd. ("Jones
Printing").  According to the evidence of Mr. Armstrong,
I.E.A. purchased share capital equally with one Peter Moss,
who became managing director or chief executive officer of
Jones Printing and who was responsible for managing the daily
operations of the company.  Jones Printing was purchased as a
private company from Mr. and Mrs. Llewellyn-Jones who were
friends of Armstrong and Moss.  This acquisition was not
significant in the overall substantial structure and
operations of the I.E.A. group and was embarked upon as a
favour to Peter Moss, his old friend, whose wife was
Armstrong's wife's friend.  Armstrong was vague in his

GT:SC                          1.                        JUDGMENT

evidence as to the purchase price paid for the share capital in Jones Printing, at one time saying $400,000 and another perhaps $600,000. He was also inaccurate in his initial evidence concerning the shareholding of Jones Printing, at least implying it was held equally by himself and Moss. An examination of the corporate record, (Exhibit 1) shows that I.E.A. Managing Agents Pty. Ltd. held 6,713 shares, Peter Edward Moss 6,713 shares and Kenneth Alan Armstrong 274 shares. The Armstrong interest therefore controlled Jones Printing. It also appears from the evidence that Armstrong gave to Moss as a gift Moss's shareholding in Jones Printing. In addition he made a gift to him of a house and a car. The reasons for this were not explored in the evidence. As will later appear, I.E.A. took back Moss's shares in December 1987.

Banking arrangements were put in place in February of 1986 for Jones Printing. These were by way of overdraft and what was called an encashment facility (Exhibit D). The defendants also financed the acquisition by way of lease of equipment. The securities required in support of these transactions were: first, a triple guarantee from Moss, Armstrong and I.E.A., in conventional form, but with a limit of $325,000 (26 February 1986, Exhibit C); second, a guarantee from BNP Pacific to the bank in the sum of $80,000 (10 April 1986, Exhibit E), and, third, a debenture in favour of BNP Pacific over the assets and undertakings of Jones Printing (26 February 1986, Exhibit B). Armstrong recalls executing the guarantee and accepted in his evidence that he knew the limit was $325,000 at that time. Thereafter,

2.                                    JUDGMENT

according to Armstrong, he left the management of Jones
Printing to Moss. He claimed that he had no idea of the
financial situation of Jones Printing (to which I will
shortly refer) in November 1987. He said he only knew the
trading results of Jones to May 1987, that is, he had the
accounts to May 1987. He said he had not seen any bank
statements or balance sheets but only saw trading figures.

The business of I.E.A. was obviously very
substantial. Its insurance facets were carried on in the
name partly of AFL Insurances, being underwriters selling
house and car insurance to the public. IOOF Insurance and
most community credit unions form part of the I.E.A. Group,
I.E.A. acting as managing agent for IOOF and AFL insurances.
Jones Printing had a printing business, panel shop business
and an insurance business. In about September 1987,
according to Armstrong, the insurance part of Jones Printing
was sold to Norwich Winterthur, that sale to be effective as
at 30 June 1987. Mr. Armstrong produced no documents
concerning this sale (although he said in evidence that he
would produce them) but claimed that there were no terms
remaining to be performed as at November 1987. He stated
that, based upon what he knew in May 1987, Jones Printing was
set to make a good profit. At some time either in late
October or early November 1987, the accountants Arthur
Andersen & Co. had been put in by Armstrong to Jones Printing
to do an audit. Notwithstanding his want of detailed
knowledge (as he claimed) of the situation of Jones Printing
towards November 1987, he agreed that he knew from February

3.                                          JUDGMENT

1986 on that there was a debt to the bank and that it was
secured by guarantee given by his company I.E.A. and him.

At some point of time in 1987 the bank became
concerned about the blow-out in Jones Printing's overdraft
which had increased to $364,000 as at 31 May 1987.
Accordingly, it sought and obtained a confidential report
from the accountants KMG Hungerfords (Mr. Dean McVeigh) dated
22 June 1987 (Exhibit 8).  This report analysed and
criticized the Jones Printing costing and accounting methods
and its control of debtors and creditors.  The premises had
been visited and discussions had with the senior management
of the company.  There was a perusal of company records,
unaudited financial statements and a perusal of budgets and
cash forecasts to December 1987.  The bank apparently decided
that it desired further protection and it procured an
alteration in the BNP Pacific guarantee to Jones Printing on
23 September 1987 by making that guarantee, not to a limit of
$80,000, but unlimited.  The Jones Printing account was
managed by one Damien Silk under the supervision of Mr. Ian
Adams, the Deputy Manager Commercial of the bank.  Silk took
over the file shortly after McVeigh's report.

On 10 July 1987, Mr. Adams and Mr. Silk visited
Jones Printing to tell Moss that the bank intended to
"disengage" in an orderly manner over the following six
months.  Shortly after that, the security from BNP Pacific to
the bank was, with Moss's consent, converted to an unlimited
guarantee.  However, the overdraft continued to deteriorate,
and on 9 November the bank requested and received from KPMG
Peat Marwick Hungerfords (the new name) an updated report on

4.                           JUDGMENT

the viability of Jones Printing.  That confidential report
(Exhibit T) pointed out that the previous weaknesses
identified in the earlier report had not been rectified and,
in effect, the state of the company's affairs was such that
urgent action as to costing and reporting had to be taken.
It also stated out that group tax and sales tax liabilities
were not being paid within the time requirements imposed by
the authorities, that the company had not paid any group tax
and sales tax since the previous review in June and was two
months behind with WorkCare and payroll tax.  The report said
that this was a major concern and required careful
consideration and possible action by the bank.  It also
analyzed the value of securities, suggesting they had a gross
value of $896,000 approximately and a net of $764,500.  The
report also referred to the fact that the Jones Printing
auditors, Arthur Andersen, were currently in the process of
completing their audit of the books and records and that it
was expected that the audit certificate would be issued
within the next few weeks.  This was the first year of an
audit.

        Mr. McVeigh's November report stated:  "The audit
was instigated by ... of the company's holding company,
Insurance Exchange of Australia Pty. Ltd., who are in the
process of being publicly listed".  Mr. Armstrong in his
evidence denied that this had ever been considered and that
the statement was incorrect.  There is no other evidence
about this.  I do not accept that there was any plan to
publicly list I.E.A. and I do not refer to this aspect again.

                    5.                    JUDGMENT

However, the bank had become concerned over the situation, notwithstanding its accountants' unaudited estimate of the value of the securities. In my opinion, this concern was to a large extent driven by the failure of Jones Printing to pay its statutory liabilities (then estimated to be about $160,000 to $180,000 in arrears) coupled with the failure of Jones Printing to address its defects between June and November. The bank, accordingly, arranged to take advice from its solicitors, apparently intending to instruct them to appoint an agent or receiver under the debenture held by BNP Pacific over Jones Printing. That meeting, on 16 November 1987, with Messrs Anzarut and Garrison of Wisewoulds, resolved to serve demands and appoint agents for the mortgagee over Jones Printing. At that time the debt of Jones Printing to the bank and BNP Pacific was $541,499. It would appear likely that the bank determined to appoint an agent rather than put in a receiver because an agent would not be liable to pay the statutory liabilities but a receiver would. It would appear that under the law prevailing at that time there would be no priority over the bank's debts in favour of the statutory liabilities.

Part of the evidence of Silk dealt with the way in which the bank managed and administered its security documents. It appears likely that, although a risk manager personally checked all securities annually, the basic reference document in any customer account file (called "the ticket") was the point of reference for someone managing the file. In this case the ticket incorrectly failed to record the $325,000 limit to the triple guarantee so that notices of

6.                                                    JUDGMENT

default founded upon the guarantee were prepared on the basis that there was unlimited liability.

I will turn to a detailed examination of the events of 17 and 18 November 1987 shortly.  For the present purpose, it is sufficient to say that on the 17th November 1987 the bank's representatives went to Jones Printing in order to take possession of the assets and undertakings of Jones Printing pursuant to the debenture.  On 18 November the bank's representatives went to the I.E.A. offices in Dandenong.  On that occasion notices of default under the guarantee were delivered to Armstrong personally and to Armstrong for I.E.A..  Armstrong agreed that I.E.A. would pay the outstanding statutory liabilities and an agreement was made that I.E.A. would discharge the Jones Printing debt to the bank on 1 December 1987, the date on which it was to receive moneys from a settlement.  Both of these events occurred on 1 December and, at the request of Armstrong, the debenture was transferred to I.E.A..  It appears that at this time Armstrong, I.E.A., the bank's officers and the solicitors dealing with the matter all mistakenly believed that the triple guarantee was unlimited rather than limited in the amount of $325,000.

Armstrong got rid of Moss in November but it appears that he did not transfer his shares until December. Armstrong sold off the non-insurance remnant of Jones Printing in part to Norwich Winterthur in December of 1988 but later took back the shares.  Subsequently in July 1993, in connection with an unrelated matter, it was necessary for Armstrong to inspect documents held by the bank relating to

7.                          JUDGMENT

the financial accommodation which had been given to Jones
Printing. In the course of inspecting the documentation,
according to Armstrong, he became aware of the fact that
neither he nor I.E.A. had provided a guarantee greater than
$325,000. Accordingly, the plaintiff (I.E.A. under its new
name) commenced proceedings for recovery of the overpayment
($244,124.61) and interest.

