# EXHIBIT B



# Report of the Inquiry into certain Australian companies in relation to the UN Oil-for-Food Programme

## Volume 1

### Summary, recommendations and background



Commissioner
The Honourable Terence RH Cole AO RFD QC

November 2006

## Inland transportation fees

3.6  The Independent Inquiry Committee found:

> On June 10, 1999 (Phase VI), the Iraqi Economic Affairs Committee issued a directive ordering ministries to impose non-negotiable 'transportation fees' on all goods requiring inland delivery by Iraqi trucks. This tariff was levied on all cargoes delivered to Umm Qasr and sometimes on cargoes shipped overland to Iraq. The Economic Affairs Committee set these fees depending on the kind of goods being transported, the form of packaging, the point of entry into Iraq, and the phase in which the contract was signed. The fees were payable to designated Iraqi entities and regime-controlled front companies. Although the Ministry of Transportation oversaw the collection of these funds, a fee schedule was circulated to all Iraqi ministries at the beginning of each phase.[1]

3.7  The finding quoted was based on interviews the Independent Inquiry Committee conducted with Iraqi officials and noted a letter dated 10 June 1999 ordering the imposition of transportation fees from Umm Qasr. The United Nations did not make available to this Inquiry that letter and the statements of interviews. The finding accords, however, with the evidence called before this Inquiry, that from June 1999 AWB was required to tender on the basis of payment of such a transportation fee, and all subsequent contracts required delivery of wheat 'FOT to silo at all Governorates of Iraq'. In fact, such inland transportation fees were paid by AWB in US dollars, euros or Deutschmarks and were paid indirectly to the Government of Iraq through Ronly Holdings Limited, shipping companies and Alia for Transportation and General Trade.

3.8  As noted in the Volcker report, and by AWB executives considering the required payment, the exporters were not required to make the payments from their own funds: the amount of the inland transport fee was added to the otherwise agreed contract price and included in the price in the contract submitted to the United Nations and paid from the escrow account. The financial disadvantage to exporters was one of timing because Iraq required payment of the transportation fee in advance of arrival of the goods.

## The after-sales-service fee

3.9 On 3 August 2000, shortly after the start of phase VIII, Vice-President Ramadan issued a 'confidential and urgent' memorandum to all ministries. The subject was 'Achieving additional revenues for commercial contracts pertaining to the Memorandum of Understanding'.[2] (The Memorandum of Understanding, dated 20 May 1996, was that agreed between the United Nations and Iraq to implement Resolution 986.)

3.10 The Vice-President's memorandum of 3 August 2000 stated:

> The issue of achieving additional revenues for commercial contracts pertaining to the MOU was discussed in a meeting held on 2/8/2000 by the Supreme Command Council, who oversee the execution of the Memorandum of Understanding, in an orderly fashion and in conformity with the Memorandum's mechanism. It has been decided to execute the following:
>
> 1. Gather all commercial contracts by content with the title:
>
>    'After Sales Services or any other suitable version that achieves the purpose and also based on the nature of the contract.'
>
> 2. The allocated percentages for bullet (1) above will be as follows:
>
>    a. 2–5% for food and medication (excluding medical tools and equipment)
>
>    b. 5–10% for everything but food and medication.
>
> 3. The designated minister and the head of the entity not related to a ministry are authorized to determine the rate amount in bullet (2) above, based on the nature of the materials that are under contract and at the highest rate whenever possible.
>
> 4. a. The Ministry of Transportation revisits the tariff for the currently adopted transportation fees, port and storage services aiming to increase it at a rate of no more than 80% of the adopted tariff in ports of neighboring countries.
>
>    b. The Ministry of Transportation raises the mentioned amendment bullet (a.) above to the financial committee to be endorsed and work accordingly.
>
> 5. **All the increases mentioned in bullet (2) above that are generated from the after sales services as well as the increase resulting from amending the tariff for transportation costs, and port and storage services fees, are to be transferred to general treasury.** [emphasis added]
>
> 6. Income generated from after sales services are to be handed over in cash inside Iraq, or to a banking entity determined by the Iraqi side according to pre-determined banking arrangements, in the case that handing over the money in cash inside Iraq fails.

> 7. The above mentioned procedure is to be applied to all commercial contracts that have not been signed in a final form yet and for all phases.
>
> Please review and take the necessary action, confirming the execution of the mentioned process in an accurate and clear manner under the supervision of the delegated Minister.
>
> Signed
> Taha Yassin Ramadan
> Vice President[3]

3.11   It is apparent from this document that Iraq intended to seek to obtain additional revenue in foreign currency both by increasing transportation charges and by imposing an after-sales-service fee. Such monies were to be transferred to the 'general treasury'. The monies were to be paid in cash in Iraq or, where that was not possible, through banking arrangements made by Iraq. The fee was to apply to all commercial contracts in all phases of the Oil-for-Food Programme.

3.12   Consistent with the desire for increased revenues, on 6 August 2000 the Council of Ministers Economic Affairs Committee, headed by Deputy Prime Minister Al-Azawi, issued a 'confidential and urgent' memorandum to all ministries (see Figure 3.1). The subject was 'Tariff for transporting MOU goods'.[4]

3.13   Two things are apparent from paragraph 3 of the memorandum. First, it was Iraqi instrumentalities that were providing services for the transport and port services. Second, the Iraqi Government recognised the need for 'front companies' in order to enable companies exporting to Iraq to make the payments.

3.14   The Iraqi objective of removing the sanctions by seeking to circumvent them was made clear in a 25 October 2000 memorandum sent to all ministries and signed by the head of the Secretariat of the Council of Ministers. The memorandum read:

> The President and leader (may God protect him) has ordered the following during the 44th Council of Ministers' meeting held on 22/10/2000.
>
> 1. The final outcome with respect to the 10% of the value of contracts that are made with external entities is considered the minimum per contract, exclusive of transportation fees. Any percentage above that will be welcomed, as this is the way sanctions are lifted. For this reason we want to provoke them so that they are faced with two options: either accept reality or lift the sanctions. With regards to oil contracts, they will be discussed by the Financial Affairs Committee and a report will be developed.