# EXHIBIT F

UNCLASSIFIED

RELEASED IN PART
B6

*N3*

# The Future Of Iraq Project



## Transitional Justice

# Working Group

UNITED STATES DEPARTMENT OF STATE
REVIEW AUTHORITY: SHARON E AHMAD
DATE/CASE ID: 12 AUG 2005   200304121

UNCLASSIFIED

UNCLASSIFIED

**Transitional Justice Working Group**

**TABLE OF CONTENTS**

Tab 1:        * The Road to Re-establishing Rule of Law and
             Restoring Civil Society

(*) Reflects consensus of the participants in the working group.  Other papers
reflect the views of their authors.

UNCLASSIFIED

UNCLASSIFIED

**Transitional Justice
in Post-Saddam Iraq**

# The Road
## to
## Re-establishing Rule of Law
## and
## Restoring Civil Society

**A Blueprint**

Report of the
    Working Group on Transitional Justice in Iraq, and
    Iraqi Jurists' Association
    (March 2003)

UNCLASSIFIED

UNCLASSIFIED

## Table of Contents

I.    Executive Overview.................................................................. 4

II.   Transitional Justice Plan...................................................... 5
      A. Dealing with the Past
            1. Truth, Accountability and Reconciliation...................... 6
                  a. Prosecution v. Truth Committees....................... 6
                  b. Truth Committees......................................... 7
                  c. Reconciliation Mechanisms............................. 8
                  d. Prosecution.............................................. 9
                        i. Legal Basis for Prosecution.................... 9
                        ii. Court Structure................................. 10
                  e. Defenses--The Problem of Immunity................ 12
                  f. Amnesty................................................... 12
            2. Victims Compensation and Reparations..................... 13
            3. Recovery of Misappropriated Public Funds................. 14
            4. De-Baathification........................................................14
                  a. Revocation of Ba'ath Party Privileges...............14
                  b. Memorialize Ba'ath Era for Future Generations ...14

      B. Building the Future
            1. Legal Reform............................................................16
                  a. Criminal Law............................................ 16
                  b. Military Penal Code.....................................17
                  c. Nationality Law  .........................................18
                  d. Administrative Law  ....................................18
                  e. Civil Law  .................................................19
                  f. Interim Laws  ............................................20
            2. Institutional Reform...................................................20
                  a. Judiciary..................................................20
                  b. Internal and Other Security Agencies  ...............22
                  c. Military Service ( The draft )..........................23
                  d. Prison System...........................................24
                  e. Institute for Legal Reform/Training of Lawyers.....25
            3. Proposed Constitutional Principles..............................25
            4. Recommendations for Authority in Transitional Phase......27
            5. Public Education and Awareness of Human/Civil
               Rights  .................................................................30

UNCLASSIFIED

UNCLASSIFIED

Table of Contents (Cont'd)

APPENDICES

**Model Codes and Draft Interim Laws**

Truth, Accountability and Reconciliation

A.    Draft Law for Amnesty & Reconciliation Process w/Chart
          1. Organizational Chart for Truth, Accountability and Reconciliation Process
B.    Draft Law of Victim's Compensation
C.    Draft Law to Recover Public Funds
D.    Draft Law to Dissolve Ba'ath Party and It's Privileges

Legal Reform

E.    Draft Law to Repeal Amendments to Penal Code/Criminal Procedure
F.    Draft Law to Repeal Military Code Service of Process Provision
G.    Draft Law to Repeal  the Nationality Law
H.    Draft Law to Repeal the Ruling Party Law

Institutional Reform

I.    Draft Law to Eliminate the Special and Emergency Courts
J.    Draft Law to Amend the Judicial Reorganization Law
K.    Draft Law to Abolish the Special Security Apparatus
L.    Draft Law to Amend the Law of Prisons
M.    A Bill of Human Rights and To Establish Human Rights Organization

**Background Studies/Reports**

Truth, Accountability and Reconciliation

N.    Ways to Activate the Reconciliation Process in Iraqi Society
O.    Report on the Responsibility and Reconciliation Committee
P.    Special Pardon and General Amnesty
Q.    Report on the Proposed Amnesty Law
R.    The General Amnesty Law
S.    Observations (On Truth & Reconciliation Process)
T.    Victim's Compensation
U.    Facts Gathering Commissions

UNCLASSIFIED

UNCLASSIFIED

Legal Reform

V.    Penal Code
W.    Nationality Law
X.    Administrative, Civil, Property, Commercial, Ba'ath Privileges, Transitional

Institutional Reform

Y.    Report of the Institutional Reform Committee
Z.    Criminal Courts and the Formation of Investigation Courts and Bodies
AA.   Post Conflict Justice Mechanisms
BB.   Post Conflict Education

**List of Participants**

UNCLASSIFIED

# I. Executive Overview

### Background

The Working Group on Transitional Justice of the Future of Iraq Project (Working Group), in cooperation with the Iraqi Jurists' Association, commenced the development of this Transitional Justice Project in meetings starting in July of 2002.

Comprised primarily of prominent former Iraqi judges, lawyers and law professors, the Working Group embarked on this project in consultation with international experts in the areas of international criminal law, truth and reconciliation, post-conflict justice and military reform.

These jurists came together with a common purpose and a singular objective. The common purpose was to assert that in order to achieve civil society in a future post-Saddam Iraq, it must be founded on the principle of respect for the rule of law. Their singular objective has been to identify and document the necessary procedures, mechanisms, rules and laws to initiate the transformation of Iraq to a society governed by the rule of law.

### Premise

There are two primary aspects for the concept of the rule of law. The first is that all persons are accountable under the law regardless of their rank or position in the country, including the head of state. The second is to provide the citizens a credible means to address legitimate grievances and to avoid self-help justice characterized by acts of vengeance.

At the outset, it was universally recognized that the foundation for a society governed by the rule of law is an independent judiciary. By contrast, the government of Saddam Hussein went to great lengths to subvert each of the major powers of state (ie. legislative, judiciary and executive) to the central authority of the president through the Ba'ath party apparatus.

The role of an independent judiciary cannot be over-emphasized, particularly in a society where individual rights and freedoms have been trampled upon so comprehensively as they have been in Iraq under Saddam Hussein.

### Vision for the Future

The vision of the Working Group for a future Iraq is one founded on the notion that the laws and institutions of state must be restructured and reformed to serve and protect the interests of its citizens. This is in stark contrast to Saddam's practice of manipulating every instrument and agency of state to protect and serve his regime. In order to re-establish civil society in Iraq, there must be a clear departure from the past and a clear focus placed on the welfare of the Iraqi people.

UNCLASSIFIED

## II. Transitional Justice Plan

This Transitional Justice Plan is aimed at transforming an unstable and chaotic state, caused by a dictatorship with a legacy of gross human rights abuses, to a democratic pluralistic system which respects the rule of law.

Transitional justice in the context of Iraq today demands sincere efforts to create the environment of trust and confidence in a new system, particularly a judicial system which establishes the rule of law in all of its meanings. This includes the general public's respect and confidence in the legal system to resolve disputes, prosecute crimes and also the important task of holding all people accountable regardless of rank or position.

In the case of Saddam Hussein's regime, the prolonged, widespread use of terror and violence against the Iraqi people requires a systematic and comprehensive approach to transitional justice. Such an approach will necessarily have to deal with the past crimes of the regime as well as to proactively create the environment for a future which respects the rights of all Iraqi citizens with coherent laws and reformed institutions.

