IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

•••••••••••••••••••••••••••••••••••••••••••••
                                           )
Saadya Mastafa and Kafia Ismail            )    Case No.:  07 CIV 7955
                                           )
            Plaintiffs,                     )
                                           )    Judge:  Honorable Gerard E. Lynch
        v.                                 )
                                           )
Australian Wheat Board Limited aka AWB     )
Limited and AWB (U.S.A.) Limited and       )
BNP Paribas,                               )
            Defendants.                    )
•••••••••••••••••••••••••••••••••••••••••••••

## MEMORANDUM OF LAW IN OPPOSITION TO AUSTRALIAN WHEAT BOARD'S MOTION TO DISMISS

Dennis E. Murray Sr.
dennis@murrayandmurray.com
John T. Murray
Direct Dial: (419) 624-3125
jotm@murrayandmurray.com
Leslie O. Murray
Direct Dial: (419) 624-3010
leslie@murrayandmurray.com
Mary S. Birkett
Direct Dial: (419) 626-7003
mso@murrayandmurray.com
MURRAY & MURRAY CO., L.P.A.
111 East Shoreline Drive
Sandusky, Ohio  44870
Facsimile:  (419) 624-0707

*Attorneys for Plaintiffs*

## Table of Contents

Table of Contents ...................................................................................................................... i

Table of Authorities ................................................................................................................. ii

I.    Preliminary Statement .................................................................................................. 1

II.   Factual Background ...................................................................................................... 2

III.  Argument....................................................................................................................... 3

    A.  Plaintiffs Have Article III Standing ....................................................................... 3

        1.  AWB knowingly financed the activities of the Hussein regime, and thus, the acts can NOT be considered Independent Acts of a Third Party ....... 6

        2.  Plaintiffs allege that AWB aided and abetted the Hussein regime by knowingly financing its illegal activities and that the funding of the regime had a substantial impact on the manner in which the injuries occurred............................................................................................................ 8

        3.  AWB's reliance on *Dellums v. U.S. Nuclear Regulatory Com'n* is misplaced and does not preclude Plaintiffs' Article III standing in this case .......................................................................................................... 9

    B.  The Complaint Should Not Be Dismissed On Grounds of Forum Non Conveniens ............................................................................................................. 11

        1.  Australia is wholly unrelated to the cause of action and thus not an adequate alternative forum................................................................... 12

        2.  Iraq is not an adequate alternative forum ............................................... 15

        3.  Plaintiffs' case is based heavily on events which occurred in New York, and thus Defendants have not overcome their burden of showing that Plaintiffs' choice of forum should be shown little deference. ................. 15

        4.  Private and Public Interest Factors weigh in favor of the Court retaining Jurisdiction over the matter ...................................................................... 18

            a.  Private Interest Factors .................................................... 18

            b.  Public Interest Factors..................................................... 19

C.  Plaintffs' Claims Should Not Be Dismissed On Comity Grounds........................ 20

D.  The Act of State Doctrine Does Not Apply to Commercial Activity .................. 22

E.  Plaintiffs Have Valid ATS Claims ........................................................................ 24

    1.  Plaintiffs have alleged adequately that AWB aided and abetted the Hussein regime in violating customary international law........................ 25

    2.  Plaintiffs have alleged adequately that AWB both conspired with the Hussein regime and served as its accomplice with respect to violations of customary international law. ................................................................... 27

F.  Plaintiffs Have Valid TVPA Claims .................................................................... 28

G.  Plaintiffs have alleged sufficient facts to establish PLAUSIBLE CLAIMS BASED ON CONCERTED ACTION LIABILITY UNDER NEW YORK LAW.31

    1.  Plaintiffs' Claims are not Time-Barred Since the Statute of Limitations was Equitably Tolled ............................................................... 31

    2.  Sufficient Facts Have Been Alleged to Support Claims Under New York Law that Defendant AWB Aided and Abetted the Torts Committed by the Hussein Regime ............................................................. 33

IV.  Conclusion.................................................................................................................... 35

## TABLE OF AUTHORITIES

**PAGE(S)**

<u>**CASES**</u>

<u>**Aguinda v. Texaco, Inc.**</u>, 142 F.Supp.2d 534, 536 (S.D.N.Y. 2001)………………… ............. 15

<u>**Aldana v. Del Monte Fresh Produce, N.A., Inc.,**</u>
416 F.3d 1242, 1247-48 (11th Cir.2005)……………………………………………… ............. 28

<u>**Allstate Life ins. Co. v. Linter Group Ltd.**</u>, 994 F.2d 996, 1001 (2d Cir. 1993)…….............. 19

<u>**Almog v. Arab Bank**</u>, 471 F.Supp.2d 257, 290 (E.D.N.Y. 2007)…………………… 11,13,30

<u>**Baker v. Carr,**</u> 369 U.S. 186, 204 (1962)…………………………………………… ................ 6

<u>**Banco Nacional de Cuba v. Sabbatino**</u>, 376 U.S. 398, 401 (1964)…………………........ 26,27

<u>**Bell v. Hood**</u>, 327 U.S. 678, 681 (1946)………………………………………………............. 20

<u>**Bigio v. Coca-Cola**</u>, 239 F.3d 440 (2d Cir. 1993)………………………………….......... 10,24

<u>**Bowoto v. Chevron Corp.**</u> 2007 WL 2349341 at *3 (N.D. Cal. August 14, 2007)…............ 32,33

<u>**Cavalo Growers of Calif. v. Generali Belgium**</u>, 632 F.2d 963, 968 (2d Cir. 1980)……........ 15,21

<u>**Cortec Indus. Inc. v. Sum Holding L.P.,**</u> 949 F.2d 42, 47…………………………............. 6

<u>**Cunard S.S. Co. v. Salen Reefer Servs. AB,**</u> 773 F.2d 452, 457 (2d Cir. 1985)………........... 24

<u>**Dalton Farms Associates v. Baker, III**</u>, 704 F.Supp. 460, 461 (S.D.N.Y. 1989)……… ............ 6

<u>**D.C. Common Cause v. District of Columbia,**</u> 858 F.2d 1, 5 (D.C. Cir. 1988)……… ............ 13

<u>**Dellums v. U.S. Nuclear Regulatory Com'n**</u>, 863 F.2d 968 (D.C. Cir. 1988)………......... 11,12

<u>**Doe v. Saravia,**</u> 348 F.Supp.2d 1116, 1148 (E.D.Cal.2004)……………………………........... 33

<u>**Franklin v. Fox,**</u> 312 F.3d 423, 445 (9th Cir.2002)…………………………………............. 33

<u>**Gilbert**</u> 330 U.S. at 508……………………………………………………………………19,21,22

<u>**Greenberg v. Bush**</u>, 150 F.Supp.2d 447 (E.D.N.Y. 2001)……………………………… .......... 12

<u>**Gulf Oil Corp. v. Gilbert**</u>, 330 F.2d 501, 508 (1947 .................................................. 15,19,21,22

**Iqabal v. Hasty**, 490 F.2d 143, 157-58 (2d Cir. 2007)……………………………………………35

**In re African-American Slave Descendants Litigation**,
304 F.Supp.2d 1027, 1046 (N.D. Ill. 2004................................................................. 8,9

**Iragorri v. United Technologies Corp**., 274 F.3d 65, 72 (2d Cir. 2001) ................................... 19

**John Doe v. Holy See** (17 A.D. 3d 793, 793 N.Y.S. 2d 565 (3d Dep't 2005)…………………32

**Kadic v. Karadzic**, 70 F.3d 232, 244-245 (2d Cir. 1995 ............................................................. 10

**Khulamani v. Barclay Nat'l Bank Ltd.**, 504 F.3d 254, 260 (2d Cir. 2007) ............................. 29

**Kodak v. Kavlin, 978 F.Supp. 1078**, 1091 (S.D.Fla. 1997 ......................................................... 8,9

**Kramer v. Time Warner, Inc**., 937 F.2d 767, 773 (2d Cir. 1991 ................................................. 6

**Murray v. British Broad. Corp**., 81 F.3d 287, 290 (2d Cir.1996 ................................................ 19

**National Wildlife Fed'n v. Hodel**, 839 F.2d 694, 705 (D.C.Cir. 1988 ........................................ 13

**Piper Aircraft Co. v. Reyno**, 454 U.S. 252, 256 (1981 ................................................................. 19

**Presbyterian Church of Sudan v. Talsiman Energy, Inc.** ,
244 F.Supp.2d 289, 324 (S.D.N.Y. 2003 ................................................................... 8,9,10,12,16,
17,23,24,25,26
**Prescient Acquisition Group, In. v. Prefect Circle Entm't, Inc.,**
No. 05 Civ. 6298 (PKC), 2006 WL 2136293, at *3(S.D.N.Y. July 31, 2006................................ 6

**Prosecutor v. Furundzija** (Case No. IT-95-17/1-T),
Judgment, Dec. 10, 1998 at ¶209 ........................................................................... 8,9,12

**Prosecutor v. Tadic** (Case No. IT-94-I-T), Opinion and Judgment May 7, 1997 .................... 5, 9

**PT United Can Co. v. Crown Cork & Seal Co**., 138 F.3d 65, 73 (2d Cir. 1998...................... 14

**Ricaud v. American Metal Co.,** 246 U.S. 304, 310 (1918 ........................................................ 28

**R. Maganlal & Co. v. M.G. Chem. Co.,** 942 F.2d 164, 167 (2d Cir. 1991 ..................... 14,15,19

**Sosa v. Alvarez-Machain**, 541 U.S. 930 (2004.......................................................................... 30

