UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------
SAADYA MASTAFA and KAFIA ISMAIL,                    Civil Action No.
                                                    07-CV-7955 (GEL)
                        Plaintiffs,                 ECF CASE


        -   against –


AUSTRALIAN WHEAT BOARD LIMITED a/k/a
AWB LIMITED and AWB (U.S.A.) LIMITED; and
BNP PARIBAS,
                        Defendants.
---------------------------------------------------------------

**Memorandum of Law in Opposition to Defendant BNP Paribas's Motion to Dismiss**

Dennis E. Murray Sr.
dennis@murrayandmurray.com
John T. Murray
Direct Dial: (419) 624-3125
jotm@murrayandmurray.com
Leslie O. Murray
Direct Dial: (419) 624-3010
leslie@murrayandmurray.com
Mary S. Birkett
Direct Dial: (419) 626-7003
mso@murrayandmurray.com
MURRAY & MURRAY CO., L.P.A.
111 East Shoreline Drive
Sandusky, Ohio  44870
Facsimile:  (419) 624-0707

*Attorneys for Plaintiffs*

## Table of Contents

Table of Contents ...................................................................................................... i

Table of Authorities .................................................................................................. ii

I.  Preliminary Statement.......................................................................................... 1

II.  Factual Background ............................................................................................. 5

III. Argument ........................................................................................................... 11

    A.  Constitutional Standing ........................................................................... 11

        1.  BNP knowingly financed the activities of the Hussein regime, and thus the acts can not be considered Independent Acts of a Third Party ...................... 14

        2.  Plaintiffs allege that BNP aided and abetted the Hussein regime by knowingly financing its illegal activities.......................................................................... 16

        3.  Plaintiffs allege facts that assert that BNP's conduct in financing the Hussein regime was a substantial assistance in the Hussein regime's campaign of violence resulting in the killing of the Plaintiffs' spouses ............................. 17

    B.  Plaintiffs allege valid claims under the Alien Tort Statute by asserting that the Bank violated the law of nations................................................................... 21

    C.  The Plaintiffs alleged that BNP aided and abetted the Hussein regime in its commission of widespread human rights abuses that resulted in the killing of the Plaintiffs' spouses ............................................................................... 21

    D.  The Plaintiffs alleged that BNP conspired with the Hussein regime in its commission of widespread human rights abuses that resulted in the killing of the Plaintiffs' spouses ............................................................................... 24

    E.  Plaintiffs Have Valid TVPA Claims .................................................... 24

    F.  BNP HAS ASSERTED NO GROUNDS THAT COMPEL DISMISSAL OF THE STATE TORT CLAIMS .................................................................... 27

        1.  Plaintiffs have asserted claims against BNP under a concerted action theory; it is therefore not necessary to establish that the bank directly caused plaintiffs' injuries........................................................................................................... 27

        2.  BNP misstates the New York law governing aiding and abetting ................. 28

3.  The New York Law of Aiding and Abetting Liability.................................. 28

4.  Sufficient facts have been alleged to support a plausible claim that BNP aided and abetted the torts committed by the Hussein regime……………………………………………………………………………..30

      a.  Sufficient facts have been pleaded from which one could plausibly infer that BNP had knowledge of the torts committed by the Hussein regime. ............................................................ 30

      b.  Sufficient facts have been alleged from which one could plausibly infer that BNP substantially assisted the Hussein regime in its commission of the tortious acts against the plaintiffs. ............................................................................... 32

IV.  Conclusion ........................................................................................................34

<u>**Table of Authorities**</u>

**Page(s)**

<u>**Cases**</u>

<u>**Aldana v. Del Monte Fresh Produce, N.A., Inc.**</u>,
416 F.3d 1242(11th Cir.2005)..................................................................................... 25

<u>**Almog v. Arab Bank,**</u> 471 F.Supp.2d 257 (E.D.N.Y. 2007) ........................................... 17, 23

<u>**Baker v. Carr**</u>, 369 U.S. 186 (1962) .................................................................................. 12

<u>**Bichler v. Eli Lilly & Co.,**</u> 55 N.Y. 2d 571 (1982).................................................................. 28

<u>**Bigio v. Coca Cola Co.**</u>, 239 F.3d 440 (2d Cir. 2000) ........................................................... 15

<u>**Bowoto v. Chevron Corp.,**</u> 2007 WL 2349341  (N.D. Cal. August 14, 2007) .............. 25, 26

<u>**Calcutti v. SBU, Inc**</u>.,  273 F.Supp. 2d 488 (S.D.N.Y. 2003).................................................. 33

<u>**Cortec Indus. Inc. v. Sum Holding L.P.**</u>, 949 F.2d 42 (2d Cir. 1991) ................................  5

<u>**Dalton Farms Associates v. Baker, III**</u>, 704 F.Supp. 460 (S.D.N.Y. 1989)......................  12

<u>**D.C. Common Cause v. District of Columbia,**</u> 858 F.2d 1 (D.C. Cir. 1988) ...................  18

<u>**Dellums v. U.S. Nuclear Regulatory Com'n,**</u> 863 F.2d 968 (D.C. Cir. 1988)....................  18

<u>**Doe v. Saravia**</u>, 348 F.Supp.2d 1116 (E.D.Cal.2004) ............................................................  25

<u>**Filartiga v. Pena-Irala**</u>, 630 F.2d 876 (2d Cir.1980)............................................................  15

<u>**Franklin v. Fox,**</u> 312 F.3d 423 (9th Cir.2002) .......................................................................  25

<u>**Greenberg v. Bush**</u>, 150 F.Supp.2d 447 (E.D.N.Y. 2001) .....................................................  18

<u>**Haleberstam v. Welch**</u>, 705 F.2d 472 (D.C. Cir. 1983) ....................................................28,30

 <u>**IIT, AN International Investment Trust v. Cornfeld**</u>,  619 F.2d 909 (2d Cir. 1980)........ 33

<u>**Iqbal v. Hasty**</u>, 490 F.3d 143, 157-58 (2d Cir. 2007) ............................................................  34

<u>**In re African-American Slave Descendants Litigation**</u>,
304 F.Supp.2d 1027 (N.D. Ill. 2004) ....................................................................................  13

**Kadic v. Karadzic**, 70 F.3d 232 (2d Cir.1995) ........................................................... 15

 **Kaufman v. Cohen**, 307 A.D. 2d 113, 760 N.Y.S. 2d 153 (1st Dep't 2003) ........................ 29

**Khulamani v. Barclay Nat'l Bank Ltd.**, 504 F.3d 254 (2d Cir. 2007) ................................ 21

**Kodak v. Kavlin**, 978 F.Supp. 1078 (S.D.Fla 1997) .................................................... 15

**Kramer v. Time Warner, Inc.,** 937 F.2d 767 (2d Cir. 1991) ........................................... 5

**McGehee v. Albright**, 210 F.Supp.2d 210 (S.D.N.Y. 1999) .................................................. 19

**National Wildlife Fed'n v. Hodel,** 839 F.2d 694 (D.C.Cir. 1988)........................................ 18

**Oie  v. Citibank**, 957 F.Supp 492, 503 (S.D.N.Y.)..................................................... 31

 **Pittmann v. Grayson**, 149 F.3d 111 (2d Cir. 1998) ...................................................... 28,29

**Presbyterian Church of Sudan v. Talsiman Energy, Inc.,**
244 F.Supp.2d 289 (S.D.N.Y. 2003) .......................................................................11,14,17

**Prescient Acquisition Group, In. v. Prefect Circle Entm't, Inc.,**
No. 05 Civ. 6298 (PKC), 2006 WL 2136293(S.D.N.Y. July 31, 2006) .................................... 5

**Prosecutor v. Furundzija,** (Case No. IT-95-17/1-T) ................................................. 15, 17, 21

**Prosecutor v. Tadic** *(Case No. IT-94-1-T)*, Opinion and judgment, May 7, 1997 .... 13, 15, 17

 **S & K Sales Co. v. Nike, Inc.,** 816 F. 2d 843, 848 (2d Cir.1987) ....................................... 28

**Sosa v. Alvarez-Machain**, 541 U.S. 930 (2004)........................................................ 22

**Stutts v. De Dietrich Group**, 2007 WL 1867060 (E.D.N.Y.).......................................... 28,31

**U. S. v. District Council of New York City**, 2007 WL 2697135 (S.D.N.Y.)....................... 33

**United States v. Alstotter**, 6 L.Rep.Tr. War Crim. 1, 62(1948)......................................... 17

**Vancore v. Teigue**,  664 N.Y.S. 2d 604 (2d Dep't 1997) ..................................... 28

 **Wantanabe Reality Corp. v. City of New York**, 2003 WL 22862646 (S.D.N.Y.) ............ 29

**Warth v. Selden,** 422 U.S. 490 (1975) ....................................................................... 12, 13

**Williams v. Bank Leumi Trust Co. of New York**, 1997 WL 289865 (S.D.N.Y.) .............. 28

**Wiwa v. Royal Dutch Petroleaum Co.,**
226 F.3d 88 (2d Cir. 2000) ................................................................................  15

**Statutes and Rules**

28 U.S.C. § 1350 (Alien Tort Statute) ...........................................  3, 4,14,21,24,27

28 U.S.C. §1350 (Torture Victim Protection Act of 1992) ...................................4, 24, 25, 27

42 U.S.C. § 1983 ................................................................................................. 25

Federal Rules of Civil Procedure Rule 8(a) ..................................................  7, 16

**Other Authorities**

Australian government's official inquiry into the role of Australian Wheat Board Limited
("AWB") in the Oil for Food Program ......................................................... 2, 4, 23

The Independent Inquiry Committee Into
The United Nations Oil for Food Program ...............................................1,4-11, 23

Memorandum of Understanding ...................................................................4-6,10

U.N. Security Council Resolutions 661 ........................................... 4, 5,6,8,10,20

U.N. Security Council Resolutions 986 ............................................... 4,5,6,8,10,20

Plaintiffs Saadya Mastafa and Kafia Ismail ("Plaintiffs") hereby file their Memorandum of Law in Opposition to Defendant BNP Paribas's ("BNP") Motion to Dismiss Plaintiffs' Class Action Complaint.  For the reasons stated herein, BNP's Motion to Dismiss should be denied.  If the Court finds BNP's Motion to Dismiss to be well-taken, either in whole or in part, the Plaintiffs respectfully request the opportunity to amend their Class Action Complaint (hereinafter "Complaint" or "Class Action Complaint").

