**EQUIPO NIZKOR**  Información  **DERECHOS**

# Judgment of the English Court Allowing the Extradition of Pinochet

Español

**JUDGMENT**

In the Bow Street Magistrates' Court

**THE KINGDOM OF SPAIN**
- v -
**AUGUSTO PINOCHET UGARTE**

**Mr Ronald David Bartle**
**Metropolitan Magistrate**
**8th October 1999**

Before I commence my judgment there are certain preliminary matters which I feel I should mention. I do so because of the enormous public attention which this case has received both in this country and abroad, and because of the emotions, indeed passions, to which it has given rise.

Extradition is a branch of law relatively unknown to the general public, and therefore I think it is very important that I should say a few words at the outset to explain the proceedings and my role as the Presiding Magistrate. I shall, by way of explanation deal with the following: the proper approach of the court to the case before it; the nature of the hearing; the function of the court; and my own duties including the delivery of my judgment.

With regard to the first point I cannot do better than quote the words of Lord Browne-Wilkinson in the early part of his judgment delivered on 24th March of this year when this case was before the House of Lords Appellate Committee. What the learned law lord said was this:

> "In 1998 Senator Pinochet came to the United Kingdom for medical treatment. The judicial

> authorities in Spain sought to extradite him in order to stand trial in Spain on a large number of charges. Some of those charges had links with Spain. But most of the charges had no connection with Spain. The background to the case", said the learned law lord, "is that to those of left-wing political convictions Senator Pinochet is seen as an arch-devil: to those of right-wing persuasions he is seen as the saviour of Chile. It may well be thought", he continued, "that the trial of Senator Pinochet in Spain for offences all of which related to the State of Chile and most of which occurred in Chile is not calculated to achieve the best justice. But I cannot emphasise too strongly that that is no concern of your Lordships. Although others perceive our task as being to choose between the two sides on the grounds of personal preference or political inclination, that is an entire misconception".

I respectfully adopt those words so far as this court is concerned, It is unfortunate that this point has to be made at all, but having regard to the appearance in the press of one or two foolish articles hinting at the possibility of bias, and taking into account the great deal of public debate, including statements of opinion by prominent public figures, I feel it incumbent upon me to emphasise that my decision in this case will be based upon the law and the law alone, in accordance with the judicial oath "to do right to all manner of persons, after the laws and ordinances of the realm, without fear or favour, affection or ill-will". If my understanding of the law is at fault a higher court will put that right.

Next I turn to the nature of these proceedings. The Spanish request is made under the terms of the European Convention on Extradition, entered into by a number of states, mostly though not entirely, European, for the purpose of simplifying and expediting the process of the return of fugitive offenders. Both Spain and the United Kingdom are signatories to the Convention and both have embodied its terms, with few reservations, into their own domestic law. In the case of this country the relevant law is contained in the Extradition Act 1989 and in The European Convention on Extradition Order 1990. The purpose of the Convention would appear to be to expedite and streamline the extradition process and so avoid the previous situation under which fugitives from justice, by taking every conceivable technicality, were able to delay, in some instances for years, their return to the requesting state.

The purpose of such Conventions is to assist the forces of law and order to counter the ever increasing sophistication with which international criminals, be they terrorists, drug traffickers, perpetrators of fraud on an international scale and such like, exploit

advanced technology and communications to commit their crimes and avoid detection and subsequent apprehension. In recent years a number of such agreements between states have been entered into, including one which has been an important factor in this case, namely the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted by the United Nations General Assembly on 10th December 1984, referred to for convenience as "The Torture Convention".

These Conventions represent the growing trend of the international community to combine together to outlaw crimes which are abhorrent to civilised society whether they be offences of the kind to which I have referred or crimes of cruelty and violence which may be committed by individuals, by terrorist groups seeking to influence or overthrow democratic governments or by undemocratic governments against their own citizens. This development may be said to presage the day when, for the purposes of extradition, there will be one law for one world.

