UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAADYA MASTAFA and KAFIA ISMAIL,

Plaintiffs,

v.

AUSTRALIAN WHEAT BOARD LIMITED aka AWB LIMITED, AWB (U.S.A.) LIMITED, and BANQUE NATIONALE DE PARIS PARIBAS

Defendants.

ECF CASE

No. 07 CIV 7955 (GEL)

**SUPPLEMENTAL DECLARATION OF CRAIG PHILLIPS IN FURTHER SUPPORT OF DEFENDANTS AWB LIMITED'S AND AWB (U.S.A.) LIMITED'S MOTION TO DISMISS THE CLASS ACTION COMPLAINT WITH PREJUDICE**

Craig Phillips hereby declares as follows:

1. I am a member of the Australian law firm Allens Arthur Robinson ("AAR") and have been a partner since 1986. I was admitted to practice in the State of Victoria, Australia, in 1980, as an Australian Legal Practitioner, and I am also admitted to practice in the Australian States of New South Wales and Queensland. AAR currently represents AWB Limited in certain court proceedings pending in the Federal Court of Australia, and in relation to other matters.

2. I offer this supplemental declaration in further support of Defendants AWB Limited's ("AWB") and AWB (U.S.A.) Limited's ("AWB USA") Motion to Dismiss the Class Action Complaint.

3. The following is true of my own personal knowledge and based upon the enquiries I have made, and, if called as a witness, I could and would testify competently thereto.

4. References to Acts, Regulations, Rules and Bills are to Australian Acts, Regulations, Rules and Bills unless otherwise indicated.

A. **AWB Offices**

5. The Australian Wheat Board, then a statutory authority of the Commonwealth of Australia, opened an office in New York in 1983. The New York office was originally proposed to be opened as foreign exchange and commodities trading desks. The foreign exchange desk, however, was retained in Melbourne, Australia, and the New York office initially consisted solely of a commodities trading desk.

6. The New York office also performed the following functions:

a. trade policy monitoring of the U.S.;

b. making representations concerning the U.S. Farm Bill and U.S. export and trade policy;

c. liaison in relation to the single desk system;

d. international sales and marketing into the South American market, commencing during the period from 1996 to 1999.

7. AWB USA was incorporated in the State of Delaware on 20 July 1999. On and from the incorporation of AWB USA, the New York office became the office of AWB USA. AWB had no separate or shared office in the State of New York or elsewhere in the United States of America.

8. In about October 2000, AWB USA relocated to Portland, Oregon. The relocation took place because Portland was considered to be located in a more optimal time zone, because Portland was closer to the U.S. competitive export market, and because more favourable leasing terms for office space were available to AWB USA. In addition to the functions described in paragraphs 5 and 6 above, AWB USA assumed the following functions after the Portland relocation:

a. in 2001, cash trading as a hedge for the AWB national pool and AWB's Australian based cash books;

b. in 2002, AWB USA became registered with the United States Department of Agriculture as an accredited U.S. exporter;

c. in late 2002, AWB USA commenced a cash trading book with orders executed on behalf of other AWB entities;

d. in 2003, AWB USA established an 'over the counter' desk for derivatives trading.

9. From the time of the Portland relocation neither AWB, nor any of its subsidiaries, including AWB USA, has maintained an office in the State of New York.

**B. <u>Location of Witnesses</u>**

10. At paragraph 80 of my previous Declaration submitted in this case, dated 14 December 2007, I expressed the opinion that a large majority of the persons with knowledge of, or relevant to, the conduct of AWB and AWB USA, as alleged in the Complaint, are resident in Australia. This includes current and former directors, officers and employees of AWB, current and former employees of the Australian Government, and current and former members of the Australian Government (including Ministers). Each of these persons is amenable to Court processes in Australia, including requiring the production of documents and the provision of oral testimony.

11. Appendix 7 to Volume 5 of the "Report of the Inquiry into certain Australian companies in relation to the U.N. Oil-For-Food Programme" (the "Cole Inquiry") sets out the sitting days for the Cole Inquiry and the witnesses called to give oral testimony on those days. To the best of my knowledge, the following witnesses called to give oral testimony to the Cole Inquiry are not current directors, officers or employees of AWB and remain resident in Australia:

| | |
|---|---|
| Nigel Officer | Murray Rogers |
| Michael Watson | Tim Goodacre |
| Andrew Lindberg | Trevor Flugge |
| Peter Geary | Andrew McConville |
| Dominic Hogan | Richard Fuller |
| Charles Stott | Thomas Harley |
| Chris Whitwell | James Lyons |
| Paul Ingleby | John Barry Prescott |
| Sarah Scales | Robin Beaumont |
| Daryl Borlase | Peter Hargreaves |
| Tim Snowball | Daryl Hockey |
| Terry Aucher | Michael Tighe |
| Peter Jones | Jill Gillingham |
| Philip Hughes | Jessica Lyons |
| Jim Cooper | Rosemary Peavey |

