UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                      :

SAADYA MASTAFA and KAFIA ISMAIL,      :

                                                    :

                      Plaintiffs,         :

                                                          :                07 Civ. 7955 (GEL)

    -v.-                                           :

                                                    :          **OPINION AND ORDER**

AUSTRALIAN WHEAT BOARD LIMITED     :
aka AWB LIMITED, AWB (U.S.A.) LIMITED,   :
and BANQUE NATIONALE DE PARIS           :
PARIBAS,                                          :

                                                    :

                      Defendants.     :

                                                    :
-------------------------------------------------------------x

Dennis E. Murray Sr., John T. Murray, Leslie O.
Murray, and Mary S. Birkett, Murray & Murray Co.,
L.P.A., Sandusky, Ohio, for plaintiffs.

Robert H. Baron and Timothy G. Cameron
Cravath, Swaine & Moore LLP, New York, NY,
for AWB Limited and AWB (U.S.A.) Limited.

Robert S. Bennett, Alan Kriegel, Jennifer L.
Spaziano, and William J. O'Brien, III,
Skadden, Arps, Slate, Meagher & Flom LLP,
Washington, DC, and New York, NY,
for Banque Nationale De Paris Paribas.

GERARD E. LYNCH, District Judge:

        Plaintiffs are Kurdish women whose husbands were allegedly imprisoned, tortured, and

killed by the Saddam Hussein regime in Iraq. They bring this class action on behalf of

themselves and others similarly situated against defendants Australian Wheat Board Limited aka

AWB Limited ("AWB"), AWB (U.S.A.) Limited ("AWB USA"), and Banque Nationale De

Paris Paribas ("BNP"). They allege violations of the law of nations and the Torture Victims

Protection Act ("TVPA") under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, and common law torts under New York law, for allegedly providing "kickbacks" to the Hussein regime in connection with their participation in the United Nations Oil-for-Food Program (the "OFP").  Defendants move to dismiss plaintiffs' claims.  For the following reasons, defendants' motions will be granted.

## BACKGROUND

In 1990, the United Nations Security Council adopted Resolution 661, imposing comprehensive economic sanctions on Iraq in response to its invasion and occupation of Kuwait. (See Compl. Ex. 2.)[1]  The resolution proscribed, among other things, any trade with Iraq except in foodstuffs and medical supplies, and prohibited any states from providing Iraq or any Iraqi entity with "any funds or any other financial or economic resources."  (Id. ¶¶ 3-4.)  In 1995, the Security Council adopted Resolution 986, which created the OFP to permit the export of oil from Iraq for the limited purpose of purchasing "medicine, health supplies, foodstuffs, and materials and supplies for essential civilian needs."  (Compl. Ex. 1 ¶¶ 1, 8(a).)  The resolution ordered the creation of an escrow account, overseen by the United Nations Secretary-General, into which purchasers of Iraqi oil would deposit payment and from which sellers of authorized goods would receive payment.  (Id. ¶¶ 1(b), 8.)  This escrow account was administered by defendant BNP, a

---

[1] Plaintiffs attach to their complaint various exhibits, including the text of two Security Council resolutions and an excerpt from the "Cole Report," an independent inquiry conducted in 2006 at the request of the Australian government into the involvement of AWB and other Australian companies in providing potentially illegal kickbacks to the Hussein regime under the OFP.  These exhibits are incorporated into the complaint by reference.  See Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991).

bank located in Paris, France.  (Compl. ¶ 28.)

In 1996, the Hussein regime began purchasing foodstuffs under the OFP, including significant quantities of wheat from AWB, a corporation owned at that time by the Australian government with a monopoly over the export of Australian wheat.  (Compl. Ex. 3 at xiii; Phillips Decl. ¶¶ 6-9.)  By 1999, AWB was selling the Hussein regime approximately ten percent of Australia's wheat exports.  (Compl. Ex. 3 at xiii.)  In that same year, the Hussein regime demanded that AWB begin paying "inland transportation" and other service fees to the Hussein regime as a condition for its continued sales of wheat to Iraq under the OFP.  (Id. at xiv.) Plaintiffs allege that the payment of these fees was not allowed under the rules of the OFP and that the fees were, in fact, "kickback[s]" designed to provide the Hussein regime with hard currency the sanctions otherwise denied it.  (Compl. ¶¶ 32-33, 40-41.)  Plaintiffs allege that AWB was aware of the true purpose of the fees and of the fact that payment of the fees was not allowed.  (Id. ¶¶ 40-42.)  Nevertheless, AWB agreed to pay and did pay, between 1999 and 2003, over $220 million in such fees to the Hussein regime.  (Id. ¶¶ 34-36; Compl. Ex. 3 at lxiii.) Plaintiffs allege that AWB concealed these payments because it knew they were prohibited by the sanctions.  (Compl. Ex. 3 at xxi.)