     The way in which the plaintiff puts its case both
in its Statement of Claim, and in the submission of Mr. Glick
who appeared for it in the proceeding, is simple enough. The
allegation is that the defendants represented to the
plaintiff that the plaintiff had executed a guarantee which
made I.E.A. liable to pay BNP Pacific Jones' debts in the sum
of $541,499.87 to the bank and the defendant's costs and
disbursements. These representations are said to be both in
writing and oral. In writing by the notice of default to
I.E.A., and orally by statements made by Mr. Adams or others
at the plaintiff's offices in Dandenong. I note the
Statement of Claim refers to the 17November. It appears to
be accepted that the correct date is the 18 November. I.E.A.
alleges that at that time it did not have a copy of the
guarantee of the 26 February. It believed that the
defendants were stating the truth as to the extent of the
liabilities created by the guarantee and that it was thereby
induced by the representations into the belief that it
executed the guarantee which bound I.E.A. to pay to BNP
Pacific those sums. The allegation is that the liability was
limited to $325,000. The plaintiff, it was said, was relying
upon the truth of the representations as to the true terms of

8.                                                    JUDGMENT

the guarantee when it paid the sum of $569,124 to the
defendants, that it would not have done so and would not have
paid any sum greater than $325,000 if it had known the true
facts.  It puts its claim in three ways:  first, that the
overpayment was made under a mistake;  second, that in the
circumstances, as the defendant has been unjustly enriched at
the expense of the plaintiff, the plaintiff is entitled to
the restitution of the sum; and third, that the
representations, made in the course of trade and commerce,
were misleading and deceptive in breach of s.52 of the Trade
Practices Act 1974.

        The defendants' defences to these claims, as set
out in the defence and articulated by Mr. W. Houghton,
counsel for the defendants, appeared to be as follows:
first, if there was a mistake made by I.E.A., it was a mutual
mistake and the defendants had both given valuable
consideration for the payment made by the plaintiff and had
changed their position as a consequence of the payment and
the plaintiff's mistake, both of these matters arguably
constituting a defence to the claims by way of mistake and
for restitution.  It is alleged that the bank gave up a first
ranking security, namely the debenture, over the assets of
Jones Printing in exchange of the payment, the parties
executing a deed of assignment in that respect.  It was
submitted that the claim for unjust enrichment - restitution
should not be treated as being any better grounded than the
mistake claimed, both claims arising out of the same set of
facts.  So far as the s.52 claim was concerned, the
submission was that even if I.E.A. was misled into believing

                        9.                    JUDGMENT

that it had an unlimited liability that it was not induced by
that to make the payment nor was the representation the cause
of any loss. Finally, it was submitted that in any event
there was no loss sustained by the plaintiff which, as a
consequence of obtaining the debenture, had complete control
over Jones Printing whose assets exceeded the $244,000
overpayment. The submission in effect was that the conduct
of I.E.A. was not induced or caused or connected with the
guarantee but with other commercial considerations.

      The Finance Director of I.E.A. at the time was
Nicholas Lines. Peter Moss was still the Managing Director
of Jones Printing. On the 17 November, Lines and Moss were
at the Jones Printing premises at 56 Moncrief Street,
Nunawading. He had been directed to go there by Armstrong to
talk to the auditors Arthur Andersen & Co. On that day, a
number of representatives of the bank attended at the Jones
Printing premises. They included Mr. Ian Adams, Mr. Damien
Silk, Mr. McVeigh and Mr. McDonald, both of KPMG Peat Marwick
Hungerfords, and Mr. Garrison of Wisewoulds. The purpose of
this attendance was to serve the appropriate notices under
the debenture, to take possession of the assets and
undertaking of Jones Printing on behalf of the bank and BNP
Pacific and to put Mr. McVeigh in possession as agent for the
mortgagee. Mr. Garrison served a notice to that effect on
Mr. Moss, leaving Mr. McVeigh in control as agent in
possession. No witness suggests that there was any mention
of a guarantee at this meeting. I am satisfied that
statements were made that the defendants were taking control
of the company and putting their accountants in. The bank

10.                  JUDGMENT

representatives other than Mr. McDonald and Mr. McVeigh left, they remaining in order to take possession.

Lines, who claimed to be unaware either of the financial position of Jones Printing, or the level of financial accommodation that had been granted to that company by the bank, communicated that afternoon with Mr. Armstrong to let him know what had occurred. Lines says that he made that call that afternoon. Armstrong claims he got a call "the night before" that is, on the night of the 17th from Lines concerning what had happened at Jones Printing that day. It appears also that Moss spoke briefly on that afternoon to Armstrong as well. Armstrong's own evidence was that, having been telephoned by Lines, he spoke to Moss who said "'The agents are here.' I said, 'What's the story?' and he said 'We are over-drawn $500,000'." Armstrong then asked for Lines to be put back on saying he could not talk to Moss at that point of time because he was angry.

Clearly, then, Armstrong knew by the afternoon of the previous day that Jones Printing owed about half a million dollars to the bank. The conversation that Lines held that afternoon with Armstrong was not closely explored. Lines had been, at Armstrong's direction, at Jones Printing for a number of days having discussions with the Arthur Andersen representatives who were there. Lines agreed that he had examined bank statements and bank reconciliations and was aware that a large sum was owed, but that he did not know what the extent of the overdraft limit was. Lines gave evidence that Jones Printing employed fifty people. Lines said that he had told Armstrong that afternoon that the bank

11.                                        JUDGMENT

was calling up the facility and that the bank wanted a
meeting the next day.  It appears that there may have been
more than one telephone call between Lines and Armstrong;
Lines himself said so.  Lines was asked:

> "Mr. Armstrong would have wanted to know from you,
> would he not, why on earth the receiver had
> turned up?---Absolutely.
>
> Did you tell him?---I had to find out.  Well,
> obviously the statutory liabilities hadn't been
> paid, but I wasn't aware of that before he
> turned up."

This suggests that the agent McVeigh (who was the very person
who had informed the bank that the statutory liabilities had
not been paid), probably had told Lines that afternoon about
that matter.  Lines also stated that he knew that
negotiations were still going on at that time between
Armstrong and I.E.A. and Norwich Winterthur about Norwich
Winterthur's acquisition of part of Jones Printing.

Before proceeding to address the evidence
concerning the all-important meeting at I.E.A. on the morning
of the 18 November 1987, it is necessary briefly to refer to
some evidence concerning a telephone conversation which
allegedly took place between Mr. Adams of the bank and Mr.
Armstrong on the previous day.  Armstrong said no such
telephone conversation took place.  Adams says that the
meeting that took place on the 18th was arranged in a
telephone conversation between himself and "a person I
believe to be Mr. Armstrong" on the late afternoon of the day
before.  Mr. Adams claimed that he was telephoned at the bank
by Armstrong late in the afternoon and a detailed discussion
about the liabilities of the bank, the group tax liabilities

12.                                    JUDGMENT

and the general financial position of the company took place. Mr. Adams said that he did not recall the exact details but it was to the effect that the bank required its funds, that they had been unsuccessful in their attempts to talk to the directors and found it necessary to attend the premises of the company that morning to appoint an agent, and that it was appropriate that a meeting took place. He said the amounts owed were discussed and that Armstrong or the company was owed a lot of money from CIC Insurance and may be in a position to pay. I will return to this matter later.

### Meeting of 18 November

Prior to the meeting, on the instructions of the bank, Wisewoulds had prepared notices of default for Armstrong, I.E.A. and Moss. The solicitor Anzarut, who was called, had the sketchiest of recollections about virtually everything. His firm clearly prepared the notices. However, he thought it more probable that he had never sighted the guarantee although the notice of default contained a reference to the date on which the guarantee had been executed. The notices of default to Armstrong, I.E.A. and Moss were in identical form. Each stated, after stating the name and address of the recipient:

### "NOTICE OF DEFAULT

TAKE NOTICE that THE JONES PRINTING SERVICE PTY. LTD. of 25 Moncrief Road, Nunawading, of whom you became an assurety to B.N.P. PACIFIC (AUSTRALIA) LIMITED of 470 Collins Street, Melbourne, under an Agreement of Guarantee in writing ("the guarantee") dated the 26th of February 1986 is made default in payment of the sum of ($541,499.87) due to us in respect of advances made to it and secured by the

13.                    JUDGMENT

guarantee and that the sum is still unpaid and due
and owing to us.

AND we hereby require you forthwith to pay or cause
to be paid to us the stated sum pursuant to the
guarantee otherwise legal proceedings to enforce
and recover payment thereof with the expiration of
one day from the date hereof be taken against you.

DATED the 17th day of November 1987."

The document was then signed on behalf of BNP Pacific by Mr.
Ian Adams.  This document was treated by the parties as being
a demand for payment of the whole of the sum as being due and
secured by the guarantee, still unpaid.