Addressing the regime's crimes through open and fair trials for those suspected of war crimes, crimes against humanity and other serious abuses is a cornerstone of this plan. In addition, Truth Committees with a mandate to discover the truth, establish a record and disseminate this information on the national and international levels are proposed. Victims' compensation mechanisms are recommended as a key element in the effort to inhibit potential public demands for vengeance.

Building a future on the basis of respect for the rule of law requires a thorough review of the system of laws left behind by this regime to identify, remove and/or replace those provisions which violate internationally recognized basic human, civil and political rights. Beyond reforming the laws, major reforms are also required for key institutions to re-establish their roles to protect and serve the public in contrast to their current capacity to protect and serve the regime of Saddam Hussein.

In parallel with these reforms and the truth, accountability and reconciliation processes, a far-reaching program to educate and re-train professionals in various fields is needed to promote basic values of public service and protection of individual rights. An additional component to the education program is to raise public awareness of the essential rights and responsibilities of citizens building a civil society in all spheres of life, including schools, colleges, the media and other public forums for the long-term transformation of the institutions and society in general.

The following sections are concrete recommendations and draft laws in each of these important areas:

UNCLASSIFIED

# UNCLASSIFIED

## A. DEALING WITH THE PAST...

It may be impossible for Iraqis to confidently and boldly face the challenges of an uncertain future, without first taking a hard, sober look at the past decades under Saddam's rule and thereafter directly addressing the fallout from the widespread crimes and repressive policies which are the hallmark of his regime. Re-establishing the rule of law and preventing individuals or groups from resorting to mob-justice requires a genuine, meaningful process to identify, prosecute and hold perpetrators of crimes accountable for their actions.

Beyond the major crimes, an active truth and reconciliation process is required to identify, record and disseminate information about what transpired under this regime. Additional remedies other than deprivation of liberty such as personal payment of victims' compensation, community service and lustration mechanisms are available for those offenses which do not rise to the level of major crimes.

### 1. Truth, Accountability and Reconciliation

#### a. Prosecution v. Truth Committees

The Iraqi regime's crimes against humanity are some of the worst in world history. Although, they have been amply recorded, they are extremely difficult to quantify with any precision.

Having established this fact, it remains necessary to give hope even to some of the perpetrators of less serious abuses. This may be done by a plea bargain offering amnesty for those who defect, or expose the regime's crimes and the persons involved. Such an offer can be made pursuant to law No. 23 of 1971 of the Criminal Procedure Code. (Note- all code references refer to the Iraqi legal codes unless specifically indicated otherwise) Article 29 of this law states:

1-    The investigative judge may offer amnesty with the approval of the criminal court for reasons set forth on the record in the case against any person accused of wrong doing with a view to obtaining their testimony against other perpetrators provided said accused presents a complete, truthful account. If the offer is accepted, the testimony shall be heard and the accused shall retain his/her status until a verdict is reached in the case.

2-    If the accused does not present a complete, truthful account, he/she shall lose his/her right to amnesty by decision of the criminal court.

3-    If the court finds that the account presented by the accused offered the amnesty is complete and truthful, it will cease all criminal proceedings and release said accused pursuant to the terms of the amnesty.

Tenets of the Islamic law may also be used in this connection, especially those that allow the victim or the victim's relatives to forfeit their rights against the perpetrator upon reconciliation, in an act of Forgiveness.

However, it must be made clear to all Iraqis that the law shall be firmly and severely applied against those who resort to score-settling or vengeful acts irrespective of their status. The point must be emphasized

# UNCLASSIFIED

# UNCLASSIFIED

that the principles of transitional justice shall be uniformly enforced against offenders in fair trials where the deserving parties shall be justly compensated for damages.

### b. Truth Committees

There is a strong link between truth and reconciliation committees and the qualified amnesty of certain crimes to be later defined.

The truth and reconciliation committees are set up and their functions are defined by order of a judicial council. They are to do everything necessary to reveal the truth with regard to abuses that do not amount to international or major crimes. These lesser abuses may be so numerous that they cannot be prosecuted by courts of law. (A case in point is Rwanda where more than 400,000 people were implicated in such abuses, and their prosecution would have taken hundreds of years.) The measures in question would involve admission of guilt. That is why the aim of these committees is to arrive at the truth and consequently at the higher objective of reconciliation.

For the truth committees to attain their goals, they need to do the following:

1. Investigate claims formally and publicly reveal the truth about past human rights violations and the individuals involved

2. Contribute to justice by imposing sentences other than deprivation of liberty, including amnesty for crimes covered by such a move, compensation for damages. In the event the case involves crimes beyond its jurisdiction or there is a breach of amnesty conditions, it shall refer the case to the criminal investigation committees which in turn may send the accused to a court of competent jurisdiction.

3. Induce confessions of responsibility and guilt. Reconciliation and amnesty is thus not tantamount to acquittal.

4. Involve and satisfy the concerns of victims, achieve reconciliation and renounce vengeance, vendettas and violence.

5. Link amnesty to the work of truth committees in bringing about reconciliation. Amnesty shall not extend to those who do not confess responsibility for abuses and publicly apologize for their misdeeds. This is similar to what occurred in South Africa.

Decisions of these committees must be subject to appeal. The truth committees should also have the power to take such decisions in addition to imposing sentences not involving imprisonment.

In each Appeals Court District, one or more truth and reconciliation committees may be set up as required. They are to comprise three members headed by a judicial officer. The members must be qualified and known for their integrity and good reputation in the community. (See Appendix A/11 for Draft Law to create Truth & Reconciliation Commissions)

UNCLASSIFIED

### c. Reconciliation Mechanisms

To bring about reconciliation and to encourage people toward acceptance, tolerance and compassion rather than vengeance, structures must be in place that are in accord with local traditions, customs and norms.

The reconciliation project is important and its objective is to promote a favourable climate for normal life in a society that has been stunted by dictatorship. It is designed to help society move forward towards stability and democratic transformation.

A large number of people will likely be implicated in abuses due to the nature of Saddam's contradictory and complex policies which required individuals to demonstrate their loyalty to the regime by transgressing on the rights of others. To punish this huge number of abuses, assuming the necessary possibilities are available to do that, is to risk undermining the existing social and economic set-up threatening the state itself. This is why the work undertaken in implementing the transitional justice and reconciliation project is so essential. It, therefore, requires technically oriented individuals who are committed to a pluralistic, democratic society which respects the rule of law.

The main objectives in a reconciliation process that can assure the uniform dispensation of justice and set the foundation for the rule of law are:

1- Build confidence in the new administration and cooperation with it. This may be realized through the following:

- Granting special priority to the issue of compensation. Fair and just compensation should be granted to victims without discrimination. Failing to do so will invite resentment, protest and eventually rebellion if the issue is manipulated by opponents of the new administration. Moreover, a fair settlement of this issue will help victims overcome their vengeful impulses towards the perpetrators and their relatives. Compensation is a pivotal element of reconciliation.

- Raising the standard of living for civil servants. Conditions for living a decent life have been denied Iraqis under Saddam's regime. A nation-wide drive will be required to raise the standard of living, particularly of civil servants, as a guard against social corruption, thereby attacking its economic causes. This will help maintain self-interests within the accepted moral norms and remove any contradiction between private and public interests.

- Establishing legal safeguards to deter the new administration from imposing restrictions on individual freedoms. To rule out any form of authoritarianism in a post-Saddam Iraq, institutions and structures with appropriate checks and balances must be in place. Above all is the requirement for an independent judiciary. The more independent the judiciary is, the more just and effective it will be.