**Turedi v. Coca Cola Company**, 460 F.Supp.2d 507, 522 (S.D.N.Y. 2006 ............................... 20

**United States v. Alstotter**, 6 L.Rep.Tr. War Crim. 1, 62(1948................................................. 9, 12

iv

**VoctoriaTea.com, Inc. v.Cott Beverages, Canada**,
239 F.Supp.2d 377, 381 (S.D.N.Y. 2003 ...................................................................... 20

**Warth v. Selden,** 422 U.S. 490 (1975 ......................................................................... 7

**Williams v. Bank Leumi Trust Co. of New York**, 1997 WL 289865 (S.D.N.Y.)………....33,34

**Wiwa v. Royal Dutch Petroleum Co.,** 226 F.3d 88 (2d Cir. 2000 ............................... 7

**W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l,**
493 U.S. 400, 405 (1990 .............................................................................................. 25

## STATUTES AND RULE

28 U.S.C. § 1350 (Alien Tort Statute ..................................................................... 17, 24

42 U.S.C. § 1983 ........................................................................................................ 32

F.R.C.P. 2(b)(6)……………………………………………………………………………….35

Torture Victim Protection Act of 1992 ("TVPA").......................................................... 34

### Other Authorities

Australian government's official inquiry into the role of Australian Wheat Board Limited
("AWB") in the Oil for Food Program ...................................................... 2, 4, 23

The Independent Inquiry Committee Into
The United Nations Oil for Food Program ............................................... 1,4-11, 23

Memorandum of Understanding ............................................................... 4-6,10

U.N. Security Council Resolutions 661 .................................................. 4, 5,6,8,10,20

U.N. Security Council Resolutions 986 ................................................. 4,5,6,8,10,20

Plaintiffs Saadya Mastafa and Kafia Ismail ("Plaintiffs") hereby file their Memorandum of Law in Opposition to Defendant Australian Wheat Board Limited aka AWB Limited and AWB (U.S.A.) Limited's ("AWB") Motion to Dismiss Plaintiffs' Class Action Complaint. For the reasons stated herein, AWB's Motion to Dismiss should be denied. If the Court finds AWB's Motion to Dismiss to be well-taken, either in whole or in part, the Plaintiffs respectfully request the opportunity to amend the Class Action Complaint (hereinafter "Complaint" or "Class Action Complaint").

## I.       Preliminary Statement

The Plaintiffs' husbands were tortured and brutally killed Hussein regime. The Plaintiffs' claims arise out the role that BNP played in knowingly funding this criminal activity. The overt purpose of the Program and specifically to use a central independent financial institution was to create a transparent process for the financial transactions that would prevent the illegal diversion of the funds to the Hussein regime. *IIC report*, Chapter 4, page 440.

AWB was the largest supplier under the humanitarian goods section of the Oil for Food Program. AWB attempts to minimize its egregious behavior by claiming that it was merely selling wheat. However, the Plaintiffs' claims do not rest on the sale of wheat. The Plaintiffs' claims arise out of AWB's direct payments of illicit funds in hard currency to a despot who the world had sanctioned for its gross human rights abuses. AWB used the program that was intended to benefit the people of Iraq by bringing them much needed humanitarian goods to increase its own profits by funding the very activities the United Nations Oil for Food Programme ("the Program" or "Oil for Food Program") was designed to curtail. AWB paid the Hussein regime in excess of $200,000,000 in illegal kickbacks when it knew that those payments

were outside of the Program's rules and that the funds would be used to finance the wide-scale human rights abuses complained of in this action.

## II.     Factual Background[1]

AWB was the single largest provider of humanitarian goods to Iraq under the Program, selling a total of 6.8 million tons of wheat and receiving over $2.3 billion in payments from the United Nations' escrow account.  *The IIC Report*, page 623.  In total, AWB paid over $221.7 million in payment for inland transportations fees, corresponding to more than 14% of the illicit funds collected by the Iraqi regime under its kickback schemes.  *The IIC Report*, page 314.

"Numerous documentary and circumstantial warning signs placed at least some employees of AWB on noticed that payments to Alia may have been illicitly funding the Iraqi regime." *The IIC report*, page 315.  AWB was alerted to the prospect that the sudden increases in fees beyond those approved by the U.N. would benefit the Iraqi regime.  *The IIC report*, 316. AWB also knew that the government of Iraq was setting the prices for the inland transportation charges.  This should have alerted AWB to the fact the regime was deriving a benefit from AWB's payments. *The IIC report*, page 316.  A number of documents clearly suggest AWB's awareness that the government of Iraq was the actual beneficiary of the kickbacks.  *The IIC report*, page 317. AWB was aware of the government of Iraq's high degree of interest in AWB

---

[1] The following summary is derived from the Class Action Complaint; the Independent Inquiry Committee Into The United Nations Oil For Food Programme: Manipulation of the Oil for Food Programme by the Iraqi Regime, October 27, 2005, www.iic-offp.org; The Memorandum of Understanding between the United Nations and Iraq (Exhibit 3); U.N. Security Council Resolutions 986 and 661; The 661 Committee Rules and Procedures, all of which are attached to the declaration of John T. Murray  ("the Murray declaration") submitted herewith.  As cited in BNP's Memorandum in Support of its Motion to Dismiss in Footnote 2, it is appropriate for this Court to consider documents essential to the complaint and documents that can be judicially noticed.  "Cortec Indus. Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991) (documents intregal to complaint are properly considered in ruling on a motion to dismiss)' Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991) (documents that can be judicially noticed are properly considered in ruling on a motion to dismiss); Prescient Acquisition Group, In. v. Prefect Circle Entm't, Inc. No. 05 Civ. 6298 (PKC), 2006 WL 2136293, at *3(S.D.N.Y. July 31, 2006) (the court may consider documents integral to the complaint" on a motion to dismiss and "may take account of the entirety of a legal agreement where the complaint relies heavily upon its terms and effect") (quotations omitted)." All of the documents listed above are either integral to the complaint, such as Resolutions 986 and 661, or can be judicially noticed, such as the IIC Report, the Cole Inquiry, the Memorandum of Understanding and the Banking Agreement.

payments to the Alia. *The IIC report*, page 323. Many of the documents received by AWB "suggests that some employees of AWB were placed on notice of facts strongly suggesting that AWB's payments were in whole or in part for the benefit of the government of Iraq". *The IIC report*, page 325.

The Australian federal court found that the "transaction was deliberately and dishonestly structured by AWB so as to misrepresent the true nature and purpose of the trucking fees and to work a trickery on the United Nations." *The Cole Inquiry*, page xi. "AWB also understood that payment of hard currency to Iraq was prohibited by U.N. sanctions. . . Senior management decided to do what was necessary to retain that trade." *The Cole Inquiry*, page xiv. Emails make clear that AWB knew that the payment of fees to Iraq were prohibited by U.N. sanctions and, accordingly, it was necessary to hide or disguise the payments of the fees. *The Cole Inquiry*, page xxi. "AWB had deliberately hidden or disguised the payment of the fee to Iraq and knew that neither the U.N. nor the Australian government was aware of it making payments to Iraq." *Id.*

### III. Argument

#### A. Plaintiffs Have Article III Standing

AWB contends that this case should be dismissed for lack of standing. Plaintiffs do not disagree that Article III standing is a prerequisite for this Court to adjudicate the matter before it. Plaintiffs, as asserted in the Complaint in ¶13-15, have standing to bring this action against BNP and AWB.

> "The standing doctrine is grounded in both case and controversy requirements of Article III and related jurisprudential considerations. The central concern of the standing requirement is whether the plaintiffs have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation

of issues upon which the court so largely depends for illumination of difficult constitutional questions."[2]

The standing doctrine ensures that a litigant is the proper party to bring a matter before the federal courts by ensuring that the Plaintiffs have a sufficient personal stake in the matter. The modern formulation of this doctrine lays out a three-part test based on Article III considerations and then an evaluation of prudential considerations to ensure that this is indeed a case and controversy as historically defined by Article III courts.

The first prong requires that the Plaintiffs must have suffered an injury in fact. Here, the Plaintiffs and members of the class suffered the loss of their spouse or other immediate relative through the ruthless and unwarranted killing by the Hussein regime. The wrongful death of an immediate relative, such as a spouse, is clearly an injury in fact and has not been disputed by the Defendants. The last prong deals with the issue of redressability. This is also not at issue in the present action. The Plaintiffs have raised claims for the discrete injury of the unlawful death of their spouses and seek the traditional remedy of monetary compensation for their loss.

AWB's argument rests on the second prong: "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court."[3]

AWB states the wrong standard when it argues that the injury complained of would not have happened but for the actions of the defendant. The case law addressing this issue has stated that a causal connection exists if the injury would not have happened in the same way, but for the

---

[2] *Dalton Farms Associates v. Baker, III*, 704 F.Supp. 460, 461 (S.D.N.Y. 1989). Citing *Baker v. Carr*, 369 U.S. 186, 204 (1962).
[3] *In re African-American Slave Descendants Litigation*, 304 F.Supp.2d 1027, 1046 (N.D. Ill. 2004).

actions of the Defendant.[4]  The Court in *Warth v. Selden,* 422 U.S. 490 (1975), held that the injury must be fairly traceable to the actions of the defendants.  In fact, the Court explicitly stated, "The fact that the harm to petitioners may have resulted indirectly does not in itself preclude standing." *Id*. at 504.  The Court was emphasizing that the petitioner must establish that the "asserted injury was the consequence of the defendants' actions…." *Id*. at 505.