## I.    Preliminary Statement

The Plaintiffs' husbands were tortured and brutally killed by the Hussein regime.  The Plaintiffs' claims arise out the role that BNP played in knowingly funding this criminal activity. BNP, as the sole escrow bank of the United Nations Oil for Food Program (hereinafter "Oil for Food Program" or "Program"), was in a unique position to obtain the knowledge of the extent of the corruption of the Program and to prevent illicit payments to the Hussein regime.  The overt purpose of the Program, and specifically to use a central independent financial institution, was to create a transparent process for the financial transactions that would prevent the illegal diversion of the funds to the Hussein regime. The Independent Inquiry Committee Into The United Nations Oil for Food Program ("IIC report" or "Volcker Report")  *IIC report*, Chapter 4, page 440.

BNP failed to prevent, and actually facilitated, millions of dollars from being illegally paid to the Hussein regime.  In many instances, BNP paid the Hussein regime directly from the escrow account[1], in other cases BNP allowed suppliers to recoup the illicit payments and kickbacks directly from the escrow account, and lastly, BNP was responsible for issuing letters of credit for the payment of illicit funds to the Hussein regime.[2]

---

[1] IIC Report, page 450.
[2] IIC Report, page 461.

1

In BNP's Memorandum in Support of its Motion to Dismiss, BNP attempts to shrug off the allegations against it by framing the Plaintiffs' complaint in terms of mere legal conclusions. BNP then mischaracterizes the complaint by referencing only the paragraphs that name BNP and leaving out the dozens of paragraphs that reference "Defendants" which includes BNP.

Plaintiffs' filed a complaint with straightforward allegations that BNP is liable for knowingly and/or recklessly funding the gross human rights violations committed by the Hussein regime. The Plaintiffs suffered the real and serious injury of the loss of their spouses as a result of this substantial support. The Federal Rules of Civil Procedure have adopted a notice pleading standard. The Plaintiffs' allegations are supported by lengthy documentation and in-depth inquiries and investigations conducted by the United Nations Independent Inquiry Committee, chaired by Paul Volcker ("IIC report") and the Australian government's official inquiry into the role of Australian Wheat Board Limited ("AWB") in the Oil for Food Program, chaired by the Honorable Terrance Cole ("Cole Inquiry"). There is nothing vague, amorphous, nor speculative about the Plaintiffs' allegations. If BNP's position is that it did not substantially assist nor conspire to commit the egregious human rights violations that the Plaintiffs' spouses suffered, they should bring those facts to light in focused discovery. The jurisprudence referred to throughout BNP's Memorandum in Support of its Motion to Dismiss does not create a requirement for increased standards of proof in the pleadings stage. The jurisprudence emphasizes the need to flush out allegations that are not rooted in fact. Here, there is no dispute that BNP was indeed the sole escrow bank of the Oil for Food Program. Furthermore, there is voluminous documentation that BNP allowed for payments to be made and made payments itself to the Hussein regime. The question of liability is one of fact. The Plaintiffs have asserted that

BNP made these payments knowingly and that those payments amount to substantial assistance to the activities of the Hussein regime which resulted in the death the Plaintiffs' spouses.

BNP further argues that the Class Action Complaint should be dismissed for lack of standing.  BNP misinterprets the law with respect to this assertion.  While Plaintiffs agree that the modern formulation of standing through a three-prong test with the middle prong requiring a causal connection between the injury and the conduct, and that the standard has been termed "fairly traceable," the Plaintiffs are not required to show that the injury would not have occurred but for the Defendant's activity.  Instead, the jurisprudence indicates that the Plaintiffs must show that the injury would not have happened in the same way.  There is no way for the Plaintiffs to know whether their spouses would have been the victims of the Hussein regime without the assistance of BNP.  The Plaintiffs can show, however, that the millions of dollars of hard currency that was diverted to the Hussein regime in direct contravention to the world's attempts to prohibit the Hussein regime from obtaining such currency, was a significant factor in the funding of the Hussein regime's campaign of violence which resulted in the killing of the Plaintiffs' spouses.  It is a basic principle of accomplice liability that the individual who provided the financing for the illegal activity is liable along with the individual who pulled the trigger, whether or not the individual who pulled the trigger had his own individual motive to do so.

Next, BNP asserts that Plaintiff Mastafa's claims should be dismissed based on a timing issue.  The Oil for Food Program began in 1996.  While it is true that the Hussein regime's demands for illicit payments became more and more vociferous over time, the Plaintiff asserts that illicit payments were being made from the beginning of the Program.

BNP then argues that the Plaintiffs' claims should be dismissed for failure to state a claim under the Alien Tort Statute ("ATS")[3]. Plaintiffs alleged that BNP offered substantial assistance by knowingly making, authorizing, and financing through the escrow account illicit payments of hard currency to the Hussein regime that was actively waging a campaign of violence against the Kurdish people in the North, the Shiites throughout the country, and the Marsh Arabs. Plaintiffs have clearly and succinctly articulated their allegations against BNP in the Class Action Complaint. Courts have consistently held that corporations may be held liable for aiding and abetting under the ATS.

Furthermore, the Torture Victim Protection Act of 1992 28 U.S.C. §1350 ("TVPA") should apply to all private actors for their violations of the law of nations. The claim that individuals should be distinguished from corporations is a false distinction and should be disregarded. As discussed below, the Plaintiffs also meet the exhaustion of remedies' requirement. For all of the reasons stated below, the Plaintiffs should be accorded the opportunity to go forward with their TVPA claims.

## II.    Factual Background[4]

---

[3] Alternatively known as the Alien Tort Claims Act (ATCA). 28 U.S.C. §1350.

[4] The following summary is derived from the Class Action Complaint; the Independent Inquiry Committee Into The United Nations Oil For Food Progam: Manipulation of the Oil for Food Progam by the Iraqi Regime, October 27, 2005, www.iic-offp.org; The Memorandum of Understanding between the United Nations and Iraq; U.N. Security Council Resolutions 986 and 661; The 661 Committee Rules and Procedures, all of which are attached to the declaration of John T. Murray ("the Murray declaration") submitted herewith. As cited in BNP's Memorandum in Support of its Motion to Dismiss in Footnote 2, it is appropriate for this Court to consider documents essential to the complaint and documents that can be judicially noticed. "Cortec Indus. Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991) (documents integral to the complaint are properly considered in ruling on a motion to dismiss)' Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991) (documents that can be judicially noticed are properly considered in ruling on a motion to dismiss); Prescient Acquisition Group, In. v. Prefect Circle Entm't, Inc. No. 05 Civ. 6298 (PKC), 2006 WL 2136293, at *3 (S.D.N.Y. July 31, 2006) (the court may consider documents integral to the complaint" on a motion to dismiss and "may take account of the entirety of a legal agreement where the complaint relies heavily upon its terms and effect") (quotations omitted)." All of the documents listed above are either integral to the complaint, such as Resolutions 986 and 661, or can be judicially noticed, such as the IIC Report, the Cole Inquiry, the Memorandum of Understanding and the Banking Agreement.

BNP was selected by the Secretary-General to serve as the Oil for Food Program's escrow bank. BNP and the UN negotiated a Banking Services Agreement ("Banking Agreement") (referred to in the IIC Report, page 433). The Banking Agreement sets forth a number of duties that the Bank accepted in signing the Banking Agreement including: "(1) establishing and managing an escrow account to receive proceeds from the sale of Iraqi oil and to disburse funds for Iraq's purchase of humanitarian goods; (2) confirming letters of credit issued from banks retained by companies buying oil from Iraq; and (3) issuing letters of credit for the purchase of humanitarian goods." Furthermore, the Banking Agreement expressly incorporated the requirements of Resolution 986 (Exhibit 1), the Iraq-UN Memorandum of Understanding ("MOU")(Exhibit 3), and the Resolution 661 (Exhibit 2) Committee's rules and procedures for review and approval of the transactions under the Program. The incorporation of these standards into the escrow bank's role was "essential and fundamental terms and conditions" of the agreement.[5]

BNP, as the central financial institution to the Oil for Food Program to both conduct financial transactions and issue letters of credit to other banks conducting transactions that fit within the terms of the Program, was in a unique position to see the inner-workings of the corruption and illicit payments and to prevent the payments from happening.