Against that background let me now turn to the function of this court. In this respect I cannot do better than quote the words of Lord Justice Kennedy in the case of *In Re Anthony*: "The whole purpose of the Convention and those parts of the statute, to which I have referred, is to provide a simplified form of procedure which does not become bogged down in detailed consideration of evidence. <u>The person whose extradition is sought needs to know, in general terms, what he is supposed to have done, and both the Secretary of State and the Magistrate need to be satisfied</u> that the conduct alleged would amount to a serious crime in either country". But as Lord Templeman said in *Evans*: "<u>The magistrate is not concerned with proof of the facts, the possibilities of other relevant facts, or the emergence of any defence</u>; these are matters for trial".

It cannot be too strongly emphasised that these proceedings are not conducted for the purpose of deciding the guilt or innocence of Senator Pinochet in respect of the allegations made against him, nor would a finding on my part that the request of Spain should be complied with be any indication whatever that I have formed a view as to his guilt or innocence.

The purpose of this hearing is to enable me as the presiding magistrate, to decide whether or not the conditions are in place which would oblige me to order the committal of Senator Pinochet to await the decision of the Secretary of State.

This is an accusation case under the Convention. No evidence is called, except on very restricted issues, and there is no requirement for the Government of Spain to establish a prima facie case. This is

because the whole purpose of this procedure is to ensure that, so far as possible, contentious matters should be thrashed out in the courts of the requesting state. Hence, it would be in the Spanish court, should the case go that far, that evidence would be called and tested. It is there that Senator Pinochet would be able to establish any defence.

I refer to my own position as magistrate. My decision is not final. Firstly, both the government and the defence have the right to appeal my ruling, depending on which way it goes, to the Divisional Court of the High Court, and thereafter, with leave, to the House of Lords. Secondly, if Senator Pinochet is not discharged, the final decision regarding his extradition to Spain rests with the Secretary of State and not with the courts.

One further matter. The Divisional Court of the High Court, which hears appeals from this court in extradition cases, has indicated, very understandably, that when such appeals are heard it is helpful to the judges if they are provided with a statement of the magistrate's reasons for his decision. It is not my proper task to give a long judgment tracing through in detail all the submissions and dwelling in depth on the authorities. I therefore now return to what I understand to be the main issues, my ruling on each of these, and my reasons for so ruling.

The first question for my consideration is whether I can properly entertain material produced by the requesting state which was not before and had not been requested by the Secretary of State when he issued his authority to proceed on the 14th April 1999.

I can find nothing in Articles 12 or 13 of the Convention or Section 7 of the Extradition Act which states this. I am also satisfied that the case of *Cuoghi* is clear authority against it.

Article 12 sets out the necessary form and contents of the Request. Article 13, under the heading "Supplementary Information" states:

> "If the <u>information</u> communicated by the requesting party <u>is found to be insufficient</u> to allow the requested party to make a decision in pursuance of this Convention, the latter party shall request the necessary supplementary information and may fix a time-limit for the receipt thereof".

The power of the Secretary of State under Article 13 to request further information is for the purpose of enabling him the better to formulate the correct offences to be contained in the authority to proceed. I draw no inference from this that further material which was not before him when he issued his authority is not receivable by the court. The purpose of Article 13 is to assist the Secretary of

State perform his task, not to deprive the court of necessary information to enable it perform its function.

I have been referred by the defence to a letter dated 15th April 1999 from a Home Office official to solicitors for the defence. I am not at all sure that in reaching my decision on this point it is appropriate for me to have regard to the contents of such a letter. But in any event I do not accede to the interpretation that the defence place upon the passages marked. The most significant appears to be paragraph 22. That paragraph states that the Secretary of State has declined the invitation of The Crown Prosecution Service to consider fresh material dated 10th December 1998, 24th December 1998, 26th March 1998(9) and 5th April 1999 subsequent to the formal request received in the Home Office on 11th November 1998.

The following words are important however.

> "He does not regard the material to be 'supplementary material' under Article 13 of the ECE since, as the requested party in that Article, <u>he has not considered it necessary to request such material from Spain in order to make his decision</u>".