12. In addition, a number of witnesses were called to give oral testimony to the Cole Inquiry in their capacity as current or former officers, employees or representatives of the Government of Australia (whether members of the public service or members of government) including:

| | |
|---|---|
| Glen Taylor | Maureen Louise Grant-Thompson |
| Terence Charman | Lachlan William Crews |
| Maurice Besley | Jeremy Bruer |

| | |
|---|---|
| Bronte Moules | Alistair Nicholas |
| Graeme Bowker | John Tileman |
| Don Cuddihy | David Stuart |
| Jill Courtney | Innes Willox |
| Jane Drake-Brockman | Peter Varghese |
| Tony Grenenger | Mark Vaile |
| Zena Judy Armstrong | Alexander Downer |
| Mark Pierce | John Howard |
| | Felicity Johnson |

13. I would expect that most, if not all, of the witnesses referred to in Paragraph 12 above are resident in Australia. For example, on 10 April 2006, the Cole Inquiry took evidence from Mr Mark Vaile. At that time, Mr Vaile was the Deputy Prime Minister of Australia. On 11 April 2006, the Cole Inquiry took evidence from Mr Alexander Downer. At that time, Mr Downer was the Australian Minister of Foreign Affairs. On 13 April 2006, the Cole Inquiry took evidence from Mr John Howard. At that time, Mr Howard was Prime Minister of Australia. A number of other witnesses on this list were senior members of the Australian public service or Ministerial advisers.

14. Further, Appendix 27 to Volume 5 of the Cole Inquiry identifies a large number of additional witnesses identified as "Commonwealth Ministers and Officers" (i.e., Australian Government Officers and Members) who submitted statements by way of statutory declaration to the Cole Inquiry. Those witnesses (excluding those referred to in paragraph 12), none of whom are under AWB's control, and most, if not all, of whom I would expect to be resident in Australia, are:

George Atkin
Ayman Ayyash
Robyn Bain
Peter Baxter
Clare Birgin
Bassim Blazey
Michael Bliss
Aldo Borgu
Gai Brodtman
Bill Campbell
Anastasia Carayanides
Brendan Doran
John Feakes
Frances Freeman
Phillip Gaetjens
Genevieve Hamilton
Brendon Hammer
Anthony Haydon
John Hennessy
Robert Hill
Owen Johnstone-Donnet
Kenneth Jordana
Sue Jorgenson

Jan Adams
Frances Adamson
Lex Bartlem
Kilmeny Beckering Vinckers
Christian Bennett
Alex Brooking
Justin Brown
Anthony Bubablo
Shae-Lee Burnell
Alison Burrows
Dr Ashton Calvert
Roderick Campbell
Mark Carroll
Gary Cowan
Malcolm Coxhead
John Dauth
Paul Davies
Michael Dean
Scott Dewar
Susan Dietz-Henderson
Jean Dunn
Malcolm Ferguson
Henry Fox

Michael Kelly
Michael L'Estrange
Robert Laurie
Glenn Miles
Chris Moraitis
Neil Mules
Paul O'Sullivan
Victoria Owen
William Paterson
Steven Pinhorn
John Quinn
Williams Richardson
David Ritchie
Richard Rowe
Ian Russell
Peter Scott
Gabrielle Simm
Malcolm Skelly
Michael Smith
Paul Stephens
Robyn Stern
Warren Truss
Simon Twisk

Bruce Gosper
Jamil Hanna
Jeannie Henderson
Warwick Herd
Colin Heseltine
Joan Hird
Christopher Lim
Caroline Linke
Alistair MacLean
Kevin Magee
Michelle Marginson
Adam McCarthy
Margaret McDonald
Beverley Mercer
Robyn Mudie
Mark Napier
Matthew Neuhaus
Guy O'Brien
Eugene Olim
Martin Quinn
Thomas Roth
Terry Ryan
Richard Sadleir

Greg Urwin
Heidi Venamore
Johann Visser
Martin Walker
Deborah Watson
Ric Wells
Penelope Wensley
Denis Whitford
Dara Williams
William Williams
Peter Woolcott
Greg Wilcock
Trudy Witbreuk

Peter Shannon
Geoffrey Shaw
Andrew Shearer
David Spencer
Catherine Steains
Edwina Stevens
Patrick Suckling
Michael Thawley
Rohan Titus
Janet Tomi

C. **The Australian Securities and Investments Commission**

15. On 19 December 2007, the Australian Securities and Investments Commission ("ASIC") commenced civil penalty proceedings in the Supreme Court of Victoria against six former directors and officers of AWB. In these proceedings, ASIC alleges that each of the defendants contravened ss180 and 181 of the Corporations Act and seeks consequential declarations, the imposition of pecuniary penalties and disqualification of each defendant from managing a corporation. Exhibit 12 is a copy of a public announcement made by ASIC on 19 December 2007 that provides further background to, and information regarding, the proceedings being pursued by ASIC in the Supreme Court of Victoria.