The plaintiffs are Iraqis who were victims of the Hussein regime.  Plaintiff Saadya Mastafa is a Kurdish woman whose husband was captured by the Hussein regime in September 1996 and held until July 1997, when he was hanged along with fourteen other individuals. (Compl. ¶ 25.)  Plaintiff Kafia Ismail is a Kurdish woman whose husband was imprisoned and tortured by the Hussein regime from 2002 until he died in December 2003.  (Id. ¶ 26.)  They purport to represent the class of "persons or their surviving immediate family members who

3

were victims of torture, extrajudicial killings, disappearances, rape and/or murder" at the hands of the Hussein regime, between 1996 and March 2003. (Id. ¶ 69.) They claim that defendants are liable for these acts because they "conspired [with] and aided and abetted the Saddam Hussein regime" in their commission by giving the regime "substantial assistance . . . through the form of kickbacks and/or financial assistance in violation of Security Council Resolution 986." (Id. ¶¶ 49, 65.)

Plaintiffs allege violations of the TVPA and international law, and various common law torts. Defendants move to dismiss the complaint in its entirety.

## DISCUSSION

### I.     Article III Standing

Defendants first argue that the Court lacks jurisdiction to hear plaintiffs' claims because plaintiffs have not satisfied the standing requirements of Article III. This is a "threshold question that must be resolved . . . before proceeding to the merits." Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 88-89 (1998). Article III limits the judicial power of federal courts to "Cases" and "Controversies," U.S. Const. art. III, § 2, which the Supreme Court has interpreted to mean "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process." Steel Co., 523 U.S. at 118. This limit helps ensure the separation of powers, by requiring an assessment of "what activities are appropriate to legislatures, to executives, and to courts." Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-60 (1992).

The standing requirement has three components: (1) that plaintiff has suffered an "injury in fact"; (2) that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; (3) that it is

4

"likely" that the injury will be "redressed by a favorable decision." <u>Id</u>. at 560-61. Defendants argue that the second requirement is not satisfied because plaintiffs have not alleged that "but for defendants' conduct, the injuries caused by the Hussein regime would have abated." (AWB Mem. 9.) Defendants argue that plaintiffs instead allege injuries that came "at the hands of the Hussein regime, a third party not before the court." (<u>Id</u>. at 7.)

Plaintiffs indeed do not allege that defendants themselves were the "but for" cause of plaintiffs' injuries. Instead, they allege that defendants "aided and abetted the Saddam Hussein regime" in its commission of acts that caused injuries to plaintiffs, by providing "substantial assistance . . . through the form of kickbacks and/or financial assistance in violation of Security Council Resolution 986."[2] (Compl. ¶¶ 49, 65.) This is sufficient for purposes of Article III. Aiding and abetting liability is not itself a tort but instead "a generally applicable means of identifying who should be held responsible for a particular act." <u>Khulumani v. Barclay Nat. Bank Ltd.</u>, 504 F.3d 254, 281 (2d Cir. 2007) (Katzmann, J., concurring). It is a form of "vicarious liability" for "harm resulting to a third person from the tortious conduct of another." <u>Halberstam v. Welch</u>, 705 F.2d 472, 477 (D.C. Cir. 1983), citing Restatement (Second) of Torts § 876 (1979). If plaintiffs aided and abetted the Hussein regime in the commission of human rights abuses that injured plaintiffs, then defendants are responsible for those acts, not because they caused them, but because the law "hold[s] the person who aids and abets liable for the tort itself." <u>Hefferman v. Bass</u>, 467 F.3d 596, 601 (7th Cir. 2006). The injuries resulting from the

---

[2] A claim of aiding and abetting liability requires that the defendant "substantially assist" in the principal violation, not that the defendant itself cause the principal violation. (<u>See</u> Section II, infra.)

5

Hussein regime's acts are thus "fairly traceable" to any who aided and abetted their commission. Similarly, the injuries are not "the result of the independent action of some third party not before the court" because the acts of the Hussein regime are not "independent" of steps taken to aid and abet those acts. Plaintiffs have alleged that the Hussein regime caused them injuries and that defendants are vicariously liable for those injuries. They therefore have alleged sufficient facts to support Article III standing.