I now turn to what transpired at the meeting.  I
should state that I required all witnesses who gave evidence
of this meeting to give oral evidence about what occurred at
it, notwithstanding that they had dealt with the matter in
their witness statements.

The substance of Armstrong's evidence is to this
effect.  Between 10.00 and 11.00 a.m. Mr. Lines brought three
gentlemen into his office and introduced them to him.  He
could not recall their names then or now, but they
represented the bank and there was a solicitor.  He stated he
was expecting the visit from "a call" the night before,
although the context of the answer suggested that Lines was
the person who told him.  He said that the gentleman
representing the bank (this is Adams) said that they had
appointed agents to Jones Printing and asked whether he was
aware the bank was reviewing its arrangements with Jones and
that the bank's auditors had done two inspections.  Armstrong
said he had not known that until yesterday afternoon when he
got knowledge that a receiver had been appointed.  Adams
asked him did he know there were statutory liabilities, group

14.                          JUDGMENT

tax, not paid in the amount of $160,000 to $180,000.
Armstrong said he did not know they had not been paid.  He
said that he had not been warned the night before that they
had not been paid so that was a question that "had just been
put to me".  Mr. Adams was almost apologetic using words to
the effect that he had to protect the bank.  There were some
discussions about the bank's inability to contact him
earlier.  He was asked whether or not he knew that Jones owed
$541,000 to the bank and he said no.  I pause to say that
this answer must be in substance incorrect since he stated
that Moss had told him on the day previous that $500,000 was
owed.  Armstrong said the last meeting that he had with Moss
was in July, reviewing the results for May.  He claimed that
Adams then said, "Well, even though we know you were not
aware of it, unfortunately we have to exercise our rights in
respect of guarantees that you have given and I.E.A. have
given in respect of the Jones Printing Company debt to the
bank".

The solicitor then handed him two envelopes, one
addressed to him and one to I.E.A.  He took the I.E.A. one,
opened it, "shaking at the time" and read it aloud so that
Lines could hear, and then read it aloud a second time to
make sure he understood what it said.  This was the notice of
default.  He passed that to Lines, then opened up and read
the Armstrong one.  He claims to have said, "Does this mean
I.E.A. has 24 hours to pay you in respect of this guarantee?"
and Adams said, "Yes".  Armstrong said, "I haven't got the
money and neither have I.E.A. got the money to pay you but I
can get sufficient money to pay the statutory liabilities, if

15.                          JUDGMENT

they're $160,000 to $180,000 within the next 24 hours but
I.E.A. or myself can't pay the amount demanded within 24
hours". He said a discussion took place that I.E.A. would be
getting money on the 1 December which would be the earliest
date on which it would have money available for it to pay the
demand. It was agreed that, if he and I.E.A. paid the
statutory liabilities within 24 hours and produced receipts
to the bank of the payments, they would make an agreement
whereby the bank could access the sums they were to get from
CIC. He claimed that it was said that the bank would not
remove the receiver but would leave him there until they got
their money. His written witness statement makes no mention
of the presence of Adams, who was clearly there, but actually
names the other bank representatives. He claims in that
statement that Silk (a young man considerably junior to his
superior Adams) asked him, "Are you aware of the fact that
Jones Printing ... owes Banque Nationale de Paris
$541,499.87?" to which he replied, "No". It does not appear
to be in dispute that it was agreed at this meeting that if
I.E.A. paid the statutory liabilities immediately and
produced a receipt to that effect and gave an Irrevocable
Order for payment of the amount outstanding, the bank would
accept payment on 1 December. Mr. Armstrong's evidence was
that he was not told that the guarantee was limited to
$325,000, nor that the guarantee given by BNP Pacific to the
bank had been restructured to an unlimited amount. He said
that he believed what the bank said and that had he known the
guarantee was limited he would not have paid the amount.

16.                              JUDGMENT

Other matters emerged in the course of the cross-examination of this witness. One matter was that Norwich Winterthur had that year, in September, purchased the insurance part of Jones Printing. According to Lines, negotiations concerning that were still going on in the November. Initially, Armstrong said that Norwich Winterthur (through a company, Skerm) had bought the balance of the business in December 1987 but subsequently corrected this to December 1988, the printing part being put in nominally at a dollar and $250,000 for the panel shops. He was strongly cross-examined that his actions were driven not by the issue of the guarantee at all but because he was concerned to keep Jones Printing afloat for a number of reasons, including his own and I.E.A.'s reputation, the possibility of dealings with Norwich Winterthur being affected, and an urgent desire to have the agent in possession out, the only way of procuring that being to agree to pay the statutory liabilities and the company's debt.

It appears that the arrangement with Norwich Winterthur involved I.E.A. managing the insurance part of that sold business for the next ten years. He claimed to have mentioned that at the meeting on the 18th of August claiming that he said that

> "I wanted to pay the debt because I was the managing
> director of the group and did not want legal
> proceedings against me and that I.E.A. managing
> agents .. had to pay the debt because he didn't
> want legal proceedings against him".

After this meeting, it appears to be common ground that an Irrevocable Authority was prepared by I.E.A.'s solicitor, Mr. Francis Galbally, probably in consultation

17.                                                JUDGMENT

with Mr. Anzarut, and that it was executed so as to bind the
payment due to be made under the arrangements made, on 1
December. I.E.A. paid the outstanding statutory liabilities
and produced a receipt to the bank, probably on 18 November.
The agent in possession, Mr. McVeigh, then ceased to be an
agent in possession although there does appear to be some
evidence to the effect that some representatives of those
accountants remained on to assist in putting Jones Printing
on a better footing. Armstrong admitted that he asked for an
assignment of the debenture to him and that Adams agreed that
this would be assigned to him when the outstanding money was
paid. A deed of assignment was prepared (Exhibit 7) and
executed on 1 December 1987. Armstrong accepted that no
demands had been put on him or I.E.A. to pay the statutory
liabilities but that he believed that if he did not pay them
then BNP Pacific may not accept the moneys in satisfaction of
the debt. However, he agreed that he would have paid the
statutory liabilities anyway whether or not the bank required
him to because the company and he, as the director, would
have been liable to pay them in any event.

In cross-examination, he agreed that what the bank
said to him was that they would not remove the agents in
possession until the statutory liabilities were paid. A
critical difference, as will appear, between this witness's
evidence and the evidence of others is that he claims that
the guarantee was mentioned on a number of occasions in the
course of the conversation on 18 November, in association
with an oral threat of legal action.

18.                         JUDGMENT

The bank's position is simply that the notices were handed over and that the balance of the discussion was directed to a method by which the Jones Printing debt could be paid.

Mr. Armstrong said that he had forgotten about the limitation in the guarantee. Although he had the opportunity to do so when formulating the Irrevocable Authority, I.E.A.'s solicitor had not asked to see the guarantee. Armstrong said that he paid because he assumed that Jones could not pay. He denied making any statement that he wished to keep Jones Printing going, that he attached value to it, or that he was kicking himself that he had not kept himself up to date with its debts. He admitted saying that the he had told the bank representatives that the matter had to be resolved. He gave the bank a copy of the terms of settlement with CIC. He was pressed about details of how Norwich Winterthur was to pay for the insurance part of the business that they had acquired but he failed to provide detailed information about that. He explained his failure to recall the limitation in the guarantee by saying that he had 34 trading companies with 250 car leases, with leases on typewriters, premises and other matters, dozens of bank accounts with three or four banks all with guarantees and probably fifty to a hundred guarantees. and he simply did not recall it.

Mr. Lines broadly confirmed that part of Armstrong's evidence which dealt with the handing over and the reading of the notices of default. Like Armstrong, he claimed to be shocked, although it is apparent that both of them were aware on the previous day that there was a half

19.                                      JUDGMENT

million dollars owing by Jones Printing to the bank. Lines
agreed that nothing was mentioned about the guarantees in
conversation other than at the time of the handover of the
notice of default, nor was there any threat of legal action
made.

The plaintiff listed six witnesses but called only
two. Witnesses listed were Mr David Beattie of Arthur
Andersen and Mr. Neil Smart, another partner in KPMG Peat
Marwick. No witness statements from them were filed and
served.

The defendants contended that those present at the
meeting on the 18 November, claimed to be at the invitation
of Armstrong, were Adams, Silk, Anzarut, McVeigh and
McDonald. There is no disagreement among these witnesses
that the notices of default were handed over although none of
them appeared to agree that Armstrong read one or other of
them aloud.