UNCLASSIFIED

UNCLASSIFIED

2- Highlight those tenets of Islamic law (sharia) that emphasize virtue, tolerance and forgiveness. Use may be made of early Islamic experiences which applied the principles of piety, justice, honesty, tolerance and respect for differences rather than ethnic, sectarian, religious, class or clan discrimination as practiced by Saddam's regime and the Ba'ath party. People need to be reminded that Islam could not have built a vast empire in its heyday if it had not espoused justice and virtue as its foundation. This policy will effectively contribute to preventing score-settling and vendettas in the wake of regime change.

3- Make use of traditional conventions and structures like tribal values to maintain order and ward off anarchy in the interests of reconciliation. This is despite the fact that these tribal values were encouraged by prior repressive regimes, nonetheless, they need to be acknowledged in the transition to a pluralist system and may even be a useful vehicle for enfranchisement of otherwise disenfranchised individuals or groups.

   d. <u>Prosecution</u>

Holding Saddam Hussein and his cohorts responsible for their crimes against the Iraqi people requires prosecution under Iraqi penal codes.   The salient issues in this regard are:
   i. Legal Basis for Prosecution
          - How to serve out arrest warrants
          - How to conduct the investigation and file charges
          - How to address the question of immunity granted to Iraqi officials under the
            existing constitution
   ii. Court Structure
          - Which courts shall hear which types of cases

          i. <u>Legal Basis for Prosecution</u>

Iraqi law No. 23, 1971 of the Criminal Procedure Code sets forth the nature of the proceedings relevant to criminal cases. Article 1 states that it is permissible to set a criminal case in motion by an oral or written complaint presented to an investigative judge, a prosecutor or a competent official at a police station. Such a case can also be initiated by an 'Information' presented to the public prosecutor. On the basis of this Information, an investigation is opened. The investigative judge shall take such necessary steps as issuing a summons, search warrants and arrest warrants against the suspect(s). In the case of arrest warrants, the accused shall be described in detail by name, title, identification (card/number), physical description, place of residence, occupation, the type of alleged offense, the relevant penal code and date of the warrant.

The question then becomes, in the event there is no complaint filed against an official, particularly in the event there is a coup or an occupation by outside forces, can the investigative judge serve an arrest warrant and determine the nature of the suspect's custody/detention based merely on suspicion?

The answer is yes. Article 103 of the Criminal Procedure Code allows the arrest of any person suspected on reasonable grounds of having committed a major crime or an intentional felony without the need for a formal complaint. Precedent shows such suspects have been put under arrest by investigative judges pending inquiry into their alleged crime or involvement in a criminal act. Investigative judges can

UNCLASSIFIED

# UNCLASSIFIED

invoke this provision to arrest and question state officials without an initial summons or complaint being formally lodged against them.

As for the legal mechanism required to serve these arrest warrants, it is proposed that a Judicial Council be established, comprised of at least 9 members selected from judges forcibly retired in Iraq, those in exile and others presently in the Kurdish region. This Council can serve as a nucleus of the judiciary in a post-Saddam Iraq, expanding to include judges of integrity inside Iraq, after regime change. The Council shall have all the powers of the judiciary as defined in the future interim constitution or basic law.

The Judicial Council shall select a presiding judge who may be the same person as the presiding judge of the Cassation Court. The Council shall appoint investigative judges to investigate alleged crimes by officials of Saddam's regime under the Iraqi penal code. The Council shall also serve to vet members of the judiciary with authority to retire judges with questionable political backgrounds or integrity.    Vacancies created by such actions may be filled by recalling retired judges of sound character and lawyers known for their competence. The Judicial Council may assume its constitutional and legal duties in the interests of justice during the transitional period.

It is proposed to initially confine all arrest warrants to top officials of the regime, including its head, his immediate associates, deputies, Revolutionary Command Council (RCC) members, ministers, regional leadership members, heads of security agencies, army chief of staff and corps commanders.

## ii. Court Structure

### Special Courts for International and Major Crimes

Criminal trials by no means imply automatic conviction of the accused. They are legal proceedings designed to arrive at the truth. The accused is innocent until proven guilty. These trials shall be instrumental in revealing the truth and eliminating the impulses for vengeance and violence. In this sense they are an effective contribution to transitional justice. The truth will lead either to conviction of the accused when proven guilty or to acquittal or to dismissal for lack of evidence.

Before holding criminal trials competent investigative teams, presided over by investigative judges, should be in place. They are to investigate officials suspected of war crimes, genocide, torture and crimes against humanity. There is no statute of limitations for the prosecution of these crimes, nor are they covered by any amnesty. The investigation teams should be supported by international experts while making use of facilities offered by specialized institutes to uncover and preserve incriminating evidence and other areas of expertise.

The measures taken by these teams are governed by provisions of the 1971 Criminal Procedure Code in line with all subsequent procedures by courts applying the same law. The investigation teams may present the respective cases to investigative judges for the issuance of arrest warrants, summons, and search warrants pursuant to the above-mentioned law. Alternatively, investigative judges may preside over these teams to facilitate the task of issuing the appropriate court orders.

# UNCLASSIFIED

# UNCLASSIFIED

Crimes not falling in the international crimes category specified above but covered under Iraqi penal codes may be investigated in the typical manner with magistrates. There may be a pressing need to increase the number of competent prosecutors to investigate these crimes due to their large number.

Criminal courts in Iraq are classified according to the nature and gravity of the crime. There are criminal courts dealing with offences punishable by more than five years in prison. There are misdemeanor courts that deal with offences carrying a maximum penalty of five-year imprisonment.

Saddam Hussein and his top officials will be tried for crimes that do not fall under either of the above two categories. Theirs are grave international acts involving war crimes, genocide, torture and crimes against humanity. There is neither a statute of limitation nor amnesty for these crimes.

Saddam Hussein and other officials at the highest echelons are to be indicted for three types of crimes:
1. The first are grave international crimes that come under international criminal law.
2. The second are major crimes codified in the Iraqi penal code.
3. The third are lesser crimes and offenses covered by Iraqi penal code.

(The third type is addressed in the section on truth and reconciliation committees.)

As for the first type, they are crimes that can be dealt with by one of the following:

An ad hoc international criminal court like those set up for former Yugoslavia and Rwanda. The maximum penalty that can be meted out by these courts is life imprisonment. They are formed by a resolution of the UN Security Council. (Note: the newly created International Criminal Court is unfortunately not an appropriate venue to prosecute these crimes as its mandate is limited to crimes committed after July 2002. The vast majority of crimes committed in Iraq occurred well before this date.)

A hybrid criminal court consisting of Iraqi and international judges. This court, too, would be set up by a UN Security Council resolution, and it may also be barred from passing sentences involving the death penalty in accordance with the provisions of the UN resolution. Such a resolution is likely to be consistent with the provisions of international criminal law, which was the case with the Yugoslavia and Rwanda courts.

A special national criminal court comprised of Iraqi judges according to law No 23 of 1971 on Criminal Procedure Code. It may be made up of a presiding judge and two associates who can seek counsel from international experts or have international judges acting as experts. The overwhelming majority of Iraqi jurists are in favour of this kind of court as it will ensure that the trials have a national character and forestall any criticism from local, Arab and regional quarters. The difficulty this court might encounter is related to the fact that under the most recent applications of international criminal law, the maximum penalty for these crimes has been

# UNCLASSIFIED

UNCLASSIFIED

life-imprisonment.  The maximum sentence under the Iraqi penal code, however, is death for major crimes such as pre-meditated murder.  It would be gravely unjust to prosecute murderers with the possibility of a death sentence, while war criminals and persons accused of crimes against humanity face only a life-sentence.  One solution to this dilemma would be to allow for the use of the death penalty for those convicted of one or more of the four major international crimes.  Another solution would be to have the appropriate/legitimate legislative body abolish capital punishment in the Iraqi penal code to be consistent with the recent applications of international law.