Other courts have ruled similarly, including the *Kodak* Court: "it would be a strange tort system that imposed liability on state actors but not on those who conspired with them to perpetrate illegal acts through the coercive use of state power."  *Kodak v. Kavlin*, 978 F.Supp. 1078, 1091 (S.D.Fla. 1997).  "While the assistance must be substantial, it "need not constitute an indispensable element, that is, a conditio ine qua non for the acts of the principal." *Presbyterian Church of Sudan v. Talsiman Energy, Inc.*   244 F.Supp.2d 289, 324 (S.D.N.Y. 2003)[5] (hereinafter "*Talsiman I*"), quoting *Prosecutor v. Furundzija* (Case No. IT-95-17/1-T), Judgment, Dec. 10, 1998 at ¶209. Attached as Exhibit 4. "The ICTY added that participation in a crime is substantial if "the criminal act most probably would not have <u>occurred in the same way</u> had not someone acted in the role that the accused in fact assumed."  These principles of international law were adopted in US Courts in   *Talisman I* 244 F.Supp.2d at 324, quoting *Prosecutor v. Tadic* (Case No. IT-94-1-T), Opinion and Judgment, May 7, 1997, at ¶688. (emphasis added). Attached as Exhibit 5.

In the present action, the Plaintiffs' injuries occurred because the Hussein regime was able to continue to wage a campaign of violence through the influx of hard currency that was

---

[4]  *Presbyterian Church of Sudan v. Talsiman Energy, Inc.*  244 F.Supp.2d 289, 333  (Complicity to gross human rights violations violates international law.) Citing *United States v. Alstotter*, 6 L.Rep.Tr. War Crim. 1, 62(1948). *Prosecutor v. Tadic* (Case No. IT-94-1-T), Opinion and Judgment, May 7, 1997, at ¶678, 691.  (The standard is not that the injury would definitely not have happened. The standard is that the injury would not have occurred in the same way but for the conduct of the defendant.) Attached as Exhibit 5.

[5] Referred to hereinafter as Talisman I.  The Court later granted a motion for summary judgment in favor of the Defendant Talisman.

received directly from the Defendants.  Specifically, AWB was instrumental in paying hundreds of millions of dollars to the Hussein regime in violation of the Program and Security Council Resolutions 986 and 661. Attached as Exhibits 1 and 2. The Program was intended by agreement of the world, through the Security Council, to prohibit the Hussein regime from receiving such an influx of hard currency in an attempt to curtail such atrocities.  AWB knowingly, or at a minimum with willful disregard, paid or created the system through approved letters of credit for payments to the Hussein regime in violation of the Oil for Food Program.  AWB's knowing contribution in financing the Hussein regime's activities that included the widespread campaign of violence resulting in the unlawful killings of the Plaintiffs' spouses is sufficient to meet the causal connection requirement.  Plaintiffs' allegations are supported in the voluminous reports issued by the Australian Government entitled the "Report of the Inquiry into certain Australian Companies in relation to the UN Oil for Food Programme" ("Cole Inquiry") and the United Nations' Independent Inquiry Committee Into the Oil For Food Program often called the "Volcker Report" or the "IIC Report".

> 1. **AWB knowingly financed the activities of the Hussein regime, and thus, the acts can NOT be considered Independent Acts of a Third Party.**

The Plaintiffs asserted in the Class Action Complaint that the AWB knew that it was funding activities that amount to gross human rights violations.  Complaint, ¶31, 33, 42,43, and 45.  There is no requirement that AWB had control over the Hussein regime.  AWB's assertion that the Plaintiffs lack standing because Hussein regime was the actor who carried out the atrocities fails to account for the well established body of law recognizing aiding and abetting and conspiracy liability.  The body of law prohibiting actions where third parties actions cut-off liability does not preclude liability for conduct that constitutes aiding and abetting, conspiracy, or

accomplice liability.  AWB knew that the Hussein regime was engaged in widespread human rights abuses and knowingly offered substantial assistance through the payment of hard currency out of the escrow account, approval of letters of credit to the Hussein regime, and recoupment of funds to suppliers for their illicit payments to the Hussein regime.  AWB knowingly provided substantial assistance to illegal activity and cannot now shield itself in the claim that the activity was that of an independent third party.

AWB argues that because the Hussein regime was the actor who "pulled the trigger", not AWB, in the torture and brutal killings of the Plaintiffs' spouses, that Plaintiffs do not have standing to sue.  AWB further argues that because the Hussein regime had an ongoing history of gross human rights abuses, the Plaintiffs do not have standing to sue.  A similar argument was raised in *Presbyterian Church of Sudan v. Talisman Energy, Inc.*  244 F.Supp.2d 289, 320-324 (S.D.N.Y. 2003)[6], and rejected by the Court in the Southern District of New York. The Court stated that for claims arising out of the ATS, the Court must look to the law of nations to determine whether aiding and abetting liability or other forms of vicarious liability exist. [7] The Court in *Talisman I* said the Defendant was unable to point to a single case where the court held that the ATS does not recognize an action for aiding and abetting or conspiracy.  On the other hand, the Second Circuit has made clear that the ATS contemplated liability for private defendants who have "acted in concert" with a state to commit torture and other gross human rights violations.  *Kadic v. Karadzic*, 70 F.3d 232, 244-245 (2d Cir. 1995).  In *Bigio v. Coca-Cola,* 239 F.3d 440 (2d Cir. 1993), the Second Circuit refused to let the plaintiff expand claims

---

[6] Referred to hereinafter as Talisman I.  The Court later granted a motion for summary judgment in favor of the Defendant Talisman.

[7] The Court articulates the standard for claims brought under the ATS are determined by international law. In determining whether there is aiding and abetting liability for ATS claims—look to international law: see generally Bigio v. Coca Cola Co. 239 F.3d 440 (2d Cir. 2000); Kadic v. Karadzic, 70 F.3d 232 (2d Cir.1995); Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir.1980).  See also Wiwa V. Royal Dutch Petroleaum Co., No. 96 Civ. 8386, 2002 WL 319887 (S.D.N.Y. Fev. 28, 2002)

because of a causal connection, but did not hold that ATCA prohibited such conspiracy-based claims. Also in *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88 (2d Cir. 2000), Judge Wood refused to dismiss a claim under the ATS that alleged that a private corporation had directed and aided the Nigerian government in violating plaintiffs' rights.

The fact that the Hussein regime was openly conducting wide scale human rights abuses of the nature that eventually victimized the Plaintiffs' spouses, does not preclude liability. To the contrary, the fact that abuses were happening prior to AWB's financial contributions to the Hussein regime goes to showing that AWB knew of the activities that it was supporting by funding the Hussein regime.

   **2. Plaintiffs allege that AWB aided and abetted the Hussein regime by knowingly financing its illegal activities and that the funding of the regime had a substantial impact on the manner in which the injuries occurred.**

AWB attempts to minimize the role it played in the financing of the Hussein regime by claiming: "Not only is it ridiculous to suggest that the Hussein regime's alleged acts of genocide, war crimes and other human rights violations can properly be traced back to the payment by a single wheat supplier of Government-mandated transportation and after sales service fees under the OFFP…." *See Memorandum in Support of AWB's Motion to Dismiss,* page 8. However, AWB was one of the largest suppliers of humanitarian goods under the program with a contract face value of $2,290,718,296 and the contract disbursements valuing at $2,323,502,447.[8] AWB paid $82,482,748 in after-sales-service fees and $139,274,494 in inland transportation fees for a total of $221,757,242 in illicit payments made to the Hussein regime. Over two-hundred million dollars in illicit payments of hard currency is a substantial amount and should not be characterized as "a single wheat supplier." As in *Almog v. Arab Bank*, 471

---

[8] IIC Report, Table 6, page 26.

F.Supp.2d 257, 290 (E.D.N.Y. 2007), the AWB's actions in knowingly funding the torture and killing of the Plaintiffs' spouses and members of the class substantially contributed to the Hussein regime's ability to carry out its campaign of violence.

### 3. AWB's reliance on *Dellums v. U.S. Nuclear Regulatory Com'n* is misplaced and does not preclude Plaintiffs' Article III standing in this case

Plaintiffs allege that they would not be injured *in the same way*, had it not been for the actions of the bank. The Plaintiffs do not need to show that the injury would definitely not have happened if it were not for the Defendant's conduct. The standard is that the injury would not have occurred in the same way but for the conduct of the defendant. *Presbyterian Church of Sudan v. Talisman Energy, Inc.* 244 F.Supp.2d 289, 333 (S.D.N.Y. 2003) (Complicity to gross human rights violations violates international law). citing *United States v. Alstotter*, 6 L.Rep.Tr. War Crim. 1, 62(1948); *Prosecutor v. Tadic* (Case No. IT-94-1-T), Opinion and Judgment, May 7, 1997, at ¶678, 691. AWB asserts that Plaintiffs "must show that but for the defendants' conduct, the injuries caused by the Hussein regime would have been abated." *See AWB's Memorandum in Support of its Motion to Dismiss*, page 9. This proposition misinterprets the law. Whether or not the Hussein regime would have been capable of finding other sources of funding or could have accomplished the same result through different means is not the critical question. The issue of standing as it relates to AWB is whether AWB's actions contributed sufficiently to the manner in which the injury occurred.