Unlike the usual relationship of a lender to a customer, where no fiduciary relationship exists, BNP took on duties through contract with higher standards than the traditional notions of a lender's obligations. A fundamental precept of the Banking Agreement was that BNP, as the escrow bank, would serve as an independent actor to ensure that the Oil for Food Program was implemented in accordance with the Resolution 986 and 661, as described in the IIC report:

---

[5] The Banking Agreement, Part II arts. 1.2, 2.2, 2.3. See generally The IIC Report, October 27, 2005, Chapter 4, page 433.

"The Banking Agreement between BNP and the United Nations specifically contemplated that all letters of credit would be issued, executed and confirmed 'in accordance with Resolution 986 and the 661 Committee Procedures.'    A principal concern of Resolution 986 was transparency.  The Resolution reads that oil could be sold subject to the following conditions:

> a)  Approval by the Committee established by resolution 661(1990), in order <u>to ensure the transparency of each transaction and its conformity with the other provisions of this resolution</u>, after submission of an application by the State concerned, endorsed by the Government of Iraq, for each proposed purchase of Iraqi petroleum and petroleum products, including details of the <u>purchase price at fair market value,</u> the export route, the opening of a letter of credit payable to the escrow account to be established by the Secretary-General for the purposes of this resolution, and any other directly related financial or other essential transaction;
> b)  Payment of the full amount of each purchase of Iraqi petroleum and petroleum products directly by the purchaser in the State concerned into the escrow account to be established by the Secretary-General for the purposes of this resolution."(S/Res/986, para.1 (Apr. 15, 1995) (emphasis added)[6]

The Banking Agreement sites Resolution 986 throughout its articles.  The language of the Agreement clearly creates a contractual obligation for BNP to abide by the Oil for Food Program Rules as articulated in Resolution 986, the 661 Resolution Committee Rules and Procedures and the MOU.  The IIC report concludes: "Based upon the language in the Agreement, it was therefore clearly incumbent upon the Bank to consider the principles and concerns espoused in Resolution 986 in connection with the performance of its banking services.  In particular, Resolution 986 and the underlying sanctions resolution (Resolution 661), in addition to the 661 Committee's procedures, contemplated in both express and implied terms that the United Nations would be made aware of, and approve, the parties to whom Iraq sold its oil."[7]

---

[6] IIC Report, October 27, 2005, Chapter 4, page 439.  The Report continues: "Resolution 986 was also referenced throughout the Banking Agreement.  Article 1.2 of the Banking Agreement states that "the procedures and requirements set forth SCR 986, the Memorandum of Understanding and the 661 Committee Procedures constitute essential and fundamental terms and conditions of this Agreement."  Article 1.4 provides that "transactions with respect to…the United Nations Iraq Account shall be only those authorized by the Security Council in and pursuant to SCR 986." Specifically concerning letters of credit, the Agreement provides that "the Bank undertakes to provide the Services…with respect to Letters of Credit…in accordance with SCR 986, the Memorandum of Understanding, the 661 Committee Procedures…." Banking Agreement, arts, 2.1.1, 2.1.1, 2.1.4; S/Res/986, para. 1(a)(Apr.14, 1995)
[7] *Id*. at 339-440.

BNP's role as the sole escrow bank for the Program placed them in the unique position to see the extent and scale of the illicit payments and to prevent such payments from being made. BNP knew that Iraq was imposing a requirement that purchasers of oil pay a sum of money for the benefit of contracting to purchase Iraqi oil under the Program.[8]  Furthermore,  as  identified by the IIC report, "BNP had sole access to specific transaction information and the ability through its worldwide affiliates to monitor payments it controlled involving the escrow account and the accounts of its private clients."[9]

Plaintiffs allege in the Class Action Complaint that BNP aided and abetted and conspired with the Hussein regime by facilitating illicit payments in hard currency to the Hussein regime. BNP argues that Plaintiffs' contentions that BNP was fundamental to the conspiracy and the aiding and abetting of the Hussein regime is fatally flawed.  This contention is based on an emphasis in the Class Action Complaint of the egregious activities of AWB in paying kickbacks to the Hussein regime outside of the approved escrow process.  However, BNP fails to recognize that the Federal Rules of Civil Procedure adopted a notice pleading standard.[10]  The Class Action Complaint asserts that BNP, as the sole escrow bank, was in the unique position to monitor and implement the Oil for Food Program as contemplated in the Banking Agreement.  The Class Action Complaint further asserts that the illicit payments and the extent of the corruption of the program was made possible through BNP's failure to monitor and scrutinize the payments that it made to the Hussein regime.  The basic outline of the scheme as related to BNP and AWB is laid out in the complaint as follows:

---

[8] IIC Report, October 27, 2005, Chapter 4, page 452, citing BNP Geneva officials interviews (Oct. 3-5, 2005); Bill Greten interview (Oct. 14, 2005).  "Several account officers at BNP Geneva stated that they learned through media reports and otherwise, that Iraq was imposing a requirement that purchasers of oil pay a sum of money for the benefit of contracting to purchase Iraqi oil under the Program."
[9] *Id*. at 459.
[10] FCRP Rule 8(a).

- o The Hussein regime introduced an inland transportation fee of $12.00 per metric ton of imported wheat. This kickback was purportedly to transport the wheat from Umm Qasr to the destination silo. This fee was not allowed under the UN Oil for Food Program. ¶32

- o According to the *Independent Inquiry Committee into the United Nations Oil-For-Food Progam* ("Volcker Report") **(Exhibit 4,** Table VII-Actual and Projected Illicit payments on Contracts for Humanitarian Goods – Summary by Supplier. (www.iic-offp.org), AWB paid $221,757,242 in kickbacks directly to the Hussein regime. ¶34

- o Of that amount $ 139,274,494 was paid in the form of inland transportation fees. (Volcker Report) ¶35

- o The rest, $82,482,748, was paid in the form of After Sales Service Fee (a fee which usually constituted 10% of the contract price and was paid to the Hussein regime.) (Volcker Report.) The After Sales Service Fee was strictly enforced to all humanitarian goods providers by the Hussein regime. ¶36

- o All illicit payments made by Defendant AWB to the Hussein regime were made possible by the Defendant BNP Paribas. ¶37

- o All illicit payments by Defendant AWB were made directly to the UN escrow account which was exclusively [operated] by BNP Paribas. ¶38

- o The payments made from the escrow account were made to the Hussein regime. ¶39

- o The Hussein regime was under sanctions under Security Council Resolution 661 **(Exhibit 2)** which prohibited foreign corporations from transferring hard currency to the Hussein regime. ¶41

- o Defendants gave substantial assistance and encouragement to the Hussein regime through their illicit payments of hard currency. ¶44

- o Defendants agreed with the Hussein regime to violate international law in order to mutual benefit from the kickback scheme. ¶45

More generally, the Class Action Complaint asserts that the Defendants, including BNP, conspired with the Hussein regime to offer substantial support to his regime. It is a

8

mischaracterization of the Class Action Complaint to cite only the paragraphs with the name BNP and leave out all of the paragraphs that reference Defendants in general.[11]

The Class Action Complaint asserts that BNP, as the escrow bank in the Oil for Food Program made illegal payments to the Hussein regime and that those payments provided substantial support to the campaign of atrocities that victimized the Plaintiffs and the members of the class. The following paragraphs from the Class Action Complaint illustrate these assertions:

o   The Defendants committed a series of illegal acts by paying kickbacks to the Hussein regime in violation of the Security Council Resolution 986. ¶58

o   The direct and proximate results of the violations of Security Council Resolution 986 were the injuries suffered by the Plaintiffs and the members of their class. ¶59

o   The Defendants knowingly gave practical assistance and encouragement to the former regime of Iraq which had a substantial effect on the perpetration of the crimes. The significant aid and financial support of the Defendants gave and/or boosted the means of the former regime of Iraq to continue its campaign of violence, crimes against humanity, war crimes, and genocide. ¶60

o   The Defendants acted in concert with the Hussein regime to profit illicitly from the United Nations Oil for Food Program which was a direct and proximate cause of the harm suffered by the Plaintiffs and the members of their class. ¶61

o   The Defendants acted as part of a common design with the Hussein regime to violate international law and receive illicit profits which was a direct and proximate cause of the harm suffered by the Plaintiffs and the members of their class. ¶62

o   The Defendants knew that the Hussein regime was using the funds of the Oil for Food Program and the illicit payments paid by the Defendants to the Hussein regime to violate the law of nations and commit egregious human rights abuses including but not limited to jus cogens violations. ¶63

The IIC conducted a thorough investigation over a number of years and determined that BNP played a critical role in the illicit payments to the Hussein regime. If BNP denies such allegations, it should do so through the equitable and transparent civil justice system. If BNP can assert that it in fact did not have a key role in the creation and extension of the illicit payments

---

[11] *See* Memorandum of Law In Support of the Motion of Defendant BNP Paribas to Dismiss Plaintiffs' Class Action Complaint, pages 2-3.

that propped up the Hussein regime during the Oil for Food Program, then it should answer the complaint and defend itself on the merits. The IIC Report concluded in relation to BNP, "once the surcharge scheme took root, BNP itself became an instrument for the payment of millions of dollars in illegal surcharges while doing little to detect or prevent such payments."[12] BNP was contractually obligated to meet the requirements of the Program—"requirements that were designed to provide for financing of Program transactions in a transparent manner and to discourage subterfuges of the sanctions regime."[13]

BNP was in a unique position to prevent such payments, and failed to do so. BNP's assertions that the Plaintiffs failed to delineate in precise detail the inner-workings of the scheme and should therefore be dismissed are wrong. The Plaintiffs alleged in a thirty-seven page Complaint the requisite facts to put BNP on notice of their claims against them. Plaintiffs are not alleging a vague and amorphous relationship between two otherwise unrelated parties. Plaintiffs allege that BNP is liable through its role as the sole escrow bank. This is supported by extensive documentation and thorough investigations by independent and neutral parties, including the Banking Agreement, Resolutions 986 and 661, the Procedures and Rules of the 661 Committee, the Memorandum of Understanding, and the IIC Report.