The authority to proceed is, as the Government of Spain submits, the document which starts the proceedings moving. I can find no basis for the proposition that material which the Secretary of State has not found it necessary to request or consider should therefore be unavailable to the court. Section 7(2)(b) of the Extradition Act which refers to "<u>particulars of the offence of which he is accused ………</u>" which "<u>shall be furnished with any such request</u>" does not in my view confine the court to those particulars which were furnished with the original request or which were before the Secretary of State when he issued his authority to proceed.

The further material, objected to by the defence is in my view supplementary to and in amplification of the conduct alleged against Senator Pinochet, namely his involvement in acts of torture and conspiracy to commit such acts. If such material described totally different offences the position would be different.

The relevant authority in point is that of *Re Cuoghi*. The Government and the defence each place a different construction on this case. I have to say I find the Government view more persuasive. The crucial words of Lord Justice Kennedy are these:

> "If the magistrate is satisfied that the authority to proceed has been issued in respect of the person arrested and that the offence to which the authority to proceed relates is an extradition crime he is required to

commit. <u>Nothing in the statute requires him to reach that state of mind on the basis of information as it was before the Secretary of State</u>".

My ruling is therefore that I am entitled to receive and consider the further information which was not before the Secretary of State at the time he issued his authority to proceed on 14th April.

The next matter for my consideration is whether the conduct of which Senator Pinochet stands accused is conduct which if it occurred in this country and also in Spain would, under the law of each country constitute extraditable offences. This is called the "double criminality rule" which must be satisfied before I can properly commit Mr Pinochet to await the Secretary of State's further direction.

Section 2(1)(a) of the Extradition Act 1989 defines an extradition crime as "conduct in the territory of a foreign state ........ which, if it occurred in the United Kingdom, would constitute an offence punishable with imprisonment for a term of 12 months, or any greater punishment, and which, however described in the law of the foreign state ....... is so punishable under that law".

May I say straight away that I feel sure that the House of Lords at the March hearing had under review the question of extradition crimes and immunity as two separate issues. Lord Browne-Wilkinson made that clear when he said at the commencement of his judgment:

> "Our job is to decide two questions of law: are there any extradition crimes and, if so, is Senator Pinochet immune from trial for committing those crimes. If, as a matter of law, there are no extradition crimes or he is entitled to immunity in relation to whichever crimes there are, then there is no legal right to extradite Senator Pinochet to Spain, or indeed to stand in the way of his return to Chile. <u>If, on the other hand, there are extradition crimes in relation to which Senator Pinochet is not entitled to state immunity</u> then it will be open to the Home Secretary to extradite him.
>
> "The task of this House <u>is only to decide those points of law</u>".

I have carefully and respectfully read and re-read the judgments of their Lordships and I am satisfied that the majority of the House regarded the Torture Convention to be of universal application. Chile, Spain and the United Kingdom are all signatories to the Convention. The Criminal Justice Act 1988 Section 134 applies the Convention to the law of this country. Section 134(3) provides that

the offence can be committed by act or omission, and the torture may be mental or physical. It has been submitted to me that the Government of Spain have to provide information that the alleged torture must be widespread and systematic. A majority of the House held that one act of torture was sufficient to establish the necessary conduct, Lord Goff dissenting. However, having admitted the further information, I respectfully adopt the view of their Lordships that the conduct alleged against Senator Pinochet would be extraditable offences under English law if the accusations were substantiated. But even without the guidance of the highest court in the land I would have come to the same conclusion.

What is the position regarding the law of Spain? The defence submit that I cannot be satisfied that by the law of Spain the conduct as alleged against Senator Pinochet is an extraditable offence in that country. Am I bound by the insistence of Spain that the conduct would be punishable in Spain with a sentence of twelve months' imprisonment or more or should I examine the situation more closely?

Here I receive great assistance from the leading House of Lords case of *In Re Evans*. I must ask the indulgence of counsel who I know are all too familiar with it, but I feel that it has such a powerful bearing on my judgment that I propose to cite those passages in the landmark judgment of Lord Templeman which I consider most important.