**D. Litigation Funding in Australia**

16. Litigation funding – which is permissible in Australia – involves a third-party commercial entity paying the costs of litigation for a plaintiff or group of plaintiffs (like the plaintiffs in this case). In exchange for paying the plaintiffs' costs, the litigation funding company will obtain a share of the proceeds of the case, as determined by agreement with the client.[1] Litigation funders may also provide ancillary services, such as conducting investigations or factual enquiries as a prelude to litigation.

17. There are five main litigation funding companies operating in Australia that fund both insolvency and non-insolvency-related litigation. The largest, IMF (Australia) Limited, is a "publicly listed company providing funding of legal claims and other related services where the claim size is over $2 million".[2]

18. Consequently, in my view, if the present U.S. action was dismissed in favor of Australia, the Mastafa plaintiffs would have the option of approaching a litigation funding company in Australia, to seek funding for any claims that they might choose to assert in that jurisdiction.

19. Paragraph 1(d) of the Further Amended Statement of Claim filed in the Watson class action, presently pending in the Federal Court of Australia and referenced at paragraphs 58-66 of my previous Declaration submitted in this case, makes clear that the Applicants and the group members have entered into a litigation funding agreement with IMF (Australia) Limited.

---

[1] Standing Committee of Attorneys-General, "Litigation Funding in Australia" (Discussion Paper, May 2006).

[2] IMF (Australia) Pty Ltd, http://www.imf.com.au/about.asp?content=aboutimf (11 March 2008).

20. In addition, apart from litigation funding arrangements, a number of law firms in Australia who specialise in the conduct of class action proceedings on behalf of plaintiffs offer their services on the basis of "no win – no charge" or similar arrangements. In my experience, "no win – no charge" arrangements are relatively common in the context of class action litigation in Australia.

**E. <u>Disposition of Proceedings in Australian Courts</u>**

21. <u>Supreme Court of Victoria</u>: In my experience, practitioners before the Supreme Court of Victoria would expect reasonably complex commercial disputes to proceed through interlocutory processes and to trial at first instance within a period of 3-4 years, often more expeditiously. Each year, the Supreme Court of Victoria publishes an annual report. In the most recent annual report publicly available (for the financial year 2005-2006), in the civil division of the Supreme Court a total number of 6,504 proceedings were filed. In that financial year, the average time from commencement to disposition of proceedings finalized in the general civil trial division was 25 months, whilst in the long cases list (civil proceedings expected to exceed 12 sitting days at trial) the average time from commencement to disposition was 37.9 months.[3]

22. <u>Federal Court of Australia</u>: In my experience, practitioners before the Federal Court would expect that reasonably complex commercial proceedings would be resolved within a period of 2-3 years. The Federal Court of Australia also publishes an annual report that contains workload statistics. In 2006-2007, a total of 5,063 proceedings were filed in the Federal Court. Excluding Native Title causes of action,[4] 92.2% of major causes of action were finalised

---

[3] Supreme Court of Victoria, *Annual Report* 2005-06, 10-11.

[4] These are claims by indigenous Australians for the recognition of proprietary interests under the <u>Native Title Act 1993</u>.

in under 18 months. In the period 1 July 2002 to 30 June 2007, 83.8% of all matters before the court were completed within 12 months from filing to disposition and only 5.7% of all matters remained unresolved after 24 months.[5]

**F. Subject Matter Jurisdiction**

23. The Supreme Court of Victoria is established by the Constitution Act 1975 (Vic). Section 85 of the Constitution Act 1975 (Vic) provides that the Supreme Court of Victoria is "the superior Court of Victoria with unlimited jurisdiction". In my opinion, the subject matter of each of the causes of action described in paragraphs 47 and 49 of my previous Declaration remain available to the plaintiffs and would fall within the jurisdiction of the Supreme Court of Victoria.

24. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 7, 2008.

Craig Phillips

[5] Federal Court of Australia – Annual Report 2006-2007