To be sure, some of the language from the Supreme Court's Article III decisions is general and superficially appears to require all plaintiffs to allege "but for" causation in order to maintain standing. The Court has stated that there must be a "causal connection between the injury and the conduct complained of," Lujan, 504 U.S. at 560, and, in a particular factual context, that "[p]etitioners must allege facts from which it reasonably could be inferred that, absent the respondents' [acts], there is a substantial probability that . . . the asserted [injury] to petitioners will [abate]," Warth v. Seldin, 422 U.S. 490, 504 (1975). However, in those cases the plaintiffs alleged that defendants bore primary liability for their injuries, not that they aided and abetted others whose acts caused plaintiffs' injuries. Nothing in those opinions suggests that the Court intended by these general pronouncements to impose "but for" causation on plaintiffs who are alleging vicarious or accessorial liability. Such an interpretation would significantly undermine aiding and abetting liability in the federal courts, since it is often the case that an accessorial defendant is not the "but for" cause of the principal tortfeasor's tortious acts. See Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289, 324 (S.D.N.Y. 2003) ("While [an accessory's] assistance must be substantial, it need not constitute an indispensable element, that is, a *conditio sine qua non* for the acts of the principal."). None of

the decisions cited by defendants discuss the impact of Article III standing on accessorial liability in any respect, and the Court has found no authority for defendants' sweeping interpretation.

Instead, there are many cases factually analogous to this one in which federal courts have held that plaintiffs may state claims for aiding and abetting the acts of others without even addressing Article III causation. See, e.g., Khulumani, 504 F.3d at 277 (Katzmann, J., concurring) (claim against corporations doing business with South Africa for its apartheid era abuses); id. at 288 (Hall, J., concurring) (same); Almog v. Arab Bank, PLC, 471 F. Supp. 2d 257, 285-86 (E.D.N.Y. 2007) (claim against Saudi bank providing banking services to Palestinian terrorist organizations for their terrorist acts); Kiobel v. Royal Dutch Petroleum Co., 456 F. Supp. 2d 457, 463-64 (S.D.N.Y. 2006) (claim against oil companies doing business with Nigerian government for its violations of international law). These courts would have been obliged to consider standing sua sponte had it presented a colorable impediment to their assertion of jurisdiction. See Pashaian v. Eccelston Props., Ltd., 88 F.3d 77, 82 (2d Cir. 1996). That they did not suggests not careless oversight, but rather that defendants have taken the Supreme Court's language out of context to craft a novel but ultimately meritless argument. Indeed, the only case this Court has found to address the issue disposed of the argument without extended discussion. See Presbyterian Church of Sudan, 244 F. Supp. 2d at 333 (rejecting standing argument by defendants alleged to have been "complicit" in ethnic cleansing by the government of Sudan). This Court extends that discussion somewhat, but reaches the same result.

## II.    Claims Against BNP

Although the Court has jurisdiction to hear them, plaintiffs' claims against BNP must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  When deciding a 12(b)(6) motion, the Court must take as true the facts as alleged in the complaint.  Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995).  All reasonable inferences must be drawn in the plaintiff's favor.  Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 216 (2d Cir. 2004).  A complaint may be dismissed where it fails to plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, ___ U.S. ___, 127 S. Ct. 1955, 1974 (2007).  This requires that a plaintiff satisfy "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible."  Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007).  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 127 S. Ct. at 1964-65.[3]

Plaintiffs allege that BNP "aided and abetted the Saddam Hussein regime" in its commission of human rights abuses against plaintiffs.  (Compl. ¶ 85)  Aiding and abetting liability requires, among other things, that defendant "knowingly and substantially assist" in the

---

[3] Plaintiffs incorrectly contend that the Federal Rules require only that a plaintiff plead sufficient facts to put a defendant "on notice of the claims against him."  (Pl. Opp'n to BNP 23.)  Twombly makes clear that this standard has been superseded.  The rules require that the complaint provide "not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests."  Twombly, 127 S. Ct. at 1965 n.3.  Accordingly, a plaintiff must provide a "statement of circumstances, occurrences, and events in support of the claim presented" and not just a "bare averment that he wants relief and is entitled to it."  Id.

commission of the principal violation.[4] Halberstam, 705 F.2d at 477. According to the complaint, BNP's aiding and abetting was accomplished by disbursing funds from the escrow account to AWB, which used some portion of those funds to pay kickbacks to the Hussein regime.[5] This allegation is insufficient to state a claim for relief.

As a preliminary matter, it must be noted that aiding the Hussein regime is not the same

---

[4] This is the requirement for aiding and abetting liability for common law torts. For violations of the law of nations under ATCA, the standard in the Second Circuit is undecided. In Khulumani, a two-judge plurality decided that aiding and abetting liability did exist under ATCA, but split as to the appropriate standard. Judge Hall concluded that the standard was the same as under the common law, that defendant must "knowingly and substantially assist" in the principal violation. 504 F.3d at 288. Judge Katzmann, by contrast, drew from international criminal law and concluded that aiding and abetting requires that a defendant provide "practical assistance" to the principal that has a "substantial effect" on the commission of the primary violation, and that he does so "with the purpose of facilitating" the commission of the primary violation. Id. at 277. Judge Katzmann's insistence on purposeful facilitation is consistent with the standard in federal criminal law, see, e.g., United States v. Frampton, 382 F.3d 213, 223 (2d Cir. 2004) (holding that government must show that aider had specific intent of facilitating or advancing principal's commission of underlying crime), and the predominant view in American criminal law generally, see, e.g., Model Penal Code § 2.06(3)(a) (requiring that accomplice have the purpose of facilitating the principal's offense). As plaintiffs have failed to allege that BNP either had knowledge of or purposefully facilitated AWB's alleged kickbacks to the Hussein regime (let alone the Hussein regime's injuries to plaintiffs), the Court need not decide which standard is correct.