Adams says that a meeting had been arranged the day
before. He stated that they were there as arranged to attend
the meeting to discuss the problems with Jones Printing. He
said that they were issuing notices of default to protect the
bank's position and that they required the money to be
repaid. He says that after Armstrong read them, they then
discussed how the administrator, that is the agent, might be
removed, Mr. Armstrong saying he was keen to have him
removed, keen to see the company continue and keen to have
this position resolved immediately. There was discussion
that the bank required the group tax and other sales tax
liabilities to be repaid immediately before the agents would

be removed.  Then discussions about how the payment of the
bank debt could be achieved took place.  This led to a
discussion concerning the CIC settlement moneys which would
not be available for two weeks.  Adams indicated that the
bank required an Irrevocable Authority, the payment of the
money from those funds and that the bank would be prepared to
remove the administrator if the group tax was paid that day,
he requiring receipts of evidence of payment.  Upon such
receipt of receipts, the administrator would be removed.  He
said that Armstrong agreed with this, advised that he would
arrange for it to occur and that he would have his solicitor
to draw up the necessary documentation.  There was no
discussion concerning the guarantee but there was discussion
concerning the assignment of the debenture and the leases,
Armstrong wanting to take over the position of the bank
rather than just repay the debt.  The bank was happy to
provide those.  There was no threat of legal action and no
reference to the guarantee other than in the handing over of
the notices of default.  He stated that Armstrong was the one
who raised the payment of the group tax, saying he wanted to
pay it to ensure the continuation of the company.

          It appears from this witness's evidence that
Garrison of Wisewoulds had attended the meeting on the 17th
and Anzarut attended the meeting on the 18th.  McVeigh and
McDonald, however, waited outside Mr. Armstrong's office.
Once the matter was resolved in the way described, it was not
necessary for them to become involved.  They were to remain
in attendance at Jones Printing until the receipts were

received and thereafter to assist Jones Printing in the
intervening period.

Adams said in evidence that they were concerned,
and had received advice from their solicitors, about the
possibility of the Australian Taxation Office appointing a
liquidator in respect of the unpaid taxes.  He thought the
guarantees had been given to their solicitors, although
Anzarut doubts that.  Neither Adams, Silk nor Anzarut were
aware that the guarantee was limited.  Mr. Adams denied that
the statement that "the bank required the money to be repaid"
meant repaid under the guarantee.  It simply meant the bank
wanted to be repaid its debt, whether by the company or the
guarantors it mattered not.  He denied that the bank insisted
upon the payment of the outstanding tax liabilities saying
the bank could not enforce such a request.  It was up to the
company to determine whether they would do that so as to
procure the removal of the administrator.  Whilst he stated
that the requirements of BNP Pacific in any settlement were
the payment of all outstanding tax liabilities of Jones
Printing, that was merely a requirement of the settlement;
they were looking to Armstrong and I.E.A. as directors and
shareholders of the company, not just as guarantors.  Adams
claimed that BNP Pacific had requested a meeting the day
before the 18th for the service of the notices but Armstrong
did not attend.  Armstrong having later sought a meeting for
the next day, they took the occasion to serve the notices.

I interpolate that it appears likely to me that
Moss, through whom some efforts were directed from time to
time to get Armstrong to a meeting, was almost certainly not

22.                          JUDGMENT

passing on that request for fear that Armstrong would become aware of the detail of the state of the overdraft.

Adams claimed, however, that they had sought to get Armstrong to attend the meeting of the 17th and he did not. The reason they wanted him to come on the 17th was as a director of the company in respect of which they were exercising their powers under the debenture.

Mr. Damien Silk gave evidence broadly corroborative of that of Mr. Adams although it must be said, I think, that there was a considerable contrast between what was said about the meeting in his witness statement and his recollection of a conversation in the witness box. Not that there was any conflict, but he appeared to have a very poor recollection of what was actually said, being prone to describe it in terms of the impression made on his mind. He appeared to state, however, that Armstrong said that he attached value to the business and the situation had to be rectified as soon as possible. He could not recall Armstrong making any remarks about the guarantee at all.

Subsequent to this meeting the parties proceeded to conclude the arrangements into which they had entered. On 1 December the bank executed the deed of assignment by which the first ranking security by way of debenture over the assets of Jones Printing was transferred to I.E.A. on the same day. I.E.A., which had already paid the outstanding statutory liabilities of Jones Printing, paid the sum of $569,124 to the defendants. Shortly after that, Armstrong regained, without any payment for them, the 6,713 shares held by Moss in Jones Printing so that he, through his corporate

23.                                JUDGMENT

vehicle and personally, totally controlled all of the assets
and liabilities of Jones Printing.

Before turning to the consideration of this
evidence, it is timely briefly to consider the legal issues
that are raised by this constellation of facts, and the way
in which both counsel approached the legal issues.

Mr. Glick argued that the service of the notice of
default containing the misrepresentation that the guarantee
was unlimited rather than being limited to $325,000
constituted deceptive and misleading conduct. Mr. Houghton
conceded this point. Both counsel then accepted that in
order for the plaintiff to succeed on the s.52 claim, the
plaintiff would have to establish that the plaintiff was
induced by the misrepresentation or that it played a
meaningful part so as to cause Mr. Armstrong to make the
payment, thereby suffering loss and damage by that deception
and misleading conduct. Mr. Glick, to use his words, had "to
prove the 24 hour demand for $540,000 played a part in the
mental motivation which caused Mr. Armstrong to pay the
funds", that is that he had to be induced by the false
representation to some degree.

It was central to the defendant's defence that the
plaintiff's conduct was not occasioned, induced or caused by
misrepresentation as to the guarantee. Further, its
submission is that the mistake, if made, did not cause the
payment to be made. Both counsel accepted that if the
findings of fact in association with the appropriate legal
principles as articulated in <u>David Securities Pty. Ltd. &
Ors. v. Commonwealth Bank of Australia</u> 175 C.L.R. 353. were

24.                                    JUDGMENT

that the plaintiff's decision to pay the debt was not caused
by the mistake, the plaintiff could not succeed on the unjust
enrichment-restitution claim, there being no additional
matrix of facts might attract the principles that underpin
unjust enrichment.

The appropriate commencing point is David
Securities by which, inter alia, the High Court rejected the
proposition that there is any distinction of moneys paid
under a mistake of fact and moneys paid under a mistake of
law for the purpose of recovery, disapproving of Bilby v.
Lumley (1802) 2 East 469 (102 E.R. 448) and Yorkair
Conditioning and Refrigeration (A/asia) Pty. Ltd. v. The
Commonwealth (1949) 80 C.L.R. 11 and 30. David Securities
and other plaintiffs had sued the Commonwealth Bank of
Australia and others claiming that they had suffered
significant losses by reason of the entry into foreign
currencies borrowing arrangements induced by the defendant
bank. The claim relied upon alleged misleading conduct,
representations and breaches of contract and common law
duties to advise of the dangers inherent in foreign currency
loans. The plaintiffs lost at first instance and the bank's
counterclaim succeeded. The plaintiffs/appellants lost on
appeal and in the High Court confined their argument to a
single point namely that they were entitled to a refund of
certain moneys paid to the bank which were paid over under a
mistake of law, and being so entitled to a refund, were
entitled to set them off against the moneys claimed by the
bank by way of counterclaim. The Court of Appeal of the
Federal Court found that the appellants had made a mistake of

25.                              JUDGMENT

law, at least mixed law and fact but that the appellants must fail because they were not entitled to maintain an action for money had and received and paid under a mistake of law. This involved consideration of s.261 of the Income Tax Assessment Act 1956. It is not necessary for my present purpose to consider the factual circumstances in David Securities as the Court specifically examined and determined the broad legal principle, the majority (Mason, C.J., Deane, Toohey, Gaudron and McHugh, JJ. (although Dawson, J. wrote a separate judgment)) deciding that a person paying money is prima facie entitled to recover those moneys paid under a mistake if it appears that the moneys were paid in the mistaken belief by the payer that he was under a legal obligation to pay them or that the payee was legally entitled to payment; further, that in order to recover, the payer does not have to prove "unjustness" over and above the mistake.

The Court dealt with certain defences to which I will refer. After tracing the history of the development of the principles that moneys paid under a mistake of law are irrecoverable and examining the error which was perpetuated since 1802, the majority judgment stated (375)

> "If the grounds for ordering the recovery is that the defendant has been unjustly enriched, there is no justification for drawing distinctions on the basis of how the enrichment was gained, except insofar as the manner of gaining the enrichment bears upon the justice of the case ..
>
> Having rejected the so-called traditional rule denying recovery in cases of payments made under a mistake of law, it is necessary to consider what principles should be put in its place. It would be logical to treat mistakes of law in the same way as mistakes of fact so that there would be a prima facie entitlement to recover moneys paid when a mistake of law or fact has caused the payment."

26.                                    JUDGMENT

I pause to emphasize that a prima facie entitlement to recover only arises when the mistake of law or fact has caused the payment. The Court rejected two alternative formulations of the basis for recovery, namely that one, the person making the mistaken payment must have supposed that he or she was legally liable to make it and, secondly, that the mistake must have been a fundamental one. Earlier formulations missed the point by concentrating on the type of mistake, instead of the crucial factor that the recipient has been enriched. Second, the notion of "fundamentality", was thought by the majority to be too vague; and that it was unnecessary that the cause of the mistake be fundamental. The Court took the view that the imposition on the plaintiff of the burden of establishing on the balance of probabilities that a mistake had been made was sufficient, that it was unnecessarily strict to require the mistake to be fundamental. Accordingly, the conclusion was expressed that a prima facie entitlement to recover the moneys that were paid in the mistaken belief referred to arose. The Court, citing Pavey v. Matthews (1987) 162 C.L.R. 256-257 and Westpac Banking Corporation (1988) 164 C.L.R. 673 emphasized that recovery founded upon mistake - unjust enrichment is not to be determined by reference to a subjective evaluation of what is fair and unconscionable. Recovery depends upon the existence of a vitiating factor, such as mistake, duress or illegality. It is the mistake prima facie causing the payment that in fact makes the enrichment unjust.