## Domestic Criminal Courts

The second type of crimes is covered under the Iraqi penal code.  With over 34 years of Ba'ath rule in Iraq, numerous and heinous crimes have been perpetrated.  The number of perpetrators may run into the tens of thousands.  These crimes come under the jurisdiction of Iraqi criminal courts.  These courts are limited in number and may not be able to cope with all of the potential cases, without taking an unreasonably long time to resolve.  Such delays may be a disservice to justice.  That is why additional criminal courts will need to be set up in the respective Appellate Court districts, even if they are provisional and last only until the major caseload is handled.

A flow chart is attached which depicts a sample organization for these courts and commissions.  (See Appendix A1/12)

### e.  Defenses- The problem of immunity against prosecution

Under Iraqi law, immunity does not pardon or annul a crime.  It merely suspends legal proceedings for specific and special reasons.  Lifting this immunity implies that the special reason for the restriction is removed and things are back to normal.  In other words, the person enjoying immunity shall be subject to legal proceedings like any other person.

The 1970 interim constitution grants this immunity to the president, RCC members, ministers and Ba'ath party regional leadership members.  Abolishing this constitution by the competent authority after regime change will automatically lift this immunity and restore normality.  The question of military immunity is addressed in the section on institutional reform, where it is proposed that immunity for members of the military be lifted and that they be treated as civilians.

### f.  Amnesty

There are two kinds of amnesty.  There is a general amnesty covering all perpetrators of crimes irrespective of their gravity and the persons involved.  Such an amnesty has been applied in certain countries like Sierra Leone in 1999 and before it Argentina in 1983.  It was unsuccessful as it had failed to restrain people's vengeful impulses and bring about the desired sense of justice.  A general amnesty will not

UNCLASSIFIED

UNCLASSIFIED

contribute to reconciliation in Iraq where the situation is much more complex. Objective conditions rule out this kind of amnesty in favour of other more relevant world experiences.

The amnesty deemed suitable for Iraq would be a qualified amnesty covering only specified abuses. It has been suggested that it should cover lesser offenses and infractions specified in the Iraqi criminal law. In other words, amnesty should be extended to crimes punishable by a maximum of five-year imprisonment. Other crimes, including criminal acts with international implications, should not be covered by the envisaged amnesty unless all of the victims or the victims' relatives settle for reconciliation, restitution according to local customs, or compensation for damages.

For the amnesty law to serve the purpose of reconciliation it should be contingent upon:

1. The persons amnestied turning themselves in within a specified time period.
2. The persons amnestied cooperating with the truth committees and fully and completely confessing their crimes.
3. The persons amnestied giving a public apology to the victims and the community as a whole.
4. The persons amnestied pledging not to repeat their misdeeds in the future.

This kind of amnesty has proved to be a success in South Africa. The essence of the amnesty is to acknowledge responsibility for previous abuses and cooperate with the truth committee investigators. On the basis of the findings, the committee will decide whether the perpetrator will be amnestied or not for reasons to be recorded in the investigation file.

## 2. Victim's Compensation and Reparations

Compensation to the victims of the Ba'ath regime since 1968 is a major component of the reconciliation process. It will soothe the victims' sense of having been unjustly treated and restrain their vengeful impulses while promoting trust between them and the new administration.

The regime's victims include those who lost loved ones in its prisons, were arbitrarily detained and tortured, lost their jobs, were expelled or forced into exile, had their property confiscated, were physically or psychologically scarred or have suffered significant injury; all deserve to be compensated for damages. (See Appendix B/21 for Draft Law enabling victim's compensation)

The two main kinds of compensation are:

1- Monetary compensation which may take two forms:

a. Monetary compensation for confiscated real or personal property as a consequence of displacement, exile or unjust decrees.

b. Monetary compensation for damages sustained as a consequence of the regime's actions, including persecution, murder, torture, imprisonment and detention on false charges.

UNCLASSIFIED

UNCLASSIFIED

2- Non-tangible compensation which may also be of two types:

    a.    A formal apology to the victim or their relatives by the perpetrators if their abuses are covered by the amnesty or if the victim or their relatives accept such a gesture.

    b.    A public registry listing of the victims to remind future generations of the regime's crimes and observing a certain day to commemorate the victims.

### 3. Recovery of Misappropriated Public Funds

The former regime consistently dispersed and dissipated public funds and deposited them in accounts and entities belonging to persons and private companies in order to conduct illegal businesses which serve the illegitimate purposes of this regime, unconcerned about the fate of this money so long as the persons in possession of these funds and property obey the orders of the regime.

As public funds are part and parcel of a nation's wealth and therefore all means and international contacts should be made to recover it, specific laws are recommended to criminalize the acts of persons in possession of this money and those who have failed to return it in the legally specified time to do so.

The laws call for all those in possession of misappropriated public funds/assets to return those funds/assets within 3 months from the issuance of this law. It is proposed that those who do return the funds/assets within this timeframe will be entitled to a 10% reward (of the value of the property). Those who do not return the property within this timeframe will be subject to prosecution. (See Appendix C/22 for Draft Law)

In addition, it is recommended that a commission be established to research and identify all companies who profited from doing business with the prior regime. This list should be published, and it would be up to the Iraqi electorate to determine what to do with these companies: whether to prosecute, blacklist, disgorge their ill-gotten profits or any other measures deemed appropriate. For the sake of posterity, it should be well known which businesses profited from their association with the prior regime.

### 4. De-Baathification
    a. Revocation of Ba'ath Party Privileges

Since it seized power in 1968, the Baghdad regime has been granting privileges and lavish perks to members of the Ba'ath party from the public treasury without regard to the public's welfare. These privileges have been granted under laws passed by the regime, as handouts from Saddam Hussein himself or by arbitrary expropriation of public as well as personal funds and property.

There are ample examples of these excesses such as the confiscation of property belonging to deported or exiled individuals, distribution of housing plots, large financial rewards, houses, luxury cars, and other special prerogatives.

UNCLASSIFIED

UNCLASSIFIED

A draft law was drafted abolishing these privileges.  (See Appendix D/31)

b. Memorialize dark Ba'ath era for future generations

The legacy of Saddam and his regime must not be lost on future generations of Iraqis.  It is proposed that a monument for the regime's victims be built in every Iraqi city with a national museum of the regime's inhumane practices with a chronicle of the brutal methods used by its security agencies.  Notorious prisons and torture chambers should be preserved as perpetual memorials for the victims of Saddam's crimes.

UNCLASSIFIED

## B. BUILDING THE FUTURE

### 1. Legal Reform

Laws affecting human rights and freedoms have been turned upside down and radically amended to assist the regime's violation of these very rights. It is, therefore, imperative to review major laws with the aim of restoring people's rights and dignity, including their right to a decent, secure life in their own country. Iraqi jurists in conjunction with international legal and human rights experts, have embarked on this project and make the following recommendations:

### a. _Criminal Law_

The objective of criminal legislation is to maintain social order and protect public safety consistently and uniformly. By contrast, the Iraqi regime introduced amendments to the Iraqi penal code No 111 of 1969 in a manner contrary to human rights in order to secure its own survival.

In both its legislation and its actions the Iraqi regime has violated (and continues to violate) every aspect of humanitarian law as set forth in international covenants and the Universal Declaration of Human Rights. This includes imposing or increasing sentences with the death penalty without regard to the well-established legal principles that:

- There is no crime and therefore no punishment without a specific text in the penal code.
- Criminal laws cannot be retroactively applied.
- The accused is innocent until proven guilty.
- Sentencing decisions should be made specific to the individual defendant.
- There should be no more than one punishment for the same crime.