AWB relies on *Dellums v. U.S. Nuclear Regulatory Com'n*, 863 F.2d 968 (D.C. Cir. 1988), in its proposition that plaintiffs must show that the injury would not have happened but for the wrongful activity of the defendant. However, *Dellums*, like the line of cases relied on in *BNP's Memorandum of Law in Support of its Motion to Dismiss* (including *Greenberg v. Bush*,

150 F.Supp.2d 447 (E.D.N.Y. 2001)), are claims which seek redress by challenging an action by

of a government entity and seek equitable relief.   In such circumstances, "the latter two

requirements of "causation" and "redressability" are often treated interchangeably by the

Supreme Court, and we have recognized that they tend to merge in cases such as this one where

the relief sought is only the cessation of the allegedly illegal conduct." *Dellums* ,863 F.2d at

971, citing *D.C. Common Cause v. District of Columbia*, 858 F.2d 1, 5 (D.C. Cir. 1988);

*National Wildlife Fed'n v. Hodel*, 839 F.2d 694, 705 (D.C.Cir. 1988).   AWB's reliance on the

language that Plaintiffs must show that their injury would have been abated but for the actions of

the Defendant, is misplaced.   Such language is referring to the Plaintiffs' burden when the

Plaintiffs seek specific damages in the form of an injunction or other similar equitable relief, that

the harm would have been abated by the action and that by granting such equitable relief the

harm will be redressed.

The Court, in *Almog v. Arab Bank*, 471 F.Supp.2d 257, 290 (E.D.N.Y. 2007), held that

the Bank's "knowing and intentional nature of the Bank's activities" was sufficient to state a

claim of genocide and crimes against humanity.   The Plaintiffs' theory of liability was that the

Arab Bank "knew that the accounts of these various organizations and individuals were being

used to fund suicide bombings and other attacks sponsored by the terrorist organizations." *Id*. at

290.[9]

The factual allegations in the present case parallel the allegations in Almog, in that the

Plaintiffs' husbands were killed by the Hussein regime and Plaintiffs' allegations delineate that

AWB's substantial funding of the Hussein regime directly contributed to their death.   The direct

---

[9] While the Court did not make a specific finding as to the Article III causal connection issue, Article III standing is a fundamental prerequisite to jurisdiction.  Courts may consider the issue sua sponte without a motion from the party.  The fact that the Court found that knowingly allowing the accounts to be used in furtherance of terrorist activities was enough to state a claim, means that the Court considered the causal connection to be sufficient to meet the Article III standing requirement.  See generally *Baker v. Carr*, 369 U.S. 186 (1962).

illegal payments of over $200,000,000 to a known violator of jus cogens norms is more overt than allowing a known terrorist organization to use one's banking services, as in the *Almog* case. The Hussein regime could not have continued such a wide-scale campaign of violence throughout the far corners of Iraq and commit the atrocities that resulted in the Plaintiffs' and the members of the class injuries with out the funding of the defendants in this action.

AWB cannot claim that the Hussein regime is an independent actor wholly unrelated to the Bank. AWB knew that the purpose of the Program was to limit the hard currency being paid to the Hussein regime. AWB knew that the payments made outside of the Program rules would undermine the Program and provide substantial assistance to the Hussein regime. AWB's argument fails because it knew precisely what its actions would lead to. The Plaintiffs allege that AWB knowingly provided substantial assistance through the funding of the Hussein regime with hard currency in the commission of the atrocities complained of. Complaint, ¶31, 33, 42, 43, and 45.

These facts are well documented in the exhibits attached to the Complaint and in the IIC report and the Cole Inquiry which the Plaintiffs have requested be judicially noticed. The Plaintiffs have alleged a sufficient causal connection between AWB's misconduct and the atrocities they suffered.

### B. The Complaint Should Not Be Dismissed On Grounds of Forum Non Conveniens

"Forum non conveniens is a discretionary device permitting a court in rare instances to 'dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim." *Wiwa v. Royal Dutch Petroleum Co*. 226 F.3d 88, 100 (2d Cir.2000) (quoting *PT United Can Co. v. Crown Cork & Seal Co*., 138 F.3d 65, 73 (2d Cir. 1998)). The doctrine of forum non conveniens presupposes that an alternative forum is available. *Cavalo Growers of Calif. v.*

*Generali Belgium,* 632 F.2d 963, 968 (2d Cir. 1980). "The defendant has the burden to establish that an adequate alternative forum exists and then to show that the pertinent factors 'tilt [] strongly in favor of trial in the foreign forum.'" *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir. 2000), quoting *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir. 1991). "The plaintiff's choice of forum should rarely be disturbed." *Wiwa*, 226 F.3d at 100 quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).

AWB asks this Court to dismiss this case based on a discretionary doctrine to Australia, a forum wholly unrelated to the events of this case. The only connection between Australia and the Plaintiffs' claims is that one of the Defendants, AWB, happens to be headquartered in Australia. The doctrine of forum non conveniens should NOT be applied to allow for reverse forum shopping by a defendant.

### 1. Australia is wholly unrelated to the cause of action and thus not an adequate alternative forum

AWB fails to acknowledge in its Memorandum in Law and its Declaration of Craig Phillips that AWB Limited, an Australian Corporation, was sued along with AWB Limited (U.S.A.) a citizen of the United States. Furthermore, AWB asserts in the Declaration of Craig Phillips that Plaintiffs could raise their cause of action in Australia. However, there is nothing in this declaration which asserts that the Australian courts would have subject matter jurisdiction over Plaintiffs' claims. Defendant lists a series of common law tort causes of action such as negligence, battery, assault, false imprisonment, and wrongful death (Craig Phillips Declaration, page 16), but says nothing about the jurisdictional issue. Surely, if these wrongs occurred within the borders of Australia, the Plaintiffs would have an alternative forum for these common law torts within Australia. However, the events leading to the torts occurred in New York and Iraq and the effects were felt in Iraq.

Neither the Craig Phillips declaration nor the Memorandum of Law in Support of the Motion to Dismiss offers a jurisdictional basis for the subject matter of Plaintiffs' claims in an Australian Court.  On the other hand, the United States courts have consistently recognized the fairly unique nature of the Alien Tort Statute in its application of universal jurisdiction.  Spain recognizes universal jurisdiction over claims of torture based on its adoption of the Torture Convention. See the Pinochet Case: Spain-Chile: Writ of the Instructing Court accepting the Jurisdiction in the Pinochet case, Summary Proceeding 1/98-J, AUDIENCIA NACIONAL, CENTRAL INVESTIGATORY COURT, NUMBER SIX, MADRID, September 20, 1998. Attached as Exhibit 9.  Belgium had a universal jurisdiction statute for war crimes and gross human rights violations, but it was repealed in 2003.  These examples, however, are some of the exceptions.  There is no basis to assume that Australia would exercise universal jurisdiction over these civil law claims.  AWB points to no statute or body of case law in Australia that would provide for such jurisdiction.

Furthermore, even if Australia would exercise jurisdiction over this case, AWB has not demonstrated that Australia's judicial system would recognize the gravity of the Plaintiffs' claims.  This is not an ordinary battery, negligence, assault, false imprisonment or wrongful death claim.  The Plaintiffs' claims arise out of egregious human rights abuses recognized by the world as non-derogable norms, or jus cogens violations.  This Court, in *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F.Supp.2d 289, 337 (S.D.N.Y. 2003) ("*Talisman I*"), was faced with similar facts and found that the usual common law causes of action (that were available in Canada) "do not reflect the gravity of the alleged offenses, and in particular, the universally-condemned nature of these acts."  In *Talisman I*, the Court noted that the defendant did not mention a cause of action for violations of the law of nations, and was particularly

13

concerned that there was no recognition of the jus cogens violations. AWB has mentioned genocide as potentially actionable in Australian courts. However, the issue of redressibility remains uncertain. The lack of remedy for all of the other international law violations, as well as the uncertainty of a remedy for genocide, leads to the conclusion that the Plaintiffs would not be able to have their claims adequately redressed. The Plaintiffs in *Talisman I* did not challenge the adequacy of the Canadian courts, and thus the court assumed its adequacy. This is significant because the Court, without the request from a party, questioned whether the Canadian courts would be an adequate for a based on the fact that domestic common law "fails to recognize the gravity of Plaintiffs' allegations." *Talisman I* 244 F.Supp.2d at 337.[10]

   Here, the events of this case occurred primarily in two locations, New York and Iraq. The two jurisdictions with the most interest in the case at issue are New York and Iraq. AWB's attempts to move this litigation to Australia amount to nothing more than reverse forum shopping. This case involves two Plaintiffs who both reside in Erbil, Iraq and represent members of the class who are likely to live all across the world. The Defendants in this action are AWB Limited, an Australian corporation, AWB (U.S.A.) Limited, a United States corporation, and BNP Paribas, a French corporation. Each of the Defendants is a multi-national corporation who conducts business world-wide. The fact that one of the Defendants happens to be from Australia may make Australia a more convenient forum for that Defendant, but it does not make Australia an adequate alternative forum. AWB seems to have leaped to the conclusion that because Australia is generally recognized as an adequate forum due to its independent and

---

[10] "The concern is that the causes of action available do not reflect the gravity of the alleged offenses, and in particular, the universally-condemned nature of these acts. The offenses alleged in the amended Complaint are considered international crimes entailing individual responsibility and subject to universal jurisdiction precisely because they constitute a fundamental affront to the international order. Such crimes are more than the sum of their parts. Genocide may quantitatively be the same as a large number of murders, but it is qualitatively different, and this difference is recognized by the fact that the act enjoys special status under international law." *Talisman I*, 244 F.Supp. at 337, citing *Restatement (Third) Foreign Relations* §§404, 702 (1987).