This case is very different than other cases that have relied on a long listing of specific facts that show a relationship indeed existed. For instance, in Talisman I[14], the Plaintiff listed a series of facts showing that a relationship existed between the energy company, Talisman, and the Sudanese government. The theory of liability in that case was that Talisman participated in the removal of people from the oil rich regions of South Sudan. In order to assert a liability theory based on participation, the Plaintiff was required to assert the type of participation

---

[12] Id. at page 461.
[13] Id. at 461.
[14] *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289.

Talisman was contributing to the situation and/or relationship.  The theory of liability in the present action against BNP is for their role as the escrow bank in the UN Oil for Food Program and their failure to abide by the duties they took on in that capacity.  Furthermore, BNP does not deny that it was the sole escrow bank in the Program.[15]  The Plaintiffs further assert that BNP failed in its role as the escrow bank by making illegal payments to the Hussein regime.  This allegation is supported by the findings of the IIC.  These allegations are straightforward and direct.  There is nothing vague and amorphous about them.  BNP confuses the Courts' obligation to weed out vague and amorphous pleadings that amount to nothing more than speculation, with the erroneous assertion that courts now require increased complexity at the pleadings stage.  The Federal Rules of Civil Procedure continue to have a notice pleadings standard.  The Plaintiffs simply and directly put BNP on notice of their claims against it.

## III.    Argument

### A.  Constitutional Standing

BNP contends that this case should be dismissed for lack of standing.  Plaintiffs do not disagree that Article III standing is a prerequisite for this Court to adjudicate the matter before it.  Plaintiffs, as asserted in the Complaint in Section D ¶13-15, have standing to bring this action against BNP and AWB.

> "The standing doctrine is grounded in both case and controversy requirements of Article III and related jurisprudential considerations.  The central concern of the standing requirement is whether the plaintiffs have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions."[16]

---

[15] *See* BNP's Memorandum in Support of its Motion to Dismiss at page 1. "In order to implement the Progam, the U.N., among other things, entered into an agreement with the Bank, pursuant to which the Bank provided non-discretionary banking services to the U.N.  These services included the establishment of the U.N. Iraq Account, into which the proceeds of Iraqi oil sales were deposited and from which suppliers of goods pursuant to the Progam were paid."

[16] *Dalton Farms Associates v. Baker*, III, 704 F.Supp. 460, 461 (S.D.N.Y. 1989).  Citing *Baker v. Carr*, 369 U.S. 186, 204 (1962).

The standing doctrine ensures that a litigant is the proper party to bring a matter before the federal courts by ensuring that the Plaintiff has a sufficient personal stake in the matter. The modern formulation of this doctrine lays out a three-part test based on Article III considerations and then an evaluation of prudential considerations to ensure that this is indeed a case and controversy as historically defined by Article III courts.

The first prong requires that the Plaintiff must have suffered an injury in fact. Here, the Plaintiffs and members of the class suffered the loss of their spouse or other immediate relative through the ruthless and unwarranted killing by the Hussein regime. The wrongful death of an immediate relative, such as a spouse, is clearly an injury in fact and has not been disputed by the Defendants. The last prong deals with the issue of redressability. This is also not at issue in the present action. The Plaintiffs have raised claims for the discrete injury of the unlawful death of their spouses and seek the traditional remedy of monetary compensation for their loss.

BNP's argument rests on the second prong: "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court."[17] The focus of BNP's Memorandum in Support of its Motion to Dismiss is on this prong.

BNP states the wrong standard when it argues that the standard requires that the injury complained of would not have happened but for the actions of the defendant. The case law addressing this issue has stated that a causal connection exists if the injury would not have happened in the same way, but for the actions of the Defendant.[18] BNP's quotation of the *Warth*

---

[17] *In re African-American Slave Descendants Litigation*, 304 F.Supp.2d 1027, 1046 (N.D. Ill. 2004).

[18] *Presbyterian Church of Sudan v. Talisman Energy, Inc.* 244 F.Supp.2d 289, 333 (Complicity to gross human rights violations violates international law.) Citing *United States v. Alstotter*, 6 L.Rep.Tr. War Crim. 1, 62(1948).

decision mischaracterizes the holding. *Warth v. Selden*, 422 U.S. 490 (1975). BNP quotes the Court, petitioner "'must allege facts from which it reasonably could be inferred that, absent [the defendants' alleged conduct], there is a substantial probability that they would not have been injured." *See Memorandum in Support of BNP's Motion to Dismiss.* However, the end of the quote actually says "would have been able to purchase or lease in Penfield." The *Warth* case was brought by individuals and organizations in Rochester, New York who complained of zoning and planning ordinances which it claimed effectively prohibited low and moderate income people from living in the town. The Court in *Warth* did not hold that the plaintiff must show that they would not be injured if it was not for the Defendant's actions. The Court in *Warth* held that the injury must be fairly traceable to the actions of the defendants. In fact, the Court explicitly stated, "The fact that the harm to petitioner may have resulted indirectly does not in itself preclude standing." *Id*. at 504. The Court was emphasizing that the petitioner must establish that the "asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." *Id*. at 505.

In the present action, the Plaintiffs' injuries occurred because the Hussein regime was able to support its vicious murderous conduct through the influx of hard currency that was received directly from the Defendants. Specifically, BNP was instrumental in paying and allowing hundreds of millions of dollars to be paid to the Hussein regime in violation of its duties in the prescribed program. The Program was intended by agreement of the world, through the Security Council, to prohibit the Hussein regime from receiving such an influx of hard currency in an attempt to curtail such atrocities. BNP knowingly, or at a minimum with willful

---

*Prosecutor v. Tadic* (Case No. IT-94-1-T), Opinion and Judgment, May 7, 1997, at ¶678, 691. (The standard is not that the injury would definitely not have happened. The standard is that the injury would not have occurred in the same way but for the conduct of the defendant.)

disregard, paid or created the system through approved letters of credit for payments to the Hussein regime in violation of the Oil for Food Program. BNP's knowing contribution in financing the Hussein regime's activities that included the widespread campaign of violence resulting in the unlawful killings of the Plaintiffs' spouses is sufficient to meet the causal connection requirement.

### 1. BNP knowingly financed the activities of the Hussein regime, and thus the acts cannot be considered Independent Acts of a Third Party.

BNP argues that because Plaintiffs do not allege that BNP actually tortured, brutalized and killed their spouses, that Plaintiffs do not have standing to sue. BNP further argues that because BNP did not actually provide the weaponry used to kill the Plaintiffs' spouses, Plaintiffs do not have standing to sue. This argument was raised in *Presbyterian Church of Sudan v. Talisman Energy, Inc.* 244 F.Supp.2d 289, 320-324 (S.D.N.Y. 2003)[19], and rejected by this Court. This Court stated that for claims arising out of the ATS, the Court must look to the law of nations to determine whether aiding and abetting liability or other forms of aiding and abetting and conspiracy liability exist.[20] The Court in Talisman I, said the Defendant was unable to point to a single case where the Court held that the ATS does not recognize an action for aiding and abetting or conspiracy. On the other hand, the Court has made clear in Second Circuit that the ATS contemplated liability for private defendants who have "acted in concert" with a state to commit torture and other gross human rights violations. *Kadic v. Karadzic*, 70 F.3d 232, 244-245 (2d Cir. 1995).

---

[19] Referred to hereinafter as "*Talisman I*." The Court later granted a motion for summary judgment in favor of the Defendant Talisman.
[20] The Court articulates the standard for claims brought under the ATS are determined by international law. In determining whether there is aiding and abetting liability for ATS claims—look to international law: see generally Bigio v. Coca Cola Co. 239 F.3d 440 (2d Cir. 2000); Kadic v. Karadzic, 70 F.3d 232 (2d Cir.1995); Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir.1980). See also *Wiwa V. Royal Dutch Petroleaum Co.*, 226 F.3d 88 (2d Cir. 2000).