Mr Nicholls has, I think, conceded that on the authority of *Evans* he is not entitled to call evidence of foreign law. He is entitled to make submissions, and I have to ask myself what is my position as a presiding magistrate having heard those submissions.

After reviewing the law generally as attaching to accusation cases under the Convention, Lord Templeman said "If the magistrate in committal proceedings were not limited to consideration of the conduct of the accused as alleged in the request for extradition, in the light of the law of the foreign state as presented with the request, then no one would ever be extradited until he had been tried and found guilty in the United Kingdom of an offence against the law of a foreign country committed in the foreign country". He then states later: "For the purposes of the court of committal, the conduct or facts are those set forth in the request for extradition; the relevant law of the requesting state is that set forth in the request for extradition".

Then again he states: "The magistrate will then consider whether the conduct set out in the particulars of conduct furnished by the requested state constituted an offence under the law set out in the particulars of law supplied by the requesting state. The magistrate

will be aware that the authorities which issued the foreign warrant for arrest and the government which requested extradition <u>must have been satisfied that the conduct constituted an offence</u>".

I read that passage as saying that having heard submissions the relevant foreign law to which I must direct my attention is that contained in the request. Can I go behind the claim in the request that the foreign law has been infringed by the alleged conduct.

To do so would surely involve me in an investigation of the foreign law of a kind which the full House in *Evans* declared impermissible. Foreign experts would surely have to assist the court. But that would be a reversion to the old system which has been ruled out in *Evans* in Convention accusation cases.

Moreover the High Court of Spain has twice ruled that the conduct complained of would amount to Extradition offences under the law of Spain. Could I, a magistrate with no particular knowledge, or quite frankly no knowledge of Spanish law challenge the rulings of Spanish High Court judges regarding the law of their own country? I think not.

Two further significant passages in Lord Templeman's judgment are worthy of note in this context: "If the presentation of the law of the foreign state set forth in the request for extradition were <u>inaccurate</u> or incomplete in a relevant and material respect and the correct law could not be presented by agreement, then <u>the accused would have his remedy in habeas corpus proceedings</u>".

The learned Law Lord is not there speaking in a derogatory manner of the committing magistrate, but emphasising the very limited nature of the role he or she has to play.

One final passage I would cite: "In my opinion where requests for extradition <u>allege acts of violence</u>, theft, fraud or the like courts should be slow to pay heed to any representations that such acts do not constitute offences under foreign law".

I conclude therefore that I am bound by the Spanish representations as to their own nation's law and I accordingly find that the double criminality rule is satisfied.

The remaining issues I propose to deal with quite briefly.

The matter of immunity has been ruled upon by the House of Lords with one dissentient voice. That ruling is binding upon this court.

Accordingly I find that the information before me relating to allegations after 8th December 1988 constitute a course of conduct amounting to torture and conspiracy to torture for which Senator

Pinochet enjoys no immunity.

The attack on the charges relate in my view to matters of evidence appropriately dealt with at the court of trial. Again I pray in aid a passage from Lord Templeman's judgment in *Evans*: "The magistrate is not concerned with proof of the facts, the possibilities of other relevant facts, or the emergence of any defence; these are matters for trial". The issues raised on the charges essentially go to Senator Pinochet's defence for which the appropriate court is the court of trial, which this is not.

I take the view that information relating to the allegation of conspiracy prior to 8th December 1988 can be considered by the court, as conspiracy is a continuing offence. However, this would not be my ruling relating to the substantive offences.

Whether the disappearances amount to torture; the effect on the families of those who disappeared can amount to mental torture. Whether or not this was intended by the regime of Senator Pinochet is in my view a matter of fact for the trial court.

On the basis of my findings I am therefore satisfied that all the conditions are in place which oblige me under the terms of Section 9(8) of the Extradition Act 1989 to commit Senator Pinochet to await the decision of the Secretary of State.