[5] Plaintiffs offer contradictory accounts of the mechanism by which they allege escrow account funds ended up in the hands of the Hussein regime. The complaint itself alleges that AWB made payments "directly to the UN escrow account" administered by BNP, and that payments were "made from the escrow account . . . to the Saddam regime." (Compl. ¶¶ 37-39.) However, the Cole Report, which plaintiffs have incorporated into their complaint, states that payments to the Hussein regime "were remitted by AWB from *its* New York account." (Compl. Ex. 3 at xviii-xix; emphasis added.) There is no mention of any deposits by AWB into the escrow account, nor of BNP making any disbursements to the Hussein regime. Instead, the Cole Report indicates that the fees AWB paid to the Hussein regime were "to be recovered" by AWB from the UN escrow account. (Id. at xxi.) On a motion to dismiss, "[g]eneral, conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint." Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1092 (2d Cir. 1995). Accordingly, the Court reads the complaint as adopting the Cole Report's detailed account in place of the complaint's conflicting general allegations.

thing as aiding and abetting its alleged human rights abuses. The Restatement (Second) of Torts,

summarizing the common-law standard for civil accessorial liability, states that the accessory is

liable for aiding and abetting if he "knows that the other's conduct constitutes a breach of duty

and gives substantial assistance or encouragement to the other *so to conduct himself*."

Restatement (Second) of Torts § 876(b) (emphasis added). It is not enough that a defendant

provide substantial assistance to a tortfeasor; the "substantial assistance" must also "advance the

[tort's] commission." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292 (2d Cir. 2006). An

example from criminal law makes the point clear: A mother who knows that her son deals drugs

on the street may provide him with substantial financial benefit by letting him live in her house

rent-free, but to become an accessory to his crimes, her assistance must facilitate the criminal

acts themselves (as, for example, if she allowed him to use the house as a secure place in which

to store or sell drugs).[6] Similarly, providing the Hussein regime with funds – even substantial

funds – does not aid and abet its human rights abuses if the money did not advance the

commission of the alleged human rights abuses. This does not mean that plaintiffs must allege

that the particular funds provided were used to commit the abuses, or that without the funds the

Hussein regime would not have been able to commit such abuses, so long as the assistance is "a

substantial factor in causing the resulting tort." Restatement (Second) of Torts § 876, comment

d. It is unnecessary to decide whether it would suffice, in the present case, for plaintiffs to allege

facts that plausibly suggest that the $220 million in kickbacks "substantially assisted" the regime

---

[6] Special statutes, such as forfeiture laws, may broaden the civil or even criminal liability rules in particular circumstances. See, e.g., 18 U.S.C. § 2339B (providing material support to foreign terrorist organizations). Such statutes are necessary to impose liability precisely because the ordinary standards of aiding and abetting do not criminalize one who generally assists the *terrorist*, but whose aid is not connected to a particular terrorist *act*.

to commit its human rights abuses by allowing it to maintain power and function as a minimally effective government, as plaintiffs do not specifically allege facts in support of this proposition.

Even if AWB's payments to the Hussein regime did substantially assist in the commission of human rights abuses, plaintiffs fail adequately to allege that BNP knew that the money it disbursed to AWB was being used to make such payments. The knowledge element of aiding and abetting requires that a defendant have "actual knowledge" that it is assisting in the tortious conduct. Lerner, 459 F.3d at 292. This means that allegations of "negligence, i.e., that a bank 'should have known,' will not suffice." Aetna Cas. and Sur. Co. v. Leahey Const. Co., 219 F.3d 519, 536 (6th Cir. 2000). The closest plaintiffs come to such an allegation is that BNP "knowingly provided knowing practical assistance" to the Hussein regime, but this is nothing more than a " formulaic recitation" of the requirement, and is not sufficient by itself to make the claim for relief "plausible." Twombly, 127 S. Ct. at 1964-65.