In my opinion, nothing in the judgments of the majority would require a Court to conclude, even in a case

27.                                    JUDGMENT

into

where a payer having paid under a mistake of fact or law was prima facie entitled to recover it, that the payer should recover if the Court reached the conclusion that the money had not been paid because of the mistake but for some other reason. The mistake would not then be causative of the payment.

Further, the Court stated (379):

> "The respondent's submission that the appellants must independently prove 'unjustness' over and above the mistake cannot therefore be sustained. The fact that the payment has been caused by a mistake is sufficient to give rise to a prima facie obligation on the part of the respondent to make restitution. Before that prima facie liability is displaced the respondent must point to circumstances which the law recognises would make an order for restitution unjust. There can be no restitution in such circumstances because the law will not provide for a recovery except when the enrichment is unjust. If follows that the recipient of a payment, which is sought to be recovered on the ground of unjust enrichment is entitled to erase by way of answer any matter of circumstance which shows that his or her receipt (or attention) of the payment is not unjust."

The law was thus stated widely although the defences relied upon by the respondent in the High Court were more confined, namely, that first that the payments were made for good consideration and, second, that in reliance upon receipt of the payment the respondent, in good faith, changed its position to its detriment. Their Honour cited with the approval the statement of Goff, J. in Barclays Bank [1980] Q.B. at 695 to this effect:

> "1. If a person pays money to another under a mistake of fact which causes him to make the payment he is prima facie entitled to recover his money paid under a mistake of fact.
>
> 2. His claim may however fail if —

28.                                          JUDGMENT

    (a)  the payer intends that the payee shall
          have the money at all events whether the
          fact be true or false or is deemed in law
          so to intend; or

    (b)  the payment is made for good consideration
          in particular if the money is paid to
          discharge, and does discharge, a debt owed
          to the payee (or a principal on whose
          behalf he is authorized to receive the
          payment) by the payer or by a third party
          by whom it is authorised to charge the
          debt; or

    (c)  the payee has changed his position in good
          faith, or is deemed in law to have done
          so."

It might be noted that the first of the principles of that
well-known formulation of defences is that the claim may fail
if the payer intends the payee shall have the money whether
the fact be true or false.  The judgment stated at 383-4:

    "It might be said that to order restitution in the
    present case would, in the absence of any other
    defences, confer something in the nature of a
    windfall upon the appellants at the expense of the
    respondent.  This possible result flows from the
    fact that, having proved the mistake, the
    appellants are prima facie entitled to recovery and
    the respondent bears the onus of proving why an
    order for restitution would be unjust."

The Court did not, given their findings as to mistake and
consideration, find it necessary to consider other arguments
advanced in this context.  However, the majority did examine
the change of position defence in greater depth, considering
various conflicting authorities in Victoria, New South Wales
and the United Kingdom, concluding that a defence of change of
position was necessary to be allowed in order to ensure that
enrichment of the recipient by the payment is prevented only
in circumstances where it would be unjust.  It clearly
considered that the central feature of the change of position

JUDGMENT

defence is acting to one's detriment on the faith of the receipt.

Dawson, J., in a separate judgment, considered the aspect of voluntary payments, not driven by any mistake of law. His Honour referred to obligations being commonly performed in the knowledge that they are not binding. His Honour further adopted the statement of Lord Goff of Cheveley in Lipkin Gorman v. Karpnale Ltd. [1991] 2 A.C. 548 that:

"Where an innocent defendant's position is so changed that he will suffer an injustice if called upon to repay or to repay in full the injustice to require him to repay outweighs the injustice of denying the plaintiff restitution."

Mr. Glick adopted the position that all of the three defences maintained by the defendant really amounted to the same defence; that is to say, change of position, consideration and no loss would, if established by the defendant, defeat the plaintiff's claim. Mr. Houghton's submission was that, leaving aside the question of causation, the burden lay on him to establish payment of valuable consideration or change of position in respect of the mistake and restitution claims, but that the burden lay on the plaintiff to establish that a loss had been sustained.

The real relevance of this was not that no over-payment had occurred but that, as a consequence of I.E.A. paying out Jones Printing's debt to the bank, it was enabled to ask for and obtain a first ranking debenture. The argument then proceeded that the evidence of the accountants demonstrated that there were more than enough assets in Jones Printing to cover the over-payment which was made. At one point of time Mr. Glick appeared to put the submission that

30.                                JUDGMENT

there could only be a change of position, and perhaps even
consideration, by the actual payment of money, relying upon
some general statements made in the majority judgment in
David's Securities. I do not myself take the view that the
High Court confined alteration in position to ones detriment
to the payment out of money, as contrasted with a forbearance
to sue or otherwise exercise rights of recovery but it seems
to me that eventually Mr. Glick withdrew the submission
(T301).

       Finally, Mr. Glick advanced a proposition, without
apparent confidence, that the payee was only entitled to rely
upon a change of position if the conduct of the recipient was
not tortious, and if it was no more at fault in its receipt
and retention of the funds than was the payer, apparently
relying upon the expression of such opinion by Prof. Butler in
"Essays on Restitution" (Ed. Finn 1990 at 126) in an article
entitled "Mistaken Payments and Change of Position in
Restitution". That position was said to reflect the American
Restatement of the Law of Restitution. The High Court did not
deal with this issue directly although in the passages earlier
cited concerning the "windfall" in that situation (384) it
indirectly touches upon the issue. Adverse change of position
by the recipient in good faith and the reliance on the
payment, the phrase adopted from Westpac Banking Corporation
Case (supra), leave open for determination the extent to which
the conduct of the recipient may be considered. Mr. Glick did
not lock this sketchy submission into any factual argument
that the bank had not acted in good faith or with impropriety.
On the contrary, the position was accepted from the outset by

31.

JUDGMENT

the plaintiff in its counsel's opening that the bank had made
the same mistake as the plaintiff. Accordingly, I do not find
it necessary to consider it further.

The other legal issue which arises on the facts
relates to the question of inducement – causation already
referred to. In my evaluation, there is little disagreement
between the plaintiff and defendant as to the law in this
regard but there is a considerable dispute as to the
application of the law to the facts as found. Concerning
deceptive conduct on which he relied, which included not only
the delivery of the Notices of Default but the alleged oral
assertions of liability pursuant to the guarantee in the
meeting of the 18 November, Mr. Glick's submissions on the
applicable principles were primarily founded upon statements
made by Wilson, J. in <u>Gould v. Vaggelas</u> (1985) 157 C.L.R. 215
at 236. His Honour there restated the applicable principles
as follows:

"1. Notwithstanding that a representation is both
   false and fraudulent if the representee does not
   rely upon it he has no case.

2. If a material representation is made which is
   calculated to induce the representee to enter
   into a contract and that person in fact enters
   into the contract there arises a fair inference
   of fact that he was induced to do so by the
   representation.

3. The inference may be rebutted, for example, by
   showing that the representee, before he entered
   into the contract, either was possessed of
   actual knowledge of the true facts and knew them
   to be true or alternatively he made it plain
   that whether he knew the true facts or not he
   did not rely on the representation.

4. The representation need not be the sole
   inducement. It is sufficient so long as it
   plays some part, even if only a minor part, in
   contributing to the formation of the contract."

32.                    JUDGMENT

Mr. Glick's submission was that, even if there were other factors influencing the decision of Armstrong and I.E.A. to pay the whole of the Jones Printing debt, so long as the terms of the notice of default, and any oral statements, played some part, even if only a minor part in making the overpayment, then his client was entitled to succeed.

There can be little doubt that as a general proposition that it is true to say that liability under s.82 of the Act for contravention of s.52 can be established where the misrepresentation was but one of a number of factors which induced the decision leading to loss and damage. Counsel for the plaintiff also relied upon other parts of the judgment of his Honour (238) to the following effect:

> "Where a plaintiff shows that a defendant has made false statements to him intending thereby to induce him to enter into a contract and those statements are of such a nature as would be likely to provide such inducement and the plaintiff did in fact enter into that contract and thereby suffered damage and nothing more appears [my emphasis] commonsense would demand the conclusion that false representations played at least some part in inducing the plaintiff to enter into the contract. However, it is open to the defendant to obstruct the drawing of that natural inference of fact by showing that there were other relevant circumstances. Examples commonly given of such circumstances are that the plaintiff not only actually knew the true facts but knew them to be the truth or that the plaintiff either by his words or conduct disavowed any reliance on the fraudulent representations. It is entirely accurate to speak of an onus resting on a defendant to draw attention to the presence of circumstances such as those I have described in order to show that the inference of the fact of inducement which would ordinarily be drawn from the fraudulent making of a false statement calculated to induce a person to enter into the contract followed by entry into that contract should not in all the circumstances be drawn. It is no more than an evidentiary onus – an

33.                                           JUDGMENT

obligation to point to the existence of
circumstances which tend to rebut the inference
which would ordinarily be drawn from the primary
facts. When all the facts are in, the fact
finding tribunal must determine whether or not it
is satisfied on the balance of probabilities that
the misrepresentations in question contributed to
the plaintiff's entry into the contract. The onus
to show that they did is a condition precedent to
relief and rests at all times on the plaintiff."