The regime has also violated the basic rights of the accused, including the ban on torture and arbitrary detention, the right to compensation for damages, and freedom of speech.

The general consensus of the commentators is that the original Iraqi penal code and Criminal Procedure Code were drafted by a distinguished group of jurists, legal experts and judges. However, successive amendments were introduced by Saddam's regime which violate basic human rights and social norms. The main purpose for these amendments was to ensure the survival of the regime.

Nonetheless, the entire criminal code needs to be overhauled under a legitimate process that is in keeping with the times and technological advances. However, this process should be the result of a thorough study and examination by legal experts who should undertake this task in a stable environment with a functioning parliament (legislative body) under favourable conditions for enacting a modern criminal code.

In the meantime, the offensive amendments which violate basic human rights should be dealt with in the interim period. The majority of the commentators are in favour of keeping the existing penal code and Criminal Procedure Code after repealing all amendments and modifications by the authority empowered to enact laws during the transitional period.

# UNCLASSIFIED

Specifically, it is proposed to repeal all provisions regarding political offences in articles 20, 21 and 22 of the penal code.

It is also proposed to amend the Criminal Procedure Code to give defense lawyers the absolute right to be present and to see all papers related to the case at every phase, and to visit their clients in custody without interference by any state authority.

In culmination, a bill has been drafted repealing all amendments in question. (See Appendix E/28)

b. Military Penal Codes

Military penal codes are marked by two main characteristics:

1.    Immunity and extensive powers.

Law No 106 of 1960 on Service of Process has turned members of the military into a privileged class. It grants them immunity against summons and legal proceedings by civil courts. Indeed, it almost absolves them of all liability. A member of the military can be apprehended only when committing a witnessed crime. Even in this case the accused shall be handed over to the nearest military authority. The accused can be brought before a civil court only with approval of the minister of defense or an official authorized by him. Also, military courts have extensive jurisdiction. (See Appendix F/8)

2.    Severity of punishment.

The military penal code is also marked by its harsh penalties in matters related to security of the regime or its military and repressive agencies. Military courts have been granted extensive powers although their member judges generally lack the necessary legal qualifications to decide cases referred to their courts.

The military penal code provides for severe penalties that are out of tune with modern criminal practice. Iraqi military penal codes are a fairly realistic reflection of the "carrot and stick" policy pursued by the regime. Members of the military enjoy extensive privileges and immunity against prosecution for crimes committed against civilians. On the other hand, they are subject to extremely harsh penalties for offences related to security of the regime and its military institutions.

Recommendation

1.        The jurisdiction of military courts is dealt with under Institutional Reform- Judiciary.

UNCLASSIFIED

2.    With regard to immunity, there is no justification whatsoever for members of the military to be more privileged than others or be elevated to a distinct class from the rest of the people. This immunity must be revoked.

#### c. Nationality law

Since the coup of 8 February 1963, Iraqi citizenship matters are governed by law No. 43 of 1963 repealing law No. 42 of 1924 and its amendments.

The general consensus is that the existing law has introduced unjust provisions that have resulted in the tragic deportation of tens of thousands of Iraqis after revoking their citizenship. That is why this law constitutes a flagrant violation of human rights pursuant to international covenants and the Universal Declaration of Human Rights. Article 15 of the latter states that every individual has the right to citizenship. It also states that a person cannot be arbitrarily denied citizenship or the right to change it.

It is agreed that this law and its amendments cannot remain effective after a regime change as hundreds of thousands have been victimized by it. It should be repealed in its entirety while recognizing the naturalization decisions taken under it.

A review should be undertaken to compensate victims and restore Iraqi citizenship to those who have unjustly lost it. There should also be a watchdog entity established to oversee implementation of the new law with a view to guaranteeing people's rights.

Work in this connection has culminated in drafting a new citizenship law taking into account the problems caused by previous laws as much as possible until a new, well-considered citizenship law is adopted by the prospective Iraqi parliament. It should be noted that, unlike most other nationality laws in the region, this proposed law is gender neutral. (See Appendix G/29)

#### d. Administrative law

The Baghdad regime's policy since it seized power has resulted in rife corruption in the state apparatus. The main causes for the corrupt bureaucracy may be summed up in the following:

1-    Politicization of administration.
2-    The economic squeeze and low wages.
3-    Absence of administrative, legal, parliamentary and public controls over the bureaucracy.
4-    Militarization of the administration.

#### Recommendation

To uplift the state bureaucracy to the level of democratic transformation in Iraq during the transition period, a host of reforms must be carried out, including:

18

UNCLASSIFIED

# UNCLASSIFIED

- Repealing all laws and decrees that have politicized administrative functions and terminating control of state institutions by the ruling party;

- Reviewing civil service and employment laws with incentives encouraging honesty and integrity with an emphasis on the concept of the "public trust" for civil servants;

- Establishing administrative, judicial, public and parliamentary oversight over civil servants;

- Preparing a development plan for the administration of the bureaucracy;

- *Identifying and dismissing all employees found to be redundant, corrupt, or grossly negligent in their duties;*

- Selecting top civil servants who are highly qualified people of unquestionable integrity to set an example for their staff; and

- Developing intensive plans to train civil servants at various levels such as:

    - Introducing modern technology in administrative work.

    - Promoting courteous interaction at all levels of the system and renouncing condescending attitudes within the system or towards the public.

    - Disbanding all state functions or positions related to the Ba'ath party—including those of security officers and operations run by that party in the state bureaucracy.

    - Reviewing all other laws governing the bureaucratic function for further reform in line with the new democratic era.

Considering the crucial nature of the transitional phase and the fact that the Ba'ath party is primarily responsible for politicizing and therefore crippling the bureaucracy, a bill has been drafted repealing the "leading party law" No. 142 of 1974 and banning the Ba'ath party itself. (See Appendix H/30)

### e. Civil Law

The general consensus of the commentators is that the existing civil law of 1951 has not experienced any radical change in contravention of human rights. Maintaining this law will not be detrimental to these rights, at least and until specialized legal authorities are in place to re-examine the law and present relevant recommendations.

UNCLASSIFIED

### f. Interim laws

These are laws expected to be required during the transitional period to deal with immediate situations and needs. A body of legal experts should be set up to examine these needs, which may be called "Ad hoc Legal Committee for Drafting Interim Laws." The Judicial Council may assist with this task during the transitional period.

Immediately after a regime change, it will be imperative to pass a law banning the Ba'ath party and privileges enjoyed by it under the "leading party law" No. 142 of 1974 as it was used as a tool of persecution and brutal repression.

## 2. Institutional Reform

The vital state institutions have undergone extensive changes in their structure and functions dissociating them from the purposes they were originally set up to serve. Their function changed from serving and protecting the public to solely serving and protecting Saddam and his regime.

This is why it is a critical manifestation of transitional justice to reform these institutions and re-establish their basic public services. Reform cannot be brought about by merely renaming the institutions that supported the dictatorship. Reform demands restructuring of these institutions and the laws under which they operate to serve the public good rather than the repressive regime. The most important institutions are the judiciary, institute of legal education, security agencies, military and prison system to name but a few.

### a. Judiciary

Before the coup of 17 July 1968, the Iraqi judiciary was marked by a measure of integrity, impartiality and commitment to the requirements of justice. It enjoyed a certain degree of independence in fulfilling its duties and making its rulings, which were characterized by the principle of even-handedness, solid substantiation and profound legal reasoning. These rulings would serve as precedents to be cited by litigants and other courts alike.