14

impartial judiciary, it would be an adequate forum in this case even though it has only a tenuous relationship to the events and may not have jurisdiction to hear the matter at all.  In *Aguinda v. Texaco, Inc*. 142 F.Supp.2d 534, 536 (S.D.N.Y. 2001), the Court held that the case should be dismissed on the grounds that "these cases have everything to do with Ecuador and nothing to do with the United States."  AWB is asking this Court to dismiss an action from a forum where many of the central events occurred to be heard in a foreign forum that has nothing to do with the events of the case.

Finally, AWB does not demonstrate that there is any basis for subject matter jurisdiction over the Plaintiffs' claims against BNP Paribas.  While the BNP and AWB may have agreed to in personum jurisdiction in the Australian courts, subject matter jurisdiction is not waivable.  The court must have legitimate authority to hear a matter that comes before it.  The Defendants have not demonstrated that such jurisdiction exists and thus the Plaintiffs would not be able to have her claims fully adjudicated in AWB's choice of forum.

### 2.  **Iraq is not an adequate alternative forum.**

The only other logical alternative forum would be Iraq.  However, AWB does not assert in its Memorandum of Law in Support of its Motion to Dismiss that Iraq is an adequate alternative forum.  AWB has the burden to demonstrate that there exists an adequate alternative forum and that the ordinarily strong presumption favoring the Plaintiffs' choice of forum is overcome by a balance of the relevant factors of private and public interest weighing heavily in favor of the alternative forum.  *Aguinda* at  537.  AWB does not demonstrate that Iraq is an adequate alternative forum, thus it should not be considered.

### 3.  **Plaintiffs' case is based heavily on events which occurred in New York, and thus Defendants have not overcome their burden of showing that Plaintiffs' choice of forum should be shown little deference.**

Assuming, arguendo, that the Court finds that there is an adequate alternative forum and Defendants have demonstrated as such, the Court should not dismiss this case on forum non conveniens grounds because the Plaintiffs' choice of forums is owed deference. AWB argues that "Plaintiffs' choice of forum should be given no deference." *AWB's Memorandum of Law in Support of its Motion to Dismiss*, page 12. This argument is contrary to the Second Circuit's body of law regarding forum non conveniens. While it is true that the Plaintiffs' residence and citizenship trigger a higher degree of deference to the Plaintiffs' choice of forum, it does not follow that a foreign residency deserves no deference at all. In fact, beginning with *Gilbert*, the courts have held that the plaintiffs' choice of forum should be given deference and that there is a sliding scale of *more* deference given to Plaintiffs who are residents of the United States. *Gilbert* 330 U.S. at 508 ("plaintiff's choice of forum should rarely be disturbed.") *Allstate Life ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 1001 (2d Cir. 1993) ("There is…a strong presumption in favor of a plaintiff's choice of forum."); *R. Maganlal & Co.*, 942 F.2d at 167 (as plaintiff's choice of forum is entitled to deference, forum non conveniens dismissal is only permissible where the relevant considerations "tilt strongly in favor of trial in the foreign forum."); *Bell v. Hood*, 327 U.S. 678, 681 (1946) (plaintiff is "master" of his or her own lawsuit.") The Second Circuit has specifically said that "while <u>any plaintiff's selection of a forum is entitled to deference,</u> that deference increases as the plaintiff's ties to the forum increase." *Wiwa* 226 F.3d at 101 citing *Murray v. British Broad. Corp.,* 81 F.3d 287, 290 (2d Cir.1996). (emphasis added). AWB's argument that Plaintiffs' choice of forum would be more persuasive if there were no connections between the Plaintiffs' choice of forum and the underlying facts. The courts have held that a plaintiff's choice of forum does not deserve "special" deference if the "events bear no bona fide connection to the Untied States, or that in relation to the core operative facts in dispute they at

best may have only marginal links to the plaintiff's choice of forum." *Turedi v. Coca Cola Company*, 460 F.Supp.2d 507, 522 (S.D.N.Y. 2006); See also *Piper Aircraft Co. v. Reyno*, 454 U.S. 252, 256 (1981); *Iragorri v. United Technologies Corp.*, 274 F.3d 65, 72 (2d Cir. 2001); *VoctoriaTea.com, Inc. v.Cott Beverages, Canada*, 239 F.Supp.2d 377, 381 (S.D.N.Y. 2003). That is not the case here.

While the Plaintiffs are not residents or citizens of the United States, their case does have significant ties to their chosen forum. This case arises out of AWB and BNP's actions in the corruption of the United Nations Oil for Food Program. The United Nations headquarters is in New York City. The bulk of the activity surrounding the financial transactions occurred in New York. AWB went as far as to set up a New York office with its primary purpose to conduct business related to the Oil for Food Program. There are two core centers of operative facts in this case: New York, the center of the Oil for Food Program and thus the heart of the financial support claim, and Iraq, where the effects of the conduct were felt by the Plaintiffs. Iraq is not an adequate forum. The security in the country is such that a case of this nature would be impossible. While the Iraqi courts may be up and running, a new court system could not be prepared to handle a case of this magnitude. The Plaintiffs chose the other forum which has a bona fide connection to the facts of this case: New York. For AWB to make the sweeping assumption that Plaintiffs are forum shopping is unfounded and inappropriate. Plaintiffs suffered the brutal loss of their spouses, and for AWB to brazenly degrade such a loss as a fishing expedition shows the callousness in which they have conducted themselves with regards to the effect of their egregious conduct in the support of the Hussein regime. Plaintiffs have come to this Court to seek just compensation for the loss they have suffered due to the zealous greed of AWB in its support of the Hussein regime. AWB chose to operate a several hundred million

dollar project within the boundaries of the Southern District of New York.  For AWB to now assert that litigating a matter in direct relation to that operation is too inconvenient for them is illogical.  AWB's motion to dismiss on forum non conveniens grounds should be denied.

4.  **Private and Public Interest Factors weigh in favor of the Court retaining Jurisdiction over the matter.**

The Plaintiffs are masters of their own lawsuit and their choice of forum is entitled to deference.  It is up to the Defendants to show that private or public interest factors weigh heavily for a foreign forum.

### a.  Private Interest Factors

The private interest factors in a forum non conveniens analysis are (1) ease of access to evidence, (2) availability of compulsory process, (3) cost of obtaining attendance of cooperative witnesses, (4) the enforceability of a judgment, and (5) all other practical problems that might shorten any trial or make it less expensive. *Gilbert,* 330 U.S. 508-510 .

While the Plaintiffs are not residents of the forum, their case is significantly tied to the forum.  The most convenient place for calling witnesses and examining evidence related to the Oil for Food Program in most likely to be New York.  New York is one of the major hubs of the world.  BNP's witnesses are likely to come from Europe.  New York is a more convenient location to Paris and Geneva, the likely sources of witnesses and documents than Australia.  AWB (U.S.A.) is headquartered in Washington State.  Again, New York is much closer and more convenient than Australia to most witnesses and documentary evidence that will likely be located in New York, Iraq and Europe.

As the Court noted in *Calavo Growers of California v. Generali Belgium*, 632 F.2d 963, 969 (2d Cir. 1993), "a forum is not necessarily inconvenient because of its distance from pertinent parties or places if it is readily accessible in a few hours of air travel.  It will often be

quicker and less expensive to transfer a witness or a document than to transfer a lawsuit. Jet travel and satellite communications have significantly altered the meaning of 'non conveniens'." (referring to the Southern District of New York).

There is no perfectly convenient location in a case of this manner. The events occurred in two primary locations. Surely, the facts as they are discovered will show that witnesses and documents are scattered throughout many parts of the world. The doctrine of forum non conveniens is not designed to make it perfectly convenient for one party over another as AWB would like. Obviously, litigating this case in a forum that would not weigh the claims against AWB with the same gravity, in its own backyard, would be cheaper and more convenient for AWB. However, Australia would not be more convenient, more efficient or less expensive for any of the other parties. Furthermore, this case involves primarily the activities of AWB and BNP in their capacity as supplier and escrow bank of the UN Oil for Food Program. These activities occurred in New York. For AWB to argue that it should not be forced to put forward the expense of being hauled into a court of law in New York regarding its actions in which it opened an office in New York to operate is absurd.

### b.  Public Interest Factors

The public interest factors in a forum non conveniens analysis are (1) administrative difficulties relating to court congestion (2) imposing jury duty on citizens of the forum, (3) having local disputes settled locally, and (4) avoiding problems associated with the application of foreign law. *Gilbert,* 330 U.S. at 508-510.