In *Bigio v. Coca Cola Co.*, 239 F.3d 440 (2d Cir. 2000), the Second Circuit refused to let the Plaintiff expand claims because of a lack of a causal connection, but did not hold that ATS prohibited such conspiracy-based claims.  The Court in *Wiwa v. Royal Dutch Petroleaum Co.,* 226 F.3d 88 (2d Cir.2000), Judge Wood refused to dismiss a claim under ATS that alleged that a private corporation had directed and aided the Nigerian government in violating plaintiffs' rights.  Other courts have ruled similarly, including the Kodak Court: "it would be a strange tort system that imposed liability on state actors but not on those who conspired with them to perpetrate illegal acts through the coercive use of state power."  *Kodak v. Kavlin*, 978 F.Supp. 1078, 1091 (S.D.Fla1997).  "While the assistance must be substantial, it "need not constitute an indispensable element, that is, a conditio ine qua non for the acts of the principal." *Talisman* at 324, quoting *Prosecutor v. Furundzija* (Case No. IT-95-17/1-T), Judgment, Dec. 10, 1998 at ¶209. (Exhibit 5).  "The ICTY added that participation in a crime is substantial if "the criminal act most probably would not have occurred in the same way had not someone acted in the role that the accused in fact assumed." *Talisman I* at 324 quoting *Prosecutor v. Tadic (Case No. IT-94-1-T)*, Opinion and judgment, May 7, 1997, at ¶688.  (Exhibit 4).

The Plaintiffs asserted in the Class Action Complaint that BNP knew that it was funding activities that amount to gross human rights violations.  There is no requirement that BNP had control over the Hussein regime.  BNP's claim that "Plaintiffs' asserted injuries thus 'depends on the unfettered choices made by independent actors not before the courts'" fails to account for the well-established principles of aiding and abetting and conspiracy liability.  The body of law prohibiting actions where a party's actions cut-off liability does not preclude aiding and abetting and conspiracy liability.  BNP knew that the Hussein regime was engaged in widespread human rights abuses and knowingly offered substantial assistance through the payment of hard currency

out of the escrow account, approval of letters of credit to the Hussein regime, and recoupment of funds to suppliers for their illicit payments to the Hussein regime. BNP's potential liability results from its own actions in the funding of human rights abuses, not the independent acts of a third party. BNP knowingly provided substantial assistance to illegal activity and cannot now shield itself in the claim that the activity was that of an independent third party.

### 2. Plaintiffs allege that BNP aided and abetted the Hussein regime by knowingly financing its illegal activities.

Plaintiffs are not required to detail precisely how the payment scheme to the Hussein regime operated. Rule 8(a) of the Federal Rules of Civil Procedure applies here. The Federal Rules of Civil Procedure adopted a liberal pleading standard. Plaintiffs assert that the illicit payments provided substantial assistance to the Hussein regime, allowing the regime to continue its reign of terror and contributing to the regime's ability to commit the atrocities that resulted in the named Plaintiffs' husband's deaths and the deaths of the members of the class.

Furthermore, the Plaintiffs' claims are supported by voluminous documentation assembled by neutral and independent committees of inquiry, both by the United Nations and the Australian Government. The reports lay out precisely how the illicit payment scheme operated and condemn BNP for its contribution to the illicit payments.

Finally, Plaintiffs assert that the BNP contributed substantially to the financing of the Hussein regime's activities which amounted to gross human rights violations. Knowingly funding illegal activity clearly creates a causal connection under the law.[21]

### 3. Plaintiffs allege facts that assert that BNP's conduct in financing the Hussein regime was a substantial assistance in the Hussein regime's campaign of violence resulting in the killing of the Plaintiffs' spouses.

---

[21]*Almog v. Arab Bank*, 471 F.Supp.2d 257, 290 (E.D.N.Y. 2007).

Plaintiffs allege that they would not be injured *in the same way*, had it not been for the actions of the Bank.  The Plaintiffs do not need to show that the injury would definitely not have happened if it were not for the Defendant's conduct. The standard is that the injury would not have occurred in the same way but for the conduct of the Defendant.  *Presbyterian Church of Sudan v. Talisman Energy, Inc.*  244 F.Supp.2d 289, 333 (S.D.N.Y. 2003) (Complicity to gross human rights violations violates international law).  citing  *United States v. Alstotter*, 6 L.Rep.Tr. War Crim. 1, 62(1948);  *Prosecutor v. Tadic* (Case No. IT-94-1-T), Opinion and Judgment, May 7, 1997, at ¶678, 691.  BNP asserts that "Plaintiffs must allege facts which allow the Court to infer that, absent AWB's payments, either is a "substantial probability" that Plaintiffs would not have been injured, i.e., that the Hussein Regime would have been unwilling or unable to persecute Plaintiffs' husbands."  *See BNP's Memorandum in Support of its Motion to Dismiss*, page 12.  This proposition misinterprets the law.  Whether or not the Hussein regime would have been capable of finding other sources of funding or could have accomplished the same result through different means is not the critical question.  The issue of standing as it relates to BNP is whether BNP's actions contributed sufficiently to the manner in which the injury occurred.  The Court, in *Almog v. Arab Bank*, 471 F.Supp.2d 257, 290 (E.D.N.Y. 2007), held that the Bank's "knowing and intentional nature of the Bank's activities" was sufficient to state a claim of genocide and crimes against humanity.  The *Almog* Plaintiffs' theory of liability was that the Arab Bank "knew that the accounts of these various organizations and individuals were being used to fund suicide bombings and other attacks sponsored by the terrorist organizations."  *Id*. at 290.[22]

---

[22] While the Court did not make a specific finding as to the Article III causal connection issue, as articulated by BNP, Article III standing is a fundamental prerequisite to jurisdiction.  Courts may consider the issue sua sponte without a motion from the party.  The fact that the Court found that knowingly allowing the accounts to be used in

BNP relies on *Dellums v. U.S. Nuclear Regulatory Com'n* 863 F.2d 968 (D.C. Cir. 1988) and *Greenberg v. Bush*, 150 F.Supp.2d 447 (E.D.N.Y. 2001), in its proposition that plaintiffs must show that the injury would not have happened but for the wrongful activity of the defendant. However, *Dellums* and *Greenberg* are cases with claims which seek redress by challenging an action by of a government entity and seek equitable relief. In such circumstances, "the latter two requirements of "causation" and "redressability" are often treated interchangeably by the Supreme Court, and we have recognized that they tend to merge in cases such as this one where the relief sought is only the cessation of the allegedly illegal conduct." *Dellums* ,863 F.2d at 971, citing *D.C. Common Cause v. District of Columbia*, 858 F.2d 1, 5 (D.C. Cir. 1988); *National Wildlife Fed'n v. Hodel*, 839 F.2d 694, 705 (D.C.Cir. 1988). BNP's reliance on the language that Plaintiffs must show that their injury would have been abated but for the actions of the defendant, is misplaced. Such language is referring to the Plaintiffs' burden when the Plaintiff seeks specific damages in the form of an injunction or other similar equitable relief, the harm would have been abated by the action and that by granting such equitable relief the harm will be redressed.

BNP cites *In re African-American Slave Descendants Litigation*, 304 F.Supp.2d 1027 in an effort to show lack of standing. However, the facts and allegations in the Slave Descendants case are vastly different from the present case. In the cited case, Plaintiffs alleged injuries were derivative from a genealogical relationship. Furthermore, the injury was conjectural in nature, i.e., plaintiffs were "denied the economic wealth of their ancestors' labor." Furthermore, that Court ruled "Plaintiffs offer no allegations that the Defendants had any relationships with specific entities that enslaved plaintiffs or their ancestors. More than "unadorned speculation" is

---

furtherance of terrorist activities was enough to state a claim, means that the Court considered the causal connection to be sufficient to meet the Article III standing requirement. See generally, *Baker v. Carr*, 369 U.S. 186 (1962).

required to establish standing." Id at 1047-1048. One of the major problems in *In re African-American Slave Descendants Litigation* is that the incidents happened beginning in the 1600's and ending in 1865. The causal links were vague throughout the case, as the plaintiffs did not allege that the named defendants were the specific actors engaged in the "co-dependant" industries that enslaved the ancestors of the named plaintiffs. The present case is very different from the Slave Descendant case in that the Plaintiffs' husbands were killed by the Hussein regime and plaintiffs' allegations delineate that the Bank's actions substantially contributed to their death through the Bank's failure to fulfill its duty as the escrow bank under the Oil for Food Program. This failure led directly to the payment of hard currency to the Hussein regime. The Hussein regime could not have effectively waged a campaign of torture and murder and commit the atrocities without those funds that resulted in the Plaintiffs' and the members of the class injuries.

BNP also relies on *McGehee v. Albright*, 210 F.Supp.2d 210, 214-26 (S.D.N.Y. 1999) in its assertion that the Plaintiffs fail to plead a causal connection between their injuries and the conduct of BNP. In *McGehee*, the Court held that a UN worker could not show US funding of the UN was traceable to her firing and that the UN was a third-party independent actor that was not before the court. McGehee differs substantially from this case because the whole purpose of the Oil for Food Program was to prevent the Hussein Regime from obtaining hard currency precisely because the Hussein regime was known to use torture and murder as tools of maintaining power. BNP cannot claim that the Hussein regime is an independent actor wholly unrelated to the Bank. The Bank knew that the purpose of the Program was to limit the hard currency being paid to the Hussein regime. The Bank's duty as the escrow bank was to maintain the integrity of the Program. The Bank knew that the payments made outside of the Program

19

rules would undermine the Program and provide substantial assistance to the Hussein regime. BNP's argument fails because it knew precisely what its actions caused. In contrast with the McGehee case, where the US served to fund the UN and only after the funding did the UN make an independent decision to fire the plaintiff, in this case, the Plaintiffs complain that BNP knowingly provided substantial assistance through the funding of the Hussein regime with hard currency in the commission of the atrocities complained of.