---

This text can also be found at the Magistrates Page

---

Trial Against Pinochet in Spain

---

Published online by Equipo Nizkor and Derechos Human Rights

Case 1:07-cv-07955-GEL     Document 32-10     Filed 02/25/2008     Page 10 of 18

**EQUIPO NIZKOR**            Información            **DERECHOS**

<u>Castellano</u>

**20Sep98**

# Spain-Chile: Writ of the Instructing Court accepting the Jurisdiction in the Pinochet case

**Summary Proceeding 1/98-J**

**AUDIENCIA NACIONAL
CENTRAL INVESTIGATORY COURT
NUMBER SIX
MADRID**

**WRIT**

At Madrid, on the fifteenth of September of One Thousand Nine Hundred and Ninety Eight

**I Facts**

First - That by the writ of this court dated 23 March of this year, the investigation was closed and the case was removed to the Criminal National Court of the Audiencia Nacional

Second- That by their writ of 9 July of this year, the first section of the Criminal National Court agreed to revoke the writ that was dictated by this court, closing the summary investigation. This action was taken to permit the Investigating Judge to resolve at the trial level whether a lack of jurisdiction does or does not exist, and, in the event that this requirement is deemed to be fulfilled, to decide additionally about the indictments and other proceedings requested by the plaintiffs.

**II. Legal Foundation**

First - That in completing the order of the National Criminal Court, it is necessary to issue a resolution regarding the jurisdiction of this court to investigate the crimes in question. This decision must be taken in relation to the claims made by the Ministerio Fiscal (Ministry of Public Prosecution), which serve, at their base, to reject the possibility that Spanish courts are legitimately competent to hear the present case.

In the first instance the Ministerio fiscal asserts, in its brief of 20 March of 1998, that there exists a lack of Spanish jurisdiction regarding the crime of genocide, signaling that the Convention on the Prevention and Punishment of the Crime of Genocide of 9 December, 1948 grants competence to try the crime of genocide only to the courts in the nation where

Case 1:07-cv-07955-GEL    Document 32-10    Filed 02/25/2008    Page 12 of 18

the act was committed.

However, one must place in opposition to this reasoning the fact that the 23rd article of the Organic Law of Judicial Authority, in correspondence with articles 10 and 96 of the Spanish Constitution, as well as the precedents established by Spanish courts, authorizes the competence of Spanish courts, especially with regards to the present case--at least that part that pertains to the priest Mr. [Antonio Llidó], who remains missing.

In effect, resolution 47/133 of the General Assembly of the United Nations "Declaration on the Protection of all People against Forced Disappearances," suggests in its 17th article that: "All acts of forced disappearances will be considered a permanent crime, while its perpetrators continue hiding the fate and the whereabouts of the disappeared person, and until all of the relevant facts have been uncovered". Article 18.1 of the same declaration states that: "The perpetrators or presumed perpetrators of the acts outlined in paragraph 1 of article 4 will not benefit from any special amnesty law, or any equivalent measures, whose effect is to exonerate them from any judicial proceeding or criminal sanction."

It is the obligation of the International Community to preserve the right to live, especially when genocide is the ultimate crime, the most grave violation of human rights that humans can commit. Consequently, the International Community must discover it, prosecute it, and adequately punish it. The investigation of these crimes must be difficult, especially when the body that threatens death, or is responsible or complicit in death, is the very State. This is true above all if one takes into account the obstructionary labor carried out by the government in question. Such action was foreseen by the UN in the Convention on the Prevention and Punishment of the Crime of Genocide, of 9 December, 1948, and to which Spain subscribed on 13 September of 1968, with a total reservation to article 9, which refers to the jurisdiction of the International Court of Justice over the interpretation, application, and execution of the Convention.

The crime of genocide is defined in the Convention of the 9th of December of 1948, and this definition has been included in our own Judicial Code, through the law 44/1971 of 15 November, as a consequence of our adherence to the Convention. This law adds article 137 two into chapter III, as one of the crimes against the rights of Man listed in title I (Crimes against the Exterior Security of the State) of book II of the Penal Code. This crime has not been removed from the Code since then. It is currently found to be regulated by article 607, chapter II (Crimes of Genocide), Title XXIV (Crimes against the International Community), book II.