Moreover, the detailed findings of the Cole Report cast doubt on this general allegation. The Cole Report says nothing to suggest that BNP knew about the kickback payments. Instead, the report details the intricate steps AWB took to "hide the payments it was making to Iraq" from the UN and the world. (Compl. Ex. 3 at xx.) Among other things, AWB masked its payments to the Hussein regime by making them to a Jordanian shipping company called Alia Shipping Co. ("Alia"), which remitted them to the Hussein regime. (Id. at xviii-xix.) And it added a layers of obfuscation on top of this, first by paying the illicit fees to the shipowners responsible for transporting the grain to Iraq, who in turn supplied payment to Alia, and then by interposing additional intermediaries between it and the shipowners. (Id. at xxi.) Plaintiffs do not allege that BNP participated in planning this elaborate scheme, and there is nothing in the Cole Report to

11

suggest that it did.  It is of course possible that BNP learned of the payments despite the

elaborate scheme to conceal them, but without specific factual allegations suggesting that BNP

did so, plaintiffs have failed to satisfy their obligation of providing the "amplification" of their

conclusory allegations about BNP's knowledge of the kickbacks that is "needed to render the[ir]

claim[s] plausible." Iqbal, 490 F.3d at 157-58.  Plaintiffs have therefore failed to state a claim

against BNP for aiding and abetting the commission of any principal violations.[7]

### III.    Claims Against AWB USA

Plaintiffs' claims against AWB USA are also dismissed for failure to state a claim.  The

complaint itself does not make a single allegation about AWB USA's role in the alleged

kickback scheme.  The complaint ascribes conduct generally to "Defendants" and to "AWB,"

which it defines to include both the Australian parent and the U.S. subsidiary.  (See Compl. ¶

27.)  But such general allegations of AWB USA's role in the alleged acts are insufficient under

Twombly.  There is no indication that, in fact, any of the relevant conduct by the AWB entities

was undertaken by the New York subsidiary rather than the Australian parent.  In fact, the

excerpt of the Cole Report attached to the complaint mentions AWB USA exactly twice, once to

say that AWB USA alerted AWB to the fact that the UN was asking about AWB's payments to

Alia, and again to say that AWB asked AWB USA to get a clarification from the UN about a

---

[7] The Court does not read the complaint as alleging that BNP itself committed principal
violations, either under ATCA or New York law.  There are simply no factual allegations that
BNP itself committed "crimes against humanity," "war crimes," "genocide," "torture,"
"extrajudicial killings," "forced disappearance," "cruel, inhuman, or degrading treatment,"
battery, or the intentional infliction of emotional distress on plaintiffs.  To the extent that the
complaint alleges that BNP is liable for negligence, the claim fails to allege facts that establish
that BNP's actions caused plaintiffs' injuries.  See Akins v. Glens Falls City School Dist., 53
N.Y.2d 325, 333 (1981) (causation is a required element of negligence).

particular aspect of the sanctions program.  (Compl. Ex. 3 at xxxviii, xliii.)  Neither of these

alleged activities is conduct that remotely supports a claim for relief by plaintiffs.  Instead, the

complaint and the incorporated Cole Report detail extensive conduct by officials of AWB in

Australia in discussing, approving, and covering up kickbacks paid to the Hussein regime

through the OFP.  Because none of this conduct is plausibly ascribed to AWB USA, plaintiffs

have failed to state a claim against it.

IV.    **Claims Against AWB**

While this Court has jurisdiction to hear plaintiffs' claims against AWB, this Court is not

the appropriate forum in which to hear those claims.  The decision to dismiss a case for forum

non conveniens is generally "committed to the district court's discretion."  <u>Wiwa v. Royal Dutch</u>

<u>Petroleum Co.</u>, 226 F.3d 88, 99 (2d Cir. 2000).  Assessing whether dismissal for forum non

conveniens is appropriate is a two-step process.  The first step is to determine whether an

"adequate alternative forum exists."  <u>Id</u>. at 100.  If so, then the second step is to "balance a series

of factors involving the private interests of the parties" in maintaining the action in their

preferred forum, as well as to consider any "public interests" at stake.  <u>Id</u>.  The defendant has the

burden of showing that an "adequate alternative forum exists" and that the relevant factors "tilt

strongly in favor of trial in the foreign forum."  <u>Id</u>.

While "the plaintiff's choice of forum should rarely be disturbed," <u>Gulf Oil Corp. v.</u>

<u>Gilbert</u>, 330 U.S. 501, 508 (1947), AWB has carried its burden of showing that it should be in

this case.  First, there is no question that Australia would be an adequate alternative forum.  The

requirements for establishing that a forum is adequate are not strenuous.  "An alternative forum

is adequate if the defendants are amenable to service of process there, and if it permits litigation

of the subject matter of the dispute." Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 75 (2d Cir. 2003). AWB, as an Australian corporation, is amenable to service of process in Australia. (Phillips Decl. ¶ 55.) Australian law allows for a range of claims covering the subject matter of the dispute, including negligence, and accessory to battery, assault, false imprisonment, and wrongful death. (Id. ¶¶ 47-48.) A claim for genocide is also apparently colorable, though the availability of such a civil claim remains an open question under Australian law. (Id. ¶ 49.) Australian law permits foreign plaintiffs to file suit in Australian courts, and in making their claims, plaintiffs would have recourse to a class action procedure analogous to the Rule 23 procedure under the Federal Rules. (Id. ¶¶ 53, 54.) Should plaintiffs prevail on those claims, they could be awarded aggravated, exemplary, and punitive damages for particularly egregious behavior by AWB. (Id. ¶ 51.) Australia's judicial system is also "fair, independent and operates according to the rule of law." (Id. ¶ 33.) The record is thus more than sufficient to establish Australia as an adequate alternative forum.