In respect of this statement the Full Court of the

Federal Court of Australia in _Ricochet Pty. Ltd. v. Equity_

_Trustees_ 41 F.C.R. 229 at 234 said:

"The statement provides a practical guide to the
way in which inferences can and should be drawn in
such cases. It remains with the tribunal of fact,
as his Honour pointed, out to determine, when all
the evidence is concluded, whether the
misrepresentation in question contributed to the
decision to enter the contract. The unremarkable
logic of these propositions is more likely to be
obscured than illuminated by reference to notions
of presumptions of fact or the incidence of the
evidentiary onus."

The Full Court of the Federal Court rejected the

submission that it was sufficient for an applicant or

plaintiff to show that the impugned representation _might_ have

induced entry into the contract. See too _National Australia_

_Bank Ltd. v. Cunningham_ [1990] A.T.P.R. 51, 619 at 624 and

_March v. E. & M.H. Stramare Pty. Ltd._ (1991) 171 C.L.R. 506,

the impact of which on the propositions here under

consideration was noticed in _Ricochet_. Informed lawyers are

familiar with the discussions in _March v. Stramare_ of the

tests employed at common law or by statute of the criteria of

causation. The Full Court in _Ricochet_ stated (235):

"A finding that a misrepresentation might have
induced a decision will not of itself establish as
a matter of probability that it did. Consistently
with that finding, it may that, on the balance of
probabilities, a party was induced to make a
decision by a combination of factors including the
misrepresentation. Assuming a non-trivial

34.                                         JUDGMENT

> contribution to the causative process by the
> misrepresentation, then it may be actionable.
>
> Ultimately, the 'causative threshold' beyond which
> liability attaches to a misrepresentation which is
> one of a number of factors inducing a decision
> that produces loss, will be a question of
> judgment."

It is in the light of these principles, and mindful of a practical commonsense approach to the question of inducement and cause, that I turn to consider the findings of fact in relation to the relevant issues.

The plaintiff's case is primarily founded upon the service of the demand by way of the notices of default on Armstrong and I.E.A., and their terms. The plaintiff also relies on statements alleged to have been made by the bank's representatives at the meeting on 18 November 1987, in effect contending that their combination, in association with the undisputed fact that the guarantee was a limited guarantee, lead to the inference that the plaintiff, at the least, partly relied on those matters, and was at least partly induced by them, in agreeing to pay the whole of the debt of Jones Printing to the bank. The plaintiff also relies upon the evidence of Mr. Armstrong that his mistaken belief that he and I.E.A. were liable under the guarantee for the whole of the debt, induced by the bank and BNP Pacific, caused him to enter into the arrangements. Although the terms of the guarantee speak for themselves, there are other substantial and important matters that bear upon the resolution of this fundamental issue. A consideration of the credibility of Mr. Armstrong, and the probabilities, are necessarily involved in the process.

Regrettably, I am bound to say that I did not find Mr. Armstrong a convincing witness. At the very outset, Mr. Armstrong attempted to suggest that he was shocked, and was "shaking" on receipt of the notice of default. I have formed the view that Armstrong was aware before the meeting of 18 November that the bank was owed in excess of $500,000. He must, of necessity, have expected that some demand pursuant to the guarantees was likely to be made on him or I.E.A. Moreover, I have formed the impression from the evidence and demeanour of Mr. Armstrong that he is a determined, even aggressive, personality. He barely took a backward step in the course of a lengthy cross-examination and, to say the least, gave as good as he got. I note that he persistently returned to the theme that all of his conduct was driven by a mistaken belief that he and his company were liable under the guarantee, even when the question asked of him did not involve the issue. On occasions he did not bother to answer the question addressed to him in his determination to argue his own case, in an effort to convince me on the main issue. He was reminded many times, often by his own counsel, to address the questions asked. More than once I suggested to him that he would serve his interests better if he gave me evidence of the facts and left the argument to Mr. Glick. Mr. Armstrong was apologetic about his lapses in that respect but was at all times, in my evaluation, in control of himself and what he wished to say. There is nothing wrong with that but I note that Armstrong was quite critical as a witness, frequently describing a question as ridiculous. He was prone to describe anything contrary to his interests as "absolutely

36.                    JUDGMENT

incorrect". I have not formed the view that Mr. Armstrong
told me any deliberate untruth, although I have formed the
view that he has not given evidence of all of the matters
that occurred, which arguably form part of the sphere of
debate as to what were the matters that influenced him to pay
out the bank. Mr. Armstrong was a very experienced
businessman and, in my opinion, a capable one. The group of
companies which he controlled transacted substantial business
with a turnover of nearly $60,000,000 a year. I.E.A., which
in effect was his company, had paid $400-$600,000 for Jones
Printing, acquiring it from a life-long friend.
Notwithstanding that there were much more substantial
companies which formed the core of his business activities,
the sum of money expended is not inconsiderable. Indeed, he
is suing in the Supreme Court of Victoria for less than half
of that amount.

I accept that Moss had a gift of his shareholding
and in addition a car and a house. No real explanation was
given to me as to why Armstrong through I.E.A. was so
generous. I do not accept Armstrong's evidence that he had
"no idea of the value of Jones Printing in November 1987",
nor that he was substantially detached from knowledge of the
conduct of his affairs. Whilst I accept that it was left to
Moss, who had a printing background, as managing director to
run the company on a day by day basis, I do not find credible
the suggestion that Armstrong, who was attending monthly
meetings as to the trading figures on his own admission, was
not keeping generally abreast of the asset/liability position
of the company, or its costs. He was at all times aware that

37.                                JUDGMENT

he and I.E.A. had given a guarantee in respect of the
company's debts, even if, as he claimed, he had forgotten the
extent of the guarantee by November 1987. Moreover, it is
thoroughly contrary to my impression of Mr. Armstrong that he
would ignore the investment, or for that matter the
management of the gift he had given to Moss. Moss was an old
friend, and the families knew each other well. There must
have been frequent contact in the 18 months from the date of
acquisition of Jones Printing to November 1987.

Even more damaging to Mr. Armstrong's claim that he
had no idea of the state of the company, nor its debts, is
that he had sold off the insurance part of Jones Printing by
negotiations which were going on as late as September 1987,
perhaps even still in November (vide Lines' evidence).
Armstrong made no reference in his witness statement nor his
oral evidence in chief, as to the Norwich Winterthur
negotiations in 1987. He was instructing his staff during
breaks from the giving of evidence to pursue documentary
details of the Norwich transaction. He produced no document
either with respect to the terms and time of sale of part of
Jones Printing to Norwich Winterthur in 1987, nor, after
correction on oath of the date of December 1987 to December
1988, as to the sale of the remnant of Jones Printing.

He had sacked Moss before the end of November 1987
and I.E.A. had acquired Moss' shareholding in December. Moss
was never called as a witness, although there were a
multitude of issues raised in relation to the value of the
assets of Jones Printing at the time of the assignment of the
first ranking debenture of the bank to I.E.A.. It may be,

38.                                    JUDGMENT

although I cannot find it as a fact, that he was suspicious of Moss' running of the company after mid 1987. It appears that he had put outside auditors, Arthur Andersen & Co., in by October 1987. He sent Lines to Jones Printing in mid November to talk to Arthur Andersen's staff. According to Lines, he had been there two or three days when the bank arrived on the 17th to put in the agents. He claimed he had not made any contact in that three days with Armstrong, although he agreed he had examined bank statements in the period. Mr. Armstrong had claimed the Norwich deal was concluded by August/September with no outstanding obligations to be met.

The issue, apart from credibility, is relevant in this respect, that it was likely to have been of significance to him that a subsidiary of I.E.A. should not be seen to have been in breach of its tax obligations, and had been so mis-managed that the bank put in agents in possession. Lines' evidence was that at about the time the agents came the Norwich Winterthur deal was still under discussion. I.E.A. was an established company conducting high profile insurance business, or managing it, viz., AFL Insurances, IOOF Insurance and most of Melbourne's community credit unions. It still had a management role to perform for Norwich.

There is no doubt that Anzarut served the demands on Armstrong, for himself and I.E.A., on the morning of 18 November. It does not appear to be denied that Armstrong read them in the presence of at least Adams, Silk & Anzarut. Armstrong said he read them out loud twice; the first so that Lines could hear it and the second, out loud, so that he could

39.                                          JUDGMENT

understand it.  I note that Armstrong read many documents
whilst in the witness box and read them all to himself.
Armstrong's recollection is that, in addition to the language
of the notice of default, that Adams confirmed that legal
action could be taken by the bank within 24 hours, that legal
action was otherwise threatened in the course of the
conversation, and that a number of references were made to the
guarantee in the context of discussions concerning what
Armstrong and I.E.A. might do in relation to the bank's debt.