Before the 1968 coup, the Iraqi judiciary ensured a modest level of justice in the sphere of social order and individual rights. This was the result of concerns by successive governments to uphold the integrity of this vital sphere. There is no denying, however, that all those governments were undemocratic and opposed to judicial scrutiny of their political actions, including the legislative process and the actions of the executive.

After the 1968 coup the Ba'ath regime introduced the notion that there are no independent state powers except one political power assisted by legislative, executive and judicial agencies to undertake its responsibilities. This eliminated any notion of the separation of powers (legislative, executive and judiciary) and turned all of these powers into institutions controlled by one ultimate political power under Saddam Hussein.

# UNCLASSIFIED

To eliminate any remaining role for an independent judiciary, the Baghdad regime dissolved the Judicial Council which was headed by the presiding judge of the Iraqi cassation court. It was re-invented as "the justice council" headed by the minister of justice who reported to the President.

As a consequence, the Iraqi judge has become a mere functionary following orders from the political power. The breakdown below demonstrates the unparalleled fragmented nature of the current Iraqi judiciary:

The Iraqi judiciary is divided into the following sectors:

I: The Iraq cassation court.
II: The military cassation court.
III: The internal security agencies cassation court.
IV: Special judiciary courts, which are divided into four parts:
    1: The revolutionary court.
    2: Judiciary of party organizations. (Serious judicial powers have been granted to party organizations.)
    3. Judiciary of ministries and security agencies. (Many courts have been set up in key ministries and departments like the interior, defense and security agencies- intelligence, public security and special security).
    4. Judiciary of provisional courts.
V- Judiciary of the joint cassation court.
VI-Judiciary of special powers. (Judicial powers granted to state functionaries, police officers and others.)

Each of the above judicial organs is completely separate from the other, and they are in no way connected with each other. Each of them is linked to a specific ministry or government agency. Each has its own functions defined by its own laws.

<u>Recommendations</u>

Justice and human rights have been the first victims of this decimation of the Iraqi judiciary. The transitional authority will have the urgent task of restoring the authority of the Iraqi judiciary and its former uniform structure as much as possible pending a more detailed plan to ensure the independence of this branch and its jurisdiction over all aspects of the legal system in Iraq. To this end the following steps are proposed after a regime change:

1.    Abolishing all special courts and powers granted to police, security and intelligence officers as well as other state functionaries. (See Appendix I/49 for Draft Law)

2.    Keeping for the time being military courts and internal security courts governed by law No 44 of 1941 on military court procedures. These courts will be difficult to dissolve due to the service laws involved and it will take some time to review these laws together with the penal codes. However, the jurisdiction of these courts can be restricted to only enforcing the military penal code. Civilian criminal courts shall have jurisdiction over all other crimes subject to the provisions of any

# UNCLASSIFIED

UNCLASSIFIED

other penal code like crimes committed by a member of the military against another or against a civilian.

3.     Incorporating all lower cassation courts into the Iraq cassation court. A body should be created within its structure to try crimes covered by the military penal code. This body may co-opt an expert on the military penal code such as the head of the legal department at the ministry of defense, his counter-part at the ministry of interior, a legal officer with a minimum of ten-years of experience or any other officer whose participation is deemed necessary for technical reasons.

4.     Setting up a higher constitutional court to serve as a watchdog over the constitutionality of laws, by-laws and decrees and their accord with the provisions of the constitution and international covenants of human rights, including the Universal Declaration of Human Rights.

5.     Setting up a judiciary council comprised of the presiding judge of the Iraq cassation court, his deputies, presiding judges of the lower cassation courts, presiding judges of the appeal courts, presiding judge of the higher constitutional court, his deputies, president of the state consultative council, his deputies, chief of the prosecutor's office and head of the justice department's inspectorate.

6.     Amending the law No. 160 of 1979 on organizing the judiciary in line with the transitional justice project while ensuring total independence of the judiciary .(See Appendix J/50 for Draft law)

b. Internal and other Security Agencies

The Baghdad regime relies on special security agencies it created which have no relationship to the conventional internal security agencies operating in the Iraqi state when it was founded. These special security agencies are: the general intelligence (mukhabarat), special security, Fyda'een Saddam, the special republican guard, the people's army, the emergency forces and the Al-Quds Army.

All of them are repressive agencies that have extensive powers and their own prisons and detention centers. They used torture and extrajudicial killing to terrorize the people.

The regular internal security agencies consist of the police general directorate, the security general directorate, the traffic police general directorate, the citizenship general directorate and the border police general directorate.

These agencies have been in existence since before the British occupation in 1918. After the occupation, the commander of British forces issued a police statement No. 72 of 1920 setting out guidelines governing police affairs. The internal security agencies developed further, and police service and discipline law No 20 of 1943 was later enacted to regulate their function. This law was more akin to the civil service law than to the military service law; in fact, the civil service law was its main source.

UNCLASSIFIED

UNCLASSIFIED

The internal security agencies have been militarized under the Ba'ath regime and subjected to service laws similar to those of military service and military penal codes. They have been granted extraordinary immunity as is the case with military personnel.

<u>Recommendations</u>

Recommendations with regard to all of the "special" security agencies are strongly in favour of disbanding them and liquidating their assets immediately after a regime change as they will be superfluous and irrelevant.

A draft resolution has been drawn up disbanding the special security agencies.  (See Appendix K/37)

To reform the relationship of the regular security agencies with the public, it is proposed that a new motto be established: "police in the service of the people."  These institutions should be re-built to focus solely on the protection of social order, individual rights and public safety.  The laws governing these agencies should be reviewed and transformed into civil laws.

The training and education of their personnel needs to be redesigned to ensure they serve the purpose which they were originally designed to serve.  To ensure the people's freedoms and rights it is equally necessary to abolish the immunity enjoyed by these agencies under the Service of Process law No. 106 of 1960.

c. <u>Military Service ( The draft )</u>

The Iraqi people, especially young Iraqis, have suffered tragically as a result of the Baghdad regime's misadventures and wars with neighbouring countries.  Hundreds of thousands of young Iraqis have been killed or disabled due to continued compulsory service in the army which has consumed the better part of life for this age group.

An international protection force under the auspices of the United Nations,  after regime change, will allow Iraqis to use their creative potential for building a new Iraq, especially the young people.  The new Iraq must be at peace with itself, its neighbours and the world refraining from destabilizing the region while focusing on democracy building.  This requires the rejection of any thinking to build a new war machine as it will be meaningless and incompatible with the aspirations of a new democratic Iraq seeking peace and goodwill.

Accordingly, the commentators see no need for compulsory military service.  Instead there should be a professional army of volunteers to defend the country against external aggression.  A new Iraq belonging to the community of democratic states can contribute to international efforts to establish the principles of justice and to fight international terrorism.

UNCLASSIFIED

d. Prison System

Prison law No 51 of 1969 was apparently passed within the framework of a reasonable penal policy to turn the prison system into an agency for reform and rehabilitation of its inmates. However, the regime's practices, its manner of operating the prisons, and the punishments meted out by the regime run counter to the aims of the above law. Punishment under Saddam's regime serves as revenge rather than reform. Amendments to the Iraqi penal code abound with prescriptions for capital punishment for minor offences, albeit primarily political offences. Indeed, the regime has introduced such inhumane punishment as chopping off ears, branding, amputation of the limbs and other prehistoric forms of punishment that are diametrically opposed to modern penal policy. Inhumane treatment is widespread against prisoners and detainees.

Recommendation

The following negative aspects of the prison law need to be eliminated:

1- Solitary confinement as a punitive measure during which the prisoner is denied regular meals.