The first two factors do not weigh heavily in favor of a foreign forum because of the nexus of the events of the case to this forum. As discussed above, this case arises out of the activities of the Defendants in relation to their abuse of the Oil for Food Program, which was

located in New York.  The Bank's duties arose out of the contract created in New York.  AWB operated out of a New York office created to deal with the Oil for Food Program.  Therefore, any administrative difficulties and the imposition of jury duty on citizens would be no different than any other complex cause of action brought in the Southern District of New York.

As for the third factor, this is not a case that would be considered truly local anywhere. Much of the conduct at issue in this case occurred in New York.  Therefore, New York does have an interest in adjudicating the matter.  However, this case is international in nature and thus there is no one locality where the claims should clearly be brought.

The fourth factor, avoiding problems associated with applying foreign law, is not at issue here.  This case arises out of international law claims.  Congress expressed its intention for United States federal courts to apply the law of nations when it passed the Alien Tort Statute. This case does not require that the court apply a foreign state's laws.

Finally, in weighing the public interest factors, it should be noted that the Secretary-General of the United Nations, in his Statement in response to the Independent Inquiry Committee on oil-for-food, called for member states to take action against companies falling within their jurisdiction who participated in the vast network of kickbacks and surcharges to the Hussein regime under the Oil for Food Program. Attached as Exhibit 7.[11]  As the host of the United Nations headquarters, New York should not shrug off its responsibility to adjudicate matters brought before it regarding this scandal when called upon by the Secretary-General when there is jurisdiction.  To use a discretionary doctrine to pass this litigation on to another forum when there are such clear ties to New York would be inappropriate.

### C.  Plaintffs' Claims Should Not Be Dismissed On Comity Grounds

---

[11] Statement attributable to the Spokesman for the Secretary-General on the Final Report of the Independent Inquiry on oil for food, New York, 27 October 2005. www.un.org/apps/sg/sgstats.asp

International comity is defined as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Talisman I*, 244 F.Supp.2d 289, 342 (2d Cir. 2003). The Second Circuit has articulated that the notion of international comity is "fundamentally discretionary and is not obligatory." *Id*. See also *Bigio*, 239 F.3d at 454. *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 457 (2d Cir. 1985). The *Talisman I* Court stated that "comity generally means deference to a foreign nation's legislative, executive, or judicial enactment." *Talisman I,* 244 F.Supp.2d at 342.

As in *Talisman I*, the defendant here does not point to a single enactment in which the court should pay deference. Instead, AWB argues that the complaint should be dismissed "in favor of allowing plaintiffs, and the Iraqi citizens they seek to represent, to seek redress or reparations in Iraq, through the Iraqi legal system, for wrongs (such as torture and genocide) committed against them by the Hussein regime." *Memorandum of Law in Support of AWB's Motion to Dismiss*, page 18. There is nothing in the commencement and prosecution of this action that would prevent the Plaintiffs or other Iraqi citizens from seeking redress for the Hussein regime's direct atrocities against them in the Iraqi judicial system or some other system of reparations established by the Iraqi government. This case was brought against AWB and BNP for their role that they played in supporting the gross human rights violations committed by the Hussein regime. The corporate activities of these private actors do not deserve to fall under the rubric of international comity.

If the Court chooses to dismiss this action on international comity grounds out of respect for the Iraqi government, it would be doing so in contravention to established principles of international law. Jus cogens violations do not deserve to be treated with deferential respect. The Southern District of New York adopted this principle in *Talisman I* when it stated "granting

comity to allegedly genocidal acts violates the strong United States interest in addressing jus

cogens violations through the ATCA." *Talisman I*, 244 F.Supp.2d at 343, citing *Wiwa*, 226 F.3d

at 103-04.

The nature of these claims have an international scope: the underlying violations are jus

cogens violations which the entire world has an interest in bringing to an end and holding

violators responsible, the defendants are multi-national corporations with no connection to Iraq

other than conducting business with Iraq as they do all over the world, and events occurred as a

part of the U.N. Oil for Food Program, headquartered in New York, and concerning all member

states. As the Court stated in *Talisman I*, "such matters are fundamentally different than a

foreign court's determination in, for example, a bankruptcy matter." *Talisman I*, 244 F.Supp.2d

at 342.

Lastly, The Secretary-General of the United Nations has called on member states to apply

its applicable laws to corporations who acted illegally within the framework of the Oil for Food

Program. The United States, as a member of the Security Council and host of the United Nations

Headquarters, should not use a discretionary doctrine to refrain from adjudicating a case and

controversy appropriately brought before it for activity that in large part happened within its

borders.

### D.  The Act of State Doctrine Does Not Apply

The act of state doctrine is defined in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S.

398, 401 (1964) "in its traditional formulation" as a doctrine that "precludes the courts of this

country from inquiring into the validity of the public acts a recognized foreign sovereign power

committed <u>within its own territory.</u>"  (emphasis added).  This definition was relied on in *W.S.*

*Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990), when it held that

> "Courts in the United States have the power, and ordinarily the obligation, to decide cases and controversies properly presented to them. The act of state doctrine does not establish an exception for cases and controversies that may embarrass foreign governments, but merely requires that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid. That doctrine has no application to the present case because the validity of no foreign sovereign act is at issue."

In articulating the state of the law, AWB fails to include the crucial element that the act of state doctrine applies only to official legislative, judicial, or executive enactments <u>within the territory of that sovereign.</u>  Even assuming, arguendo, that AWB's actions in the support of the Hussein regime were official state acts, the actions were not taken within the sovereign of Australia and thus the act of state doctrine does not apply.  There is no basis for extending the doctrine beyond what the Supreme Court has carefully crafted the doctrine to include.  The doctrine is a "consequence of domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs."  *Kirkpatrick* 493 U.S. at 404, quoting *Sabbatino* 376 U.S. at 423.

The act of state doctrine does not apply to actions outside of the sovereign territory. Even if AWB's actions are considered official and do not fall into one of the exceptions that some Justices have articulated in relation to the doctrine, such as a commercial activity exception, the doctrine does not apply to this case because AWB's actions occurred in Iraq and New York and the effects were felt in Iraq.

Furthermore, for the act of state doctrine to apply, as the Supreme Court stated in *Kirkpatrick* that "in *every* case in which we have held the act of state doctrine applicable, the

relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *Kirkpatrick,* 493 U.S. at 405. The Plaintiffs are not seeking this Court to declare an official enactment of Australia to be illegal. As in *Kirkpatrick*, the Court may make factual findings that suggest that contracts at issue are illegal, but the legality of the contracts is not the issue of this case.[12] No claim or defense requires this Court to determine whether the contracts were or were not effective. The issue is whether the acts occurred and what the effects of those acts were.

"The act of state doctrine is not some vague doctrine of abstention but a 'principle of decision binding on federal and state courts alike.'" *Kirkpatrick,* 493 U.S. at 406. This doctrine relates only to acts that occur within its own boundaries and that act "becomes …a rule of decision for the courts of this country." *Ricaud v. American Metal Co*., 246 U.S. 304, 310 (1918). Whether or not AWB, even if considered an agency of the Australian government, was paying kickbacks to the Hussein regime in contravention to the Oil for Food Program rules is not a rule of decision that must be applied or determined to be invalid in this case. The Courts have clearly stated that unless the court MUST decide the legality of a foreign sovereign's official act within its own boundaries, the act of state doctrine does not apply. The Court does not need to declare the legality of an action of the Australian government within its own territory in this case, thus the act of state doctrine does not apply.

### E.  Plaintiffs Have Valid ATS Claims

Plaintiffs clearly assert that both Defendants aided and abetted, conspired, and acted as accomplices in the perpetration of crimes against humanity, torture, genocide, war crimes, extrajudicial killings, forced disappearances of persons, and cruel, inhumane and/or degrading

---

[12] In *Kirkpatrick*, the Plaintiffs were a construction company who unsuccessfully bid on a contract with the Nigerian government. The defendants allegedly bid on the contract with a promise to pay a "commission" that would eventually find its way into the hands of the Nigerian government. *Kirkpatrick* 493 U.S. at 402.

treatment and/or punishment.  All of these allegations are violations of the law of nations and most of which are jus cogens violations.[13]  As stated above in both the sections on Factual Background and Article III standing, the Plaintiffs alleged that AWB paid over $200,000,000 to the Hussein regime in illicit kickbacks and that it did so knowing that the money would be used to fund egregious human rights abuses of the very nature that victimized the Plaintiffs' spouses. These payments made knowingly to a regime who was openly conducting the atrocities complained of in the Class Action Complaint amounts to substantial assistance.

1. **Plaintiffs have alleged adequately that AWB aided and abetted the Hussein regime in violating customary international law**

AWB articulates the Second Circuit's recent decision in *Khulamani v. Barclay Nat'l Bank Ltd*., 504 F.3d 254, 260 (2d Cir. 2007) where Judges Katzmann and Hall agreed that aiding and abetting liability exists under the ATS.  The Court disagreed, however, as to the standard to apply for aiding and abetting.  Judge Hall looked to federal common law to ascertain the appropriate standard: "knowingly and substantially assisting[ing] a principal tortfeasor, such as a foreign government or its proxy, to commit an act that violates a clearly established international law norm."  *Id* at 288 (Hall, J., concurring).  Judge Katzmann looks to international **criminal** law[14] to determine the standard of aiding and abetting liability: "when the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime." *Id*. at 277 (Katzmann, J., concurring) (Judge Korman concurred to this section, but disagreed with the conclusion).