BNP's characterization that the Plaintiffs have not alleged that BNP knowingly made direct payments to the Hussein regime in contravention to the Program is simply untrue. The Plaintiffs allege that BNP, as the escrow bank, contracted to be the sole monitor of the financial transactions and implement the Program in accordance with Resolutions 986, 661, and the 661 Committee Rules. These Resolutions and Rules specifically provide that the purpose of the Program is to prohibit the Hussein regime from obtaining hard currency. BNP knowingly paid the Hussein regime illicit payments, approved letter of credit to be paid to the Hussein regime and paid suppliers in recoupment for the kickbacks paid to Hussein. These facts are well documented in the exhibits attached to the Complaint and in the reports which can be judicially noticed. The Plaintiffs have alleged a sufficient causal connection between BNP's misconduct and the atrocities they suffered.

**B. Plaintiffs allege valid claims under the Alien Tort Statute by asserting that the Bank violated the law of nations**

BNP's assertion that Plaintiffs have not alleged that BNP violated the law of nations must be based on BNP's misreading of the Class Action Complaint. Plaintiffs clearly assert that both Defendants aided and abetted, conspired, and acted as accomplices in the perpetration of crimes against humanity, torture, genocide, war crimes, extrajudicial killings, forced disappearances of persons, and cruel, inhumane and/or degrading treatment and/or punishment. All of these

allegations are violations of the law of nations and most of which are jus cogens violations.[23]  As stated above in both the sections on Factual Background and Article III standing, the Plaintiffs alleged that BNP was in a unique position as the sole escrow bank to prevent payments from being made in contravention to the Program rules.  However, BNP not only failed to prevent such payments, BNP directly made payments, issued letters of credit for payment, and paid suppliers in recoupment for the illegal payments they made to the Hussein regime.  These payments made knowingly to a regime who was openly conducting the atrocities complained of in the Class Action Complaint amounts to substantial assistance.

### C. The Plaintiffs alleged that BNP aided and abetted the Hussein regime in its commission of widespread human rights abuses that resulted in the killing of the Plaintiffs' spouses.

BNP articulates the Second Circuit's recent decision in *Khulamani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007), where Judges Katzmann and Hall agreed that aiding and abetting liability exists under the ATS.   They disagreed, however, as to the standard to apply for aiding and abetting.  Judge Hall looked to federal common law to ascertain the appropriate standard: "knowingly and substantially assisting[ing] a principal tortfeasor, such as a foreign government or its proxy, to commit an act that violates a clearly established international law norm."  *Id* at 288 (Hall, J., concurring).  Judge Katzmann looks to international **criminal** law[24] to determine the standard of aiding and abetting liability: "when the defendant (1)provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime." Id at 277 (Katzmann, J., concurring) (Judge Korman concurred to this section).

---

[23] Jus cogens violations are violations of "the most basic rules of international law and, indeed, of civilized conduct.. Such acts violate peremtory norms, or jus cogens.  Talisman at 306 citing Restatement (Third) of Foreign relations §702 (stating that acts of genocide, slavery, and extrajudicial killing violate jus cogens norms).

[24] Judge Katzmann relies on the Rome Statute governing the International Criminal Court, the International Criminal Tribunal for Yugoslavia statute and case law, and the International Criminal Tribunal for Rwanda statute and cases.

It is the Plaintiffs' position that reliance on the long-standing federal common law for the standard in which to apply is more appropriate than raising the bar to a criminal standard for civil liability. While the ATS is a jurisdictional statute,[25] and creates jurisdiction for torts that in violation of the law of nations, it is appropriate to look to international standards for what constitutes a violation of the law of nations and to look to the body of tort law established within the federal justice system to determine if the violation constitutes a tort. The fact that international law recognizes vicarious liability, including aiding and abetting liability, means that parties who are not the principal tortfeasor may be held accountable in United States Federal Courts for their actions in support violating international law. However, to adopt a criminal standard, as Judge Katzmann has, may not be the best approach. This is not a novel concept that the Court is facing. Many of the torts that may be brought in U.S. Courts have a criminal counterpart. The civil standard, however, does not incorporate the strict mens rea requirement that is present in the criminal standard. In determining the standard of the tort, i.e., what the mental state must be of the defendant in order to be held liable, the federal common law regarding tort and vicarious liability is more appropriate than the body of international criminal law.

Contrary to BNP's assertions, the Plaintiffs have alleged that BNP knowingly made direct payments, issued letters of credit for payment, and paid suppliers in recoupment for the illegal payments they made to the Hussein regime. These payments were made knowingly to a regime who was openly conducting the atrocities complained of in the Class Action Complaint.

Furthermore, the crux of Plaintiffs' allegations parallel very closely to the allegations set forth in Almog v. Arab Bank PLC, 471 F.Supp. 2d 257 (E.D.N.Y. 2007). In Almog, the plaintiffs allege that the bank should be held vicariously liable for aiding and abetting Hamas and

---

[25] *Sosa v. Alvarez-Machain*, 541 U.S. 930 (2004).

other terrorist organizations for knowingly providing them with banking and other services that facilitated their actions. BNP maintains that this case should be dismissed with prejudice because Plaintiffs did not include enough facts in their Class Action Complaint. The Plaintiffs maintain that its Class Action Complaint provides enough detail and factual allegations as to put BNP on notice of exactly what the Plaintiffs' claims are against it. That is the purpose of the complaint. The purpose of the pleading stage is not to try the case in its entirety, but to put the defendant(s) on notice of the claims against them. Secondly, the Plaintiffs' allegations are well-founded in the documents referenced in the Class Action Complaint—the IIC Report and the Cole Inquiry. The extent to which the facts of this case have been investigated and considered by independent neutral third parties and then documented makes this case fairly unique. Thirdly, if the Court finds that the Plaintiffs' Complaint is lacking in detail as asserted by BNP, the Plaintiffs request that this Court allow the Plaintiffs to amend its complaint. The Class Action Complaint at issue here is the first complaint filed by the Plaintiffs.

### D. The Plaintiffs alleged that BNP conspired with the Hussein regime in its commission of widespread human rights abuses that resulted in the killing of the Plaintiffs' spouses.

Plaintiffs have alleged sufficient facts for conspiracy and accomplice liability under the BNP. As discussed above, the Federal Rules of Civil Procedure have a liberal pleading standard that is intended to put the Defendant on notice of the claims against him. The recent Court decisions emphasizing the need for complaints to be more than vague and speculative does not create a requisite for the Plaintiff to prove his or her case at the pleadings stage.

Plaintiffs allege that there is an association between the Hussein regime and BNP. ¶45 of the Complaint. Plaintiffs further allege that an unlawful objective existed between BNP and the Hussein regime in order to fund the Hussein regime with illegal kickbacks. It is irrelevant that

BNP's motive may not have been to commit human rights abuses. BNP knew it was funding human rights abuses through an illegal arrangement with the common objective to violate the sanctions scheme. BNP committed the unlawful acts of making over $200,000,000 in illegal kickbacks to the Hussein regime which resulted in the torture and killings of the Plaintiffs' spouses.

Plaintiffs have alleged the elements of conspiracy and will be able to prove such elements at trial. Accomplice liability is akin to aiding and abetting liability. Plaintiffs have sufficiently alleged claims under the theory that BNP substantially supported the Hussein regime by funding its campaign of violence through the payment of hundreds of millions of dollars in illicit kickbacks.

### E.  Plaintiffs Have Valid TVPA Claims

BNP argues that the TVPA only provides liability for the individual who physically tortured and/or committed the extrajudicial killing. BNP further argues that only individuals and not corporations may be sued under the TVPA. The courts are split on these issues. However, the better line of cases holds that corporations may be subject to the TVPA and that corporations may be liable under aider and abettor liability. This line of cases was recently summarized in *Bowoto v. Chevron Corp.* 2007 WL 2349341 at *3 (N.D. Cal. August 14, 2007) (Exhibit 6) as follows:

> Several courts have suggested that under the TVPA, private individuals can be liable for aiding foreign state actors.[26] Similarly, under § 1983, private parties can be liable for

---

[26] *See Aldana v. Del Monte Fresh Produce, N.A., Inc.,* 416 F.3d 1242, 1247-48 (11th Cir.2005) ("State-sponsored torture, unlike torture by private actors, likely violates international law and is therefore actionable under the Alien Tort Act.... In construing this state action requirement, we look 'to the principles of agency law and to jurisprudence under 42 U.S.C. § 1983.' A claim for state-sponsored torture under the Alien Tort Act or the Torture Victim Protection Act may be based on indirect liability as well as direct liability.") (citations omitted); *Doe v. Saravia,* 348 F.Supp.2d 1116, 1148 (E.D.Cal.2004) ( "Saravia's role in coordinating and planning the assassination of Archbishop Romero is sufficient to establish liability against him under the TVPA and [ATS] as a direct participant, conspirator, accomplice, and aider and abettor."); *Wiwa v. Royal Dutch Petroleum Co.,* 2002 U.S. Dist. LEXIS 3293, 2002 WL 319887 at *50 (S.D.N.Y.2002) ("individuals who 'cause someone to undergo' torture or extrajudicial killing, as well

aiding a state actor's violations if they "acted in concert." <u>Franklin v. Fox,</u> 312 F.3d 423, <u>445 (9th Cir.2002)</u>.