Second - The Ministerio Fiscal alleges secondly that Spain would not be competent to judge the denounced crimes of terrorism committed abroad, given that the Organic Law of Judicial Authority entered into effect on 3 August of 1985, whereas the actions denounced by the plaintiffs were committed before, and given the absolute prohibition on retroactivity.

We must similarly reject the abovementioned allegation given that, until the creation of the Audiencia Nacional, competence to judge acts of international terrorism was based in the Code of Military Justice through the law 42/1971 of 15 November; since the creation of the Audiencia Nacional, competence has been assumed by this body.

The Code of Military Justice, in its 17th article, had already determined in 1971 that "Spaniards or Foreigners who commit, in a foreign country, a crime contained in this Code

Case 1:07-cv-07955-GEL    Document 32-10    Filed 02/25/2008    Page 14 of 18

or in other Military Penal Codes," will be tried in Spain. Consequently, we insist that the universal prosecution of terrorism has been recognized in the Spanish legal order since the abovementioned year. The Sala de lo Penal of this Audiencia Nacional, in a sentence of 20 November, 1991, affirmed the permanent competence of that body for the prosecution of crimes of terrorism committed outside our national territory.

Third - The Ministerio Fiscal signals that the court also lacks competence to judge the crimes of torture that have been denounced, given that the Convention Against Torture of 10 December of 1984 establishes in its 5th article that competence to judge those crimes will rest with the signatory state in whose territory the acts were committed.

The crime of torture was introduced into the Spanish Penal Code by the Organic Law 31/78 of July. It can be found in article 204.2 of the Penal Code, in the crimes against the Interior Security of the State. In this matter, one must keep in mind article 7 of the International Pact on Civil and Political Rights of 16 December, 1996, ratified by Spain on 27 April of 1977, which prohibits torture, as well as inhuman and degrading treatment. Article 5.1 of the Convention Against Torture, of 10 December, 1984, establishes that, "All States party to the treaty will take all necessary measures in order to institute their jurisdiction over the crimes referred to in article 4...when the victim is a national of that State and when that State considers it appropriate; article 3 of the Four Conventions of Geneva of 12 July, 1949, ratified by Spain, which refer to the basic norms applicable to all armed conflict, including non-international or internal conflict, prohibits torture and inhuman treatments at all times. These principles, when considered in relation to article 23.4-G of the Law of Organic Judicial Authority leaves little doubt of its identity with the crime of torture, recognized by the Penal Code in force.

Fourth - The Ministerio Fiscal alleges, however, that litispendence exists, given that the Appeals Court of Santiago de Chile has asserted jurisdiction over similar complaints against the ex-President of Chile, Mr. Augusto Pinochet Ugarte. It is then necessary, in order to reliably verify the truthfulness of the documentation provided, to send immediately an International Rogatory Commission so that the Most Excellent Court of Appeals of Santiago de Chile may, with the utmost possible speed, certify the truthfulness of the documentation provided, and it is therefore agreed,

In consideration of the abovementioned

## I ORDER

First -That the jurisdictional competence of this body is maintained, in order for the proceedings of the investigation to proceed.

Second - That an International Rogatory Commission will be sent to the judicial authorities of Santiago de Chile, in order that they may certify, with the utmost possible speed, if there exist open criminal cases against Mr. Augusto Pinochet Ugarte, and in the event that there are, the number of the same and the crimes which they allege.

This writ is not final and appeal to this Court may be made within the next three days.

To this I agree, order, and sign D. Manuel Garcia-Castellón, Judge-Magistrate of the Central Investigatory Court number six.

This I dispatch. That this be immediately executed, I give faith.

---

Unofficial translation and original information provided by the Director of the Plaintiffs team in the Pinochet case before the Audiencia Nacional of Spain

---

Human Rights in Chile | Trial against Pinochet

---

Este documento es publicado en la internet por Equipo Nizkor y Derechos Human Rights

Case 1:07-cv-07955-GEL    Document 32-10    Filed 02/25/2008    Page 18 of 18