Plaintiffs do not dispute any of the above, but argue that Australia is nonetheless inadequate because it is not clear that an Australian court would have "subject matter jurisdiction" over plaintiffs' claims. (Pl. Opp'n to AWB 15.) This argument is meritless. It may be that certain courts within Australia are courts of limited jurisdiction, and would not be able to hear these claims, just as federal courts here (as opposed to state courts, which are courts of general jurisdiction) can only hear certain claims. But as it is undisputed that the claims are cognizable in Australia, that non-citizens such as plaintiffs are permitted to bring claims in Australia, and that AWB is amenable to suit in Australia, it would follow naturally that *some* court in Australia has subject matter jurisdiction to hear them. This conclusion is confirmed by

AWB's expert on Australian law, who affirms that the Supreme Court of Victoria has "unlimited jurisdiction." (See Phillips Supp. Decl. ¶ 23.)

Plaintiffs also argue that Australia is not an appropriate forum because the causes of action it recognizes – for negligence, battery, assault, false imprisonment, and wrongful death – do not adequately "recognize the gravity" of plaintiffs' claims. (Pl. Opp'n to AWB 13.) It is not clear what it means for a cause of action to "recognize the gravity" of a plaintiff's claims. Plaintiffs' claims under ATCA for "crimes against humanity," "war crimes," "genocide," "torture," "extrajudicial killings," "forced disappearance," and "cruel, inhuman, or degrading treatment" may sound more heinous than the familiar common law torts, but they do not provide – and plaintiffs do not seek – any relief under these causes of action that they could not seek under the traditional common law torts. (See Compl. 36-37.) Moreover, the requirement is that an alternative forum "permit[] litigation of the subject matter of the dispute," not that it attach names to the causes of action that seem to "recognize the gravity" of the claims. Plaintiffs cite Presbyterian Church of Sudan for the proposition that causes of action should "reflect the gravity" of the alleged offenses. 244 F. Supp. 2d at 337. But the opinion expressed in Presbyterian Church of Sudan, which is in any event not binding on this Court, is dictum, as the court goes on to "assume[], without so deciding, that Canadian courts would be adequate alternative fora," despite recognizing only common law causes of action. Id. at 338. Finally, to the extent that it is appropriate to consider whether an alternative forum recognizes the gravity of the offenses alleged, Australia's provision for aggravated, exemplary, and punitive damages sufficiently does so. AWB has therefore established that Australia is an adequate alternative forum.

AWB has also proved the second requirement for forum non conveniens, that the relevant private and public factors tilt strongly in favor of adjudication in Australia.[8] "The private interests to be considered include: the interests of the litigants in having the case tried in a particular forum; the relative ease of access to sources of proof; the availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; . . . and, all other practical problems that make trial of a case easy, expeditious and inexpensive." Carey v. Bayerische Hypo-Und Vereinsbank AG, 370 F.3d 234, 237 (2d Cir. 2004), citing Gilbert, 330 U.S. at 508.

Australia would be a far better forum based on these considerations. Plaintiffs are residents of Iraq, so the difference in convenience and cost to them between Australia and the United States is minimal. Plaintiffs contend in their brief that the litigation has "significant ties" to the United States and that the "bulk of the activity surrounding the financial transactions occurred in New York." (Pl. Opp'n to AWB 17.) But they provide evidence for neither contention, and indeed, both are flatly contradicted by the Cole Report, which details the extensive dealings by AWB officials *in Australia* in planning, paying, and covering up the alleged kickbacks. They are also contradicted by evidence that a "large majority, if not all, of the persons with knowledge of, or relevant to, the conduct of AWB and AWB USA as alleged in

---

[8] AWB's burden is actually something less than that the factors "tilt strongly" in favor of adjudication in Australia. Plaintiffs' choice of forum is entitled to less deference here because no plaintiffs are residents of the United States. "Where . . . the plaintiff is foreign, the plaintiff's choice of forum is entitled to less weight" than where the plaintiff is a resident of the forum. R. Maganlal & Co. v. M.G. Chemical Co., Inc., 942 F.2d 164, 168 (2d Cir. 1991). Instead, a foreign plaintiff's choice of forum is entitled only to "some weight." Id. Drawing fine distinctions between levels of deference for plaintiffs' choice of forum is not necessary, however, as AWB has shown that the relevant factors favor adjudication in Australia even under the higher standard.

the Complaint – including both current and former employees of AWB [and] employees and officers of the Australian Government" are resident in Australia. (Phillips Decl. ¶ 80.) AWB is located in Australia, and litigation in the United States would be significantly more burdensome for it than litigation in Australia, where AWB already has counsel who are working on related matters, where relevant documents are located, and where the majority of their witnesses are located. (Id. ¶ 82.) By contrast, there is no evidence that litigation would be more burdensome for plaintiffs in one forum over the other.