He claimed that it was Adams, or Silk, who inquired
whether he knew that the bank was owed $540,000 (No);  that
he was aware that $160-180,000 of statutory liabilities was
still outstanding (No.);  and then, in an apologetic way and
certainly non-hostile way, Adams said the bank wanted to have
their money repaid.  Adams denied that there had been any
oral mention of the guarantee in the course of the
conversation and denied that any legal action had been
threatened.  Armstrong agreed that no demands were made by
Adams on I.E.A. or him for payment of the statutory
liabilities.  He said that he believed that if he did not pay
them BNP Pacific would not accept payment even of the whole
debt.

Adams says that, whoever raised the issue of the
statutory liabilities, the bank had no standing to demand
their payment but in effect he made it clear that unless they
were paid the bank would not remove the agents.  Ultimately,
it seems to me, that Armstrong accepted that in his evidence.
I accept the evidence of Adams and reject the evidence of
Armstrong that legal action was verbally threatened and that

40.                                              JUDGMENT

the guarantees were mentioned, as an implied threat, in the course of the conversations. I note that Lines' recollection was that guarantees were not mentioned in the course of the conversations (other than when the notice of default was read) and that no legal action was threatened outside that context.

I have already referred to the conflict of evidence between Armstrong and Adams as to whether there had been a conversation on the previous afternoon. Mr. Glick relied strongly on the fact that Adams had no note of any such conversation, that it was not recorded in any bank memorandum, and that it was not mentioned in his witness statement. Notwithstanding those omissions, I am satisfied that a conversation did take place on the previous day between Armstrong and Adams. The failure for it to be included in any contemporaneous memorandum, either of Adams or Silk, is of no particular significance as the meeting on the 18th, during which the deal was done, was recorded. So far as the witness statement is concerned, it does not appear to me that it would have been in any way thought to be of significance to refer to what must have been a brief telephone conversation. However, on closely observing both witnesses about this aspect, I accept the evidence of Adams. Notwithstanding that, I am unable to conclude with any confidence as to what the detail of the conversation was, other than that there was a reference to a meeting of the next day, that the bank wanted its debt paid and that the agent would remain in until arrangements were made.

41.                                                        JUDGMENT

With reference to this aspect, and on a general
credibility basis, I am satisfied that Armstrong was told on
the 17th, the day before the meeting at I.E.A., the amount of
debt and what the bank's demand was.  He gave conflicting
evidence about this, saying at one stage that he did not know
the extent of the debt until the 18th.  In cross-examination,
however, he conceded that he was told by Moss on the previous
day, in a telephone conversation made at about the time or
shortly after the agents arrived or left, that the bank was
owed in excess of $500,000.

He also had one or possibly two conversations with
Lines who had been present throughout whilst the agents were
there.  It is beyond belief that a man with the business
acumen and intelligence of Mr. Armstrong simply waited until
the next dat to see what the bank said.  In my view, it is
probable that he had Lines send to him the documents served
on Jones Printing on the 17th and had discussions with Lines
and/or Moss later that day.  I note that he referred to a
telephone conversation "that night".  I have concluded that
he did telephone the bank and speak to Adams and was given
general information about the extent of the debt, that the
bank wanted something done about it and that the bank's
agents in possession would stay there until the debt was
paid.

I also find that it is likely that Armstrong had
obtained information from Moss or Lines as to the unpaid
group and tax liabilities.  He had already decided they would
be paid forthwith.  It was because of that he was able to
tell the bank representatives on the next day that they would

42.                              JUDGMENT

be paid that day. It was Armstrong who brought that issue
up. He had also, in my view, decided that he could access
the moneys coming in from the CIC settlement to discharge the
Jones Printing debt to the bank. He admitted that he knew
from February 1986 that the bank's debt was secured, that
there was a debenture and that both he and I.E.A. had given a
guarantee. Of course, his evidence was that he had forgotten
that the guarantee was limited rather than unlimited. It is
common ground that the bank either told him, or agreed with
his proposal, that if the statutory liabilities were paid
that day and their payment evidenced by production of a
receipt, the agent in possession would be removed. It is
common ground that this was in conjunction with a promise by
Armstrong for I.E.A. that he would pay the whole of the
outstanding amount on 1 December from the CIC funds and that
he would give an Irrevocable Authority to enable the bank to
obtain the payment of its debt from those funds said to be
excess of $2,000,000. It is admitted that it was Armstrong
who asked for the assignment of the debenture and that Adams
agreed that would be assigned upon the payment of the
outstanding money. This issue of the debenture was discussed
in this conversation.

      Mr. Armstrong said in his evidence in chief, that
he would not have paid the whole of the debt had he not
mistakenly believed he and I.E.A. were liable under the
guarantee to meet the whole amount. However, he also said
under cross-examination that I.E.A. would have paid the
amount anyway whether or not the bank required them to be

43.                         JUDGMENT

paid because Jones, and he as a director of Jones, was liable to pay them.

There is a dispute as to whether or not the agents stayed on as agents in possession. I accept the evidence of McVeigh that upon production of the receipts, they retired as agents in possession but some of the staff remained over the next fortnight to assist in the management of the company. Lines appeared to confirm this. It should not be forgotten that two reports of the accountants had emphasised the mess in which the company was and its failure, because of the absence of outside control, to implement the appropriate procedures. I note the plaintiff failed to call anyone from Arthur Andersen & Co which was there before and after the bank's agents had been put in.

Apart from the facts to which I have referred, a critical part of the evidence concerns whether or not the mistake made, apparently, both by Armstrong and the relevant bank officers and their solicitors in believing that the Armstrong and I.E.A. guarantees were unlimited, induced or caused Armstrong, to any degree, to make the overpayment or, to discharge the whole of the Jones Printing debt. Armstrong said it did and his maintained desire to tell me so created a serious inability in him at times to concentrate on what was said to him.

Mr. Glick's submission was that, once the misleading conduct was conceded as it was, then it was but a short and logical step to conclude that the mis-statement in the document, or by the bank individuals on the 18th, must have played some part, even if only a minor part, in payment

44.                                        JUDGMENT

by I.E.A. of the whole of the Jones Printing debt to the bank.

Notwithstanding that I was at one time attracted to this proposition, I have finally concluded that the guarantee played no part in Armstrong's decision. There are a number of reasons which lead me to this conclusion. They are both intertwined and cumulative and no reason is more potent than any other. The reasons are, to some extent, underwritten by the views I have formed as to Mr. Armstrong's credibility. By that I do not mean that I formed the view that, as I have earlier stated, that he was deliberately giving false evidence. It is likely, I think, that Mr. Armstrong, having later on found out that the guarantee was for a lesser amount, has reconstructed events to accord with his company's interests. He may well now believe that the mistake about the guarantee was of importance at the time. However, I am convinced that it was not of any significance to him. In my view, the following matters were of significance to the Armstrong-I.E.A. decision, and the guarantee was of no significance.

Armstrong was the visible head of a large corporation. He had been in business for many years and had, I have little doubt, a well-justified pride in his business reputation. The I.E.A. group either controlled or managed large insurance enterprises well known to the public and the business community. It may be that, after settling the Norwich deal, he paid little attention to Moss' management of the company although I am confident that he had a good grasp of what its value probably was. When he discovered, as I

45.                                    JUDGMENT

find that he discovered, on 17 November that the bank debt
had blown out to in excess of $500,000 and that the bank had
already put agents in possession into Jones Printing, he
decided that it was essential to get the agents out and
essential to keep the mis-management of the company, of which
I.E.A. and he owned more than half, as quiet as possible and
certainly out of the public domain. I suspect that he
suffered considerable angst to find that his generosity to
Moss, almost certainly contrary to the business principles
which guided him, had created a source and cause of possible
damage to his business reputation and probity, on which he
placed considerable store. Having confirmed the worst, he
was not the kind of man who would wait until tomorrow. I
believe that he contacted Adams and had a confirmation of the
broad picture. In particular, I am satisfied that for a man
such as Armstrong the neglect of a company which in effect he
owned and controlled to pay its taxes, and other statutory
liabilities such as workers' compensation and the like, was a
humiliation not to be borne. He determined that there would
be a quick result to this and he effected it within the hour
on 18 November. A number of the witnesses referred to his
statement that he wanted the matter resolved and resolved
quickly. He said so himself. Furthermore, notwithstanding
his evidence to the contrary in the sense that he said he had
no idea what the net worth of Jones Printing was, I am
satisfied that he believed that it was well worth saving.
After all there was substantial and valuable machinery, in
respect of which $246,000 was still owing and which would be

46.                                      JUDGMENT

discharged as payment of the Jones Printing debt, and the debts. I refer to the company's value later.