2- Section 7 of the prison law dealing with political prisoners and detainees, which grossly contradicts democratic practice under the prospective new government. Self-expression and opposition are by no means a crime punishable by law, and, therefore, there should be no political prisoners. This section must be repealed.

It is proposed to add the following new provisions:

3. None of the punitive measures laid down in the prison law may be enforced without an inquiry. In the course of such inquiry the prisoner is faced with the alleged offence and given a hearing with the right to self-defense. There should be a written record of the proceeding.

4. None of these punitive measures should entail delay of release after serving the sentence passed or the order of remand.

5. Defense lawyers shall have the right to meet privately with the detained or imprisoned defendant. Foreign detainees or prisoners shall have access to their respective consulates or the mission representing their country's interests.

6. No staff members of a public authority may contact any detainee or prisoner without a written consent from the general prosecutor.

7. Any pregnant woman prisoner shall be accorded special treatment and medical care from the date pregnancy has become evident.

24
UNCLASSIFIED

UNCLASSIFIED

8.    Special treatment shall be accorded the mentally ill prisoner. Upon determination of the prisoner's condition, he/she shall be moved to a mental institution.

9.    Release may be obtained for health reasons if it is established that a prisoner has a life-threatening condition or the prisoner's condition poses a threat to the lives of others in prison. Release for health reasons shall be effected by a decision of the general prosecutor with a copy of the decision to the ministry of labour and social affairs.

10.    Prisoner's relatives shall be informed if his/her condition has become sufficiently serious.

11.    Bodies of dead prisoners shall be turned over to their relatives with a detailed report on the history of illness, the nature of work on the day of death, the kind of food, the date the prisoner was committed to hospital, the date when the condition was first diagnosed, the specific nature of illness, the last day a doctor examined the prisoner and the date and time of death.

For a Draft law implementing these recommendation see Appendix L/54.

### e. Institute for Legal Reform and Training of Lawyers

There is at present a judicial institute affiliated with the ministry of justice. It has two-year courses to graduate judges and general practice attorneys. This institute can be developed to offer three-year courses, including one or two years for practical training in the work of judges and public prosecutors. Also, its curriculum should be re-examined to be consistent with Iraq's future development.

Courses at the institute can be expanded to the training of lawyers and legal personnel. As the institute is engaged in the training of judicial personnel in general, a body specialized in legal reform at the institute will be very relevant. Reform questions can be discussed with competent legal personnel at the institute.

### 3. Proposed Constitutional Principles

Having universally accepted constitutional principles is important at any stage of governance in Iraq. No state function can be fulfilled by the various authorities without a constitution as the basic law. Serious thought must given to the issue of constitutional principles during the transitional period. Without these supreme rules ensuring people's rights and defining their duties, transitional justice in Iraq will be unthinkable.

Iraq's multi-ethnic, multi-religious and multi-cultural structure has been further compounded by Saddam's sectarian policy. Working out constitutional principles for such a country will be a daunting task.

UNCLASSIFIED

# UNCLASSIFIED

A permanent constitution at this or any subsequent stage can only deliberated with the full involvement of the public as well as all political groups and personalities in post-Saddam Iraq.

The transitional stage will be better served with transitional constitutional principles that will serve as a basis for the authority of state powers and a guarantee of people's rights. Such principles should be drafted by a team of experts –technocrats- specialized in law, political science, sociology and economics.

Recommendation

It is proposed that the future transitional constitution or basic law include the following principles:

1. Separation of the three branches (legislative, executive and judicial) and defining the character of each branch, its structure, duties and mechanism of discharging its functions.
2. Recognition of Iraq's multi-ethnic structure comprising Arabs, Kurds, Turkmans and Assyrians among other ethnic groups.
3. Recognition that Iraq is a multi-religious society, including Islam, Christianity, Judaism, Mandaeim, Yazidism, and religious communities like the Shiites, Sunnis, etc.
4. Commitment to international covenants ensuring human rights in Iraq, including the Universal Declaration of Human Rights.
5. Upholding people's basic rights and responsibilities, including safeguarding property and banning unlawful confiscation.
   -Equality in rights and duties and prohibition against all forms of discrimination.
   -The principle that the accused is innocent until proven guilty.
   -The principle of non-retroactivity of criminal and economic laws.
   -Non-interference in people's private affairs like the freedom of thought, faith, etc.
   - Prohibition of torture.
   - Commitment to other related humanitarian principles.
6. Recognition of cultural rights and languages of all nationalities.
7. Freedom of worship rites and religious freedom for all communities.
8. Right of regular courts to oversee constitutionality of laws or assigning this task to a constitutional court.
9. Maintaining the present administrative provincial divisions until a permanent constitution is adopted, and state constitutional structures are in place in the course of democratic transformation.
10. Any other basic principles that contribute to stability without controversy with groups inside Iraq.

It should be pointed out that any attempt to enforce any of Iraq's past constitutions since 1925 will antagonize one group or another in Iraq and provoke senseless disputes. The republicans refuse to recognize the 1925 constitution; the monarchists refuse the republican constitutions; and the Kurds do not recognize any constitution that does not guarantee their right to federalism.

It will, therefore, be more practical to adopt a transitional constitution drafted by competent experts. Such a constitution should ensure the separation of the branches and protect human rights and the basic norms of citizenship.

# UNCLASSIFIED

UNCLASSIFIED

**4. Recommendations for Authority in Transitional Phase**

It should be emphasized that the basic principle for a transitional authority in Iraq is that it should be comprised of Iraqis. The qualifications should be established such that any person serving on a transitional authority should have:

    a. a solid track record of service to the country
    b. sound moral character and unquestioned integrity
    c. no prior associations with Saddam's regime which might taint his/her reputation
    d. no prior involvement or even appearance of involvement with criminal activities or other improprieties

Furthermore, it is recommended that anyone with executive authority in the transitional phase be ineligible for participating in the first round of elections. Since one of the tasks of the transitional authority will be to prepare for the first round of elections, it is imperative there not be any conflict of interest issues.

In addition, the affairs of the state should be run by technical experts (i.e., technocrats) in key areas. It is proposed that the branches at this stage are as follows:

    1.    The executive consisting of:

        First, a presidential council which is proposed to be comprised of 3-5 Iraqi members representing Iraq's diversified structure. Needless to say, members of the presidential council must be people known for their independent thinking, integrity, expertise and good reputation in Iraqi society.

        Second, a council of ministers: comprising highly experienced Iraqi technocrats known for their independent thinking and good reputation in Iraqi society.

    2.    The judiciary: Represented by a judicial council of high-level judges. The council may be headed by the presiding judge of the Iraq cassation court. Its membership may consist of the presiding judge of the cassation court, of course, his deputies, presiding judges of civil, family, administrative and criminal courts, presiding judge of the higher constitutional court, his deputies, president of the state consultative council, his deputies, head of the judicial inspectorate, head of the law drafting department and presiding judges of appeal courts. The judicial council may be authorized to decide on all matters related to judges like appointment, promotion, allowances, retirement, etc. The presiding judge and members of the judicial council are to have the same grade and privileges as the president and members of the council of ministers. The council is to have its own budget separate from that of the justice ministry to ensure maximum independence of the judiciary in the interests of justice and democracy in post-Saddam Iraq. An independent judiciary is a solid guarantee for the establishment of the rule of law.