---

[13] Jus cogens violations are violations of "the most basic rules of international law and, indeed, of civilized conduct.. Such acts violate peremptory norms, or jus cogens.  Talisman at 306 citing Restatement (Third) of Foreign relations §702 (stating that acts of genocide, slavery, and extrajudicial killing violate jus cogens norms).

[14] Judge Katzmann relies on the Rome Statute governing the International Criminal Court, the International Criminal Tribunal for Yugoslavia statute and case law, and the International Criminal Tribunal for Rwanda statute and cases.

It is the Plaintiffs' position that reliance on the long-standing federal common law for the standard in which to apply is more appropriate than raising the bar to a criminal standard for civil liability.  While the ATS is a jurisdictional statute,[15] and creates jurisdiction for torts that in violation of the law of nations, it is appropriate to look to international standards for what constitutes a violation of the law of nations and to look to the body of tort law established within the federal justice system to determine if the violation constitutes a tort.  The fact that international law recognizes vicarious liability, including aiding and abetting liability, means that parties who are not the principal tortfeasor may be held accountable in United States Federal Courts for their actions in support of violating international law.  However, to adopt a criminal standard, as Judge Katzmann has, may not be the best approach.  This is not a novel concept that the Court is facing.  Many of the torts that may be brought in U.S. courts have a criminal counterpart.  The civil standard, however, does not incorporate the strict mens rea requirement that is present in the criminal standard.  In determining the standard of the tort, i.e., what the mental state must be of the defendant in order to be held liable, the federal common law regarding tort and vicarious liability is more appropriate than the body of international criminal law.

Contrary to AWB's assertions, the Plaintiffs have alleged that AWB knowingly made direct payments to the Hussein regime.  These payments were made knowingly to a regime who was openly conducting the atrocities complained of in the Class Action Complaint.

Furthermore, the crux of Plaintiffs' allegations parallel very closely to the allegations set forth in *Almog v. Arab Bank PLC*, 471 F.Supp. 2d 257 (E.D.N.Y. 2007).  In *Almog*, the plaintiffs allege that the bank should be held vicariously liable for aiding and abetting Hamas and other

---

[15] *Sosa v. Alvarez-Machain*, 541 U.S. 930 (2004).

terrorist organizations for knowingly providing them with banking and other services that facilitated their actions.

AWB maintains that this case should be dismissed with prejudice because Plaintiffs did not include enough facts in their Class Action Complaint. The Plaintiffs maintain that its Class Action Complaint provides enough detail and factual allegations as to put AWB on notice of exactly what the Plaintiffs' claims are against it. That is the purpose of the Complaint. The purpose of the pleading stage is not to try the case in its entirety, but to put the defendant(s) on notice of the claims against them. Secondly, the Plaintiffs' allegations are well-founded and substantiated in the documents referenced in the Class Action Complaint—the IIC Report and the Cole Inquiry. The extent to which the facts of this case have been investigated and considered by independent neutral third parties and then documented makes this case fairly unique. Thirdly, if the Court finds that the Plaintiffs' Complaint is lacking in detail as asserted by BNP, the Plaintiffs request that this Court allow the Plaintiffs to amend its Complaint. The Class Action Complaint at issue here is the first complaint filed by the Plaintiffs.

> 2. **Plaintiffs have alleged adequately that AWB both conspired with the Hussein regime and served as its accomplice with respect to violations of customary international law.**

Plaintiffs have alleged sufficient facts for conspiracy and accomplice liability under the ATS. As discussed above and in the *Plaintiffs' Opposition to BNP's Motion to Dismiss*, the Federal Rules of Civil Procedure have a liberal pleading standard that is intended to put the Defendant on notice of the claims against him. The recent Court decisions emphasizing the need for complaints to be more than vague and speculative does not create a requisite for the Plaintiffs to prove his or her case at the pleadings stage.

Plaintiffs allege that there is an association between the Hussein regime and AWB. Complaint, ¶54, 55 and 57. Plaintiffs further allege that an unlawful objective existed between AWB and the Hussein regime in order to fund the Hussein regime with illegal kickbacks. It is irrelevant that AWB's motive may not have been to commit human rights abuses. AWB knew it was funding human rights abuses through an illegal arrangement with the common objective to violate the sanctions scheme. AWB committed the unlawful acts of making over $200,000,000 in illegal kickbacks to the Hussein regime which resulted in the torture and killings of the Plaintiffs' spouses.

Plaintiffs have alleged the elements of conspiracy and will be able to prove such elements at trial. Accomplice liability is akin to aiding and abetting liability. Plaintiffs have sufficiently alleged claims under the theory that AWB substantially supported the Hussein regime by funding its campaign of violence through the payments of over $200,000,000 in illicit kickbacks.

### F. Plaintiffs Have Valid TVPA Claims

AWB argues that the TVPA only provides liability for the individual who physically tortured and/or committed the extrajudicial killing. AWB further argues that only individuals and not corporations may be sued under the TVPA. The courts are split on these issues. However, the better line of cases, holds that corporations may be subject to the TVPA and that corporations may be liable under aider and abettor liability. This line of cases was recently summarized in *Bowoto v. Chevron Corp*. 2007 WL 2349341 at *3 (N.D. Cal. August 14, 2007) as follows:

> Several courts have suggested that under the TVPA, private individuals can be liable for aiding foreign state actors.[16] Similarly, under § 1983, private parties can be liable for

---

[16] *See* <u>Aldana v. Del Monte Fresh Produce, N.A., Inc.</u>, 416 F.3d 1242, 1247-48 (11th Cir.2005) ("State-sponsored torture, unlike torture by private actors, likely violates international law and is therefore actionable under the Alien Tort Act.... In construing this state action requirement, we look 'to the principles of agency law and to jurisprudence under <u>42 U.S.C. § 1983</u>.' A claim for state-sponsored torture under the Alien Tort Act or the Torture Victim

aiding a state actor's violations if they "acted in concert." _Franklin v. Fox,_ 312 F.3d 423, 445 (9th Cir.2002).

AWB argues that because the statute uses the word "individual" it precludes corporate liability. AWB cites legislative history which contrasts individual with a state or a state entity. There are many reasons why Congress may have wanted to exclude states and arms of a state from liability under the TVPA including sovereignty and comity. Neither of which are attributable to corporate liability. Under traditional common law claims, corporations are held accountable for their actions in the same fashion that individuals are held accountable. Sovereign governments are treated differently through doctrines of immunity and other forms of deference. There is no basis to distinguish between an individual and a corporation.

To the contrary, public policy considerations favor allowing any private party, whether an individual or a corporation, to be held liable for aiding and abetting international human rights violations that require state action. When a state actor violates an international norm, concern for the state's sovereignty dissolves.

> Similarly, when a private actor aids the state in committing a violation, the state, by participating in the violation, unequivocally demonstrates that it is unwilling to punish its co-perpetrator, and concern for the state's sovereignty is diminished. Allowing a private party to be held liable for aiding and abetting a state actor's human rights violation therefore does not conflict with the concern for state sovereignty that underlies the state-action requirement. _Bowoto v. Chevron Corp._ 2007 WL 2349341 at *3 (N.D. Cal. August 14, 2007)

---

Protection Act may be based on indirect liability as well as direct liability.") (citations omitted); _Doe v. Saravia,_ 348 F.Supp.2d 1116, 1148 (E.D.Cal.2004) ( "Saravia's role in coordinating and planning the assassination of Archbishop Romero is sufficient to establish liability against him under the TVPA and [ATS] as a direct participant, conspirator, accomplice, and aider and abettor."); _Wiwa v. Royal Dutch Petroleum Co.,_ 2002 U.S. Dist. LEXIS 3293, 2002 WL 319887 at *50 (S.D.N.Y.2002) ("individuals who 'cause someone to undergo' torture or extrajudicial killing, as well as those who actually carry out the deed, could be held liable under the TVPA. The legislative history of the TVPA supports this reading. In the Committee Report, the Senate Judiciary Committee explained that the Act would permit suits 'against persons who ordered, abetted, or assisted in torture.' S.Rep. No. 249, 102nd Cong., 1 st Sess. (1991).").

Plaintiffs have alleged that they were tortured and killed through extrajudicial means by state actors. Plaintiffs further alleged that AWB aided and abetted the Hussein regime by funding the regime's campaign of violence resulting in the torture and killings of the Plaintiffs' spouses. Plaintiffs allege and can demonstrate that AWB paid over $200,000,000 in illegal kickbacks to the Hussein regime. These payments allowed the Hussein regime to continue its reign of terror across the country of Iraq, especially in the northern Kurdish region. With out such funding, the Hussein regime would not have been able to launch such a wide scale campaign of attacks on the population.

Finally, Plaintiffs have met the exhaustion of remedies requirement for two distinct reasons. The first is that the center of conduct by the named Defendants is located in New York. As such, there is no requirement for the exhaustion of remedies. The Oil for Food Program was headquartered and operated out of New York. AWB opened an office to conduct its business in relation to the Program from New York. Furthermore, the escrow Bank conducted much of its financial activity in relation to the Program in New York. As a result, New York is an appropriate forum.