BNP argues that because the statute uses the word "individual," it precludes corporate liability.  BNP cites legislative history which contrasts individuals with a state or a state entity. There are many reasons why Congress may have wanted to exclude states and arms of a state from liability under the TVPA including sovereignty and comity.  Neither of which are attributable to corporate liability.  Under traditional common law claims, corporations are held accountable for their actions in the same fashion that individuals are held accountable. Sovereign governments are treated differently through doctrines of immunity and other forms of deference.  There is no basis to distinguish between an individual and a corporation.

To the contrary, public policy considerations favor allowing any private party, whether an individual or a corporation, to be held liable for aiding and abetting international human rights violations that require state action. When a state actor violates an international norm, concern for the state's sovereignty dissolves.

> Similarly, when a private actor aids the state in committing a violation, the state, by participating in the violation, unequivocally demonstrates that it is unwilling to punish its co-perpetrator, and concern for the state's sovereignty is diminished. Allowing a private party to be held liable for aiding and abetting a state actor's human rights violation therefore does not conflict with the concern for state sovereignty that underlies the state-action requirement.  *Bowoto v. Chevron Corp.* 2007 WL 2349341 at *3 (N.D. Cal. August 14, 2007)

Plaintiffs have alleged that they were tortured and killed through extrajudicial means by state actors.  Plaintiffs further alleged that BNP aided and abetted the Hussein regime by funding the regime's campaign of violence resulting in the torture and killings of the Plaintiffs' spouses.

---

as those who actually carry out the deed, could be held liable under the TVPA. The legislative history of the TVPA supports this reading. In the Committee Report, the Senate Judiciary Committee explained that the Act would permit suits 'against persons who ordered, abetted, or assisted in torture.' S.Rep. No. 249, 102nd Cong., 1 st Sess. (1991).").

Plaintiffs allege and can demonstrate that BNP facilitated and paid hundreds of millions of dollars in illegal kickbacks to the Hussein regime. These payments allowed the Hussein regime to continue its reign of terror across the country of Iraq, especially in the northern Kurdish region. Without such funding, the Hussein regime would not have been able to launch such a wide scale campaign of attacks on the population.

Finally, Plaintiffs have met the exhaustion of remedies requirement for two distinct reasons. The first is that the center of conduct by the named Defendants is located in New York. As such, there is no requirement for the exhaustion of remedies. The Oil for Food Program was headquartered and operated out of New York. AWB opened an office to conduct its business in relation to the Program from New York. Furthermore, BNP, as the escrow bank conducted much of its financial activity in relation to the Program in New York. As a result, New York is an appropriate forum.

The second reason that Iraq is not a feasible forum at this stage for this litigation is due to the lack of security and lack of established rule of law. The Plaintiffs' claims are against two multi-national corporations with no current presence in Iraq. AWB has moved this Court to dismiss these claims in favor of Australia, but has not asked this Court to dismiss these claims in favor of Iraq. Notably, both AWB and BNP have offered to accept in personum jurisdiction in Australia, but have not done so in Iraq. The security situation is such that a case of this magnitude would bring with it a great deal of risk. All parties and practitioners involved would be potential targets of violence. A fair comparison to the security risk is to look at the levels of violence targeted at the individuals involved in the Saddam Hussein criminal trial. An investigative judge and his son were murdered on the street of Baghdad in 2005 in what has been

widely recognized as a targeted killing to send a message against the tribunal. (see attached news articles, Exhibit 8).

Regarding AWB's assertion that the rule of law in Iraq is functioning at an acceptable level, there is scant recent documentary evidence to support such a claim. AWB points to a quote from Paul Bremer from the beginning of the reconstruction period of Iraq in 2003. AWB relies on one article and a quote from the UNDP web page. The UN only has five people located in Iraq at this time due to the security situation. Normally, when a country embarks on a massive reconstruction period, as is occurring in Iraq, the international community is able to monitor and release regular reports regarding the current state of the rule of law. The United Nations, non-governmental international organizations such as Amnesty International, Human Rights Watch and International Crisis Group, and state foreign offices such as the U.S. State Department all conduct monitoring activities and report on the current status. The U.S. State Department has not released a Human Rights Report since 2003 which would normally contain information on the rule of law. The United Nations only has 5 individuals on the ground in Baghdad and is thus not conducting its usual monitoring activities. There is also little available in the way of non-governmental organization reports.

Plaintiffs TVPA claims should not be dismissed.

   **F.  BNP HAS ASSERTED NO GROUNDS THAT COMPEL DISMISSAL OF THE STATE TORT CLAIMS.**

   1.  Plaintiffs have asserted claims against BNP under a concerted action theory; it is therefore not necessary to establish that the bank directly caused plaintiffs' injuries.

BNP asserts that plaintiffs' state common law tort claims must be dismissed because they have failed to allege a causal connection between the bank's conduct and their injuries. Mem. in Support at 26-27. However, these claims are not predicated upon BNP's independent violation

27

of a duty, but upon concerted action liability. Under that theory, "all those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request or who lend aid or encouragement to the wrongdoer. . . are equally liable with him." *Bichler v. Eli Lilly & Co.,* 55 N.Y. 2d 571, 580 (1982) (internal quotations omitted); *Vancore v. Teigue,* 664 N.Y.S. 2d 604, 605 (2d Dep't 1997). The fact BNP did not itself commit the atrocities is not dispositive; it may nonetheless be vicariously liable for those acts. *See, e.g., Haleberstam v. Welch,* 705 F.2d 472 (D.C. Cir. 1983) at 476-478, *passim.*

2. BNP misstates the New York law governing aiding and abetting

BNP cites *Stutts* v. *De Dietrich Group*, 2007 WL 1867060 (E.D.N.Y.) to shore up its argument that plaintiffs' claims must fail because the bank had no duty to prevent third persons from harming them. (Mem. in Support at 28) However, BNP quotes from only that portion of *Stutts* that treats with liability for injuries caused by a third party where the defendant has actual control over that third party -- ignoring the section discussing aiding and abetting. In fact, aiding and abetting contains substantially different elements: (1) a violation by the primary wrongdoer; (2) knowledge of the violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation. *Id.* at *12, *Williams v. Bank Leumi Trust Co. of New York,* 1997 WL 289865 (S.D.N.Y.) at *4.

3. The New York Law of Aiding and Abetting Liability

As to the second prong of the three-part test for aiding and abetting liability,, although it is necessary to show that the defendant knew the "wrongful nature of the primary actor's conduct," *Pittmann v. Grayson,* 149 F.3d 111, 123 (2d Cir. 1998), there is no requirement that the defendant <u>intend</u> the resulting conduct or that it have as its <u>purpose</u> the underlying the tort or crime. *See, e.g., S & K Sales Co. v. Nike, Inc.,* 816 F. 2d 843, 848 (2d Cir.1987), discussing the

difference between "wrongful intent" and "knowing participation" in the context of aiding and abetting under New York law. *See also Kaufman v. Cohen,* 307 A.D. 2d 113, 760 N.Y.S. 2d 153 (1st Dep't 2003). ("Although a plaintiff is not required to allege that the aider and abettor had an intent to harm, there must be an allegation that such defendants have actual knowledge of the breach of duty." *Id.* at 125, citiations omitted.)

As is discussed *supra,* Judge Katzmann in *Khulumani* concluded that a defendant may be liable under customary international law for aiding and abetting only where the defendant provided practical assistance to the principal and where this is done with the *purpose* of facilitating the commission of the wrongdoing. *Khulumani* at 277. Clearly, however, New York does not require a plaintiff to establish the defendant's purpose in rendering assistance to the primary tortfeasor and for that reason, plaintiffs' state claims must be analyzed separately.

*Pittmann, supra*, cited by AWB, is factually different from the instant case. In *Pittmann,* the father of a child claimed the defendant had secretly flown with the plaintiff's child to Iceland in violation of a court order. He then sued the airline for its participation in the removal of the child. The Second Circuit affirmed the district court's setting aside of the plaintiff's verdict, finding there were no facts from which the airline could have reasonably inferred that the defendant was absconding with the child in violation of a court order.

In the case at bar, in contrast, there was nothing vague or ambiguous about how the Program was being perverted by the funneling of bribes to the Hussein operatives. Indeed, as will be discussed *infra,* it is clear that AWB was fully aware of those illicit payments, yet chose to participate fully and conceal its involvement for years.