Moreover, conducting the litigation at all could be very difficult in the United States, even for plaintiffs. Witnesses and documents in Australia are outside this Court's subpoena power, except through procedures afforded by the Hague Convention on the Taking of Evidence in Civil or Commercial Matters, March 18, 1970, 23 U.S.T. 2555 (the "Hague Convention"). These procedures are cumbersome and time-consuming. See Do Rosario Veiga v. World Meteorological Organisation, 486 F. Supp. 2d 297, 306 (S.D.N.Y. 2007) (dismissing for forum non conveniens based on the difficulty of obtaining testimony through the Hague Convention). Moreover, they do not provide a mechanism for compelling live testimony at trial, and Australia has a general policy of not honoring Hague Convention requests for the pre-trial discovery of documents. (See Phillips Decl. ¶ 43.)[9]

Thus, the parties' ability to conduct discovery and to put forth a credible case at trial could be significantly prejudiced if litigation were to proceed in the United States. Courts have

_____

[9] While this Court's personal jurisdiction over AWB would permit the Court to compel production of AWB's documents and the participation of witnesses under AWB's control, that power would not enable the Court to secure witnesses and documents not under AWB's control, of which there appear to be a great number. (See Phillips Decl. ¶ 79; Phillips Supp. Decl. ¶¶ 10-14.)

found such difficulties to be legitimate grounds for dismissing for forum non conveniens.  See, e.g., Carey, 370 F.3d at 238 (dismissing based on "the difficulty the German defendant will encounter in securing the presence of its witnesses in the United States"); Do Rosario Veiga, 486 F. Supp. 2d at 306 (fact that significant non-party witnesses live abroad "would cause not only greater financial hardships, but significant delays in preparing the case for trial before this Court, and ultimately in resolving the merits of the dispute"); Turedi, 460 F. Supp. 2d at 526 (same).  There is simply no legitimate advantage to any of the parties to litigating in a forum where none of them live and where little, if any, of the evidence exists.

The public interest factors also weigh in favor of litigation in Australia.  The relevant factors include avoiding administrative difficulties, avoiding the imposition of jury duty on people with no relation to the litigation, choosing a place close to those affected by the litigation, and deciding local controversies at home.  Pollux Holding, 329 F.3d at 76, citing Gilbert, 330 U.S. at 508-09.  While none of these factors suggest a significant United States interest, the United States does have some interest in adjudicating the dispute.  ATCA explicitly grants federal courts jurisdiction over "any civil action by an alien for a tort . . . committed in violation of the law of nations or a treaty of the United States," and the TVPA provides for a cause of action under ATCA for torture and extrajudicial killings.  See 28 U.S.C. § 1350.  The Second Circuit has held that the "passage of the TVPA . . . , in addition to merely permitting U.S. District Courts to entertain suits alleging violation of the law of nations, expresses a policy favoring receptivity by our courts to such suits."  Wiwa, 226 F.3d at 105.

However, this interest is fairly abstract and unpersuasive in comparison to Australia's interest.  AWB is an Australian corporation, owned for a time during the purported class period

by the Australian state, and it continues to have the sole right to market and sell Australian wheat internationally.  (Phillips Decl. ¶¶ 7, 14-20.)  Australia has shown and continues to show keen interest in and concern over AWB's conduct regarding the OFP.  The extensive independent inquiry that produced the Cole Report detailed the involvement of AWB in providing potentially illegal kickbacks to the Hussein regime under the OFP.  (Id. ¶¶ 67-73.)  The report noted the "immense" consequences of AWB's actions on Australian interests (Compl. Ex. 3 at xi), and recommended the creation of a government task force to consider possible criminal prosecutions against those responsible for providing kickbacks to the Hussein regime (Phillips Decl. ¶ 73).  The Australian Attorney-General created such a task force to conduct a review, and its work is ongoing.  (Id. ¶ 74.)  An investigation is also being undertaken by the Australian Securities and Investment Commission (id. ¶ 75), and there is a private securities lawsuit pending against AWB (id. ¶¶ 58-66).  All of this is evidence of Australia's strong interest in resolving the allegations of wrongdoing against its citizens and institutions.  There is no equivalent interest on the part of the United States in AWB's role in the OFP scandal.[10]

ATCA and the TVPA permit adjudication of foreigners' claims for certain violations of international law.  However, they have not "nullified, or even significantly diminished, the