When asked whether he was concerned to keep Jones Printing going, he said that "his only concern was in respect of myself as the managing director of I.E.A. ... and I.E.A.'s contract to manage the business of the Insurance Exchange of Australia Group for the next 10 years as per the agreements entered into August and September", claiming that was mentioned at the meeting on the 18th.

No other person said this was mentioned but it is a revealing perspective on what he was then concerned about. It provides the reason why he would determine, quite independently of the issue of the guarantee, to settle the matter up by paying out the bank. It also suggests that he was concerned about the effect of this debacle on I.E.A.'s on-going obligations to continue its management role, if it were not settled quickly. Indeed he said, claiming that it was mentioned at the meeting "I wanted to pay the debt because I was the managing director of the group and did not want legal proceedings against me but I.E.A. had to pay the debt because it didn't want legal proceedings against it."

Mr. Armstrong conceded that his view was that Jones Printing was set to make a good profit ($110,000). He had paid something between $400,000 and $600,000 (he failed to produce any document concerning the price actually paid) only 18 months before. I note that there is evidence that he had said that he wanted to keep Jones Printing going, that he attached value to it. At the meeting on the 18th, he was alert enough to ask the bank to assign the debenture to

47.                                    JUDGMENT

I.E.A.. At that point of time, he had had no legal advice of which I know. He did not ask either to see a copy of the guarantee or for it to be given to him at the time of settlement.

Mr. Francis Galbally, in conjunction with the bank's solicitors, prepared the Irrevocable Authority to direct the deduction of the bank's debt from the CIC settlement funds. Armstrong did not ask Mr. Galbally to check the guarantee either before or after the meeting of the 18th. This seems to me to be of significance. The omission was probably due to the fact that the guarantee had nothing to do with the decision he had made. Mr. Armstrong in effect said to me, in explanation of his failure to remember that the guarantee was limited to $325,000, that there were hundreds of guarantees given by him in association with I.E.A. as explaining why he did not recall this one. But, he did recall that there was a guarantee; what he forgot was the limit. It does not appear that he had entered into another other guarantee with this bank, which was in effect a foreign bank.

Furthermore, Armstrong stated in his evidence that he thought that he was legally obliged to pay because he was a director of Jones Printing and that he caused I.E.A. to pay that debt because he was worried about his personal liability as the director of an insolvent company that was trading at a loss.

For these reasons, I have reached a positive conclusion that the mistake made by the plaintiff as to the extent of the guarantee played no part in inducing or causing

him to decide to discharge the whole of the debt. In my view, he dismissed the guarantee from his consideration.

Having regard to the legal principles to which I have referred, this finding leads to the conclusion that the plaintiff fails on both the mistake-restitution claim and the s.52 claim on the basis that I have concluded that neither the mistake, nor the misrepresentation amounting to deceptive and misleading conduct, caused or induced the loss. In those circumstances, it is unnecessary to determine the other issues raised for consideration.

However, in deference to the arguments of counsel and in order to assist any other court on appeal, I should briefly state the conclusions I have reached in respect of the other matters raised.

The burden lies on the defendant, if I were otherwise of the mind that causation-inducement had been established, to establish the giving of valuable consideration or a change in position.

As to their defence of valuable consideration, I have reached the conclusion that such valuable consideration was given. It was the plaintiff which proposed, or required, the assignment of the debenture for the payment by the plaintiff of the Jones Printing debt. That deed specifically expresses (cl.1) that the assignment of the debenture is in consideration of a payment by I.E.A. to be the sum set out elsewhere in the deed. The parties themselves, by the deed, agreed that there was consideration. There is no matter raised which would warrant any consideration of principles of equity that might entitle going behind the deed, which will

49.                                JUDGMENT

not be inquired into. Mr. Armstrong questioned about this,
stated in his usual argumentative way, that he got a
debenture over a company which he owned 100%. However, at
the time of entering into the deed I.E.A. did not own the
company 100% as the transfer of the shares from Moss to
I.E.A. occurred later in the month of December. Moreover,
the obtaining of a first ranking debenture by I.E.A. had
value in that I.E.A. ultimately gained control of all the
assets of Jones Printing unencumbered and, furthermore, Jones
Printing was freed of the obligations to the Bank imposed on
it by the terms of the debenture. In the event, the
agreement on 18 November of the bank to assign the debenture
by way of formal assignment obliged the bank, on payment of
the money, to perform an act which absent the agreement it
would not have had to perform. I am quite satisfied that
Jones Printing did have net assets (a matter to which I shall
shortly refer).

The second defence was change of position.
Firstly, the assignment of the debenture itself constituted
some alteration in position because the bank gave up its
security. That security, in my judgment, must have at least
realised, if exercised, the amount of the overpayment namely
approx. $244,000. The critical mistake in this context is
the mistake made by the plaintiff. If one assumes that the
mistake was the cause of the loss (contrary to the findings I
have made) then the bank accepted a sum of money which
arguably it would have to return on the basis of the
applicable principles as pronounced in Davis Securities. Its
change of position in that respect was that instead of

50.                                    JUDGMENT

exercising its powers under the debenture, which I conclude would have enabled it to recover its debt, it would, if the plaintiff succeeded, be obliged to return the overpayment. In my judgment this constitutes a change of position with detriment. It has never been argued by the plaintiff that the moneys were not lawfully due to the bank.

The third matter argued by way of defence was that the plaintiff had not established any loss, that is that the plaintiff obtained control of Jones Printing by paying out the bank's debt of the company. This, it was contended, meant that it got control of a company the net assets of which were sufficient to meet the overpayment. That is, that Jones Printing could have paid $244,000 to the parent. I.E.A. could have called upon the subsidiary to pay the sum of $244,000 to it, and then paid the balance of the $325,000 due by it under the guarantee.

Mr. Houghton's submissions were that as a consequence of I.E.A. getting the first ranking debenture, it sustained no loss at the net value of the company was in excess of $550,000. He relied upon the evidence of Mr. McVeigh and Mr. McDonald, two accountants who had reported on the company's value at the relevant time - the KPMG report of November 1987. Mr. Glick, indeed, conceded that if the value of the debenture was proven to be of sufficient value, then his client would be bound to fail because the bank had given up the right to sue.

He claimed, however, that the evidence was wholly unsatisfactory on this aspect. He first claimed that the

51.                                                    JUDGMENT

accountant who actually examined the documents, one Priestley, was not called.

It is probably true to say that McVeigh had not seen the primary documents, or at least not all of them, and had relied upon Priestley's provision of what they said. However the plaintiff has known for some time, by virtue of discovery, of the reports of the bank's accountants which set out all of the relevant matters to be taken into account in determining the value of the company on the basis of an unaudited appraisal.

In the list of witnesses provided by the plaintiff there was included both Mr. David Beatty of Arthur Andersen and Mr. Neil Smart of KPMG, which firm was also the general accountants for the plaintiff. Neither of those witnesses were called although both of them, particularly Arthur Andersen, who were doing the audit, were in a position to give both practical and opinion evidence about the matters dealt with. No explanation of the failure to call them was advanced.

Mr. McVeigh made a number of concessions as to matters which might be included as off-sets of the realization, e.g. some diminution in the inventories to substantially below $100,000. However, he rejected the suggestion that the fixed assets included the figure of $180,000 for goodwill, relying instead upon the valuations (CB.199-203). These were valuations of plant and equipment some of which was by no means new. McVeigh expressed the opinion and there was no evidence called to contradict it, that, while some equipment such as computer equipment would

52.

JUDGMENT

have become superseded, other established equipment in his experience did not lose much value over time. Additionally, there was a figure of $340,000 in the accounts for debtors and, even making some allowance for doubtful debts, McVeigh obviously considered that as not to be greatly diminished. Even with the diminution process suggested in cross-examination, it seems to me that it is difficult to arrive at a gross figure of much less than $600,000 for realizable assets which an agent in possession, or the plaintiff, if it sought to exercise its debenture, could have realized to meet the moneys paid out to the bank. None of this includes the cost of administration.

Mr. Armstrong in effect said that on the sale of the remnant of Jones Printing at the end of 1988, a figure of about $1 was put in as the value. However, this was not explained in any detail in the evidence and, of course, more than the year had gone by. It would be unsafe to draw any inferences as to what had transpired in that period as to the alteration in the assets of Jones Printing.

Although it is not necessary for me to decide the issue, in view of my conclusions in respect of inducement/reliance, I am not satisfied that the plaintiff sustained any loss as a consequence of the mistake. This is simply because it built into the arrangement the acquisition of Jones Printing, the realizable assets of which appear to me to have substantially exceeded the over-payment. For the reasons given, I conclude that the plaintiff's claim must fail and accordingly there will be judgment for the defendant in the proceeding. I will hear counsel on costs if necessary,

53.

JUDGMENT

but otherwise the plaintiff will be ordered to pay the
defendant's cost of the proceeding including the reserved
cost.

---

**CERTIFICATE**

I certify that this and the 53 previous pages are a true
copy of the reasons for judgment of Hedigan, J. of the
Supreme Court of Victoria delivered on 28th June 1994.

DATED this  28th  day of  June  1994.

...................................
Associate

54.                                    JUDGMENT