    3.    The legislative: The transitional period will be without a parliament to pass laws. A safe arrangement on the path to a democratic and just society is for both the executive and the judiciary to jointly pass laws. Legislation at this stage should not be left to the executive alone lest it establish a monopoly in this sphere. In other words, the

UNCLASSIFIED

legislative during the transitional period will be a combination of the presidential council, the council of ministers and the judicial council pending the formal approval of a permanent constitution and development of constitutional institutions.

<u>Possible Violence and Resistance to Change</u>

Since it seized power in 1968 the Baghdad regime has surrounded itself with different centers designed to tighten its grip on the internal situation. These centers are a major part of an array of potential factors that may trigger acts of violence and resistance to the expected change in Iraq.

To preempt such potential risks these factors have to be identified keeping in mind the situation cannot be totally controlled due to the political minefields created by the Saddam regime. Effective action is still required to minimize any losses that may be sustained as a consequence.

The main risk factors and how to deal with them:

A-   Sectarianism
Saddam Hussein has used every possible means to ensure his survival in power. This has taken a heavy human and material toll affecting all components of Iraqi society. Saddam Hussein has always been aware how unpopular he is. To find support in the region and within Iraq he has played the sectarian card in his policies and official propaganda. He has been suggesting to Sunni army officers that they are the first to be targeted in the coming change and that is why they have to remain on his side for their own survival. His media has been working 'round the clock to fuel sectarian discord with a view to winning supporters at home and in the region.

Saddam's ploys to use the sectarian card for winning support at home and in the region must be effectively countered by a plan focused on exposing the dangers of sectarianism.

B-   Involvement in Saddam's Crimes
To tie the fate of as many state officials as possible to his own, Saddam has involved them in his crimes as members of the Revolutionary Command Council, ministers, security officials, military commanders or party commissars.

People involved in lesser abuses than war crimes, crimes against humanity, torture or genocide under international criminal law, should be given hope that they may be amnestied in a general pardon and national reconciliation process. It will be also useful to cite article 129 of law No 23 of 1971 on Criminal Procedure Code concerning the possibility of appeal bargains and amnesty to those who admit to their abuses and provide information about other suspects in the interests of a proper investigation. Such steps will give those people hope and encourage them to defect.

C-   Economic benefits and bribery

During his years in power Saddam has created an army of beneficiaries, whether by perks or privileges to officers serving in the republican guard and special republican guard and other personnel in the security agencies, his body guards, etc. Others are bought off by cash rewards

## UNCLASSIFIED

distributed every now and then. Contractors are bribed by lucrative deals. Even dissidents and expatriates have been stigmatized with salaries, allowances and grants to start up businesses. Others have been hired as consultants to government oil companies.

The discourse to be adopted in this regard should be reassuring to those who have legitimately benefited from doing business with the regime, who have received payments for certain normal services and those who have won contracts in clean bidding.

D-     New class

Saddam has created a new class of tribal chiefs who have been given money, arms and limousines in return for controlling their tribesmen.

Those tribal leaders can be won over through contacts they still have with Iraqi exiles or by a clear message that they can keep their privileges so long as they side with the people against dictatorship.

E-     Score settling and vengeful acts

Saddam Hussein and his cohorts are guilty of war crimes, genocide, crimes against humanity, extrajudicial killings, plunder, rape, torture, displacement and unlawful expropriation of property. These atrocities have created entire groups of victims impatient for revenge and score-settling when the opportunity presents itself after a regime change with a possible breakdown of security structures. That is what happened during the March 1991 uprising. Actions by victims or their relatives are bound to be accompanied by common criminal acts. After all, crime is a phenomenon seen in all societies with various degrees depending on economic, political, psychological, social and genetic factors. Iraqi society is no different. It has its own criminals who are a product of these conditions. Saddam's regime has further aggravated these factors by its inhumane policies in all spheres. Indeed, it has released all common criminals some of whom are likely to revert to their old habits. The period immediately after regime change might offer these criminals an opportunity to engage in acts of killing, plunder, looting, etc. .

To foil people seeking revenge and the potential acts of common criminals, it is necessary to take a host of decisive measures, including:

1.     Impose a 24-hour curfew on the first day to be gradually relaxed according to the extent of security and order established.

2.     Order all police forces to be on their guard and arrest all offenders.

3.     Organize military patrols by coalition forces in all major cities to prevent lawlessness, especially against vital utilities and key government facilities.

4.     Instruct tribal and clan leaders to use their authority to control rural areas.

5.     Propagate the new laws and decrees via all mass media, including the use of airplanes. A stern warning is to be issued against any revenge acts targeting government officials as a crime punishable by law. It should be made clear that law,

## UNCLASSIFIED

UNCLASSIFIED

order and justice are a prime concern and that all criminals against the people will be brought to trials.

 6. Give explicit orders to the border guard and army units stationed on the border to tighten their control and block all escape routes that may be used by wanted criminals or for intervention by other forces to cause disturbances in Iraq.

 7. Make appeals to all hospital, ambulance, civil defense, water, electricity and other utility personnel to immediately report to duty.

 8. Make appeals to all government employees and the public as a whole to maintain law and order and protect state property, including museums, public buildings and other facilities against any acts of sabotage or vandalism.

 9. Assemble investigation teams, truth and reconciliation committees and criminal courts without delay in order to reassure the people that the new administration will safeguard their rights.

## 5. Public Education and Awareness of Human/Civil Rights

Legal awareness is lacking even among Iraqi intellectuals. The reason is indifference by Iraqi society and disinterest by the state towards laws as they have both been in the grip of despotism.

Awareness of laws and rights will help people shed the despotic, dictatorial thinking in favour of tolerance, understanding the need for public participation in governance as well as the peaceful transition from one administration to another in government. People with good legal understanding of their rights will be in a better position to identify danger signs which run counter to the rule of law and democratic practice. Law, after all, is the outcome of such practice when it is enacted by democratically elected legislatures.

How can public awareness of their rights be promoted? It can only be fostered by harnessing all required resources in society towards this end. We have to start with the education system and the media as well as laws that will give people a sense of security and ensure justice for them. For this awareness to be in step with the new reality, the laws that are passed must meet people's actual needs.

Considering the appalling state of culture and media in Iraq due to the regime's policy, a forward-looking vision has to be developed for Iraqi culture and media in terms of public awareness and methodology. The Saddam regime has politicized culture and turned the media into a propaganda machine serving its own purposes. That is why it is imperative for the future Iraqi media to be independent and unfettered promoting freedom of expression and transparency. The media will act as a vox populi reflector and a watchdog over government actions and state institutions. Another prerequisite of media and cultural work is free access to information and educating the young Iraqi generation in a spirit of tolerance and multiculturalism.

UNCLASSIFIED

UNCLASSIFIED

That is why it is important to focus on promoting legal awareness as well in the curricula of journalism faculties and the media as a whole. Teaching legal subjects will contribute to a public culture that may serve as a mass education for democracy while excluding the culture of violence and personality cult. Saddam's regime has undermined rational, humanitarian education, misguided the young generation and trampled such values as fair play and equal opportunity. Attention should be paid to re-educate the young generation for its members to be good, well qualified and scientifically equipped citizens capable of safeguarding the people's democratic gains.

Iraq is the land of great civilizations that prospered in climates of inter-cultural coexistence. To revive such positive elements in our heritage, publications and mass communications should be free from all forms of censorship. The private sector should be enabled to compete with state-owned media, and this also goes for the arts in general as an essential component of national culture.

The rule of law will be jeopardized in the absence of legal awareness on the part of both government employees and the public. It will be absurd for state laws to remain the domain of scholars and experts. These laws should be part of the public domain for their enforcement to be meaningful. (See Appendix M/66 for Draft Law to Create Human Rights Organization in Iraq).

UNCLASSIFIED