The second reason that Iraq is not a feasible forum at this stage for this litigation due to the lack of security and lack of established rule of law. The Plaintiffs' claims are against two multi-national corporations with no current presence in Iraq. AWB has moved this Court to dismiss these claims in favor of Australia, but has not asked this Court to dismiss these claims in favor of Iraq. Notably, both AWB and BNP have offered to accept in personum jurisdiction in Australia, but have not done so in Iraq. The security situation is such, that a case of this magnitude would bring with it a great deal of risk. All parties and practitioners involved would be potential targets of violence. A fair comparison to the security risk is to look at the levels of

violence targeted at the individuals involved in the Hussein criminal trial.  An investigative judge and his son were murdered on the street of Baghdad in 2005 in what has been widely recognized as a targeted killing to send a message against the tribunal. (see attached news articles Exhibit 8).

Regarding AWB's assertion that the rule of law in Iraq is functioning at an acceptable level, there is scant recent documentary evidence to support such a claim.  AWB points to a quote from Paul Bremer from the beginning of the reconstruction period of Iraq in 2003.  AWB relies on one article and a quote from the UNDP web page.  The UN only has five people located in Iraq at this time due to the security situation.  Normally, when a country embarks on a massive reconstruction period, as is occurring in Iraq, the international community is able to monitor and release regular reports regarding the current state of the rule of law.  The United Nations, non-governmental international organizations such as Amnesty International, Human Rights Watch and International Crisis Group, and state foreign offices such as the U.S. State Department all conduct monitoring activities and report on the current status.  The U.S. State Department has not released a Human Rights Report since 2003 which would normally contain information on the rule of law.  The United Nations only has 5 individuals on the ground in Baghdad and is thus not conducting its usual monitoring activities.  There is also little available in the way of non-governmental organization reports.

Plaintiffs' TVPA claims should not be dismissed.

### G.  Plaintiffs New York State Law Claims Should Not be Dismissed

### H.  Plaintiffs have alleged sufficient facts to establish PLAUSIBLE CLAIMS BASED ON CONCERTED ACTION LIABILITY UNDER NEW YORK LAW.

    1.  Plaintiffs' Claims are not Time-Barred Since the Statute of Limitations was Equitably Tolled.

AWB asserts that plaintiffs' state common law claims are time-barred. However, the statute of limitations will be tolled where a plaintiff has been induced by fraud, misrepresentation or deception to refrain from timely filing an action. *John Doe v. Holy See (State of Vatican City),* 17 A.D. 3d 793, 793 N.Y.S. 2d 565 (3d Dep't 2005). If a plaintiff has been so induced, the action nonetheless must be brought within a reasonable time after the facts giving rise to the estoppel ceased to be operational. *Id.*

Until the publication of the Cole Report on November 24, 2006, plaintiffs could not have been aware of AWB's responsibility for the torts inflicted upon them. Although the Volker Report, issued on October 27, 2005, had concluded that AWB was aware of "circumstantial warning signs" that payments were being illicitly funneled to the Iraqi regime and that it should have been alerted to the "probability" that the regime had derived some benefit from AWB's payments, those pronouncements made AWB's responsibility hypothetical only. Volker Report at 315, 316.

The Cole Report, however, made AWB's complicity crystal clear. It concluded that the Oil-For-Food transactions were "deliberately and dishonestly structured by AWB as so as to misrepresent the true nature and purpose of the trucking fees and to work a trickery on the United Nations." *Id.* at xi. "Obviously AWB - - at a very senior management level - - knew Alia [one of the shell entities] was linked to the Iraqi regime by at least December 2002." *Id.* at lix. At that point, plaintiffs had sufficient bases to commence an action, and they did so on September 11, 2007, less then one year after the publication of the report.

The Cole Report also leaves no room for doubt that AWB's complicity in the bribe scheme was purposefully suppressed by AWB -- meeting the "fraud, misrepresentation or deception" criteria of *Holy See, supra.*

Accordingly, the statute of limitations was tolled until November 24, 2006 and the plaintiffs' commencement of this action was timely.

> 2. Sufficient Facts Have Been Alleged to Support Claims Under New York Law that Defendant AWB Aided and Abetted the Torts Committed by the Hussein Regime.

The criteria for establishing liability for aiding and abetting in New York are well established: (1) a violation by the primary wrongdoer; (2) knowledge of the violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation. *Williams v. Bank Leumi Trust Co. of New* York, 1997 WL 289865 (S.D.N.Y.) at *4. (The Court is respectfully referred to plaintiffs' more complete discussion of aiding and abetting in the accompanying memorandum addressing defendant BNP's motion to dismiss.)

With this framework in mind, Plaintiffs will address AWB's assertion that no facts have been alleged to support the second and third prongs of the foregoing test for aiding and abetting - - that is, whether AWB was aware of the Hussein regime's atrocities and, second, whether AWB provided "substantial assistance" in the commission of those crimes.[17]

> *a. Sufficient facts have been alleged from which one could plausibly infer that AWB had knowledge of the Hussein regime's tortious activities.*

.
The corrupt Hussein regime proved to be one of the biggest profit centers for AWB and it promptly developed a corporate culture to keep those profits pouring in. When the Iraqi government demanded millions in bribes to keep the scheme going, AWB acceded, plotting with BNP to funnel millions to the Iraqis in derogation of the U.N. Resolutions and camouflaging the bribes as legitimate transactions. Instead of furthering the distribution of humanitarian aid to the Iraqi people, the payments went to the promoters of Saddam Hussein's campaign of torture and

---

[17] AWB does not challenge the first prong of the test - -  the existence of a violation by the primary wrongdoer.

genocide - - Iraqi intelligence, the Iraqi military, and Saddam Hussein himself. The fact AWB

concealed the nature of these transactions is itself proof it was aware of the nefarious purposes to

which the funds were being put.  This inference becomes especially compelling when one

considers the long duration of the illicit scheme. Given the public notoriety of Saddam's

genocidal activities and his apparently unquenchable thirst for money,[18] the Cole Report's

findings are especially compelling in that regard:

> The facts are not now in doubt…. The Federal Court has found that
> a "transaction was deliberately and dishonestly structured by AWB
> so as to misrepresent the true nature and purpose of the trucking
> fees and to work a trickery on the United Nations."

Cole Report at xi.

> AWB also understood that payment of hard currency to Iraq was
> prohibited by U.N. sanctions. . . Senior management decided to do
> what was necessary to retain that trade.

*Id*. at xiv.

> Emails make clear that AWB knew that the payment of fees to Iraq
> was prohibited by U.N. sanctions and, accordingly, it was
> necessary to hide or disguise a payment of fees.

*Id*. at xxi.

> Obviously, AWB - - at a very senior management level - - knew
> that Alia was linked to the Iraqi regime by at least December 2002.

*Id.* at lix.

The foregoing clearly support an inference that AWB had knowledge of the link between

the bribes it paid to the corrupt Iraqi regime and the atrocities being perpetuated.

> b. *Sufficient facts have been alleged from which one could plausibly infer that AWB
> substantially assisted the Hussein  regime in its commission of tortious acts
> against the plaintiffs.*

---

[18]  For example, the Volker Report recounts how one of Saddam Hussein's sons, Qusay, absconded with nearly one
billion dollars in cash, carted away in over 200  boxes.

AWB claims it "did no more then sell wheat to Iraq" and that it was a "mere supplier of wheat to Iraq under the OFFP." (Mem. in Support at 1,3). Nothing could be further from the truth. As determined by the Cole inquiry, the "consequences of AWB's actions. . .have been *immense*." Cole Report at xi. (Emphasis added.) AWB was the largest single provider of humanitarian goods to Iraq under the Program, selling a total of 6.8 million of tons of wheat and receiving over $2.3 billion on payments from the United Nations escrow account. Volcker Report at 623. In total, AWB paid over $221.7 million in illicit fees for inland transportation fees, corresponding to more than 14% of the illicit kickbacks collected by the Iraqi regime -- cash to be spent at its discretion. *Id*. at 314.

In summary, when drawing all reasonable inferences from the complaint and the documents incorporated therein by reference, plaintiffs have stated a plausible right to relief under New York common law. There is accordingly no basis to dismiss those claims under Rule 12 (b)(6). *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir. 2007).

## IV.    Conclusion

AWB's Motion to Dismiss should be denied on all grounds. Plaintiffs have alleged sufficient facts for their claims under both the ATS and the TVPA. Plaintiffs have standing to sue the named Defendants as they have met the injury in fact requirements of Article III. Furthermore, the Court should not dismiss this case on any of the discretionary grounds brought before it. This case has a nexus with the forum and is appropriate for adjudication here. In the alternative, should the Court find that the Plaintiffs' pleading is lacking, the Plaintiffs request the opportunity to file an amended complaint.

Respectfully submitted,

**s/ John T. Murray**
John T. Murray  (0008793)
jotm@murrayandmurray.com

35

MURRAY & MURRAY CO., L.P.A.
111 East Shoreline Drive
Sandusky, Ohio  44870-2517
Telephone:  (419) 624-3125
Facsimile:     (419) 624-0707
Attorney for Plaintiffs


CERTIFICATION

I hereby certify that on February 22, 2008, the foregoing was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

**/s/ John T. Murray**
John T. Murray (Reg 0008793)
Attorney for Plaintiffs