The third prong -- "substantial assistance" -- is defined in New York by reference to comment d, §876(b) of the Restatement (Second) of Torts. *Wantanabe Reality Corp. v. City of*

*New York,* 2003 WL 22862646 (S.D.N.Y.).  It is not necessary that the assistance provided be a tort or even obviously wrongful. ("The contributing activity itself need not be so obviously nefarious as cheering a beating or probing someone to drive recklessly," *Halberstam v. Welch,* 705 F.2d 472 (D.C. Cir. 1983).  The more egregious the underlying tort, the less substantial the aider and abettor's role must be.   ("Defendant's responsibility. . .increases with the blameworthiness of the tortious act or the seriousness of the foreseeable consequences. . . ." *Id.* at fn 3.)  Thus, a defendant may be liable "despite his relatively trivial role" in the wrongdoing. Finally, it is significant if the wrongful conduct was carried out over a substantial length of time. ("The length of time an alleged aider and abettor had been involved with a tortfeasor almost certainly affects the quality and extent of their relationship and probably influenced the amount of aid provided as well; additionally, it may afford evidence of the defendant's state of mind*. Id.* at 484.)

       4.  Sufficient facts have been alleged to support a plausible claim that BNP aided and abetted the torts committed by the Hussein regime

BNP does not challenge the first prong of the three-part test for aiding and abetting --  the existence of a violation by the primary wrongdoer. Instead, the bank claims plaintiffs have not, and cannot, allege facts demonstrating it had knowledge of the wrongful conduct, or that it provided substantial assistance to the Hussein regime.   (Mem. in Support at 29.)   Those propositions will be addressed in turn.

       a.  Sufficient facts have been pleaded from which one could plausibly infer that BNP had knowledge of the torts committed by the Hussein regime.

BNP does not dispute that the U.N. prohibited transfers of hard currency to the corrupt Iraqi government and that the purpose of that sanction was to thwart Hussein's avowed goal of genocide and torture, particularly as directed toward certain ethnic groups. Those atrocities were

well-known throughout the world and it is not plausible that BNP could have been ignorant of their scope.

As part of the Program, BNP was required to affirmatively undertake to ensure that disbursements from its escrow accounts would comply with U.N. directives. (*See* discussion at pages 5-6, *supra.)* The U.N. also mandated complete transparency to ensure that funds unrelated to the sale of food would never make their way into the hands of the corrupt regime. From these facts, it is at least plausible to infer that BNP knew that the bribes secretly being funneled to the Iraqis could -- and would -- be used to facilitate the nefarious goals of Saddam Hussein.

This case is a far cry from *Stutts De Dietrich Group*, 2007 WL 1867060 (E.D.N.Y.), where the plaintiffs sought to recover for injuries caused by the detonation of chemical weapons during the first Gulf War. The *Stutts* plaintiffs claimed the defendant banks had aided and abetted the development of Saddam Hussein's chemical weapons arsenal by issuing letters of credit to facilitate the sale of chemicals to the Iraqi government. In dismissing the complaint under Rule 12(b)(6), the district court found that the plaintiffs had failed to sufficiently allege the bank's knowledge of Hussein's primary wrongdoing, citing the precept that issuers of letters of credit merely process documents and are deemed to be "third parties ignorant of the specifics of the transactions." *Id.* at *13, quoting *Oie v. Citibank,* 957 F.Supp 492, 503 (S.D.N.Y.).

The fund transfers in *Stutts* were facially neutral, in sharp contrast to the transfer arrangements in the instant case where "BNP was obligated to the United Nations to perform its duties under the Agreement in full contemplation of Resolution 986 and the 666 Committee's procedures." IIC at 462. Accordingly, the transfers in and out of BNP's escrow accounts could scarcely be described as simple, non-discretionary banking transactions, as was the case in *Stutts*.

Upon these facts, it is plausible to infer that BNP had knowledge of the uses to which the illicit funds would be put.

      b.   Sufficient facts have been alleged from which one could plausibly infer that BNP substantially assisted the Hussein regime in its commission of the tortious acts against the plaintiffs.

BNP was clearly an active participant in the illicit scheme to bribe the Hussein regime, in direct violation of the U.N. Resolutions, all the while keeping its participation secret. It is therefore disingenuous, at best, to assert that its only role was to issue non-discretionary letters of credit and pay down those letters upon demand. (Mem. in Support at 7.)

As found by the IIC:

> In short, BNP's dual role burdened it with divided loyalties that ultimately *facilitated . . . the success of Iraq's oil surcharge scheme*. The success of the scheme relied upon the ability of the true parties at interest to conceal their roles and the flow of funds stemming from the oil purchase transactions. Once the surcharge scheme took root, BNP itself became an instrument for the payment of millions of dollars in illegal surcharges while doing little to detect or prevent such payments.

IIC 461. (Emphasis added.)

Thus, BNP affirmatively and substantially rendered assistance to the Saddam Hussein regime, rendering it liable for aiding and abetting the human rights violations inflicted upon the plaintiffs. However, an alternative basis for finding "substantial assistance" can be predicated upon BNP's <u>failure</u> to act. Under certain circumstances, a bank has an affirmative duty to monitor its customers' transactions and expose wrongdoing, regardless of a lack of fiduciary or other relationship with the injured party. Specifically, liability for aiding and abetting may be imposed under New York law based on a *public* duty.

This principle is well illustrated in *Calcutti v. SBU, Inc.,* 273 F.Supp. 2d 488 (S.D.N.Y. 2003). In that case, the defendant SBU had assumed the duty of administering a trust set up for the benefit of an infant plaintiff following a personal injury settlement and was required under the terms of the settlement to purchase U.S. Treasury obligations with the funds, but instead used the money to purchase and operate grocery stores. SBU also failed to report the taxable income generated from the grocery stores to the IRS. Defendant BDO, SBU's accountant, knew of SBU's failure to inform the IRS and that this failure would negatively affect the interests of the plaintiff.

In finding that the accountant could be liable under an aiding and abetting theory, the court rejected the argument that "substantial assistance" was lacking simply because the accountant had engaged in no affirmative wrongdoing but had merely failed to disclose or otherwise prevent SBU's wrongdoing. Despite the fact the accountant owed no duty to the plaintiff and that no fiduciary relationship existed, liability for aiding and abetting could be imposed based on the accountant's duty not to mislead when making statements or submissions detrimental to or affecting the public -- in that case, a duty to disclose information to the IRS in an accurate and complete manner. Where there is such a duty, one must speak truthfully and disclose any qualifying information, the absence of which would render misleading that which was communicated. *Id*. at 495. *See also U. S. v. District Council of New York City,* 2007 WL 2697135 (S.D.N.Y.), citing *IIT, AN International Investment Trust v. Cornfeld,* 619 F.2d 909 (2d Cir. 1980) for the proposition that "inaction on the part of the alleged aider and abettor ordinarily should not be treated as substantial assistance, except when it was designed

33

intentionally to aid the primary fraud or it was in conscious and reckless violation of a duty to act." *Id*. at *16, citing *Cornfeld* at 925-27.[27]

In this case BNP, similar to the accountant in *Calcutti,* had a public duty to vet its escrow transactions to ensure compliance with the U.N. mandates. Those mandates were based on a consensus of world opinion and were entitled to at least as much respect as are regulations of the Internal Revenue Service.

        c.  Plaintiffs' state common law claims are not time- barred.

The statute of limitations with respect to plaintiffs' state law claims are subject to equitable tolling and as such, this action was timely commenced. (The Court is respectfully referred to the discussion of this issue in the accompanying memorandum addressing defendant AWB's motion to dismiss for a more complete discussion.)

In summary, when drawing all reasonable inferences from the complaint and the documents incorporated therein by reference, plaintiffs have stated a plausible right to relief under New York common law. There is accordingly no basis to dismiss those claims under Rule 12 (b)(6). *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir. 2007).

## IV.    Conclusion

BNP's Motion to Dismiss should be denied on all grounds. Plaintiffs have alleged sufficient facts for their claims under both the ATS and the TVPA. Plaintiffs have standing to sue the named Defendants as they have met the injury in fact requirements of Article III. Furthermore, the Court should not dismiss this case on any of the discretionary grounds brought before it.

---

[27] *District Council* involved criminal aiding and abetting and *Cornfeld* involved federal securities law. Although *Cornfeld* is no longer good law in the securities context, given the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, the *Calcutti* Court noted that "while aider and abettor liability does not lie under the securities laws, the same standards and elements used under New York common law were applied by the Second Circuit [in *Cornfeld*] and its analysis of the breach and requirements of the fulfillment of those elements cannot be disregarded." *Calcutti* at fn 4.

This case has a nexus with the forum and is appropriate for adjudication here.  The Court should

deny BNP's Motion to Dismiss.  In the alternative, should the Court find that the Plaintiffs'

pleading is lacking, the Plaintiffs request the opportunity to file an amended complaint.

          Respectfully submitted,

          */s/ John T. Murray*
          John T. Murray  (0008793)
          jotm@murrayandmurray.com
          MURRAY & MURRAY CO., L.P.A.
          111 East Shoreline Drive
          Sandusky, Ohio  44870-2517
          Telephone:  (419) 624-3125
          Facsimile:     (419) 624-0707
          Attorney for Plaintiffs

## <u>CERTIFICATION</u>

I hereby certify that on February 22, 2008, the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<u>*/s/ John T. Murray*</u>
John T. Murray  (0008793)