---

[10] Plaintiffs' argument that the location of United Nations headquarters in New York provides the United States with a public interest in hearing this dispute is unpersuasive.  While the UN's presence in New York could certainly affect the calculation of private interests, to the extent that UN documentary evidence and witnesses are conveniently located in this District, its presence does not affect the calculation of public interests.  The United States is but one among many members of that global body, and its interests in resolving disputes related to the UN are shared with every other member.  Mere physical proximity does not make the United States's interests in that body superior to other member states' interests.  See Do Rosario Veiga, 486 F. Supp. 2d at 306-07 (rejecting argument that this Court should assume jurisdiction because defendant is a UN-affiliated entity).

doctrine of forum non conveniens." Wiwa, 226 F.3d at 106. Adjudication of foreign claims

under ATCA is certainly appropriate where an adequate foreign forum is unavailable or there is

reason to think that the foreign forum lacks an interest in pursuing such an adjudication or that

litigation in the United States would be more convenient for the parties. But where, as here,

there is an adequate foreign forum with a profound interest in adjudicating the dispute and

litigation here would be significantly less convenient, the abstract interest of the United States in

enforcing international law does not compel an assertion of jurisdiction. See Adamu v. Pfizer,

Inc., 399 F. Supp. 2d 495, 505 n.6 (S.D.N.Y. 2005) ("Plaintiffs' choice of forum is not entitled to

a greater deference because they have alleged international law violations."); Aguinda v. Texaco,

Inc., 142 F. Supp. 2d 534, 553 (S.D.N.Y. 2001) ("[N]othing in [ATCA's] text suggests that the

United States forum should . . . be given preference over a more convenient foreign forum which

is adequate to handle the case."). Accordingly, the interests of the parties, of judicial economy,

and of Australia and the United States are better served by adjudication of this dispute in

Australia.

As a safeguard, however, the dismissal of claims against AWB will be conditioned to

provide that if a court of last review in Australia affirms a dismissal of plaintiffs' action against

AWB for lack of jurisdiction over any of the claims here at issue, or if AWB does not waive any

and all statute of limitations defenses available to it, this Court, upon motion made within 60

days, will resume jurisdiction over that action. A conditional dismissal such as this is "standard

in the Second Circuit" because it helps to ensure that an adequate alternative forum is truly

available. Do Rosario Veiga, 486 F. Supp. 2d at 308 n.1.

## V. Leave to Amend

Plaintiffs seek leave to amend their complaint in the event this Court grants defendants' motions to dismiss. Rule 15(a) of the Federal Rules of Civil Procedure provides that a "court should freely give leave when justice so requires." While leave to amend is a matter of discretion for a district court, there must be "good reason to deny the motion." Acito v. IMCERA Group, Inc., 47 F.3d 47, 55 (2d Cir. 1995). One such reason is where repleading would be futile. Id. There is good reason for denying plaintiffs leave to replead with respect to the claims against AWB, which are dismissed on grounds of forum non conveniens, not because of a defect in the pleadings. However, with respect to the claims against BNP and AWB USA, leave to amend is appropriate, as it is not clear that repleading would be futile. Plaintiffs appear to have overlooked Twombly and related authority that have clarified standards for dismissals under Rule 12(b)(6), and were decided just prior to the filing of the complaint. It is possible that, with these standards in mind, plaintiffs could state claims for relief against BNP and AWB USA.[11]

_____

[11] That leave to replead is granted does not indicate that repleading is encouraged, or suggest that an amended complaint is likely to state a cause of action. It merely reflects that the Court, necessarily ignorant of the facts that plaintiff might be able to allege, cannot conclude that repleading is _necessarily_ futile. Moreover, as the claims pled against BNP and AWB USA in the present complaint must be dismissed on the merits as a matter of law, the Court has not had occasion to address how or whether the doctrine of forum non conveniens applies to claims against entities that might have a significant local presence here, but that are essentially adjunct to broader claims that must be adjudicated elsewhere. Such issues would need to be addressed if plaintiffs were to replead in a manner that successfully stated claims against these defendants.

## CONCLUSION

For the foregoing reasons, defendants AWB and AWB USA's motion to dismiss is granted in its entirety, with the condition that if a court of last review in Australia affirms a dismissal of plaintiffs' action against AWB for lack of jurisdiction over any of the claims here at issue, or if AWB does not waive any and all statute of limitations defenses available to it, this Court, upon motion made within 60 days, will resume jurisdiction over that action. Defendant BNP's motion to dismiss is granted in its entirety. Plaintiffs' motion for leave to amend their complaint is granted with respect to claims against AWB USA and BNP, and denied with respect to claims against AWB.

SO ORDERED.

Dated: New York, New York
September 25, 2008

GERARD E. LYNCH
United States District Judge

22